Brandon J. Mark (10439)
Alissa M. Mellem (13299)
Ruth Hackford-Peer (15049)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah  84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
Email: bmark@parsonsbehle.com
        amellem@parsonsbehle.com
        rhackford-peer@parsonsbehle.com
*Attorneys for Relators*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. KATIE BROOKS and NANNETTE WRIDE, | Case No. 2:15-cv-00119-CW-EJF |
| Plaintiffs, | |
| vs. | **THIRD AMENDED COMPLAINT** |
| STEVENS-HENAGER COLLEGE, INC., a Utah Corporation; CALIFORNIA COLLEGE SAN DIEGO, INC., a Utah Corporation; COLLEGEAMERICA DENVER, INC., a Colorado Corporation; COLLEGEAMERICA ARIZONA, INC., a Colorado Corporation; CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC., an Indiana Corporation; CARL BARNEY, an individual; SHAW, MUMFORD & CO., P.C., an expired Utah Professional Corporation; SHAW & CO., P.C., a Utah Professional Corporation; PRICEWATERHOUSECOOPERS LLP, a Delaware Limited Liability Partnership; WEWORSKI & ASSOCIATES, a California Accountancy Corporation; and DOES 1-500, Inclusive, | JURY TRIAL DEMANDED |
| Defendants. | |

Relators and Plaintiffs Katie Brooks and Nannette Wride (collectively, "Relators"), on behalf of themselves and the United States of America, complain as follows:

## I.   <u>INTRODUCTION</u>

1.   Relators incorporate by reference the United States of America's Complaint in Intervention (ECF No. 41) dated May 2, 2014.

2.   This Third Amended Complaint alleges facts relating to and supporting the United States of America's Complaint in Intervention, in addition to other and separate claims. To the extent this Third Amended Complaint alleges facts relating to claims the government has intervened in, Relators acknowledge the primacy of the government's complaint.

3.   This action arises from false statements and claims that Defendant Stevens-Henager College ("SHC"), its affiliated schools listed in the caption (collectively "Defendant Schools"), and their owner, Carl Barney ("Barney"), knowingly presented to, or caused to be presented to, the United States and the United States Department of Education in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA").

4.   Defendant Schools and Barney knowingly presented and/or made, or caused to be presented or made, the false claims and statements at issue in order to participate in the federal student aid programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq.* ("Title IV, HEA programs"). Title IV, HEA programs, which are administered by the United States Department of Education ("Department of Education"), provide students

2

with financial aid in the form of, among other things, federal Pell Grants, federal direct student loans, and loans guaranteed by the federal government. Defendant Schools and Barney presented and/or made numerous false claims and statements in order to obtain eligibility to participate in Title IV, HEA programs.

5.     On information, Relators believe that from at least January 1, 2002, to at least 2011, Defendant Schools and Barney knowingly submitted, or caused to be submitted, numerous claims for payment to the Department of Education based on these false certifications and statements. Relators further believe that since at least January 1, 2002, to at least 2011, Defendant Schools and Barney have fraudulently induced the Department of Education into granting Defendant Schools eligibility to participate in Title IV, HEA programs when, in fact, Defendant Schools were ineligible to participate in those programs.

6.     From approximately January 1, 2002, to January 1, 2013, Defendant Schools and/or students enrolled in Defendant Schools received over $660 million ($660,000,000.00) in federal funds through Title IV, HEA programs. Neither Defendant Schools nor students attending the schools were eligible to receive any of these funds.

7.     Because Defendant Schools pay or have paid bonuses, commissions, and other forms of incentive compensation to employees in the admissions departments based directly and indirectly on the number of students that these employees enroll (or "start") in Defendant Schools, Defendant Schools' compensation system, as actually implemented and practiced, violates the incentive compensation

ban applicable to schools that participate in Title IV, HEA programs. Additionally, Defendant Schools' compensation system for admissions personnel was not eligible for any of the regulatory safe harbors that were applicable during certain relevant periods. Instead, the bonuses and commissions that Defendant Schools paid to admissions personnel for recruiting students were exactly the types of incentive compensation barred by the applicable statutes and regulations.

8.     Even if Defendant Schools' compensation system for admissions personnel, as designed, was eligible for a regulatory safe harbor, which it was not, Defendant Schools' compensation system, as implemented and practiced, did not comply with the incentive compensation ban or regulatory safe harbors. For example, Defendant Schools' compensation system paid bonuses and commissions to admissions personnel for recruiting students, which bonuses and commissions were paid on a monthly or semi-monthly basis. Therefore, such bonuses and commissions were not a "fixed annual salary or a fixed hourly wage," and they were "adjusted up or down more than twice during any twelve month period." 34 C.F.R. § 668.14(b)(22)(ii)(A) (July 1, 2010). Additionally, because the bonuses and commissions were based directly and indirectly on recruiting students, they were not "based upon students successfully completing their educational programs, or one academic year of their educational programs." 34 C.F.R. § 668.14(b)(22)(ii)(E) (July 1, 2010). Despite knowing that their compensation system, as implemented, did not comply with Title IV of the HEA and its regulatory safe harbors, Defendant Schools and Barney falsely represented and certified to the federal government

4

their compliance with Title IV of the HEA and submitted, or caused their students to submit, claims for payment pursuant to Title IV, HEA programs. Accordingly, Defendant Schools' and Barney's conduct violates the FCA.

## II.    JURISDICTION AND VENUE

9.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. §§ 3730, 3732.

10.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants transact business and are found in this District and because acts proscribed by 31 U.S.C. § 3729 occurred in this District.

11.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because Defendant Schools maintain and operate numerous campuses in this District wherein the alleged violations occurred on a regular basis.

## III.    PARTIES

12.    Relator and Plaintiff Katie Brooks is a resident and citizen of the State of Utah. From March 2009 to approximately March 2011, Ms. Brooks was one of the highest performing Admissions Consultants ("AC") at SHC's Orem, Utah, campus. In this position, Ms. Brooks became aware of Defendant Schools' compensation practices for ACs and Financial Aid Officers ("FAOs"), as well as other material information. Defendant Schools employ numerous ACs at each campus location to recruit new students into their programs. In her position, Ms. Brooks also became

aware of certain practices relating to SHC's reporting of student grades and attendance to the Department of Education and its accrediting agency.

13.    Ms. Brooks brings this action for violations of the federal FCA on behalf of herself and the United States of America. Ms. Brooks, through her work as an AC, has personal knowledge of the false records, statements, and claims presented to the government by and for the Defendant Schools named herein and of Defendant Schools' fraudulent certification, billing, and auditing practices.

14.    Relator and Plaintiff Nannette Wride is a resident and citizen of the State of Utah.  From July 2009 to June 2011, SHC's Orem campus employed Ms. Wride as a part-time AC and part-time executive assistant to various manager agents of SHC. In the various positions she held, Ms. Wride became aware of Defendant Schools' compensation practices for ACs and FAOs. Additionally, through her work at Defendant SHC's Orem campus, Ms. Wride learned about certain false statements and representations that Defendant SHC had made, and continued to make, to SHC's accrediting agency. In her position, Ms. Wride also became aware of certain practices relating to SHC's reporting of student grades and attendance to the Department of Education and its accrediting agency.

15.    Ms. Wride brings this action for violations of the federal FCA on behalf of herself and the United States of America. Ms. Wride, through her work as an AC and executive assistant, has personal knowledge of the false records, statements, and claims presented to the government and third parties (who, in turn, submitted false records and statements to the government) by and for the Defendant Schools

named herein and of Defendant Schools' fraudulent certification, billing, and auditing practices.

16. As required under the FCA, 31 U.S.C. § 3730(b)(2), Relators have provided the United States Attorney and the United States Attorney General with written disclosures of substantially all material evidence and information supporting the allegations herein.

17. Relators are "original sources" as that term is defined in the FCA. 31 U.S.C. § 3730(e)(4)(B). Relators have independent, material, and first-hand knowledge of the information on which the allegations of fraudulent misconduct are based. Relators voluntarily provided such information to the Office of the Inspector General of the Department of Education and the United States Attorneys for the Districts of Idaho and Utah on October 16, 2012, June 7, 2013, and May 13, 2014. Additionally, Ms. Wride orally provided information to the Department of Education at various prior times, including in approximately May 2011.

18. The United States of America is named as a plaintiff because funds of the United States of America were awarded and paid to Defendant Schools in connection with their participation in Title IV, HEA programs, which participation is the result of the false claims alleged in this Complaint.

19. Defendant Schools operate for-profit (or "proprietary") postsecondary educational schools throughout the western United States. On or about December 31, 2012, all Defendant Schools merged into an Indiana nonprofit corporation by the name of Center For Excellence in Higher Education, Inc. ("CEHE"). CEHE

7

continues to operate the schools under the same trade names as before. On information, Relators believe that Defendant Schools merged into CEHE, at least in part, to evade certain regulatory requirements that apply to for-profit schools but not to not-for-profit schools, particularly the requirement that for-profit schools derive at least ten percent (10%) of their revenues from sources other than Title IV, HEA programs. For the sake of simplicity and ease of reference, this Third Amended Complaint will refer to all corporate school entities as "Defendant Schools" except where a specific reference to a specific institution is necessary.

20.    A substantial portion of Defendant Schools' revenues came (and still come) from funds provided through Title IV, HEA programs. Defendant Schools offer associate's, bachelor's, and master's degree programs in various disciplines.

21.    Barney is the former sole shareholder of the corporate entities that operated Defendant Schools. Until their merger into CEHE on December 31, 2012, the corporate entities that operated Defendant Schools were all privately owned by Barney. Because Defendant Schools were not public companies, specific information about ownership, control, and management structure was not publicly available. Barney is a resident of Nevada. Barney continues to manage and control Defendant Schools through CEHE. Barney is chairman of CEHE and the sole statutory member of CEHE. As the sole member, Barney has the power to appoint members of CEHE's governing board. In 2012, Barney worked 40 hours per week on CEHE business. Barney has an arrangement or relationship with CEHE, either personally or through other entities he controls, through which he receives substantial

8

compensation from CEHE. In 2012, CEHE reported that it owes Barney over $431,000,000.00 and that it leases office space from entities owned by Barney.

22.   Until December 31, 2012, Defendant SHC was a Utah corporation with its principal place of business in Murray, Utah. Defendant SHC operated a number of campuses in the intermountain west, including in Idaho (Boise and Nampa) and Utah (Salt Lake City/Murray, Logan, Odgen, Layton, Lehi, Provo/Orem,[1] and St. George). The SHC campuses have been assigned at least the following identification codes by the Office of Postsecondary Education ("OPEID Codes")[2]: 00367400, 00367401, 00367403, 00367405, and 00367406. On information, Relators believe that CEHE continues to operate these campuses under the "Stevens-Henager College" trade name.

23.   Additionally, Defendant SHC operated and controlled Independence University ("IU"), an Internet-based, distance-learning institution. On information, Relators believe that IU was, or was treated as, an operating division of SHC. IU has been assigned at least the following OPEID Code: 00367409. On information, Relators believe that CEHE continues to operate IU under the "Independent University" trade name and that IU continues to have a strong affiliation with the campuses operating under the "Stevens-Henager College" trade name.

24.   Until December 31, 2012, Defendant California College San Diego, Inc. ("CCSD"), was a Utah corporation with its principal place of business in Salt Lake

---

[1] Although most SHC materials refer to the campus where Relators worked as the "Provo" campus, it was actually located in Orem, Utah.

[2] The Department of Education and other agencies transact business, collect and report data, and track school performance using OPEID Codes, among other methods.

City, Utah. Defendant CCSD operated three campuses in southern California (San Diego, National City, and San Marcos). The CCSD campuses have been assigned at least the following OPEID Code: 02110800. On information, Relators believe that CEHE continues to operate these campuses under the "California College San Diego" trade name.

26.     Until December 31, 2012, Defendant CollegeAmerica Denver, Inc. ("CAD"), was a Colorado corporation with its principal place of business in Denver, Colorado.

26.     Until December 31, 2012, Defendant CollegeAmerica Arizona, Inc. ("CAA"), was a Colorado corporation with its principal place of business in Flagstaff, Arizona.

27.     Defendants CAD and CAA operate eight campuses in four states: two in Arizona (Flagstaff and Phoenix), four in Colorado (Denver, Colorado Springs, South Colorado Springs, and Fort Collins), one in Wyoming (Cheyenne), and one in Idaho (Idaho Falls).

28.     Defendants CAD and CAA hold themselves out to the public as a single operating entity under the name "CollegeAmerica." For example, CAD and CAA jointly operate a website that lists all eight campuses and makes no distinction between the two corporate entities. The CollegeAmerica campuses have been assigned at least the following OPEID Codes: 03120300, 03120301, 03120302, 02594300, 02594301, 02594302, and 02594303. On information, Relators believe

that CEHE continues to operate these campuses under the "CollegeAmerica" trade name.

29.     Until December 31, 2012, Defendants SHC, CCSD, CAD, and CAA advertised and held themselves out to the public as related and affiliated schools. For example, Defendants SHC, CCSD, CAD, and CAA published and used a single unified catalog of courses for students, which displayed the names and trademarks of each such Defendant School prominently on the cover. Additionally, the homepages of the websites belonging to Defendants SHC, CCSD, CAD, and CAA were virtually identical, except for the change in the name of the school. The homepages of the websites for CCSD and CAD/CAA explained that "[o]nline programs are offered by our affiliated college, Stevens-Henager College Salt Lake City/Murray." (*See* http://www.collegeamerica.edu/ (last visited Oct. 31, 2012); http://www.cc-sd.edu/ (last visited Oct. 31, 2012).)

30.     Since the merger of Defendant Schools into CEHE, the connection between the schools has become even more apparent. The websites for each of the schools now states that the schools' trade names are "a registered mark of Center for Excellence in Higher Education, Inc."

31.     CEHE is an Indiana nonprofit corporation with its principal place of business in Salt Lake City/Murray, Utah—at the same address as the former headquarters for both SHC and CCSD. As the corporate successor to Defendant Schools, CEHE is liable for the acts and omissions of Defendant Schools. Insofar as the merger of Defendant Schools into CEHE has caused or resulted in the

dissipation of corporate assets with the purpose or effect of defrauding creditors, including potential judgment creditors, or attempting to make such assets inaccessible to potential judgment creditors, other entities and individuals may also face liability.

32.   On information, Relators believe that despite the merger of the separate schools into CEHE, the schools continue to operate more or less as they did prior to the merger. On information, Relators believe and allege that the merger of the schools into CEHE, a nonprofit, was intended to evade certain regulations and requirements that apply to for-profit schools but not nonprofit schools, such as the requirement that at least ten percent (10%) of Defendant Schools' revenue come from non-government sources ("the 90-10 Rule"). *See* 20 U.S.C. § 1094(a)(24), 24 C.F.R. § 668.14(b)(16). As detailed further below, that Defendant Schools have created and used falsified records in order to meet the 90-10 Rule.

33.   Defendant Shaw, Mumford & Co., P.C. ("Shaw Mumford"), is an expired Utah professional corporation. Shaw Mumford conducted the required compliance audits of Defendant Schools, described further below, for the audit years 2007 and 2008. On information, Relators believe and allege that Shaw Mumford is the predecessor-in-interest to Defendant Shaw & Co, P.C.

34.   Defendant Shaw & Co, P.C. ("Shaw & Co."), is a Utah professional corporation. On information, Relators believe and allege that Shaw & Co. is the successor-in-interest to Shaw Mumford.

35.     Defendant PricewaterhouseCoopers LLP ("PwC") is a Delaware limited liability partnership. PwC conducted the required compliance audit of Defendant Schools for the 2009 audit year.

36.     Defendant Weworski & Associates ("Weworksi") is a California Accountancy Corporation located in San Diego, California. Weworski conducted the required compliance audits of Defendant Schools for the 2010 and 2011 audit years. Collectively, Shaw Mumford, Shaw & Co., Weworksi, and PwC are referred to herein as "Defendant Auditors."

37.     Relators are unaware of the true names and capacities of the defendants sued as Does 1 through 500 (collectively with Defendant Schools and Defendant Auditors, "Defendants"). Relators will amend their complaint when the true names and capacities have been ascertained. Each Doe Defendant is responsible in some actionable manner for the events, occurrences, injuries, and damages alleged herein.

38.     The terms "Defendants," "Defendant Schools," and "Defendant Auditors" will refer to the Defendants identified herein acting by and through their managerial employees, and each of them.

39.     Managerial employees of the Defendants, in doing the acts and things described in this Complaint, were acting within the course and scope of their respective agencies and/or employment with the Defendants, and each of them, with the knowledge and consent of the Defendants, and each of them, unless otherwise indicated.

40.    At all relevant times, each Defendant was the authorized agent of each other Defendant.

## IV.    **FEDERAL FALSE CLAIMS ACT**

41.    For violations occurring prior to May 20, 2009, the false claims provision of the FCA, at 31 U.S.C. § 3729(a)(1)(1986), provides in pertinent part that a person is liable to the United States government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . [a] false or fraudulent claim for payment or approval."

42.    For violations occurring on or after May 20, 2009, the false claims provision of the FCA, at 31 U.S.C. § 3729(a)(1)(A) (2009), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), provides in pertinent part that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be liable to the United States Government.

43.    The FCA defines the term "claim" to mean

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

14

31 U.S.C. § 3729(b)(2)(A) (2009).

44.     The false statements provision of the FCA, prior to the FERA amendments, provides that a person is liable to the United States Government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (1986). As amended by FERA, the false statements provision of the FCA makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).

45.     The FCA, as amended by FERA, defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4) (2009).

46.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(B) (2009).

## V.     TITLE IV OF THE HIGHER EDUCATION ACT OF 1965

### A.     General Provisions

47.     Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070 *et seq.*, Congress established various student loan and grant programs,

including but not limited to the Federal Pell Grant Program ("Pell Grant program"), the Federal Family Education Loan Program ("FFELP"),[3] and the Federal Direct Loan Program ("FDLP") (collectively "Title IV funding") in order to financially assist eligible students in obtaining a post-secondary education.

48.     Although the mechanism by which Title IV funding is disbursed to eligible students under the Title IV, HEA programs varies by program, each Title IV, HEA program requires compliance with specific conditions and obligations, and certification of compliance with such conditions and obligations, as a prerequisite to earning and obtaining Title IV funding.

49.     In order to become eligible to receive Title IV funding under programs such as the Pell Grant program, FFELP, or FDLP, or to have its students receive Title IV funding, a post-secondary educational institution must first enter into a program participation agreement ("PPA") with the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14.

50.     Each PPA expressly conditions a school's initial and continuing eligibility to receive funds under Title IV, HEA programs on compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

**B.     Incentive Compensation Ban**

51.     Section 487(a)(20) of Title IV of the HEA explicitly requires that in order to be eligible to receive Title IV funding, schools "[w]ill not provide any commission, bonus, or other incentive payment based directly or indirectly on

---

[3] No new loans were made under FFELP after July 1, 2010.

success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20) ("Incentive Compensation Ban"). Title IV of the HEA expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools comply with the Incentive Compensation Ban.

52.     The Department of Education's regulations further reiterate that schools must comply with the Incentive Compensation Ban in order to be eligible to receive Title IV funding and that schools must expressly agree to the Incentive Compensation Ban in PPAs. 34 C.F.R. § 668.14(b)(22) ("Incentive Compensation Regulations").

53.     In 2002, the Incentive Compensation Regulations accompanying the Incentive Compensation Ban were amended to clarify that certain types of compensation did not violate the Incentive Compensation Ban. These regulatory safe harbors were intended to "provide guidance to institutions so they may adopt compensation arrangements that do not run afoul of the incentive compensation prohibition contained in section 487(a)(20) of the HEA." *Adjustments to Employee Compensation (Section 668.14(b)(22)(ii)(A))*, 67 Fed. Reg. 67054, 67055 (Nov. 1, 2002).

54.     Relevant to this Third Amended Complaint, the 2002 amendments to the Incentive Compensation Regulations included a safe harbor allowing schools to pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as

long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. §668.14(b)(22)(ii)(A) (July 1, 2010) ("Regulatory Safe Harbor A").

55.    With respect to the Regulatory Safe Harbor A, in the Preamble to the Notice of Proposed Rulemaking for the safe harbor, the Secretary of the Department of Education reminded post-secondary educational institutions that salary adjustments based solely on the number of students recruited, admitted, enrolled, or awarded financial aid do not fall within the safe harbor, that the Regulatory Safe Harbor A was not intended to protect salary adjustments that are formulated to circumvent the statutory prohibition against incentive compensation, and that salary adjustments based on success in securing enrollments remain prohibited. *Program Participation Agreement (Section 668.14)*, 67 Fed. Reg. 51722, 51723 (Aug. 8, 2002).

56.    Also relevant to this Complaint, the 2002 amendments to the Incentive Compensation Regulations included a safe harbor permitting schools to pay "[c]ompensation that is based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter." 34 C.F.R. § 668.14(b)(22)(ii)(E) ("Regulatory Safe Harbor E").

57.    With respect to the Regulatory Safe Harbor E, in the Preamble to the Notice of Proposed Rulemaking for the safe harbor, the Secretary of the Department of Education explained that the Incentive Compensation Ban was intended, in part,

"to prevent institutions from enrolling students into a program without regard to their qualifications or likelihood of completing the program," that "completion of the program or . . . the completion of the first academic year is a reliable indicator that the student was qualified for the program," and, as a result, the safe harbor allows schools to make payments that are "based upon students' successful completion of their educational program, or one academic year for a longer program." *Program Participation Agreement (Section 668.14)*, 67 Fed. Reg. 51722, 51724 (Aug. 8, 2002).

58.     In each PPA, a school certifies that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program." (*See* PPA at 1, attached hereto as Exhibit 1.) The PPA further states that a school's participation in Title IV, HEA programs is "subject to the terms and conditions set forth in this Agreement." (*Id.*)

59.     The PPA further provides, among other things, that

> [b]y entering into this Program Participation Agreement, the Institution agrees that . . . (22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance . . . .

(*Id.* at 4, 6.) This certification is a critical prerequisite for a school's eligibility to request and receive Title IV funding.

60.     Congress enacted the prohibition against paying commissions, bonuses, or other incentive payments based on success in recruiting students

because such payments were associated with high loan default rates, which in turn resulted in a significant drain on program funds. When Congress amended the HEA in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, including the payment of incentive compensation to motivate admissions personnel to enroll students without regard to the students' ability to benefit from the education. S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters"). The U.S. Senate committee with oversight responsibility recently acknowledged that systemic fraud and abuse continues unabated among for-profit colleges. S. Comm. on Health, Education, Labor, and Pensions, 112th Cong., For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success (Comm. Print July 30, 2012).

61.    In June 2010, the Department of Education proposed to eliminate many of the regulatory safe harbors, including Regulatory Safe Harbor A and Regulatory Safe Harbor E. The Department explained that the elimination of the safe harbors was necessary because "[s]ince [the adoption of the regulatory safe harbors], the Department's experience demonstrates that unscrupulous actors routinely rely upon these safe harbors to circumvent the intent of section 487(a)(20)

of the HEA." *Incentive Compensation (§ 668.14(b))*, 75 Fed. Reg. 34816, 34817 (June 18, 2010). The Department concluded that "rather than serving to effectuate the goals intended by Congress through its adoption of section 487(a)(20) of the HEA, the safe harbors have served to obstruct those objectives." *Id.*

62.    In particular, the Department of Education observed that while many schools had adopted compensation practices that complied with the regulatory safe harbors "on paper," "in practice" those same schools had used compensation practices that directly violated the Incentive Compensation Ban and failed to comply with both the letter and spirit of the safe harbor provisions. *Id.*

63.    The Department of Education promulgated final regulations eliminating the regulatory safe harbors, including Regulatory Safe Harbor A and Regulatory Safe Harbor E, on October 29, 2010, effective July 1, 2011. *Program Integrity Issues*, 75 Fed. Reg. 66832, 66832 (October 29, 2010); 34 C.F.R. § 668.14(b)(22) (2011).

## C.    **Audit Requirement**

64.    In order to maintain its eligibility to receive Title IV funding, each year a school participates in any Title IV, HEA program, it also must provide the Department of Education with an annual compliance audit of its administration of Title IV, HEA programs, as well as an audit of the school's general purpose financial statements, prepared by independent auditors. 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. §§ 668.23(a)(2), (a)(4). For-profit educational institutions, including Defendant Schools, must conduct their annual financial statements and compliance

audits in accordance with the Department of Education Office of Inspector General's Audit Guide.

65.     The Department of Education uses the results of the compliance and financial statements audits in part to determine whether schools receiving Title IV funding are adhering to applicable requirements for Title IV, HEA programs, including the Incentive Compensation Ban, and whether to allow the schools to continue participating in the programs. As part of the annual audits, Defendant Schools are required to certify, in the form of written "Required Management Assertions," that, among other things, they are complying with the requirements for eligibility to participate in Title IV, HEA programs, including the Incentive Compensation Ban. (*See* Department of Education Audit Guide ("Audit Guide") at II-3, attached hereto as Exhibit 2.) Specifically, Defendant Schools must certify in their "Required Management Assertions" regarding "Institutional Eligibility and Participation" that they have "[n]ot paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention [34 C.F.R. § 668.14(b)(22)]." (*Id.* at p. II-4.)

**D.     90-10 Rule**

66.     In order to be eligible to receive Title IV funding, schools must not "derive less than ten percent of [their] funding from sources other than [Title IV] funds." 20 U.S.C. § 1094(a)(24) (referred to hereafter as the ("90-10 Rule")).

67.     The Department of Education's regulations further reiterate that schools must comply with the 90-10 Rule in order to be eligible to receive Title IV

funding and that schools must expressly agree to abide by the 90-10 Rule in PPAs. 34 C.F.R. § 668.14(a) & (b)(16).

68.     Additionally, the schools must report their calculations under the 90-10 Rule in their annual financial audits. 34 C.F.R. § 668.23(d)(3).

69.     The relevant statutes and regulations specify exactly how schools must compute their revenues for the purpose of calculating compliance with the 90-10 Rule. 20 U.S.C. § 1094(d); *see also* Appendix C to Subpart B of Part 668 of Title 34 of the Code of Federal Regulations—90/10 Revenue Calculation.

### E.     <u>Accreditation Requirement</u>

70.     As a condition to be eligible to participate in Title IV, HEA programs and to earn and receive Title IV funding, schools must also "meet the requirements established by . . . accrediting agencies or associations." 20 U.S.C. § 1094(a)(21) ("Accreditation Requirement").

71.     The accreditation process ensures that before a school receives Title IV funding, the school has effective educational programs and has met high standards of quality. The accrediting agencies, by rigorously investigating the schools and their educational programs and determining whether they meet the Department of Education's and the agencies' standards, help guarantee that the federal government, the Department of Education, and taxpayers are receiving a valuable educational product in exchange for the Title IV funding.

72.     The PPAs that all schools must sign in order to participate in Title IV, HEA programs, and to be eligible to receive Title IV funding, explicitly provide that the schools "will meet the requirements established pursuant to part H of Title IV of

23

the HEA by . . . nationally recognized accrediting agencies." 34 C.F.R. § 668.14(b)(23).

73.     "[F]or purposes of student assistance programs," the HEA defines "proprietary institution of higher education," which is the category to which Defendant Schools belong, as a school that, among other things, "is accredited by a nationally recognized accrediting agency or association recognized by the Secretary." 20 U.S.C. § 1002(b)(1).

74.     In order to be recognized by the Secretary of Education as an accrediting agency, an agency must establish "sufficiently rigorous" "standards for accreditation" that include provisions for, among other areas, "faculty." 34 C.F.R. § 602.16(a).

75.     Before accrediting a school or program, an accrediting agency must "[c]onduct[] at least one on-site review of the institution or program during which it obtains sufficient information to determine if the institution or program complies with the agency's standards."  34 C.F.R. § 602.17(c).

76.     Defendant Schools' accrediting agency is the Accrediting Commission of Career Schools and Colleges ("ACCSC"). According to Defendant Schools, ACCSC is a "quasi-governmental body recognized by the United States Secretary of Education." Defendant Schools have explained that ACCSC's "quasi-governmental" status derives from the "oversight authority granted through its recognition by the United States Secretary of Education."

24

77. ACCSC must "provide written notice of its accrediting decisions to the Secretary," including about "[a] decision to renew an institution's or program's accreditation." 34 C.F.R. § 602.26.

### F.    Attendance-Taking and Refund Requirement

78. Schools participating in Title IV, HEA programs are required to carefully and accurately track and report student attendance for a number of reasons.

79. If a student enrolls at a school but fails to attend class, the school is obligated to refund any Title IV funding received for that student to the Department of Education within a specified period of time. 34 C.F.R. § 668.21(a), (c); 20 U.S.C. § 1091b.

80. Similarly, if a student enrolls and attends some classes but then subsequently stops attending classes, the school is obligated to calculate the amount of Title IV funding the student earned and to refund any Title IV funding the school received in excess of the amount earned to the Department of Education. 34 C.F.R. § 668.22(a)(1) (Schools are obligated to "determine the amount of title IV grant or loan assistance that the student earned as of the student's withdrawal date."); 34 C.F.R. § 668.22(a)(4) (The "difference between these amounts must be returned to the title IV programs."); *see also* 20 U.S.C. § 1091b; 34 C.F.R. §§ 668.22(b), (g), (i).

81. Under the applicable regulations, "a student is considered to have withdrawn from a payment period or period of enrollment" if, in the case of a program measured in credit hours (as are Defendant Schools' programs), "the student does not complete all the days in the payment period or period of

enrollment that the student was scheduled to complete." 34 C.F.R. § 668.22(a)(2)(i)(A).

82. The applicable regulations also dictate exactly how schools must determine a student's withdrawal date. For "an institution that is required to take attendance," "the student's withdrawal date is the last date of academic attendance as determined by the institution from its attendance records." 34 C.F.R. § 668.22(b).

83. A school is "required to take attendance if" either an "outside entity (such as the institution's accrediting agency or a State agency) has a requirement that the institution take attendance" or "[t]he institution itself has a requirement that its instructors take attendance." 34 C.F.R. § 668.22(b)(3)(i)(A), (B).

84. As discussed above, ACCSC is Defendant Schools' accrediting agency. (A copy of ACCSC's Standards of Accreditation is attached hereto as Exhibit 3.)

85. ACCSC's accrediting standards require accredited schools, including Defendant Schools, to create, publish, and enforce attendance policies that "must promote sufficient levels of student attendance such that the required knowledge, skills, and competencies can be reasonably achieved." (*See generally* ACCSC "Standards of Accreditation," Ch.2, Sec. VII.)

86. Indeed, Defendant Schools' written policies also require the taking of attendance. (*See, e.g.*, Defendant Schools' Combined Course Catalog 2012 at 78.)

87. When schools enter into PPAs with the Department of Education, all schools must certify they are complying and will continue to comply with the statutes and regulations relating to attendance-taking and refund calculations.

26

88.    Because a student's withdrawal date is determined from the school's attendance records and because the determination of the withdrawal date directly affects how much money a school must refund to the Department of Education following a withdrawal, it is important that the school accurately record and report student attendance so that the correct refund amount is calculated. However, because schools may retain more money if the withdrawal date is postponed, schools have a strong financial incentive to misreport the attendance of students who withdraw.

### G.    Academic Progress Requirements

89.    Schools participating in Title IV, HEA programs must also create and enforce reasonable standards of academic performance.

90.    Under applicable regulations, "[a]n institution must establish a reasonable satisfactory academic progress policy for determining whether an otherwise eligible student is making satisfactory academic progress in his or her educational program and may receive assistance under the title IV, HEA programs." 34 C.F.R. § 668.34(a); *see also* 20 U.S.C. § 1091(a)(2) (requiring students to make satisfactory progress); 20 U.S.C. § 1091(c) (defining satisfactory academic progress); 34 C.F.R. § 668.14(b)(24); 34 C.F.R. § 668.16(e)(2)(i).

91.    Such a policy must include "the grade point average (GPA) that a student must achieve at each evaluation" in order to remain eligible to receive Title IV funding. 34 C.F.R. § 668.34(a)(4)(i).

92.    Furthermore, ACCSC must require that all schools that it accredits establish standards regarding "[s]uccess with respect to student achievement," 34

27

C.F.R. § 602.16(a)(1)(i); 20 U.S.C. § 1099b(a)(5), and Defendant Schools must follow those standards to be eligible to receive Title IV funding, 34 C.F.R. § 668.14(b)(23).

93.     Indeed, the ACCSC's Standards of Accreditation include such requirements. (*See generally* ACCSC "Standards of Accreditation," Ch. 2, Sec. VII, Exhibit 3.)

94.     When schools enter into PPAs with the Department of Education, all schools must certify they are complying and will continue to comply with the statutes and regulations relating to academic performance.

95.     As with the attendance-tracking requirement, it is required that the schools establish and enforce reasonable academic performance standards and to actually and genuinely grade student performance based on reasonable standards. However, since schools lose revenue when a student's Title IV funding eligibility is suspended due to poor grades, schools have a strong financial incentive to misrepresent students' academic performance to keep them eligible to receive Title IV funding.

## H.     Claims for Payment under Title IV, HEA Programs

96.     After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways. Under the Pell Grant program and FDLP, for example, students submit requests for funding directly to the Department of Education, or to the Department of Education with the assistance of schools. Under FFELP, students and schools jointly submitted requests to private lenders for loans that were guaranteed by state

agencies that were, in turn, insured by the Department of Education, which paid in the event of a default.

97.    With respect to all Title IV, HEA programs, the disbursement of Title IV funding depends on a school's statements and certifications of eligibility that are necessary for requests for payment to be considered.

98.    For all Title IV, HEA programs, students who are interested in receiving federal student aid must complete a "Free Application for Federal Student Aid," known as a "FAFSA."

**Title IV Grant Programs**

99.    Under the Pell Grant program, which provides federal funds to assist postsecondary school students with demonstrated financial need, 20 U.S.C. § 1070a; 34 C.F.R. § 690.1, the student initiates the process by submitting a FAFSA to the Department of Education to have her expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell Grant program funds. 34 C.F.R. § 690.12(a). The student either sends the FAFSA directly to the Department of Education or provides it to a school for the school to transmit it to the Department of Education on the student's behalf. 34 C.F.R. § 690.12(b).

100.    The Department of Education sends the student's application information and EFC to the student on a Student Aid Report ("SAR") and sends each school the student has designated an Institutional Student Information Record ("ISIR") for that student. 34 C.F.R. § 690.13.

101.    The school uses the above-described information, including the EFC, to calculate the student's eligibility for all aid and to assemble a "financial aid award

package" for the student borrower. The financial aid package may include Pell Grants, FDLP loans, or Campus-Based Aid (which in turn includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student may be eligible.

102.    The student can accept all or part of the financial aid award package.

103.    If the student accepts a Pell Grant, an FDLP loan (for which the Department of Education is both lender and guarantor), or both a Pell Grant and a FDLP loan, the school creates an electronic "origination" record that the school submits to a Department of Education computerized database called the Common Origination and Disbursement ("COD") system. The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts. The COD database, in turn, links the information in the origination record to another Department of Education database, called CPS, which compares the information in the origination record to the information on the student's SAR and ISIR.

104.    Provided that the information submitted by the school is consistent with the information possessed by the Department of Education, the Department of Education makes funds available for the school to electronically draw down from a computerized system known as "G5."

105.    Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request . . . the funds are being expended

within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement." (*See* Example of G5 Certification, attached hereto as Exhibit 4.)

106.   In addition to the Pell Grants themselves, the Department of Education also pays to the school an annual administrative cost allowance of $5.00 for each student who receives a Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV, HEA federal student aid programs. 20 U.S.C. § 1096; 34 C.F.R. § 690.10.

### FDLP and FFELP Loan Programs

107.   The FDLP, through which the Department of Education makes loans directly to eligible students and parents, "enables an eligible student or parent to obtain a loan to pay for the student's cost of attendance at [an eligible] school." 34 C.F.R. § 685.101(a)(1).

108.   Under the FFELP, which included subsidized and unsubsidized Stafford Loans, private "lenders use their own funds to make loans to enable a student or his or her parents to pay the costs of the student's attendance at postsecondary schools." 34 C.F.R. § 682.100(a). "[A] guaranty agency guarantees [the private] lender against losses due to default by the borrower on a FFEL loan," and "the guaranty agency is reimbursed by the [Department of Education] for all or part of the amount of default claims it pays to lenders." 34 C.F.R. § 682.100(b)(1). In this way, the government is ultimately called upon to satisfy claims for payment.

109.   No new loans were made under FFELP after July 1, 2010. *See* Health Care and Education Reconciliation Act of 2010 (P.L. 111-152).

110.   Like the Pell Grant program, students seeking to obtain a FDLP or FFELP loan begin by completing and submitting a FAFSA. 34 C.F.R. § 685.201(a); 34 C.F.R. § 682.102(a).

111.   In order to participate in the FDLP and FFELP, as opposed to a grant program, a student also completes a Master Promissory Note ("MPN") and submits the MPN to the educational institution. 34 C.F.R. § 685.201; 34 C.F.R. § 682.102.

112.   Parents may also borrow money through the FDLP and FFELP, in the form of a Parent PLUS loan, to help pay tuition and other related costs of education for their children.  34 C.F.R. § 685.200(c); 34 C.F.R. § 682.102(c). A parent borrower commences the loan process by completing and submitting a Direct PLUS MPN for a Parent Direct PLUS loan, 34 C.F.R. § 685.201(b), or an application for a PLUS loan under FFELP, 34 C.F.R. § 682.102(c).

113.   For student loans, schools participating in the FDLP must at a minimum create a loan origination record and ensure that the loan is supported by a completed MPN.  34 C.F.R. § 685.201(a)(2)(i), (ii). For parent direct loans, a participating school must complete and submit its portion of the PLUS MPN. 34 C.F.R. § 685.201(b)(3).

114.   A school participating in the FDLP or FFELP must determine and certify that the student is eligible to receive the loan and must provide information regarding student eligibility to the Department of Education. 34 C.F.R. § 85.301(a)(1), (2); 34 C.F.R. § 682.102(a); 34 C.F.R. § 682.603(a). Among other requirements, to be eligible to receive proceeds from a FDLP or FFELP loan, a

student must be enrolled, or accepted for enrollment, at a school eligible to receive Title IV funding. 34 C.F.R. § 685.301(a)(2)(i); 34 C.F.R. § 685.200(a)(1)(ii); 34 C.F.R. § 668.32(a)(1)(i); 34 C.F.R. § 682.201(a); 34 C.F.R. § 682.603(a).

115.    As described above, for a school to be eligible to participate in Title IV, HEA programs, thereby making students attending the school eligible for FDLP and FFELP loans, a school must comply with the Incentive Compensation Ban.  By certifying that any student is eligible to receive a FDLP or FFELP loan, the school is certifying its own eligibility to participate in the programs, including its compliance with the Incentive Compensation Ban.

116.    Additionally, for a student to be eligible to receive a FDLP or FFELP loan, the school, as well as the specific program of study, must be accredited by the appropriate accrediting agency.  20 U.S.C. § 1094(a)(21); Department of Education, Direct    Loans    School    Guide,    at    1-3,    *available    at* http://www.direct.ed.gov/pubs/schoolguide.html.

117.    As described above, a school participating in the FDLP also determines the amount of each type of FDLP loan (subsidized or unsubsidized), as well as other types of financial aid, that the student is eligible to receive based on information provided by the student in the FAFSA and from other available sources. 34 C.F.R. § § 685.301(4), (5). The school submits this information to the COD system.

118.    Schools must verify that a student remains eligible to receive FDLP and FFELP loan proceeds at the time of disbursement. Direct Loans School Guide

at 5-66; Department of Education, Federal Student Aid Handbook at 3-135 (2010-11).

119.   Schools receive the proceeds of FDLP loans for disbursement through the G5 system. As described above, schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request . . . the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement." (G5 Certification, Exhibit 4 hereto.)

120.   Under FFELP, the school submits the MPN to the lender. Upon approval by the lender, the lender obtains a loan guarantee from a guarantee agency. 34 C.F.R. § 682.102. The loan is made in reliance upon the accuracy of the information provided by the school.

121.   The lender transfers the FFELP funds directly into the school's account. Upon receiving the FFELP funds, the school credits a student's account at the school for education-related expenses, such as tuition, fees, books, and supplies.

122.   For subsidized Stafford loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis, and during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

123.   In the event of default on a FFELP loan, the Department of Education pays to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs. 34 C.F.R. § 682.404.

## VI.    FACTUAL ALLEGATIONS

124.    Defendant Schools knowingly made false statements, certifications, and claims regarding compliance with the Incentive Compensation Ban in order to become and remain eligible to receive Title IV funding. Defendant Schools' statements were false when made, and caused the Department of Education to pay various claims under Title IV, HEA programs that Defendant Schools were not eligible to receive.

125.    Defendant Schools knowingly made false statements, certifications, and claims regarding compliance with the Accreditation Requirement in order to become and remain eligible to receive Title IV funding. Defendant Schools' statements were false when made, and caused the Department of Education to pay various claims under Title IV, HEA programs that Defendant Schools were not eligible to receive. Additionally, Defendant Schools knowingly made false statements and certifications to their accrediting agency in order to induce and cause the accrediting agency to accredit Defendant Schools even though they did not comply with the relevant accrediting standards.

### A.    Defendant Schools' Submission of Program Participation Agreements to the Department of Education.

126.    Defendant Schools sign and submit PPAs to the Department of Education in order to become eligible to participate in Title IV, HEA programs.  All Defendant Schools are currently operating under approved PPAs and have been since at least January 1, 2002.

127.    In each PPA, each Defendant School certifies that "[i]t will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA."

128.    In each PPA, each Defendant School further certifies that "[i]t will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance."

129.    In their PPAs, Defendant Schools also certify that they "will meet the requirements established" by a "nationally recognized accrediting agenc[y]."

130.    In addition to the certifications they make in the PPAs, Defendant Schools also make, or cause to be made, additional certifications as part of their annual compliance audits and as part of the student financial aid process, including but not limited to Required Management Assertions, G5 Certifications, Master Promissory Notes, and their accompanying school certifications.

131.    Defendant Schools submitted a variety of claims to the government for Title IV funding that they knew to be false based upon their non-compliance with the Incentive Compensation Ban.

132.    Defendant Schools submitted a variety of claims to the government for Title IV funding that they knew to be false based upon their submission of false information and certifications to their accrediting agency for the purpose of obtaining accreditation for which they are not eligible.

**B.**    **Title IV Funding Received by Defendant Schools.**

133.    According to information available from the Department of Education, Defendant Schools have received more than $660 million in Title IV funding since the 2002-2003 academic award year. This figure includes amounts received under FDLP, FFELP, and Pell Grant program, as well as smaller amounts received pursuant to Academic Competitiveness and National SMART Grant programs and campus-based financial aid (Federal Work Study, Perkins Loans, Federal Supplemental Educational Opportunity Grants).

134.    For example, during the 2009-2010 award year, which ran from July 1, 2009 to June 30, 2010, Defendant Schools received over $127 million in Title IV funding.

135.    During the 2010-2011 award year, Defendant Schools received over $139 million in Title IV funding.

136.    Defendant Schools receive a large portion of their total revenues from Title IV, HEA programs. For example, in 2009-2010, the percentage of Defendant Schools' total revenues derived from Title IV, HEA programs were as follows: Defendant SHC: 77%; Defendant CAA: 85.5%; Defendant CAD: 82.8%; and Defendant CCSD: 79.3%. *See* Department of Education, Proprietary School 90/10 Revenue Percentages from Financial Statements with Fiscal Year Ending Dates

37

Between 7/1/2009 and 6/30/2010, *available at* http://studentaid.ed.gov/about/data-center/school/proprietary.

137.  In 2010-2011, the percentage of Defendant Schools' total revenues derived from Title IV, HEA programs were as follows: Defendant SHC: 80%; Defendant CAA: 85.1%; Defendant CAD: 81.4%; and Defendant CCSD: 69.3%. *See* Department of Education, Proprietary School 90/10 Revenue Percentages from Financial Statements with Fiscal Year Ending Dates Between 7/1/2010 and 6/30/2011,      *available      at*      http://studentaid.ed.gov/about/data-center/school/proprietary.

### C.   <u>Defendant Schools' Violations of the Incentive Compensation Ban.</u>

138.  Throughout their employment with SHC, SHC paid Ms. Brooks and Ms. Wride incentive compensation that violated the Incentive Compensation Ban. SHC and the other Defendant Schools have paid incentive compensation to ACs that violates the Incentive Compensation Ban since at least July 1, 2002, and SHC and the other Defendant Schools continued to pay incentive compensation to ACs that violates the Incentive Compensation Ban up to at least 2011.

139.  Defendant Schools deliberately cultivated a corporate culture that prizes and rewards enrollment of students above all else. This "boiler room" style sales culture has made recruiting and enrolling students the sole focus of ACs and others involved in the recruitment and enrollment processes, including FAOs.

140.  Through their compensation system and compensation practices, the representations and certifications they make to the federal government in their

PPAs, in connection with annual compliance audits, and in other documents, Defendant Schools knowingly violated and continue to violate Title IV of the HEA's Incentive Compensation Ban, as well as its accompanying and implementing regulations.

### Admissions Consultants

141. An AC's primary objective at Defendant Schools is to "**enroll students**." (Defendant School's Admissions Consultant Manual at 21 (emphasis in original) ("Manual"), attached hereto as Exhibit 5.) (Defendant Schools provide a written policy manual to their ACs on an annual basis.  The copy of the Manual in Relators' possession was provided to an AC on or about September 2010 and states on the title page: "Copyright 2006, 2007, and 2008 by Carl Barney."  Prior versions of the Manual were similar in form and content to the version attached as Exhibit 5 to this Complaint.  At the bottom of the title page of the Manual, the following schools are identified: CollegeAmerica, CCSD [California College San Diego], Stevens-Henager College, and Independence University.)

142. ACs enroll students by developing leads through various events, promotions, and networking activities and through referrals generated by Defendant Schools' call center and marketing campaigns.  ACs meet with these leads and referrals, usually in person, at Defendant Schools' campuses and attempt to persuade them to enroll as students in Defendant Schools' programs.  According to Defendant Schools, the sole "purpose" of ACs is to "motivate, enroll, and start students."  (*Id.* at 22.)  The Defendant Schools' joint Manual reminds ACs that

"[t]he AC's job is to enroll every person they possibly can" and that "no salary increases occur unless Admissions enrolls more students." (*Id.* at 15.)

143.   ACs are the primary contact that prospective students have with Defendant Schools during the recruitment process.   The recruiting process often involves hours of personal contact between the AC and prospective student. Typically, ACs will accompany potential recruits to meetings with FAOs, where financial aid options are discussed.

144.   Defendant Schools provide regular training to the ACs in various sales techniques. For example, ACs are instructed to tell prospective students that "[f]or their tuition [they] get in return a **quality job** with much **more money** to help them pay for their hopes and dreams," and that Defendant Schools "do this in half the time of many other colleges and universities." (*Id.* at 20 (emphasis in original).)

### Defendant Schools' Written Compensation Policy

145.   Defendant Schools issued frequent written statements concerning their compensation policies, including for ACs. The revisions often related to the portions of the Manual covering AC compensation. Many of these written policies were contradictory and inconsistent. As will become apparent, Relators are informed and believe that Defendant Schools' actual compensation practices deviated from their written policies, that the written policies were issued merely to satisfy regulators, and that the deviations from the written policies further violated Title IV regulations and requirements.

146.   In addition to Manuals, Defendant Schools issued various types of "directives" to their employees, including directives to their admissions department

staff. These communications took the form of "Procedure Directives" and "Information Letters."

147.   In one such Procedure Directive, dated both November 15, 2007, and November 17, 2008, that Defendant SHC provided to Ms. Brooks, Defendant Schools appeared to set down new policies for "Admissions Consultant Compensation." (Procedure Directive at 2, attached hereto as Exhibit 6.)

148.   The Procedure Directive was issued by Carl Barney, as "Chairman," to Admissions Consultants, Directors of Admission (DoAs), and Campus Directors.

149.   The Procedure Directive discusses the Defendant School's "compensation plan based upon students who complete 36 credits and are thus likely to graduate" and makes explicit reference to Regulatory Safe Harbor E. (Procedure Directive 1-2.)

150.   The Procedure Directive explains that each student who completes 36 credits entitles the AC who enrolled that student to a "Completion Certificate" if, and only if, the completing "student ha[s] *a value at completion of 36 credits* as show in Appendix 1." (Procedure Directive 2 (emphasis in original).)

151.   "Appendix One" to the Procedure Directive contains a chart showing "Admission Consultant Potential Compensation." The chart provides the "value at completion" referenced previously.

152.   The chart contains a range of money values—from $100 up to $600.

153.   The first column in the chart is titled "Packaged Starts." The lowest value shown in the row is 5 packaged starts—there are no values for anything less than 5 starts.

154.   The top row of the chart lists "Intconversion%." The lowest value in the row is ">33%"—there are no values for anything less than 33%.

155.   Notes to the chart explain that "Intconversion%" is calculated by "[t]otal[ing] the last three modules' starts and interviews" and dividing the total number of starts by the total number of interviews.

156.   According to the chart in Appendix One of the Procedure Directive, which is consistent with actual practice (as described below), before an AC could receive a bonus for a completing student, the AC had to (1) start *at least* 5 students per module, and (2) convince at least one out of every three potential students he or she met with to enroll in the school. Based on the compensation systems set forth in the Procedure Directive, if an AC failed to meet either of these two enrollment-related requirements, the AC was ineligible to receive a bonus, regardless of how many students the AC was responsible for starting who completed 36 credit hours.

157.   At the other end of the scale, Appendix One provides great incentives for ACs to start more students and convince greater numbers of potential students to enroll. An AC that has an interview-to-start rate greater than 50% is eligible to receive $600 per completing student. An AC with 20 starts and an interview-to-start rate of 50% would receive a total of $12,000.

158.   Appendix One of the Procedure Directive also states that for "each start from personally developed interviews, the completion certificate is valued at an additional $500."

159.   The Procedure Directive contains an Appendix Two, which appears to set forth AC compensation for personally developed leads. (Appendix Two is not referenced anywhere in the Procedure Directive.) Appendix Two contains a chart that is identical to the chart in Appendix One, except that all of the values are higher. Under that chart, an AC must still first (1) start at least 5 students, and (2) achieve an interview-to-start rate of 33% to be eligible for any bonus, regardless of the number of students they started who completed 36 credit hours.

160.   Under that chart, the values based on the number of starts and interview-to-start rate ranged from $500 to $3,000 per student (or more).

161.   The Procedure Directive acknowledges that the incentive compensation plan is designed to ensure that ACs "contribute to admissions goals." (Procedure Directive at 1.)

162.   The Defendant Schools' joint Manual also ostensibly sets forth the schools' compensation policies and plan for ACs. (*See* Manual at 21-37, Exhibit 5.) Although much of the text of Procedure Directive is also set forth in the Manual, the two policies are very different.

163.   Like the Procedure Directive, the Manual acknowledges that the payment of incentive compensation based directly or indirectly on starts is prohibited under applicable regulations and accrediting standards.  (Manual at 33.)

43

These acknowledgements demonstrate that Defendant Schools knew (and know) that compensation practices resulting in the payment of incentive compensation based directly or indirectly on enrolling (or starting) students was strictly prohibited.

164. While Defendant Schools' written compensation plan appears to implicate several regulatory safe harbors, the precise terms of the compensation plan are less than clear. It appears that Defendant Schools attempted to exploit this ambiguity and vagueness by implementing and using a different compensation system than what is set forth in the Manual.

165. As written, the compensation plan set forth in the Manual appears to confuse and muddle several of the regulatory safe harbors for the Incentive Compensation Ban, even though each of the regulatory safe harbors has separate and distinct provisions and requirements. (*See*, *e.g.*, Manual at 33 (combining the elements of several regulatory safe harbors under the same numbered item).) Although the Manual purports to refer ACs to the Manual's appendices for more information about the "safe harbors," no additional information about the safe harbors is contained in the appendices. (*Id.*)

166. The Manual states that that "ACs will receive a salary commensurate with their experience (Appendix 1 – see attached)" and that the compensation "plan will not be adjusted more than twice annually" (Manual at 25; *see also* Procedure Directive 1), in apparent reference to Regulatory Safe Harbor A, which required, among other things, the "payment of fixed compensation, such as a fixed annual

salary . . . , as long as that compensation [wa]s not adjusted up or down more than twice during any twelve month period," 34 C.F.R. § 668.14(b)(22)(ii)(A) (July 1, 2010). (Notably, however, Appendix 1 does not reveal salary information but only shows example of "Additional Compensation" that ACs can earn under Defendant Schools' incentive bonus program.)

167.    The Manual also describes an incentive bonus program, explaining that the "Department of Education allows colleges to compensate ACs for students who successfully complete an academic year." (Manual at 25.) The Manual then purports to set forth Regulatory Safe Harbor E in its entirety, although the quotation contains several errors. (*Id.*)

168.    The Manual next explains Defendant Schools' incentive bonus program: "the college has developed a compensation plan based upon students who complete 36 credits" ("Completion Bonus"). (Manual at 25.)

169.    The Completion Bonus plan, like the plan stated in the Procedure Directive, provides that

> ACs will be issued Completion Certificates (CCs – see attached) for each student having *a value at completion of 36 credits* as shown in Appendix 1.   When a student named on a CC completes, the AC may redeem the CC. . . . **Compensation is paid only for students who successfully complete 36 credits**.

(Manual at 25 (emphasis in original).)

170.    The Manual makes clear that the Completion Bonuses associated with the "[C]ompletion [C]ertificates are not part of <u>regular</u> compensation." (Manual at 28 (emphasis in original); *see also* Procedure Directive at 6.)

45

171.   The Manual vaguely explains that the Completion Certificates "must be earned by meeting or exceeding each of the requirements outlined in the program" and that if the ACs "fail to meet each of the performance criteria, . . . all Complete Certificates will become null and void and of no value." (Manual at 28.)

172.   The only "requirements" and "performance criteria" relating to the Completion Bonuses contained in the Manual provide that "ACs must be employed by the college at the time a student completes 36 credits" and "must have provided support functions such as corresponding on a regular basis with the student after enrollment, checking on the student's progress, and helping students with any question they might have during the duration of the program." (Manual at 25; *see also* Procedure Directive at 2.) The Manual also states that ACs must (1) complete "Interview Surveys" and (2) accurately enter information relating to inquiries, referrals, interviews, and enrollments in Defendant Schools' computer system in order to earn a Completion Certificate. (Manual at 29-30.)

173.   No other requirements for earning or redeeming Completion Certificates are stated in the Manual.

174.   The Manual vaguely explains Defendant Schools' system for assigning a monetary value for each of the bonus Completion Certificates. (Manual at 30.)

175.   The written system for assigning a monetary value to the Completion Certificates bases the assigned value directly on the number of students an AC has succeeded in starting (or enrolling) at Defendant Schools.   (Manual at 30.) Specifically, the Manual contains a chart that assigns a "Completion Value" that is

based on each AC's "Avg. Starts." (Manual at 30.)[4]  The notes to the chart explain that the relevant "Average" is "the **last 3 modules'** performance" in terms of starts. (*Id.* (emphasis in original).) Thus, an AC with a three-module average of five (5) starts per module[5] would receive $50 for each Completion Certificate associated with a student enrolled in a bachelor's degree program, while an AC with a three-module average of eighteen (18) starts would receive $700 for each Completion Certificate. If an AC failed to achieve a minimum three-module average of five (5) starts per module, the Completion Certificate was worth nothing. Thus, the Manual itself shows that the "completion" bonus would not be awarded unless an AC achieved start-related quotas that have nothing to do with the completion of an academic year of study by a student. Defendant Schools' written policy therefore attempted to hide impermissible incentive bonus compensation based on enrollments within an ostensibly permissible compensation system relating to students' completion of one academic year of study.

176.   If Defendant Schools actually followed the written policies stated in the Procedure Directive or in the Manual, they would have violated the Incentive Compensation Ban because they would have paid incentive compensation based directly on success in securing enrollments. Although Defendant Schools' written policy suggested that such bonus compensation related to students' completion of one academic year of study, in reality the bonuses were tied directly to

---

[4] Note the significant differences between the chart contained in the Manual and the charts contained in the Procedure Directive.

[5] Defendant Schools use their academic "module" as the relevant time period for measuring AC performance. Each module is approximately one month long.

enrollments—the bonuses were only paid if ACs achieved certain start quotas. Defendant Schools' Completion Bonus plans merely used students who completed an academic year of study as a convenient way to hide bonuses tied to the enrollment of *other* students.

177.   As explained below, Defendant Schools did not actually pay compensation pursuant to their written compensation plans.

178.   On information, Relators believe and allege that Defendant Schools' written compensation plan was (and is) drafted to deceive the Department of Education and Defendant Schools' accrediting agency concerning Defendant Schools' compensation practices and to provide cover for Defendant Schools' actual compensation practices, which more obviously violate the Incentive Compensation Ban.

**Ms. Brooks' Experience with Incentive Compensation**

179.   Ms. Brooks began working at SHC as an AC on March 2, 2009.

180.   Ms. Brooks was paid a base salary of $42,000 per year,[6] and she was ostensibly eligible to receive bonuses for those students that she enrolled who completed 36 credit hours ("Potential Bonus Students").

181.   While Defendant SHC's written compensation plan, described above, stated that Ms. Brooks would receive a Completion Bonus for each and every student that Ms. Brooks enrolled who completed 36 credit hours of study, SHC

---

[6] Ms. Brooks' starting salary was $38,000 per year, which was increased to $42,000 in September 2009.

imposed three additional requirements on Ms. Brooks in order to receive these bonuses.

182.   Specifically, to receive a "completion" bonus, Ms. Brooks and the other ACs had to (1) start a total of five (5) students in the same module as the Potential Bonus Student started, (2) achieve a three-module average of five (5) starts per module, calculated using the modules before and after the module in which the Potential Bonus Student started, and (3) attain an interview-to-start ratio ("conversion rate") of at least thirty-three percent (33%) in the same module that the Potential Bonus Student started (collectively, "the Enrollment-Related Requirements").

183.   As a result, SHC's bonus compensation system, as actually practiced and carried out, provided incentive payments based directly and indirectly upon Ms. Brooks' and the other ACs' success in securing enrollments. Therefore, SHC's compensation system violated the ban on the payment of incentive compensation by schools receiving Title IV funding, 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(i), and did not qualify under the then-existing safe-harbor regulations, 34 C.F.R. § 668.14(b)(22)(ii) (July 1, 2010), including Regulatory Safe Harbor A, 34 C.F.R. § 668.14(b)(22)(ii)(A) (July 1, 2010), and Regulatory Safe Harbor E, 34 C.F.R. § 668.14(b)(22)(ii)(E) (July 1, 2010).

184.   Jesse Hafen, the Director of Admissions at Defendant SHC's Orem campus, told Ms. Brooks when she began working as an AC that she had to meet the three Enrollment-Related Requirements in order to receive a single

49

"completion" bonus. Mr. Hafen and his assistant applied these Enrollment-Related Requirements when determining Ms. Brooks' eligibility for bonuses. Mr. Hafen was Ms. Brooks' direct supervisor during her entire tenure at SHC.

185.   Ms. Brooks was aware from the statements of Mr. Hafen and others that she would not receive any "completion" bonuses for her Potential Bonus Students unless she met the three Enrollment-Related Requirements in every module.

186.   Ms. Brooks recalls that the version of the Manual that she received when she first started working for Defendant SHC in March 2009 included a chart that showed how Defendant SHC determined ACs' bonuses. That chart associated particular bonus awards with an AC's number of starts and three-module average number of starts. In mid- to late-2009, Defendant SHC demanded that all ACs surrender all copies of the Manual to management. Defendant SHC then issued a revised version of the Manual that omitted the chart directly connecting starts to bonuses. The new version of the Manual that Ms. Brooks and the other ACs received had been scrubbed of all references connecting start-related performance measures to bonuses. Even though the Manual omitted such terms and conditions, in practice, Defendant SHC continued to use starts and other start-related measures to determine ACs' bonuses.

187.   Ms. Brooks was a top performing AC at SHC's Orem campus. Ms. Brooks received significant bonus payments, which SHC paid to Ms. Brooks semi-monthly, or twice a month, with and in addition to her regular paycheck as they

were earned. Because the bonus payments fluctuated from paycheck to paycheck, Ms. Brooks' total monthly compensation also changed from month to month.

188.   SHC denied Ms. Brooks bonuses for numerous Potential Bonus Students who satisfied the credit-hour requirement due to her failure to achieve the Enrollment-Related Requirements. For example, SHC denied Ms. Brooks "completion" bonuses for Potential Bonus Students who started in December 2009 because she had an interview-to-start conversion ratio of thirty-two percent (32%), which was 1% below SHC's required minimum of thirty-three percent (33%). In another case, SHC denied Ms. Brooks "completion" bonuses because she only had three (3) starts in March 2010, below SHC's required quota of five (5) starts. If Ms. Brooks had successfully enrolled and started more students during the months in question, she would have been paid bonuses for all of the Potential Bonus Students who had started those months. As such, SHC's bonus system, as actually practiced and implemented, was structured to maximize the ACs' enrollment of students. Because of the way SHC structured the bonus system, the single greatest factor that determined whether an AC would receive a bonus was the number of students the AC enrolled and started. All other factors were relatively inconsequential, including whether any given student completed the required number of credit hours.

189.   SHC paid Ms. Brooks numerous bonuses for meeting the Enrollment-Related Requirements. Ms. Brooks' bonuses ranged from $300 to $1100 per student. The amount of the bonus Ms. Brooks received depended on two factors: (1) her

conversion rate for the module in question—the higher the conversion rate, the larger the bonus—which is itself an indirect measurement of enrollment (interviews divided by starts), and (2) whether Ms. Brooks personally generated the potential student lead on her own, for which she was paid more than if she received it from another source, such as the call center.

190.   The bonuses that Ms. Brooks received for meeting the Enrollment-Related Requirements were substantial. Often, the semi-monthly bonus payments equaled or exceeded Ms. Brooks' base salary. For example, on her check from the pay period December 1 through December 15, 2010, Ms. Brooks' year-to-date wages were $31,618.50 (net of taxes and withholdings) while her year-to-date bonuses were $31,450.00.

191.   Thus, the bonuses provided a significant incentive to Ms. Brooks and the other ACs to meet the Enrollment-Related Requirements by enrolling and starting more students. On information, Relators believe and allege that Ms. Brooks' experiences with the bonus compensation system were typical of other ACs working for Defendant SHC and Defendant Schools generally.

192.   Defendant SHC's management communicated start quotas for each module to each of the campuses, and on information, Relators believe and allege that administrative officials, including but not limited to Mr. Hafen, were promised and paid incentives for meeting the start quotas. On information, Relators believe and allege that the same practices occurred at the other Defendant Schools.

193.    On at least three occasions, Ms. Brooks personally received a bonus because the Orem campus, where she worked, met its overall start goal for the module. These incentive compensation payments violated the Incentive Compensation Ban and do not even potentially qualify for a safe harbor.

194.    Similarly, SHC and its administrative officials provided each AC with a personal start goal for each module. On information, Relators believe and allege that the individual start goals were tailored to each AC in such a way that the goals always pushed the AC to enroll and start more students. For example, if an AC routinely started 5 students in a module, SHC would set that AC's goal as 7 starts; if an AC routinely started 7 students in a module, SHC would set that AC's goal as 9 starts. ACs were always expected to enroll and start more students.

195.    To further incentivize ACs to meet their start quotas, Mr. Hafen would periodically offer prizes to the ACs for achieving certain numbers of enrollment or starts ("non-'completion' bonuses"). Mr. Hafen would award these prizes through contests that were based on enrolling or starting new students at SHC.  The prizes usually consisted of cash payments or expensive consumer electronics products. Mr. Hafen would offer and pay these incentives at least monthly, if not more frequently.

196.    As an example of one of these "contests," in or about March 2010, Mr. Hafen communicated to the ACs at SHC, including Ms. Brooks, that any AC that met his or her individual goal on the start list would receive an extra $250 on their paycheck. Further, Mr. Hafen communicated to the ACs at SHC's Orem campus

that any AC that met his or her individual goal on the start list would be eligible for a drawing for a 32" flat screen television.

197.   On other occasions, Mr. Hafen ran similar contests where he gave Ipods as prizes. Ms. Brooks, among other ACs, received an Ipod for achieving her start goals.

198.   In addition and on many occasions, Mr. Hafen gave free movie tickets to ACs who met certain goals relating to enrollments, including best interview-to-start conversion rates or highest starts or enrollments, despite the fact that he knew that such bonuses are strictly prohibited under federal law. Ms. Brooks, as well as other ACs, were given free movie tickets for achieving the specified start goals.

199.   Additionally, Mr. Hafen would from time to time provide cash incentives, such as a $20 bill, to the first AC so set up a certain number of interviews on a particular day or to the first AC to reach a certain number of enrollments on a particular day.

200.   Mr. Hafen also ran a contest where the incentive to the ACs for attaining a certain number of starts and a certain conversion rate was a night's stay at a resort in Park City, Utah. Mr. Hafen awarded this prize to another AC.

201.   Ken Plant, the Executive Director of SHC's Orem campus, and Dr. Stephen Babb, the Dean of Education at the campus, openly referred to the admissions department as the "cesspool" because of the cutthroat competition that existed between the ACs over the enrollment-related contests.

202.   Ms. Brooks is also aware that SHC's Orem campus paid bonuses to its FAOs for obtaining financial aid for prospective students. On information, Relators also believe and allege that the FAOs at Defendant Schools' other campuses received large bonuses for completing financial aid award files for students. Such bonuses also violate the Incentive Compensation Ban. *See* 20 U.S.C. § 1094(a)(20) (banning incentive compensation for securing financial aid); 34 C.F.R. § 668.14(b)(22)(i) (same).

203.   The Department of Education was scheduled to audit SHC's Orem campus, where Ms. Brooks worked as an AC, in approximately March 2011. Prior to the Department of Education's audit, Barbara Thomas, SHC's Chief Operations Officer, "coached" Ms. Brooks and the other ACs to provide acceptable responses to questions concerning SHC's enrollment practices. For example, Ms. Thomas made sure that the ACs were prepared to answer "No" to the question: "Are you pressured to enroll or start prospective students in any way?" Ms. Thomas worked closely with Barney and took her instructions directly from him.

204.   Several times a year, all ACs, FAOs, and directors of admission who work for SHC and the other Defendant Schools gather at a convention in Las Vegas, Nevada, to discuss tactics to boost enrollment, among other topics.

205.   Ms. Brooks attended several Las Vegas conferences in 2009 and 2010. At these conferences, she met ACs and FAOs from SHC's other campuses, as well as from the campuses of the other Defendant Schools. At these conferences, SHC and the other Defendant Schools would distribute written policy manuals to their ACs.

206.    At    these    approximately    quarterly    conferences,    upper-level management of Defendant Schools specifically reminded ACs from all Defendant Schools about the requirements for earning bonuses, including the Enrollment-Related Requirements. All Defendant Schools used the Enrollment-Related Requirements to determine whether ACs were eligible for bonuses.

207.    During the conferences, Defendant Schools conveyed a clear message that enrolling students was the most important measure of success for ACs. One of the most important awards given out during the Las Vegas conferences is the "rock" trophy, which is awarded to the campus with the highest three-month average conversion rate. This award contributes to a corporate culture that prizes any enrollments or starts, regardless of whether the students who are enrolled are capable of completing the academic program or can benefit from the education offered by Defendant Schools.

208.    Other awards given out to ACs during the Las Vegas conferences are for the most enrollments or starts by an individual AC and the highest interview-to-enrollment conversion ratio by an AC. These awards also contribute to a corporate culture that (1) prizes any enrollments or starts, whether those enrollments or starts are by qualified students who can benefit from the education offered by Defendant Schools; and (2) prizes an AC's ability to convert a potential student into a tuition-paying student, whether or not the potential student is qualified or can benefit from the education offered by Defendant Schools.

209.   Periodically, the top performing ACs (and their directors) from the various campuses of Defendant Schools are provided an all-expenses-paid vacation for "elite" training. Defendant Schools measure performance for this incentive bonus based on conversion rates, which is a measure of starts. ACs are continually competing for these top positions. When ACs failed to enroll enough students to qualify for this benefit, it would motivate them to enroll more students in subsequent periods so they could qualify for the later trips.

210.   Relevant to Ms. Wride's experiences, set forth below, several SHC faculty members and other employees admitted to Ms. Brooks that many of SHC's faculty members did not meet the qualification requirements of the accrediting standards.

211.   In approximately March 2011, Ms. Brooks resigned her employment with SHC after SHC was unable accommodate her with a flexible work schedule, which she needed in order to care for her two children.

### Ms. Wride's Experience With Incentive Compensation

212.   Ms. Wride was hired on or about July 10, 2009, by David Sambrano, Dean of the Graduate School for SHC's Orem campus, as an AC for the graduate school and as an executive assistant to Mr. Sambrano.

213.   At the time she was hired, Ms. Wride was also a student at SHC, having enrolled on or about February 25, 2009, in SHC's respiratory therapy program.

214.   When SHC hired Ms. Wride, Mr. Sambrano and Mr. Hafen told her that she would receive a bonus for each student that she enrolled in the graduate school who completed fifteen (15) credit hours of coursework.

215.   Because there were not enough prospects for the graduate school, Ms. Wride soon began recruiting students for SHC's undergraduate programs as well.

216.   At the time, Mr. Hafen told Ms. Wride that she would also receive a bonus for each student that she enrolled in SHC's undergraduate-level programs who completed thirty-six (36) credit hours.

217.   Ms. Wride was successful in enrolling students in both SHC's graduate and undergraduate schools. Consistent with the statements of SHC's management concerning bonuses, Ms. Wride carefully tracked the credit-hour progress of the students that she enrolled.

218.   After the first group of the students that Ms. Wride enrolled into SHC's undergraduate programs completed thirty-six (36) credit hours in approximately summer 2010, Ms. Wride went to Mr. Hafen to request her bonuses. Ms. Wride took the transcripts for the relevant students to Mr. Hafen to demonstrate that the students completed the requisite credit hours.

219.   Mr. Hafen filled out a "Certificate of Completion" on behalf of Ms. Wride and Ms. Wride signed the Certificate, thereby officially requesting "completion" bonuses.

220.   Mr. Hafen then took the information to Ken Plant, Executive Director of the Orem Campus of SHC and regional director of SHC's southern region.

221.    About a week later, Mr. Hafen told Ms. Wride that she would receive bonuses for some, but not all, of the students that she enrolled.  When she asked Mr. Hafen why she was not receiving bonuses for all of the students she enrolled, Mr. Hafen told her she had to discuss the matter with Mr. Plant.

222.    Ms. Wride went to Mr. Plant to discuss the issue and asked why she was not receiving bonuses for all of the students that she enrolled, as she was promised.

223.    Mr. Plant told her that she was not eligible to receive the "completion" bonuses because she had not met all the requirements to receive them. Mr. Plant informed her that there were other Enrollment-Related Requirements for receiving bonuses that applied to all of the other ACs and that she also had to meet those requirements in order to receive a bonus.

224.    Specifically, Mr. Plant told Ms. Wride that she was not eligible for bonuses on the other students because she had not met the required number of starts. Mr. Plant told Ms. Wride that the reason she did not receive a bonus for the some of the students she enrolled who completed the required number of credit hours is because she "didn't meet the starts that everybody else has to meet" and failed to meet the three-module start average requirement that applied to all other ACs' bonuses.

225.    Mr. Plant referred Ms. Wride back to Mr. Hafen to discuss the Enrollment-Related Requirements in detail. Mr. Hafen told Ms. Wride that in order to receive a "completion" bonus, she also had to achieve a certain number of starts

in the same module as the Potential Bonus Student started. Specifically, Mr. Hafen told Ms. Wride that she had to start at least six (6) students per module in order to qualify for the bonus. In addition, Mr. Hafen told Ms. Wride that she also had to have a three-module average of six (6) starts. Mr. Hafen told Ms. Wride that she had to achieve these other requirements during the same module as the Potential Bonus Student had started. (Ms. Wride believes that SHC did not impose the conversion-rate requirement on her because she was not a full-time AC and split her time as an administrative assistant. Because Ms. Wride did not have regular "interviews" with potential students, like the other ACs, SHC could not compute a conversion rate for her.)

226.   This same process—in which Ms. Wride would demonstrate that students she enrolled had completed the required number of credit hours to Mr. Hafen, and Mr. Hafen would confer with Mr. Plant about whether Ms. Wride met the other Enrollment-Related Requirements—continued for several months.

227.   Ms. Wride did receive bonus payments when she met the Enrollment-Related Requirements, which SHC paid her semi-monthly, with and in addition to her regular paycheck as they were earned. Because the bonus payments fluctuated from paycheck to paycheck, Ms. Wride's total monthly compensation also changed from month to month.

228.   Over the course of her employment with SHC, Ms. Wride received four (4) or five (5) bonus payments, each totaling from $1,200 to $4,000. Because Ms. Wride's base salary was approximately $33,000 per year when she started (which

SHC later increased to $37,000 per year), the bonus payments she received were large relative to her base salary. Occasionally, the bonus payments exceeded Ms. Wride's base semi-monthly salary.

229.   Ms. Wride received these "completion" bonuses only because she met the Enrollment-Related Requirements of six (6) total starts in the same module that the Potential Bonus Student started, as well as a three-module average of six (6) starts.

230.   Ms. Wride is aware that SHC paid bonuses on a similar basis to the other ACs.

231.   Additionally, several ACs also served as FAOs when needed. Ms. Wride is aware that FAOs were paid large bonuses based on the number of students "pushed through" the financial aid system. Such bonuses violate the Incentive Compensation Ban.

232.   Ms. Wride is also aware of the non-"completion" bonuses offered to ACs to motivate them to enroll students. On at least a monthly basis, Mr. Hafen would offer bonuses to ACs for attaining certain enrollment-related goals, such as best interview-to-start conversion rate, the first AC to achieve a certain number of enrollments in a given time period, or for the most number of starts or enrollments in a certain period of time, despite the fact that he knew that such bonuses are strictly prohibited under federal law. Mr. Hafen was constantly trying to find prizes for his bonus contests. These bonuses usually took the form of cash payments or expensive consumer electronics products, such as Ipods. On one occasion, Mr. Hafen

raffled a big-screen television as the prize. ACs were only eligible to participate in the raffle if they attained certain enrollment objectives.

233.   On many occasions, Mr. Hafen gave free movie tickets to ACs who met certain goals, including best interview-to-enrollment conversion rates or the most starts or enrollments.

234.   Mr. Hafen told the ACs not to tell anyone about these bonuses because he admitted that he could get in trouble for them.

235.   Ms. Wride also attended many of the Las Vegas conferences in 2009 and 2010, where Defendant Schools emphasized that enrolling students was the most important measure of success for ACs, regardless of whether the students who were enrolled were capable of completing the academic program or could benefit from the education.

**Bonuses Paid To Admissions Consultants at Other Campuses**

236.   Consistent with the experiences of Relators, as set forth above, the other campuses of Defendant Schools paid bonuses to ACs based on starts and/or their interview-to-start ratio—the "conversion rate," which is also a measure of success in enrolling students. Numerous ACs at Defendant Schools' other campuses received such bonuses over various years.

237.   Defendant Schools' other campuses paid the bonuses to the ACs on substantially the same basis as Relators received them. For example, if the ACs failed to satisfy the Enrollment-Related Requirements, they were not paid bonuses for students who completed the requisite number of credits, just like Relators.

238.   During certain periods, the Director of Admissions over the Boise and Nampa, Idaho, campuses would fill out the value of the "Completion Certificates," described further herein, based on starts and/or interview-to-start rate. If the AC failed to achieve the enrollment-related requirements, the Director of Admissions would put a zero value on the Completion Certificates. On information, Relators believe and allege that the Campus Director over the Idaho Falls campus of Defendant Schools adopted the same AC compensation practices.

239.   ACs at Defendant Schools' Wyoming and Colorado campuses were also paid bonuses based on the interview-to-start rate, or the conversion rate, and the number of starts.

240.   On information, Relators believe and allege, for the reasons set forth elsewhere in this Third Amended Complaint, that ACs at all of Defendant Schools' campuses were paid bonuses based on their success in enrolling students on essentially the same basis as Relators.

241.   On information, Relators believe and allege that some ACs at Defendant Schools' campuses were paid as much as $50,000.00 to $60,000.00 per year in bonuses.

242.   On information, Relators believe and allege that it was "common knowledge" among employees at Defendant Schools' campuses, including among the ACs, that bonuses were paid based on the number of starts (and similar measures of enrollment success), not based on the quality of the potential student enrolled or whether the student actually graduated.

## Defendant Schools Closely Track ACs' Starts

243.   Defendant Schools closely monitor and track the starts of each AC on a daily, weekly, and annual basis. Each AC's enrollment activity was (and is) included in "Daily Admissions Reports" and monthly "Admissions Performance Reports," which, on information and belief, were (and are) distributed to the ACs of Defendant Schools. Because these reports list the performance of other ACs, ACs are invited to compare the number of students they enrolled with the numbers achieved by other ACs and to compete to enroll the most students. Those ACs who enrolled the most students received special recognition and valuable rewards.

244.   Defendant Schools emphasize the importance of enrollments and starts to the ACs by providing these performance reports to ACs on a regular basis. For example, each day, Defendant SHC provided a Daily Admissions Report to each of its ACs. This report showed the number of starts that each AC at each of Defendant Schools had obtained during the module and invited ACs to compare their starts against other ACs. On information, Relators allege and believe that all Defendant Schools provide the Daily Admissions Reports to all ACs on a daily basis to foster competition among the ACs over the number of the starts they generate.

245.   Defendant Schools identify three "Top Achievers" across all Defendant Schools on the Admissions Performance Reports that are circulated to each AC at each Defendant School after each module. The "Top Achievers" identified on these reports are selected based on the number of starts generated during the module in question.

246. The Procedure Directive mentions that a "Company-wide Top Achievers report," which "ranks the results of all currently employed Admissions Consultants and enrolling Directors of Admission," is distributed to all Campus Directors and Directors of Admission. (Procedure Directive at 5, Exhibit 6.)

### Enrollment-Related Bonuses Paid to Supervisors and Managers

247. In addition to bonuses paid to ACs and FAOs, Defendant Schools also paid bonuses to Campus Directors, Deans, Assistant Deans, and Directors of Admission for achieving certain enrollment-related quotas or goals. For example, Campus Directors were paid bonuses on a quarterly basis according to "Bonus Plans" issued by Defendant Schools. Campus Directors were allowed to allocate possible bonus money in their Bonus Plans to several performance criteria set by Defendant Schools. The criteria included in the Bonus Plans included the following enrollment-related categories: interview conversion (interview-to-start ratio), retention, and upgrades. The "Upgrade" category referred to the number of students the campus convinced to enroll in a more advanced degree. For example, turning an associate's degree student into a bachelor's degree student was considered an "upgrade." All three of these criteria are a direct or indirect measure of success in enrolling students, and the Incentive Compensation Ban prohibits the payment of any type of bonus relating to such measures.

248. Campus Directors, including the former Campus Director at the Wyoming campus of Defendant Schools, received bonuses for successfully achieving benchmarks that were directly and indirectly tied to enrolling students. On information, Relators believe and allege that the Campus Directors over the Boise

and Nampa campuses in Idaho and over the Phoenix campus in Arizona also received bonuses based on the interview conversion rate of their recruiters. These bonuses did not even ostensibly qualify for any regulatory safe harbor and violated the Incentive Compensation Ban.

249.   On information, Deans and Assistant Deans were also paid based on Bonus Plans that included criteria tied to enrollments—specifically retention and upgrades. These bonuses did not even ostensibly qualify for any regulatory safe harbor and violated the Incentive Compensation Ban.

250.   On information, Relators believe and allege that Defendant Schools paid bonuses to Directors of Admission for achieving certain enrollment-related quotas or goals. These bonuses did not even ostensibly qualify for any regulatory safe harbor and violated the Incentive Compensation Ban.

### The Effects of Defendant Schools' Unlawful Practices

251.   Defendant Schools' incentive compensation practices and emphasis on enrollments, regardless of a student's ability to benefit from the education, resulted in ACs enrolling students who were incapable of benefitting from the educational programs. For example, Ms. Brooks and Ms. Wride observed other ACs enrolling students with severe cognitive disabilities, as well as others with severe mental disabilities. One such student spent class time talking to inanimate objects. Relators are also aware that at least one AC affirmatively recruited "students" from known homeless populations, persuading them to enroll by telling them that taking classes would give them a warm place to go during poor weather.

252.   These are not isolated incidents. At Defendant Schools' Colorado Springs campus, the Schools' administration ensured that a student with severe cognitive disabilities was allowed to enroll, over the objections of lower-level employees. According to sworn testimony from a former employee and relatives of the student, this student had a "mental disability" that was readily apparent even to children who interacted with him; would routinely express "incoherent" thoughts; had "delayed and choppy" speech; would ask the same questions repeatedly in a conversation, with no apparent recollection of the earlier answers; and, according to the dean of the school, "shouldn't have been in school" at Defendant Schools. Even though the student, due to his cognitive disabilities, lived with parents, Defendant Schools failed to even disclose to his parents that the student was taking classes and incurring "an exorbitant amount in student loans"—in excess of $50,000. It appears that someone at Defendant Schools even went so far as to ghost write a letter for the student in order to allow him to continue taking classes, so the Schools could continue receiving funding from Title IV, HEA Programs for the student, after he failed numerous classes and was placed on academic probation.

253.   Similarly, an instructor at Defendant Schools' Ft. Collins, Colorado, campus from January 2008 to October 2010, stated under oath that she "had several mentally challenged students who were unable to pass their classes and eventually dropped out." However, "[b]efore those students eventually dropped out, [she] was counseled by the Dean of Education and then the President of the campus, Joel Scimeca, to pass those students along even though they were failing."

254.   On information, Relators believe and allege that at certain times relevant to this Third Amended Complaint, some of Defendant Schools' Idaho ACs specifically targeted their recruiting efforts at single mothers at government assisted daycare facilities and visitors to payday lending and government assistance offices. These recruiting techniques were authorized by Jesse Hafen when he was acting as Regional Director.

255.   On information, Relators believe and allege that the Idaho campuses of Defendant Schools enrolled homeless students, including students who lived in vehicles outside of the campus, so that certain ACs would hit their start quotas to be eligible for bonuses. On information, Relators believe and allege that Defendant Schools' Salt Lake City/Murray campus enrolled students who were obviously homeless.

256.   At Defendant Schools' Denver campus, prospective students receiving food stamps and other government assistance were enticed to enroll in the Schools with promises of tuition "discounts" that still required them to incur tens of thousands of dollars in debt from Title IV, HEA Programs.

257.   When ACs did not receive bonuses for failing to achieve the Enrollment-Related Requirements, they would focus on achieving those numbers in subsequent periods. The bonus structure motivated ACs to focus on starts and, particularly, starting every prospect.

258.   The incentives to enroll students caused ACs to misrepresent facts to potential students. As one AC explained in sworn testimony, "[m]any admission

representatives would tell prospective students anything to get them enrolled in the school in order to make their quotas to earn bonuses."

259.   It was a common practice among ACs at Defendant Schools' Salt Lake City/Murray campus and their campuses throughout Colorado to recruit students into the Medical Specialties program by telling the students they could upgrade to the nursing program. However, only a very small percentage of graduates from the Medical Specialties program were accepted into nursing programs—a fact that was hidden from the prospective students.

260.   This is just one example of the misleading information that ACs used to recruit students to enroll for the purpose of obtaining bonuses. Indeed, Defendant Schools have been found to have engaged in misleading advertising by the Board of the Colorado Department of Private Occupational Schools. In 2012, the Board determined that Defendant Schools' Colorado campuses had used "student aid as an inducement to enroll in violation of the deceptive sales and trade provision[s]" of Colorado law.

261.   Similarly, Defendant Schools' incentive compensation practices, which motivate ACs to use high-pressure sales tactics, resulted in ACs unduly influencing and persuading prospective students with serious misgivings about enrolling in school and assuming significant debt to pay for school to enroll in Defendant Schools. For example, although many prospective students who "interviewed" at Defendant SHC's Orem campus expressed a desire to enroll in academic programs that Defendant SHC's Orem campus did not offer, ACs at the Orem campus were

instructed to convince the prospective students that they should study one of the four programs that the Orem campus offered. Defendant Schools' pressured enrollment of students has resulted in numerous students dropping out of the programs and defaulting on loans provided under the Title IV, HEA programs.

262.   For example, Defendant SHC's FY2008 three-year cohort default rate was 24.25%. The FY2008 three-year cohort default rates for the other Defendant Schools were as follows: Defendant CAA: 39.74%; Defendant CAD: 32.02%; and Defendant CCSD: 30.67%. *See* Department of Education, FY2008 Cohort Default Rates (Updated April 2011), Column: "Trial 3-Year Default Rate," *available at* http://studentaid.ed.gov/about/data-center/student/default.

263.   The 2010 two-year cohort default rate for Defendant SHC's students was 19.7%. The 2010 two-year cohort default rates for the other Defendant Schools were as follows: Defendant CAA: 19.9%; Defendant CAD: 26.2%; and Defendant CCSD: 15.3%. *See* Department of Education, Official 2-Year Cohort Default Rate Search for Postsecondary Schools (Fiscal Years 2010, 2009, 2010), *available at* http://www.nslds.ed.gov/nslds_SA/defaultmanagement/search_cohort _2yr.cfm.

264.   The high-pressure sales tactics that Defendant Schools teach their ACs and incentivize through illegal bonuses have resulted in an astonishing dropout rate at Defendant Schools. For example, according to Defendant CollegeAmerica's *own data*, more than 70% of students who enroll at the school dropout before graduating, 26% dropout within 90 days of the beginning of their term, and 46% of

70

all students dropout within 180 days. Almost all of these students incur debt from Title IV, HEA programs, often tens of thousands of dollars in debt.

265.  Graduation rates at Defendant Schools are dismal. For example, for the 2010-11 academic year, the mean graduation rate among Defendant Schools was a scant 40%. (Information reported from the mean across all reporting Defendant Schools; information derived from data available from Department of Education's Integrated Postsecondary Education Data System.)

266.  Defendant Schools' use of the interview-to-start conversion rate as the measure of performance for many, if not most, of their incentive compensation programs has a particularly perverse effect on ACs' recruiting practices. Whereas pure start-based quotas do not punish AC's for determining that a particular prospect is not genuinely interested in Defendant Schools' programs or cannot benefit from the education that Defendant Schools provide, the conversion rate measures ACs on their ability to convince *each and every* prospect to enroll, regardless of whether the student really desires to attend or can actually benefit from the education. The use of the conversion rate as a measure of AC performance—and determining eligibility for bonuses based on that measure—punishes ACs for determining that, for example, a prospective student cannot benefit from Defendant Schools' programs or does not want to study the programs offered at a particular campus. Because the conversion-rate metric punishes ACs who determine a prospective student is not a good fit for the school, it deters ACs

from even attempting to elicit information from a prospective student that might reveal the student is not a good fit.

## Defendant Schools Have the Same Management and Policies, Which Were Formulated by Carl Barney

267.   Until January 1, 2013, when Defendant Schools merged into CEHE, Carl Barney was the sole shareholder and owner of Defendant Schools. As the sole shareholder of Defendant Schools, Barney was motivated to maximize the Schools' revenues and profits. In 2010, Barney received a distribution from the Schools of $23,864,000.00. This was in addition to the $28,954,000.00 that Defendant Schools paid to CollegeAmerica Services, Inc., another company wholly owned by Barney, as well as $3,485,000.00 that Defendant Schools paid to companies owned by Barney associated with leasing real estate.

268.   Similarly, in 2011, Barney received a shareholder distribution from Defendant Schools of $39,356,000.00. This was in addition to the $30,809,000.00 that Defendant Schools paid to Barney's company CollegeAmerica Services, Inc., as well as $4,323,000.00 that Defendant Schools paid to companies owned by Barney associated with leasing real estate.

269.   On information, Relators believe and allege that Barney was a corporate director of each Defendant School until their merger. On information, Relators believe and allege that Barney continues to maintain a central management role in CEHE and the individual schools that are now part of CEHE. Barney has played and continues to play an active and central role in all significant

management decisions of Defendant Schools, including their policies and practices relating to compensation.

270.   On information, Relators believe and allege that Barney was the corporate president of each Defendant School until their merger or held that position with each Defendant School in the recent past.

271.   Barney helped to formulate the policies and practices of all Defendant Schools, particularly policies and practices related to AC compensation. According to Defendant Schools' Chief Executive Officer's sworn testimony, "[t]he compensation plans at issue in this case relating to [Defendant Schools'] Admissions Consultants were created in-house with the primary involvement of Carl Barney (Chairman and formerly the sole shareholder) and Barbara Thomas (Chief Operating Officer at the time)" and "[t]he compensation plans were primarily created by Mr. Barney."

272.   Barney also personally authored and sent numerous "Procedure Directives," "Management Memos," and "Information Letters"—categories of official corporate communication he devised—to campus directors, deans, and other employees, including ACs. These messages were mostly sent from Barney's personal email address. Often, Barney would require employees to acknowledge their receipt of his communications by requiring written confirmation from them, and he would track whether the employees had sent their acknowledgments. As a result of Barney's personal involvement in establishing business policies and practices for each Defendant School, Defendant Schools have (and had at all times relevant to

this Third Amended Complaint) identical policies and practices with respect to employee compensation and bonuses.

273.   Barney personally signed PPAs for Defendant Schools at various times, including the 2001 PPA for Defendant SHC.

274.   Defendants Schools collectively used CollegeAmerica Services, Inc., another company owned, managed, and operated by Barney, to provide centralized management and operational support to each of Defendant Schools. CollegeAmerica Services, through Barney, may have also played a role in establishing collective policies and practices for all Defendant Schools, including policies and practices relating to AC compensation. As of January 1, 2013, CollegeAmerica Services also merged into CEHE. According to Barney's sworn testimony, CollegeAmerica Services "continues to provide the same services . . . as a division of CEHE."

275.   All Defendant Schools compile information about the performance of ACs at each of their campuses into a single report, which, on information and belief, all Defendant Schools distribute to each of their ACs. On some of these reports, Defendant Schools rank their ACs based on the number of starts, and the ACs from all Defendant Schools are ranked on the same scale and compared with one another. These reports specifically recognize the achievement of the top three ACs, measured in terms of starts during the last module, from across all Defendant Schools. Thus, the top three achieving ACs for any given report could be from different Defendant Schools. Such practices serve to highlight how Defendant

Schools employ collective policies and standards for ACs and, particularly, for measuring ACs' performance.

276.   All Defendant Schools collectively publish a single course catalog for distribution to students and prospective students.

277.   All Defendant Schools prepare a single employment manual for ACs (i.e., the Manual), which, on information and belief, all Defendant Schools provide to all new ACs.

278.   Defendant Schools use the same application form for employees and share human resource functions.

279.   All Defendant Schools send their ACs to the same conventions in Las Vegas on approximately a quarterly basis. At these conventions, ACs from all Defendant Schools are provided the same instruction and training—including instruction about Defendant Schools' compensation system for ACs and the Enrollment-Related Requirements for bonuses. At these combined conventions, Defendant Schools also collectively recognize the top achievers among all Defendant Schools, which recognition is typically based on the number of starts.

280.   Defendant Schools have shared policies and practices for almost all aspects of their businesses, including for employee compensation and bonuses. Because Defendant Schools use the same compensation practices, Relators' experiences at Defendant SHC's Orem campus are materially similar to the experiences of ACs at Defendant SHC's other campuses and at all other Defendant Schools. Likewise, the experiences of other employees, including campus directors,

at certain campuses were materially similar to the experiences of other similarly situated employees at other compauses

### D.   **Defendant Schools' Compensation Practices Did Not Qualify for Regulatory Safe Harbor**

281.   As previously set forth in this Complaint, in 2002, the Department of Education issued regulations accompanying the Incentive Compensation Ban to clarify that under regulatory safe harbors, schools could pay certain types of compensation without violating the Incentive Compensation Ban. The Department of Education eliminated these regulatory safe harbors in 2011.

282.   Under Regulatory Safe Harbor A, schools were allowed to pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation [wa]s not adjusted up or down more than twice during any twelve month period, and any adjustment [wa]s not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (July 1, 2010).

283.   Defendant Schools' above-described conduct, however, did not fall within the purview of, or satisfy, Regulatory Safe Harbor A for several reasons.

284.   First, Defendant Schools' compensation system, as practiced, was not eligible for Regulatory Safe Harbor A because the compensation at issue was not "fixed compensation" within the meaning of Regulatory Safe Harbor A. Instead of a permissible "fixed annual salary" or "fixed hourly wage," the compensation at issue was a form of incentive compensation—bonuses. Indeed, Defendant Schools themselves stated that the bonus payments were "not part of regular

76

compensation." The bonuses were not "fixed compensation" because they constantly fluctuated in value—worth anywhere from nothing to many thousands of dollars. Additionally, the bonuses were not an hourly wage—they did not depend on the number of hours worked. Nor were they a form of salary—they were not regular payments of a certain amount.

285.   Second, because Defendant Schools paid the "completion" bonuses semi-monthly with and in addition to the regular paycheck, as the ACs earned the bonuses, the bonus payments caused ACs' compensation to fluctuate paycheck to paycheck. Stated otherwise, Defendant Schools adjusted ACs' compensation up or down twice each month—much more than twice during any twelve-month period.

286.   Third, with respect to the non-"completion" bonuses that Defendant SHC offered and paid to ACs, such bonuses were based solely and exclusively on enrollments. Such bonuses ran afoul of Regulatory Safe Harbor A, which expressly required that "any adjustment" in an ACs compensation "not [be] based solely on the number of students recruited, admitted, [or] enrolled."

287.   Under Regulatory Safe Harbor E, schools were permitted to pay "[c]ompensation that [wa]s based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter." 34 C.F.R. § 668.14(b)(22)(ii)(E).

288.   Defendant Schools' above-described conduct, however, did not fall within the purview of, or satisfy, Regulatory Safe Harbor E for several reasons.

289.    First, Defendant Schools did not pay the "completion" bonuses "based upon" a student's success in completing one academic year of study but instead paid bonuses to ACs for achieving the Enrollment-Related Requirements.   Defendant Schools structured the "completion" bonus requirements so that the Enrollment-Related Requirements determined whether an AC received a bonus. Unless an AC had met the minimum Enrollment-Related Requirements, the AC would receive *no* bonuses at all, irrespective of the number of students who had completed the required credit hours. Under Defendant Schools' compensation practices, an AC responsible for dozens of completing students would receive no bonus compensation if she failed to meet the Enrollment-Related Requirements, while another AC who had *just one* completing student could receive a substantial bonus for meeting the Enrollment-Related Requirements. The "completion" bonus was not "based upon" completions—the completions were just an administratively expedient way to try to hide the real criteria for the bonuses: the Enrollment-Related Requirements.

290.    Because the Enrollment-Related Requirements were far more difficult for ACs to attain, meeting the Enrollment-Related Requirements motivated AC activity. Although Regulatory Safe Harbor E was expressly designed to motivate recruiters, such as ACs, to focus on the quality of a potential student recruitment, rather than on the sheer number of students recruited, Defendant Schools' "completion" bonus system, by imposing the Enrollment-Related Requirements, returned the focus to the sheer number of students each AC enrolled.

291.   For example, under Defendant Schools' "completion" bonus program, an AC who, in a given module, carefully recruits four (4) students who each complete their first year of study receives no bonuses, while another AC who uses high-pressure sales tactics to recruit eight (8) students of dubious quality, only two (2) of which complete their first year of study, receives substantial bonuses. Because the average student at Defendant Schools receives at least some form of Title IV funding assistance, in both cases the Department of Education is likely paying significant sums to help the students pay for tuition at Defendant Schools. In the first case, the Department of Education has received good value for its investment— four students who are likely to graduate. In the latter case, the Department of Education has not received a good value for its investment—it paid for eight students, but received only two who were likely to graduate. However, Defendant Schools financially benefit more from the latter recruiter, who has generated eight students paying tuition using Title IV funding, than from the first recruiter, who has only generated four tuition-paying students.  Defendant Schools' compensation system was designed to encourage the latter, even though it is contrary to the letter and spirit of Regulatory Safe Harbor E.

292.   Second, none of the regulatory safe harbors, other than Regulatory Safe Harbor A, permitted schools to consider an employee's success in enrolling students as *any* part of the compensation decision. As a result, Defendant Schools' use of the Enrollment-Related Requirements as part of the "completion" bonus

program removed such compensation from the protections afforded by Regulatory Safe Harbor E.

293.   Third, none of non-"completion" bonuses that Defendant SHC offered and paid to ACs qualified for protection under Regulatory Safe Harbor E because none of those bonuses was related in any way to a student's completion of one year of study. Instead, all of the non-"completion" bonuses were directly tied to the ACs' success in enrolling and starting students.

294.   Consequently, Defendant Schools' compensation system, as practiced, violated the Incentive Compensation Ban and did not qualify for protection under the regulatory safe harbors.

**Defendant Schools Knowingly Violated the Incentive Compensation Ban**

295.   Under the False Claims Act,

the terms "knowing" and "knowingly"—

(A)  mean that a person, with respect to information—

(i)  has actual knowledge of the information;

(ii)   acts in deliberate ignorance of the truth or falsity of the information; or

(iii)  acts in reckless disregard of the truth or falsity of the information; and

(B)  require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

296.   Defendant Schools knew that their compensation practices violated the Incentive Compensation Ban and did not qualify for any regulatory safe harbors. Consequently, when Defendant Schools made statements and certifications in their

PPAs and other documents, such as compliance audit Management Assertions, G5 Certifications, school certifications associated with FDLP and FFELP loans, and MPNs, regarding their compliance with the Incentive Compensation Ban and eligibility for Title IV funding, those statements were knowingly false. Defendant Schools' compensation practices are inconsistent with Defendant Schools' statements and certifications of compliance in their PPAs, compliance audit Management Assertions, and other documents.

297. At the time that Defendant Schools stated in their PPAs and other documents that they would not make incentive payments to admissions personnel based on their success in securing enrollments, Defendant Schools knew that they were paying, and planned to continue to pay, admissions personnel incentive payments based directly on their success in securing enrollments.

298. Defendant Schools knew that their misrepresentations regarding compliance with the Incentive Compensation Ban would result in the payment of federal funds and that a reasonable and foreseeable consequence of such misrepresentations was that such funds would be paid out.

299. Defendant Barney, who personally authored Defendant Schools' compensation policies, has in the past admitted knowing that the relevant "regulations . . . prohibit *any kind* of incentive, bonus, commission, payable to admissions personnel based on recruiting students." (emphasis added). Barney has explained that the Inventive Compensation Ban is so fundamental, "[i]t's known by everybody . . . who has student federal financial aid."

300.    Barney has in the past admitted that he understands that payment of incentive compensation for recruiting students is a "serious violation" that carries with it "adverse consequences" for schools that engage in the practice. Barney has stated that he is aware that the payment of incentive compensation "is a violation of federal regulations" of a "serious nature."

301.    Defendant Schools' Manual discusses the Incentive Compensation Ban in detail, including the requirements for the regulatory safe harbors. Defendant Schools' Manual states that "[a]ccording to Federal Regulations [sic] . . . bonuses, commissions or other incentive payments may **not** be paid to any employee based, directly or indirectly, on **starts**. (Manual at 33 (emphasis in original), Exhibit 5.) The Manual then sets forth the pertinent parts of the Incentive Compensation Ban in full. (*Id.*) The Manual concludes that "according to the regulation, incentives relating to enrolling students is generally prohibited." (*Id.*)

302.    The Manual also explains and summarizes, generally correctly, the applicable regulatory safe harbors. The Manual attempts to explain how Defendant Schools' written compensation plan falls within Regulatory Safe Harbor E. However, Defendant Schools' actual compensation practices are materially different from their written compensation plan. These differences remove Defendant Schools' compensation practices from the protection afforded by Regulatory Safe Harbor E, as well as all other regulatory safe harbors.

303.    That Defendant Schools knew their compensation practices violate the Incentive Compensation Ban is demonstrated by the material differences between

Defendant Schools' written compensation plan, as set forth in Manual, and Defendant Schools' actual compensation practices. On information, Relators believe and allege that Defendant Schools prepared the written compensation plan for the Manual to demonstrate to the Department of Education and ACCSC that its "official" compensation plan complied with the Incentive Compensation Ban and applicable regulatory safe harbors. On information, Relators believe and allege that Defendant Schools failed to include their actual compensation practices in the Manual because they knew that such practices violated the Incentive Compensation Ban and failed to qualify for protection under the regulatory safe harbors.

304. That Defendant Schools knew that their compensation practices violated the Incentive Compensation Ban and did not qualify under any of the regulatory safe harbors is also demonstrated by the fact that in 2009, Defendant Schools retrieved (or attempted to retrieve) all copies of their Manual that contained charts and other possible information revealing that Defendant Schools determined ACs' bonuses based, at least in part, on the number of students each AC started and each AC's three-module average number of starts. Although Defendant Schools did not modify their compensation practices in any material way when they revised the Manual—and specifically continued to base AC bonuses on start-related performance measures, specifically the Enrollment-Related Requirements— Defendant Schools removed all references to such practices in their written Manual because they knew that such practices were unlawful.

305. Defendant SHC's Director of Admissions for the Orem campus admitted knowing that Defendant SHC's non-"completion" bonuses were not lawful.

306. Additionally, as described above, Defendant Schools' senior management "coached" ACs at Defendant SHC's Orem campus about how to respond to inquiries from auditors from the Department of Education concerning the propriety of Defendant SHC's enrollment practices, demonstrating that Defendant Schools knew their enrollment practices were inappropriate.

307. In another example of Defendant Schools' most senior management coaching ACs to lie to regulators about the bonuses—and specifically about whether the bonuses were tied to enrollments—Cristi Brougham, who was an AC at Defendant Schools' Denver campus, was told by Defendant Schools' Chief Operating Officer, Barbara Thomas, and other senior management to lie to regulators from the Colorado Board of Education about how bonuses were paid at the Schools. Ms. Brougham understood that the bonuses were based on the ACs' starts and interview conversion rate, as alleged elsewhere herein. When regulators from the Board of Education visited the Denver campus in February 2011, Ms. Brougham was selected to participate in what was supposed to be a confidential interview with the regulators. Before she went into the room with the regulators for the interview, Ms. Thomas and the campus's director, Nathan Larson, took her aside. Ms. Thomas and Mr. Larson told Ms. Brougham how to respond to questions about AC bonuses, specifically telling her that if asked about bonuses, she should tell them "we don't give bonuses based on enrollments." They told her to avoid suggesting bonuses were

based on starts, even though they were. As Ms. Brougham explained in sworn testimony, "I was instructed to lie to the auditors about the bonuses received by admissions representatives." After the meeting, which was supposed to be confidential, Ms. Thomas and Mr. Larson took Ms. Brougham aside and asked her what questions she was asked by the regulators and what answers she had given them.

308.   Ms. Brougham also recalls that white boards in the office where the ACs worked, which had the recruitment statistics for all of the ACs listed, were erased just before regulators and accreditors visited the campus.

309.   On information, Relators believe and allege that Defendant Schools' management had similar discussions with ACs and employees of other campuses to cover up Defendant Schools' true compensation practices.

310.   In 2012, ACCSC scheduled a "surprise" visit to various campuses of Defendant Schools. Although the visits were considered unannounced, Defendant Schools actually received several days' notice of the inspections. The day before the ACCSC's visit to the Salt Lake City/Murray campus, the written bonus policy for ACs was altered, the new version was printed and distributed, and employees were told to destroy the copies of the existing bonus policy so that ACCSC could not review them. Defendant Schools' Chief Operating Officer, Barbara Thomas, who came to the campus to supervise ACCSC's visit became irate when she found out that an employee still had a copy of the replaced bonus policy—changed the day prior—on her desk. Ms. Thomas berated the Campus Director, Robert Salmon,

about the fact the employee had the replaced policy where ACCSC could potentially view it.

311.   In another case, Barbara Thomas went to the Defendant Schools' Boise campus just before, and during, an ACCSC audit. Just before the audit, Ms. Thomas told the ACs to take their manuals home so that auditors could not see the manuals, which, on information, contained information on how ACs could achieve bonuses and how these bonuses were based on enrollment statistics.

### E.   Defendants Schools' Violation of the 90-10 Rule

312.   The 90-10 Rule specifically applies only to for-profit colleges. It requires that for-profit schools receive at least ten percent (10%) of their revenues from non-governmental sources.

313.   At various times, Defendant Schools have falsified records to show themselves in compliance with the 90-10 Rule, when, in fact, they were not.

314.   On information, including sworn testimony from a former dean of Defendant Schools, Relators believe and allege that Defendant Schools use a scheme involving student textbooks to inflate their revenue from non-governmental sources for 90-10 Rule purposes. The relevant statute dictates precisely how schools are to treat "amount[s] charged for books, supplies, and equipment" as part of their 90-10 Rule calculations, requiring schools to exclude such revenues from their calculations, with some narrow exceptions. 20 U.S.C. § 1094(d)(1)(F)(v). Although numerous former employees of Defendant Schools have provided sworn testimony, and the Colorado Attorney General's undercover investigation has revealed, that Defendant Schools represent to prospective students that their tuition includes the

costs of textbooks and suggest that they get to keep the books without additional charges, Defendant Schools actually only allow students to borrow the books. If students fail to return them, which often happens when students drop out, Defendant Schools charge the students for the books, and those revenues are counted toward non-government sources for 90-10 Rule purposes.

315.    One reason that Relators believe and allege that the Defendant schools used a scheme involving student textbooks is because Barbara Thomas, the Schools' former Chief Operating Officer, told employees to hide the existence of one of the Defendant Schools' book rooms, where books were checked out and returned by students, during an ACCSC inspection of the Cheyenne, Wyoming, campus. On approximately April 25, 2012, just prior to the inspection, Ms. Thomas specifically told the campus's staff that she did not want ACCSC to see the book room because it might cause the accrediting body to raise questions about Defendant Schools' compliance with the 90-10 Rule. Indeed, there is no other apparent reason to hide the existence of a book room from ACCSC other than irregularities that involve the 90-10 Rule.

316.    As a former employee of Defendant Schools has stated under oath, "CollegeAmerica attempts to manipulate the Title IV funding requirements to maximize Title IV funds beyond the 90% limit. An example of this is where Ms. Thomas attempted to hide the existence of a textbook room from an accrediting body survey" because "Ms. Thomas indicated that the textbook loan program might

detrimentally affect CollegeAmerica's 90% federal funding limit under Title IV and she did not want the accrediting body to know about it."

317.   On information, Relators believe and allege that one or more campuses of Defendant Schools have created false student records for the purposes of complying with the 90-10 Rule. For example, on information, Relators believe and allege that in approximately January 2014, certain closed student files from the Salt Lake City/Murray campus—that is, files for students who graduated or were no longer attending the campus—were changed to show that those students had instead attended one of the Arizona campuses of Defendant Schools. The students' files were reviewed, selected, and altered over a weekend by a number of employees called into work for the purpose, including Michelle Romney, Gina Seats, and Robert Anderson. On information, Relators believe and allege that the student files were selected to make the Arizona campus's statistics appear better than they actually were for purposes of the 90-10 Rule.

318.   Presently, Defendant Schools are attempting to convert to not-for-profit status under the Department of Education's regulations, which would exempt them from the 90-10 Rule.

   **F.   Defendant Schools' Violation of Attendance-Taking and Refund Requirements**

319.   Through their work, Ms. Brooks and Ms. Wride became aware of certain practices at SHC's Orem campus relating to the falsification of attendance records by both faculty and administration. Both faculty and administrative

personnel were known to mark students present on official attendance forms when students did not, in fact, attend classes.

320.    Similarly, faculty and administrative officials would alter attendance reports to show that certain students had attended classes when the students had not actually done so.

321.    In one example, a professor recorded a student as having perfect attendance even though the student had given birth during the module in a different part of the state and had not been to the campus since that time.

322.    In another example, a professor submitted a grade change form for a grade that another professor had given the student. The grade change form indicated that the "reason" for the grade change was that a "death in the family" had resulted in "almost no attendance." However, the original attendance records for the class indicated that the student had perfect attendance.

323.    In another example, an instructor submitted an attendance reporting sheet during the first week of an externship that was completely filled out and that indicated the student had perfect attendance for the module that had only just begun.

324.    As an additional example, a professor was found "incorrectly report[ing] attendance," including "record[ing] student attendance when the student was actually not in the building or completing a documented assignment in replacement of attendance," because of the instructor's "drive to qualify for bonus dollars." Email communications between the instructor, Dr. Stephen Babb, the

Dean of Education at SHC's Orem Campus, Austin Collier, the registrar, and others document several examples of an instructor marking students present when the students had not, in fact, attended the classes in question.

325.    Defendant SHC's own internal communications demonstrate the school was aware of the consequence of falsely reporting student attendance. In one such email communication, Dr. Babb wrote that "the attendance roll and grade sheet are official documents . . . that when they are signed by the instructor, they represent legal documents that are used to draw down federal funds." The communication notes that "we have to be able to certify their accuracy."

326.    Nevertheless, if Defendant SHC's records at the end of a disbursement period indicated that SHC was required to reimburse Title IV funds to the Department of Education because a student had failed to attend class, Defendant SHC's administration would ask the instructor who had marked the student absent whether the attendance records could be modified so that SHC would not have to return Title IV funds. Mr. Collier observed the administration put "lots of pressure" on instructors to change the attendance records.

327.    Other employees reported similar attendance-reporting issues at other campuses of Defendant Schools. For example, according to Joshua Allen, who was a faculty member and an associate dean at Defendant Schools' Denver campus from November 2009 to October 2013, the campus had "'Last Day Attended' meetings in which [the deans] reached out to students who weren't showing up and encouraged them to log on to their student account so [Defendant Schools] wouldn't have to

count them as 'dropped.'" As Mr. Allen explained in sworn testimony, it was his "most important duty" to encourage students to appear to be attending classes by logging into their accounts because Defendant Schools "needed the students to have 'attendance' so [they] wouldn't have to drop them."

328.   As a former CollegeAmerica employee explained in sworn testimony, "in terms of holding a student," the Schools "could change that last day of attendance without [the student] even knowing it," which could change student's financial aid eligibility as well. Defendant Schools could "draw things out a little bit longer if [they] wanted to" by "not showing [the student] as dropping as soon." In other words, by changing the attendance records, Defendant Schools were able to obtain more money from Title IV, HEA Programs for students who had actually withdrawn from school.

329.   By reporting a student as having attended classes when he or she did not, Defendant Schools either (i) delayed the applicable withdrawal date, 34 C.F.R. §§ 668.22(b)(1) ("[T]he student's withdrawal date is the last date of academic attendance as determined by the institution from its attendance records."), thereby fraudulently inflating the amount of Title IV funds the student appeared to have earned and lowering the amount SHC was obligated to return to the Department of Education, or (ii) completely avoided reporting a student as having withdrawn (i.e., having ceased attending classes), thereby fraudulently avoiding any obligation to return unearned Title IV funds to the Department of Education. By recording students as having attended classes that they did not attend, Defendant Schools

falsely represented that the students had earned more Title IV funding than they actually had earned, even though Defendant Schools were legally obligated to refund the unearned funds to the Department of Education.

### G.   Defendant   Schools'   Violation   of   Academic   Progress Requirements

330.   Through their work, Ms. Brooks and Ms. Wride became aware of certain practices at SHC's Orem campus relating to the falsification of grades by both faculty and administration. Faculty and administrative staff would falsify students' grades by various means, including employing grading standards that guaranteed students would receive passing grades or by simply giving students grades they did not earn.

331.   Because faculty members were paid bonuses both based on the number of students who "successfully" completed their courses and based on students' evaluations, faculty members had an incentive to ensure that all students received passing scores—regardless of merit.

332.   Specifically, both Ms. Brooks and Ms. Wride are aware that SHC's Orem campus registrar, Austin Collier, was directed to change a student's grade from a failing grade ("F") to a passing grade by the Director of the Orem campus's Financial Aid Office, Mary Jo Barratt, so that the School could "order more money [from the Department of Education] for the student."

333.   In another example, Dr. Bryan Thayn, an instructor, attempted to change a student's grade two years after the grade was first reported in order to

make the student eligible for Title IV funding and so that the school could obtain that funding on behalf of the student.

334.   In another example, a student that only attended two classes during the entire module was given an 88% for attendance, was given credit for a paper that she never wrote, and was given a passing grade by the instructor.

335.   As another example, a professor submitted a grade change form for a student—from a D to a C+ —for a class the student had not yet taken and that was scheduled to begin in the future.  This grade change was submitted for the same student, described above, who had recently given birth and was unable to attend classes because of her distance from the campus.

336.   As an additional example, it appeared that a professor submitted grades for an externship that the students never actually participated in.

337.   On information, Relators believe and alleged that instructors at SHC's Salt Lake City/Murray campus also engaged in grade falsification. For example, instructors in the business school regularly "rubber stamped" perfect grades (100%) for all of their students, regardless of actual performance.

338.   Defendant Schools' faculty was paid bonuses based on the number of students who "successfully completed" their courses. Instructors were not given bonuses for students given failing grades. Instructors would receive larger bonuses as greater percentages of the students in their classes "successfully completed" their courses. For example, according to sworn testimony from a former dean, "Nathan

Larson, the president of the Denver Campus, gave bonuses for instructors who had a 90% pass rate."

339.   Mr. Collier was aware that instructors submitted passing grades for students who had failed to complete all of the necessary course work based on the assumption that the students would complete make-up work in lieu of work they had missed but prior to the make-up work actually being completed.

340.   Furthermore, correspondence between Mr. Collier and faculty members documents the faculty members' use of grading scales that guaranteed that every student would receive a passing grade in the class.

341.   If Defendant SHC's records at the end of a disbursement period indicated that SHC was required to reimburse Title IV funds to the Department of Education because a student had failed to make satisfactory academic performance, Defendant SHC's administration would ask the instructor who had given the student failing grades whether the grade could be modified so that SHC would not have to return Title IV funds. Mr. Collier observed the administration put "lots of pressure" on instructors to change grades.

342.   This happened at other campuses of Defendant Schools as well. At Defendant Schools' Colorado Springs campus in the period from July 2010 to March 2011, Defendant Schools allowed students to pass a class and advance in their programs so long as they had a D- or better grade even though faculty members teaching the courses expected students to achieve a grade of at least a C to pass the course.

343.   According to the sworn testimony of Jean Lesmeister, a former faculty member at Defendant Schools' Denver campus from November 2010 to August 2011, "the administrators, Kacey Jechura and Nathan Larson, encouraged faculty to do whatever it took to keep students enrolled. That policy basically meant that students needed passing grades to stay enrolled." Indeed, "faculty members were, without fail, called into Kacey's office every time they gave failing grades."

344.   Even though some students who took Ms. Lesmeister's course "could not write papers" and "were unable to create a cogent sentence," "Kacey [Jechura] saw that failing grades could lead to upset students threatening to drop or academic suspensions from low GPAs. Either way, failing grades meant losing money" in the administration's view. Ms. Lesmeister is personally aware of another faculty member changing a student's grade from failing to passing due to the pressure exerted by the campus's administrators.

345.   On another occasion, Ms. Lesmeister "gave a student an F due to his excessive absences." When the student complained to the administration, Defendant Schools' management took him out of her class "and switched to an independent study." However, because it "was too late in the semester for him to withdraw," Ms. Lesmeister "gave him an F as his final grade." "The next time [Ms. Lesmeister] looked at the class's grades, [she] saw the student's F was changed to an A-" without her knowledge or consent.

346.   In March 2011, a former faculty member at Defendant Schools' Colorado Springs campus, Kellie Hayes, submitted final grades for one of her

classes. She gave one of her students, who "had not attended a single class and had not completed any assignments," a failing grade for the course. According to Ms. Hayes' sworn testimony, the faculty member's supervisor, Dr. Garcia, "instructed [Ms. Hayes] to call this student and work with her to see if [Ms. Hayes] could get her grade up to a D-." Even though Ms. Hayes explained to her supervisor that the student had not attended a single class or even bothered to make contact with her, "Mr. Garcia responded that [she] needed to work with her to get her to a passing grade."

347. Defendant Schools punished faculty members who gave failing grades or failed to change students' grades from failing to passing. For example, according to sworn testimony of Dale Greenfell, who was a faculty member at Defendant Schools' Fort Collins campus from July 2009 to approximately July 2011, faculty members were told that if they "had three successive classes with a certain percentage of failing students, then the instructor could lose his or her job *because there was pressure from corporate for higher numbers of passing and graduating students*." (emphasis added). Mr. Greenfell personally "heard other instructors express concern, anger, and frustration about passing students who were struggling academically." As related by Mr. Greenfell, "[t]he instructors felt like they were being penalized for the students not being able to or choosing not do the academic work required to pass their classes."

348. According to the sworn testimony of Joshua Allen, a faculty member and dean at Defendant Schools' Denver campus from November 2009 to October

2013, "instructors had regular meetings with associate deans" and at "these meetings, [they] talked about completion rates, attendance rates, and admissions rates." "The associate deans told [the instructors] that [they] needed to keep [their] completion and attendance rates up so [they] would meet the graduation requirements of CollegeAmerica's accreditor." The deans told the instructors that "the school would lose money and [the instructors] could lose [their] jobs if [they] didn't keep [their] pass rates high enough." Indeed, "instructors who didn't pass enough students didn't have their contracts renewed."

349.   Mr. Allen "felt pressured by [his] superiors to pass students who hadn't met [his] course requirements." "A dean named Barbara Snyder told [Mr. Allen] that 'we all do it.' Referring to the students, [Ms. Snyder] told [Mr. Allen] to 'get 'em out of your hair' and 'pass 'em along.'" Because of the pressure, the overt threats of termination, and the advice of Defendant Schools' management, Mr. Allen "set up [his] courses so that if a student showed up, they passed," even though he "thought it was shameful to pass students along like this."

350.   Similarly, Ann Scott, who was an instructor at Defendant Schools' Fort Collins campus from January 2008 to October 2011, reported in sworn testimony that "there was a great deal of pressure from the Dean of Education [and others] at the Fort Collins Campus to pass students who failed a class three times *because students are not eligible to receive Federal student loans for continuing to take a class the student previously failed three times*." (emphasis added).

351.   According to Ms. Scott's sworn testimony, "[t]he Dean of Education called [Ms. Scott] into her office to tell [her] that one of the students in [Ms. Scott's] Microbiology class needed to pass [Ms. Scott's] class because the student had already failed the class twice." Ms. Scott "told the dean of students that [she] would give the student the same test that every other student gets and [that she would] tutor him if necessary." However, the student failed the test. Incredibly, the "Dean of Education told [Ms. Scott] to give the student another test that was easier, but [Ms. Scott] refused to do that in fairness to the other students." "After [Ms. Scott] refused [to give the student an easier test], the dean . . . said that it was out of [Ms. Scott's] hands and gave the student another test, which the student passed with flying colors." Defendant Schools reported that the student had passed the class based on the substitute test.

352.   While Defendant Schools ostensibly have a formal appeals process to address students who are failing to meet the academic performance standards, the "appeal process was all lip service" according to sworn testimony from a former CollegeAmerica dean and faculty member, Clay Goodwin. According to his sworn testimony, Defendant Schools' "policy was to keep students in school and do whatever it took to finish them," which meant "pressur[ing] faculty to pass students along in classes and not fail them."

353.   Mr. Goodwin, who worked at Defendant Schools' Colorado Springs campus from 2006 to 2011, is personally aware of "other faculty members [who] were giving students passing grades when they didn't earn them." Other

"instructors would confide in [him] and tell [him] about a specific student who didn't do the work but was given a 'C'" to placate Defendant Schools' management.

354.   Defendant Schools even went so far as to give students credit for academic requirements that they never completed. For example, Andrea Brannan, who attended CollegeAmerica in Colorado from May 2004 to May 2005 was given credit for an externship—a required part of her medical specialties program—even though she never completed an externship. As Ms. Brannan has explained in sworn testimony, the Schools' externship coordinator told Ms. Brannan in approximately April 2005 that because she was unable to find her an externship, "she was going to say that [Ms. Brannan] fulfilled all [her] hours to graduate," even though she had not. In fact, Ms. Brannan was honored as the class valedictorian despite not having completed all of the hours to graduate.

355.   According to sworn testimony from a former CollegeAmerica dean, the pressure to give passing grades to students who were failing "was coming from corporate. It was coming off the phone calls" between Defendant Schools' central management and their campus managers and deans.

356.   By giving students grades they did not earn and by grading students based on impossible-to-fail standards, Defendant Schools ensured that those students would continue to take additional classes from the Schools that were paid for using Title IV funds, even though the students were not eligible to take any additional classes or utilize any additional Title IV funds.

### Defendant Schools Knowingly Submitted False Attendance Records and Grades

357.   Defendant Schools knew that they were required to submit accurate information concerning student attendance and grades, that their submission of this information constituted a certification by the school to the Department that the information they supplied was accurate, and that submitting false information concerning attendance and grades was unlawful. Indeed, Defendant Schools were well aware that they submitted such information to the Department of Education in order to request additional Title IV funding—or, in the vernacular of Defendant Schools, to "order more money" from the Department of Education

358.   Indeed, ACCSC's accreditation standards expressly require Defendant Schools to accurately maintain grade and attendance records and enforce reasonable academic performance requirements.

359.   Additionally, Defendant Schools' combined course catalog discusses the importance of academic progress and attendance and the necessity of students attending classes and meeting minimum academic performance standards.

360.   Managerial-level employees at Defendant Schools' various campuses were often directly and personally involved in the violations of the attendance and grading regulations.

### H.   Defendant Schools' Violation of Accrediting Standards

361.   In the summer of 2010, Ms. Wride changed jobs, becoming the executive assistant to Dr. Stephen Babb, the Dean of Education at SHC's Orem Campus.

362. Soon after she started working as Dr. Babb's executive assistant, Dr. Babb asked Ms. Wride to investigate each faculty member's qualifications, including education, work, and clinical experience, to ensure that each faculty member met the minimum accrediting standards of ACCSC.

363. In the course of her investigation, Ms. Wride discovered that many faculty members at SHC's Orem campus did not have the required minimum qualifications, as established by the ACCSC, to teach the courses that SHC had assigned them to teach. For example, several faculty members lacked sufficient academic degrees and/or related practical work experience to meet the ACCSC accreditation standards for faculty members.

364. As an example, Ms. Wride discovered that Dr. Robert Roberts did not have the minimum number of years of related practical work experience that the ACCSC required him to have to be eligible to teach certain courses, including medical and radiological courses, in the Medical Specialties and Health Care Administration programs.

365. Ms. Wride discovered the deficiencies in Dr. Roberts' background when she reviewed the information in SHC's "Faculty Personnel Report" for Dr. Roberts. SHC prepares such Faculty Personnel Reports for the ACCSC to demonstrate that the faculty members meet the minimum accreditation standards. The Faculty Personnel Reports specifically state: "By submitting this report to ACCSC, both the school and the faculty member certify that the information contained herein, attached hereto, and maintained on file with the school is correct and that the

faculty member's qualifications comply with the applicable Standards of Accreditation."

366.  Ms. Wride found mistaken, misleading, or untrue representations in Dr. Roberts' Faculty Personnel Report. Indeed, Ms. Wride contacted the businesses that Dr. Roberts claimed to serve as his required practical work experience and found that Dr. Roberts had materially misrepresented the nature of his prior work experience.

367.  As a result, Dr. Roberts did not have the required minimum number of years of practical work experience in the relevant subject area, as required by the ACCSC's accrediting standards, for him to teach the courses that SHC assigned him to teach and that he was in fact teaching.

368.  Ms. Wride found similar problems with the claimed qualifications and credentials of numerous other faculty members at SHC's Orem campus. For example, through her investigation, Ms. Wride also discovered that Dr. Bryan Thayn did not have sufficient education and related practical work experience to meet the ACCSC accreditation standards for faculty members. In particular, Ms. Wride discovered that Dr. Thayn had never practiced as a chiropractor and had no related practical work experience and therefore did not have the minimum number of years of related practical work experience required by the ACCSC to teach the courses that SHC assigned him to teach and that he was in fact teaching.

369.  Ms. Wride brought these deficiencies to the attention of Dr. Babb. Dr. Babb informed Ms. Wride that he was already aware of the shortcomings in the

qualifications and credentials of several of the faculty members. Dr. Babb told Ms. Wride that when he previously brought the problems to the attention of SHC's upper management, he was nearly terminated for exposing the problems. Dr. Babb asked Ms. Wride to "dig deeper" and report back to him.

370.    After confirming her prior findings, Ms. Wride went back to Dr. Babb with the information. Eventually, Dr. Babb went to Mr. Plant with the information. On information, Relators believe and allege that SHC retaliated against Dr. Babb for attempting to bring to light the fact that SHC had knowingly provided materially false Faculty Personnel Reports to ACCSC by reprimanding Dr. Babb, withholding bonuses he had earned, and sanctioning him with a three-day involuntary leave of absence.

371.    Shortly thereafter, Mr. Plant called Ms. Wride into his office and demanded that she stop investigating faculty qualifications and to stop doing anything more with respect to faculty issues, even though Ms. Wride was specifically hired by Dr. Babb to track and document faculty qualifications and to ensure that SHC's faculty members complied with accrediting standards.

372.    Ms. Wride showed documentary proof of the results of her investigation to Mr. Plant during the meeting. In response, Mr. Plant told Ms. Wride to "leave it alone" and to "never look at it again."

373.    Concerned about the information she had learned, Ms. Wride instead reported the results of her investigation directly to Eric Juhlin, Defendant Schools' Chief Executive Officer, and Barbara Thomas, the Chief Operating Officer.

Specifically, Ms. Wride showed the documentary proof establishing the faculty members' deficiencies to both Mr. Juhlin and Ms. Thomas and discussed in detail each item with them. Even though Mr. Juhlin and Ms. Thomas assured Ms. Wride that they would address the issue, no corrective action was ever taken. Most, if not all, of the faculty members that Ms. Wride discovered had insufficient qualifications continue to teach courses at SHC that they are not eligible to teach pursuant to ACCSC accreditation standards.

374.   Additionally, SHC failed to correct any of its prior false representations to the ACCSC regarding the faculty members' qualifications.

375.   Instead, after Ms. Wride brought the materially erroneous information to the attention of Defendant Schools' most senior management, SHC continued to submit the same false Faculty Personnel Reports to the ACCSC to maintain its accreditation.

376.   Additionally, for a certain period of time, Ms. Wride was responsible for preparing the Faculty Personnel Reports that SHC provided to the ACCSC. Generally speaking, the faculty member would provide information to prepare the reports to Ms. Wride, who would investigate the information provided to determine whether it was accurate and truthful. She would then prepare the written report for the faculty member to sign. SHC management pressured Ms. Wride to provide false information on many of the reports. Ms. Wride refused to complete any report that SHC pressured her to falsify.

377.   After Mr. Plant learned that Ms. Wride had reported the results of her investigation to Mr. Juhlin and Ms. Thomas, he stripped her of all responsibility and excluded her from day-to-day operations in retaliation. Ms. Wride believes that SHC did not want to risk firing her because of the information she had learned.

378.   Ms. Brooks also believes that SHC stripped Ms. Wride of all responsibilities because Ms. Wride brought the fact that SHC's faculty lacked the requisite qualifications to the attention of Defendant School's upper-level management.

379.   The ACCSC conducted an audit of SHC's Orem campus in approximately spring 2011. SHC's management forced Ms. Wride to "take the day off" to make sure that Ms. Wride did not have any contact with the auditors and, in particular, to prevent Ms. Wride from disclosing the results of her investigation about insufficient faculty qualifications to the auditors.

380.   In further retaliation for Ms. Wride's report to Mr. Juhlin and Ms. Thomas, Mr. Plant had Ms. Wride dropped from SHC's respiratory therapy program. At the time, Ms. Wride only needed six additional classes to complete her bachelor's degree.

381.   When Ms. Wride contacted Ms. Thomas to complain of her treatment, Ms. Thomas agreed to reinstate Ms. Wride and to waive her tuition and fees if Ms. Wride agreed to be quiet about the faculty qualifications problems and to "just leave things alone."

382. Ms. Wride resigned her employment with SHC on June 6, 2011, three days after she graduated and after she found a job as a respiratory therapist.

383. Both before and after resigning her position at SHC, Ms. Wride attempted to report the faculty qualifications problems to the Department of Education and the ACCSC. Neither the Department of Education nor the ACCSC ever responded to any of her reports.

384. Ms. Wride's experience with reporting ACCSC violations to the most senior management of Defendant Schools, only to have those concerns ignored, is consistent with Defendant Schools' open disregard for the ACCSC and its accrediting standards.

385. Indeed, Barney and Mr. Juhlin, during a company meeting in November 2011, stated that ACCSC standards would not prevent Defendant Schools from taking a course of action, regardless of whether ACCSC standards prohibited the practice. For example, when employees questioned whether certain practices were permitted under ACCSC standards, Barney and Mr. Juhlin responded, in effect, that Defendant Schools would do as they "please and ask for forgiveness later."

386. Barney later told a former Campus Director that he did not really care about the ACCSC standards.

387. This corporate policy of open disregard for ACCSC standards manifested itself in many ways. For example, before an ACCSC visit to the Wyoming campus of Defendant Schools in 2012, Defendant Schools' former Chief

Operating Officer, Barbara Thomas, told employees to deceive ACCSC representatives by failing to show them the room where textbooks were held. Ms. Thomas also told employees to remove promotional materials relating to Defendant Schools' GED program so that ACCSC representatives would not see them.

388.   Defendants Schools' efforts to mislead and deceive ACCSC has caused employees to resign. The former Campus Director at the Wyoming campus of Defendant Schools quit after she was forced to engage in deceptive practices during an ACCSC visit to the campus. That Campus Director applied for unemployment benefits to the Wyoming Department of Workforce Services based on her forced resignation. The Wyoming Department of Workforce Services allowed the unemployment benefits and determined that the employee quit her job because she was directed to lie to accrediting agencies regarding business practices. Defendant Schools failed even to respond to the Wyoming Department of Workforce Service's request for information in response.

389.   The former Campus Director at the Wyoming campus also disclosed all of these facts directly to Barney, including those relating to Ms. Thomas instructing her to mislead and deceive ACCSC. On information, Relators believe and allege that Barney failed to take any corrective action after being informed of these facts.

390.   Similarly, the former dean of CollegeAmerica's campus in Wyoming, Linda Carter, quit because Defendant Schools' most senior management asked her to lie to ACCSC. Ms. Carter applied for unemployment benefits after voluntarily quitting because her "employer [CollegeAmerica] was having her lie to the

accreditation team" from ACCSC. Defendant Schools contested Ms. Carter's unemployment benefits, appealing the issue to Division of Appeals of the Wyoming Department of Workforce Services. After holding a hearing, the Division of Appeals made the following findings of fact, which Defendant Schools did not further appeal:

- "claimant left her employment with the employer because the claimant was being asked to conceal information from an accreditation team";

- "claimant proved, by a preponderance of the evidence, the employer's customary working conditions involved deceit on the part of the employer"; and

- "claimant established she left her employment with the employer for good cause."

391.   Defendant Schools routinely create and provide false information to ACCSC, their accrediting agency. Joshua Allen, who was an instructor and an associate dean at Defendant Schools' Denver campus beginning in approximately November 2009, was personally "involved in preparing for a five-year reaccreditation audit by CollegeAmerica's accreditor, ACCSC." As Mr. Allen has explained in sworn testimony, because the Schools' student files were out of compliance with ACCSC standards, the Schools used students who were being paid from work-study funds to fabricate compliant student files, making them appear in compliance. He personally observed "several work study students and assistants at a table with stacks of student files and blank forms." When he "asked them what they were doing," they told him "they were filling in the forms that were missing

from the student files and putting them in the files. These were forms that should have been completed and signed by students prior to starting at CollegeAmerica."

392.   When the ACCSC auditors were on the Denver campus to complete the audit, Mr. Allen was tasked with providing the auditors with specific student files that they requested. After auditors asked for a specific file, but before Mr. Allen was permitted to provide the file to the auditors, he was required to take the requested file to another room where Defendant Schools' management, including Chief Operating Officer Barbara Thomas, were located. After Defendant Schools' senior management reviewed the file and realized it did not comply with ACCSC requirements because it was missing an important form containing key student information, Defendant Schools' Chief Operating Officer, Barbara Thomas, told Mr. Allen to complete the form "even though [he] hadn't checked in with the student" about the information and to "put the form in the student's file" before giving the file to the ACCSC auditor. Mr. Allen was later "praised" by Defendant Schools' senior management, including Ms. Thomas, for the "great job" he had done on the audit.

393.   Defendant Schools have an openly hostile view of ACCSC and its auditors and instruct their employees to do the same. The Schools' current highest-level compliance officer wrote a memorandum to all employees instructing them that ACCSC "is not your friend" and telling them not to share "dirty laundry" or their "frustrations" with ACCSC, apparently even if that "dirty laundry" or those frustrations relate directly to accrediting issues within the purview of ACCSC.

394. Other campuses of Defendant Schools have engaged in similar practices of using teachers and faculty members who do not have the required qualifications to teach classes for which they are unqualified.

395. For example, in approximately November 2009, when Joshua Allen was hired as an instructor at Defendant Schools' Denver campus and assigned to teach Anatomy, Physiology, and Medical Terminology, he was, according to his sworn testimony, "not at all qualified to teach these classes." Mr. Allen was not even provided with the textbooks for the course until the night before classes were scheduled to begin. As Mr. Allen has explained in sworn testimony, "[t]he priority at [Defendant Schools] was not the students. It was the money."

396. At Defendant Schools' Colorado Springs campus between April 2009 and August 2010, the Schools had recent graduates of the Schools teach classes. Those recent graduates could not have had the requisite years of practical experience required to teach those classes by virtue of the fact they had just graduated in the fields they were teaching.

397. In another instance, at Defendant Schools' Denver campus between August 2006 and December 2007, the Schools had a current student, who only had a high school diploma, teach a computer science class.

398. On information, Relators believe and allege that the Boise campus of Defendants Schools hired a recent graduate of Defendant Schools to teach a computer networking class despite the fact that ACCSC requires this type of class

to be taught by a teacher with a certain number of years of experience in the field. The new graduate had no such experience.

399.   In another example, the Boise campus hired another recent graduate (with a bachelor's degree from Defendant Schools) to teach an English general education class that was meant to teach students college success strategies. ACCSC required such classes to be taught by a teacher with a master's degree, which the recent graduate did not have.

400.   Further, the head of the medical department for the Boise and Nampa campuses, and who taught classes in that department, was also a recent graduate of Defendant Schools, and thus did not have the required years of experience in the relevant field to teach the classes.

401.   As another example, at the Salt Lake City/Murray campus, Defendant Schools allowed instructors without the required years of experience to teach medical coding and billing courses. That campus also allowed an instructor without a background in the law to teach a business law course.

402.   Similarly, Defendant Schools have circumvented ACCSC requirements relating to faculty qualifications by formally assigning teachers with the required qualifications to teach courses, but then substituting teachers without the proper qualifications to do the actual instruction. For example, the Salt Lake City/Murray campus told students and ACCSC that a professor with the required qualifications was teaching a philosophy class, but then used a different teacher, without the required qualifications, to actually teach it. Nevertheless, the name of the instructor

with the required qualifications was included on all records associated with the course, even though he never taught it.

403.    Defendant Schools have engaged in a long-standing pattern and practice of using unqualified teachers. As far back as the early 2000s, Defendant Schools assigned unqualified instructors to teach courses. For example, at one Utah campus, Defendant Schools assigned an instructor with an associate's degree in computer technology to teach an upper-level English course.

404.    Defendant Schools have also violated ACCSC's admission requirement standards.

405.    ACCSC standards require Defendant Schools to "develop[] admissions criteria that are designed to admit only those students who are reasonably capable of successfully completing and benefitting from the training offered." (ACCSC Standards, Section V, A.1.)

406.    ACCSC standards further require Defendant Schools to "use appropriate techniques to assess whether applicants have the skills and competencies to benefit from the training provided at the undergraduate level." (*Id.* Section V.C.)

407.    Defendant Schools have an "open admissions policy," which permits anyone with a high school diploma or equivalency certificate to enroll, regardless of whether the potential student can benefit from the education. Defendant Schools have no official screening practice for assessing a student's ability to benefit, aside from the requirement of a "personal statement" from the applicant. On information,

Relators believe and allege that the personal statements are not genuinely used to assess a potential student's competencies.

408. As an instructor at Defendant Schools' Denver campus from November 2010 to August 2011 explained in sworn testimony, "[t]he goal and the focus are making money. *There is no consideration of the student for acceptance into the school. If the student is eligible for financial aid, the student is admitted.*" (emphasis added).

409. Similarly, an instructor and the Dean of Education at Defendant Schools' Colorado Springs campus from 2006 to 2011 explained in sworn testimony that "[t]he truth is acceptance into CollegeAmerica is a business matter. If you can get financial aid and have a diploma or GED, you get in. *There is no assessment of the capability of students to succeed in the programs.*" (emphasis added).

410. This "open admission policy" violates ACCSC standards, which require Defendant Schools to do more to determine whether students actually have the necessary "skills and competencies to benefit" from the education. (*Id.*)

**Defendant Schools Knowingly Submitted False Information to ACCSC**

411. On information, Relators believe and allege that Defendant SHC knowingly prepared the false Faculty Personnel Reports before Ms. Wride became responsible for preparing and verifying their accuracy. On information, Relators believe and allege that Defendant SHC knowingly submitted these false Faculty Personnel Reports to ACCSC to obtain accreditation.

412. Defendant SHC's management knew that several Faculty Personnel Reports that SHC has previously submitted to ACCSC to obtain accreditation were

materially false. However, Defendant SHC did nothing to correct these false submissions to ACCSC.

413.   Ms. Wride specifically informed Defendant SHC's senior management that certain Faculty Personnel Reports that SHC had submitted to ACCSC were materially false. Defendant SHC's management took no corrective action in response to this information.

414.   Instead of taking corrective action, Defendant SHC's management took steps to cover up the problem, including reprimanding Dr. Babb, taking away all responsibilities from Ms. Wride, demanding that Ms. Wride stop looking into the issue and remain quiet about the results of her investigation, and removing Ms. Wride from her program of study for refusing to stay quiet about the problems she discovered.

415.   Ms. Wride also specifically informed Defendant Schools' senior management that certain Faculty Personnel Reports that Defendant SHC had submitted to ACCSC were materially false. Defendant Schools' management took no corrective action in response to this information.

416.   Instead of taking corrective action, Defendant Schools' senior management attempted to cover up of the information that Ms. Wride had discovered. For example, Defendant Schools' senior management offered to allow Ms. Wride to attend school for no cost in exchange for Ms. Wride agreeing to remain quiet about the faculty qualification problems and false Faculty Personnel Reports.

417.   Even after Ms. Wride brought the materially false information to the attention of Defendant SHC's and Defendant Schools' senior management, Defendant SHC continued to make the false Faculty Personnel Reports available to ACCSC as proof of the faculty members' purported qualifications.

418.   Even after Ms. Wride brought the materially false information to the attention of Defendant SHC's and Defendant Schools' senior management, Defendant SHC's management asked Ms. Wride to prepare further false Faculty Personnel Reports.

419.   Knowing that the information Ms. Wride possessed about the false Faculty Personnel Reports seriously jeopardized Defendant SHC's accreditation, Defendant SHC's management told Ms. Wride to be absent from work on the day that ACCSC's auditors were scheduled to visit SHC's Orem campus.

420.   Defendant SHC knew that providing false Faculty Personnel Reports to ACCSC would result in ACCSC accrediting Defendant SHC even though many of its faculty members did not possess the minimum qualifications required under the relevant ACCSC accreditation standards.

421.   Defendant SHC knew that its misrepresentations concerning faculty qualifications, which it knew would cause ACCSC to accredit Defendant SHC, would result in the payment of federal funds and that a reasonable and foreseeable consequence of such misrepresentations was that such funds would be paid out.

422.   Defendant Schools' management has pressured faculty at other campuses to submit false information to ACCSC. Defendant Schools have a pattern

and practice of submitting false information to accrediting agencies to obtain accreditation.

I.  **Defendant Schools' Submission of False Claims**

423.   Every request for a federal grant, every request for a loan under FDLP, every request for a federally guaranteed loan under FFELP, every interest payment on a subsidized Stafford Loan, and every government payment on a loan made on behalf of a student attending Defendant Schools constitutes a separate false claim.

424.   A large majority of students attending Defendant Schools receive Title IV funding assistance in one form or another.

425.   For example, during the 2010-2011 academic year, approximately 85% of students attending Defendant Schools received some type of loan under a Title IV, HEA program, while approximately 74% of students received a Pell Grant. (Information reported from the mean across all reporting Defendant Schools; information derived from data available from Department of Education's Integrated Postsecondary Education Data System.)

426.   During the 2009-2010 academic year, approximately 87% of students attending Defendant Schools received some type of loan under a Title IV, HEA program, while approximately 74% of students received a Pell Grant.  (*Id.*)

427.   According to data reported by Defendant Schools to ACCSC in their 2011 annual reports (covering the period July 2010 to June 2011), 91% of students received Title IV Financial Assistance at Defendant Schools' Fort Collins, Colorado, campus, 86% received Title IV Pell Grants, and 84% received Title IV Loans. At Defendant Schools' Denver campus, 99.2% of students received some sort of Title IV

Financial Assistance, with 83.8% receiving Pell Grants and 98.1% receiving Title IV Loans. At Defendant Schools' Colorado Springs campus, 96% of students received some type of Title IV Financial Assistance, with 85% receiving Pell Grants and 96% receiving Title IV Loans.

428.    Student A enrolled in Defendant SHC's program on or about January 18, 2010.[7] On information, Relators believe and allege that Student A received a loan under a Title IV, HEA program and may have received a Pell Grant. Ms. Brooks received a bonus for enrolling Student A because Ms. Brooks met the Enrollment-Related Requirements.

429.    Student B enrolled in Defendant SHC's program on or about February 15, 2010. On information, Relators believe and allege that Student B received a loan under a Title IV, HEA program and may have received a Pell Grant. Ms. Brooks received a bonus for enrolling Student B because Ms. Brooks met the Enrollment-Related Requirements.

430.    Student C enrolled in Defendant SHC's program on or about April 12, 2010. On information, Relators believe and allege that Student C received a loan under a Title IV, HEA program and may have received a Pell Grant. Ms. Brooks received a bonus for enrolling Student C because Ms. Brooks met the Enrollment-Related Requirements.

---

[7] The students' actual names have been withheld in accordance with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g; 34 CFR Part 99. The true names of the students can be supplied upon request assuming appropriate safeguards are maintained.

431. Additionally, on information, Relators allege that Defendant SHC received Title IV funding for Student A, Student B, and Student C at a time when the school was knowingly out of compliance with the (1) attendance-taking and refund requirements, (2) the academic progress requirements, and (3) the faculty-qualification accrediting standards.

432. Each grant award, disbursement of FDLP loans, and government repayment of loan interest or defaulted loan principal was caused by Defendants' false certifications and statements in the PPAs, compliance audit Management Assertions, G5 Certifications, MPNs, school certifications, and other documents, that Defendant Schools were in compliance with the Incentive Compensation Ban and were therefore eligible to receive Title IV funding. Defendants made these false certifications and statements despite the fact that they had actual knowledge of their falsity. Each request for payment constitutes a false claim under the FCA.

433. Each grant award, disbursement of FDLP loans, and government repayment of loan interest or defaulted loan principal to a student attending Defendant Schools was caused by Defendant Schools' false certifications and statements to ACCSC. Defendant Schools made these false certifications and statements despite the fact that they had actual knowledge of their falsity. Each request for payment constitutes a false claim under the FCA.

## J.    Defendant Auditors' Submission of False Statements

434. As stated above, to remain eligible to receive Title IV funding, a school that participates in any Title IV, HEA program must each year provide the Department of Education with an annual compliance audit of its administration of

Title IV, HEA programs, and an audit of the school's general purpose financial statements, prepared by independent auditors. 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. §§ 668.23(a)(2), (a)(4). Accountants preparing these audits for for-profit schools, such as Defendant Schools, must conduct their annual financial statements and compliance audits in accordance with the Department of Education Office of Inspector General's Audit Guide, among other applicable standards and guidelines.

435. The Department of Education relies on the certifications of the auditors to determine whether the audited schools are complying with the specified regulatory requirements of the Title IV, HEA Programs, including the Incentive Compensation Ban. Without the representations of the auditors that the schools are in compliance, the schools would not be eligible to participate in the Title IV, HEA Programs and would not receive any funds provided by those programs. *Id*. Indeed, the engagement agreements between Defendant Auditors and Defendant Schools had to include an express "statement that both parties understand that [the Department of Education] intends to use the [Defendant Auditors'] report to help carry out its oversight responsibilities of the Title IV programs." (Audit Guide at I-5, Exhibit 2 hereto.)

436. Defendant Auditors and others conducted the annual compliance audits for Defendant Schools from approximately July 1, 2002, to the present.

437. Defendant Auditors were required to comply with a variety of standards and policies in conducting their audits of Defendant Schools, which are specified in the Audit Guide. Indeed, as part of the engagement agreement with the

audited institution, auditors of institutions receiving funding from Title IV, HEA Programs must expressly agree to perform their work according to certain auditing standards. In addition to following the specific audit requirements of the Audit Guide itself, Defendant Auditors were required to perform the audits in accordance with the standards for audits of the U.S. General Accounting Office's *Government Auditing Standards* ("GASs"), issued by the Comptroller General of the United States, and the Statements on Standards for Attestation Engagements ("SSAEs"), as amended by SSAE #9, issued by the American Institute of Certified Public Accountants ("AICPA").  (Audit Guide at I-1, I-5, Exhibit 2 hereto.)  SSAE #3, as amended, provides "that an examination-level engagement includes 'designing the examination to detect both intentional and unintentional noncompliance that is material to management's assertion.'"  (*Id.* at I-3.)

438.   One of the primary objectives of the audit and attestation activities of the Defendant Auditors was to "determine and report whether" the school under investigation "complied with laws, regulations, and the provisions of contracts or grant agreements which could have a direct and material effect on the financial statements," as well as "complied, in all material respects with specified compliance requirements."  (Audit Guide at I-2.)  Defendant Auditors were required to use "due care to tailor the procedures so that the financial statement audit and compliance attestation engagement objectives are achieved."  (*Id.*)

439.   The relevant audit requirements specifically require auditors, including Defendant Auditors, to "design and perform procedures to provide

reasonable assurance of detecting significant illegal acts and to report . . . any fraudulent act or indication of such acts." (*Id.* at I-2.)

440.   The Audit Guide specifically instructs auditors, such as Defendant Auditors, to "be aware of fraud or high risk areas and recognize basic weaknesses in internal control." (*Id.* at I-2.) The Audit Guide provides some examples of "high risk indicators" that trigger further obligations on the part of auditors. (*Id.*; *id.* Appendix B.) The Audit Guide requires that "[u]pon discovery of a fraudulent act or indication of such an act related to Title IV Federal programs, regardless of dollar value," an auditor must promptly report such information to the Department of Education in writing. (*Id.* at I-4.)

441.   The Audit Guide requires auditors to perform examination-level verification of the following Required Management Assertion, among others: The school did "[n]ot pa[y] to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention [34 CFR 668.14(b)(22)]." (*Id.* at II-3.) The Audit Guide further explains that "**the institution must have methods of determining compliance with**" this and the other eligibility requirements and that the auditor must report any compliance failures. (*Id.* at II-5 (emphasis in original).)   Additionally, the Audit Guide requires that "all instances of noncompliance identified . . . by the [auditor] during his/her engagement must be reported as a finding in the Schedule of Findings and Questioned Costs." (*Id.* at I-15.)

442. In order to ensure that the Required Management Assertions are true and correct, compliance auditors, such as the Defendant Auditors, must "[r]eview, evaluate, and document the institution's methodologies for determining compliance with institutional eligibility and participation criteria." (*Id.* at II-5.)

443. The Audit Guide specifically requires compliance auditors, such as Defendant Auditors, to "[t]est payroll and other disbursement records to determine whether the institution paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in: securing enrollments, financial aid to students or student retention." (*Id.* at II-7.)

444. Furthermore, the Department of Education's Audit Guide, with which Defendant Auditors were required to comply, specifically points out that auditors are required not only use to due care in planning, performing, and evaluating the results of their investigation, they must exercise "the proper degree of professional skepticism to achieve reasonable assurance that material noncompliance will be detected." (*Id.* at I-4 (quoting GAS, Paragraph 3.26).) In particular, the Audit Guide "caution[s auditors] against ignoring basic weaknesses in internal control, performing audit steps mechanically (auditing form over substance), and accepting explanations for audit exceptions without competent evidence." (*Id.*)

### Shaw Mumford

445. In 2008, Defendant Shaw Mumford completed its financial and compliance audits of Defendant Schools for the year ending December 31, 2007, which Defendant Schools submitted to the Department of Education to maintain their eligibility to participate in Title IV, HEA Programs. Defendant Shaw Mumford

specifically represented that it "conducted [its] audit in accordance with auditing standards generally accepted in the United States of America and *Government Auditing Standards*, issued by the Comptroller General of the United States." (Cover Letter from Shaw Mumford, June 17, 2008.)

446.   Shaw Mumford further represented and certified to the Department of Education that in "accordance with *Government Auditing Standards,* [Shaw Mumford] also issued [its] report dated June 17, 2008 on . . . [Shaw Mumford's] tests of [Stevens-Henager College, Inc.'s] compliance with certain provisions of laws, regulations, contracts and grant agreements and other matters." (*Id.*) Shaw recognized that its compliance audit "report is an integral part of an audit performed in accordance with *Government Auditing Standards*." (*Id.*)

447.   With respect to the compliance portion of its audit, Shaw Mumford represented and certified to the Department of Education that it "examined management's assertions, that Stevens-Henager College, Inc. complied with the specified compliance requirements regarding Institutional Eligibility . . . listed in Section II of the U.S. Department of Education's Audit Guide, *Audits of Federal Student Financial Assistance Programs at Participating Institutions and Institution Servicers*, relative to participation in the Federal Student Financial Assistance Programs during the year ended December 31, 2007." (Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 16, 2008.)

448.   Shaw Mumford specifically represented and certified to the Department of Education that its work "included examining, on a test basis,

evidence about Stevens-Henager College, Inc.'s compliance with those requirements." (*Id.*)

449.   Shaw Mumford understood that the 2007 audit report was intended for the benefit of the Department of Educations, that Defendant Schools would submit the report to the Department of Education, and that the Department of Education would rely on Shaw Mumford's compliance audit findings to determine whether Defendant Schools were eligible to participate in Title IV, HEA Programs. Indeed, Shaw Mumford's compliance audit reports *twice* specifically noted that they were "intended solely for the information and use of the audit committee, management and the U.S. Department of Education." (Report on Internal Control Over Financial Reporting and on Compliance and Other Matters, June 17, 2008; Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 16, 2008.)

450.   On March 13, 2008, Shaw Mumford, through its representative Justin Shaw, requested that Defendant Schools provide copies of various forms of payroll reports, specifically payroll reports from Paychex (Defendant Schools' payroll service provider at the time) and quarterly payroll reports (Forms 941), for Defendant Schools' 2007 operations.

451.   On information, Relators believe and allege that the payroll information that Shaw Mumford received in response to its request disclosed that Defendant Schools were paying substantial bonuses to employees whose primary

responsibilities included recruiting students and obtaining financial aid, including to ACs, FAOs, and Directors of Admission.

452. Even though the Audit Guide and other auditing standards specifically required Shaw Mumford to, among other things, (1) report any "discovery of a fraudulent act or indication of such an act related to Title IV Federal programs," (*id*. at I-4), (2) report "all instances of noncompliance identified . . . by the [auditor] during his/her engagement" (*id*. at I-15), and (3) to avoid "accepting explanations for audit exceptions without competent evidence" (*id*. at I-4), and despite having information that Defendant Schools paid substantial bonuses to ACs and others whose job responsibilities involved recruiting and enrolling students and obtaining financial aid, Shaw Mumford failed to report such information to the Department of Education.

453. On the contrary, Shaw Mumford certified to the Department of Education that Defendant Schools "complied, in all material respects, with the aforementioned requirements for the year ended December 31, 2007." (Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 16, 2008.)

454. In 2009, Defendant Shaw Mumford completed its financial and compliance audits of Defendant Schools for the year ending December 31, 2008, which Defendant Schools submitted to the Department of Education to maintain their eligibility to participate in Title IV, HEA Programs. Defendant Shaw Mumford specifically represented that it "conducted [its] audit in accordance with auditing

standards generally accepted in the United States of America and *Government Auditing Standards*, issued by the Comptroller General of the United States." (Cover Letter from Shaw Mumford, July 28, 2010.).

455.   Shaw Mumford further represented and certified to the Department of Education that in "accordance with *Government Auditing Standards,* [Shaw Mumford] also issued [its] report dated June 23, 2009 on . . . [Shaw Mumford's] tests of [Stevens-Henager College, Inc.'s] compliance with certain provisions of laws, regulations, contracts and grant agreements and other matters." (*Id.*) Shaw recognized that its compliance audit "report is an integral part of an audit performed in accordance with *Government Auditing Standards*." (*Id.*)

456.   With respect to the compliance portion of its audit, Shaw Mumford represented and certified to the Department of Education that it "examined management's assertions, that Stevens-Henager College, Inc. complied with the specified compliance requirements regarding Institutional Eligibility . . . listed in Section II of the U.S. Department of Education's Audit Guide, *Audits of Federal Student Financial Assistance Programs at Participating Institutions and Institution Servicers*, relative to participation in the Federal Student Financial Assistance Programs during the year ended December 31, 2008." (Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 18, 2009.)

457.   Shaw Mumford specifically represented and certified to the Department of Education that its work "included examining, on a test basis,

evidence about Stevens-Henager College, Inc.'s compliance with those requirements." (*Id.*)

458.   Shaw Mumford understood that the 2008 audit report was intended for the benefit of the Department of Education, that Defendant Schools would submit the report to the Department of Education, and that the Department of Education would rely on Shaw Mumford's compliance audit findings to determine whether Defendant Schools were eligible to participate in Title IV, HEA Programs. Indeed, Shaw Mumford's compliance audit reports *twice* specifically noted that they were "intended solely for the information and use of the audit committee, management and the U.S. Department of Education." (Report on Internal Control Over Financial Reporting and on Compliance and Other Matters, June 23, 2009; Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 18, 2009.)

459.   On January 20, 2009, Shaw Mumford, through its representative Justin Shaw, requested that Defendant Schools provide copies of various forms of payroll reports, specifically payroll reports from Paychex and quarterly payroll reports (Forms 941), for Defendant Schools' 2008 operations.

460.   On information, Relators believe and allege that the payroll information that Shaw Mumford received in response to its request disclosed that Defendant Schools were paying substantial bonuses to employees whose primary responsibilities included recruiting students and obtaining financial aid, including to ACs, FAOs, and Directors of Admission.

461.   Even though the Audit Guide and other auditing standards specifically required Shaw Mumford to, among other things, (1) report any "discovery of a fraudulent act or indication of such an act related to Title IV Federal programs," (*id.* at I-4), (2) report "all instances of noncompliance identified . . . by the [auditor] during his/her engagement" (*id.* at I-15), and (3) to avoid "accepting explanations for audit exceptions without competent evidence" (*id.* at I-4), and despite having information that Defendant Schools paid substantial bonuses to ACs and others whose job responsibilities involved recruiting and enrolling students and obtaining financial aid, Shaw Mumford failed to report such information to the Department of Education.

462.   On the contrary, Shaw Mumford certified to the Department of Education that Defendant Schools "complied, in all material respects, with the aforementioned requirements for the year ended December 31, 2008." (Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 18, 2008.)

463.   Shaw Mumford also represented and certified to the Department of Education that the "results of [its] tests disclosed no instances of noncompliance." (Report on Internal Control Over Financial Reporting and on Compliance and Other Matters, June 23, 2009.)

464.   For both the 2007 and 2008 compliance audits, Shaw Mumford represented to the Department of Education that with respect to "Institutional Eligibility" parameters, which includes compliance with the Incentive

128

Compensation Ban, it applied a "0%" "error rate" "threshold . . . with respect to the definition of material noncompliance." (Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 18, 2008; Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 18, 2009.) In other words, Shaw Mumford told the Department of Education that for violations of the Incentive Compensation Ban, *any single* violation would have been reported. But Shaw Mumford reported none, even though it certified to the Department of Education that it reviewed Defendant Schools' payroll records, which showed that Defendant Schools had paid large bonuses to numerous employees engaged in recruiting students and securing financial aid during the years audited.

### PricewaterhouseCoopers

465.   In 2010, PwC completed its compliance audit of Defendant Schools'

> management's assertion, included in its representation letter dated June 30, 2010, that, for the year ended December 31, 2009, Stevens-Henager College, Inc. (the "College") complied with the requirements listed in Section II of the U.S. Department of Education's Audit Guide, *Audits of Federal Student Financial Assistance Programs at Participating Institutions and Institution Servicers*, 2000 Revision (the "Audit Guide"), relative to participation in the *Federal Student Financial Assistance Programs* (the "Programs") regarding[,]

among other things, "Institutional Eligibility and Participation." (Cover Letter from PwC, June 30, 2010.)

466.   PwC understood that the audit report was intended for the benefit of the Department of Education, that Defendant Schools would submit the report to the Department of Education, and that the Department of Education would rely on

PwC's compliance audit findings to determine whether Defendant Schools were eligible to participate in Title IV, HEA Programs. Indeed, PwC's compliance audit report specifically noted that the "report is intended solely for the information and use of management and the U.S. Department of Education." (*Id.*)

467.   With respect to the 2009 compliance audit, which Defendant Schools submitted to the Department of Education to maintain their eligibility to participate in Title IV, HEA Program, PwC represented and certified that its "examination was made in accordance with *Government Auditing Standards*, issued by the Comptroller General of the United States; attestation standards established by the American Institute of Certified Public Accountants; and the Audit Guide, and accordingly, included examining, on a test basis, evidence about the College's compliance with Program requirements." (*Id.*)

468.   In connection with PwC's compliance audit for 2009, on June 1, 2010, PwC's representative, Stewart McRae, requested that Defendant Schools provide information relating to the payroll/compensation of the Schools' recruiting personnel in 2009, including information about how campus recruiting personnel were compensated.

469.   Defendant Schools provided some information in response to this request later on June 1, 2010.

470.   On June 3, 2010, PwC's representative, Yair Katz, whose office is located in Los Angeles, California, requested further payroll reports for Defendant Schools' 2009 operations.

471.   Defendant Schools provided the requested payroll reports to PwC's representative, Mr. Katz, on June 15, 2010. That information included payroll information for ACs who had received bonuses in 2009.

472.   From that information, PwC selected a sample of four ACs who received bonuses in 2009, including Kiersten Murdoch, Hilary Baker, Hillary Kirschman, and Caleb Garcia. PwC learned that several of these ACs received substantial bonus amounts in 2009, including, in one case, more than $25,000, which PwC knew from the information provided represented more than 36% of that AC's take home pay for 2009.

473.   PwC never contacted Hilary Baker or Hillary Kirschman to discuss why they were paid bonuses in 2009, even though PwC knew that both of them received substantial bonuses for that year. Both Ms. Baker and Ms. Kirschman were paid bonuses on the same basis as the other ACs, as described above, including the Enrollment-Related Requirements. On information, Relators believe and allege that PwC never contacted any of the other ACs identified by Defendant Schools as having received bonuses in 2009 to inquire about why and how such bonuses were awarded and paid.

474.   Even though the Audit Guide and other auditing standards specifically required PwC to, among other things, (1) report any "discovery of a fraudulent act or indication of such an act related to Title IV Federal programs," (*id*. at I-4), (2) report "all instances of noncompliance identified . . . by the [auditor] during his/her engagement" (*id*. at I-15), and (3) to avoid "accepting explanations for audit

exceptions without competent evidence" (*id*. at I-4), and despite having knowledge that Defendant Schools paid substantial bonuses to ACs whose job responsibilities involved recruiting and enrolling students, PwC failed to report such information to the Department of Education.

475.   On the contrary, PwC's concluded and certified that "the College complied, in all material respects, with the aforementioned compliance requirements contained in Section II of the Audit Guide for the year ended December 31, 2009." (Cover Letter from PwC, June 30, 2010.) Indeed, PwC told the Department of Education that "[t]here were no findings for the audit period (year ended December 31, 2009)" even though PwC was aware that numerous ACs were paid bonuses during the relevant time period. (2009 Compliance Audit Report.)

### Weworksi & Associates

476.   In Weworski's audit reports for 2010 and 2011, Weworksi certified that it had

> examined management's assertions that Stevens-Henager College (the Institution) complied with the specified compliance requirements regarding Institutional Eligibility . . . listed in Section II of the U.S. Department of Education's Audit Guide, *Audits of Federal Student Financial Assistance Programs at Participating Institutions and Institution Servicers*, relative to participation in the Federal Student Financial Assistance Programs during the fiscal year ended December 31, 2010.

(Cover Letters to Independent Accountants' Report on Compliance with Specified Requirements Applicable to the FSFA Programs, June 16, 2011 & June 18, 2012.)

132

477.   In its 2010 and 2011 audit reports, Weworksi also specifically certified to the Department of Education that its

> examination was conducted in accordance with *Government Auditing Standards*, issued by the Comptroller General of the United States; attestation standards established by the American Institute of Certified Public Accountants; and the Audit Guide, *Audits of Federal Student Financial Assistance Programs at Participating Institutions and Institution Servicers*, issued by the U.S. Department of Education, Office of Inspector General, [2000 Revision, including all subsequent amendments] and accordingly, included examining, on a test basis, evidence about the Institution's compliance with those requirements."

(*Id.*)

478.   Weworski specifically understood and knew that Defendant Schools would send its audit reports to the Department of Education and that the Department of Education would rely on its audit reports to determine whether Defendant Schools were eligible to participate in Title IV, HEA Programs. Indeed, Weworski's compliance audit report specifically noted that the "report is intended solely for the information and use of the audit committee, management, and the U.S. Department of Education." (*Id.*)

479.   In approximately April 2011, Weworksi, or someone acting on behalf of Weworkski, asked to review Defendant Schools' payroll records for all financial aid and admissions personnel for the period January 1, 2010, to December 31, 2010. Defendant Schools complied with this request and provided the requested payroll information. On information, Relators believe and allege that Weworski, or someone

acting on behalf of Weworksi, made similar requests for payroll records for the 2011 compliance audits.

480.   The payroll information that Defendant Schools provided in response to the request in 2010 disclosed that Defendant Schools were paying substantial bonuses to employees whose primary responsibilities included recruiting students and obtaining financial aid, including to ACs and FAOs. For example, the documents identified specific ACs and FAOs at each of Defendant Schools' campuses and showed that these employees received substantial bonus payments on a regular basis on their 2010 paychecks. The reports were compiled summaries of the employees' paystubs throughout the year, separately listing regular pay, bonus pay, taxes, and benefit payments for each 2010 paystub. The reports also aggregated the payments by campus and by position. For example, the reports showed that in 2010, ACs at Defendant Schools' Fort Collins campus were paid more than $135,000 in bonuses and the ACs at the San Diego campus were paid more than $100,000 in bonuses. On information, Relators believe and allege that Weworski obtained similar information for the 2011 audit year.

481.   Even though Weworksi was required to obtain and review these payroll records for the purpose of determining whether Defendant Schools were paying bonuses to ACs, FAOs, and other employees in similar positions, Weworksi told the Department of Education in its 2010 and 2011 audit reports that "the Institution complied, in all material respects, with the aforementioned

requirements[, which includes the Incentive Compensation Ban,] for the [relevant] fiscal year[s]." (*Id.*)

482.   Weworksi represented to the Department of Education that with respect to "Institutional Eligibility" parameters, which includes compliance with the Incentive Compensation Ban, it applied a "0%" "error rate" to the determination of "a material instance of non-compliance." (*Id.*) In other words, Weworksi told the Department of Education that for violations of the Incentive Compensation Ban, *any single* violation would have been reported. But Weworski reported none, even though it certified to the Department of Education that it reviewed Defendant Schools' payroll records, which showed that Defendant Schools had paid large bonuses to numerous employees engaged in recruiting students and securing financial aid during the years audited.

483.   On information, Relators believe and allege that Defendant Auditors knowingly failed to perform the audits under the standards set forth in the Audit Guide, the GASs, and the SSAEs, even though they certified to the Department of Education they had done so, and particularly, knowingly failed to determine whether Defendant Schools' compensation practices for ACs, FAOs, and other employees complied with all applicable legal requirements using the procedures required by the Audit Guide, the GASs, and the SSAEs, and therefore, whether the corresponding Required Management Assertions were true and correct.

484.   Specifically, based on the information set forth above, Relators believe and allege that Defendant Auditors knowingly failed to, among other things, (1) test

payroll and other disbursement records to determine compliance with the Incentive Compensation Ban, even though the payroll records disclosed that Defendant Schools were not in compliance; (2) perform examination-level verifications of Defendant Schools' attestation that they did not violate the Incentive Compensation Ban; (3) design their examinations to detect intentional noncompliance with the Incentive Compensation Ban; (4) use due care to tailor the examination procedures so that the compliance attestation engagement objectives were achieved, including the objectives relating to the attestations about the Incentive Compensation Ban; (5) design and perform examination procedures that were reasonably capable of detecting significant illegal acts, including systematic and widespread violations of the Incentive Compensation Ban; (6) take special precautions to detect fraud or high risk areas, including with respect to the Incentive Compensation Ban; (7) recognize basic weaknesses in internal control; (8) review, evaluate, and document the institution's methodologies for determining compliance with institutional eligibility and participation criteria, particularly the methodologies relating to the Incentive Compensation Ban; (9) exercise the proper degree of professional skepticism to achieve reasonable assurance that material noncompliance would be detected; and (10) guard against accepting explanations for audit exceptions without competent evidence. Nevertheless, Defendant Auditors certified to the Department of Education that they in fact had done these things as part of their audits.

485.   Additionally, even though several (if not all) of Defendant Schools displayed "high risk indicators" of fraud and abuse, on information, Relators believe and allege that Defendant Auditors knowingly failed to identify or follow up on such indicators and knowingly failed to notify the Department of Education, as required. These high risk indicators of fraud included, among other things, (1) payroll records that disclosed substantial bonus payments to employees engaged in recruiting students and securing financial aid, (2) "[r]apid growth in a short period of time," which is listed in the Audit Guide as an example of a high risk indicator of fraud and abuse (Audit Guide, Appendix B), (3) "use of high pressure recruitment tactics," which is also listed in the Audit Guide (*id*.), and (4) "high turnover of . . . staff," particularly ACs, which is also listed in the Audit Guide (*id*.).

486.   On information, Relators believe and allege that Defendant Auditors should have paid particular attention to Defendant Schools' compensation practices for ACs because Defendant Auditors knew that (1) Defendant Schools derived a substantial portion of their revenues from Title IV, HEA programs; (2) a large majority of students attending Defendant Schools paid for their education, at least in part, with Title IV funding; (3) Defendant Schools expended large amounts on AC compensation; and (4) a large proportion of Defendant Schools' compensation for ACs was denominated as "bonuses."

487.   On information, Relators believe and allege that Defendant Auditors issued compliance audit reports knowing them to be false with respect to the audit procedures they performed to determine Defendant Schools' compliance with the

Incentive Compensation Ban or in reckless disregard of the truth or falsity of the information they provided to the United States on this subject.

488.   Defendant Auditors made false certifications of compliance respecting Defendant Schools' compliance obligations while knowing that Defendant Schools would submit such certifications to the Department of Education to obtain Title IV funding and to remain eligible to receive Title IV funding. Defendant Auditors intended for the Department of Education to rely on their audit opinions and statements. As a result, Defendant Auditors caused the United States to pay Title IV, HEA program funds to Defendant Schools by such false and fraudulent compliance audit opinions.

489.   Defendant Auditors were required to know every significant aspect of Defendant Schools' AC compensation practices under applicable audit standards and guidelines. Nevertheless, on information, Relators believe and allege that Defendant Auditors either failed to discover that Defendant Schools' compensation practices violated the Incentive Compensation Ban, even though they had a duty to discover such facts and would have discovered such facts had they complied with the Audit Guide, the GASs, and the SSAEs, or failed to disclose and make known to the Department of Education that Defendant Schools' compensation practices violated the Incentive Compensation Ban.   Under either alternative, Defendant Auditors facilitated Defendant Schools' violation of the Incentive Compensation Ban even though Defendant Auditors were specifically responsible for detecting and disclosing to the Department of Education such violations.

490.   On information, Relators believe and allege that Defendant Auditors received substantial compensation for preparing the compliance audits and financial statement audit opinions for Defendant Schools. On information, Relators believe and allege that Defendant Auditors realized that if they made known Defendant Schools' illegal compensation practices to the Department of Education or even closely scrutinized such practices, as they were required to do, they were likely to lose Defendant Schools' business and the substantial compensation they received from Defendant Schools.

491.   As set forth above, each compliance audit opinion issued by Defendant Auditors expressly stated and certified that Defendant Auditors had conducted their audit work in accordance with applicable standards and guidelines, including the Audit Guide, the GASs, and the SSAEs, even though Defendant Auditors knew such certifications were false.

492.   By issuing audit statements and opinions that failed to disclose that Defendant Schools' compensation practices violated the Incentive Compensation Ban, Defendant Auditors facilitated the ongoing and long-term violation of the Incentive Compensation Ban by Defendant Schools. Defendant Schools were required to submit the audit reports from Defendant Auditors each year in order to establish to the Department of Education that they had complied with all applicable rules and regulations, including the Incentive Compensation Ban, and that Defendant Schools would continue in compliance with such rules and regulations going forward. Had Defendant Auditors disclosed Defendant Schools' violations of

the Incentive Compensation Ban, the Department of Education and ACCSC would have taken action against Defendant Schools and prevented further violations of the Incentive Compensation Ban. By failing to disclose Defendant Schools' violations of the Incentive Compensation Ban, Defendant Auditors compounded the damages to the Department of Education by permitting Defendant Schools' to remain eligible for Title IV, HEA programs year after year.

**VII.**   **CLAIMS FOR RELIEF.**

## CLAIM I

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1) (1986)  --  False Claims Regarding Compliance With Title IV  -- Against Defendant Schools and Defendant Auditors)

493.   Relators re-allege and incorporate herein paragraphs 1 through 492.

494.   From July 1, 2002, to May 20, 2009, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of the FCA, 31 U.S.C. § 3729(a)(1).

495.   Specifically, Defendant Schools knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA programs and receive Title IV funding, when in fact, Defendant Schools' compensation practices did not comply with the Title IV of the HEA and its associated safe harbor regulations. Additionally, Defendant Schools knowingly submitted or caused to be submitted false

140

certifications regarding compliance with the requirements of Title IV of the HEA relating to the 90-10 Rule. In submitting or causing to be submitted such certifications and applications, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

496. Defendant Schools made express representations in writing to the Department of Education that they would not make incentive payments to their admissions personnel based directly or indirectly on their success in securing enrollments. These representations induced the Department of Education to make students at Defendant Schools eligible for many forms of financial aid under Title IV, HEA programs. These representations were material to the Department of Education's decision to make Defendant Schools eligible for these financial aid programs. At the time Defendant Schools made these representations, they knew that these representations were false, and would continue to be false, because Defendant Schools were paying their admissions personnel incentive payments based on their success in securing enrollments. Therefore, Defendant Schools fraudulently induced the Department of Education to make Defendant Schools eligible to participate in the Title IV, HEA programs, and each and every one of the claims they submitted or caused a student to submit violated the FCA.

497. Even if Defendant Schools had not affirmed to the government that they would comply with the Incentive Compensation Ban and 90-10 Rule, the mere fact that such compliance was material to the government's decision to make Defendant Schools eligible for Title IV, HEA programs, combined with the fact that

Defendant Schools, knowing that they were in violation of the Incentive Compensation Ban and 90-10 Rule and therefore ineligible to receive such student financial aid, submitted claims for student financial aid, caused students to submit claims for student financial, and/or received such aid, makes Defendant Schools liable under the FCA.

498.   Defendant Barney established, directed, and controlled the policies, practices, and procedures of Defendant Schools, including policies, practices, and procedures relating to Defendant Schools' submission of materially false certifications and statements to the Department of Education concerning their purported compliance with the Incentive Compensation Ban and Defendant Schools' actual compensation practices, including the practices that violate the Incentive Compensation Ban. Even though Defendant Barney knew that such compensation practices violated the Incentive Compensation Ban, he directed or permitted Defendant Schools to expressly certify to the Department of Education that they were in compliance with the Incentive Compensation Ban and to represent to the Department of Education that Defendant Schools would comply with the ban. As a result, Defendant Barney knowingly caused Defendant Schools' submission of false claims to the Department of Education.

499.   Additionally, Defendant Schools expressly promised the Department of Education in writing that they would comply with all applicable regulations concerning attendance-taking, refunds of unearned Title IV funds, and requiring satisfactory academic progress of all students. Defendant Schools later expressly

certified to the Department of Education that they had, in fact, complied with all such applicable regulations. However, at the time Defendant Schools made such promises, representations, and certifications to the Department of Education, they knew that such promises, representations, and certifications were materially false and that they did not intend to comply with such regulations. Defendant Schools therefore fraudulently induced the Department of Education to make them eligible to participate in the Title IV, HEA programs, and each and every one of the claims they submitted or caused a student to submit violated the FCA. Further, because Defendant Schools knew that compliance with such regulations was material to the Department of Education's decision to permit them and their students to participate in Title IV, Defendant Schools' knowledge they were not in compliance with such regulations renders every request for Title IV funding that Defendant Schools and their students submitted false and fraudulent.

500. Defendant Auditors made express representations to the Department of Education that they performed their audits of Defendant Schools in accordance with applicable standards and guidelines. These representations induced the Department of Education to make students at Defendant Schools eligible for many forms of financial aid. These representations were material to the Department of Education's determination that Defendant Schools were eligible to participate in Title IV, HEA programs. At the time Defendant Auditors made these representations, they knew that these representations were false, and would continue to be false, because Defendant Auditors did not perform the audit steps

and procedures required under applicable standards and guidelines. Therefore, Defendant Auditors fraudulently induced the Department of Education to make Defendant Schools eligible to participate in the Title IV, HEA programs, and each of the claims they submitted or caused a student to submit violated the FCA.

501.   In submitting or causing to be submitted such claims, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

502.   By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## CLAIM II

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1)(A) (2009) - False Claims Regarding Compliance With Title IV -- Against Defendant Schools and Defendant Auditors)

503.   Relators re-allege and incorporate herein paragraphs 1 through 502.

504.   From May 20, 2009 to at least 2011, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A). Specifically, Defendant Schools knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA programs and receive Title IV funding, when in fact, Defendant Schools' compensation practices did not comply with the Title IV of the HEA and its

144

associated safe harbor regulations.  In submitting or causing to be submitted such certifications and applications, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

505.   Defendant Schools made express representations in writing to the Department of Education that they would not make incentive payments to their admissions personnel based directly or indirectly on their success in securing enrollments. Additionally, Defendant Schools made specific representations regarding compliance with the 90-10 Rule. These representations induced the Department of Education to make students at Defendant Schools eligible for many forms of financial aid under Title IV, HEA programs. These representations were material to the Department of Education's decision to make Defendant Schools eligible for these financial aid programs. At the time Defendant Schools made these representations, they knew that these representations were false, and would continue to be false, because Defendant Schools were paying their admissions personnel incentive payments based on their success in securing enrollments and were knowingly violating the 90-10 Rule. Therefore, Defendant Schools fraudulently induced the Department of Education to make Defendant Schools eligible to participate in the Title IV, HEA programs, and each and every one of the claims they submitted or caused a student to submit violated the FCA.

506.   Even if Defendant Schools had not affirmed to the government that they would comply with the Incentive Compensation Ban and 90-10 Rule, the mere fact that such compliance was material to the government's decision to make

Defendant Schools eligible for Title IV, HEA programs, combined with the fact that Defendant Schools, knowing that they were in violation of the Incentive Compensation Ban and 90-10 Rule and therefore ineligible to receive such student financial aid, submitted claims for student financial aid, caused students to submit claims for student financial, and/or received such aid, makes Defendant Schools liable under the FCA.

507.   Defendant Barney established, directed, and controlled the policies, practices, and procedures of Defendant Schools, including policies, practices, and procedures relating to Defendant Schools' submission of materially false certifications and statements to the Department of Education concerning their purported compliance with the Incentive Compensation Ban and Defendant Schools' actual compensation practices, including the practices that violate the Incentive Compensation Ban. Even though Defendant Barney knew that such compensation practices violated the Incentive Compensation Ban, he directed or permitted Defendant Schools to expressly certify to the Department of Education that they were in compliance with the Incentive Compensation Ban and to represent to the Department of Education that Defendant Schools would comply with the ban. As a result, Defendant Barney knowingly caused Defendant Schools' submission of false claims to the Department of Education.

508.   Additionally, Defendant Schools expressly promised the Department of Education in writing that they would comply with all applicable regulations concerning attendance-taking, refunds of unearned Title IV funds, and requiring

satisfactory academic progress of all students. Defendant Schools later expressly certified to the Department of Education that they had, in fact, complied with all such applicable regulations. However, at the time Defendant Schools made such promises, representations, and certifications to the Department of Education, they knew that such promises, representations, and certifications were materially false and that they did not intend to comply with such regulations. Defendant Schools therefore fraudulently induced the Department of Education to make them eligible to participate in the Title IV, HEA programs, and each and every one of the claims they submitted or caused a student to submit violated the FCA. Further, because Defendant Schools knew that compliance with such regulations was material to the Department of Education's decision to permit them and their students to participate in Title IV, Defendant Schools' knowledge they were not in compliance with such regulations renders every request for Title IV funding that Defendant Schools and their students submitted false and fraudulent.

509.   Defendant Auditors made express representations to the Department of Education that they performed their audits of Defendant Schools in accordance with applicable standards and guidelines. These representations induced the Department of Education to make students at Defendant Schools eligible for many forms of financial aid.  These representations were material to the Department of Education's determination that Defendant Schools were eligible to participate in Title IV, HEA programs. At the time Defendant Auditors made these representations, they knew that these representations were false, and would

continue to be false, because Defendant Auditors did not perform the audit steps and procedures required under applicable standards and guidelines. Therefore, Defendant Auditors fraudulently induced the Department of Education to make Defendant Schools eligible to participate in the Title IV, HEA programs, and each and every one of the claims they submitted or caused a student to submit violated the FCA.

510.   In submitting or causing to be submitted such claims, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

511.   By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## CLAIM III

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1) (1986)  -  False Claims Regarding Compliance With Accrediting Standards  --  Against Defendant Schools)

512.   Relators re-allege and incorporate herein paragraphs 1 through 511.

513.   From July 1, 2002, to May 20, 2009, Defendant Schools knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the FCA, 31 U.S.C. § 3729(a)(1). Specifically, Defendant Schools knowingly submitted or caused to be submitted false certifications of accreditation by the ACCSC, Defendant Schools' accrediting agency. Defendant Schools knowingly provided false information to ACCSC, including false Faculty Personnel Reports, other false information about faculty qualifications and

admissions standards, false information about attendance-taking practices, and false information about student academic performance practices, for the purpose of causing and inducing ACCSC to determine that Defendant Schools met ACCSC's minimum accrediting standards and were therefore eligible for accreditation when in fact Defendant Schools did not meet the minimum accrediting standards and were not eligible for accreditation. Defendant Schools knew that ACCSC would communicate such accreditation decision, which was based on false information, to the Department of Education and that the Department of Education would rely on the ACCSC's accreditation to determine that Defendant Schools were eligible to participate in Title IV, HEA programs. Defendant Schools knew that ACCSC's accreditation determination was (and is) material to the Department of Education's decision to make Defendant Schools eligible to participate in Title IV, HEA programs. Therefore, Defendant Schools knowingly caused ACCSC to fraudulently induce the Department of Education to make Defendant Schools eligible to participate in the Title IV, HEA programs, and each and every one of the claims Defendant Schools submitted or caused a student to submit violated the FCA.

514.   Additionally, Defendant Schools knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA, specifically the requirement that it meet the requirements established by a nationally recognized accrediting agency, in their PPAs. Because Defendant Schools knew that they did not meet the requirements established by the ACCSC with respect to faculty qualifications, attendance, academic performance,

and admissions standards, such certifications were knowingly false. Defendant Schools knew that their certifications regarding compliance with the accrediting standards were material to the Department of Education's decision to make Defendant Schools eligible to participate in Title IV, HEA programs. As a result, each and every one of the claims Defendant Schools submitted or caused a student to submit violated the FCA.

515.   In submitting or causing to be submitted such claims, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

516.   By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## CLAIM IV

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1)(A) (2009)  -  False Claims Regarding Compliance With Accrediting Standards  --  Against Defendant Schools)

517.   Relators re-allege and incorporate herein paragraphs 1 through 516.

518.   From May 20, 2009 to at least 2011, Defendant Schools knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A). Specifically, Defendant Schools knowingly submitted or caused to be submitted false certifications of accreditation by the ACCSC, Defendant Schools' accrediting agency. Defendant Schools knowingly provided false information to ACCSC, including false Faculty Personnel Reports, other false information about faculty qualifications and

admissions standards, false information about attendance-taking practices, and false information about student academic performance practices, for the purpose of causing and inducing ACCSC to determine that Defendant Schools met ACCSC's minimum accrediting standards and were therefore eligible for accreditation when in fact Defendant Schools did not meet the minimum accrediting standards and were not eligible for accreditation. Defendant Schools knew that ACCSC would communicate such accreditation decision, which was based on false information, to the Department of Education and that the Department of Education would rely on the ACCSC's accreditation to determine that Defendant Schools were eligible to participate in Title IV, HEA programs. Defendant Schools knew that ACCSC's accreditation determination was (and is) material to the Department of Education's decision to make Defendant Schools eligible to participate in Title IV, HEA programs. Therefore, Defendant Schools knowingly caused ACCSC to fraudulently induce the Department of Education to make Defendant Schools eligible to participate in the Title IV, HEA programs, and each and every one of the claims Defendant Schools submitted or caused a student to submit violated the FCA.

519.  Additionally, Defendant Schools knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA, specifically the requirement that they meet the requirements established by a nationally recognized accrediting agency, in their PPAs. Because Defendant Schools knew that they did not meet the requirements established by the ACCSC with respect to faculty qualifications, attendance, academic performance,

and admissions standards, such certifications were knowingly false. Defendant Schools knew that their certifications regarding compliance with the accrediting standards were material to the Department of Education's decision to make Defendant Schools eligible to participate in Title IV, HEA programs. As a result, each and every one of the claims Defendant Schools submitted or caused a student to submit violated the FCA.

520.   In submitting or causing to be submitted such claims, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

521.   By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## CLAIM V

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(2) (1986)  -  False Statements and Records Regarding Compliance with Title IV  --  Against Defendant Schools and Defendant Auditors)

522.   Relators re-allege and incorporate herein paragraphs 1 through 521.

523.   From July 1, 2002, to June 7, 2008, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2).   Specifically, Defendant Schools knowingly made, used, and caused to be made or used, false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs and annual compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA programs

and to receive Title IV funding, when in fact, Defendant Schools' compensation practices did not comply with Title IV of the HEA and its associated safe harbor regulations.  Additionally, Defendant Schools knowingly submitted or caused to be submitted false records regarding compliance with the requirements of Title IV of the HEA relating to the 90-10 Rule.

524.   Defendant Barney directed Defendant Schools' submission of materially false certifications and statements to the Department of Education, including those concerning their purported compliance with the Incentive Compensation Ban and Defendant Schools' actual compensation practices, including the practices that violate the Incentive Compensation Ban. Even though Defendant Barney knew that such compensation practices violated the Incentive Compensation Ban, he directed or permitted Defendant Schools to expressly certify to the Department of Education that they were in compliance with the Incentive Compensation Ban and to represent to the Department of Education that Defendant Schools would comply with the ban. As a result, Defendant Barney knowingly caused Defendant Schools' submission of false claims to the Department of Education.

525.   Additionally, Defendant Schools expressly certified to the Department of Education that they were in compliance with all regulations relating to attendance-taking, refunds of unearned Title IV funds, and requiring satisfactory academic progress of all students. At the time Defendant Schools made such certifications to the Department of Education, they knew that such certifications

were materially false and that they did not intend to and were not then in compliance with such regulations.

526.    Defendant Auditors knowingly made, used, and caused to be made or used, false certifications regarding Defendant Schools' compliance with the requirements of Title IV of the HEA in their annual audit reports for the purpose of inducing the Department of Education to make Defendant Schools eligible to participate in Title IV, HEA programs when in fact, Defendant Schools' compensation practices did not comply with Title IV of the HEA and its associated safe harbor regulations.

527.    In making, using, or causing to be made or used such false records and statements, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

528.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## CLAIM VI

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1)(B) (2009)  -  False Statements and Records Regarding Compliance with Title IV  --  Against Defendant Schools and Defendant Auditors)

529.    Relators re-allege and incorporate herein paragraphs 1 through 528.

530.    From June 7, 2008 to at least 2011, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). Specifically, Defendant Schools knowingly made, used, and caused to be made or used, false certifications

regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs and annual compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA programs and to receive Title IV funding, when in fact, Defendant Schools' compensation practices did not comply with Title IV of the HEA and its associated safe harbor regulations.  Additionally, Defendant Schools knowingly submitted or caused to be submitted false records regarding compliance with the requirements of Title IV of the HEA relating to the 90-10 Rule.

531.   Defendant Barney directed Defendant Schools' submission of materially false certifications and statements to the Department of Education, including those concerning their purported compliance with the Incentive Compensation Ban and Defendant Schools' actual compensation practices, including the practices that violate the Incentive Compensation Ban. Even though Defendant Barney knew that such compensation practices violated the Incentive Compensation Ban, he directed or permitted Defendant Schools to expressly certify to the Department of Education that they were in compliance with the Incentive Compensation Ban and to represent to the Department of Education that Defendant Schools would comply with the ban.  As a result, Defendant Barney knowingly caused Defendant Schools' submission of false claims to the Department of Education.

532.   Additionally, Defendant Schools expressly certified to the Department of Education that they were in compliance with all regulations relating to

attendance-taking, refunds of unearned Title IV funds, and requiring satisfactory academic progress of all students. At the time Defendant Schools made such certifications to the Department of Education, they knew that such certifications were materially false and that they did not intend to and were not then in compliance with such regulations.

533.    Defendant Auditors knowingly made, used, and caused to be made or used, false certifications regarding Defendant Schools' compliance with the requirements of Title IV of the HEA in their annual audit reports for the purpose of inducing the Department of Education to make Defendant Schools eligible to participate in Title IV, HEA programs when in fact, Defendant Schools' compensation practices did not comply with Title IV of the HEA and its associated safe harbor regulations.

534.    In making, using, or causing to be made or used such false records and statements, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

535.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## CLAIM VII

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(2) (1986)  -  False Statements and Records Regarding Compliance With Accrediting Standards  --  Against Defendant Schools)

536.    Relators re-allege and incorporate herein paragraphs 1 through 535.

537. From July 1, 2002, to June 7, 2008, Defendant Schools knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2). Specifically, Defendant Schools prepared and caused the preparation of false reports to the ACCSC regarding the qualifications of Defendant Schools' faculty and their admissions standards. On information, Relators believe and allege that ACCSC relied on these false reports about faculty qualifications and admissions standards when it determined to accredit Defendant Schools. Defendant Schools knew that ACCSC would consult these false reports to make its accreditation decision and that ACCSC would communicate its accreditation decision based on these false reports to the Department of Education. Defendant Schools also knew that the ACCSC's accreditation was a condition to Defendant Schools' eligibility to participate in Title IV, HEA programs and that the ACCSC's accreditation was material to the Department of Education's decision to make Defendant Schools eligible to participate in Title IV, HEA programs.

538. Additionally, Defendant Schools knowingly submitted or caused to be submitted false records or statements regarding compliance with the requirements of Title IV of the HEA, specifically the requirement that it meet the requirements established by a nationally recognized accrediting agency, in their PPAs. Because Defendant Schools knew that they did not meet the requirements established by the ACCSC with respect to faculty qualifications, attendance, academic performance, and admissions standards, such certifications were knowingly false. Defendant

Schools knew that their certifications regarding compliance with the accrediting standards were material to the Department of Education's decision to make Defendant Schools eligible to participate in Title IV, HEA programs. As a result, each and every one of the claims Defendant Schools submitted or caused a student to submit violated the FCA.

539.   In making, using, or causing to be made or used such false statements or records, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

540.   By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## CLAIM VIII

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1)(B) (2009)  -  False Statements and Records Regarding Compliance With Accrediting Standards  --  Against Defendant Schools)

541.   Relators re-allege and incorporate herein paragraphs 1 through 540.

542.   From June 7, 2008 to at least 2011, Defendant Schools knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). Specifically, Defendant Schools prepared and caused the preparation of false reports to the ACCSC regarding the qualifications of Defendant Schools' faculty and their admissions standards. On information, Relators believe and allege that ACCSC relied on these false reports about faculty qualifications and admissions standards when it determined to accredit Defendant Schools. Defendant Schools knew that

ACCSC would consult these false reports to make its accreditation decision and that ACCSC would communicate its accreditation decision based on these false reports to the Department of Education. Defendant Schools also knew that the ACCSC's accreditation was a condition to Defendant Schools' eligibility to participate in Title IV, HEA programs and that the ACCSC's accreditation was material to the Department of Education's decision to make Defendant Schools eligible to participate in Title IV, HEA programs.

543. Additionally, Defendant Schools knowingly submitted or caused to be submitted false records or statements regarding compliance with the requirements of Title IV of the HEA, specifically the requirement that they meet the requirements established by a nationally recognized accrediting agency, in their PPAs. Because Defendant Schools knew that they did not meet the requirements established by the ACCSC with respect to faculty qualifications, attendance, academic performance, and admissions standards, such certifications were knowingly false. Defendant Schools knew that their certifications regarding compliance with the accrediting standards were material to the Department of Education's decision to make Defendant Schools eligible to participate in Title IV, HEA programs. As a result, each and every one of the claims Defendant Schools submitted or caused a student to submit violated the FCA.

544. In making, using, or causing to be made or used such false statements or records, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

545.   By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## VIII.  PRAYERS FOR RELIEF

WHEREFORE, Relators, on behalf of themselves and the United States, demand and pray that judgment be entered in their favor against Defendants, as follows:

1.     On Claims I through VIII under the FCA, as amended, for triple the amount of the United States' damages plus interest and such civil penalties as are allowable by law, together with the costs of this action and such other and further relief as may be just and proper;

2.     That judgment be entered in favor of Relators and the United States and against the Defendants for actual damages, pre-judgment and post-judgment interest, litigation costs, investigative costs, disgorgement of all profits, an accounting, to the fullest extent as allowed by law, and for such further relief as may be just and proper;

3.     That Relators be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730;

4.     That to the extent the United States Government has intervened in this action, the Relators be awarded an amount of at least 15% but not more than 25% of the proceeds of any award or the settlement of the intervened claims; and

5.     That to the extent that the United States Government has not intervened in this action, the Relators be awarded an amount that the Court

decides is reasonable, which is not less than 25% nor more than 30% of the proceeds of any award or settlement for those claims.

## IX.    **JURY TRIAL DEMAND**

1.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators demand a jury trial.

DATED this 5th day of June 2015.

/s/ Brandon J. Mark

BRANDON J. MARK
ALISSA M. MELLEM
RUTH HACKFORD-PEER
PARSONS BEHLE & LATIMER
*Attorneys for Relators*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 5, 2015, I caused the foregoing Third Amended
Complaint to be served on the following in the manner specified:

Gerald Ritzert
gritzert@ritzert-leyton.com
Steven M. Gombos
sgombos@ritzert-leyton.com
R. Willis Orton
worton@kmclaw.com
Alexander Dushku
adushku@kmclaw.com
*(attorneys for defendants Center for
Excellence in Higher Education, Inc.,
Stevens-Henager College, Inc.,
CollegeAmerica Denver, Inc.,
CollegeAmerica Arizona, Inc.,
California College of San Diego, Inc.,
and Carl Barney via the Court's
CM/ECF system pursuant to LR
5.1(k))*

Eric G. Maxfield
egmaxfield@hollandhart.com
*(attorneys for defendants Shaw,
Mumford & Co., P.C., and Shaw &
Co., P.C. via the Court's CM/ECF
system pursuant to LR 5.1(k))*

Antony L. Ryan
aryan@cravath.com
Samira Shah
sshah@cravath.com
Thomas G. Rafferty
trafferty@cravath.com
James S. Jardine
jjardine@rqn.com
Mark W. Pugsley
mpugsley@rqn.com
*(attorneys for defendant
PricewaterhouseCoopers LLP  via the
Court's CM/ECF system pursuant to
LR 5.1(k))*

Anna M. Pugsley
anna.pugsley@usdoj.gov
Jay D Majors
Jay.Majors@usdoj.gov
John W. Black
john.w.black@usdoj.gov
*(via the Court's CM/ECF system
pursuant to LR 5.1(k))*

*/s/ Brandon J. Mark*