**FOR PUBLICATION**

---

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

---

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KATIE BROOKS and NANNETTE WRIDE, <br><br> Plaintiffs, <br><br> v. <br><br> STEVENS-HENAGER COLLEGE, et al., <br><br> Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS <br><br> Case No. 2:15-cv-119-JNP-EJF <br><br> Judge Jill N. Parrish <br> Magistrate Judge Evelyn J. Furse |

---

Before the court are five pending motions to dismiss: Defendant PricewaterhouseCoopers LLP's ("PwC") Motion to Dismiss the Relators' Complaint (Docket 194); Defendant Shaw & Co.'s ("Shaw") Motion to Dismiss the Relators' Complaint (Docket 196); Defendant Weworski & Associates' ("Weworski") Motion to Dismiss the Relators' Complaint (Docket 201); Defendants Carl Barney's, California College San Diego's ("California College"), Center for Excellence in Higher Education's ("CEHE"), Collegeamerica Arizona, Inc.'s ("Collegeamerica Arizona"), Collegeamerica Denver, Inc.'s ("Collegeamerica Denver"), and Stevens-Henager College's ("Stevens-Henager") Motion to Dismiss the Relators' Complaint (Docket 198); and Defendants CEHE's and Stevens-Henager's Motion to Dismiss the Intervenor's Complaint (Docket 197).

On October 6, 2015, the court held a hearing on all pending motions to dismiss. The court then took the motions under advisement. After careful consideration of the record, relevant law, and the parties' memoranda, the court GRANTS PwC's Motion to Dismiss (Docket 194), Shaw's Motion to Dismiss (Docket 196), and Weworski's Motion to Dismiss (Docket 201), and GRANTS IN PART AND DENIES IN PART the Motion to Dismiss the Relators' Complaint

(Docket 198) and the Motion to Dismiss the Intervenor's Complaint (Docket 197).

## BACKGROUND

Katie Brooks and Nannette Wride (collectively "Relators") filed this case in the District of Idaho in January 2013 seeking relief under the federal False Claims Act, 31 U.S.C. §§ 3729–33 ("FCA"). Relators allege that Defendants CEHE, Stevens-Henager, California College, Collegeamerica Arizona, Collegeamerica Denver (collectively "Defendant Schools")[1] and Mr. Barney, the owner of Defendant Schools, submitted false claims and statements to the United States Department of Education ("DOE") from 2002 to 2011 in order to participate in Title IV federal financial aid programs. Relators separately allege that Defendants PwC, Shaw, and Weworski (collectively "Defendant Auditors") facilitated Defendant Schools' false claims when they performed audits of Defendant Schools' compliance with Title IV regulations. In April 2014, the United States (the "Government") intervened as to claims related to only two of the Defendants, CEHE and Stevens-Henager.

In February 2015, the District of Idaho granted Defendants' motion for transfer of venue without ruling on several pending motions to dismiss. Because previous briefing primarily relied on Ninth Circuit law, the court ordered new briefing and allowed Relators to file a Third Amended Complaint.

Before detailing the Relators' and Government's allegations against Defendants, the Court first provides background information on the FCA and Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §§ 1070–99.

## I.       The FCA

The FCA is the Government's "primary vehicle . . . for recouping losses suffered through

---

[1] On December 31, 2012, Defendant Schools merged into an Indiana nonprofit corporation, CEHE. CEHE continues to operate Defendant Schools under the same trade names as before.

fraud." *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 700 (7th Cir. 2015) (quoting 31 U.S.C. § 3729 *et seq.*). Prior to May 20, 2009, the FCA imposed civil liability on "[a]ny person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," or "(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1)–(2) (1986). On May 20, 2009, Congress amended the FCA to impose civil liability on "any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B) (2009).[2] Because Relators bring claims spanning from 2002 to 2011, the court must analyze the applicability of both versions of the FCA.

FCA violations result in civil penalties and treble damages. *Id.* § 3729(a)(1). The FCA also provides a *qui tam* enforcement mechanism, thereby allowing private parties, known as relators, to bring a civil suit on the Government's behalf. *Id.* § 3730(b). If the *qui tam* action is successful and results in the recovery of money for the Government, the relator shares in the Government's award. *Id.* § 3730(d).

## II.  Title IV

In order to participate in financial aid programs under Title IV of the Higher Education Act, institutions must enter into a Program Participation Agreement ("PPA") with the DOE. 20 U.S.C. § 1094(a). The PPA "condition[s] the initial and continuing eligibility of an institution to participate in a program [for Title IV funding] upon compliance with . . . [certain] requirements."

---

[2] As amended, § 3729(a)(1)(B) applies retroactively to claims pending on or after June 7, 2008. *See infra* I.A.4.

*Id.* "In sum, the PPA includes certifications of existing facts and forward-looking promises that the institution will abide by certain statutes and regulations attendant to Title IV." *Sanford-Brown*, 788 F.3d at 701.

## III.   The Relators' and Government's Allegations

Relators worked as admissions consultants at Stevens-Henager's Orem, Utah campus from 2009 to 2011. The Relators' Third Amended Complaint asserts three different categories of alleged FCA violations. First, Relators allege that they, along with their counterparts at other Defendant Schools, were paid bonuses for enrolling students in violation of the Incentive Compensation Ban, a law that prohibits institutions from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid." 20 U.S.C. § 1094(a)(20). Relators further allege that from 2002 to 2011, Defendant Schools and Mr. Barney falsely certified to the Government in their PPAs that Defendant Schools were in compliance with the Incentive Compensation Ban when in fact they paid bonuses to admissions personnel based on their success in enrolling students. Relators allege that Defendant Schools knew the certifications in their PPAs were false and that they made the certifications in order to induce the Government to allow them to receive Title IV funding. Defendant Schools and Mr. Barney contend, however, that their compensation system fell within Safe Harbor E, a former regulatory safe harbor to the Incentive Compensation Ban that allowed schools to pay "[c]ompensation . . . based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter." 34 C.F.R. § 668.14(b)(22)(ii)(E) (repealed 2011).[3]

---

[3] Effective July 2011, the DOE eliminated the regulatory safe harbors to the Incentive Compensation Ban. *See* Program Integrity Issues, 75 Fed. Reg. 66,832 (Oct. 29, 2010). In 2012, the D.C. Circuit found that the DOE's repeal of Safe Harbor E was "arbitrary and capricious." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d

Second, Relators allege that Defendant Schools falsely certified compliance with other regulations in their PPAs, including the 90/10 Rule[4] and regulations concerning accreditation requirements, such as attendance-taking, refunds of unearned Title IV funds, and students' satisfactory academic progress. Relators allege that Defendant Schools knew that their promises to comply with these regulations were false and were made only to induce the Government to allow them to receive Title IV funding. Relators also allege that Defendant Schools presented false certifications to their accreditation agency, ACCSC, such as falsified faculty personnel reports, in order to meet ACCSC's accrediting standards to appear eligible for Title IV funding.

Third, Relators allege that Defendant Auditors violated the FCA when they falsely certified in their audits that they had audited Defendant Schools in accordance with applicable standards and guidelines. Relators also allege that Defendant Auditors made false certifications regarding Defendant Schools' compliance with Title IV requirements in their annual audit reports in order to induce the DOE to deem Defendant Schools eligible to participate in Title IV.

After evaluating all of the Relators' claims, the Government intervened in claims against only two of the defendants, Stevens-Henager and CEHE. The Government's allegations are limited to violations of the Incentive Compensation Ban and do not include claims against Defendant Auditors. The Government also alleges it paid Stevens-Henager and CEHE by mistake of fact and that these two schools were unjustly enriched when they obtained federal funds they were not entitled to receive.

## ANALYSIS

Defendant Schools, Mr. Barney, and Defendant Auditors collectively bring five different

---

427, 448 (D.C. Cir. 2012). However, neither the Relators nor the Government allege any FCA violations occurring after 2011. Thus, any issues arising out of the D.C. Circuit's opinion are not implicated in this case.

    [4] The "90/10 Rule" prohibits schools from "deriv[ing] . . . less than ten percent of . . . [their] revenues from sources other than [Title IV] funds." 20 U.S.C. § 1094(a)(24), (d); 34 C.F.R. § 668.14(b)(16). Schools are also required to report their calculations under the 90/10 Rule in their annual financial audits. 34 C.F.R. § 668.23(d)(3).

motions to dismiss the Relators' and Government's complaints under Federal Civil Rules of

Procedure 12(b)(6), 8(a), and 9(b). The court first addresses Defendants' arguments to dismiss

the Relators' and Government's FCA claims and then addresses Stevens-Henager's and CEHE's

arguments to dismiss the Government's claims for mistake and unjust enrichment.

## I.        The Relators' and Government's FCA Claims

The court first addresses the legal sufficiency of the Relators' and Government's FCA

claims under Rule 12(b)(6). The court then addresses the sufficiency of the Relators' and

Government's factual allegations under Rules 8(a) and 9(b).

### A.        The Legal Sufficiency of the Relators' and Government's FCA Claims

In order to survive a Rule 12(b)(6) motion to dismiss, plaintiffs must "state a claim upon

which relief can be granted." Fed. R. Civ. P. 12(b)(6). To do so, plaintiffs must plead both a

legitimate legal theory and "enough factual matter, taken as true, to make [their] 'claim to

relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The FCA "covers all fraudulent attempts to cause the government to pay out sums of

money." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217

(10th Cir. 2008) (quoting *United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d

1169, 1172 (10th Cir. 2007)). Both Relators and the Government allege violations of 31 U.S.C.

§ 3729(a)(1)(A)–(B) and their pre-amendment predecessors, 31 U.S.C. § 3729(a)(1)–(2). Before

the 2009 amendment, § 3729(a)(1)–(2) imposed liability on any person who

> (1) knowingly presents, or causes to be presented, to an officer or employee of the
> United States Government . . . a false or fraudulent claim for payment or
> approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the Government.

Following the 2009 amendment, the FCA was renumbered as § 3729(a)(1)(A)–(B). It

6

then imposed liability on "any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* While the text of these provisions varies, each shares the common elements of a "false or fraudulent claim" and scienter. Consequently, the court addresses these elements first. The court then reviews the remaining elements particular to each subsection of the FCA and addresses any material differences between the pre-and post-2009 FCA.

### 1)   A False or Fraudulent Claim

The first element universal to all FCA claims is a false or fraudulent claim. The allegations in this case fall within three broad categories: the Relators' and Government's allegations regarding Defendant Schools' and Mr. Barney's Incentive Compensation Ban violations, the Relators' and Government's allegations regarding Defendant Schools' fraudulent certifications, and the Relators' allegations regarding Defendant Auditors' fraudulent certifications.

Defendant Schools raise a defense that applies only to the alleged Incentive Compensation Ban violation. The court first addresses this defense before turning to the issue of whether Relators and the Government have alleged a legitimate legal theory for pleading a false or fraudulent claim.

### a)   The Incentive Compensation Ban and Safe Harbor E

At the outset, Defendant Schools and Mr. Barney assert that their incentive compensation program did not violate the Incentive Compensation Ban, 20 U.S.C. § 1094(a)(20), because they complied with a former regulatory safe harbor known as Safe Harbor E, 34 C.F.R. § 668.14(b)(22)(ii)(E) (repealed 2011). On this basis, Defendant Schools and Mr. Barney seek dismissal under Rule 12(b)(6) of all FCA claims arising out of Defendant Schools' and Mr.

Barney's alleged Incentive Compensation Ban violation.

In order to evaluate Defendant Schools' and Mr. Barney's defense, it is necessary to begin with the Incentive Compensation Ban's statutory and regulatory framework. The Incentive Compensation Ban states that an institution receiving Title IV funds

> will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance, except that this paragraph shall not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance.

20 U.S.C. § 1094(a)(20).

Following Congress's enactment of the Incentive Compensation Ban, the DOE adopted numerous regulations interpreting the ban in an effort to provide greater clarity with respect to how it would be enforced. These regulations reiterate the overarching prohibition on providing "any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of Title IV, HEA program funds." 34 C.F.R. § 668.14(b)(22)(i). But the DOE also set forth several regulatory safe harbors that describe "[a]ctivities and arrangements that an institution may carry out without violating the provisions of [the Incentive Compensation Ban]." 34 C.F.R. § 668.14(b)(22)(ii) (repealed 2011). Among these, Safe Harbor E excludes "[c]ompensation that is based upon students successfully completing their educational programs, or one academic year of their educational programs whichever is shorter." *Id.* § 668.14(b)(22)(ii)(E).

With this framework in mind, the court can dismiss the Relators' and Government's claims under Rule 12(b)(6) only if the court concludes that Defendant Schools' and Mr. Barney's incentive compensation plan fell within Safe Harbor E. And at this stage of the proceedings, the

court must accept as true all of the Relators' and Government's factual allegations regarding Defendant Schools' and Mr. Barney's compensation plan. *Jordan-Arapahoe, LLP v. Bd. of Cty. Comm'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011).

Here, Relators and the Government both allege that Defendant Schools and Mr. Barney provided incentive compensation to admissions consultants and other employees involved in the recruiting process if they satisfied three requirements: (1) the employee recruited a student who completed thirty-six credit units—the equivalent of one year of study, (2) that employee had also recruited at least five new students within the past three months, and (3) the employee maintained at least a 33% conversion ratio over the past three months.[5] If an employee met each of these criteria, the employee was entitled to a bonus. The value of the bonus was determined on a sliding scale that considered the employee's conversion ratio and whether the employee independently recruited new students.

Defendant Schools and Mr. Barney assert that, accepting all of these facts as true, their incentive compensation program fell within the plain language of Safe Harbor E and did not violate the Incentive Compensation Ban. Defendant Schools and Mr. Barney emphasize that Safe Harbor E lacks any language restricting a school's ability to set additional requirements for awarding bonuses so long as the bonuses are always tied to a student who has completed thirty-six credits.

The court disagrees. For the reasons that follow, the court concludes that, accepting all factual allegations as true, Defendant Schools' and Mr. Barney's compensation program falls outside the scope of Safe Harbor E and violates the plain language of the Incentive Compensation Ban. Defendant Schools and Mr. Barney attempt to read Safe Harbor E in a

---

[5] Defendant Schools' "conversion ratio" is the number of actual enrollments divided by the number of interviews the employee conducted with prospective students.

vacuum. Standing by itself, Safe Harbor E might fairly be read in a way that allows schools to set additional requirements for awarding bonuses so long as the bonus is linked to a student who has completed at least thirty-six credits. But Safe Harbor E is not a standalone provision. It is part of a statutory and regulatory framework that opens with an expansively worded ban on any incentive compensation for recruiters. Both the language of the statute and the regulation prohibit the payment of "*any* commission, bonus, or other incentive payment *based directly or indirectly on success in securing enrollments* or financial aid." 20 U.S.C. § 1094(a)(20) (emphasis added); 34 C.F.R. § 668.14(b)(22)(i). Safe Harbor E is an exception to this overarching ban. Thus, the language of Safe Harbor E allowing "[c]ompensation that is based upon students successfully completing" at least one year of their programs, 34 C.F.R. § 668.14(b)(22)(ii)(E) (repealed 2011), must be read narrowly and in light of the overarching prohibition on incentive payments "based directly or indirectly" on enrollments. *See In re Woods*, 743 F.3d 689, 699–700 (10th Cir. 2014) (holding that "exceptions must not be interpreted so broadly as to swallow the rule"); *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 994 (9th Cir. 2011).

Defendant Schools and Mr. Barney attempt to read Safe Harbor E's silence on additional requirements for awarding completion bonuses as an affirmative authorization for such requirements. This reading is erroneous. Safe Harbor E is the exception and not the rule. Therefore, in construing the exception narrowly, the regulation's silence regarding additional requirements for completion bonuses may not be read as an affirmative authorization for a more expansive exception allowing bonuses to be conditioned on meeting recruiting goals.

In fact, the court concludes that the opposite of Defendant Schools' and Mr. Barney's reading is true. That is, the absence of an affirmative authorization for additional requirements on awarding bonuses is evidence of the DOE's intent *not* to allow such requirements. In Safe

Harbor A, the DOE created an exception allowing consideration of an employee's recruitment statistics for awarding raises, subject to specific limitations. *See* 34 C.F.R. § 668.14(b)(22)(ii)(A) (repealed 2011). The fact that the DOE expressly authorized consideration of recruitment statistics in Safe Harbor A, but did not authorize such consideration in Safe Harbor E, indicates that Safe Harbor E does not encompass completion bonuses if they are dependent upon the realization of additional recruiting requirements. *Cf. Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)).

Because Defendant Schools' and Mr. Barney's incentive compensation program falls outside of Safe Harbor E, Safe Harbor E does not provide a basis for dismissing the Relators' or Government's claims as alleged in the operative complaints.[6]

### b)      Actionable False or Fraudulent Claims

Having rejected Defendant Schools' and Mr. Barney's arguments with respect to Safe Harbor E, the court reviews whether Relators and the Government have stated a proper legal theory for all three categories of violations: the Relators' and Government's allegations regarding Defendant Schools' and Mr. Barney's Incentive Compensation Ban violations, the Relators' and Government's allegations regarding Defendant Schools' fraudulent certifications, and the Relators' allegations regarding Defendant Auditors' fraudulent certifications.

---

[6] After the hearing, Defendants submitted supplemental briefing regarding a recent administrative decision published by the DOE. The decision clarified the DOE's 2011 amendments to the Incentive Compensation Ban regulations. However, because Defendant Schools' alleged violations of the Incentive Compensation Ban occurred prior to the 2011 amendments, the DOE's clarification is not relevant and the court need not consider it in ruling on Defendants' motions to dismiss.

Because the court need not consider Defendants' supplemental authority, all other motions regarding the supplemental authority—Relators' Motion to Strike (Docket 240) and Defendant Weworski's Alternative Motion for Leave for Court to Consider Weworski's December 10, 2015 Response (Docket 242)—are DENIED AS MOOT.

"The FCA recognizes two types of actionable claims—factually false claims and legally false claims." *Conner*, 543 F.3d at 1217. A plaintiff under the False Claims Act may plead the element of a false or fraudulent claim by showing that a claim was either factually or legally false or fraudulent.

"[P]roving [factual] falsehood is relatively straightforward: A relator must generally show that the government payee has submitted 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *Id.* (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)). Proving legal falsehood is less straightforward. In the Tenth Circuit, "legally false certification claims can rest [on] one of two theories—express false certification, and implied false certification." *Id.* While an express false certification theory may be pled under any of the FCA sections at issue, an implied false certification theory arises only under § 3729(a)(1)(A) and its predecessor, § 3729(a)(1). *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010).

"An express false certification theory applies when a government payee 'falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment.'" *Conner*, 543 F.3d at 1217 (quoting *Mikes*, 274 F.3d at 698). An implied false certification theory "focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Id.* at 1218. When defendants "knowingly violate[] such a condition while attempting to collect remuneration from the government, [they] may have submitted an impliedly false claim." *Id.*

Under both false certification theories, the court must assess whether compliance with the underlying statute, regulation, or contractual term is "a prerequisite to payment," namely,

whether compliance is "material to the government's decision to pay out moneys to the claimant." *See id.* at 1217–19 (quoting *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1172 (9th Cir. 2006)). "Thus, a false certification—regardless of whether it is implied or express—is actionable under the FCA only if it leads the government to make a payment which, absent the falsity, it may not have made." *Lemmon*, 614 F.3d at 1169.

With respect to federal programs, the Tenth Circuit has been "careful to distinguish between conditions of program *participation* and conditions of *payment*." *Conner*, 543 F.3d at 1220. This distinction is important in determining whether compliance with a given statute, regulation, or contractual provision is material to the Government's payment decisions, thereby triggering potential FCA liability. Congress and the agencies that administer federal programs are free to adopt a scheme that expressly requires strict regulatory compliance as a condition of payment. They are equally free, however, to adopt a system where "[c]onditions of participation, as well as a [participant institution's] certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." *Id.*

In *United States ex rel. Conner v. Salina Regional Health Center, Inc.*, the Tenth Circuit reviewed Medicare's administrative enforcement regime to determine whether a provider's compliance with Medicare regulations was a prerequisite to receiving Medicare payments or a condition of continuing eligibility to participate in the Medicare program. *See id.* at 1220–22. After reviewing various aspects of the Medicare regulatory scheme, the Tenth Circuit determined that compliance with Medicare regulations is a condition of ongoing program participation that is enforced through an administrative scheme. *See id.* at 1221. In making this determination, the Tenth Circuit rejected the argument that strict regulatory compliance was material to the

Government's decision to pay a provider's claims for Medicare funds.[7]

In this case, the parties dispute whether an institution's compliance with Title IV regulations is a condition of participation in Title IV (i.e. not material for purposes of FCA liability) or is a condition of receiving federal financial aid payments (i.e. material for purposes of FCA liability). Following the Tenth Circuit's analytical framework in *Conner*, the court "review[s] . . . the scheme for managing [Title IV, HEA program] participation" to discern whether Congress and the DOE have conditioned program payments on regulatory compliance, or whether, like Medicare, regulatory compliance is instead only a condition of ongoing program participation that is enforced through an administrative regime. *See id.* at 1220–21. The court addresses in turn each of the considerations identified by the Tenth Circuit in *Conner*.

First, the *Conner* court noted that before participating in Medicare, "hospitals must undergo inspections, which may be conducted by private accreditation organizations." *Id.* at 1220 (citing 42 C.F.R. § 488.5(a)). Similarly, in order to participate in Title IV, educational institutions must "meet the requirements established by . . . accrediting agencies or associations." 20 U.S.C. § 1094(a)(21). Accrediting agencies are required to assess an institution's educational objectives and degree requirements through written reports and on-site reviews "to determine if the institution or program complies with the agency's standards." 34 C.F.R. § 602.17(c).

Second, hospitals must "complete a Medicare Participation Certification, which includes a representation that the provider has complied with all applicable laws and regulations." *Conner*, 543 F.3d at 1220. Likewise, institutions desiring to participate in Title IV programs are

---

[7] *See Conner*, 543 F.3d at 1221 ("It follows that the certification in the annual cost report represents the provider's assurance that it continues to comply with the requirements of Medicare participation. Implied in this certification is the recognition that the provider could face consequences through the administrative procedures described above if it falls short of substantial compliance. Based on the fact that the government has established a detailed administrative mechanism for managing Medicare participation, we are compelled to conclude that although the government considers substantial compliance a condition of ongoing Medicare *participation,* it does not require perfect compliance as an absolute condition to receiving Medicare *payments* for services rendered.").

required to enter into a PPA. 20 U.S.C. § 1094(a). The PPA "condition[s] the initial and continuing eligibility of an institution to participate in [Title IV] program[s] upon compliance with" a number of statutes and regulations with which the institution must comply or promise to comply in order to participate in Title IV. *Id.*

Third, "[a]fter the organization is accredited, the government may at any time initiate a 'validation survey,' which may be conducted by a state agency that ensures ongoing compliance with Medicare conditions." *Conner*, 543 F.3d at 1220 (citing 42 C.F.R. § 448.10(c)). Similarly, after an institution enters into a PPA and begins to participate in Title IV programs, the institution must continue to comply with the PPA's requirements in order to remain eligible to participate in Title IV. 20 U.S.C. § 1094(a). Continued compliance is in part measured by accreditation agencies, which "must reevaluate, at regularly established intervals, the institutions or programs it has accredited." 34 C.F.R. § 602.19(a). This monitoring "must include periodic reports, and collection and analysis of key data and indicators, . . . including, but not limited to, fiscal information and measures of student achievement." *Id.* § 602.19(b). Accreditation agencies may also conduct unannounced inspections. *Id.* § 602.23(f). Similarly, each institution is required to undergo compliance audits "with regard to any funds obtained by it under [Title IV] . . . on at least an annual basis." 20 U.S.C. § 1094(c)(1)(A)(i).

Fourth, "[e]ven if . . . a provider appears noncompliant, the government does not immediately suspend Medicare enrollment or billing privileges. Rather, the relevant regulations permit the provider to create a plan of correction, and allow a reasonable period of time . . . to address any deficiencies." *Conner*, 543 F.3d at 1220–21 (citing 42 C.F.R. § 488.28 (a), (c) & (d)). Similarly, institutions participating in Title IV programs may be placed on "provisional status" for violations of the 90/10 Rule, 20 U.S.C. § 1094(d)(2)(B), and are afforded

opportunities to correct instances of noncompliance discovered through audits by creating a

corrective action plan. U.S. DEP'T OF EDUC. OFFICE OF INSPECTOR GEN., AUDIT GUIDE I-6

(2000), *available at* http://www.ifap.ed.gov/aguides/attachments/sfgd2000.pdf.

     Fifth, "[o]nly after finding that the provider has not 'substantially' complied may the

government, at its discretion, terminate a Medicare participation agreement." *Conner*, 543 F.3d

at 1221 (citing 42 C.F.R. § 1395cc(b)(2)). Likewise, if an institution is noncompliant with Title

IV requirements, the relevant regulations allow for "the limitation, suspension, or termination of

the participation . . . of an eligible institution, or the imposition of a civil penalty." 20 U.S.C.

§ 1094(c)(1)(F) & (3). Such penalties, however, may only be administered "after reasonable

notice and opportunity for hearing." *Id.* Title IV regulations also provide for emergency action in

which the DOE can temporarily withhold funds from an institution if the DOE "determines that

immediate action is necessary to prevent misuse of Federal funds." *Id.* § 1094(c)(1)(G)(ii).

     Finally, like the plaintiff in *Conner*, neither Relators nor the Government cite

"regulations or case law indicating that the government normally seeks retroactive recovery of

[Title IV] Payments for [education] actually [provided] on the basis that the noncompliance

rendered [the payments] fraudulent." *Conner*, 543 F.3d at 1221.[8]

     For all of the foregoing reasons, the court concludes that like Medicare, Title IV does not

condition payment on regulatory compliance. Upon entering a PPA and becoming a program

participant, regulatory compliance is enforced through an administrative regime where the

ultimate sanction is removal from the program. False certifications of compliance during

program participation do not have any tendency to affect payment of program funds in the first

instance. Instead, regulatory noncompliance and false certifications during program participation

---

[8] Title IV requires institutions to return funding in some instances, for example, when a student fails to
attend a sufficient number of classes. 20 U.S.C. § 1091b. However, these requirements are part of the administrative
regime and do not evidence an intent to condition initial payment on perfect regulatory compliance.

provide grounds for administrative sanctions and possible removal from the program.

Relators and the Government counter with the Tenth Circuit's statement in *Conner* that some "regulations or statutes may be so integral to the government's payment decision as to make any divide between conditions of participation and conditions of payment a 'distinction without a difference.'" *Id.* at 1222 (quoting *Hendow*, 461 F.3d at 1177). But neither the Tenth Circuit nor any other court to grapple with the issue has established a meaningful standard for distinguishing "integral" conditions of participation that trigger FCA liability from traditional conditions of participation that are enforced exclusively through the "carefully crafted remedial process[es]" of an administrative regime. *See id.* at 1221–22. At minimum, the circuit courts that have addressed this issue, including the Tenth Circuit in dicta, agree that "falsely promis[ing] to comply with Title IV's [regulatory scheme including the] ban on 'incentive compensation' simply to become eligible for Title IV federal funds" materially impacts "the government's payment decision," even though the promise is made as a condition of program participation. *Id.* at 1222;[9] *see also Sanford-Brown*, 788 F.3d at 708–12; *United States ex rel. Miller v. Weston Educ., Inc.*, 784 F.3d 1198, 1204, 1207–09 (8th Cir. 2015), *petition for cert. docketed*, No. 15-404 (U.S. Oct. 1, 2015); *Hendow*, 461 F.3d at 1172–73; *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916–17 (7th Cir. 2005).

Relators and the Government argue that the Incentive Compensation Ban qualifies as an integral regulation under *Conner*, a violation of which automatically triggers FCA liability. The court disagrees. Indeed, the overarching theme of the *Conner* opinion is that courts should be careful not to impose a requirement of strict regulatory compliance where none exists.

---

[9] The Tenth Circuit expressly acknowledged the Ninth Circuit's reasoning that if FCA liability were not triggered by knowingly making false promises to gain admission to Title IV participation, defendants "would be virtually unfettered in [their] ability to receive funds from the government while flouting the law." *Conner*, 543 F.3d at 1222 (quoting *Hendow*, 461 F.3d at 1176).

As the Tenth Circuit reasoned in *Conner*, under the FCA "[a]n individual private litigant, ostensibly acting on behalf of the United States, could prevent the government from proceeding deliberately through [its] carefully crafted remedial process and could demand damages far in excess of the entire value of [program] services [provided] by the [recipient of program funds]." *Conner*, 543 F.3d at 1221. There is a significant risk that such claims could have "catastrophic" consequences directly contrary to the purpose of the federal program. *See id.* For example, in the Medicare context, the Tenth Circuit noted that FCA liability for regulatory noncompliance would "likely be catastrophic for hospitals that provide medical services to the financially disadvantaged and the elderly," and would undermine the very purpose of Medicare. *Id.* Similarly, in the Title IV context, imposition of FCA liability for regulatory violations may jeopardize broad access to education. Just as federal courts are ill-equipped to make decisions about medical care standards, *see id.*, courts are equally ill-equipped to determine the proper balance between enhancing access to education by allowing schools to retain eligibility for Title IV funding and adequately enforcing the requirements of program participation.

For these reasons, the court concludes that "[g]ood-faith entry into the PPA is the [sole] condition of payment necessary to be eligible for subsidies under the U.S. Department of Education's subsidies program." *Sanford-Brown*, 788 F.3d at 710. Drawing the line at entering into a PPA makes sense. The Title IV administrative regime is not set up to monitor whether an institution knowingly makes false promises of compliance in a PPA to gain entry into the program. Rather, it is designed to monitor and remediate compliance issues arising *after* institutions become program participants—that is, after participants have promised in good faith to abide by the requirements of program participation. In short, until an institution participates in Title IV, Title IV has no hold over them.

18

In contrast, the very purpose of the FCA is to protect the Government from deliberate and knowing efforts to submit false claims. Liability at the PPA stage protects the Government from an institution's knowingly false entry into the program. Thus, the FCA fills the gaps and protects the Government at the stage where Title IV cannot. But once an institution becomes a Title IV participant, Title IV's regulatory scheme, rather than the FCA, governs program compliance.

In addition, the court's conclusion that FCA liability does not extend to subsequent regulatory violations prevents "catastrophic" consequences undermining the purposes of Title IV. Instead, the court's conclusion gives the DOE room to calibrate its enforcement efforts to balance the need to maintain broad access to education with Title IV compliance.

For these reasons, the court reaches the same conclusion as every circuit to address the question: entry into a PPA is the condition of payment triggering potential FCA liability. In contrast, subsequent regulatory compliance—such as complying with the 90/10 Rule and other accreditation regulations—is only a condition of continuing program participation and is governed only by Title IV's administrative compliance regime. *See id.* at 710–11; *Miller*, 784 F.3d at 1204.[10]

With this standard in mind, the Court addresses the legal sufficiency of the Relators' and Government's allegations of a false or fraudulent claim under Rule 12(b)(6). Relators and the Government raise several distinct theories to satisfy the element of a false or fraudulent claim. The court addresses each of these theories in turn.

---

[10] In their motions to dismiss, Defendant Schools ask the court to take judicial notice of several documents that state what they believe to be the DOE's position on the materiality of Incentive Compensation Ban violations. In light of the above analysis, the court declines Defendant Schools' request. Regardless, it would be improper for the court to take judicial notice of these documents because Defendant Schools rely on them "to prove the truth of matters asserted therein." *See Tal v. Hogan*, 453 F.3d 1244, 1264–65 n.24 (10th Cir. 2006) (holding that documents that a court takes judicial notice of at the motion to dismiss stage "may only be considered to show their contents, not to prove the truth of matters asserted therein" (quoting *Oxford Asset Mgmt. Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

<b>c)</b>    <b>The Sufficiency of the Relators' Allegations with Respect to a False or Fraudulent Claim Against Defendant Schools and Mr. Barney</b>

The Relators' Third Amended Complaint contains a host of allegations of wrongdoing by Defendant Schools and Mr. Barney. With respect to a false or fraudulent claim, these allegations can be categorized under two legal theories. Relators' first legal theory is that Defendant Schools and Mr. Barney entered into multiple PPAs, promising to comply with Title IV requirements, including the Incentive Compensation Ban, while knowing they were in fact violating these requirements or knowing they did not intend to comply with them. The second theory is that once Defendant Schools and Mr. Barney became Title IV participants, they made numerous, subsequent false certifications of compliance with Title IV requirements in order to maintain Title IV eligibility and draw down Title IV funds. These subsequent false certifications include promises to comply with the 90/10 Rule and regulations concerning accreditation requirements, including attendance-taking, refunding unearned Title IV funds, accurately recording students' satisfactory academic progress, and maintaining accurate faculty personnel reports.

For the reasons outlined in the foregoing analysis of this issue, the court holds that the first theory, with respect to Defendant Schools' and Mr. Barney's entry into the PPAs, states a legally cognizable theory for a false or fraudulent claim. However, the court further holds that the alleged subsequent false certifications cannot give rise to a false or fraudulent claim. Payment of Title IV funds is conditioned only on properly becoming a program participant, not on regulatory compliance. Subsequent certifications are material only to continued eligibility for program participation, which is governed by Title IV's comprehensive administrative regime and not the FCA.[11]

---

[11] Although evidence of subsequent false certifications and affirmative attempts to cover up such violations—such as failing to comply with the 90/10 Rule and other accreditation regulations—are not an

### d)     The Sufficiency of the Relators' Allegations with Respect to a False or Fraudulent Claim Against Defendant Auditors

The Relators' allegations against Defendant Auditors raise a third legal theory for finding a false or fraudulent claim. Title IV requires program participants to obtain an annual compliance audit conducted in accordance with the DOE's Audit Guide. Relators allege that Defendant Auditors knowingly failed to comply with the audit standards. Relators further allege that an audit that complies with all relevant regulations is material to the DOE's decision to make Defendant Schools eligible to receive Title IV funds. Relators therefore conclude that all claims for payment in the year following the deficient audits are false or fraudulent.

The Relators' audit theory fails as a matter of law. Title IV auditor compliance is governed by an administrative regime. Like the subsequent certifications addressed previously, the compliance audit requirement is a condition of ongoing program participation. While an auditor's failure to follow mandated regulations may trigger civil penalties or bar the auditor from conducting further Title IV audits, it does not render a school's subsequent claims false or fraudulent, or give rise to auditor liability under the FCA. A school's failure to obtain a proper audit may also lead to administrative sanctions against the school. But unless the school's promise to obtain a proper compliance audit in its PPA is knowingly false at the time the PPA is signed, a noncompliant audit will not render the school's subsequent claims false or fraudulent.[12] Because Relators have not alleged that Defendant Schools falsely promised to obtain a proper compliance audit, Relators' noncompliant audit theory fails.[13]

---

independent basis for showing a false or fraudulent claim, this evidence may nonetheless provide circumstantial proof that Defendant Schools and Mr. Barney knowingly entered into the PPAs to become eligible for Title IV funding with no intention of following through on their promise to comply with program requirements.

[12] If the promise to obtain a proper compliance audit were false when made, this would still fail to trigger FCA liability for the auditor. The school, not the auditor, would be the entity making a false promise to receive access to Title IV funds.

[13] During oral argument, Relators warned that without FCA liability for knowingly deficient audits, Defendant Auditors would be immunized from accountability for their wrongful conduct. The court is not persuaded

e)      **The Sufficiency of the Government's Allegations with Respect to a False or Fraudulent Claim Against Stevens-Henager and CEHE**

Like the Relators' allegations against Defendant Schools, the Government's allegations against Stevens-Henager and CEHE are premised on two general legal theories. Under the first theory, the Government alleges that Stevens-Henager and CEHE entered into multiple PPAs while knowingly violating the Incentive Compensation Ban and promising compliance with the ban while knowing they in fact did not intend to comply with it. Under the second theory, the Government alleges that Stevens-Henager and CEHE made numerous certifications of compliance with the Incentive Compensation Ban during their participation in Title IV programs while knowing they were violating the ban. For the same reasons outlined above with respect to the Relators' allegations against Defendant Schools, the court holds that only the Government's allegations of knowingly false entry into the PPAs states a legally cognizable theory for satisfying the element of a false or fraudulent claim.

2)      **Scienter**

The second element universal to all FCA claims is scienter. The relevant subsections of 31 U.S.C. § 3729(a) require defendants to have the state of mind of "knowingly." Defendants must have acted with "actual knowledge of the information," "deliberate ignorance," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1) (2009). The FCA does not require proof of specific intent to defraud. 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1) (2009). The court next addresses the legal and factual sufficiency of the Relators' and Government's allegations regarding Defendants' scienter.

---

by this argument. Auditors may be held accountable by both the DOE and their clients. *See, e.g.*, *Reynolds v. Bickel*, 307 P.3d 570, 573 (Utah 2013) (outlining statutory remedies available to third parties against auditors). The Audit Guide itself makes clear that failure to follow DOE Guidelines can result in civil penalties and being barred from conducting subsequent DOE compliance audits. *See, e.g.*, AUDIT GUIDE, *supra*, at I-15 to I-16. And the Defendant Auditors' clients may seek remedies for breach of contract when auditors knowingly perform an audit that does not comply with required regulations.

Both Relators and the Government allege the proper standard for scienter in their respective complaints. But Defendant Schools and Mr. Barney argue that even if the court concludes their incentive compensation program did not fully comply with Safe Harbor E, neither Defendant Schools nor Mr. Barney had the requisite scienter because they believed their program complied with Safe Harbor E and the Incentive Compensation Ban. This argument, however, is not a proper basis for granting a motion to dismiss. A defendant's state of mind is a fact peculiarly within the defendant's control and need not be pled with particularity to survive a motion to dismiss. *See Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992).

Here, the Relators and the Government allege that Defendant Schools and Mr. Barney knew their incentive compensation program was prohibited under the Incentive Compensation Ban. These allegations are sufficient to survive a motion to dismiss.[14]

### 3)   Elements for Claims under § 3729(a)(1)(A) and its Predecessor, § 3729(a)(1)

With respect to the claims at issue in the present case, the court finds that the 2009 amendments to § 3729(a)(1) did not materially alter this section.[15] Therefore, the court addresses the remaining elements of § 3729(a)(1)(A) and its predecessor, § 3729(a)(1), together. These sections include an element of presentment in addition to the requisite scienter and proof of a false or fraudulent claim. Specifically, the defendant must have presented or proximately caused to be presented a false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1) (1986); 31 U.S.C.

---

[14] For the reasons stated above, the court concludes that Relators failed to state a legitimate legal theory against Defendant Auditors. *Supra* I.A.1.d. However, for completeness, the court notes that Relators adequately pled that Defendant Auditors acted knowingly in their alleged FCA violations.

[15] The 2009 amendments removed the requirement that a claim be presented "to an officer or employee of the United States Government or a member of the Armed Forces of the United States," and expanded liability for all false or fraudulent claims "knowingly present[ed], or cause[d] to be presented . . . for payment or approval." *Compare* 31 U.S.C. § 3729(a)(1) (1986), *with* 31 U.S.C. § 3729(a)(1)(A) (2009). In this case, all of the alleged claims were presented "to an officer or employee of the United States Government," 31 U.S.C. § 3729(a)(1) (1986), so the amendments do not alter the court's analysis of the legal sufficiency of the Relators' and Government's claims.

§ 3729(a)(1)(A) (2009); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 713–15 (10th Cir. 2006).

The Tenth Circuit has rejected a loose "but for" causation standard in favor of a proximate cause standard for FCA liability under § 3729(a)(1). *Sikkenga*, 472 F.3d at 715 n.17 ("The proximate causation standard strikes the proper analytical balance and comports with the rule requiring strict construction of punitive civil statutes."). In so doing, the Tenth Circuit "narrow[ed], rather than enlarge[d], the field of actions for which FCA liability may be imposed." *Id.* Thus, plaintiffs must establish a "sufficient nexus," more than an "attenuated link[,]" between the defendants' specific actions and the presentation of the false claim." *Id.* at 714. They must demonstrate that Defendants have taken some "affirmative action" that "cause[s] or assist[s] the presentation of a fraudulent claim." *Id.* at 714–15.

In deciding the issue of proximate cause on a Rule 12(b)(6) motion to dismiss, the court must not "weigh potential evidence that the parties might present at trial, but [rather] assess whether the plaintiff's complaint alone is legally sufficient to state a claim upon which relief may be granted." *Id.* at 715 (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). As an initial matter, the court has no trouble finding the Relators' allegations against Defendant Schools and the Government's allegations against Stevens-Henager and CEHE legally sufficient. Both Relators and the Government allege direct presentment claims against these defendants. The court thus assesses and compares the allegations against Defendant Auditors[16] and Mr. Barney to determine whether the Relators' allegations present a legally cognizable causation theory to support the presentment element.

---

[16] For the reasons stated above, the court concludes that Relators failed to state a legitimate legal theory against Defendant Auditors. *Supra* I.A.1.d. The court nonetheless addresses the sufficiency of Relators' § 3729(a)(1)(A) allegations against Defendant Auditors as an alternative basis for dismissing the claims against them.

a)      **The Sufficiency of the Relators' § 3729(a)(1)(A) Allegations
Against Defendant Auditors**

Relators aver that Defendant Auditors proximately caused false claims to be submitted

when Defendant Auditors failed to conduct audits in accordance with DOE regulations. This

allegation is premised on either of two potential causation theories. First, had the DOE known

the audits did not comply with its regulations, it could have terminated Defendant Schools' Title

IV eligibility. Second, a properly conducted audit could have turned up evidence of substantial

regulatory violations by Defendant Schools. The DOE could therefore have terminated

Defendant Schools' Title IV eligibility on account of the violations. Under either theory, if the

DOE had terminated Defendant Schools' eligibility, Defendant Schools would not have been

able to submit false claims in the year following the compliance audits.

In asserting that these allegations are legally sufficient to establish causation, Relators

cite *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th

Cir. 2006). *Sikkenga* involved allegations that a lab facility submitted false claims for payment to

a Medicare-contracted insurer by using a generic code that triggered Medicare coverage even

when doctors had not authorized its use. *Id.* at 712–15. The plaintiff alleged that the insurer

could be held liable under the FCA because the insurer caused the claims for payment to be

submitted when it assured the lab that it "would continue to accept the [allegedly miscoded]

claims" and affirmatively "'agree[d] to circumvent' contractual and statutory requirements." *Id.*

at 715.

Unlike *Sikkenga*, which the Tenth Circuit acknowledged was a "close case," *see id.*,

Relators fail to allege any basis on which Defendant Auditors actually assisted in the submission

of claims to the DOE. Even the Relators' case of "but for" causation is tenuous. Relators allege

only that the DOE had "authority" to render noncompliant schools ineligible for Title IV

funding. They do not actually allege that the DOE would in fact have terminated Defendant

Schools' eligibility for Title IV funds had it known of the deficient audits.

In any case, the mere possibility that the DOE would have terminated Defendant Schools'

Title IV eligibility had Defendant Auditors properly conducted the audits is a far different

allegation than the allegation that Defendant Auditors affirmatively assisted in the submission of

false claims. There is no allegation of an agreement between Defendant Schools and Defendant

Auditors to circumvent Title IV regulations,[17] nor is there an allegation that Defendant Auditors

were involved at all in submitting claims for Title IV funding. Consequently, the court holds, as

an alternative and independent ground for dismissal, that the Relators' Third Amended

Complaint fails to plead a "legally sufficient" theory of presentment under § 3729(a)(1)(A), and

its predecessor, § 3729(a)(1), with respect to Defendant Auditors. *See id.*

> **b)** **The Sufficiency of the Relators' § 3729(a)(1)(A) Allegations Against Mr. Barney**

The sufficiency of the Relators' allegations with respect to Mr. Barney stands in contrast

to the sufficiency of the allegations against Defendant Auditors. Although Mr. Barney did not

himself submit the claims, Relators allege that he was both the architect of Defendant Schools'

compensation scheme and the signer of Defendant Schools' PPAs. Relators allege that Mr.

Barney owned and controlled Defendant Schools and orchestrated the alleged scheme to submit

fraudulent claims to the DOE. Consequently, the court holds that Relators have sufficiently

alleged the presentment element with respect to their claims against Mr. Barney.

---

[17] The closest Relators come to such an allegation is to assert on information and belief that Auditors were motivated to conduct lax audits by a desire to retain valuable clients. There is no affirmative allegation that Defendant Auditors agreed with Defendant Schools to circumvent DOE regulations in order to assist Defendant Schools in submitting false claims.

4)      **Elements for Claims under § 3729(a)(1)(B) and its Predecessor,**
        **§ 3729(a)(2)**

Relators assert claims under both 31 U.S.C. § 3729(a)(1)(B) (2009) and its predecessor,

31 U.S.C. § 3729(a)(2) (1986). The Fraud Enforcement and Recovery Act of 2009 ("FERA"),

Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009), amended and renumbered § 3729(a)(2) of

the FCA as § 3729(a)(1)(B). Although FERA was not enacted until 2009, Congress stated the

new version applied retroactively: it "shall take effect as if enacted on June 7, 2008, and apply to

all claims under the False Claims Act that are pending on or after that date." § 4, 123 Stat. at

1625. In *Lemmon*, the Tenth Circuit acknowledged that "certain changes" to the FCA "would

apply to all claims pending on June 7, 2008." *See* 614 F.3d at 1167 n.3. But the court found those

changes immaterial to the facts before it, so to "avoid confusion," the court cited the unamended

§ 3729(a)(2). *See id.*

In this case, the amendments to § 3729(a)(2) embodied in § 3729(a)(1)(B) are relevant to

the court's evaluation of the legal sufficiency of the Relators' and Government's claims. After

reviewing FERA, the court agrees with the Sixth Circuit that § 3729(a)(1)(B) applies to cases

filed after June 7, 2008. *Sanders v. Allison Engine Co.*, 703 F.3d 930, 936–42 (6th Cir. 2012)

(holding that the language, "all claims under the False Claims Act," referred to FCA cases

alleging violations of § 3729(a)(1)(B) or its predecessor, § 3729(a)(2), that were pending on or

after June 7, 2008). The Sixth Circuit's opinion is both consistent with the Tenth Circuit's

footnote in *Lemmon* and persuasive in its reasoning. *See Lemmon*, 614 F.3d at 1167 n.3; *United*

*States ex rel. Baker v. Cmty. Health Sys., Inc.*, Civ. No. 05-279 WJ/ACT, 2014 WL 10212869, at

*1–2 (D.N.M. Sept. 15, 2014) (finding *Sanders* "persuasive and dispositive" with respect to the

applicability of § 3729(a)(1)(B) to cases pending on or after June 7, 2008).

Because the FERA amendments to § 3729(a)(2) apply retroactively, the court must also

determine whether retroactive application of § 3729(a)(1)(B) violates the Ex Post Facto Clause. Here, the court again agrees with the Sixth Circuit in *Sanders* that retroactive application of § 3729(a)(1)(B) does not violate the Ex Post Facto Clause. *Sanders*, 703 F.3d at 941–49. In analyzing the constitutionality of the retroactive application, the Sixth Circuit followed the same law applicable in the Tenth Circuit, namely the factors outlined by the Supreme Court in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69 (1963). *Compare Sanders*, 703 F.3d at 941–49, *with Femedeer v. Haun*, 227 F.3d 1244, 1248–49 (10th Cir. 2000); *see also Baker*, 2014 WL 10212869, at *1 (adopting the holding in *Sanders* that retroactive application of § 3729(a)(1)(B) does not violate the Ex Post Facto Clause). The court concludes that *Sanders* reached the correct result. Thus, the court applies § 3729(a)(1)(B) to all of the alleged false claims in this case, even those submitted before the 2009 FERA amendments to the FCA.

In addition to the elements of scienter and a false or fraudulent claim, § 3729(a)(1)(B) requires plaintiffs to plead that defendants "ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim." Unlike § 3729(a)(2), the amended and renumbered § 3729(a)(1)(B) does not require the false record or statement to be made "for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" *See Sanders*, 703 F.3d at 933–34 (quoting *Allison Engine Co.*, 553 U.S. at 671). Rather, the statement or record need only be "material to a false or fraudulent claim." *See id.* Under the amended statute, material means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4).

In light of this analysis, the court next addresses the legal sufficiency of the Relators' and Government's claims for relief under this provision of the FCA.

<blockquote>

**a)      The Sufficiency of the Relators' § 3729(a)(1)(B) Claims Against Defendant Schools and Mr. Barney**

</blockquote>

As indicated above, the court finds that the pre-amendment version of the FCA, § 3729(a)(2), does not apply to this case. Accordingly, the Relators' fifth claim for relief, which asserts claims for the time period of July 1, 2002 to June 7, 2008, and relies only on liability under § 3729(a)(2), is therefore dismissed. Relators re-allege the allegations of their fifth claim as part of their sixth claim under the amended § 3729(a)(1)(B). The court thus reviews the sufficiency of these allegations under § 3729(a)(1)(B).

Relators sufficiently allege that Defendant Schools and Mr. Barney made and used false statements and records. But for the reasons stated above, only false statements or records made or used, or caused to be made or used, in connection with entry into a PPA are material to a false or fraudulent claim. Subsequent certifications of compliance do not have a natural tendency to influence and are not capable of influencing the payment or receipt of money or property. Rather, these subsequent certifications are material only to continued participation in Title IV and are governed by the administrative enforcement regime. *See supra* I.A.1.b.

<blockquote>

**b)      The Sufficiency of the Relators' § 3729(a)(1)(B) Claims Against Defendant Auditors**

</blockquote>

Relators also bring claims against Defendant Auditors under § 3729(a)(2) and § 3729(a)(1)(B).[18] For reasons already articulated, the court dismisses the Relators' claims against Defendant Auditors under § 3729(a)(2) and reviews all of the allegations against Defendant Auditors under the amended statute, § 3729(a)(1)(B). Relators properly allege that Defendant Auditors falsely certified that their audits complied with DOE regulations. But the Relators' allegations against Defendant Auditors fail on the issue of materiality. The audits at

---

[18] For the reasons stated above, the court concludes that Relators failed to state a legitimate legal theory against Defendant Auditors. *Supra* I.A.1.d. However, for completeness, the court addresses the sufficiency of the Relators' § 3729(a)(1)(B) claims against Defendant Auditors.

issue in the Relators' Third Amended Complaint are compliance audits that are only material to the DOE's determination of continuing program eligibility, not its decision to admit Defendant Schools into the program. While certain financial audits are required in the initial PPA and may thus trigger potential FCA liability, Relators have not brought any FCA claims associated with the initial audit. Rather, Relators' claims against Defendant Auditors under § 3729(a)(1)(B) are limited to the annual compliance audits for which no FCA liability can attach. Thus, the court concludes that Relators have failed to plead the materiality element against Defendant Auditors.

        **c)**        **The Sufficiency of the Government's § 3729(a)(1)(B) Claims Against Stevens-Henager and CEHE**

The Government raises claims under § 3729(a)(1)(B) for false records and statements made between July 1, 2007 and July 1, 2011. Like Relators, the Government pleads several allegedly false statements and records. For the same reasons outlined previously, the court concludes that only the statements and records made or used, or caused to be made or used, by Stevens-Henager and CEHE in connection with their entry into the PPAs are material to a claim. The court thus holds that annual financial and compliance audits, student loan and grant applications, and all other subsequent certifications of compliance do not qualify as material false statements or records for purposes of satisfying § 3729(a)(1)(B).

      **B.**        **The Factual Sufficiency of the FCA Claims under Rules 8(a)(2) and 9(b)**

Having considered the legal sufficiency of the Relators' and Government's claims, the court now turns to the sufficiency of the Relators' and Government's factual allegations to support those claims. Because the Relators' and Government's claims involve allegations of fraud and mistake, they must satisfy both Federal Rules of Civil Procedure 8(a)(2) and 9(b).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In evaluating the

sufficiency of factual allegations under Rule 8(a)(2), the court "accept[s] all well-pleaded facts as true and view[s] them in the light most favorable to the plaintiff[s]." *Jordan-Arapahoe*, 633 F.3d at 1025. However, the court will not accept as true "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Consequently, "if the complaint is sufficiently devoid of facts necessary to establish liability [such] that it 'encompass[es] a wide swath of conduct, much of it innocent,' a court must conclude that 'plaintiffs have not nudged their claims across the line from conceivable to plausible.'" *Bryson*, 534 F.3d at 1286 (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008)).

In addition to satisfying the pleading requirements of Rule 8(a)(2), claims under the FCA must also satisfy the more rigorous pleading requirements of Rule 9(b). *Sikkenga*, 472 F.3d at 726. Rule 9(b) requires allegations of fraud to "state with particularity the circumstances constituting fraud or mistake." In the FCA context, Rule 9(b) requires the "who, what, when, where and how," including the "time, place, content, and consequences of the fraudulent conduct" such that the allegations lay out "the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as a part of that scheme." *Lemmon*, 614 F.3d at 1171–72 (quoting *Sikkenga*, 472 F.3d at 727). Rule 9(b) thus "afford[s] defendant[s] fair notice of the plaintiff[s'] claim[s] and the factual ground upon which [they are] based" and "safeguards defendant[s'] reputation and goodwill from improvident charges of wrongdoing." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992) (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)).

Upon thorough review of the Government's complaint, the court concludes that the Government has satisfied both the Rule 8(a)(2) and 9(b) requirements with respect to their

allegations against Stevens-Henager and CEHE. The court, likewise, concludes that Relators have alleged sufficient facts to satisfy the pleading standards with respect to their claims against Defendant Schools and Mr. Barney. But the court finds that Relators have failed to meet the Rule 9(b) requirements with respect to Defendant Auditors. In support of its holding, the court outlines the "who, what, when, where, and how" pled in the Relators' and Government's complaints against Stevens-Henager, CEHE, Mr. Barney, and the remaining Defendant Schools. It then contrasts these well-pled allegations with the Relators' deficient allegations against Defendant Auditors.

> **1)    The Sufficiency of the Government's Allegations Against Stevens-Henager & CEHE**

The Government's allegations against Stevens-Henager and CEHE meet the heightened pleading standards of Rule 9(b). The Government clearly provides detailed allegations regarding the "who, what, when, where, and how" of the alleged FCA violations.

With regard to the "who," the Government alleges that Mr. Barney issued Procedure Directives in 2000, 2003, 2004, and 2007. These directives were incorporated into employee manuals and set out the compensation structure that violated the Incentive Compensation Ban. Despite its ongoing compensation scheme, the Government alleges that Vicky Dewsnup, then-president of Stevens-Henager, signed PPAs in 2007 and 2010 in which Stevens-Henager promised compliance with the Incentive Compensation Ban.

Addressing the "what," the Government alleges that the compensation structure outlined in company materials set up a bonus program in direct violation of the PPAs entered into by Stevens-Henager. The Government further alleges that Stevens-Henager knew its compensation structure did not comply with PPA requirements and that it signed the PPAs solely to become eligible for Title IV funds despite its intent not to comply.

In support of its theory, the Government first notes that Stevens-Henager certified in its PPAs that it would not offer "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments . . . to any persons or entities engaged in any student recruiting or admission activities." To show that Stevens-Henager's promise to comply with this provision was knowingly false, the Government attached to its complaint copies of procedure directives and employee handbooks, published both before and after entering into the PPAs, showing that Stevens-Henager offered its admissions consultants bonuses on a sliding scale depending on average recruitment of new students.[19]

To plead the "when," the Government alleges that "[f]rom July 1, 2007, or earlier, through the last claims for the funding year ending July 1, 2011, Stevens-Henager submitted numerous claims to the government for Title IV funding that it knew to be false based upon its non-compliance with the Incentive Compensation Ban." The Government also provided dates for when the PPAs were signed as well as several dated procedure directives and employee manuals, including manuals that were distributed before Defendant Schools signed the 2007 PPA.

For the "where," the Government alleges that Ms. Wride attended conferences at which Stevens-Henager conducted trainings for admissions consultants at "schools in Utah, Idaho and other states." From the trainings, "Ms. Wride understood that Stevens-Henager's incentive compensation practices were institution-wide."

Finally, with regard to the "how," the Government lays out in detail the requirements of the Incentive Compensation Ban that are incorporated into the PPAs and the means through which Stevens-Henager circumvented the ban. The Government's allegations demonstrate how

---

[19] The Government further alleges that Stevens-Henager made additional subsequent certifications of compliance with the Incentive Compensation Ban. But as the court has already noted, these subsequent certifications are not material to the DOE's payment decisions and are therefore not an independent basis for FCA liability. The court does, however, consider these additional allegations as circumstantial evidence showing that Stevens-Henager made knowingly false promises to comply when it entered into its PPAs.

the use of completion certificates circumvented the ban by awarding completion bonuses that appear to fall within a regulatory safe-harbor but are in fact awarded based on recruitment.

Taken together, the Government has satisfied the pleading requirements of Rules 8(a) and 9(b) with respect to Defendants Stevens-Henager and CEHE.

> ### 2) The Sufficiency of the Relators' Factual Allegations Against Defendant Schools & Mr. Barney

Like the Government, Relators plead the "who, what, when, where, and how" of Defendant Schools' and Mr. Barney's alleged fraudulent scheme.

With regard to the "who," Relators identify Mr. Barney as the sole shareholder and owner of Defendant Schools. Relators allege that Mr. Barney not only controlled Defendant Schools' operations, but also authored the compensation directives that constitute the knowingly false scheme to unlawfully obtain Title IV funds. Relators also include the names of individuals who allegedly violated regulations and attempted to conceal Defendant Schools' and Mr. Barney's ongoing violations.

Addressing the "what," Relators offer at least two ways in which Defendant Schools and Mr. Barney made knowingly false certifications in their PPAs in order to be eligible for Title IV funds they otherwise could not have obtained. First, in entering the PPAs, Defendant Schools and Mr. Barney made knowingly false certifications about their compliance and intent to comply with the Incentive Compensation Ban. Second, in entering the PPAs, Defendant Schools and Mr. Barney made knowingly false certifications about their compliance with and intent to comply with accreditation requirements.

In pleading the "when," Relators provide a timeframe during which they allege Defendant Schools and Mr. Barney knowingly violated the PPAs, and they further allege the dates of specific instances of conduct that demonstrate Defendant Schools and Mr. Barney knew

they violated the PPAs.

For the "where," Relators allege that Defendant Schools' and Mr. Barney's false certifications led to FCA liability for funds that improperly went to all of Defendant Schools' campuses. This sweeping conclusion is supported with specific factual allegations. Specifically, Relators allege that Defendant Schools' employees were trained in how to circumvent the Incentive Compensation Ban at companywide conferences. Relators likewise provide factual allegations of particular campuses that violated PPA obligations and attempted to conceal violations from regulators.

With regard to the "how," Relators provide extensive factual detail regarding Defendant Schools' and Mr. Barney's misconduct. Relators outline not only the conduct at issue, but also why that conduct violated specific regulations and how Defendant Schools and Mr. Barney concealed these violations from the DOE. Finally, Relators allege the effect of the violations in terms of funds unlawfully obtained.

In sum, Relators have satisfied the pleading requirements of Rules 8(a) and 9(b) with respect to Defendant Schools and Mr. Barney.

### 3) The Sufficiency of the Relators' Factual Allegations Against Defendant Auditors

Having already concluded that the Relators' allegations against Defendant Auditors fail to state a legal claim on which relief may be granted, the court nonetheless reviews the Relators' factual allegations and, as an alternative basis for its decision, holds that Relators have failed to satisfy the pleading standards under Rules 8(a) and 9(b) for Defendant Auditors. Unlike their factual allegations against Defendant Schools and Mr. Barney, Relators' allegations against Defendant Auditors amount to little more than vague, conclusory allegations that could describe any auditor who fails to uncover a school's violations of Title IV requirements. Relators

essentially allege that Defendant Auditors must have conducted knowingly deficient audits because they failed to identify  Defendant Schools' misconduct. But unlike their allegations against Defendant Schools and Mr. Barney, Relators' substantive allegations against Defendant Auditors are made on information and belief without the requisite factual background to support inferential pleadings.

"Allegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt*, 956 F.2d at 967; *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1237 (10th Cir. 2000); *Sikkenga*, 472 F.3d at 728. But this "exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Sikkenga*, 472 F.3d at 728 (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). In short, even in the limited circumstances where allegations of fraud may be pled on information and belief, plaintiffs must still provide sufficient "factual basis" to support these allegations. *Id.* (quoting *Koch*, 203 F.3d at 1237).

Here, Relators have not provided a sufficient factual basis to support their allegations. Thus, the court concludes that Relators failed to plead with particularity the "who, what, when, where, and how" of its fraud claims against Defendant Auditors.

With regard to the "who," Relators fail to identify any individual whose conduct was knowingly deficient. The only factual allegations that identify actual individuals at the auditing firms do not allege any wrongdoing or deficiency. In fact, the only allegation against these individuals is that they requested payroll records from Defendant Schools in accordance with the Audit Guide requirements. It is simply not enough under Rule 9(b) to bring a claim for FCA liability without identifying any of the individuals whose conduct, statements, or certifications

36

knowingly caused false claims to be submitted.

The court next combines its analysis of the Relators' allegations with respect to the "what" and the "how." In pleading the "what" and the "how," Relators rely on conclusory allegations made almost exclusively on information and belief. The only facts not alleged on information and belief are as follows: Relators plead that Defendant Auditors certified that their audits complied with required regulations. Standing alone, this does not establish the "what" or the "how" of Defendant Auditors' alleged fraud. Relators then allege that the payroll records Defendant Auditors received from Defendant Schools showed that bonuses were paid to admissions consultants, financial aid officers, and admissions directors. But Defendant Auditors' actions in requesting payroll records are again consistent with the Audit Guide requirements.[20]

Relators next allege that the audits certified to the DOE that there were no instances of non-compliance. The fact that Defendant Auditors reported full compliance even though the requested payroll records showed bonuses may support an inference that the audit opinion was false. But Relators expressly disavow any theory of liability arising from the DOE's reliance on an auditor's opinion that there were no violations. Instead, Relators assert only that an FCA violation arises out of the Defendant Auditors' alleged failure to follow the Audit Guide as well as other auditing standards. Specifically, Relators plead, on information and belief, that contrary to their certifications, Defendant Auditors did not follow the requirements of the audit guide in conducting the audits.

The court has significant doubts with respect to the weight that can be given to these information and belief allegations. For example, in Relators' view, the factual allegation that payroll records disclosed bonus payments to admissions consultants, financial aid officers, and admissions directors is sufficient standing alone to support allegations on information and belief

---

[20] And with respect to Shaw, this allegation was made only on information and belief.

that Defendant Auditors failed to, among other things,

> (1) test payroll and other disbursement records to determine compliance with the Incentive Compensation Ban, even though the payroll records disclosed that Defendant Schools were not in compliance; (2) perform examination-level verifications of Defendant Schools' attestation that they did not violate the Incentive Compensation Ban; (3) design their examinations to detect intentional noncompliance with the Incentive Compensation Ban; (4) use due care to tailor the examination procedures so that the compliance attestation engagement objectives were achieved, including the objectives relating to the attestations about the Incentive Compensation Ban; (5) design and perform examination procedures that were reasonably capable of detecting significant illegal acts, including systematic and widespread violations of the Incentive Compensation Ban; (6) take special precautions to detect fraud or high risk areas, including with respect to the Incentive Compensation Ban; (7) recognize basic weaknesses in internal control; (8) review, evaluate, and document the institution's methodologies for determining compliance with institutional eligibility and participation criteria, particularly the methodologies relating to the Incentive Compensation Ban; (9) exercise the proper degree of professional skepticism to achieve reasonable assurance that material noncompliance would be detected; and (10) guard against accepting explanations for audit exceptions without competent evidence. Nevertheless, Defendant Auditors certified to the Department of Education that they in fact had done these things as part of their audits.

The court disagrees. Not only are these specific allegations conclusory, but Relators also fail to plead a sufficient "factual basis" to support them. *See id.*

Relators have alleged one fact that does not itself "establish liability." *See Bryson*, 534 F.3d at 1286. And taking as true the other facts pleaded, "it 'encompass[es] a wide swath of conduct, much of it innocent,'" such that the "court must conclude that 'plaintiffs have not nudged their claims across the line from conceivable to plausible'" with respect to Defendant Auditors. *See id.* (quoting *Robbins*, 519 F.3d at 1247). In short, the court finds that Relators do not even satisfy the minimal Rule 8(a) requirements for pleading sufficient facts to plausibly establish an FCA violation.

Even assuming the Relators' pleading met the Rule 8(a) standard, they have not set out with particularity the "what" or the "how" as required by Rule 9(b). In *Lemmon*, the plaintiff's

pleadings with respect to the "what" "alleged a series of contractual and regulatory breaches, pointing to specific obligations that [the defendant] breached." 614 F.3d at 1172. And, in alleging the "how," the plaintiff "included extensive factual detail regarding how the violations occurred, adding, in many instances, the conduct that led to the violation, the reason the result constituted a violation, and a description of the effect of the violation." *Id.* Here, while Relators include numerous allegations with respect to the "what," the allegations are all conclusory. More importantly, the Relators' allegations with respect to the "how" are a far cry from the "extensive factual detail" in *Lemmon*. *See id.* In fact, in reviewing the Relators' allegations, the court finds the complaint is wholly lacking in "factual detail regarding how the violations occurred." *See id.*

With respect to the "when," the complaint includes sufficient allegations with respect to the timeframe during which the audits were conducted to satisfy the Rule 9(b) requirements.

Finally, on the question of "where," Relators plead only the identities of the auditing firms, and given the nature of the Relators' claims, this is likely sufficient.

For these reasons, the court holds that, even assuming Relators had alleged a viable legal theory upon which relief might be granted, the factual pleadings with respect to Defendant Auditors fail to satisfy the Rule 8(a) and 9(b) pleading standards.

In sum, the court grants Defendant Auditors' motions to dismiss. But the court does not dismiss any of the Relators' or Government's FCA claims with respect to Defendant Schools or Mr. Barney.[21] The court does, however, limit the basis on which Relators and the Government may proceed on these claims. Namely, the only well-pleaded basis for relief against these defendants is that Defendant Schools and Mr. Barney knowingly made false certifications or

---

[21] The solitary exception is the Relators' fifth claim for relief, which is dismissed on the grounds that 31 U.S.C. § 3729(a)(2) (1986) has been superseded by 31 U.S.C. § 3729(a)(1)(B) (2009). *See supra* I.A.4.a. Relators incorporated by reference the substance of the allegations in the fifth claim for relief into the sixth claim for relief under § 3729(a)(1)(B). Thus, Relators may continue to pursue these allegations under the sixth claim for relief.

statements, either express or implied, when entering into PPAs with the DOE. Subsequent certifications of compliance are not material for FCA purposes but are instead governed exclusively by the DOE's administrative compliance regime.

## II.    The Government's Mistake and Unjust Enrichment Claims

In addition to its FCA claims, the Government also brings claims for mistake and unjust enrichment. Defendant Schools briefly argue for dismissal of these claims on the basis that the Government failed to plead a proper theory for relief and that Defendant Schools complied with Title IV requirements and were thus entitled to the funds they received. Defendant Schools also argue that recovery under unjust enrichment would be improper because the Government has various regulatory remedies available to it.

Defendant Schools' arguments fail. First, the Government pleads a proper theory for relief under federal common law. *See United States v. Wurts*, 303 U.S. 414, 415–16 (1938). Second, the Government pleads sufficient facts to demonstrate that Defendant Schools may not have been entitled to the funds they received due to their allegedly false entry into Title IV programs. *See supra* I.B.1. And third, the Government may plead inconsistent claims for relief in the alternative. *See Huffman v. Saul Holdings Ltd. P'ship*, 194 F.3d 1072, 1081 (10th Cir. 1999). The Government has thus properly pled its mistake and unjust enrichment claims, and it is entitled to bring these claims with its FCA claims. For these reasons, the court denies Defendant Schools' motion to dismiss the Government's mistake and unjust enrichment claims.

## CONCLUSION

For the foregoing reasons, the court GRANTS PwC's Motion to Dismiss (Docket 194), Shaw's Motion to Dismiss (Docket 196), and Weworski's Motion to Dismiss (Docket 201). All claims against Defendant Auditors are therefore dismissed with prejudice. The court GRANTS IN PART and DENIES IN PART Defendant Schools' Motion to Dismiss the Relators'

Complaint (Docket 198) and CEHE's and Stevens-Henager's Motion to Dismiss the Intervenor's

Complaint (Docket 197). While all claims against Defendant Schools and Mr. Barney may

proceed, Relators and the Government are limited to the legal theory that Defendant Schools and

Mr. Barney knowingly made false certifications or statements, either express or implied, when

entering into PPAs with the DOE.

 DATED this 30th day of March, 2016.

<br>

<br>

            Jill N. Parrish
            United States District Court Judge