Brandon J. Mark (10439)
Alissa M. Mellem (13299)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
Email: bmark@parsonsbehle.com
          amellem@parsonsbehle.com

*Attorneys for Relators*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. KATIE BROOKS and NANNETTE WRIDE, <br><br> Plaintiffs, <br><br> vs. <br><br> STEVENS-HENAGER COLLEGE, INC., a Utah Corporation; CALIFORNIA COLLEGE SAN DIEGO, INC., a Utah Corporation; COLLEGEAMERICA DENVER, INC., a Colorado Corporation; COLLEGEAMERICA ARIZONA, INC., a Colorado Corporation; CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC., an Indiana Corporation; CARL BARNEY, an individual; and DOES 1-500, Inclusive, <br><br> Defendants. | **RELATORS' MOTION FOR PARTIAL RECONSIDERATION** <br><br> Case No. 2:15-CV-00119-JNP-EJF <br><br> Judge Jill Parrish <br><br> Magistrate Judge Evelyn J. Furse |

Pursuant to Federal Rule of Civil Procedure 54(b), Plaintiffs and Relators Katie Brooks and Nannette Wride ("Relators") respectfully submit this Motion for Partial Reconsideration of the Court's ruling (ECF 245) granting a portion of Defendant Stevens-Henager College, Inc.'s, *et al.* ("Defendants") Motion to Dismiss.

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

EXPLANATION OF TIMING ...............................................................................................1

RELIEF SOUGHT AND GROUNDS THEREFOR ........................................................2

STATEMENT OF FACTS ......................................................................................................3

ARGUMENT ............................................................................................................................9

1.  The Court must accept as true all facts pled in the TAC, as well as all reasonable inferences from those facts. ..........................................................................................9

2.  Reconsideration is warranted because there has been an intervening change in the law. ......9

3.  The Supreme Court held in *Escobar* that the exact form a false certification takes does not determine whether it is actionable under the FCA. ............................................10

4.  This Court's holding that the availability of administrative remedies forecloses FCA liability for post-PPA false certifications is incompatible with *Escobar*, contrary to how other lower courts have applied *Escobar*, inconsistent with relevant pre-*Escobar* precedent, and fundamentally alters the reach of the FCA contrary to congressional intent. ..............................16

5.  Relators have alleged adequate facts demonstrating that Defendants' post-PPA false certifications are actionable under the FCA, and any doubt should be resolved in favor of Relators. ...............................................................................................................23

CONCLUSION ......................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Dias v. City & Cnty. of Denver,*
    567 F.3d 1169 (10th Cir. 2009) ..........................................................................9

*Miller v. Weston Educ., Inc.,*
    840 F.3d 494 (8th Cir. 2016) ............................................................................ 19

*Moral v. Hagen,*
    553 F. App'x 839 (10th Cir. 2014) .............................................................. 9, 10

*Rose v. Stephens Inst.,*
    No. 09-CV-05966-PJH, 2016 WL 5076214 (N.D. Cal. Sept. 20, 2016) ................. 13, 19

*S.E.C. v. Shields,*
    744 F.3d 633 (10th Cir. 2014) ..........................................................................9

*U.S. ex rel. Conner v. Salina Regional Health Ctr.,* Inc.,
    543 F.3d 1211 (10th Cir. 2008) ............................................................... passim

*U.S. ex rel. Emanuele v. Medicor Assocs.,*
    242 F. Supp. 3d 409 (W.D. Pa. 2017) ............................................................ 19

*U.S. ex rel. Forcier v. Computer Scis. Corp.,*
    No. 12 CIV. 1750, 2017 WL 3616665 (S.D.N.Y. Aug. 10, 2017) ................... 20

*U.S. ex rel. Haskins v. Omega Inst.,*
    11 F. Supp. 2d 555 ...................................................................... 17, 18, 21

*U.S. ex rel. Hendow v. Univ. of Phoenix,*
    461 F.3d 1166 (9th Cir. 2006) .......................................................... 6, 14, 23

*U.S. ex rel. Irwin v. Significant Educ., Inc.,*
    No. CV-07-1771-PHX-DGC, 2009 WL 322875 (D. Ariz. Feb. 10, 2009) ............ 15

*U.S. ex rel. Laporte v. Premiere Education Group,*
    No. CV 11-3523, 2017 WL 3471163 (D.N.J. Aug. 11, 2017) .......................... 12

*U.S. ex rel. Lee v. Corinthian Colls.,*
    655 F.3d 984 (9th Cir. 2011) ........................................................................ 14

*U.S. ex rel. Main v. Oakland City Univ.,*
    426 F.3d 914 (7th Cir. 2005) ........................................................................ 14

*U.S. ex rel. Mayers v. Lacy Sch. of Cosmetology, LLC,*
    No. 1:13-CV-00218-JMC, 2015 WL 8665345 (D.S.C. Dec. 14, 2015) .............. 15

*U.S. ex rel. Miller v. Weston Educ., Inc.,*
    784 F.3d 1198 (8th Cir. 2015) .................................................................. 14, 15

*U.S. ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5,*
    688 F.3d 410 (8th Cir. 2012) ........................................................................ 17

*U.S. ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.,*
    No. CV-F-91-194, 1992 WL 795477 (E.D. Cal. May 4, 1992) ....................... 20

*U.S. ex rel. Sobek v. Educ. Mgmt., LLC, No. CIV.A.,*
    10-131, 2013 WL 2404082 (W.D. Pa. May 31, 2013) ............................... 16, 18

*U.S. ex rel. Washington v. Educ. Mgmt. Corp.,*
    871 F. Supp. 2d 433 (W.D. Pa. 2012) ........................................................... 15

*U.S. ex rel. Williams v. City of Brockton,*
   No. 12-CV-12193, 2016 WL 7428187 (D. Mass. Dec. 23, 2016) ........................9

*U.S. v. DynCorp Int'l, LLC,*
   253 F. Supp. 3d 89 (D.D.C. 2017) ........................................................ 20

*U.S. v. Sanford–Brown, Ltd.,*
   840 F.3d 445 (7th Cir. 2016) ...................................................... 5, 11, 12

*U.S. v. FastTrain II Corporation,*
   No. 12-CIV-21431, 2017 WL 606346 (S.D. Fla. Feb. 15, 2017) ...................... 13

*U.S. ex rel. Wood v. Allergan, Inc.,*
   246 F. Supp. 3d 772 (S.D.N.Y. 2017) ..................................................... 20

*U.S. v. Sanford-Brown,*
   788 F.3d 696 (7th Cir. 2015) ...................................................... 5, 11, 14

*Universal Health Services v. United States ex rel. Escobar,*
   136 S. Ct. 1989 (2016) ................................................................ passim

## Statutes

31 U.S.C. § 3730(c) .......................................................................... 21

41 U.S.C. § 7103(c) .......................................................................... 18

P.L. 99-562 ................................................................................. 20

## Rules

Federal Rule of Civil Procedure 54(b) ........................................................1

# EXPLANATION OF TIMING

Relators intended to file this Motion about a year ago, as a cross-motion to Defendants' motion for reconsideration. Relators' counsel informed counsel for Defendants and the government of that intent during a telephone conference after the stay was lifted on November 16, 2016. (ECF 259.) Relators' counsel had an earlier version of this Motion drafted by late 2016. Relators believed that it was appropriate to raise the issues discussed below at the same time as Defendants' motion.

The government disagreed and in early January 2017 asserted its authority to restrict Relators' counsel from taking actions in the case that the government believed were inappropriate. The government instructed Relators' counsel not to file the cross-motion.

It has never been Relators' intent to hide this issue from this Court, to deprive the Court of the opportunity to consider this issue in the first instance, or to save this issue for a later appeal. As this Motion demonstrates, Relators believe that the United States Supreme Court's ruling in *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) ("*Escobar*") undermines the limitations this Court placed on their claims and that *Escobar* supports their claims in this case. Relators have been eager to alert the Court to these changes since *Escobar* issued in June 2016. This Motion has been essentially ready to file for nearly a year.

Relators understand and share in the Court's frustration about the way this issue was handled. Relators' counsel also apologizes that the full explanation could not have been provided at the hearing on November 15, 2017, which was due to the absence of Relators' lead counsel, who was struck by illness.

Accordingly, Relators respectfully request that the Court consider this motion for reconsideration.

## RELIEF SOUGHT AND GROUNDS THEREFOR

In *Escobar*, the Supreme Court unanimously rejected the test applied by this Court to determine that the Defendants' post-Program Participation Agreement ("PPA") certifications of compliance to the Department of Education ("DOE") were not actionable under the False Claims Act ("FCA"). In *Escobar*, the Supreme Court held that the supposed distinction between so-called "conditions of payment" and "conditions of participation" (the "Payment/Participation Test")—the test this Court relied upon when it granted a portion of Defendants' motions to dismiss—was the wrong legal standard.

Following *Escobar*, the Seventh Circuit vacated the portion of its decision in *U.S. v. Sanford-Brown* relied upon by this Court when partially granting the motions to dismiss. Indeed, the Supreme Court in *Escobar* specifically identified *Sanford-Brown* as wrongly decided. Furthermore, earlier this year, a district court allowed the government in a similar case to proceed to trial on the same claims this Court dismissed, and even more recently, another district court squarely held that allegations identical to those here were sufficient under *Escobar* to plead implied certification claims. For these reasons and others, Relators ask the Court to reconsider its ruling partially granting Defendants' motion to dismiss.

In its earlier ruling, this Court recognized that *all* of the legal requirements identified in Relators' Third Amended Complaint were material. However, the Court ruled that of the many false statements and certifications of compliance with the legal requirements that Defendants made, only one *form* of the false statements was actionable—the statements in the PPAs. Applying the now-discredited Payment/Participation Test, the Court held that *all of the other forms* in which Defendants communicated these *exact same false certifications* of compliance to the DOE were not material.

The Court's primary rationale for excluding all post-PPA false certifications from the purview of the FCA under the Payment/Participation Test—that the DOE can bring administrative actions for such violations—has never been recognized as a limitation on FCA liability, even by the cases cited by this Court in its ruling.

More to the point, the United States Supreme Court in *Escobar* declined to adopt this exact test. Moreover, all of the courts that have squarely addressed this issue in the student financial aid context after *Escobar* have recognized that the availability of administrative enforcement actions *weighs in favor* of finding such violations are material and therefore actionable under the FCA. After *Escobar*, the availability and use of administrative enforcement mechanisms is evidence that the underlying legal requirements are actionable under the FCA.

Because this Court's earlier ruling was based on the Payment/Participation Test, and because that test was overruled by *Escobar*, this Court should reconsider its ruling that Defendants' only actionable false statements are those in the PPAs and that Defendants' many other false certifications of compliance with the exact same legal requirements are not actionable.

## STATEMENT OF FACTS

1. **Relators allege that Defendants violated four core legal requirements for participating in and receiving funds from federal student aid programs.**

In the Third Amended Complaint ("TAC") (ECF 175), Relators assert claims under the FCA based on Defendants' submission of false statements, claims, and certifications relating to Defendants' (1) payment of illegal bonuses to recruiters and others—the Incentive Compensation Ban ("ICB") claims, (2) violations of rules designed to limit the amount of federal funds for-profit colleges, such as the Defendants, may receive—the 90-10 Rule claims, (3) violations of regulations requiring the Schools to maintain accurate grade and attendance records and to

refund federal student aid based on those records—the Refund claims, and (4) false certifications to the Schools' accreditor—the Accreditation claims (collectively, the ICB, 90–10 Rule, and Refund and Accreditation requirements are referred to herein as the "Legal Requirements").

In its earlier ruling on Defendants' motions to dismiss, the Court held that Defendants' promises to comply with each of the Legal Requirements in their PPAs were material to the government's actions and actionable in this suit. (ECF 245 at 5, 29, 39.)

In an effort to streamline the briefing on this Motion—and because the materiality of these four Legal Requirements has been addressed in other past briefing—Relators incorporate by reference their arguments regarding the materiality of Defendant's misrepresentations regarding these Legal Requirements from their Opposition to Defendants' Motion for Reconsideration. (ECF 275.)

## 2. Relators alleged that Defendants made at least three different forms of false statements and certifications of compliance with the Legal Requirements to the DOE.

In the TAC, Relators alleged particularly that Defendants made at least three forms of false statements or certifications to the DOE about their compliance with the Legal Requirements in order to receive hundreds of millions of dollars in federal student financial aid under Title IV of the Higher Education Act.

Specifically, Relators alleged that Defendants had falsely certified compliance in at least their PPAs, G5 certifications, and Required Management Assertions. (ECF 175 ¶¶ 49–50, 52, 58–59, 65, 67, 72, 87, 94, 104–05, 119, 126–130, 296, 432–33.)

As Relators explained in the TAC, each and every time that Defendants request money from the DOE, they contemporaneously "must electronically certify in G5 prior to drawing down the funds that 'by processing this payment request . . . the funds are being expended . . . for the

purpose and condition[s] of the [Program Participation] agreement.'" (ECF 175 ¶¶ 104–05, 119.)

Relators also alleged that "[i]n order to maintain its eligibility to receive Title IV funding, each year a school participates in any" federal student aid program, it must provide the DOE with compliance and financial audits. (ECF 175 ¶ 64.) "As part of the annual audits, Defendant Schools are required to certify, in the form of written 'Required Management Assertions,'" that they are in compliance with the ICB, Refund, and Accreditation requirements. (ECF 175 ¶ 65; DOE Audit Guide, ECF 175-2 at 32–33, 55.) Additionally, Defendants' financial audits must expressly state the Defendants' calculations establishing they are complying with the 90-10 Rule. (*Id.* at 23.)

### 3. In its ruling on Defendants' motions to dismiss, the Court used the wrong legal test to determine that Relators' false certification claims based on the G5 certifications and Required Management Assertions were not actionable.

Relying on now discredited precedent from the Tenth and Seventh Circuit Courts of Appeals, this Court "conclude[d] that '[g]ood-faith entry into the PPA is the [sole] condition of payment necessary to be eligible for subsidies under the U.S. Department of Education's subsidies program.'" (ECF 245 at 18 (quoting *U.S. v. Sanford-Brown*, 788 F.3d 696, 710 (7th Cir. 2015) ("*Sanford-Brown I*")[1]).) The Court "[f]ollow[ed] the Tenth Circuit's analytical framework in" *U.S. ex rel. Conner v. Salina Regional Health Ctr.*, Inc., 543 F.3d 1211 (10th Cir. 2008), setting forth the Payment/Participation Test. (ECF 245 at 14.) The Court read *Conner* to establish a bright-line rule[2] between "'between conditions of program *participation* and conditions of *payment*,'" which

---

[1] Following *Escobar*, the Seventh Circuit vacated the portion of the *Sanford-Brown* decision containing this holding. *U.S. v. Sanford–Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

[2] While this Court determined that *Conner* erected a bright-line test, *Conner* itself recognized that the regulations at issue in this case did not conform to that standard. Indeed, *Conner* specifically identified the Title IV Legal Requirements at issue here as examples of "regulations or statutes

the Court held "determin[ed] whether compliance with a given statute, regulation, or contractual provision is material to the Government's payment decisions, thereby triggering potential FCA liability." (*Id.* at 13 (emphasis in original) (quoting *Conner*, 543 F.3d at 1220).)

But the Court did not simply apply the Payment/Participation Test to the Legal Requirements to determine whether they were material, it went a step further, applying the Payment/Participation Test to the *form* in which Defendants certified compliance with the Legal Requirements. The Court believed its role was "to discern whether Congress and the DOE have conditioned program payments on regulatory compliance, or whether, like Medicare, regulatory compliance is instead only a condition of ongoing program participation that is enforced through an administrative regime." (ECF 245 at 14.)

Relying on several factors identified in *Conner* under the Payment/Participation Test, which are inconsistent with the factors *Escobar* identified for determining materiality, the Court found that the availability of administrative remedies for violations of the Legal Requirements meant that Defendants' post-PPA compliance with the requirements were "conditions of participation" rather than "conditions of payment." (*Id.* at 15–16.)

4.      **The Court put substantial weight on the availability of administrative enforcement actions to find that Defendants' false certifications of compliance in the G5 certifications and Required Management Assertions were not actionable under the FCA.**

This Court's rationale for "[d]rawing the line [of FCA liability] at entering into a PPA"

---

[that are] so integral to the government's payment decision as to make any divide between conditions of participation and conditions of payment a 'distinction without a difference.'" 543 F.3d at 1220 (quoting *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1177 (9th Cir. 2006)). This Court nevertheless proceeded to apply the factors that *Conner* identified for the Payment/Participation Test to analyze the very regulations *Conner* recognized were actionable under the FCA, reaching the opposite result. (ECF 245 at 14–16.)

was its determination that "once an institution [signs a PPA and] becomes a Title IV participant, Title IV's regulatory scheme, rather than the FCA, governs program compliance." (ECF 245 at 18-19; *see also id.* at 16.) Without citing any legal authority for the proposition that the FCA's role is merely to fill regulatory "gaps," this Court held that the FCA simply "fills the gaps and protects the Government at the stage where Title IV cannot." (*Id.* at 19.) Similarly, the Court held that "[s]ubsequent certifications are material only to continued eligibility for program participation, which is governed by Title IV's comprehensive administrative regime and not the FCA." (ECF 245 at 20; *see also id.* at 40.)

The Court made the availability of administrative remedies the cornerstone of FCA liability, holding that as a matter of law, subsequent false certifications "do not have any tendency to affect payment of program funds" if they can be addressed through "administrative sanctions and possible removal from the program." (*Id.* at 16.) In other words, the Court held that the availability of administrative remedies meant that the Legal Requirements had to be "enforced exclusively" through those remedies and *never* through the FCA. At its essence, the Court concluded that where administrative remedies exist, they wholly displace the FCA—a conclusion with sweeping consequences for the FCA. Notably, the Court referenced no legal authority for the notion that the existence of administrative remedies eliminates (much less diminishes) the important role the FCA plays in protecting the public fisc.

Based on its conclusion that the administrative remedies were the exclusive means by which post-PPA false certifications could be addressed, the Court held that the only false certifications that were actionable under the FCA were those made in the PPAs, while *all other* subsequent false certifications made by Defendants to obtain payments (G5 certifications) or maintain eligibility (Required Management Assertions) were not.

**5.** **The Court also based it holding on Defendants'** *in terrorem* **arguments that making post-PPA certifications actionable would impinge on the DOE's regulatory enforcement prerogatives.**

Even though the DOE, which is represented by the Department of Justice in this case, did not make the argument, and even though the DOE (through the DOJ) has made the exact opposite argument in other cases, the Court was also persuaded by Defendants' claim that allowing Defendants' post-PPA certifications to serve as basis of FCA liability would somehow "undermine the purposes of Title IV." (ECF 245 at 19.) The Court determined that a bright-line judicial determination that no post-PPA certifications could *ever* be actionable under the FCA better "gives the DOE room to calibrate its enforcement efforts" rather than allowing the DOE to utilize its authority under the FCA to dismiss claims (31 U.S.C. § 3730(c)(2)(A)) on a case-by-case basis. (*Id.*) According to the Court's decision, the DOE can *never* bring a fraud action based upon *any* post-PPA false certification of compliance, no matter how egregious the violation and regardless of whether the FCA otherwise applies.

**6.** **Defendants have admitted submitting (1) thousands of G5 certifications in order to obtain payments from the DOE and (2) numerous Required Management Assertions specifically certifying compliance with the Legal Requirements to maintain eligibility to participate in Title IV programs.**

Although the focus of the Court's analysis must remain on the allegations in the TAC, it is notable that discovery in this matter has corroborated Relators' allegations about Defendants submitting numerous G5 certifications. In particular, Defendants have admitted to submitting thousands of claims for payment through the G5 payment system (Defs.' Resp. to Court's May 9, 2017 Order Compelling Interrogatory Answer, May 22, 2017), each of which required Defendants to submit a G5 certification. Additionally, in the course of discovery, evidence of the many Required Management Assertions that Defendants' management have made over the years

has been produced. (*See*, *e.g.*, PWCSH00013096–99.) That evidence has exactly tracked the allegations in the TAC.

## ARGUMENT

**1.** **The Court must accept as true all facts pled in the TAC, as well as all reasonable inferences from those facts.**

The Court must "accept as true all well-pleaded factual allegations in the complaint," *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014), and it must "draw all reasonable inferences therefrom in the light most favorable to the" Relators, *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

**2.** **Reconsideration is warranted because there has been an intervening change in the law.**

*Escobar* "altered the standard" by which courts determine whether express or implied certifications of compliance can be actionable under the FCA. *Moral v. Hagen*, 553 F. App'x 839, 840 (10th Cir. 2014). While previously the Tenth Circuit applied the Payment-Participation Test, which this Court applied in its ruling on Defendants' motions to dismiss (ECF 245 at 12-19), *Escobar* held that the Payment/Participation Test was the wrong standard, as discussed further below.[3] *See, e.g.*, *U.S. ex rel. Williams v. City of Brockton*, No. 12-CV-12193, 2016 WL 7428187 (D. Mass. Dec. 23, 2016) (vacating prior ruling based on Payment/Participation Test and granting relator's motion for reconsideration in light of *Escobar*).

---

[3] In the briefing on the original motions to dismiss, Relators argued that the Payment/Participation Test was contrary to the text of the False Claims Act, that the U.S. Supreme Court had never adopted that framework, and that using the standard to determine whether false certifications were actionable was erroneous. (ECF 209 at 37 & n.19.) As *Escobar* later held, Relators urged this Court to decide the question under the broader materiality standard. (*Id.*)

**3.   The Supreme Court held in *Escobar* that the exact form a false certification takes does not determine whether it is actionable under the FCA.**

The Supreme Court unanimously held in *Escobar* that "[n]othing in the text of the False Claims Act" supports the Payment/Participation Test, concluding that the FCA "does not impose this limit on liability." 136 S.Ct. at 2001.

**3.1   *Escobar* overruled the Payment/Participation Test upon which this Court's ruling rested.**

This Court held that both of Relators' false certification theories—express and implied—required the Court to "assess whether compliance with the underlying statute, regulation, or contractual term is 'a prerequisite to payment,' namely, whether compliance is material to the government's decision to pay out moneys to the claimant." (ECF 245 at 12-13 (relying on *Conner*).) This Court held that the Payment/Participation Test was dispositive of materiality for purposes of the FCA and therefore determined whether a violation is actionable. (*Id.*)

In its ruling on the motions to dismiss, this Court treated the Payment/Participation Test as the sole determinant of materiality. According to this Court, its role was to determine "whether an institution's compliance with Title IV regulations is a condition of participation in Title IV (i.e. not material for purposes of FCA liability) or is a condition of receiving federal financial aid payments (i.e. material for purposes of FCA liability)." (ECF 245 at 14.) In *Escobar*, however, the Supreme Court squarely rejected that construction of the FCA, holding that "False Claims Act liability for failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment" and that "[d]efendants can be liable for violating requirements even if [those requirements] were not expressly designated as conditions of payment." 136 S.Ct. at 1996.

**3.2 Following *Escobar*, the Seventh Circuit vacated the portion of its opinion in *Sanford-Brown* relied on by this Court to determine that fraudulent inducement of the PPA is the only actionable theory.**

This Court rested its holding that fraudulent inducement of the PPA was the only actionable theory on the Seventh Circuit's opinion in *Sanford-Brown I* (ECF 245 at 18), which the Supreme Court specifically identified in *Escobar* as wrongly decided, 136 S.Ct. at 1998-99. Indeed, this Court quoted directly from the Seventh Circuit's opinion when it "conclude[d] that '[g]ood-faith entry into the PPA is the [sole] condition of payment necessary to be eligible for subsidies under the U.S. Department of Education's subsidies program.'" (ECF 245 at 18 (quoting *Sanford-Brown I*, 788 F.3d at 710).)

However, following *Escobar*, the Seventh Circuit vacated the entire part of its *Sanford-Brown I* opinion relied on by this Court, including the line quoted by this Court for its conclusion that entry into the PPA was the sole basis for FCA liability. Although the *Sanford-Brown* court, ruling on a motion for summary judgment, ultimately reaffirmed its decision on alternate grounds—namely that the relator "offered no evidence" on his false certification claims—the Seventh Circuit recognized that false statements in connection with "claims for payment" could also be actionable under the FCA. *U.S. v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) ("*Sanford-Brown II*"). Thus, the Seventh Circuit recognized that *Escobar* had overruled its earlier holding that fraudulent inducement of the PPA was the sole basis of liability under the FCA—the holding relied on by this Court to reach the same conclusion.

Just as the Seventh Circuit rightly recognized that its ruling in *Sanford-Brown I* limiting FCA liability to fraudulent inducement of the PPA was incompatible with the Supreme Court's directives in *Escobar*, so too should this Court reconsider its prior ruling relying on *Sanford-Brown I*.

**3.3    Every court to look at the issue after *Escobar* has held that a school's post-PPA certifications of compliance and requests for payment are actionable.**

Following the Seventh Circuit's recognition that *Escobar* overruled the portion of its opinion in *Sanford-Brown I* limiting liability to fraudulent inducement of the PPAs, this Court's ruling is now, as far as Relators can discern, the *only one* limiting potential liability to the PPA representations.

Indeed, others courts that have examined these specific issues in light of *Escobar*'s guidance have concluded that post-PPA statements, including in requests for payment, are precisely the type of statements *Escobar* recognized were actionable.

In *U.S. ex rel. Laporte v. Premiere Education Group*, decided just a few months ago, relators brought FCA claims relating to "violations of the Incentive Compensation Ban . . . and altering students' grades and attendance records." No. CV 11-3523, 2017 WL 3471163 (D.N.J. Aug. 11, 2017), *reconsideration denied*, 2017 WL 4167434 (Sept. 20, 2017). The relators in *Laporte*, like Relators here, alleged that the defendant schools were violating various regulations that were a "condition for [d]efendants' continued Title IV eligibility" and therefore that the "[d]efendants' requests for payment were misleading because they represented that [d]efendants were eligible to receive Title IV funds when they were ineligible." *Id.* at *3. The *Laporte* court concluded that such allegations fell squarely within *Escobar*'s recognition of implied certification claims. *Id.*

Although the *Laporte* court did not expressly reference the G5 certifications, the court in *U.S. v. FastTrain II Corporation* explained the significance of those payment certifications in holding that each one was a false claim. No. 12-CIV-21431, 2017 WL 606346 (S.D. Fla. Feb. 15, 2017). As the court explained, while PPAs can contain false certifications, after those PPAs are signed, schools request "separate draw-downs . . . in the DOE's Grants Management System (G-

5)" and "[e]ach draw-down falsely certifie[s the school's] compliance with DOE regulations." *Id.* at *11. The court held that each of those separate certifications was also a false claim under the FCA. *Id.*

The district court's ruling in *Rose* is also highly instructive. *U.S. ex rel. Rose v. Stephens Inst.*, No. 09-CV-05966-PJH, 2016 WL 5076214, at *5 (N.D. Cal. Sept. 20, 2016), *interlocutory appeal certified*, No. 15-15111 (9th Cir. Jan. 18, 2017). There, the court ruled that the relators could not pursue a fraudulent inducement theory based on the PPA—the only theory this Court found viable—because "relators had no evidence that either promise in the PPAs was 'false when made.'" 2016 WL 5076214, at *2. Nevertheless, the court allowed the relators' claims to proceed based on a false certification theory tied to certifications of eligibility that schools make in student loan forms submitted after they enter into the PPAs. *Id.* at *5.[4] In the loan forms, schools "represent that the student-borrower is 'eligible' and is enrolled 'in an eligible program.'" *Id.* The *Rose* court found that if the school "was not in compliance with the ICB, failure to disclosure this fact would render the loan forms misleading because [the school] would not have been an 'eligible' institution." *Id.* The court found these "'specific representations' in the submitted student loan forms . . . would be 'misleading half-truths' should the relators prove at trial that [the school] was not in compliance with the ICB." *Id.* (quoting *Escobar*, 136 S. Ct. at 2001).

### 3.4 Prior to *Escobar*, no other court had limited liability to the PPA, though many had specifically recognized that the post-PPA certifications alleged in the TAC are actionable.

In its ruling on the motions to dismiss, the Court claimed to reach "the same conclusion

---

[4] Although Relators also pled these false certifications in the TAC (ECF 175 ¶¶ 114–16), these are not the certifications upon which Relators intend to principally rely.

as every circuit to address the question: entry into a PPA is the condition of payment triggering potential FCA liability." (ECF 245 at 19 (citing *Sanford-Brown I*, 788 F.3d at 710–11, and *U.S. ex rel. Miller v. Weston Educ., Inc.*, 784 F.3d 1198, 1204 (8th Cir. 2015), *cert. granted, judgment vacated*, 136 S. Ct. 2505, 195 L. Ed. 2d 836 (2016)).) The Court's statement concerning the rulings of circuit courts was not accurate.

In fact, *none* of the circuit courts that have addressed FCA liability in the Title IV context—except for the Seventh Circuit in its now-vacated opinion—have limited liability to the PPA representations under a fraudulent inducement theory. For example, the leading case in this field, *U.S. ex rel. Hendow v. Univ. of Phoenix*, which the Tenth Circuit approvingly referenced numerous times in *Conner*, held that under allegations identical to those here, the relators could pursue *both* fraudulent inducement (or promissory fraud) claims based on the PPA *and* false certification claims based on subsequent requests for payment. 461 F.3d 1166, 1177 (9th Cir. 2006).

Likewise, in *U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005), the court held that when a college makes false promises of compliance to gain entrance into the student financial aid program, the college's subsequent request for "specific grants, loans, or scholarships"—which the court referred to as the "phase two application"—"is itself false because it represents" implicitly that the school is complying with its earlier promises even though it is not. In other words, the court found that the specific requests for payment could open schools to liability under an implied certification theory. *See also U.S. ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) (cited by this Court in its ruling (ECF 245 at 10), the Ninth Circuit expressly held that false certifications of compliance associated with the required compliance and financial audits were actionable under the FCA).

In *Miller*, which this Court suggested had limited FCA liability to fraudulent inducement of the PPA, the court simply never addressed whether there were other viable theories because fraudulent inducement of the PPA was the *only* theory pled. 784 F.3d at 1203 (relators theory limited to fraudulent inducement of PPA). The *Miller* court never said or suggested that fraudulent inducement of the PPA was the only actionable theory under the FCA.

Moreover, prior to *Escobar*, every other court that ruled on the question of whether the G5 certifications and Required Management Assertions were actionable false claims found that they were. *U.S. ex rel. Mayers v. Lacy Sch. of Cosmetology, LLC*, No. 1:13-CV-00218-JMC, 2015 WL 8665345, at *4 (D.S.C. Dec. 14, 2015) (finding that G5 certifications submitted to receive payments were "necessary to receive the payment of federal funds" and falsely certified compliance with various requirements); *U.S. ex rel. Washington v. Educ. Mgmt. Corp.*, 871 F. Supp. 2d 433, 451 (W.D. Pa. 2012) (finding complaint adequately alleged false certification claims based on "EDMC's statements in . . . periodic audits regarding its compliance with the Incentive Compensation Ban," as well as each request for payment (i.e., the G5 certifications)); *U.S. ex rel. Irwin v. Significant Educ., Inc.*, No. CV-07-1771-PHX-DGC, 2009 WL 322875, at *3 (D. Ariz. Feb. 10, 2009) (finding allegations about Required Management Assertions similar to those in TAC adequately pled that "management officials falsely certified to the government that [the college] complied with the incentive compensation ban in order to receive Title IV funding").

As far as Relators can determine, this is now the only Court in the country to have limited FCA liability to the PPA promises. Every other court to look at these particular issues before and after *Escobar* has reached the opposite conclusion.

**4.** **This Court's holding that the availability of administrative remedies forecloses FCA liability for post-PPA false certifications is incompatible with *Escobar*, contrary to how other lower courts have applied *Escobar*, inconsistent with relevant pre-*Escobar* precedent, and fundamentally alters the reach of the FCA contrary to congressional intent.**

In its prior ruling, this Court utilized the Payment/Participation Test to "draw[] the line" of FCA liability "at entering the PPA." (ECF 245 at 18.) The Court held that none of the post-PPA certifications of compliance satisfied the Payment/Participation Test because the DOE has administrative remedies to address post-PPA violations.

Specifically, this Court held that "[s]ubsequent certifications are material *only to continued eligibility* for program participation, which is governed by Title IV's comprehensive administrative regime and not the FCA." (ECF 245 at 20 (emphasis added).) However, the Supreme Court rejected this distinction in *Escobar*, finding it "arbitrar[y]" to exempt false statements about "compliance with a condition of eligibility to even participate in a federal program." 136 S. Ct. at 2002. In other words, *Escobar* recognized that certifications of compliance with conditions of eligibility can be actionable under the FCA and that nothing in the FCA immunizes false certifications of compliance with conditions of eligibility. *Id.*

**4.1** **Prior to *Escobar*, courts held that the availability of administrative remedies, including remedies under Title IV, did not preclude FCA liability.**

Because the Tenth Circuit in *Conner* had specifically found the administrative remedies under Title IV did not eliminate FCA liability, albeit in dicta,[5] Relators' prior briefing did not

---

[5] *Conner* said that the administrative remedies under Title IV were "unlike" the administrative remedies under Medicare. 543 F.3d at 1222; *U.S. ex rel. Sobek v. Educ. Mgmt., LLC*, No. CIV.A. 10-131, 2013 WL 2404082, at *28 (W.D. Pa. May 31, 2013) ("In *Conner*, the [c]ourt explicitly stated that the Incentive Compensation Ban at issue in *Hendow* provided a 'telling contrast' to an alleged violation of Medicare regulations." (citation omitted)).

address the numerous other court rulings holding that the existence of administrative remedies under Title IV does not affect FCA liability.

For example, in *U.S. ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 414 (8th Cir. 2012), the government participated on appeal "for the purpose of opposing the district court's alternative ruling that FCA actions based upon violations of Title IV of the Higher Education Act are inconsistent with, and thus precluded by, the comprehensive administrative remedies and sanctions available to the government under that Act." The Eighth Circuit, after thoroughly considering *Conner* and numerous other circuit court decisions, recognized that "none of these cases has held that a complex regime of regulatory sanctions *precludes* . . . suing under the FCA when the government has been damaged by a materially false or fraudulent claim for payment or by use of a record or statement in a materially false claim." *Id.* at 415. The court "agree[d] with the government that Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud." *Id.*

In *U.S. ex rel. Haskins v. Omega Institute*, the court rejected the argument that the DOE's actual administrative enforcement action, instituted two years before the FCA suit and for which the DOE had already "demanded repayment," somehow precluded a subsequent FCA suit relating to the exact same violations. 11 F. Supp. 2d 555, 558¬59 (D.N.J. 1998).

As the *Haskins* court explained in allowing a qui tam suit to proceed in parallel with an administrative enforcement action "based on the same facts," the DOE "lacks the authority" to pursue false claims actions since the "exclusive authority" to do so rests with the Attorney General (or a relator) under the FCA. *Id.* at 561; *see* 41 U.S.C. § 7103(c) (providing that an "agency head" is not authorized "to settle, compromise, pay, or otherwise adjust any claim involving

fraud"); *see also U.S. ex rel. Sobek v. Educ. Mgmt.*, LLC, No. CIV.A. 10-131, 2013 WL 2404082, at

*4 (W.D. Pa. May 31, 2013) (holding, in a Title IV case, that "[t]he existence of an administrative

enforcement mechanism does not preclude the possibility of an FCA claim").

As far as Relators can discern, this is the only Title IV case in which FCA liability has

been curtailed based on the existence of administrative remedies.

### 4.2 The Supreme Court in *Escobar* refused to limit FCA liability based on the availability of administrative remedies.

More importantly, however, the Supreme Court in *Escobar* said nothing about

administrative remedies having any effect on FCA liability—either under the falsity element or

the materiality element—even though the defendant-petitioner in that case (as well as amicus

parties) urged the Court to adopt that very standard.

Indeed, in *Escobar*, the defendant urged the Supreme Court to adopt a standard similar to

that announced by this Court, arguing that allowing FCA actions for regulatory violations also

punishable through administrative remedies "would short-circuit the very remedial process the

Government has established to address non-compliance with those regulations" and would

"undermine the government's own regulatory procedures." Brief for Petitioner at 51 (quoting,

inter alia, *Conner*, 543 F.3d at 1222). Just as this Court held that post-PPA false certifications

were "enforced exclusively through the 'carefully crafted remedial process[es]' of an

administrative regime" (ECF 245 at 17), the defendant in *Escobar* urged the Supreme Court to

limit FCA liability when there are "numerous remedies available" to the affected agency, which

can "choos[e] among" the available remedies in the "public interest." *Id.*

However, the unanimous opinion in *Escobar* never once suggested that the availability of

administrative remedies limited or curtailed the reach of the FCA in any way.

To the contrary, in its discussion of the materiality element, the Supreme Court suggested that evidence that an agency has taken action against similar past violations supports a finding that the violation is material and thus actionable under the FCA. *See Escobar*, 136 S. Ct. at 2003.

**4.3    Since *Escobar*, every court that has examined the question in the Title IV context has held that the availability of administrative remedies supports FCA liability.**

Indeed, since *Escobar*, every court to look at the question of how the availability of Title IV administrative remedies affects FCA liability has found that the availability (and use) of such remedies weighs in favor of FCA liability—not against it. For example, in *United States ex rel. Miller v. Weston Educ., Inc.*, the Eighth Circuit found the DOE's past enforcement actions *supported* a finding of FCA liability after *Escobar*. 840 F.3d 494, 504–05 (8th Cir. 2016) ("The government's acts confirm that it cares about the promise at issue: The DOE relies on school-maintained records to monitor regulatory compliance." (citing several administrative enforcement actions)). The district court in *Rose* came to the same conclusion. 2016 WL 5076214, at *6 ("[T]he DOE took corrective actions against schools, issued fines, and entered into settlement agreements (which function like a fine or partial revocation of funds) totaling tens of millions of dollars" and "show that the DOE cared about the ICB, and that it did not always pay the claims 'in full' despite knowledge of the ICB violations").

Numerous other courts outside of the Title IV context have likewise held that under *Escobar*, the availability (and use) of administrative enforcement actions helps to establish FCA liability. *See, e.g.*, *U.S. ex rel. Emanuele v. Medicor Assocs.*, 242 F. Supp. 3d 409, 431 (W.D. Pa. 2017) (holding that evidence that similar violations have resulted in administrative enforcement and violators "have paid penalties" supports finding of materiality and FCA liability); *U.S. v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89 (D.D.C. 2017) (holding that evidence the government "claws back

unreasonable charges" through regulatory actions supports materiality and FCA liability); *U.S. ex rel. Forcier v. Computer Scis. Corp.*, No. 12 CIV. 1750, 2017 WL 3616665, at *14 (S.D.N.Y. Aug. 10, 2017) (fact that agency "designed and implemented a computer program to identify" claims violating the law for administrative action proves materiality and supports FCA liability); *cf.* U.S. *ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 818 (S.D.N.Y. 2017) (government criminal enforcement actions for similar violations support materiality and FCA liability), *motion to certify appeal granted*, No. 10-CV-5645 (JMF), 2017 WL 1843288 (S.D.N.Y. May 4, 2017).

### 4.4 The Court's concern about FCA liability interfering with administrative priorities is adequately addressed in the FCA.

The Court's concern that FCA liability could interfere with administrative enforcement goals was considered by Congress when it enacted the modern FCA in 1986. When the 1986 amendments were under consideration, the Justice Department raised concerns about "dilution and potential impairment" of administrative enforcement actions from expanded *qui tam* liability. *U.S. ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.*, No. CV-F-91-194, 1992 WL 795477, at *11 (E.D. Cal. May 4, 1992) (quoting extensively from legislative history). But "[i]n strengthening the *qui tam* provisions of the FCA, Congress recognized that 'only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds.'" *Id.* at *10 (quoting Claims Amendments Act of 1986, P.L. 99-562, reprinted in 6 U.S.C.C.A.N. (1986) at p. 5267 (Senate Report No. 99-345)). In short, permitting potentially "cumulative remedies . . . is a legislative choice that has been made." 1992 WL 795477, at *11.

Moreover, Congress provided practical tools in the FCA for addressing the Court's concern. If an agency believes that a particular FCA action is interfering with its administrative enforcement goals, the agency, through the Department of Justice, "can compel dismissal or

settlement of a *qui tam* action." *See Haskins*, 11 F. Supp. 2d at 561 (internal marks omitted); 31 U.S.C. § 3730(c)(2) (establishing government's authority to dismiss or settle FCA suits). Thus, the government always has the ability to modulate FCA liability in particular cases based on administrative enforcement objectives.

### 4.5 The Tenth Circuit's language in *Conner* about administrative remedies must be viewed in context.

In its earlier Ruling, the Court relied heavily on the Tenth Circuit's decision in *Conner* addressing violations of Medicare regulations, though the Court eschewed *Conner*'s express statements distinguishing Title IV requirements from those at issue in *Conner*. *Conner*'s various statements about the Medicare regulations at issue in that case must be viewed in the context in which they were made.

Conner, the relator and a former physician at the defendant hospital, alleged a scattershot of legal violations relating to the hospital's treatment of a handful of (mostly) emergency room patients over the span of a number of years. *See generally* Fourth Am. Compl., ECF 41, *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 2:01-cv-02269 (D. Kan.). The alleged violations associated with each patient's case were varied and different. *Conner*, 543 F.3d at 1215. Many of the alleged violations surrounded the hospital's decision to countermand Conner's medical opinions at a time when Conner and the hospital had "developed a contentious relationship." *Id.*; *see* Conner's Fourth Am. Compl, ECF 41. Prior to filing the FCA case, Conner had been declined for reappointment to the hospital's staff and had filed three prior suits—all unsuccessful (including one affirmed on appeal by the Tenth Circuit)—relating to his failed reappointment. *Id.* The FCA suit was Conner's fourth suit against the hospital in five years.

Moreover, as the Tenth Circuit noted, the hospital did not make any representations of

compliance with the legal requirements at issue. Instead, the *only* certification in *Conner* was a "general sweeping" certification of compliance with all laws and regulations pertaining to healthcare services, which the hospital submitted with its annual cost reports to Medicare's intermediary. 543 F.3d at 1219.

Against this factual backdrop and the small number of isolated, singular violations alleged, which did not establish any pattern, practice, or policy by the hospital to commit the violations, the Tenth Circuit ruled that the allegations at issue *in that case* were better addressed through administrative mechanisms than the FCA. The Tenth Circuit emphasized that its decision turned on the confined and minor nature of the alleged violations, reasoning that "[t]here is thus no basis in either law or logic to adopt an express false certification theory that turns every violation of a Medicare regulation into the subject of an FCA qui tam suit." 543 F.3d at 1221.

The allegations in Relators' TAC are nothing like the sporadic, technical violations in *Conner*. Here, Relators have particularly alleged that Defendants' management directed policies and practices that systematically violated core legal requirements for years, which have resulted in thousands upon thousands of violations pursuant to these policies. Relators are not serial litigants with an ax to grind against Defendants—they both resigned their employment largely because of the sharp practices outlined in the TAC. Simply stated, the Tenth Circuit's concerns in *Conner* have no applicability to the allegations in this case.

Moreover, it bears repeating that *Conner* explicitly noted that the legal requirements in that case were nothing like the legal requirements at issue in this case. *Conner* expressly and specifically observed that "some regulations or statutes may be so integral to the government's payment decision as to make any divide between conditions of participation and conditions of

payment a 'distinction without a difference.'" 543 F.3d at 1222 (quoting *Hendow*, 461 F.3d at 1177). *Conner* noted that "Title IV's ban on 'incentive compensation'" provided "a telling contrast to the present case." *Id.* In its Ruling on Defendant's motions to dismiss, the Court relied extensively on *Conner* but failed to address *Conner*'s specific conclusion that the Title IV legal requirements, like the ICB, were different in kind from the legal requirements at issue in that case.

5. **Relators have alleged adequate facts demonstrating that Defendants' post-PPA false certifications are actionable under the FCA, and any doubt should be resolved in favor of Relators.**

Relators allegations relating to the G5 certifications and Required Management Assertions adequately plead claims for both express and implied false certification. Specifically, the allegations regarding the Required Management Assertions establish viable express certification claims, while the allegations relating to the G5 certifications adequately plead implied certification claims.

As this Court previously recognized, "[a]n express false certification theory applies when a government payee falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." (ECF 245 at 12 (internal marks omitted).) As outlined above, Relators have adequately alleged express false statements claims relating to Defendants' Required Management Assertions, which Defendants' management must provide to the DOE annually to remain eligible to receive Title IV funds. (ECF 175 ¶¶ 64–65.) In those Required Management Assertions, Defendants' management specifically certified Defendants' compliance with the ICB (ECF 175 ¶ 65; ECF 175-2 at 33), Refund requirement (*id.* at 55), Accreditation requirement (*id.* at 32–33), and the 90-10 Rule (*id.* at 23). (Notably, discovery has corroborated these allegations.)

Under *Escobar*, an implied certification claim exists where "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements." 136 S. Ct. at 1999. Here, Relators have alleged that in order to receive each and every Title IV payment, Defendants certify in the electronic payment system that "by processing this payment request . . . the funds are being expended . . . for the purpose and condition[s] of the" PPA. (ECF 175 ¶¶ 104–05, 119.) (Again, it is notable that discovery has shown that these allegations are all accurate.) These allegations are more than sufficient to plead implied certification claims since the G5 certifications contain specific representations of continued compliance with the PPA conditions. By omitting their violations of statutory, regulatory, and contractual requirements, Defendants have violated the FCA.[6]

## CONCLUSION

Because the Supreme Court later concluded that the legal test this Court applied in partially dismissing Relators' claims was erroneous, the Court should reconsider its prior ruling.

DATED this 16th day of November 2017.

/s/ Brandon J. Mark
BRANDON J. MARK
ALISSA M. MELLEM
PARSONS BEHLE & LATIMER
*Attorneys for Relators*

---

[6] As explained above, because the parties have already addressed the materiality of the Legal Requirements in the briefing on Defendants' motion for reconsideration, that issue is not addressed again in this Motion.

## CERTIFICATE OF SERVICE

I hereby certify on this _____ Day of _____ 201_, that a true and correct copy of the foregoing _____ was served via the court's CM/ECF electronic filing system to all counsel of record, including the following:

- **John W. Black**
  john.w.black@usdoj.gov

- **Steven M. Gombos**
  sgombos@ritzert-leyton.com

- **Jay D. Majors**
  jay.majors@usdoj.gov

- **Amber M. Mettler**
  amettler@swlaw.com,lpump@swlaw.com,docket_slc@swlaw.com

- **Gerald M. Ritzert**
  gritzert@ritzert-leyton.com

- **Alan L. Sullivan**
  asullivan@swlaw.com,phaslam@swlaw.com,lpump@swlaw.com,
  amcdonald@swlaw.com,DOCKET_SLC@swlaw.com

/s/_____