JOHN W. HUBER, United States Attorney (#7226)
SANDRA STEINVOORT, Assistant United States Attorney (#5352)
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Sandra.Steinvoort@usdoj.gov

CHAD A. READLER, Principal Deputy Assistant Attorney General
MICHAEL D. GRANSTON, Director
ALLISON CENDALI, Assistant Director
JAY D. MAJORS, Trial Attorney
JOHN W. BLACK, Trial Attorney
U.S. Department of Justice, Civil Division
601 D St. NW
Washington, DC 20004
Telephone: (202) 307-0264
Jay.Majors@usdoj.gov

Attorneys for the United States

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. KATIE BROOKS and NANNETTE WRIDE, <br><br> Plaintiffs, <br><br> vs. <br><br> STEVENS-HENAGER COLLEGE, INC., et al., <br><br> Defendants. | Case No. 2:15-cv-00119-CW-EJF <br><br> **UNITED STATES' MOTION FOR PARTIAL RECONSIDERATION** <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Evelyn J. Furse |

**TABLE OF CONTENTS**

I.     RELIEF SOUGHT AND GROUNDS THEREFOR ....................................................... 1

II.    ARGUMENT ................................................................................................................ 3

       A.     Implied Certification is an Appropriate Basis For Liability in This Case ............. 3

       B.     The United States Has Properly Alleged Materiality as to its False-Certification
              Claims ................................................................................................................. 6

              1.     Language of Applicable Requirements .................................................... 8

              2.     Importance of the Requirements to the Program ............................... 10

              3.     Significance of the Violations ............................................................... 11

              4.     How the Government Treats the Same or Similar Violations ........... 11

       C.     Reconsideration Would Not Be Disruptive Or Prejudicial ................................. 14

III.   CONCLUSION ........................................................................................................... 15

**TABLE OF AUTHORITIES**

**Federal Cases**

*Kungys v. United States*, 485 U.S. 759 (1988)....................................................................... 6

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ...................................................... 7

*Neder v. United States*, 527 U.S. 1 (1999)................................................................................ 6

*United States ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103 (1st Cir. 2016) ... 9

*United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)........ 5, 9, 10, 13

*United States ex rel. LaPorte v. Premiere Education Group, L.P.*, 2017 WL 3471163

      (D.N.J., Aug. 11, 2017)................................................................................................... 6, 9

*United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005).................... 9, 10

*United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494 (8th Cir. 2016) ................... 9, 12

*United States ex rel. Nelson v. Sanford-Brown Institute*, 788 F.3d 696 (7th Cir. 2015) ............... 6

 *United States ex rel. Rose v. Stephens Institute*, 2016 WL 5076214

      (N.D. Cal., Sep. 20, 2016)........................................................................................ 6, 9, 12, 14

*United States v. FastTrain II Corp.*, 2017 WL 606346 (S.D. Fla., Feb. 15, 2017) ................... 5, 6

*United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010) ...................... 7

*Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) ... passim

**State Cases**

*Junius Constr. Co. v. Cohen*, 257 N.Y. 393 (1931) ....................................................................... 7

**Federal Statutes**

20 U.S.C. § 1094.................................................................................................................... 8

31 U.S.C. § 3729(b)(4) ...................................................................................................... 6, 7

**Federal Rules**

34 C.F.R. § 668.32(a) – (a)(1)(i) ................................................................................................ 4, 8

59 Fed. Reg. 22,348 (Apr. 29, 1994) ........................................................................................ 10

75 Fed. Reg. 34,806 (June 18, 2010) ........................................................................................ 10

Fed. R. Civ.P. 12(b) ...................................................................................................................... 1

## I.     **RELIEF SOUGHT AND GROUNDS THEREFOR**

In accordance with the Court's Order of November 17, 2017, the United States seeks

reconsideration of those portions of this Court's Order of March 30, 2016, dismissing the

government's causes of action under the False Claims Act to the extent that those claims were

premised upon express or implied false certifications submitted by the defendants to the

Department of Education ("ED" or "Department") after the execution of the Program

Participation Agreements ("PPA") that granted eligibility to receive federal student aid funds

pursuant to Title IV of the Higher Education Act of 1965, as amended.[1]  The Court correctly

held that false statements made in connection with the execution of the PPA could be actionable

under a theory of promissory fraud (also called fraudulent inducement), but as to the

government's false-certification theories of liability, the Court found that the materiality element

of the FCA could not be satisfied.  Essentially, the Court held that because ED has a range of

administrative remedies available to it to redress violations of the laws and regulations

incorporated into the terms of the PPA occurring after the execution of that agreement, those

terms amounted only to conditions of participation, and not conditions of payment actionable

under the FCA.

Some time after the Court issued its order, the U.S. Supreme Court decided *Universal*

*Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), which reaffirmed

the existing legal standard for determining materiality under the FCA, but which also articulated

a new evidentiary framework by which to evaluate whether that standard has been met.  In

---

[1]     Because the government's motion seeks reconsideration of a ruling on a motion filed
pursuant to Fed. R. Civ. P. 12(b), it complies with the length limits of DUCivR 7-1(a)(3)(A) for a
Rule 12(b) motion.

pertinent part, that framework superseded the rationale set forth by this Court and rendered reconsideration appropriate.

The Government's Complaint in Intervention ("GCI") alleges one cause of action against Defendants Stevens-Henager College and its apparent successor in interest, the Center for Excellence in Higher Education (collectively, "Stevens-Henager," "SHC," or "Defendants") – that the Defendants sought to use a regulatory safe harbor to disguise a compensation plan that violated the prohibitions on enrollment-based incentives to admissions personnel ("Incentive Compensation Ban" or "ICB").  The government alleges that the Defendants falsely purported that they paid their admissions personnel bonuses that complied with a then-applicable safe harbor exception for bonuses paid upon a student's completion of a program, *see* Gov't Compl. in Intervention ¶¶ 72-73, ECF No. 41, when in fact Defendants only paid bonuses to admissions personnel who met certain levels of success in securing enrollments.  *Id.* ¶¶ 74-82.

As noted above, this Court granted in part Defendants' Motion to Dismiss to the extent that the government alleged false certification theories of liability under the FCA, but it denied the remainder of Defendants' motion and permitted the United States to proceed on a theory of fraudulent inducement.  *See* Memorandum Decision and Order at 22, ECF No.  245.  Defendants have moved for reconsideration of the partial denial of their earlier Motion to Dismiss the government's case, arguing incorrectly that the *Escobar* decision made the materiality element of the FCA more restrictive. *See* Defs. Mot. for Reconsideration, ECF No. 261.  The United States has opposed this motion.

*Escobar* does, however, provide a strong basis for this Court to reconsider its dismissal of the government's false-certification theories of liability, arising from SHC's ongoing violations of the ICB after execution of its PPA.  The *Escobar* ruling superseded two key elements of this

Court's ruling, by finding: (1) that implied certification may form the basis for FCA liability under appropriate circumstances, "at least" where a defendant has made representations that amount to "half-truths;" and (2) that the availability of an agency's administrative powers to redress misconduct is a significant indicator of FCA materiality, rather than a bar to FCA liability.  Because this holding superseded certain aspects of this Court's March 2016 ruling, and because this Court did not have that guidance available at the time of its ruling, partial reconsideration is now in order.[2]  Ultimately, the Defendants' ongoing and intended statutory violations in connection with claims for payment after entering into eligibility for federal funds form an adequate basis for FCA liability.

## II.    **ARGUMENT**

A.    Implied Certification is an Appropriate Basis For Liability in This Case

In *Escobar*, the Supreme Court endorsed the implied certification theory of liability under the FCA, holding that claims for payment can be false under that theory when they make a representation that misleadingly fails to disclose non-compliance with a material requirement. As the *Escobar* Court explained, "[b]ecause common-law fraud has long encompassed certain misrepresentations by omission, 'false or fraudulent claims' include more than just claims

---

[2]    As stated at the hearing on Defendants' Motion for Reconsideration, the government's decision not to immediately seek reconsideration of the Court's Order was based on a number of litigation considerations.  First, because the Court upheld the fraudulent inducement claim, the government could still pursue the same full range of discovery.  Second, if the government were ultimately to prevail on the fraudulent inducement theory, it would recover the entire spectrum of damages pleaded in the GCI.  Finally, any motion necessarily presents uncertainty, and in the immediate wake of *Escobar*, no further law had yet developed to explore its implications in the context of Title IV funding.  In light of the practicalities noted above regarding the scope of the case even under the fraudulent inducement theory, the government opted not to pursue reconsideration at that time.  Over the past year, numerous courts around the country have applied and developed the interpretation of *Escobar* in Title IV cases, such that the grounds for this Motion became surer.

containing express falsehoods." *Escobar*, 136 S. Ct. at 1999.  Additionally, "[d]efendants can be liable for violating requirements even if they were not expressly designated as conditions of payment . . . . What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.* at 1996.  Indeed, the Court rejected the argument that "misrepresenting compliance with a condition of eligibility to even participate in a federal program" would not lead to liability.  *Id.* at 2002.  Ultimately, the Court held that a claim can be false under the FCA "at least" where a defendant has made representations that amount to "half-truths." *Id.* at 1995.

Notably, the Supreme Court in *Escobar* explicitly stated that it was *not* deciding "whether all claims for payment implicitly represent that the billing party is legally entitled to payment." *Id.* at 2000.  The Court thus held that it need not decide the full scope of implied certification liability.  In *Escobar*, the Court explained that the claims at issue in that case "fall squarely within the rule that half-truths – representations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations." *Id.*

Likewise, the claim forms for Title IV funding in this case, accompanied by the certifications known as "G5 Certifications" as alleged in the GCI, are half-truths capable of misleading the Department.  Stevens-Henager's claims for payment purported to be submitted on behalf of eligible students, and the G5 Certifications accompanying its claims represented that "by processing this payment request … the funds are being expended within three business days of receipt for the purpose and condition of the agreement." *See* Gov't Compl. in Intervention ¶¶ 49-50, ECF No. 41.  However, a student is only eligible if he or she is enrolled at an eligible institution. *See* 34 C.F.R. § 668.32(a) – (a)(1)(i) ("A student is eligible to receive Title IV, HEA

program assistance if the student . . . . [i]s a regular student enrolled . . . *at an eligible institution*") (emphasis added).   The United States has alleged that Stevens-Henager was not an eligible institution because it violated a core requirement in its PPA – the ICB – and that violation made the institution (and thus its students) ineligible for Title IV funds. This is so because the applicable statute, regulations, and PPA "explicitly conditioned" both "initial and continuing eligibility of an institution upon compliance" with the ICB, among other provisions. *See United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1175 (9th Cir. 2006).

Stevens-Henager's post-eligibility claims for payment therefore contained the very type of half-truths to which liability can attach under *Escobar*.  At the time of payment, Stevens-Henager impliedly represented that it was submitting a loan request on behalf of an eligible student, and its G5 Certifications represented that the funds were sought "for the purpose and condition" of the PPA,[3] yet the school failed to disclose that it was in violation of the ICB and thus was no longer an eligible institution. *See* Gov't Compl. in Intervention ¶¶ 49-50. The court in *United States v. FastTrain II Corp.* ("*FastTrain*"), described the mechanics of these claims for payment: an institution requests "separate draw-downs … in the DOE's [Department of Education's] Grants Management System (G-5)" while "[e]ach draw-down falsely certified … compliance with DOE regulations."  2017 WL 606346, *11 (S.D. Fla. Feb. 15, 2017).  That court held that each of those separate certifications was also a false claim under the FCA.  *See id*.  In short, by alleging that Stevens-Henager previously agreed, as part of its PPA, to comply with the

---

[3]     The Defendants disagree with the government's position that "agreement" as used in the G5 Certification refers to the PPA, but they offer no other alternative meaning.  In any event, this disagreement cannot be resolved on the pleadings.

ICB, and subsequently submitted claims for payment while knowing it was not in compliance with the ban, the United States has sufficiently pleaded allegations of implied false claims.[4]

As noted in the relators' Motion for Reconsideration, this Court's earlier rejection of the plaintiffs' theory of implied false certification rested heavily upon the Seventh Circuit's holding in *United States ex rel. Nelson v. Sanford-Brown Institute*, which categorically rejected that theory as a basis for FCA liability. *See* Pls' Mot. for Recons. at 15, ECF No. 364; *see also Nelson*, 788 F.3d 696 (7th Cir. 2015). In the course of recognizing implied-certification liability and articulating its parameters, however, *Escobar* overturned that ruling, rendering reconsideration wholly warranted in this instance. As noted by the relators in their motion, case law since *Escobar* from other courts uniformly supports this conclusion. *See FastTrain*, 2017 WL 606346 at *8; *United States ex rel. Rose v. Stephens Institute*, No. 09-CV-05966-PJH, 2016 WL 5076214 at *6 (N.D. Cal. Sep. 20, 2016)[5]; *United States ex rel. LaPorte v. Premiere Education Group, L.P.*, No. CV 11-3523 (RBK/AMD), 2017 WL 3471163 at *3 (D.N.J. Aug. 11, 2017).

    B.    <u>The United States Has Properly Alleged Materiality as to its False-Certification Claims</u>

The Supreme Court also explained that requirements (such as the ICB) are material when there is reason to think they are capable of affecting the government's decision-making process. The False Claims Act defines the term "material" to mean "having a natural tendency to influence or be capable of influencing, the payment or receipt of money or property." 31 U.S.C.

---

[4]    The terms of the G5 Certifications, attesting to compliance with certain terms and conditions, support an express-certification theory of liability as well. While that theory was not the subject of *Escobar*'s ruling, it should nonetheless be restored by the Court, for the same reasons as implied certification.

[5]    *Rose* is currently pending before the Ninth Circuit on interlocutory appeal.

§ 3729(b)(4).  In *Escobar*, the Court cited the statutory definition of materiality and noted that the "natural tendency" and "capable of influencing" concepts in that definition are derived from the common law and are used in other federal fraud statutes.  *See Escobar*, 136 S. Ct. at 2002 (citing *Neder v. United States*, 527 U.S. 1, 16 (1999); *Kungys v. United States*, 485 U.S. 759, 770 (1988)).

By embracing the "natural tendency" test codified in the False Claims Act and enshrined in the common law, the Supreme Court made clear that materiality is determined through a holistic assessment of the tendency or capacity of the undisclosed violation to affect the government decision-maker.  Critically, the Supreme Court did not depart from the statutory text and the common law and hold that a relator (or the United States) must demonstrate that the government would *in fact* refuse payment if it knew of the alleged violations.  Thus, it is not necessary for the United States to show that it would in fact have refused payment had it known the full details of the defendant's scheme, or even that it likely would have refused payment, but merely that the type of violation alleged had the tendency or capability to influence the decision to pay.

Of greatest relevance to the instant motion, *Escobar* also clarified that a variety of factors are relevant to the materiality inquiry and stressed that no one factor is automatically dispositive.  *See Escobar*, 136 S. Ct. at 2001 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011), for the proposition that "materiality cannot rest on a 'single fact or occurrence as always determinative'").  Notably, the Court rejected the dichotomy between a so-called condition of participation and a condition of payment: "[s]ection 3729(a)(1)(A) imposes liability on those who present 'false or fraudulent claims' but does not limit such claims to misrepresentations about express conditions of payment."  *Id.* at 2001 (c*iting United States v. Science Applications*

*Int'l Corp.*, 626 F.3d 1257, 1268 (D.C. Cir. 2010)); *see also id.* at 2003 ("the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive").  In addition, the Court identified at least three other factors bearing on, but not necessarily dispositive of, the materiality inquiry, including whether the violation goes to the "essence of the bargain," whether the violation is significant or "minor or insubstantial," and whether the government took action when it had actual knowledge of the same or similar violations.  *See id.* at n.5 *(quoting Junius Construction Co. v. Cohen,* 257 N.Y. 393, 400 (1931)) and at 2003-04.  Ultimately, because materiality has now been shown to depend on a holistic assessment of many factors, it is likely to involve questions of fact that cannot be resolved on the pleadings.  Reconsideration of the Court's partial dismissal order thus only requires that the United States have alleged sufficiently that the Defendants' undisclosed violations would have a natural tendency to influence the government's decision-making process.

Because the United States filed its GCI before *Escobar* was issued, that pleading does not specifically address the *Escobar* factors in a neatly enumerated fashion.  However, the GCI substantially alleges sufficient facts establishing materiality under *Escobar*.

### 1.    Language of Applicable Requirements

In *Escobar*, the Supreme Court explained that "the Government's decision to expressly identify a provision as a condition of payment is relevant but not automatically dispositive" in determining materiality.  *Escobar*, 136 S. Ct. at 2003.  That factor has been properly alleged as a basis for a jury to conclude that Stevens-Henager's false statements regarding compliance with the incentive compensation prohibition, made after executing the PPA and in connection with obtaining payment, were material.

As pleaded in the GCI, the governing statute and regulations expressly condition a university's "initial and continuing eligibility" to receive Title IV funds on compliance with all applicable requirements, including the recordkeeping requirements at issue here.  *See* Gov't Compl. in Intervention ¶¶ 30-31, ECF No. 41 (citing 20 U.S.C. § 1094(a)); *see also* 34 C.F.R. § 668.14).  Moreover, ED has authority to withhold payment of funds based upon non-compliance with statutory requirements.  *See* 20 U.S.C. § 1094(c)(1)(G) (allowing the Department to take "emergency action" to withhold funds where it receives reliable information regarding violations of funding requirements); *see also* 34 C.F.R. § 668.83.  After the PPA was executed, compliance had to be re-attested repeatedly in annual audits and in the G5 Certifications with every claim for payment (or else payment might not issue). *See* Gov't Compl. in Intervention ¶¶ 49-50, 64-65, ECF No. 41.

Prior to *Escobar*, the Seventh and Ninth Circuits held that the prohibition on paying incentive compensation to student recruiters is material to ED's decision-making process.  *See United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (holding that false statement in PPA was "integral to the causal chain leading to payment"); *see also Hendow*, 461 F.3d at 1176 (explaining that PPA "is a condition of payment that the federal government requires – a promise that the University shall not break the law").  Those courts that have considered the issue post-*Escobar* have likewise found that continued compliance with the PPA is a condition of payment for materiality purposes.  *See Rose*, 2016 WL 5076214 at *7; *see also LaPorte*, 2017 WL 3471163 at *3.  The Eighth Circuit recently reached the same conclusion as to a different provision of the PPA.  *See United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 504 (8th Cir. 2016).  The incentive compensation ban is a prerequisite to an institution's initial and continued participation in Title IV programs under the statute,

regulations, and PPA. Stevens-Henager could not have executed the PPA without stating it would comply with that prohibition, and without a PPA, Stevens-Henager could not have received any Title IV funds. *See Hendow*, 461 F.3d at 1176.

### 2. Importance of the Requirements to the Program

The Supreme Court also indicated in *Escobar* that an important factor in evaluating materiality is whether the alleged violation "went to the very essence of the bargain." 136 S. Ct. at 2003 n.5 (citation omitted); *see also United States ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103, 110-11 (1st Cir. 2016) (on remand). That factor strongly supports the conclusion that violations of the incentive compensation prohibition are material.

As alleged in the government's complaint, Congress recognized the pernicious influence of commissions when it enacted the incentive compensation ban, specifically noting that its purpose was to ensure that Title IV funds were disbursed to students who enrolled in institutions likely to meet their educational needs and who could repay their loans. *See* Gov't Compl. in Intervention ¶ 32, ECF No. 41; *see also Hendow*, 461 F.3d at 1168-69 (prohibition "is meant to curb the risk that recruiters will 'sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans.'") (*quoting Main*, 426 F.3d at 916). Thus, a core reason for Congress' adoption of the prohibition was to protect the public fisc.

The Department has also repeatedly emphasized the importance of the ban. "[T]he Secretary has seen evidence of lowered satisfactory progress standards and in extreme cases, falsified attendance and leave of absence requests, all in an effort to keep students enrolled. In many cases, these practices were designed by admissions personnel who were duly paid after the student passed a retention mark. After that mark, the students were dropped." 59 Fed. Reg. 22,348 at 22,377 (Apr. 29, 1994); *see also* 75 Fed. Reg. 34,806 at 34,817 (June 18, 2010)

("[w]hen admission personnel are compensated substantially, if not entirely, upon the numbers of students enrolled, the incentive to deceive or misrepresent the manner in which a particular educational program meets a student's need increases substantially"). There can be little doubt that the violations of the incentive compensation ban alleged here go to the "very essence of the bargain" that the department entered into when it allowed Stevens-Henager to participate in Title IV programs.

### 3. Significance of the Violations

The Supreme Court also noted that "[m]ateriality . . . cannot be found where noncompliance is minor or insubstantial." *Escobar*, 136 S. Ct. at 2003. This factor likewise underscores the materiality of the violations alleged. Far from "minor or insubstantial," the improper compensation alleged by the government makes up a large portion of the compensation earned by Stevens-Henager's recruiters. Under the Defendants' plan, admissions recruiters who secure a high number of enrollments can earn commissions large enough to raise their compensation as much as six times as much as recruiters with low enrollment success. *See* Gov't Compl. in Intervention ¶ 81, ECF No. 41. By any measure, this is a significant amount of remuneration that clearly had significant potential to influence recruiters in their decisions about how and whom to recruit.

### 4. How the Government Treats the Same or Similar Violations

The Supreme Court also indicated that how the government has treated violations that are the same or similar to the ones alleged may provide "proof of materiality." *Escobar*, 136 S. Ct. at 2003. It is as to this factor where this Court's pre-*Escobar* analysis differs most broadly from the guidance set forth by the Supreme Court, and thus where the basis for reconsideration is most apparent. This Court held that after execution of the PPA, "[s]ubsequent certifications are material only to continued eligibility for program participation, which is governed by Title IV's

- 11 -

comprehensive administrative regime and not the FCA," thus drawing a distinction between conditions of payment and conditions of participation, based on the availability of administrative remedies for misconduct.  *See* Memorandum Decision and Order at 20, ECF No. 245.  The Supreme Court rejected this distinction, however, as one prone to "arbitrariness," and as noted above, it made the designation of a condition of payment merely one consideration among many. *See Escobar*, 136 S. Ct. at 2002.

Further, however, *Escobar*'s approach takes a very different view of the availability of administrative action.  In the Supreme Court's view, the agency's exercise of administrative authority is not a substitute for (or a bar against) FCA enforcement; rather, it is a factor in determining materiality for FCA purposes:

> proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.

136 S.Ct. at 2003.  As the relators noted in their motion, cases following *Escobar* have taken this approach as well.  The Eighth Circuit found that ED's past enforcement actions were relevant to a finding of FCA liability after *Escobar*.  *See Miller*, 840 F.3d at 504-05 ("The government's acts confirm that it cares about the promise at issue: The DOE relies on school-maintained records to monitor regulatory compliance").  The district court in *Rose* likewise supported a finding of FCA materiality based on the fact that ED "took corrective actions against schools, issued fines, and entered into settlement agreements (which function like a fine or partial revocation of funds) totaling tens of millions of dollars" and "cared about the ICB, and … did not always pay the claims 'in full' despite knowledge of the ICB violations."  *Rose*, 2016 WL 5076214, at *6.

As a matter of pleading, the government's complaint does not directly address this *Escobar* factor – the actions taken by the affected agency in this or other similar cases.  Pre-*Escobar*, the materiality element of the FCA was generally approached as a purely legal question, without the factual inquiry embodied in this element of *Escobar*'s ruling.  However, this point is not an obstacle to reconsideration and reinstatement of the government's false-certification theories of liability in this case, because as a practical matter, the Defendants have had a full opportunity to conduct discovery into this issue.  The Defendants have issued document requests and interrogatories seeking information about all of the administrative actions taken by ED over the issue of the ICB during the time period in question, and the United States has produced responsive information.  The government has asserted formal objections to many of these discovery requests on the basis that post-PPA administrative actions are irrelevant to a claim of fraudulent inducement (the only currently active theory of liability), but it has not withheld production of any responsive information on the basis of that objection.  In other words, reinstatement of the government's false-certification theories of liability would not be prejudicial to the Defendants in that it would not require them to propound extensive new discovery.

As a substantive matter, the discovery responses produced by the United States thus far show that ED has taken administrative actions over post-eligibility non-compliance with the ICB in numerous cases.  As the *Rose* court found, this supports a finding that the government's false-certification claims satisfy this element of *Escobar*'s materiality analysis and thus are appropriate for reinstatement upon reconsideration.  As a rule, ED's administrative actions have involved fines or settlements, rather than termination of Title IV funds, but *Escobar* itself makes the point

that continued payment is evidentiary only and does not weigh dispositively against materiality.[6]

In the particular context of for-profit post-secondary education, where Title IV funding can

comprise nearly 90 percent of an entity's revenue, cutting off such funding can mean abruptly

shutting down the school, with potentially severe consequences for innocent third-party students,

which can reasonably be expected to restrict an agency's handling of a violation even when

material.

C.      Reconsideration Would Not Be Disruptive Or Prejudicial

---

[6]      Moreover, the *Rose* court made the point that fines and settlements are themselves
a form of partial disgorgement of funds, and its instructive findings are worth noting in full:

> AAU is thus correct that, with one exception, the DOE "has not limited, suspended
> or terminated any schools' participation in Title IV" based on ICB [incentive
> compensation ban] violations.  However, this fact does not prove that the DOE
> considered ICB violations immaterial or unimportant to the Title IV bargain.  To
> the contrary, the DOE took corrective actions against schools, issued fines, and
> entered into settlement agreements (which function like a fine or partial revocation
> of funds) totaling tens of millions of dollars.  The government's actions show that
> the DOE cared about the ICB, and that it did not always pay the claims "in full"
> despite knowledge of the ICB violations.  *Escobar*, 136 S. Ct. at 2003; *cf. Hendow*,
> 461 F.3d at 1176 ("[T]he DOE . . . quite plainly care about an institution's ongoing
> conduct, not only its past compliance [with the ICB.]").

> Finally, the court notes that the DOE's enforcement of the ICB has changed over
> time, signaling a "change in position" that is relevant under *Escobar*.  136 S. Ct. at
> 2004.  In 2002, in informal guidance, the DOE took the position that fines, and not
> suspension of participation in Title IV, were the most appropriate penalty for ICB
> violations.  *See* Hansen Memo.  It also created the safe harbors in that year.
> However, by 2008 this position had attracted criticism and Congress commissioned
> a study of DOE's ICB enforcement.  The DOE subsequently took steps to eliminate
> the safe harbors.  In 2015, after the Office of the Inspector General released a
> critical report, *see id.*, the DOE officially rescinded the Hansen Memo.  Considering
> these recent changes, it would be a mistake to give too much weight to the DOE's
> record of past enforcement.

*Rose*, 2016 WL 5076214 at *6 (internal docket citations omitted).

Reconsideration would not be disruptive to the case or prejudicial to the Defendants. Most transactional data regarding the Defendants' post-eligibility claims for payment will have already been the subject of discovery, since the universe of damages for a violation of the ICB is the same under promissory fraud or false certification theory. Any additional data that might become relevant can be readily exchanged without the need for burdensome additional discovery. Additional email production from the Defendants based on reinstatement of the government's false certification would not be extensive, since post-eligibility email communications would have been relevant for the element of *scienter* even under a promissory-fraud theory. In any event, based on the communications between the parties in recent weeks, Stevens-Henager's production of email records is gearing up to begin and could be adjusted accordingly. Finally, reconsideration would not raise new issues as to damages, since the same potential universe of damages is implicated by any theory.

## III.   <u>CONCLUSION</u>

For the reasons set forth above, this Court should reconsider its order of March 30, 2016, partially dismissing the United States' complaint in intervention, and reinstate the government's false certification theories of liability.

DATED this 4th day of December, 2017.

CHAD A. READLER
Principal Deputy Assistant Attorney General

JOHN W. HUBER
United States Attorney

/s/ Jay D. Majors
JAY D. MAJORS, Trial Attorney
MICHAEL D. GRANSTON, Director
ALLISON CENDALI, Assistant Director
JOHN W. BLACK, Trial Attorney
U.S. Department of Justice, Civil Division
601 D St. NW
Washington, DC 20004
Telephone: (202) 307-0264
Jay.Majors@usdoj.gov

SANDRA STEINVOORT
Assistant United States Attorney (#5352)
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Sandra.Steinvoort@usdoj.gov

Attorneys for the United States

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of December 2017, a true and correct copy of the foregoing

**United States' Motion For Partial Reconsideration** was served via the court's CM/ECF electronic

filing system to all counsel of record.

/s/ Melissa A. Meldrum
Office of the United States Attorney
District of Utah