IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KATIE BROOKS and NANNETTE WRIDE, <br><br> *Plaintiffs*, <br><br> v. <br><br> STEVENS-HENAGER COLLEGE, *et al.*, <br><br> *Defendants*. | **MEMORANDUM DECISION AND ORDER** <br><br><br> Case No. 2:15-cv-119-JNP-EJF <br><br> District Judge Jill N. Parrish |

# I.  INTRODUCTION

This is a *qui tam* action. Relators Katie Brooks and Nannette Wride filed this case in January 2013 seeking relief under the False Claims Act. They allege that Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; the Center for Excellence in Higher Education ("CEHE"); and Carl Barney (collectively, the "Colleges") submitted, or caused to be submitted, "false or fraudulent" claims for federal financial aid. In April 2014, the Government intervened with respect to certain allegations against two of the defendants: Stevens-Henager and its apparent successor in interest, CEHE.

The parties engaged in extensive motion practice, and Relators amended their complaint three times. On March 30, 2016, the court issued a memorandum decision and order (the "Prior Order"). In it, the court limited Relators and the Government (collectively, "Plaintiffs") to the legal theory that the Colleges knowingly made false statements, either express or implied, when entering into Program Participation Agreements with the Department of Education. Relators, the

Government, and the Colleges have all asked the court to reconsider the Prior Order based on the Supreme Court's ruling in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

## II.    LEGAL AND FACTUAL BACKGROUND

### A.  TITLE IV

Under Title IV of the Higher Education Act, the Government "operates a number of programs that disburse funds to help students defray the costs of higher education." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1043 (11th Cir. 2015) (citing 20 U.S.C. §§ 1070–1099d). "These programs include the Federal Pell Grant, the Federal Family Educational Loan Program, the William D. Ford Federal Direct Loan Program, and the Federal Perkins Loan." *Id.* (citing 20 U.S.C. §§ 1070a, 1071–1087, 1087a–1087j, 1087aa–1087ii). Title IV funds are available only to those students who attend "eligible" institutions. *Id.*

To become an eligible institution, a school must enter into a Program Participation Agreement ("PPA") with the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R § 668.14(a)(1). Each PPA provides that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV . . . program." Third Am. Compl., Ex. 1 at 1. Each PPA also provides that a school's participation in Title IV is "subject to the terms and conditions set forth in this Agreement." *Id.* When signing a PPA, a school promises to comply with all federal statutes applicable to Title IV and all regulations promulgated thereunder: "The Institution understands and agrees that it is subject to and will comply with the program statutes and implementing regulations for institutional eligibility as set forth in 34 CFR Part 600 and for each Title IV . . . program in which it participates . . . ." *Id.*, Ex. 1 at 3.

2

1. **The Incentive Compensation Ban**

To be eligible to receive Title IV funds, a school must agree to comply with the Incentive Compensation Ban (the "ICB"). The ICB prohibits schools from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." § 1094(a)(20). Each PPA expressly provides:

> By entering into this [PPA], the Institution agrees that:
>
> . . .
>
> (22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance . . . .

Third Am. Compl., Ex. 1 at 4–6.

2. **The 90/10 Rule**

Proprietary schools that execute a PPA agree to comply with what is known as the 90/10 Rule. § 1094(a)(24). Under this rule, a proprietary school must derive more than ten percent of its revenue from sources other than Title IV programs. § 1094(a)(24). A proprietary school loses eligibility for Title IV programs if it violates the 90/10 Rule for "two consecutive institutional years." § 1094(d)(2)(A); 34 C.F.R. § 668.28(c)(1). If a proprietary school violates the 90/10 Rule for any fiscal year, it "becomes provisionally certified . . . for the two fiscal years after the fiscal year it failed to satisfy the [90/10 Rule]." § 668.28(c)(2).

### 3. Record Keeping Requirements

Schools that participate in Title IV programs must track and report student attendance. In each PPA, a school agrees to "establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds." Third Am. Compl., Ex. 1 at 4; 20 U.S.C. § 1094(a)(3). If a student enrolls but fails to attend class, the school must return the funds received for that student to the Department of Education within a specified period of time. 20 U.S.C. § 1091b; 34 C.F.R. § 668.21(a), (c). Similarly, if a student enrolls and attends some classes but then stops attending, the school must calculate the funds that the student earned and refund to the Department of Education any unearned funds. § 668.22(a)(1) (schools are obligated to "determine the amount of title IV grant or loan assistance that the student earned as of the student's withdrawal date"); § 668.22(a)(4) (the "difference between these amounts must be returned to the title IV programs"); *see also* 20 U.S.C. § 1091b; 34 C.F.R. § 668.22(b), (g), (i).

### 4. Satisfactory Academic Progress

Schools that participate in Title IV programs must create and enforce reasonable standards of academic progress. Under the applicable regulations, "[a]n institution must establish a reasonable satisfactory academic progress policy for determining whether an otherwise eligible student is making satisfactory academic progress in his or her educational program and may receive assistance under the title IV . . . programs." § 668.34(a); *see also* 20 U.S.C. § 1091(a)(2) (requiring students to make "satisfactory progress"); § 1091(c) (defining "satisfactory progress").

### 5. Accreditation Standards

To participate in Title IV programs, schools must "meet the requirements established by . . . accrediting agencies or associations." 20 U.S.C. § 1094(a)(21). In each PPA, a school

expressly agrees that it "will meet the requirements established pursuant to part H of Title IV of the HEA by . . . nationally recognized accrediting agencies." Third Am. Compl., Ex. 1 at 6.

## B. RELATORS' COMPLAINT

Relators' Third Amended Complaint ("Realtors' complaint") spans 160 pages and includes over 130 pages of factual allegations. In brief, Relators allege that the Colleges ran afoul of various Title IV requirements. According to Relators, the Colleges made false statements to the Department of Education in, among other things, PPAs. These false statements allegedly induced the Department of Education to make the Colleges eligible for Title IV programs. The Colleges' requests for Title IV funds were allegedly "false or fraudulent" because the Colleges fraudulently induced the Department of Education to allow the Colleges to participate in Title IV programs.

### 1. The Colleges and Mr. Barney

The Colleges, other than CEHE, operated for-profit postsecondary educational schools throughout the western United States. *Id.* ¶ 19. Mr. Barney allegedly signed PPAs on behalf of the Colleges at various times, including one in 2001 for Stevens-Henager. *Id.* ¶ 273. The Colleges derived a substantial portion of their revenue from Title IV programs. *Id.* ¶ 20. On or about December 31, 2012, the Colleges merged into CEHE, an Indiana nonprofit corporation. *Id.* ¶ 19. Before the merger, all of the Colleges, other than CEHE, were privately owned by Mr. Barney. *Id.* ¶ 21. Mr. Barney is the chairman of CEHE and the sole statutory member of CEHE. *Id.*

### 2. Relators Katie Brooks and Nanette Wride

Ms. Brooks began working at Stevens-Henager as an admissions consultant in March 2009. *Id.* ¶ 179. Her base salary was $38,000 per year when she started, but it was increased to $42,000 per year in September 2009. *Id.* ¶ 180 & n.6. Ms. Brooks allegedly received significant

bonuses based on the number of students she enrolled in Stevens-Henager. *Id.* ¶ 180. For instance, in 2010, Ms. Brooks allegedly received bonuses (net of taxes and withholding) of approximately $31,450. *Id.* ¶ 190. Ms. Brooks stopped working at Stevens-Henager around March 2011. *Id.* ¶ 211.

Mr. Wride began working at Stevens-Henager as an admissions consultant in July 2009. *Id.* ¶ 212. She was paid a base salary of approximately $33,000 per year when she first started, which was later increased to $37,000 per year. *Id.* ¶ 228. She too was allegedly paid significant bonuses based on the number of students she enrolled in Stevens-Henager. *Id.* For instance, Ms. Wride allegedly received four or five bonuses ranging from $1,200 to $4,000 based on her success in enrolling students at Stevens-Henager. *Id.* Ms. Wride stopped working at Stevens-Henager on June 6, 2011. *Id.* ¶ 382.

### 3. Alleged Violations of the ICB

The Colleges, according to Relators, violated the ICB from "at least July 1, 2002" to at least 2011. *Id.* ¶ 138. Specifically, Relators allege that the Colleges' compensation plan, as detailed in the 2007 version of Procedure Directive 85R, violated the ICB. *Id.* ¶ 176. Admissions consultants, under the terms of the plan, received bonuses if they satisfied three requirements: *first*, the admissions consultant recruited a student who completed thirty-six credit units (the equivalent of one year of study); *second*, the admissions consultant recruited at least five new students within a three-month period; and *third*, the admissions consultant maintained at least a thirty-three percent "conversion ratio"[1] over the three-month period. *Id.* ¶ 182. According to Relators, the Colleges' written compensation plan, which purportedly relied on regulatory safe

---

[1] A "conversion ratio" is the number of actual enrollments achieved by an admissions consultant divided by the number of interviews the admissions consultant conducted with prospective students. If an admissions consultant interviewed ten students and five enrolled, the admissions consultant's conversion ratio would be fifty percent.

harbors, was drafted to disguise ICB violations. *Id.* ¶¶ 165, 178. Relators also allege that, during their time at Stevens-Henager, the director of admissions offered "prizes" to admissions consultants who achieved a certain number of enrollments. *Id.* ¶ 195. These prizes consisted of vacations, cash payments, movie tickets, and consumer electronic products, such as televisions and iPads. *Id.* ¶¶ 196–200, 233.

### 4. Alleged Violations of the 90/10 Rule

Relators allege that the Colleges have attempted to disguise violations of the 90/10 Rule. *Id.* ¶ 313. Relators rely on three allegations to show that the Colleges violated the 90/10 Rule. *First*, Relators allege that the Colleges used a "scheme" involving textbooks to inflate their revenue from non-governmental sources. *Id.* ¶ 314. Relators "believe and allege" that the Colleges used this "scheme" because, on approximately April 25, 2012, the Colleges' chief operating officer told employees at a CollegeAmerica campus that she did not want accreditors to see a book room that might "raise questions" about compliance with the 90/10 Rule. *Id.* ¶ 315. *Second*, Relators allege that, in early 2014, employees at Stevens-Henager altered files to show that Stevens-Henager students attended CollegeAmerica Arizona. *Id.* ¶ 317. According to Relators, this was done to make CollegeAmerica Arizona's "statistics appear better than they actually were" for purposes of the 90/10 Rule. *Id. Third*, Relators allege that the Colleges are attempting to achieve not-for-profit status so that they are exempt from the 90/10 Rule. *Id.* ¶ 318.

### 5. Violations of Refund Requirement

Relators allege that the faculty and administrative personnel at Stevens-Henager falsified attendance records to delay students' withdrawal dates, thereby decreasing the amount of Title IV funds that the Colleges were required to return to the Department of Education. *Id.* ¶ 329. Specifically, "faculty and administrative officials would alter attendance reports to show that certain students had attended classes when the students had not actually done so." *Id.* ¶ 320. For

instance, one professor "recorded a student as having perfect attendance even though the student had given birth during the module in a different part of the state and had not been to the campus since that time." *Id.* ¶ 321. Ms. Brooks and Ms. Wride were aware of these practices during their time at Stevens-Henager. *Id.* ¶ 319.

Employees at CollegeAmerica allegedly reported similar misconduct. *Id.* ¶ 327. For instance, Relators allege that one CollegeAmerica employee testified that the school "could change the last day of attendance without [the student] even knowing it." *Id.* ¶ 328. Relators also allege that the associate dean at CollegeAmerica Denver would hold a "Last Day Attended" meeting each year where the deans would reach out to students who had stopped attending and encourage them to log on to their account so the school would not have to count them as "dropped." *Id.* ¶ 327.

### 6. Satisfactory Academic Progress

Relators allege that the faculty and administrators at Stevens-Henager falsified grades to show that students were achieving satisfactory academic progress when, in reality, they were not. *Id.* ¶ 330. According to Realtors, faculty would also employ grading standards that guaranteed passing grades. *Id.* Ms. Brooks and Ms. Wride were aware of these practices during their time at Stevens-Henager. *Id.* Relators allege that CollegeAmerica Denver engaged in similar conduct between July 2010 and March 2011. *Id.* ¶ 342. Specifically, students were allowed to pass a class with a D- or better even though "faculty members . . . expected students to achieve a grade of at least C to pass." *Id.*

### 7. Accrediting Standards

Relators allege that faculty at Stevens-Henager lacked the qualifications that were required by the school's accreditor. *Id.* ¶ 363. Specifically, Ms. Wride discovered that many faculty members did not meet the minimum qualifications to teach the courses they were

assigned. *Id.* For instance, Ms. Wride discovered that one professor did not have the requisite work experience to teach the courses he was assigned to teach. *Id.* ¶ 364. Relators allege that Stevens-Henager circumvented accreditation requirements by assigning qualified teachers to certain courses but then substituting unqualified teachers in their place. *Id.* ¶ 402.

## C. THE GOVERNMENT'S COMPLAINT

The Government intervened with respect to the claims brought against Stevens-Henager based on alleged violations of the ICB. The Government's Complaint in Intervention (the "Government's complaint") alleges that Stevens-Henager's compensation plan violated the ICB from approximately 2000 to at least July 1, 2011. Gov't Compl. Intervention ("GCI") ¶¶ 72, 88.[2] During this time, Stevens-Henager promised in a 2007 PPA and a 2010 PPA that it would not "provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance." GCI ¶ 63. Both promises were allegedly false when made because Stevens-Henager knew that it was violating and would continue to violate the ICB. GCI ¶ 99. According to the Government, Stevens-Henager's promises to comply with the ICB were "material to the Department of Education's decision to make Stevens-Henager eligible for [Title IV] programs." GCI ¶ 106, 111.

## D. PROCEDURAL BACKGROUND

In the Prior Order, the court limited Plaintiffs to the legal theory that the Colleges knowingly made false statements, either express or implied, when entering into PPAs with the

---

[2] The Government alleges that Stevens-Henager's compensation plan, as written, violated the ICB. GCI ¶ 88. The Government, unlike Relators, does not allege that management at Stevens-Heanger violated the ICB "in practice" by rewarding admissions consultants with prizes, such as cash bonuses. *Cf.* Third Am. Compl. ¶¶ 196–200, 233.

Department of Education. In reaching this conclusion, the court relied on the now-discredited "condition of participation versus condition of payment" test, which was articulated by the Tenth Circuit in *United States ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211 (10th Cir. 2008). About three months after the court issued the Prior Order, the Supreme Court issued its decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). In it, the Supreme Court expressly rejected the "condition of participation versus condition of payment" test upon which this court had relied.

Shortly after the Supreme Court decided *Escobar*, the parties requested that the court stay all deadlines while they attempted to mediate the case. The court did so. After about five months of unsuccessful mediation, the parties requested that the court lift the stay. The court lifted the stay on November 16, 2016, and on December 7, 2016, the Colleges filed a motion for reconsideration, arguing that all claims under the False Claims Act should be dismissed in light of the Supreme Court's decision in *Escobar*.

On November 15, 2017, at a hearing on the Colleges' motion for reconsideration, the court raised concerns that it had impermissibly limited Plaintiffs' claims, in light of *Escobar*. The court inquired of Plaintiffs why they had not sought reconsideration of the Prior Order. Plaintiffs stated that they believed that the Prior Order was erroneous in light of *Escobar*, but offered various reasons as to why they had not sought reconsideration.

The day after the hearing, Relators filed a motion for reconsideration, arguing that the court had impermissibly narrowed their claims in the Prior Order. Relators stated that they had been instructed by the Government, in January 2017, not to seek reconsideration. The Government followed suit shortly thereafter and filed a similar motion seeking reconsideration,

explaining that it had not promptly sought reconsideration for strategic reasons. Both motions were fully briefed, and the court entertained oral argument on March 15, 2018.

### III.    DISCUSSION

#### A. REQUIREMENTS FOR RECONSIDERATION

Grounds for seeking reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Moreover, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law. *Id.* But a motion for reconsideration is an inappropriate vehicle to "reargue an issue previously addressed by the court when the motion merely advances new arguments." *Id.*

Here, reconsideration is appropriate because there has been an intervening change in the law, namely the Supreme Court's decision in *Escobar*. The parties agree that *Escobar* has effected an intervening change in the law, but they disagree on what it means for this case. The court agrees that *Escobar* has effected an intervening change in the law and therefore concludes that reconsideration is appropriate. *See Rose v. Stephens Inst.*, No. 09-cv-05966-PJH, 2016 WL 5076214, at *3 (N.D. Cal. Sept. 20, 2016) ("*Escobar* articulated a materiality standard under the [False Claims Act] that, at least potentially, undermines the existing Ninth Circuit law on the issue.").[3]

---

[3] The Colleges contend that the court should not consider Plaintiffs' motions for reconsideration because Plaintiffs filed their motions almost a year after the Colleges filed their motion for reconsideration. This delay, according to the Colleges, effected a waiver of Plaintiffs' rights to seek reconsideration and prejudices the Colleges because they may be forced to defend against claims that the court erroneously dismissed. The Colleges' arguments ring hollow. The court, during a hearing on the Colleges' motion for reconsideration, raised the issue of whether Plaintiffs also were entitled to reconsideration based on *Escobar*. In fact, the court was concerned that portions of the Prior Order, which the Colleges had not addressed, were erroneous

In the Prior Order, the court also conflated two related but distinct theories used to show that claims are "false or fraudulent": (1) false certification (either express or implied); and (2) promissory fraud. After review of the Prior Order, the court concludes that portions of its ruling relating to the claims against the Colleges are erroneous. The court therefore vacates the Prior Order as it relates to these claims.[4]

### B. MOTION STANDARD

Because the Prior Order addressed motions to dismiss, the court analyzes the issues presented by the pending motions under the Rule 12(b)(6) standard. That is, the court must determine whether Plaintiffs have stated claims for relief under the False Claims Act. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Where the allegations are merely "label and conclusions" or a "formulaic recitation of the elements of a cause of action," the plaintiff's claim will not survive a motion to dismiss. *Twombly*, 550 U.S. at 555. For the claim to survive, the plaintiff's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

in light of *Escobar*. But the court need not have provided Plaintiffs an opportunity to seek reconsideration. Instead, the court could, on its own accord, reconsider the Prior Order. *See* Fed. R. Civ. P. 54(b) ("[A]ny order, or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of judgment . . . ."). Plaintiffs' motions for reconsideration merely gave the court the benefit of additional briefing on potential errors that the court could have corrected on its own. Thus, even if Plaintiffs somehow waived their right to seek reconsideration (they did not), the court would (and could) reconsider the Prior Order *sua sponte*.

[4] The court does not reconsider the Prior Order as it relates to claims against the previously dismissed defendants.

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility, in this context, means that the plaintiff has alleged facts that allow "the court to draw [a] reasonable inference that the defendant is liable for the alleged misconduct." *Iqbal*, 556 U.S. at 678. Factual allegations that are "'merely consistent with' a defendant's liability," however, are not facially plausible. *Id.* (quoting *Twombly*, 550 U.S. at 557).

Where multiple defendants are involved, "[i]t is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (quoting *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1250 (10th Cir. 2008)); *see also Bulanda v. A.W. Chesterton Co.*, No. 11 C 1682, 2011 WL 2214010, at *2 (N.D. Ill. June 7, 2011) (dismissing complaint that made a number of generic allegations as to the defendants collectively); *Boykin Anchor Co. v. AT&T Corp.*, No. 5:10-CV-591-FL, 2011 WL 1456388, at *4 (E.D.N.C. Apr. 14, 2011) ("Plaintiff's attempt to treat all defendants as one 'corporate family' for purposes of this lawsuit is unfounded."). "The law recognizes a difference between notice pleading and 'shotgun' pleading." *Glenn v. First Nat'l Bank in Grand Junction*, 868 F.2d 368, 371 (10th Cir. 1989). As such, "[i]t is not the role of the court to sort through a lengthy complaint to construct the plaintiff's case." *Chavez v. Huerfano Cnty.*, 195 F. App'x 728, 730 (10th Cir. 2006).

A party alleging violations of the False Claims Act must also comply with Rule 9(b)'s heightened pleading requirement. *United States ex rel. Lemmon v. Enviocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010). Under Rule 9(b), a party must "state with particularity the circumstances constituting fraud." The purpose of this rule is to afford defendants fair notice of the plaintiff's claims and the factual grounds upon which they are based. *Lemmon*, 614 F.3d at

1172. To comply with Rule 9(b), a plaintiff seeking relief under the False Claims Act must allege the who, what, when, where, and how of the alleged fraud. *Id.* at 1171. In short, the plaintiff must "show the specifics of [the] fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.* at 1172.

## C. THE FALSE CLAIMS ACT

The False Claims Act imposes liability on any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . .

31 U.S.C. § 3729(a)(1)(A), (B) (2009).[5] A claim under § 3729(a)(1)(A) has three elements: (1) the defendant submits a claim for payment to the Government; (2) the claim is false; and (3) the

---

[5] The pre-2009 version of the False Claims Act imposes liability on any person who "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . ." 31 U.S.C. § 3729(a)(1), (2) (1986). Plaintiffs have alleged violations of the pre- and post-2009 versions of the False Claims Act, but the 2009 amendments did not alter the essential elements for a violation of the False Claims Act as applied to the facts of this case. The 2009 amendments removed the requirement that a claim be presented "to an officer or employee of the United States Government or a member of the Armed Forces of the United States" and expanded liability to all false or fraudulent claims presented "to an officer, employee, or agent of the United States; or . . . to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government . . . provides or has provided any portion of the money or property requested or demanded; or . . . will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." *Compare* § 3729(a)(1) (1986) *with* § 3729(a)(1)(A), (b)(2) (2009). In short, the 2009 amendment ensures that claims submitted to "recipients of government funds to be spent on government objectives were subject to [False Claims Act] liability without the necessity of meeting a presentment to the government requirement or an intent to defraud the government requirement." John T. Boese, *Civil False Claims and* Qui Tam *Actions*, at 2-30 (4th Ed.). Here, all of the alleged claims were presented to an "officer or employee of the United States Government," so the 2009 amendment does not alter the court's analysis. When Congress enacted the 2009 amendment, it indicated that the changes to § 3729(a)(2), which were codified at § 3729(a)(1)(B), "shall take effect as if enacted

defendant knows the claim is false. Similarly, a claim under § 3729(a)(1)(B) has three elements: (1) the defendant makes a false statement; (2) the defendant acts knowing that the statement is false; and (3) the false statement is material to a false claim for payment. "Claim," as it is used in the False Claims Act, means, among other things, "any request or demand . . . for money or property . . . that . . . is presented to . . . the United States." § 3729(b)(2).

Section 3729(a)(1)(B) is "designed to prevent those who make false records or statements . . . to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014) (quoting *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004)). In other words, the primary purpose of § 3729(a)(1)(B) is to remove any defense that the defendant did not personally submit, or cause to be submitted, a false claim. Boese, *supra* at 2-32. "Obviously, many violations of [§ 3729(a)(1)(B)] may also be considered violations of [§ 3729(a)(1)(A)] under the 'causes to be presented' language." *Id.*

The issue in this case is whether the Colleges submitted "false or fraudulent" claims for payment. Unlike the terms "claim" and "knowingly," which are defined in the False Claims Act, "false" and "fraudulent" are defined only by judicial interpretation and construction. Boese,

---

on June 7, 2008, and apply to all *claims* under the False Claims Act . . . that are pending on or after that date." Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625 (2009) (emphasis added). This court previously interpreted "claim" to mean "cause of action," as opposed to claim for payment. *See Sanders v. Allison Engine Co.*, 703 F.3d 930, 942 (6th Cir. 2012) ("[W]e conclude that 'claim' in § 4(f)(1) refers to a civil action or case."). Because Relators' "claims" (*i.e.*, causes of action) were filed after June 7, 2008, § 3729(a)(2) does not apply to the case at hand. For that reason, the court previously dismissed with prejudice Relators' fifth claim for relief, which relied on § 3729(a)(2). The court did not but should have also dismissed Relators' seventh claim for relief based on the same reasoning: the seventh claim for relief relies on § 3729(a)(2). Accordingly, the court now dismisses with prejudice Relators' seventh claim because it fails as a matter of law. For the reasons set forth in this footnote, the court determines that it can analyze the issues presented under the current version of the False Claims Act because there are no material differences between the pre- and post-2009 versions of the False Claims Act as applied to the facts of this case.

*supra* at 2-137. Plaintiffs contend that Colleges' requests for Title IV funds were "false or fraudulent" based on two distinct legal theories: (1) false certification (either express or implied); and (2) promissory fraud. In the Prior Order, the court conflated these two theories, and so the court now discusses both in detail.

Historically, most False Claims Act cases involved "factually false" claims for payment. *United States ex rel. Conner v. Salina Regional Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (describing a "run-of-the-mill 'factually false' case"); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006) ("In an archetypal *qui tam* False Claims action . . . the claim for payment is itself literally false or fraudulent."). To prove that a claim is factually false, a plaintiff must show that the defendant submitted "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Conner*, 543 F.3d at 1217 (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)).

But the False Claims Act is not limited to factually false claims. Rather, it is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Specifically, when amending the False Claims Act, Congress emphasized that the term "false or fraudulent claim" should be broadly construed:

> [E]ach and every claim submitted under a contract, loan guarantee, or other agreement *which was originally obtained by means of false statements* or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.

S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (emphasis added). "The principles embodied in this broad construction of 'false or fraudulent claim' have given rise to two doctrines that attach potential False Claims Act liability to claims for payment that are not explicitly and/or independently false: (1) false certification (either express or implied); and (2)

promissory fraud." *Hendow*, 461 F.3d at 1171. These are the theories upon which Plaintiffs seek to proceed.

### 1. Promissory Fraud

Promissory fraud, which is also referred to as fraudulent inducement, is a theory that attaches liability to each and every claim submitted under a contract obtained through fraudulent statements. *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 503 (8th Cir. 2016); *Hendow*, 461 F.3d at 1173; *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005). Put simply, an initial falsehood "can taint subsequent claims for payment, even if those claims are for legitimate goods or services." John H. Krause, *Reflections on Certification, Interpretation, and the Quest for Fraud that "Counts" Under the False Claims Act*, 2017 U. Ill. L. Rev. 1811, 1817 (2017); *see also Hendow*, 461 F.3d at 1173 ("[S]ubsequent claims are false because of an *original fraud* (whether a certification or otherwise)."); *Pencheng Si*, 71 F. Supp. 3d at 87–88 ("The fraudulent inducement theory prescribes liability 'for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves.'" (citation omitted)).

The most prominent case involving promissory fraud is *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) (cited in *Escobar*, 136 S. Ct. at 2003). There, the Supreme Court held that contractors were liable under the False Claims Act for claims submitted under government contracts that the contractors obtained through collusive bidding. *Id.* at 542. As the Court explained:

> This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [Government]. . . . The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded.

*Id.* at 543–44.

Courts of appeal in at least three circuit have recognized that a school's requests for Title IV funds can be "false or fraudulent" if the school made false statements in its PPA. First, in *United States ex rel. Main v. Oakland City University*, the Seventh Circuit held that relators stated violations of the False Claims Act based on allegations that a university promised, in its PPA, to comply with the ICB when the university had no intentions of doing so. 426 F.3d at 916. Second, in *United States ex rel. Hendow v. University of Phoenix*, the Ninth Circuit held that relators had stated a claim under the False Claims Act based on allegations that a university promised, in its PPA, to comply with the ICB when the university knew that it would not do so. 461 F.3d at 1177–78. Third, in *United States ex rel. Miller v. Weston Educational, Inc.*, the Eighth Circuit held that relators stated a claim under the False Claims Act based on allegations that a college promised, in its PPA, to keep accurate grade and attendance records when, in fact, it did not intend to keep accurate records. 840 F.3d at 502–03.[6]

To prove that a claim was "false or fraudulent" under a theory of promissory fraud, a plaintiff must establish: (1) that the defendant made false statements; (2) that the defendant knew that the statements were false; (3) that the false statements were material to the Government's decision to enter into a contract with the defendant, and (4) that the defendant made claims for payment under the contract that was fraudulently induced. *See id.* at 500; *Hendow*, 461 F.3d at 1174. Thus, in the Title IV context, a plaintiff can establish that claims for Title IV funds were "false or fraudulent" by showing: (1) that a school made false statements in its PPA; (2) that the

---

[6] In *United States v. FastTrain II Corp.*, No. 12-Civ-21431, 2017 WL 606346, at *10 (S.D. Fla. Feb. 15, 2017), a case cited by both parties, the court held that PPAs "constituted false claims." This court disagrees with that characterization. The PPAs themselves are not "claims" (*i.e.*, PPAs are not requests or demands for money or property). A PPA is simply an agreement that a school enters with the Department of Education to participate in Title IV programs. 20 U.S.C. § 1094(a). Rather it is a later request for disbursement of Title IV funds, made under a PPA, which constitutes a "claim," as that term is defined in the False Claims Act.

school knew the statements were false; (3) that the statements were material to the Department of Education's decision to execute the PPA; and (4) that the school made claims for Title IV funds under the fraudulently induced PPA. *See Miller*, 840 F.3d at 500; *Hendow*, 461 F.3d at 1174.

### 2. False Certification

Claims for payment can be "false or fraudulent" when the claim falsely certifies that the claimant is complying with an underlying statute, regulation, or contract. Express false certification occurs when a claim for payment "falsely certif[ies] compliance with a *particular* statute, regulation or contractual term." *Conner*, 614 F.3d at 1168 (emphasis added) (quoting *Mikes*, 274 F.3d at 698). A claim for payment is impliedly false when it impliedly certifies compliance with underlying legal requirement when, in fact, the claimant is not in compliance. *Id.* at 1169; *see also Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994) ("[T]he payment vouchers represented an implied certification by [claimant] of its continuing adherence to the requirements for participation in the program.").

The Supreme Court has recognized that the "the implied false certification theory can, at least in some circumstances, provide a basis for liability." *Escobar*, 136 S. Ct. at 1999. Specifically, liability attaches "at least where two conditions are satisfied: *first*, the claim does not merely request payment, but also makes *specific representations* about the goods or services provided; and *second*, the defendant's failure to disclose noncompliance with *material* statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001 (emphasis added).[7]

The facts of *Escobar* provide insight on when a claim "does not merely request payment, but also makes specific representations about the goods or services provided." In *Escobar*, a

---

[7] The Court stated that it was *not* deciding "whether all claims for payment implicitly represent that the billing party is legally entitled to payment." *Escobar*, 136 S. Ct. at 2000.

healthcare provider "submitted reimbursement claims that made representations about the specific services provided by specific types of professionals, but that failed to disclose serious violations of regulations pertaining to staff qualifications and licensing requirements for those services." *Id.* at 1997–98. The state Medicaid program, unaware of these violations, paid the claims. *Id.* at 1998. The Court concluded that "by submitting claims for payment using payment codes that corresponded to specific counseling services, [the healthcare provider] represented that it had provided individual therapy, family therapy, preventative medication counseling, and other types of treatment." *Id.* at 2000. Staff members also "submitt[ed] Medicaid reimbursement claims by using National Provider Identification numbers corresponding to specific job titles." *Id.* These representations "were clearly misleading in context" and fell "squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable." *Id.*

### D. THE GOVERNMENT'S CLAIMS

The Government alleges three causes of action under the False Claims Act.[8] *First*, the Government alleges that Stevens-Henager submitted false claims from approximately July 1, 2007 to May 20, 2009, in violation of § 3729(a)(1). GCI ¶ 105. The Government alleges that the claims were false because Stevens-Henager promised to comply with the ICB in its PPAs when Stevens-Henager knew that it would not comply with the ICB. *Id. Second*, based on the same theory, the Government alleges that Stevens-Henager submitted false claims from May 20, 2009 to approximately July 1, 2011, in violation of § 3729(a)(1)(A). *Id.* ¶¶ 110–11. *Third*, based on a similar theory, the Government alleges that Stevens-Henager submitted false claims for payment from approximately May 20, 2009 to July 1, 2011, in violation of § 3729(a)(1)(B). *Id.* ¶ 115.

---

[8] The Government also alleges causes of action for payment by mistake and unjust enrichment. GCI ¶¶ 117–24. These causes of action are not at issue on these motions for reconsideration.

1. **The Government's Claims Under § 3729(a)(1) and § 3729(a)(1)(A): False Certification**

The Government argued, in its briefing and at oral argument, that it can proceed on a theory of implied false certification. Specifically, the Government contends that the "claim forms for Title IV funding in this case, accompanied by the certifications known as 'G5 certifications' . . . are half-truths capable of misleading the Department [of Education]." In each G5 certification, Stevens-Henager certified that "the funds are being expended within three business days of receipt for the purpose and condition of the [PPA]." GCI ¶ 50. According to the Government, when Stevens-Henager made these G5 certifications, it impliedly represented that it was an eligible institution when it was not—because it was in violation of the ICB.

When submitting G5 certifications, Stevens-Henager may have impliedly represented that it complied with the ICB and that it was eligible to receive Title IV funds. Indeed, some courts have held that G5 certifications impliedly certify compliance with various Title IV requirements. *See, e.g.*, *Fast Train II*, 2017 WL 606346, at *10 ("Each draw-down falsely certified [the school's] compliance with [Department of Education] regulations."); *Rose v. Stephens Inst.*, No. 09-cv-05966-PJH, 2016 WL 2344225, at *10 (N.D. Cal. May 4, 2016); *United States ex rel. Mayers v. Lacy Sch. of Cosmetology, LLC*, No. 1:13-cv-00218-JMC, 2015 WL 8665345, at *4 (D.S.C. Dec. 14, 2015) (holding that G5 certifications were "necessary to receive the payment of federal funds").

While the Government's implied-false-certification theory appears to be a valid legal theory, it does not align with the Government's pleadings. In fact, the Government's complaint does not articulate this theory of liability. Instead, the Government relies exclusively on a theory of promissory fraud:

> Stevens-Henager knowingly submitted or caused to be submitted, false representations regarding compliance with the requirements of Title IV . . . , [in]

its [PPA] and annual financial and compliance audits as well as in student loan and grant applications. Stevens-Henager submitted these false representations *in order to obtain eligibility to participate in Title IV funding programs and receive Title IV funding*. . . . Stevens-Henager made express representations in writing . . . [that] *induced* the Department of Education to make students at Stevens-Henager colleges eligible for many forms of financial aid. These representations were material to the Department of Education's decision to *make Stevens-Henager eligible* for these financial aid programs. . . . Therefore, Stevens-Henager *fraudulently induced* the Department of Education to make Stevens-Henager eligible to participate in Title IV funding . . . .

GCI ¶¶ 105–06, 110–11 (emphasis added). Nowhere does the Government's complaint allege that Stevens-Henager's requests for Title IV funds were "false or fraudulent" because the requests impliedly certified that the school was eligible to receive Title IV funds when it was not. Indeed, the Government does not even explicitly reference the G5 certifications in its causes of action. In short, the Government attempts to argue a legal theory—implied false certification—which it does not allege in its complaint, and which it has not supported with factual allegations. If the Government intends to pursue this theory of liability, it must amend its complaint to articulate both the legal theory and the facts that support it.[9] The Government has 21 days from the date of this order to amend its complaint.[10]

## 2. The Government's Claims Under § 3729(a)(1) and § 3729(a)(1)(A): Promissory Fraud

In the Prior Order, the court allowed the Government to proceed on a theory of promissory fraud. As discussed above, to state a claim for promissory fraud, the Government

---

[9] At a minimum, the Government needs to allege what Stevens-Henager impliedly represented when it requested Title IV funds. The Government argued, in its briefing: "At the time of payment, Stevens-Henager impliedly represented that it was submitting a loan request on behalf of an eligible student, and its G5 Certifications *represented* that the funds were sought 'for the purpose and condition' of the PPA, yet the school *failed to disclose that it was in violation of the ICB and thus was no longer an eligible institution*." ECF No. 372 at 9 (emphasis added). But these allegations are noticeably absent from the Government's complaint.

[10] Counsel for the Colleges did not object to the court granting the Government leave to amend. Hearing Tr. 48:11–25.

must allege facts establishing that: (1) Stevens-Henager made false statements in its PPAs; (2) Stevens-Henager knew that its statements were false; (3) the statements were material to Department of Education's decision to execute the PPAs; and (4) Stevens-Henager made claims for payment under the fraudulently induced PPAs. Stevens-Henager, in light of *Escobar*, contends that the Government has not alleged sufficient facts to establish the third element of materiality.

### a. *False Statements*

The Government has alleged sufficient facts to plausibly establish that Stevens-Henager made false statements in its 2007 and 2010 PPAs regarding its intent to comply with the ICB.[11] In both PPAs, Stevens-Henager promised that it would "not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance . . . ." GCI ¶ 63. Both promises were allegedly false because Stevens-Henager did not comply with the ICB after it signed the PPAs in question. GCI ¶ 99; *see also Hendow*, 461 F.3d at 1174–75 (relators alleged falsity by alleging that university "violates a statutory requirements, the [ICB], to which it agreed in writing in the [PPA]"). Thus, the Government has alleged sufficient facts to establish that Stevens-Henager falsely certified that it would comply with the ICB in its 2007 and 2010 PPAs.

### b. *Knowledge*

The Government has also alleged sufficient facts to plausibly establish that Stevens-Henager knew that its promises to comply with the ICB were false when made. Specifically, the

---

[11] The 2007 PPA was executed on April 19, 2007, GCI ¶ 60, and the 2010 PPA was executed on January 21, 2010. GCI ¶ 61.

Government has alleged facts showing: (1) that Stevens-Henager was aware of the ICB, and (2) that the school's compensation plan violated the ICB from 2000 to at least July 1, 2011. *See* GCI ¶ 70.[12] Put simply, the Government has alleged that Stevens-Henager knowingly violated the ICB before it executed the 2007 PPA and continued to knowingly violate the PPA after it executed the 2010 PPA. Taking the Government's allegations as true, and drawing all reasonable inferences in the light most favorable to it, Stevens-Henager knew that its promises to comply with the ICB in the 2007 and 2010 PPAs were false when made.[13]

---

[12] In the Prior Order, the court determined that the Government had plausibly alleged that the Colleges' compensation plan, as detailed in 2007 version of Procedure Directive 85R, violated the ICB. Specifically, the compensation plan violated the plain language of the ICB because admissions consultants were paid either "directly or indirectly on success in enrolling students." 20 U.S.C. § 1094(a)(20). The court affirms this conclusion here. The 2007 version of Procedure Directive 85R was implemented on November 15, 2007, months after the 2007 PPA was executed. GCI, Ex. I at 1 (Procedure Directive 85 issued on November 15, 2007). But the Government has also attached to its complaint manuals that were given to admissions consultants between 2006 and 2011, and according to the Government, "[e]ach manual sets forth examples of compensation consultants can achieve by enrolling more students." GCI ¶¶ 68, 72; *see e.g.*, *id.*, Ex. D at 86 (Procedure Directive 85R, issued on January 1, 2000, stating "[t]o recognize the performance and achievement of [admissions consultants] who *successfully recruit* future graduates, the college has developed a compensation plan based upon students who complete 36 credits and are thus likely to graduate." (emphasis added)). These allegations suggest that Stevens-Henager knew that it would not comply with the ICB when it promised to do so in 2007 and 2010.

[13] The Colleges have indicated that they intend to raise an advice of counsel defense to show that they did not "know" that their promises to comply with the ICB were false. In short, the Colleges intend to show that they believed that their compensation plan did not violate the ICB because counsel told them it did not. A party asserting an advice-of-counsel defense must show: "(1) a request for advice of counsel on the legality of the proposed action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from counsel that the action to be taken will be legal, and (4) [reasonable] reliance on counsel's advice." *United States v. Wesberry*, 656 F. App'x 895, 899 (10th Cir. 2016). Documents reflecting compensation paid to counsel, including billing records, may be relevant to determine whether the Colleges reasonably relied on the advice of counsel. For instance, a billing record showing that counsel spent little time determining whether the compensation plan complied with the ICB may suggest that the Colleges did not reasonably rely on the advice of counsel.

*c. Materiality*

Stevens-Henager contends that the Government, in light of *Escobar*, has failed to allege sufficient facts to establish that the Stevens-Henager's promises to comply with the ICB were material to the Department of Education's decision to enter into PPAs with the Stevens-Henager. Put simply, Stevens-Henager argues that Government has not alleged sufficient facts to establish that Stevens-Henager knew or should have known that Department of Education attached importance to the school's promise to comply with the ICB. The court disagrees.

Section 3729(b)(4) of the False Claims Act defines material as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." While the Supreme Court, in *Escobar*, found it unnecessary to "decide whether § 3729(a)(1)(A)'s materiality requirement is governed by § 3729(b)(4) or derived directly from the common law," the Court suggested that there was no difference between the formulations. 136 S. Ct. at 2002.[14] "Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* (quoting 26 R. Lord, Williston on Contracts § 69:12 at 549 (4th ed. 2003) (Williston)).

To shed further light on the materiality standard, the Court looked to the common law. In contract law, "a misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." Restatement (Second) Contracts § 162(2) (quoted in *Escobar*, 136 S. Ct. at 2003). And in tort law, a matter is material in only two instances: (1) if a reasonable person would likely attach importance to it, or (2) if the defendant knew or should have known that the recipient would

---

[14] Section 3729(b)(4) defines, at a minimum, "material" as it is used in § 3729(a)(1)(B), which imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim." (emphasis added).

attach importance to it. Restatement (Second) Torts § 538 (quoted in *Escobar*, 136 S. Ct. at 2003). Thus, a false statement is material under the False Claims Act "if either (1) a reasonable person would likely attach importance to it or (2) the defendant knew or should have known that the government would attach importance to it." *Miller*, 840 F.3d at 503 (citing *Escobar*, 136 S. Ct. at 2002–03).

In *Escobar*, the Court rejected the argument that a misrepresentation is material if it goes to a condition of payment: "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." 136 S. Ct. at 2003. Instead, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not *automatically* dispositive." *Id.* (emphasis added). Moreover, "[a] defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment." *Id.* at 2001. For instance, "[i]f the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do not shoot, the defendant has 'actual knowledge'" that a term—that the guns must shoot—is material. *Id.*

In addition to whether compliance with a particular provision is labeled as a condition, the Supreme Court identified three other non-exclusive factors bearing on materiality: (1) whether the violation goes to the "essence of the bargain," *id.* at 2003 n.5 (quoting *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (N.Y. 1931)), (2) whether the violation is significant, as opposed to "minor or insubstantial," *id.* at 2003, and (3) whether the Government has taken action in response to similar, known violations, *id.* at 2003–04. As to the third factor, proof of materiality may include evidence that the defendant "knows that the Government consistently

refuses to pay claims" based on noncompliance. *Id.* at 2003. Conversely, it is less likely that a provision is material if the "Government pays a particular claim in full despite its *actual knowledge that certain requirements were violated*." *Id.* (emphasis added).

Materiality depends on a holistic assessment of many factors, such as the ones discussed above, *Escobar*, 136 S. Ct. at 2001 ("[M]ateriality cannot rest on 'a single fact or occurrence as always determinative.'" (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)), and it is usually a determination that is left to the jury, *see* Restatement (Second) of Torts § 538 cmt. e ("[T]he question of whether a reasonable man would have regarded the fact misrepresented to be important in determining his course of action is a matter for the judgment of the jury subject to the control of the court."); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("Materiality is a mixed question of law and fact."). While *Escobar* did not rule out the possibility that materiality could be decided on a motion to dismiss, 136 S. Ct. at 2004 n.6, it did not suggest that the issue should be routinely decided at such a stage, *see United States v. Gaudin*, 515 U.S. 506, 512 (1995) (explaining that materiality is peculiarly one for the trier of fact).

As an initial matter, the Government's claims are based on promissory fraud, unlike the claim in *Escobar*, which was based on implied certification. The Supreme Court, in *Escobar*, discussed materiality as it relates to claims for reimbursement that are allegedly false because they impliedly certify compliance with underlying regulations. Here, the Government alleges that claims were false based on promissory fraud: Stevens-Henager falsely certified that it would comply with the ICB in its 2007 and 2010 PPAs. In other words, the "fraud" was not a failure to disclose noncompliance with a regulation, as was the case in *Escobar*, but rather an affirmative misrepresentation: a false promise to comply with the ICB. Because the Government alleges

promissory fraud, the court "examines the false statements that *induced the government to enter the* [*PPAs*]." *Miller*, 840 F.3d at 504 (emphasis added) (citing *In re Baycol Prods. Litig.*, 732 F.3d 869, 875–76 (8th Cir. 2013)). Thus, the court must determine whether the Government has alleged sufficient facts to plausibly establish that Stevens-Henager's allegedly false promises to comply with the ICB *in its PPAs* were material to the Department of Education's decision to execute the PPAs.[15]

Here, the Government has alleged sufficient facts to plausibly establish that the Department of Education attached importance to Stevens-Henager's promises to comply with the ICB, which were made in the school's 2007 and 2010 PPAs. *First*, the Government expressly conditioned Stevens-Henager's participation in Title IV programs on the school promising to comply with the ICB. *Id.*; *Hendow*, 461 F.3d at 1175. The Government imposed the condition in three ways. First, a federal statute provides that to be eligible an institution must:

> enter into a [PPA] with the Secretary [of Education]. The agreement *shall condition* the initial and continuing eligibility of an institution to participate in a program *upon compliance* with the following regulations . . . [including the ICB.]

20 U.S.C. § 1094(a) (emphasis added). Second, a federal regulation specifies:

> An institution may participate in any Title IV . . . program . . . *only if* the institution enters into a written [PPA] with the Secretary [of Education] . . . . A

---

[15] In *Escobar*, the Court sometimes spoke in terms of "material statutory, regulatory, or contractual requirements." 136 S. Ct. at 2001. Such terminology may be confusing because the question is, as the Court later framed it, whether "a *misrepresentation* about compliance with a statutory, regulatory, or contractual requirement [is] material to the Government's payment decision." *Id.* at 2002 (emphasis added). That is, courts must ask whether the misrepresentation is material, not whether the statutory, regulatory, or contractual requirement is "material." *See id.* at 2003 ("A misrepresentation cannot be deemed material merely . . . ."); Restatement (Second) Contracts § 162(2) ("A misrepresentation is material if . . . ."). Indeed, this court could imagine a scenario in which one school's certification that it will comply with the ICB is material to the Government's decision to execute a PPA (because the school flagrantly violates the ICB) while another school's certification that it will comply with the ICB is not material (because the school's violation of the ICB is "minor or insubstantial"). *See id.* at 2003 ("Materiality . . . cannot be found where noncompliance is minor or insubstantial.").

[PPA] *conditions* the initial and continued participation of an eligible institution in any Title IV . . . program *upon compliance* with the provisions of this part [such as the ICB.]

34 C.F.R. § 668.14(a)(1) (emphasis added). Third and finally, the PPA itself provides:

The execution of this Agreement [which references the ICB] by the Institution and the Secretary [of Education] is a *prerequisite* to the Institution's initial or continued participation in any Title IV, HEA program.

(emphasis added).

The above passages show that a school *must* promise to comply with the ICB to become eligible to participate in Title IV programs. *Miller*, 840 F.3d at 504; *Hendow*, 461 F.3d at 1176. Thus, Stevens-Henager's promises to comply with the ICB were "prerequisites" to federal funding because if it did not promise to comply with the ICB "it would not have gotten paid." *Id.*; *see also Escobar*, 136 S. Ct. at 2003 ("[C]ontractors' misrepresentation that they satisfied a non-collusive bidding requirement for federal program contracts violated the False Claims Act because '[t]he government's money would have never been placed in the joint fund for payment to respondents had its agents known the bids were collusive.'" (quoting *Marcus*, 317 U.S. at 543)). Put another way, Stevens-Henager could not request Title IV funds *unless* it promised to comply with the ICB. While conditioning payment on a promise is not "automatically dispositive" of materiality, it is "relevant." *Escobar*, 136 S. Ct. at 2003. Thus, the Government's decision to condition Title IV eligibility on a promise to comply with the ICB is evidence that the Department of Education attached importance to that promise.

*Second*, the importance of the ICB, as reflected in the legislative and regulatory history, suggests that Stevens-Henager's promises to comply with the ICB were something to which the Department of Education attached importance. Congress enacted the ban on recruitment-based incentives in 1992 because it determined that such payments were associated with serious

program abuses and high loan default rates, resulting in a drain on program funds where the Government acts as a loan guarantor. S. Rep. No. 102-58, at 8 (1991) (Abuses in Federal Student Aid Programs) (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period"); H.R. Rep. No. 102-447, at 10 *reprinted in* 10 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

The Department of Education has also emphasized the importance of the ICB in safeguarding Title IV funds. In the initial regulations implementing the ICB, the Department of Education explained that incentive payment structures are prone to abuse and fraud even when based solely on the number of students retained. Student Assistance General Provisions; Federal Family Education Loan Programs; Federal Pell Grant Program, 59 Fed. Reg. 22,348, 22,377 (Apr. 29, 1994); *see also* 75 Fed. Reg. 34,806, 34,817 (June 18, 2010) ("When admission personnel are compensated substantially, if not entirely, upon the numbers of students enrolled, the incentive to deceive or misrepresent the manner in which a particular educational program meets a student's needs increases substantially.").

The legislative and regulatory history surrounding the ICB, when viewed in the light most favorable to the Government, suggests that the Department of Education attached importance to Stevens-Henager's promises to comply with the ICB. Indeed, the ICB "is designed to prevent schools from incentivizing recruiters to enroll poorly-qualified students who will not benefit from federal subsidies, and may be unable or unwilling to repay federal student loans." *Rose*, 2016 WL 5076214, at *1 (citing *Main*, 426 F.3d at 916). Accordingly, at this stage of the proceedings, the Government has sufficiently pled that Stevens-Henager's promises to comply

with the ICB went to the "essence of the bargain" that it struck with the Department of Education. *See Escobar*, 136 S. Ct. at 2003.

*Third*, the importance of Stevens-Henager's promise to comply with the ICB is underscored by the fact that it annually certified in writing that it was complying with the ICB and obtained an independent, professional audit of its certifications. *See* GCI ¶ 65; 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. § 668.23(a)(2), (a)(4). When viewed in the light most favorable to the Government, the Department of Education required annual certifications of compliance with respect to the ICB because the Department of Education attached importance to a school's promise to comply with the ICB—the Department of Education wanted to ensure that schools lived up to their promises. If the Department of Education did not attach importance to a school's promise to comply with the ICB, it likely would not have required that schools annually certify their compliance.

*Fourth*, the availability of administrative remedies supports the conclusion that the Department of Education attached importance to Stevens-Henager's promises to comply with the ICB. *See* 20 U.S.C. § 1094(c)(1)(G) (allowing the Department of Education to withhold Title IV funds if it receives reliable information that an institution is violating, among other things, the ICB).[16] In short, the fact that the Department of Education could take action against schools that

---

[16] The Government acknowledges that its complaint did not allege that the Department of Education has taken administrative action against schools that violate the ICB. ECF No. 372 at 17. But the fact that the Department of Education has taken corrective action against other schools based on ICB violations would, if alleged, support the conclusion that Stevens-Henager's promises to comply with the ICB were material. *See Rose*, 2016 WL 5076214, at *6 (finding of materiality was supported based on the fact that the Department of Education "took corrective actions against schools, issued fines, and entered into settlement agreements (which function like a fine or partial revocation of funds) totaling tens of millions of dollars"). The Government, in its motion, states that "post-PPA administrative actions are irrelevant to a claim for fraudulent inducement." The court disagrees. How the Department of Education reacted when it discovered ICB violations is relevant to the question of whether the Department of Education cared about

violated the ICB suggests that the Department of Education attached importance to Stevens-Henager's promises to comply with it.

*Fifth*, and perhaps most importantly, the Government alleges facts suggesting that Stevens-Henager was aware of the importance of the ICB and took steps to conceal ICB violations. Specifically, the Government alleges that Stevens-Henager's compensation plan purported to invoke certain regulatory safe harbors that did not actually apply. GCI ¶ 97. Construing the allegations in the light most favorable to the Government, it appears that Stevens-Henager designed its compensation plan to disguise ICB violations because it knew that the Department of Education would not enter into a PPA with a school that violated the ICB. *See Rose*, 2016 WL 5076214, at *4 n.1 ("[R]elators presented evidence suggesting that [the university] was keenly aware of the significance of the ICB . . . , such that [the university's] employees took active steps 'to hide their compensation practices.' This evidence suffices to create a genuine dispute of fact that '[the university] knew that it was actively circumventing the

---

Stevens-Henager's promises to comply with the ICB. Evidence that the Department of Education did not take action when it discovered ICB violations would tend to prove that the Department of Education did not care about a school's promise to comply with the ICB. On the other hand, evidence that the Department of Education took action against schools that violated the ICB would tend to prove that the Department of Education attached importance to a school's promises to comply with the ICB. Perhaps more probative, however, would be evidence that the Department of Education refused to enter into a PPA with a school when it knew that the school was not in compliance with the ICB. The Colleges have taken the position that the Government, to plausibly allege materiality, must allege specific examples of when the Department of Education refused to execute PPAs because it knew that a school was in violation of the ICB. The court disagrees that such an allegation is necessary in a complaint. Such a refusal, while relevant, is but one of a number of possible factors bearing on materiality in light of *Escobar*. 136 S. Ct. at 2004 n.6 (stating that "False Claims Act plaintiffs must plead their claims with plausibility and particularity under Federal Rule of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality").

law,' and that [the university] knew that the ICB was material to the government." (citations omitted)).[17]

In sum, under the holistic approach mandated by *Escobar*, the Government has alleged sufficient facts that, when viewed in the light most favorable to the Government, establish that Stevens-Henager's promises to comply with the ICB were material to the Department of Education's decision to enter into PPAs with Stevens-Henager.

### d. False Claims

Finally, the Government has adequately alleged that Stevens-Henager submitted claims for payment under both the 2007 and 2010 PPAs. Specifically, the Government alleges that "[e]very request for a federal grant, a loan under the Federal Direct Loan Program, a federally guaranteed loan under the Federal Family Education Loan Program, an interest payment on a subsidized Stafford Loan and for Title IV funding made on behalf of a student attending a Stevens-Henager institution constitutes a separate false claim." GCI ¶ 102.

In sum, the Government has alleged sufficient facts to plausibly establish: (1) that Stevens-Henager falsely certified that it would comply with the ICB in its 2007 and 2010 PPAs; (2) that Stevens-Henager knew that its promises to comply with the ICB were false; (3) that the promises to comply with the ICB were material to the Department of Education's decision to execute the PPAs in question; and (4) that Stevens-Henager requested and received Title IV funds under its 2007 and 2010 PPAs. Thus, the Government has alleged sufficient facts to state a plausible claim that Stevens-Heanger knowingly presented false claims for payment to the Government from July 1, 2007 to July 1, 2011. *See* 31 U.S.C. § 3729(a)(1)(A).

---

[17] It is possible the compensation plan invoked the safe harbors because the Colleges actually believed that the safe harbors applied. But at this stage, the court draws all reasonable inferences in favor of the Government.

### 3. The Government's Claim Under § 3729(a)(1)(B)

The Government alleges that from approximately July 1, 2007 to July 1, 2011, Stevens-Henager knowingly made, used, or caused to be made or used false records or statements that were material to false or fraudulent claims, thereby violating § 3729(a)(1)(B). GCI ¶ 115. Specifically, the Government alleges that Stevens-Henager, to become eligible to participate in Title IV programs, falsely certified compliance with the ICB in, among other things, its PPAs. *Id.*

The Government's claim under § 3729(a)(1)(B) is duplicative of its claims under § 3729(a)(1) and § 3729(a)(1)(A). The primary purpose of § 3729(a)(1)(B) is to remove any defense that the defendant did not personally submit, or cause to be submitted, a false claim for payment. The Government has not alleged any facts suggesting that Stevens-Henager could be held liable under § 3729(a)(1)(B) but not under § 3729(a)(1) or § 3729(a)(1)(A). Specifically, the Government alleges that Stevens-Henager fraudulently induced the Department of Education to execute PPAs and then, pursuant to those PPAs, "knowingly present[ed] . . . false or fraudulent claims for payment or approval." *See* § 3729(a)(1)(A). Because it is entirely duplicative, the court dismisses without prejudice the Government's claim under § 3729(a)(1)(B). *See Rose*, 2016 WL 2344225, at *7 ("The court similarly finds that there is no reason to present two duplicative causes of action [based on the False Claims Act] to a jury, and dismisses the second cause of action [which alleged violations of § 3729(a)(1)(B)] . . . .").

Even if the Government's claim under § 3729(a)(1)(B) were not duplicative of its other claims, the Government has not alleged a theory upon which it could hold Stevens-Henager liable under § 3729(a)(1)(B). The Government alleges a plethora of false statements—those made in PPAs, annual financial and compliance audits, and student loan and grant applications—but the Government fails to identify the false claims to which these false statements or records were "material":

> In submitting or causing to be submitted such certifications and applications, Stevens-Heanger acted with actual knowledge . . . of the . . . falsity of the claims. By virtue of these false or fraudulent claims, the United States suffered damages in the amount to be determine at trial.

GCI ¶ 115–16. Thus, it appears that the Government's complaint conflates the false "record or statement" requirement with the false "claim" requirement. *See* § 3729(b)(2) (defining "claim" to mean, among other things, "a request or demand, whether under contract or otherwise, *for money or property* . . . that . . . is presented to . . . the United States" (emphasis added)). That is, the Government attempts to impose False Claims Act liability on false statements alone. But the "'*sine qua non* of a False Claims Act violation' is the submission of a false claim to the [G]overnment." *Urquilla-Diaz*, 780 F.3d at 1045 (citation omitted). Accordingly, the Government's claim under § 3729(a)(1)(B) is also dismissed without prejudice on the grounds that the Government has not identified the false claims upon which it seeks to impose liability.[18]

### E.  RELATORS' COMPLAINT

Relators allege eight claims for relief but the court has dismissed the fifth and the seventh claims on the grounds that the code section upon which they are based, § 3729(a)(2), was abrogated by Congress when it amended the False Claims Act in 2009. *See* Pub. L. No. 111-21, § 4(f), 123 Stat. 1616, 1625 (2009). Relators allege that the Colleges violated the False Claims

---

[18] To the extent the Government intends to amend its complaint, it should consider avoiding duplicative causes of action. The court also notes that, prior to *Escobar*, the Tenth Circuit held that implied-false-certification claims arise under § 3729(a)(1) but not under § 3729(a)(2), the pre-2009 version of § 3729(a)(1)(B). *Lemmon*, 614 F.3d at 1168. The Tenth Circuit reasoned that "claims under an implied-false-certification theory do not require courts to examine a [claimant's] statements to the [G]overment." *Id.* "Rather, 'the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the [G]overnment's payment." *Id.* Moreover, the Supreme Court, in *Escobar*, analyzed an implied-false-certification claim under § 3729(a)(1)(A), supporting the Tenth Circuit's approach. 136 S. Ct. at 1995. Thus, even if the Government amends its complaint to include a claim under § 3729(a)(1)(B), this court is not convinced that such a claim could be based on a theory of implied false certification.

Act beginning on July 1, 2002 to at least 2011. But the court, relying on the False Claims Act's six-year statute of limitations, dismissed Relators' claims to the extent they were based on claims for payment that the Colleges' submitted before January 3, 2007. *See* § 3731(b) ("A civil action under section 3730 may not be brought more than 6 years after the date on which the violation of section 3729 is committed . . . ."). As such, Relators' claims are limited to false claims submitted between January 3, 2007 and at least 2011.

### 1. Relators' Complaint Does Not Comply with Rule 8(a)(2)

As noted above, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). This rule "serves the important purpose of requiring plaintiffs to state their claims intelligibly so as to inform the defendants of the legal claims being asserted." *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007). To comply with Rule 8(a)(2),

> a complaint must explain what each defendant did . . . ; when the defendant did it; how the defendants actions [caused harm]; and, what specific legal right the plaintiff believes the defendant violated. . . . [T]hese are, very basically put, the elements that enable the legal system to get weaving—permitting the defendant sufficient notice to begin preparing its defense and the court sufficient clarity to adjudicate the merits.

*Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007). "Something labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to preform the essential functions of a complaint." *Mann*, 477 F.3d at 1148 (citation omitted).

If a complaint does not comply with Rule 8(a)(2), a court may dismiss it under Rule 41(b) for failure "to comply with [the Federal Rules of Civil Procedure]." Dismissing a case without prejudice under Rule 41(b) for failure to comply with Rule 8(a)(2) allows plaintiffs the opportunity to hone their claims. *Nasious*, 492 F.3d at 1162. As such, a district court may,

without abusing its discretion, enter such orders "without attention to any particular procedures." *Id.*

Relators' complaint is not a "short and plain statements" of their claims showing that they are entitled to relief. Fed. R. Civ. P. 8(a)(2). Rather, Relators have taken a shotgun approach to pleading. Realtors' complaint spans 162 pages and contains over 130 pages of factual allegations.[19] After setting forth over 130 pages of factual allegations, Relators allege in conclusory paragraphs that the "Defendant Schools" are liable under the False Claims Act because they made false statements regarding: (1) the ICB; (2) the 90/10 Rule; (3) attendance taking and refund requirements; and (4) accreditation standards. Third Am. Compl. ¶¶ 493–545.

Relators do not distinguish between individual defendants in their claims for relief, nor do they state separate claims for relief based on the distinct sets of false statements. *See Hart v. Salois*, 605 F. App'x 694, 701 (10th Cir. 2015) ("It is not the sheer length of [the] filing, the number of paragraphs, or the number of claims, that triggers the Rule 8 violation. Rather, the culprit is [the plaintiff's] failure to connect his 60 separate claims to the Complaint's hundreds of factual allegations."). In short, Realtors leave it to the court to piece together 130 pages of facts to create causes of action as to each individual defendant based on four distinct sets of false statements. *See id.* ("[Plaintiffs'] multiple collective allegations against the defendants and his corresponding failure to identify each individual defendant's culpable actions only exacerbated [the complaint's] deficenc[ies]."). But it is not the court's job to construct causes of action for plaintiffs that are unwilling to do so themselves. *See Glenn*, 868 F.2d at 372.

By way of example, Relators' first claim for relief provides, in relevant part:

493.    Relators re-allege and incorporate herein paragraphs 1 through 492.

---

[19] Relators, in addition to their 162-page complaint, incorporate by reference the Government's complaint, adding 33 pages of allegations to their 162-page complaint.

494.    From July 1, 2002, to May 20, 2009, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of the [False Claims Act], 31 U.S.C. § 3729(a)(1).

495.    Specifically, Defendant Schools knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA, in, *inter alia*, their PPAs and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA programs and receive Title IV funding, when, in fact, Defendant Schools' compensation practices did not comply with Title IV of the HEA and its associate safe harbor regulations. Additionally, Defendants Schools knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA relating to the 90-10 Rule. In submitting or causing to be submitted such certifications and applications, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

496.    Defendant Schools made express representations in writing to the Department of Education that they would not make incentive payments to their admissions personnel based directly or indirectly on their success in securing enrollments. These representations induced the Department of Education to make students at Defendant Schools eligible for many forms of financial aid under Title IV, HEA programs. These representations were material to the Department of Education's decision to make Defendant Schools eligible for these financial aid programs. At the time Defendant Schools made these representations, they knew that these representations were false, and would continue to be false, because Defendant Schools were paying their admissions personnel incentive payments based on their success in securing enrollments. Therefore, Defendant Schools fraudulently induced the Department of Education to make Defendant Schools eligible to participate in Title IV, HEA programs, and each and every one of the claims they submitted or caused a student to submit violate the [False Claims Act].

497.    Even if Defendant Schools had not affirmed to the government that they would comply with the Incentive Compensation Ban and the 90-10 Rule, the mere fact that such compliance was material to the government's decision to make Defendant Schools eligible for Title IV, HEA programs, combined with the fact that Defendant Schools, knowing that they were in violation of the Incentive Compensation Ban and the 90-10 Rule and therefore ineligible to receive such student financial aid, submitted claims for student financial aid, caused students to submit claims for student financial, and/or received such aid, makes Defendant Schools liable under the [False Claims Act].

498.    Defendant Barney established, directed, and controlled the policies, practices, and procedures of Defendant Schools, including policies, practices, and

procedures relating to Defendant Schools' submission of materially false certifications and statements to the Department of Education concerning their purported compliance with the Incentive Compensation Ban and Defendant Schools' actual compensation practices, including the practices that violate the Incentive Compensation Ban. Even though Defendant Barney knew that such compensation practices violated the Incentive Compensation Ban, he directed or permitted Defendant Schools to expressly certify to the Department of Education that they were in compliance with the Incentive Compensation Ban and to represent to the Department of Education that Defendant Schools would comply with the ban. As a result, Defendant Barney knowingly caused Defendant Schools' submission of false claims to the Department of Education.

499. Additionally, Defendant Schools expressly promised the Department of Education in writing that they would comply with all applicable regulations concerning attendance-taking, refunds of unearned Title IV funds, and requiring satisfactory academic progress of all students. Defendant Schools later expressly certified to the Department of Education that they had, in fact, complied with all such applicable regulations. However, at the time Defendant Schools made such promises, representations, and certifications to the Department of Education, they knew such promises, representations, and certifications were materially false and that they did not intend to comply with such regulations. Defendant Schools therefore fraudulently induced the Department of Education to make them eligible to participate in Title IV, HEA programs, and each and every one of the claims they submitted or caused a student to submit violated the [False Claims Act]. Further, because Defendant Schools knew that compliance with such regulations was material to the Department of Education's decision to permit them and their students to participate in Title IV, Defendant Schools' knowledge they were not in compliance with such regulations renders every request for Title IV funding that Defendant Schools and their students submitted false or fraudulent.

Third Am. Compl. ¶¶ 493–99.[20] Relators' first claim for relief and their other claims for relief are neither short nor plain. *See* Fed. R. Civ. P. 8(a)(2). Nor are their allegations "simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).

---

[20] At oral argument, counsel for Relators admitted that his claims for relief were based largely on a complaint that the United States used in *United States v. Educ. Mgmt. Corp.*, 871 F. Supp. 2d 433 (W.D. Penn. 2012). Hearing Tr. 9:1–7. A review of the United States' complaint in *Education Management* shows that Relators copied wholesale entire portions of the United States' complaint, changing only dates and the names of the parties. *See United States v. Educ. Mgmt. Corp.*, No. 07-CV-461, ECF No. 128 ¶ 271 (filed Aug. 8, 2011) ("From May 20, 2009 to present, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the [False Claims Act], 31 U.S.C. § 3729(a)(1). Specifically, EDMC knowingly submitted or caused to be submitted, false certifications

When asked at oral argument to articulate the factual and legal basis for Relators' first claim for relief, counsel for Relators stated: "[T]he claims that are under [this claim for relief] . . . [are] the G5 claims that they are making for payment with respect to, you know, they make hundreds of times per year, that they certify that they are using those funds." Hearing Tr. 9:18–10:8. But, noticeably absent from the over 700 words comprising Relators' first claim for relief are any express references to G5 certifications. In fact, Relators' first claim for relief does not set forth the text of the G5 certifications and, more importantly, does not allege what, if anything, a school impliedly represents when it submits a G5 certification.[21]

This problem is not unique to Relators' first claim for relief. Realtors' claims for relief bear little, if any, resemblance to the legal theories on which they now state they intend to proceed. While it is possible that Relators' complaint may contain sufficient facts to support some of their legal theories, those facts are scattered over 130 pages. When the court raised this issue, counsel for Relators suggested that the court look to the parties briefing, as opposed to the complaint, to ascertain the basis for Realtors' claims:

---

regarding compliance with the requirements of Title IV of the HEA, in, *inter alia*, its PPAs and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA programs and to receive Title IV funding, when in fact, EDMC's compensation system, as implemented by EDMC, was not compliant with Title IV of the HEA and its associated safe harbor regulations."). Notably, the complaint in *Education Management* alleged false statements concerning the ICB only. Relators have simply duplicated the boilerplate language used in the *Education Management* complaint to allege, under the same claims for relief, false statements concerning four distinct Title IV requirements. The court is concerned that this boilerplate pleading confuses false statements with false claims: "In submitting or causing to be submitted *such certifications and applications*, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity *of the claims*"; "In making, using, or causing to be made or used *such false records and statements*, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity *of the claims*." Third Am. Compl. ¶¶ 495, 534.

[21] When asked at oral argument where Relators' complaint sets forth the language contained in G5 certifications, counsel for Relators pointed the court to paragraph 105, Hearing Tr. 26:1–6, a paragraph that comes over 100 pages before their first claim for relief.

> Relators:     This is—again, I'm trying to explain that the way this was pled, it doesn't fit into what we're now thinking with *Escobar*.
>
> . . .
>
> The Court:    . . . It's a motion to dismiss and I'm being asked to dismiss certain claims and the claims are broken into six or seven claims in your complaint.
>
> Relators:     And I understand that, Your Honor. If you look at how other courts have resolved a motion to dismiss in this, they don't typically break them out in this sort of statutory framework. They typically ask about them in the rubric of implied certification, express certification, promissory [fraud]. And I know that's not the way they were pled.
>
> . . .
>
> The Court:    I mean it's hard at this point because [the complaint] is so lengthy and so confusing. But, anyway, I'm trying to understand how it wouldn't be beneficial to us, just in terms of going forward to have a legally comprehensible, you know, template to move forward on.
>
> Relators:     I feel like our motion—our motion briefing does that. It organizes the complaint allegations in the way that *Escobar* now has us all thinking about the elements of the False Claims Act.

Hearing Tr. 29:19–21, 30:10–19, 41:24–42:7. The court, however, is not inclined to allow Relators to proceed on legal theories that are neither clearly articulated, nor factually supported, in their 162-page complaint. And if Relators' briefing truly does "organize[] the complaint allegations" in a manageable fashion, then they should have little difficulty amending their complaint to align with their briefing. Accordingly, Relators' complaint is dismissed without prejudice on the grounds that it does not comply with Rule 8(a)(2). Relators have 21 days from the date of this order to amend their complaint.

## 2. Factual Deficiencies

Even when the court attempts to sort through Relators' complaint, there are significant problems. A generous reading of Relators' complaint suggests that they are alleging that the Colleges submitted false claims based on a theory of promissory fraud:

> [The Colleges] made express representations in writing to the Department of Education that they would not make incentive payments to their admissions personnel based directly or indirectly on their success in securing enrollments. These representations *induced* the Department of Education to make students at [the Colleges] eligible for many forms of financial aid . . . . These representations were material . . . . Therefore, [the Colleges] *fraudulently induced* the Department of Education to make [the Colleges] eligible to participate in Title IV . . . .

Third Am. Compl. ¶¶ 496, 505. But Relators have failed to allege with particularity the PPAs in which the Colleges made false statements.

The only PPA that is explicitly referenced in Relators' 162-page complaint is a 2001 PPA that Mr. Barney personally signed for Stevens-Henager. But Relators do *not* allege that Stevens-Henager, or any other defendant, fraudulently induced the Department of Education to execute a PPA in 2001. Instead, Realtors allege that the Colleges fraudulently induced the Department of Education since "at least January 1, 2002, to at least 2011." Third Am. Compl. ¶ 5. Relators do not even attempt to allege that Stevens-Henager made false statements in its 2001 PPA—the only PPA explicitly identified in their complaint. Relators' reference to the 2001 PPA is also problematic because the court has dismissed Relators' claims to the extent they are based on false claims submitted before January 3, 2007. Thus, even if Relators attempt to allege that Stevens-Henager made false statements in its 2001 PPA (they do not), they could pursue only claims for payment that were submitted under the 2001 PPA on or after January 3, 2007.[22]

Even more problematic, Relators have not alleged when the following defendants executed PPAs: CollegeAmerica Arizona, CollegeAmerica Denver, or California College San Diego. Relators allege that these schools have operated under PPAs since at least January 1,

---

[22] Realtors have attached to their complaint Stevens-Henager's 2007 PPA and have incorporated by reference the Government's complaint, which refers to Stevens-Henager's 2007 and 2010 PPAs. If they intend to again amend their complaint, Relators should consider whether wholesale incorporation of the Government's complaint satisfies the requirements of Rule 8(a)(2). And if allegations from the Government's complaint are necessary to Relators' claims, perhaps Realtors should include those allegations in their own complaint, rather than incorporating by reference.

2002. Third Am. Compl. ¶ 126. But Relators do not identify the dates on which any of these schools executed their PPAs. Without more, the court has no basis to determine whether any of the promises these schools made in their PPAs were "false when made." Accordingly, Relators have failed to state claims against CollegeAmerica Arizona, CollegeAmerica Denver, or California College San Diego based on a theory of promissory fraud.

Relators have also failed to allege that any of the Colleges were ineligible to participate in Title IV programs based on 90/10 Rule violations. For a school to lose eligibility based on 90/10 Rule violations, it must derive "less than ten percent of [its] revenue from sources other than" Title IV programs for "two consecutive institutional years." 20 U.S.C. § 1094(d)(2). But Relators' complaint falls far short of alleging that any of the Colleges derived less than ten percent of their revenue from Title IV funds for two consecutive years.

Relators allege that the Colleges used a "scheme" involving textbooks to disguise 90/10 Rule violations. But Relators have not alleged with particularity whether this scheme actually resulted in 90/10 Rule violations: there are no allegations concerning when the Colleges began to use this scheme, and more importantly, there are no allegations concerning whether the Colleges actually derived less than ten percent of their revenue from sources other than Title IV *for two consecutive years* because of the "scheme." In fact, Relators' claim that the Colleges violated the 90/10 Rule is undermined by other allegations in their complaint indicating that the Colleges derived *less than* 90 percent of their revenue from Title IV. *See* Third Am. Compl. ¶¶ 136–37.[23]

_____

[23] Relators allege that in 2009–2010, the Colleges total revenues derived from Title IV programs were as follows: Stevens-Henager: 77%; CollegeAmerica Arizona: 85.5%; Defendant CollegeAmerica Denver: 82.8%; and California College San Diego: 79.3%." Third Am. Compl. ¶ 136. Relators allege that in 2010–2011, the percentage of the Colleges total revenues derived from Title IV programs were as follows: Stevens-Henager: 80%; CollegeAmerica Arizona: 85.1%; CollegeAmerica Denver: 81.4%; and California Colleges San Diego: 69.3%.

Moreover, Relators allege that *all* of the Colleges made false statements concerning the 90/10 Rule from July 1, 2002 to at least 2011. Third Am. Compl. ¶¶ 497, 505. But Relators have alleged almost no facts to support this claim. Relators cite two incidents to show that the Colleges violated the 90/10 Rule *between July 1, 2012 and 2011*: an incident that occurred *in 2012* and an incident that occurred in *2014*. One of the incidents occurred at a "Cheyenne, Wyoming, campus," *id.* ¶ 315, and the other incident involved employees at Stevens-Henager falsifying records to show that Stevens-Heanger students attended CollegeAmerica Arizona, *id.* ¶ 317. The court struggles to see how these two incidents plausibly establish that *all* of the Colleges knowingly violated the 90/10 Rule *for two consecutive years* between July 1, 2002 and 2011.

In sum, Relators have failed to allege sufficient facts that to plausibly establish that any of the Colleges were ineligible to receive Title IV funds based on 90/10 Rule violations. *See Urquilla-Diaz*, 780 F.3d at 1056 (holding that "absent allegations about [a school's] total revenue," general allegations of a "scheme" were insufficient to establish 90/10 Rule violations). Relators' allegations may be consistent with the Colleges violating the 90/10 Rule, "but that is not enough to state a claim under the False Claims Act." *Id.* Consequently, Relators' claims fail to the extent they are based on alleged violations of the 90/10 Rule.

The court is also concerned by Relators attempts to treat the "Defendant Schools" as a collective entity. With respect to attendance taking and refund requirements, Relators' allegations appear to be limited to Stevens-Henager and CollegeAmerica Denver. Relators allege that faculty and administrative official at Stevens-Henager's Orem campus would alter

---

Problematically, Relators do not explain what these percentages would be *but for* the textbook "scheme."

attendance reports. Third Am. Compl. ¶ 320.[24] And Relators allege that a former CollegeAmerica employee explained that the school "'*could* change the last day of attendance without [the student] even knowing it,' which could change student's financial aid eligibility as well." *Id.* ¶ 328 (emphasis added).[25] Relators, throughout their complaint, appear to have taken a shotgun approach, alleging a few examples of misconduct and then attempting to impute liability to the "Defendant Schools." In most instances, this appears to be unfounded.

Perhaps the most egregious examples of Relators' attempt to treat the "Defendant Schools" as a collective entity are their claims against California College San Diego. Relators allege that California College San Diego made false statements regarding the 90/10 Rule, attendance taking and refund requirements, and accreditation standards. But, apart from conclusory statements, Relators allege no facts whatsoever suggesting that California College San Diego violated the 90/10 Rule, attendance taking and refund requirements, and accreditation standards. California College San Diego is referred to sparingly in sections of the complaint that discuss violations of the ICB, *id.* ¶¶ 141, 480, but there are no examples whatsoever of California College San Diego violating the 90/10 Rule, attendance taking and refund requirements, and accreditation standards.

---

[24] Problematically, Relators fail to allege sufficient facts to plausibly establish *when* Stevens-Henager violated attendance taking and refund requirements. Thus, there is no way to determine whether the allegations plausibly establish that Stevens-Henager's, or any of the Colleges', promises to "establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds" were false when made. *See Miller*, 840 F.3d at 501. To the extent Relators can identify particular instances when students withdrawal dates were falsified, Relators may be able to pursue claims under 31 U.S.C. § 3729(a)(1)(D), which imposes liability on any person who "has possession . . . of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property."

[25] This allegation does not even suggest that CollegeAmerica *actually* falsified attendance records. The employee merely testified that the school "could" change a student's withdrawal date to receive more Title IV funds.

Finally, the court is skeptical of Relators' suggestion that all of the management assertions submitted by the Colleges are actionable under a theory of promissory fraud. The Colleges, in required management assertions, annually certified that they were complying with various Title IV requirements, such as the ICB. Third Am. Compl. ¶ 65. At oral argument, counsel for Relators clearly articulated, for the first time, Relators' view "that the filing of every management certification rendered every claim for payment made subsequent to that management certification false." Hearing Tr. 38:18–39:2.

This court is unaware of any case in which a court has applied promissory fraud, in the Title IV context, to anything other than PPAs. Promissory fraud, as articulated by Congress, attaches liability to "every claim submitted under a contract" when the contract "was originally obtained by means of false statements." S. Rep. No. 99-345, at 9. Requests for Title IV funds are "submitted under" a school's PPA; the requests are not "submitted under" the school's required management assertions. In fact, according to Relators, the G5 certifications that accompany requests for Title IV funds state that "the funds are being expended within three business days of receipt for the purpose and condition of the [PPA]." (emphasis added). Thus, while the G5 certifications arguably acknowledge that the request for Title IV funds is being "submitted under" a PPA, they do not reference a school's management assertions in any way.

Relators' approach would read the "false or fraudulent claim" requirement out of § 3729(a)(1)(B). Relators seek to impose liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a . . . claim." But § 3729(a)(1)(B) requires that the false record or statement be material to a "*false or fraudulent claim.*" *See United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003) (en banc) ("Although § 3729(a)(2) prohibits the submission of a false record or statement, it does so only

when the submission of the record or statement was done in an attempt to get a false claim paid."). A claim can be false based on promissory fraud, and a claim can be false because the claim falsely certifies compliance, either expressly or impliedly, with underlying legal requirements. But Relators simply urge that the court impose liability for any claims for payment submitted after the Colleges made any false statement, whether in a contract or otherwise. If Congress had intended this, the False Claims Act would not have attached liability only to those false statements material to a "false or fraudulent claim." Consequently, the court is not inclined to apply a theory of promissory fraud to the required management assertions.

For the reasons set forth above, Relators complaint is dismissed without prejudice on the grounds that it does not contain a short and plain statement of their claims showing that they are entitled to relief. Fed. R. Civ. P. 8(a)(2). To the extent Relators intend to re-plead, they should take care to ensure that there is a both a factual and legal basis for their claims.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the court HEREBY ORDERS:

1. Defendants' Motion for Reconsideration (ECF No. 261) is GRANTED IN PART and DENIED IN PART;

2. Relators' Motion for Partial Reconsideration (ECF No. 364) is GRANTED IN PART and DENIED IN PART;

3. The United States' Motion for Partial Reconsideration (ECF No. 372) is GRANTED IN PART and DENIED IN PART;

4. Relators' Third Amended Complaint (ECF No. 175) is DISMISSED WITHOUT PREJUDICE;

5. Relators have 21 days from the date of this order to file an amended complaint;

6. Counts I and II of the Government's complaint survive to the extent they are based on a theory of promissory fraud, but they do not adequately articulate claims based on a theory of implied false certification;

7. Count III of the Government's complaint is DISMISSED WITHOUT PREJUDICE;

8. The Government has 21 days from the date of this order to file an amended complaint; and

9. With the exception of that related to Counts I and II of the Government's complaint, discovery is stayed pending the further amendment of the pleadings contemplated by this ruling.


Signed March 30, 2018

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge