Brandon J. Mark (10439)
Alissa M. Mellem (13299)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
Email: bmark@parsonsbehle.com
        amellem@parsonsbehle.com

*Attorneys for Relators*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. KATIE BROOKS and NANNETTE WRIDE,<br><br>     Plaintiffs,<br>vs.<br><br>STEVENS-HENAGER COLLEGE, INC., a Utah Corporation; CALIFORNIA COLLEGE SAN DIEGO, INC., a Utah Corporation; COLLEGEAMERICA DENVER, INC., a Colorado Corporation; COLLEGEAMERICA ARIZONA, INC., a Colorado Corporation; CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC., an Indiana Corporation; CARL BARNEY, an individual; and DOES 1-500, Inclusive,<br>     Defendants. | **RELATORS' FOURTH AMENDED COMPLAINT AGAINST CURRENT DEFENDANTS**<br><br><br>Case No. 2:15-CV-00119-JNP-EJF<br><br>Judge Jill Parrish<br><br>Magistrate Judge Evelyn J. Furse<br><br>**REDACTED VERSION** |

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................4

   A.   Although Separate Schools for Branding Purposes, Defendant Schools Have Always Been Operated as a Single Entity and Used the Same Policies and Procedures Relating to the Legal Requirements....................................................8

   B.   Defendant Barney Controls Defendant Schools' Actions and Was Personally Involved in Numerous Activities that Violated the FCA. ................13

II.   FALSITY: DEFENDANTS HAVE VIOLATED FOUR KEY LEGAL REQUIREMENTS OF TITLE IV OF THE HIGHER EDUCATION ACT. .........16

   A.   The Incentive Compensation Ban ("ICB"). ...............................................16

   B.   Accreditation ..............................................................................52

   C.   Accurate Recordkeeping Relating to Refunds: Grade and Attendance Records. ........................................................................................64

   D.   90/10 Rule. .......................................................................................74

III.   STATEMENTS AND CLAIMS: DEFENDANTS HAVE FALSELY CERTIFIED COMPLIANCE WITH THE LEGAL REQUIREMENTS IN THREE SEPARATE WAYS....................................................................................87

   A.   PPAs: Defendant Schools' False Promises of Compliance with the Legal Requirements Fraudulently Induced the DOE to Allow Them to Participate in the Title IV, HEA Programs. ..........................................................................87

   B.   G5 Certifications. ..........................................................................96

   C.   Required Management Assertions. .........................................................100

IV.   MATERIALITY. ....................................................................................108

   A.   ICB. ...................................................................................................109

   B.   Accreditation Requirement. ...............................................................114

   C.   Recordkeeping and Refund Requirements...............................................118

   D.   90/10 Rule. ......................................................................................124

   E.   The Government Has Already Taken Some Action against Defendant Schools Due to the Allegations in this Lawsuit...............................................129

V.   SCIENTER. ...........................................................................................129

A. ICB. ...............................................................................................129

B. Accreditation. ................................................................................136

C. Accurate Recordkeeping of Grades and Attendance. .............................141

D. 90/10 Rule. ...................................................................................144

VI. DAMAGES .........................................................................................145

VII. CLAIMS FOR RELIEF. ..........................................................................151

A. First Claim for Relief: Fraudulent Inducement (PPAs) under 31 U.S.C.
§ 3729(a)(1)(B) and Its Predecessor. ...............................................151

B. Second Claim for Relief: Implied False Certifications (G5 Certifications)
under 31 U.S.C. § 3729(a)(1)(A) and its Predecessor. ....................................153

C. Third Claim for Relief: Express False Certifications (RMAs) under 31
U.S.C. § 3729(a)(1)(B) and Its Predecessor. .................................................155

VIII. JURISDICTION AND VENUE. ...........................................................156

IX. PRAYERS FOR RELIEF ........................................................................157

X. JURY TRIAL DEMAND .........................................................................158

Pursuant to this Court's order (ECF 417) and Rules 15(c) and 15(d) of the Federal Rules of Civil Procedure, Relators and Plaintiffs Katie Brooks and Nannette Wride (collectively, "Relators"), on behalf of themselves and the United States of America, complain as follows:

## I.   INTRODUCTION

1.      Despite Defendants' efforts to convince the Court that their fraudulent activities are too complex and difficult for this Court to bring to justice, this case is, at its core, quite simple. For years, Defendants have been violating critical requirements of the federal student financial aid programs from which they have received hundreds of millions of dollars. Notwithstanding these violations, Defendants repeatedly told the U.S. Department of Education ("DOE"), in various forms, that they would comply, were complying, and had complied with these requirements. Although the specific legal violations evolved and expanded over time, encompassing violations of ever-greater numbers of legal requirements, any single material violation of any of the legal requirements rendered Defendants' certifications of compliance false.

2.      While the extensive nature of Defendants' violations of the legal requirements over a long period of time and across a number of campuses throughout the western United States means that Relators cannot feasibly allege

every single example (and fortunately there is no requirement for Relators to do so), the facts alleged below demonstrate that (1) the policies and practices that resulted in the violations of legal requirements originated with Defendant Schools' senior management, including and particularly Defendant Carl Barney, and (2) those policies and practices were carried out at all or most of Defendant Schools' campuses and operations, examples of which are provided below.

3.     Particularly, Relators bring claims under the False Claims Act ("FCA") based on Defendants' submission of false claims, statements, and certifications relating to Defendant Schools' (1) payment of illegal bonuses to recruiters and others—the Incentive Compensation Ban ("ICB") claims, (2) Defendant Schools' violations of accrediting standards—the Accreditation Requirement claims, (3) violations of regulations requiring Defendant Schools to maintain accurate grade and attendance records and to refund federal student aid based on those records—the Recordkeeping and Refund Requirements claims, and (4) violations of rules designed to limit the amount of federal funds for-profit colleges, such as Defendant Schools, may receive—the 90/10 Rule claims (collectively, the requirements that Defendants have violated are referred to as the "Legal Requirements").

4. As detailed further below, Defendants have made various false statements concerning their (1) future intent to comply, (2) current compliance, and (3) past compliance with the Legal Requirements in order to gain and maintain their eligibility to participate in student aid programs and get claims paid. These false claims, statements, and certifications have been made in, among other things, (1) the contracts that the Defendant Schools entered into with the DOE, called Program Participation Agreements ("PPA"), at various times; (2) in the very claims for payment made by the Defendant Schools thousands of times per year ("G5 Certifications"); and (3) the annual certifications by Defendant Schools' management of their compliance with the Legal Requirements, called Required Management Assertions ("RMA"). Each of these false claims, statements, and certifications is separately actionable under the FCA.

5. These false statements and claims establish violations of the FCA under at least three theories: (1) express false certification, (2) implied false certification, and (3) promissory fraud or fraud in the inducement. Each of these theories is separately actionable under the FCA and each requires different evidence. The three theories, and claims upon which they are based, are not duplicative.

6.     Defendant Schools began violating the ICB in 2003[1] and, although they changed the details of their compensation policies at various times over the years, continued to violate the ICB through at least 2014. Over the years, Defendant Schools violated other Legal Requirements, as detailed below. When Defendant Schools executed numerous contracts with the DOE promising to comply with the ICB and other Legal Requirements at various times after 2003 and prior to 2014, they did so knowing that they were not in compliance and did not intend to change their practices to come into compliance. Thus, Defendants fraudulently induced the DOE to execute these contracts with them and permit them to participate in federal student aid programs, even though the Defendant Schools were not eligible.

---

[1] Relators recognize that the Tenth Circuit Court of Appeals has construed the applicable statute of limitations to limit a relator's claim to six years. Relators have preserved their objection to the Court's ruling in this regard and note that the Eleventh Circuit recently concluded the Tenth Circuit is wrong and that relators may take advantage of the FCA's tolling provision. *U.S. ex rel. Hunt v. Cochise Consultancy, Inc.*, __ F.3d __, 2018 WL 1736788 (11th Cir. April 11, 2018).

Nevertheless, Relators allege facts prior to the presumptive limitations period in this case because such facts are relevant to and provide important context for the claims that fall within the limitations period. Because the ICB violations in particular began well before the limitations period, certain historical facts are set forth to provide context, as this Court has already determined. (ECF 381 at 10–11.) *See also Consumer Fin. Prot. Bureau v. Borders & Borders, PLC*, No. 3:13-CV-1047-JGH, 2015 WL 11675669, at *7 (W.D. Ky. Apr. 28, 2015) ("The statute of limitations does not establish the relevant time frame when a party alleges a pre-existing, continuing course of illegal conduct that extends well into the statute of limitations period.").

7.     Defendants also submitted (or caused to be submitted) tens of thousands of false claims for payment between 2007 and 2014, in which the Defendant Schools specifically represented that they were complying with the various contracts they had entered into with the DOE, all of which expressly required them to comply with the ICB and other Legal Requirements.

8.     Defendant Schools' management also made annual false certifications of compliance with the ICB and other Legal Requirements each year between 2008 and 2015 (for the prior year), which certifications were material to the DOE's payment of thousands of claims to Defendant Schools.

A.     **Although Separate Schools for Branding Purposes, Defendant Schools Have Always Been Operated as a Single Entity and Used the Same Policies and Procedures Relating to the Legal Requirements.**

9.     Like the corporations it succeeded, Center for Excellence in Higher Education, Inc. ("CEHE"), operates for-profit colleges in numerous states and is, as one former high-level DOE official explained, "very highly dependent" on the federal student aid programs established under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 et seq. ("Title IV, HEA programs").

10.    Defendant CEHE is an Indiana corporation[2] with a principal place of business in Murray, Utah. It operates a number of for-profit (or "proprietary") postsecondary educational schools throughout the western United States. Although CEHE uses different regional trade names (Stevens-Henager in Utah and Idaho; CollegeAmerica in Colorado, Arizona, and Wyoming; California College of San Diego in southern California), it is a single corporation with centralized management. Essentially, only the brands are different; everything else about their operations is and always has been effectively the same.

11.    Although CEHE brought all of these brands under a single corporation on December 31, 2012, the operations and management have remained the same. According to CEHE's current CEO (and the CEO of the four corporations that preceded it), ███████████████████████████████████████████ ██████████████████████████."

---

[2] Although CEHE is a nonprofit corporation, the DOE previously denied its application to be treated as a nonprofit for Title IV, HEA program purposes. It appears that CEHE's was the first application for conversion ever denied by the DOE. CEHE is currently considered a for-profit— or proprietary—institution by the DOE. CEHE has sued the Secretary of Education in this District for refusing to recognize it as a nonprofit institution. It appears CEHE is seeking nonprofit status in part to be relieved of the burden of complying with the 90/10 Rule, as explained further below.

12.   The four separate corporations that preceded the merger into CEHE—

Stevens-Henager College, Inc. ("SHC"),[3] California College San Diego, Inc.

("CCSD"),[4] CollegeAmerica Denver, Inc. ("CAD"), CollegeAmerica Arizona, Inc.

("CAA")[5]—were all centrally managed by Defendant Carl Barney through a fifth

---

[3] The SHC campuses have been assigned at least the following identification codes by the Office of Postsecondary Education ("OPEID Codes"): 00367400, 00367401, 00367403, 00367405, and 00367406. Until December 31, 2012, Defendant SHC was a Utah corporation with its principal place of business in Murray, Utah. Defendant SHC operated a number of campuses in the intermountain west, including in Idaho (Boise and Nampa) and Utah (Salt Lake City/Murray, Logan, Odgen, Layton, Lehi, Provo/Orem, and St. George). CEHE continues to operate these campuses under the "Stevens-Henager College" trade name.

Additionally, Defendant SHC operated and controlled Independence University ("IU"), an online, Internet-based, distance-learning institution. IU has been assigned at least the following OPEID Code: 00367409. CEHE continues to offer online services under the "Independence University" trade name.

[4] The CCSD campuses have been assigned at least the following OPEID Code: 02110800. Until December 31, 2012, Defendant California College San Diego, Inc. ("CCSD"), was a Utah corporation with its principal place of business in Salt Lake City, Utah. Defendant CCSD operated three campuses in southern California (San Diego, National City, and San Marcos). CEHE continues to operate campuses under the "California College San Diego" trade name.

[5] The CollegeAmerica campuses have been assigned at least the following OPEID Codes: 03120300, 03120301, 03120302, 02594300, 02594301, 02594302, and 02594303. Until December 31, 2012, Defendant CollegeAmerica Denver, Inc. ("CAD"), was a Colorado corporation with its principal place of business in Denver, Colorado. Until December 31, 2012, Defendant CollegeAmerica Arizona, Inc. ("CAA"), was a Colorado corporation with its principal place of business in Flagstaff, Arizona. CAD and CAA operated eight campuses in four states: two in Arizona (Flagstaff and Phoenix), four in Colorado (Denver, Colorado Springs, South Colorado Springs, and Fort Collins), one in Wyoming (Cheyenne), and one in Idaho (Idaho Falls). CAD and CAA held themselves out to the public as a single operating entity under the name "CollegeAmerica." For example, CAD and CAA jointly operated a website that listed all eight campuses and made no distinction between the two corporate entities. CEHE continues to operate these campuses (except for several campuses it has closed) under the "CollegeAmerica" trade name.

corporation,[6] which existed solely to manage and operate the other four corporations, in the exact the same manner as they are currently managed. In other words, the policies, procedures, and operations were the same; only the brands were different.[7] (Collectively, CEHE, SHC, CAD, CAA, and CCSD are referred to herein as "Defendant Schools.")

13.     CEHE is the corporate successor of SHC, CCSD, CAD, and CAA, and is liable for their violations of the FCA prior to the merger.

14.     Even before the merger, all of the Defendant Schools were centrally managed and used the exact same policies and procedures. Indeed, policies and procedures were communicated through Procedure Directives, Management Memos, and Information Letters, which, when issued, simultaneously went to

---

[6] CollegeAmerica Services, Inc., another company owned, managed, and operated by Defendant Barney, provided centralized management, accounting, marketing, and operational support to each of the other four corporations. CollegeAmerica Services also merged into CEHE. According to Barney's sworn testimony, CollegeAmerica Services "continues to provide the same services . . . as a division of CEHE."

[7] SHC, CCSD, CAD, and CAA operated as a single, unitary school. SHC, CCSD, CAD, and CAA published and used a single unified catalog of courses for students, which displayed the names and trademarks of each such school prominently on the cover. Additionally, the homepages of the websites belonging to SHC, CCSD, CAD, and CAA were virtually identical, except for the change in the name of the school. The homepages of the websites for CCSD and CAD/CAA explained that "[o]nline programs are offered by our affiliated college, Stevens-Henager College Salt Lake City/Murray." (See http://www.collegeamerica.edu/ (visited Oct. 31, 2012); http://www.cc-sd.edu/ (visited Oct. 31, 2012).) In fact, before the merger, the Defendant Schools operated a campus in Idaho Falls, Idaho, that used the "Stevens-Henager" trade name but was actually a branch campus of the CollegeAmerica corporate entity, highlighting the unitary nature of the management and operations.

employees at all four corporations. The four separate corporations also shared the same senior management. Although legally separate, all four corporations were run as a single business entity from a procedure, policy, and operations standpoint.

15.     Defendant Schools have always combined their operations from all campuses of all Schools:

- All Defendant Schools compile information about the performance of ACs and FPs at each of their campuses into a single report, which Defendant Schools distribute to each of their ACs and FPs. Defendant Schools rank their ACs based on the number of starts, and the ACs from all Defendant Schools are ranked on the same scale and compared with one another. Such practices serve to highlight how Defendant Schools employ collective policies and standards for ACs and FPs and, particularly, for measuring ACs' and FPs' performance.

- All Defendant Schools collectively publish a single course catalog for distribution to students and prospective students.

- All Defendant Schools prepare joint employment manuals for ACs and FPs, which all Defendant Schools provide to all new hires at all locations.

16.     All Defendant Schools send their ACs to the same conventions in Las Vegas on approximately a quarterly basis. At these conventions, ACs from all Defendant Schools are provided the same instruction and training.[8]

---

[8] Relators Katie Brooks and Nannette Wride attended several Las Vegas conferences in 2009 and 2010. At these conferences, they met ACs and FPs from SHC's other campuses, as well as from the campuses of the other Defendant Schools. At these conferences, SHC and the other Defendant Schools would distribute written policy manuals to their ACs. Defendant Schools' management would discuss policies and procedures applicable to ACs at all of the Defendant Schools throughout the conferences.

17.     Defendant Schools have regular meetings for more senior management as well, during which corporate policies are announced and enforced. Additionally, senior management from all Defendant Schools have regular conference calls during which corporate policies and procedures are discussed. These calls include senior management from all of the Defendant Schools.

**B.     Defendant Barney Controls Defendant Schools' Actions and Was Personally Involved in Numerous Activities that Violated the FCA.**

18.     Defendant Carl Barney is the former sole shareholder of the corporate entities that merged into CEHE on December 31, 2012. The corporate entities were all privately owned by Barney, and therefore Barney personally benefitted from the violations alleged herein. Barney was a corporate director of each Defendant School and its corporate president until their merger into CEHE. Barney has directed and controlled Defendant Schools at all times, and he personally directed a number of the FCA violations, as detailed below.

19.     Barney continues to ultimately manage and control Defendant Schools through CEHE. Barney is chairman of CEHE and is the sole statutory member of CEHE. As the sole member, Barney had the power to appoint members of CEHE's governing board and make governance decisions.

20.     Barney has an arrangement with CEHE, either personally or through other entities he controls, through which he receives substantial compensation from CEHE. Barney works 40 hours per week on CEHE business.

21.     In 2012, CEHE reported that it owed Barney over $431 million and that it leases office space from entities owned by Barney. In 2015, CEHE reported that it still owes Barney $75 million relating to the original merger, that it paid entities related to Barney more than $3.4 million dollars in rent, and that it paid Barney more than $1.4 million in interest payments associated with the debt it owes him. In 2015, CEHE also reported that it owes $16 million to a foundation whose address is listed in the same small Nevada town that Barney lives in.

22.     Until January 1, 2013, when Defendant Schools merged into CEHE, Carl Barney was the sole shareholder and owner of Defendant Schools. As the sole shareholder of Defendant Schools, Barney was motivated to maximize Defendant Schools' revenues and profits. In 2010, Barney received a distribution from the Schools of nearly $24 million. This was in addition to the nearly $29 million that Defendant Schools paid to CollegeAmerica Services, Inc., another company wholly owned by Barney, as well as $3.4 million that Defendant Schools paid to companies owned by Barney associated with leasing real estate.

23.    Similarly, in 2011, Barney received a shareholder distribution from Defendant Schools of nearly $40 million. This was in addition to the $30 million that Defendant Schools paid to Barney's company CollegeAmerica Services, Inc., as well as $4.3 million that Defendant Schools paid to companies owned by Barney associated with leasing real estate.

24.    Barney personally signed PPAs for Defendant Schools at various times, including the April 2001 PPA for SHC, the May 2004 PPA for CAA, and the January 2004 PPA for CCSD.

25.    As a result of Barney's personal involvement in establishing business policies and practices for each Defendant School, Defendant Schools have (and had at all times relevant to this Fourth Amended Complaint) identical policies and practices. Barney personally authored and sent numerous "Procedure Directives," "Management Memos," and "Information Letters" to Campus Directors, Directors of Admission, Deans, and other employees, including recruiters (Admissions Consultants or "ACs") and Financial Planners ("FPs"). These messages were mostly sent from Barney's personal email address. Often, Barney would require employees to acknowledge their receipt of his communications by requiring written confirmation from them, and he would track whether the employees had sent their acknowledgments. Procedure Directives, Management Memos, and

Information Letters with Barney's typed signature were personally authored by Barney. Procedure Directives were announcements of policy changes that were implemented on the date of the Procedure Directive.

## II. FALSITY: DEFENDANTS HAVE VIOLATED FOUR KEY LEGAL REQUIREMENTS OF TITLE IV OF THE HIGHER EDUCATION ACT.

26.    Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070 *et seq.*, Congress established various student loan and grant programs, including but not limited to the Federal Pell Grant Program ("Pell Grant program"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP") (collectively "Title IV funding") in order to financially assist eligible students in obtaining a post-secondary education.

27.    As described further below, in order to become and remain eligible to participate in Title IV, HEA Programs, schools must comply with a number of Legal Requirements. The schools promise to comply with these Legal Requirements, and certify their continued compliance, in various ways, as described below.

### A.    The Incentive Compensation Ban ("ICB").

28.    One of the Legal Requirements applicable to all schools that participate in Title IV, HEA programs is the Incentive Compensation Ban, which

provides that schools "[w]ill not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20) ("ICB").

29.     The DOE's regulations further reiterate that schools must comply with the ICB in order to be eligible to receive Title IV funding and that schools must expressly agree to the ICB in PPAs. 34 C.F.R. § 668.14(b)(22) ("Incentive Compensation Regulations").

30.     In 2002, the Incentive Compensation Regulations accompanying the ICB were amended to add certain "safe harbors," which identified certain types of compensation that did not violate the ICB.

31.     The 2002 amendments to the Incentive Compensation Regulations included a safe harbor permitting schools to pay "[c]ompensation that is based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter." 34 C.F.R. § 668.14(b)(22)(ii)(E) ("Regulatory Safe Harbor E").[9]

---

[9] The 2002 amendments also included a safe harbor allowing schools to pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment

32.    With respect to the Regulatory Safe Harbor E, in the Preamble to the Notice of Proposed Rulemaking for the safe harbor, the Secretary of Education explained that the ICB was intended, in part, "to prevent institutions from enrolling students into a program without regard to their qualifications or likelihood of completing the program," that "completion of the program or . . . the completion of the first academic year is a reliable indicator that the student was qualified for the program," and, as a result, the safe harbor allows schools to make payments that are "based upon students' successful completion of their educational program, or one academic year for a longer program." *Program Participation Agreement (Section 668.14)*, 67 Fed. Reg. 51722, 51724 (Aug. 8, 2002).

33.    In July 2011,[10] the DOE repealed the regulatory safe harbors, including Regulatory Safe Harbor E, because "the Department's experience demonstrate[d] that unscrupulous actors routinely rely upon these safe harbors to

---

is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. §668.14(b)(22)(ii)(A) (July 1, 2010) ("Regulatory Safe Harbor A"). It is Relators' understanding that Defendants do not contend that any of their compensation practices complied with Regulatory Safe Harbor A, and, as such, Relators have therefore omitted detailed allegations, set forth in the Third Amended Complaint, demonstrating that none of Defendants' compensation practices complied with Regulatory Safe Harbor A.

[10] *Program Integrity Issues*, 75 Fed. Reg. 66832, 66832 (October 29, 2010); 34 C.F.R. § 668.14(b)(22) (2011). The Department concluded that "rather than serving to effectuate the goals intended by Congress through its adoption of section 487(a)(20) of the HEA, the safe harbors have served to obstruct those objectives." *Incentive Compensation (§ 668.14(b))*, 75 Fed. Reg. 34816, 34817 (June 18, 2010).

circumvent the intent of section 487(a)(20) of the HEA." *Incentive Compensation (§ 668.14(b))*, 75 Fed. Reg. 34816, 34817 (June 18, 2010).

### 1. Defendants' Violations of the Incentive Compensation Ban.

34.     Defendants have violated the ICB in various ways over the years. Each of the policies and practices existed over different periods of time and different campuses, though most were applicable to all campuses.

### a) Admission Consultant Bonuses.

35.     According to the Defendant School's Admissions Consultant Manual, bearing Carl Barney's copyright notice on its cover, an AC's primary objective at Defendant Schools is to "**enroll students**." (emphasis in original). (2008 AC Manual, attached as Exhibit A hereto.) Defendants refer to enrollments as "starts."

36.     According to Defendant Schools, the "purpose" of ACs is to "motivate, enroll, and start students." (*Id.* at 22.) The Defendant Schools' joint Manual explains that "[t]he AC's job is to enroll every person they possibly can" and that "no salary increases occur unless Admissions enrolls more students." (*Id.* at 15.)[11]

---

[11] During the conferences in Las Vegas, which Relators attended, Defendant Schools conveyed a clear message that enrolling students was the most important measure of success for ACs. One of the most important awards given out during the Las Vegas conferences is the "rock" trophy, which is awarded to the campus with the highest three-month average conversion rate.

37.     Defendant Schools provide leads of prospective students from various sources to their ACs. ACs are the primary contact that prospective students have with Defendant Schools during the recruitment process. The recruiting process often involves hours of personal contact between the AC and prospective student, either in person or over the telephone for online courses. ACs are taught to "peel the onion" to find the emotional issue that is driving a potential student to consider college and to use that issue to convince them to enroll. ACs are encouraged to find the prospective student's "pain point" and convince the prospective student that enrolling at Defendant Schools will alleviate the "pain."

38.     Beginning in the early 2000s, Defendant Schools began paying incentive compensation to motivate its AC sales force, armed with hard-sell tactics, to enroll ever greater numbers of students.

39.     In approximately 2000, before any of the regulatory safe harbors adopted in 2002 were even known, Defendant Schools began developing the general components of their AC compensation plan, which was distributed as a

---

Other awards given out to ACs during the Las Vegas conferences are for the most enrollments or starts by an individual AC and the highest interview-to-enrollment conversion ratio by an AC.

Periodically, the top performing ACs (and their directors) from the various campuses of Defendant Schools are provided an all-expenses-paid vacation for "elite" training. Defendant Schools measure performance for this incentive bonus based on conversion rates, which is a measure of starts. ACs are continually competing for these top positions.

Procedure Directive ("AC Bonus Plan"). The Procedure Directive went to all of the Defendant Schools, including SHC, CAD, CAA, and CCSD.

40.     While Carl Barney[12] and others revised the AC Bonus Plan from time to time, the features that violated the ICB remained constant.

41.     The AC Bonus Plans all attempted to conceal the payment of bonuses directly tied to enrollments in the form of completion bonuses under Regulatory Safe Harbor E—that is, bonuses ostensibly tied to an enrolled student completing a certain portion of his or her course work. However, the enrollment-related requirements for earning the bonuses were tied to the enrollment of *other* students, and, because they were much harder to achieve, the real focus of recruiters' efforts to get bonuses.

42.     The Procedure Directives that set forth the AC Bonus Plans over the years all discuss the Defendant Schools' "compensation plan based upon students who complete 36 credits" and explicitly reference Regulatory Safe Harbor E. (*E.g.*, 2004 and 2008 Procedure Directives, attached as Exhibits B and C hereto.)[13] The

---

[12] According to Defendant Schools' Chief Executive Officer's sworn testimony, "[t]he compensation plans at issue in this case relating to [Defendant Schools'] Admissions Consultants were created in-house with the primary involvement of Carl Barney (Chairman and formerly the sole shareholder) and Barbara Thomas (Chief Operating Officer at the time)" and "[t]he compensation plans were primarily created by Mr. Barney."

[13] Defendant Schools' employee manual for ACs also contained similar explanations of the AC Bonus Plan over its various revisions. (AC Manual, Ex. A at 25.) The Manual makes clear that

Procedure Directives explain that each student who completes 36 credits entitles the AC who enrolled that student to a "Completion Certificate" if, and only if, the completing "student ha[s] a *value at completion of 36 credits* as show in Appendix 1." (2008 Procedure Directive at 2 (emphasis in original).) While the precise method of calculating the value of the Completion Certificate changed over time, its value was always tied to the AC's enrollment of *other* students in various ways.



This change in value of the Certificates of Completions was tied directly to enrollments and violated the ICB.

---

the "completion" bonuses associated with the "[C]ompletion [C]ertificates are not part of <u>regular</u> compensation." (Manual at 28 (emphasis in original); *see also* 2008 Procedure Directive at 6.)

46.     Just like the AC Bonus Plan that followed, the plan also tied the value of the Certificates of Completion—that is, the value of the completion bonus—directly to the AC's own enrollments (which Defendant Schools call "starts"). A chart contained in an exhibit to the AC Bonus Plan, which set forth the method of calculating the value of the CompletionCertificates, linked the number of enrollments directly to the value of the Certificates. (2004 Procedure Directive, Ex. B.)[14] Specifically, according to the chart, the value of the bonuses increase as the ACs' three-month average number of starts increases. There is literally a one-to-one correlation in the chart between value of the bonuses and the average start rate.

47.     The change in value due to enrollments was usually bigger than the base bonus for the completion. In other words, an AC who recruited an average of three students (for bachelor's degrees) would get $25 per Certificate (the base amount), but an AC who recruited an average of nine students received $100 per Certificate. The $75 difference in value is attributable solely and exclusively to the AC's success enrolling *other* students. Thus, of the $100 bonus paid to the high-enrollment AC, $25 is attributable to the completion aspect while the remaining $75 is linked to enrollments of other students.

_____

[14] Because ██████ and 2004 AC Bonus Plans contained the same chart, Relators here reference the publicly available version of the document.

48.     In 2004, Carl Barney and others revised the AC Bonus Plan. The only change from the  However, the 2004 AC Bonus Plan retained the chart that tied the largest portion of the bonus directly to enrollments.

49.     From January 22, 2004, to November 15, 2007, all Defendant Schools paid AC bonuses under this plan, including before and after a number of PPAs were signed by the Schools.

50.     On November 15, 2007, Defendant Schools issued a new Procedure Directive setting forth a revised AC Bonus Plan. Defendant SHC later provided the Procedure Directive to Ms. Brooks. (2008 Procedure Directive, Ex. C at 2.)

51.

53. 

55.    Defendant Carl Barney personally emailed further revisions he made to the Procedure Directive in early January 2008. The changes did not alter the way that bonuses were paid.

---

[15] Defendant Schools use their academic "module" as the relevant time period for measuring AC performance. Each module is approximately one month long.

56. ███████████  ████████████  ████

████████████████████████████████████

██████████████████████

57.    On November 17, 2008, ████████████████

████████████████  As with the prior versions, the November 2008

version was authored by Barney. (2008 Procedure Directive, Ex. C.)

58.    The November 2008 version contained a new chart for calculating the

value of the bonuses. The November 2008 version first introduced the use of an

AC's Interview Conversion Rate, in addition to starts, to determine the value of the

bonuses.[16]

59.    In the November 2008 version of the chart, the first column in the

chart is titled "Packaged Starts." The lowest value shown in the row is 5 packaged

starts—there are no values for anything less than 5 starts.

---

[16] Defendant Schools' use of the interview-to-start conversion rate as the measure of performance for their incentive compensation programs had a particularly perverse effect on ACs' recruiting practices. Whereas pure start-based quotas do not punish ACs for determining that a particular prospect is not genuinely interested in Defendant Schools' programs or cannot benefit from the education that Defendant Schools provide, the conversion rate measures ACs on their ability to convince each and every prospect to enroll, regardless of whether the student really desires to attend or can actually benefit from the education. The use of the conversion rate as a measure of AC performance—and determining eligibility for bonuses based on that measure—punishes ACs for determining that, for example, a prospective student cannot benefit from Defendant Schools' programs or does not want to study the programs offered at a particular campus. Because the conversion-rate metric punishes ACs who determine a prospective student is not a good fit for the school, it deters ACs from even attempting to elicit information from a prospective student that might reveal the student is not a good fit.

60.     The top row of the chart lists the Interview Conversion Rate or "Intconversion%." The lowest value in the row is ">33%"—there are no values for anything less than 33%.

61.     Notes to the chart explain that "Intconversion%" is calculated by "[t]otal[ing] the last three modules' starts and interviews" and dividing the total number of starts by the total number of interviews.

62.     According to the chart, before an AC could receive a bonus for a completing student, the AC had to (1) start *at least* 5 students per module, and (2) convince at least one out of every three potential students he or she met with to enroll in the school. Based on the compensation systems set forth in the Procedure Directive, if an AC failed to meet either of these two enrollment-related requirements, the AC was ineligible to receive a bonus, regardless of how many students the AC was responsible for starting who completed 36 credit hours.

63.     Under the 2008 version of the AC Bonus Plan, an AC who enrolled 4 students, all of whom completed their studies, received no bonus. An AC who achieved a 33% conversion rate and enrolled 5 students, 3 of whom completed, received a $1,500 bonus ($500 per completion). An AC who achieved a 40% conversion rate and enrolled 10 students, only 2 of whom completed, received an $8,000 bonus ($4,000 per completion).

| Hypothetical AC | Starts | Completions | Conversion Rate | Bonus |
|---|---|---|---|---|
| Cathy Careful | 4 | 4 | 33% | $0 |
| Bob Ambitious | 5 | 3 | 33% | $1,500 |
| Harry Hardsell | 10 | 2 | 40% | $8,000 |

64.     The   Procedure   Directives   acknowledge   that   the   incentive
compensation  plan  is  designed  to  ensure  that  ACs  "contribute  to  admissions
goals." (2008 Procedure Directive, Ex. C at 1.)

65.     Because  they  all  tied  the  AC  bonuses  to  one  or  more  enrollment-
related requirements (starts and conversion rate), the  AC Bonus Plans employed
from  2003  to  July  2011  all  violated  the  ICB  and  did  not  qualify  under  the  then-
existing  Regulatory  Safe  Harbor  E.  34  C.F.R.  § 668.14(b)(22)(ii)(E)  (July  1,
2010).[17]

> **b) Examples of Violations of the ICB under the AC Bonus Plans.[18]**

---

[17] This Court has repeatedly determined that the 2007–08 AC Bonus Plan did not qualify for
protection under Regulatory Safe Harbor E. (ECF 245 at 10–11; ECF 417 at 24 n.12.) The
Court's conclusions in this regard are correct. Because of the Court's determinations, Relators
omit here detailed allegations about why the bonus plans do not comply with the Regulatory Safe
Harbor E, which were contained in the Third Amended Complaint.

[18] Because Defendant Schools did not begin separately tracking bonuses in payroll documents
until approximately 2007, it is impossible to identify specific examples of bonus payments prior
to 2007, though Heather Burckhard, the head of the Human Resources for Defendant Schools
can testify that they were in fact paid before they were separately tracked for payroll purposes.

66.     Example: 2009–2011, Orem/Provo, Utah, Campus. Relator Katie Brooks began working at SHC as an AC on March 2, 2009.[19] Ms. Brooks was paid a base salary of $42,000 per year,[20] and she was ostensibly eligible to receive bonuses for those students that she enrolled who completed 36 credit hours ("Potential Bonus Students").

67.     Consistent with Carl Barney's Procedure Directives, to receive a "completion" bonus, Ms. Brooks and the other ACs she worked with had to (1) achieve a three-module average of at least five starts per module, and (2) attain an interview-to-start ratio ("conversion rate") of at least thirty-three percent (33%) in the same module that the Potential Bonus Student started.[21]

---

Ms. Burckhard was the first HR director to begin separately tracking bonuses in payroll records, which she started around 2007.

[19] In approximately March 2011, Ms. Brooks resigned her employment with SHC after SHC was unable accommodate her with a flexible work schedule, which she needed in order to care for her two young children.

[20] Ms. Brooks' starting salary was $38,000 per year, which was increased to $42,000 in September 2009.

[21] Ms. Brooks' supervisor, Jesse Hafen, imposed an additional enrollment-related requirement on Ms. Brooks—she also had to start a total of five students in the same module as the Potential Bonus Student started in order to receive a bonus. Mr. Hafen, who was known to bend the rules, likely imposed this additional requirement on Ms. Brooks, who was a very successful recruiter, to further incentivize her enrollment of additional students.

To further incentivize ACs to meet their start quotas, Mr. Hafen would periodically offer prizes to the ACs for achieving certain numbers of starts. These were awarded outside of the policy established by the AC Bonus Plans. Mr. Hafen would award these prizes through contests that were based on enrolling or starting new students at SHC. The prizes usually consisted of cash payments or expensive consumer electronics products. Mr. Hafen would offer and pay these incentives at least monthly, if not more frequently. As an example of one of these "contests," in

68.     Jesse Hafen, the Director of Admissions at Defendant SHC's Orem campus, told Ms. Brooks when she began working as an AC that she had to meet the enrollment-related requirements in order to receive a single "completion" bonus. Mr. Hafen and his assistant applied these enrollment-related requirements when determining Ms. Brooks' eligibility for bonuses.

69.     Ms. Brooks was a top performing AC at SHC's Orem campus. Ms. Brooks received significant bonus payments. However, SHC denied Ms. Brooks bonuses for numerous Potential Bonus Students due to her failure to achieve the enrollment-related requirements. For example, SHC denied Ms. Brooks "completion" bonuses for Potential Bonus Students who started in December 2009 because she had an interview-to-start conversion ratio of thirty-two percent (32%), which was 1% below SHC's required minimum of thirty-three percent (33%). In

---

or about March 2010, Mr. Hafen communicated to the ACs at SHC's Orem campus, including Ms. Brooks, that any AC that met his or her individual goal on the start list would receive an extra $250 on his or her paycheck. Further, Mr. Hafen communicated to the ACs at SHC's Orem campus that any AC that met his or her individual goal on the start list would be eligible for a drawing for a 32" flat screen television. On other occasions, Mr. Hafen ran similar contests where he gave Ipods as prizes. Ms. Brooks, among other ACs, received an Ipod for achieving her start goals. Mr. Hafen also ran a contest where the incentive to the ACs for attaining a certain number of starts and a certain conversion rate was a night's stay at a resort in Park City, Utah. Mr. Hafen awarded this prize to another AC.

Ken Plant, the Executive Director of SHC's Orem campus, and Dr. Stephen Babb, the Dean of Education at the campus, openly referred to the admissions department as the "cesspool" because of the cutthroat competition that existed between the ACs over the enrollment-related contests.

On at least three occasions, Ms. Brooks personally received a bonus because the Orem campus, where she worked, met its overall start goal for the module.

another case, SHC denied Ms. Brooks "completion" bonuses because she only had three starts in March 2010, below SHC's required quota of five starts. If Ms. Brooks had successfully enrolled and started more students during the months in question, she would have been paid bonuses for all of the Potential Bonus Students who had started those months. As such, SHC's bonus system was structured to maximize the ACs' enrollment of students. Because of the way Defendant Schools structured the bonus system, the single greatest factor that determined whether an AC would receive a bonus was the number of students the AC enrolled and started. All other factors were relatively inconsequential, including whether any given student completed the required number of credit hours.

70.     SHC paid Ms. Brooks numerous bonuses for meeting the enrollment-related requirements. Ms. Brooks' bonuses ranged from $300 to $1100 per student. The amount of the bonus Ms. Brooks received depended on two factors: (1) her conversion rate for the module in question—the higher the conversion rate, the larger the bonus, and (2) whether Ms. Brooks personally generated the potential student lead on her own, for which she was paid more than if she received it from another source, such as the call center.

71.     The bonuses that Ms. Brooks received for meeting the enrollment-related requirements were substantial. Often, the semi-monthly bonus payments

equaled or exceeded Ms. Brooks' base salary. For example, on her check from the pay period December 1 through December 15, 2010, Ms. Brooks' year-to-date wages were $31,618.50 (net of taxes and withholdings) while her year-to-date bonuses were $31,450.00.

72.     The DOE was scheduled to audit SHC's Orem campus, where Ms. Brooks worked as an AC, in approximately March 2011. Prior to the DOE's audit, Barbara Thomas, SHC's Chief Operations Officer, "coached" Ms. Brooks and the other ACs to provide acceptable responses to questions concerning SHC's enrollment practices. For example, Ms. Thomas made sure that the ACs were prepared to answer "No" to the question: "Are you pressured to enroll or start prospective students in any way?" Ms. Thomas worked closely with Barney and took her instructions directly from him.

73.     Example: 2009–2011, Orem/Provo, Utah, Campus. Relator Nannette Wride was hired on or about July 10, 2009, by David Sambrano, Dean of the Graduate School for SHC's Orem campus, as an AC and as an executive assistant to Mr. Sambrano.[22] Mr. Hafen told Ms. Wride that she would receive a bonus for each student that she enrolled in SHC's undergraduate-level programs who completed 36 credit hours.

---

[22] At the time she was hired, Ms. Wride was also a student at SHC, having enrolled on or about February 25, 2009, in SHC's respiratory therapy program.

74.     Ms. Wride carefully tracked the credit-hour progress of the students that she enrolled. After the first group of the students that Ms. Wride enrolled into SHC's undergraduate programs completed 36 credit hours in approximately summer 2010, Ms. Wride went to Mr. Hafen to request her bonuses. She received Completion Certificates from Mr. Hafen for all of the students that had completed the credit-hour requirement.

75.     Mr. Hafen later told Ms. Wride that she had earned bonuses for some of the Completion Certificates, but not all. She was directed to the Campus Director, Ken Plant, who explained that she was not eligible for bonuses on the other students because she had not met the required average number of starts.

76.     Ms. Wride did receive bonus payments when she met the enrollment-related requirements. Over the course of her employment with SHC, Ms. Wride received four or five bonus payments, each totaling from $1,200 to $4,000. Because Ms. Wride's base salary was approximately $33,000 per year when she started (which SHC later increased to $37,000 per year), the bonus payments she received were large relative to her base salary. Occasionally, the bonus payments exceeded Ms. Wride's base semi-monthly salary.[23]

---

[23] Ms. Wride is also aware of the bonuses offered by Mr. Hafen to ACs to motivate them to enroll students. Mr. Hafen was constantly trying to find prizes for his enrollment contests. These bonuses usually took the form of cash payments or expensive consumer electronics products,

77.    Additional examples of bonuses paid under the AC Bonus Plan to ACs at the CAD campuses include the following, which are representative and not exhaustive:[24]

- Example: 2008, Colorado Springs, Colorado, Campus. In September 2008, Defendant CAD paid the following ACs located in Colorado Springs, Colorado, the following bonuses under the AC Bonus Plan: Kylie Burwell $1,830, William Patee $1,400, and Tammy Allen $800. Other ACs were also paid bonuses at the campus during this time— these are just a few examples.

- Example: 2009, Colorado Springs, Colorado, Campus: In December 2009, Defendant CAD paid the following ACs located in Colorado Springs, Colorado, the following bonuses under the AC Bonus Plan: Kylie Burwell $1,300, Heather Heinbaugh $1,900, and Sherrie Maple $1,400. Other ACs were also paid bonuses at the campus during this time—these are just a few examples.

---

such as Ipods. On one occasion, Mr. Hafen raffled a big-screen television as the prize. ACs were only eligible to participate in the raffle if they attained certain enrollment objectives.

Mr. Hafen told the ACs not to tell anyone about these bonuses because he admitted that he could get in trouble for them.

[24] It is bedrock law that where a complaint covers multiple years and multiple locations, a relator may satisfy Rule 9(b) by pleading representative examples. *U.S. ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 355 (D. Mass. 2011) ("[W]here the relator alleges specific claims in one state or region, such pleadings can satisfy Rule 9(b) requirements by establishing a nationwide inference of fraud."); *U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 47 (D. Mass. 2001) (where the allegations "involve numerous transactions or transactions that occur over a long period of time," it is not necessary under Rule 9(b) to plead "specifics with regard to every instance of fraudulent conduct"). Nevertheless, this Court has requested that Relators provide additional examples of the violations of the Legal Requirements at issue in this case across all campuses over many years. While Relators can provide such additional examples in this version of the complaint because of their unique access to information at this stage of the litigation, the level of detail provided in this version of the complaint is neither required by the FCA nor by Rule 9(b) of the Federal Rules of Civil Procedure. In short, the level of detail contained in this version of the complaint should not used to judge the adequacy of future FCA complaints.

- Example: 2009, Ft. Collins, Colorado, Campus: On approximately December 20, 2009, Defendant CAD paid Maria Portales $2,800, Kristy McNear $3,500, Julianne Brashear $3,200, and Dustan Dailey $3,600 in bonuses under the AC Bonus Plan. They were ACs at the Ft. Collins campus. A month earlier, on November 20, 2009, Defendant CAD paid Maria Portales $2,800, Julianne Brashear $5,650, and Dustan Dailey $1,400 in bonuses under the AC Bonus Plan. Other ACs were also paid bonuses at the campus during this time—these are just a few examples.

- Example: 2010, Ft. Collins, Colorado, Campus. In 2010, Defendant CAD paid the following ACs located in Ft. Collins, Colorado, the following bonuses under the AC Bonus Plan for various months: Charles Kuchynka $4,300; Dustan Dailey $7,000, $2,100, $4,600; and Julie Anne Brashear $1,400. Other ACs were also paid bonuses at the campus during this time—these are just a few examples. In total, the Ft. Collins campus paid more than $135,000 in bonuses to admissions staff in 2010.

78.    Additional examples of bonuses paid under the AC Bonus Plan to ACs at the SHC campuses include the following, which are representative and not exhaustive:

- Example: 2009, Boise, Idaho, Campus: In December 2009, Defendant SHC paid the following ACs located in Boise, Idaho, the following bonuses under the AC Bonus Plan: Anthony Bridgeforth $2,000, Benjamin Everson $2,500, and Connie Haycock, $1,600. Other ACs were also paid bonuses at the campus during this time—these are just a few examples.

- Example: 2010, Ogden, Utah, Campus. In 2010, Defendant SHC paid the following ACs located in Ogden, Utah, the following bonuses under the AC Bonus Plan for various months: Micah Berger $3,300, Michael Duncombe $3,500, and Nikelle Farley $6,500. Other ACs were also paid bonuses at the campus during this time—these are just

a few examples. In total, the Ogden campus paid more than $120,000 in bonuses to admissions staff in 2010.

- Example: 2010, Salt Lake City/Murray, Utah, Campus. In 2010, Defendant SHC paid the following ACs located in Salt Lake City, Utah, the following bonuses under the AC Bonus Plan for various months: Eldon Weber $3,200, Tammy Stoner $3,800, and Easton Linde $2,700. Other ACs were also paid bonuses at the campus during this time—these are just a few examples. In total, the Salt Lake City campus paid more than $80,000 in bonuses to admissions staff in 2010.

- Example: 2010, Logan, Utah, Campus. In 2010, Defendant SHC paid the following ACs located in Logan, Utah, the following bonuses under the AC Bonus Plan for various months: Bracken Atkinson $2,800 and Hillary Kirschman $5,700. Other ACs were also paid bonuses at the campus during this time—these are just a few examples. In total, the Logan campus paid more than $64,000 in bonuses to admissions staff in 2010.

79.    Additional examples of bonuses paid under the AC Bonus Plan to ACs at the CAA campuses include the following, which are representative and not exhaustive:

- Example: 2009, Flagstaff, Arizona, Campus: In just one month (December 2009) under the AC Bonus Plan, Flagstaff AC Caleb Garcia was paid $12,200 by Defendant CAA. In requesting a raise in Mr. Garcia's base salary in July 2010, the Campus Director, Suzanne Scales, noted that "under the AC bonus plan, he made a lot more annually with the bonuses" than his base salary. Other Flagstaff employees were also paid significant bonuses under the AC Bonus Plan that month, including Jennifer Curtis ($1,500) and Michael Roberts ($600).

- Example: 2009, Phoenix, Arizona, Campus. In December 2009, Defendant CAA paid the following ACs located in Phoenix, Arizona,

the following bonuses under the AC Bonus Plan: Rebecca Soltis $4,200, Suzanne Stevenson $2,400, and Marlon Liddell $3,500. Other ACs were also paid bonuses at the campus during this time—these are just a few examples.

- Example: 2010, Phoenix, Arizona, Campus. In 2010, Defendant CAA paid the following ACs located in Phoenix, Arizona, the following bonuses under the AC Bonus Plan for various months: Leonard Jones $3,000 and Marlon Liddell $4,100. Other ACs were also paid bonuses at the campus during this time—these are just a few examples. In total, the Phoenix campus paid more than $38,000 in bonuses to admissions staff in 2010.

80.     Additional examples of bonuses paid under the AC Bonus Plan to ACs at the CCSD campuses include the following, which are representative and not exhaustive:

- Example: 2010, San Diego, California, Campus. In 2010, Defendant CCSD paid the following ACs located in San Diego, California, the following bonuses under the AC Bonus Plan for various months: Scott Ashdown $3,100 (April), $3,600 (May), $10,500 (October); Chastity Buchanan $2,300 (September), $8,000 (October), and Craig Hinson $5,400 (December). Other ACs were also paid bonuses at the campus during this time, including in 2009—these are just a few examples. In total, the San Diego campus paid more than $126,000 in bonuses to admissions staff in 2010.

81.     Relators have provided examples from across all brands of Defendant Schools for a representative period of time. Relators have many further examples that could be provided upon request.

82.     On information, Relators allege that Defendant Schools ceased paying bonuses under the AC Bonus Plan in approximately 2012 after revoking the

Procedure Directive setting forth that policy in July 2011. The payment of the bonuses continued because of the inherent lag time built into the program—bonuses were paid approximately eight to ten months after the students for whom bonuses were paid had started. Thus, even though ACs could earn no new bonuses after July 2011, they continued to be paid under the old program until approximately early 2012, which the ICB does not permit.

### c) Online Admissions Consultant Bonuses.

83.    On July 31, 2007, Carl Barney, on behalf of Defendant SHC, personally issued a Management Memo setting forth a bonus plan for Online ACs[25] located in Salt Lake City, Utah. Notably, unlike any other Procedure Directive or Management Memo setting forth employee compensation plans, Mr. Barney clearly emblazoned the Online AC Bonus Plan with the designation "Confidential" for internal purposes. (Online AC Bonus Plan, attached as Exhibit D hereto.)

84.    Unlike the AC Bonus Plans (and the FP Bonus Plans discussed below), the AC Online Bonus Program dropped all pretense of feigning compliance with any safe harbor.

---

[25] Defendant Schools refer to their online recruiters as "Enrollment Advisors" instead of Admission Consultants. However, for the sake of simplicity, Relators will refer to them as "Online ACs."

85.     Indeed, the Management Memo setting forth the Online AC Bonus Plan explained that "[t]he bonus plan is based on starts." (emphasis in original). The Online AC Bonus Plan noted that Online ACs could earn more than $30,000 annually under the plan.

86.     The Online AC Bonus Plan included a chart, with the explanatory title "Bonuses per Start," setting forth how the bonuses were calculated based directly on the number of enrollments.

**Bonuses per Start:**

| Full Program | | Bonus per Month |
|---|---|---|
| Average Starts* | Bonus | Cumulative |
| 5 | $100 | $500 |
| 6 | $110 | $660 |
| 7 | $120 | $840 |
| 8 | $125 | $1,000 |
| 9 | $140 | $1,260 |
| 10 | $150 | $1,500 |
| 11 | $160 | $1,760 |
| 12 | $175 | $2,100 |
| 13 | $195 | $2,500 |
| 14 | $200 | $2,800 |
| 15 | $205 | $3,075 |
| 16 | $210 | $3,360 |
| | $5 increments for every start over 13 | |

87.     The chart explained that "Average Starts" is the three-month average number of starts over the prior three months. As Hoby Gall, the Associate Director of Admissions over the online division explained in any email dated September 22, 2008, the Online AC Bonus Plan is really a "3 month average enrollment bonus."

88.     Bonuses paid under this Online AC Bonus Plan blatantly violated the ICB by tying bonuses directly to starts. Defendant SHC paid numerous substantial bonuses over many years to Online ACs under the Online AC Bonus Plan.

89.     The bonuses paid under the Online AC Bonus Plan were personally approved by Defendant Schools' controller, Les Marstella, or, later, by the Vice President and Director over the online division of SHC.

90.     Examples of bonuses paid under the Online AC Bonus Plans include:

- Example: February 2008. Jeana DeRoche and Ben Mayfield were paid $840 under the Online AC Bonus Plan, while Breyer Stoddard was paid $660 under the Plan. These bonuses were paid because the Online ACs had a certain "Starts/Avg." for the months of October, November, and December 2007.

- Example: October 2008. Jeana DeRoche and Ikwo Ibiam were both paid bonuses of $660 under the Online AC Bonus Plan. The bonuses were for achieving "6 Starts/Avg." according to the documentation. The document transmitting these bonus payments is designated "Confidential."

- Example: April 2009. Jeana DeRoche was paid $840, Ben Mayfield was paid $1,760, and Breyer Stoddard, Bill Summa, Kevin White, and Ikwo Ibiam were all paid $660 under the Online AC Bonus Plan.

These bonuses were paid because the Online ACs had a certain "Starts/Avg." for the prior three months.

91.     Large bonuses were paid to Online ACs under the Online AC Bonus Plan each and every month from at least February 2008 to April 2009, and, on information, actually began in late 2007 pursuant to the policy that went in effect in July 2007. The foregoing examples are not exhaustive.

### d)  Financial Planner Bonuses.

92.     Financial Planners are supposed to counsel prospective students regarding their financial aid options for paying for courses at Defendant Schools.

93.     However, based on a review of Defendant Schools' business practices compared to those of other colleges, Rohit Chopra, a former Special Advisor to the Secretary of Education, determined that FPs at Defendant Schools are "an integral part of the sales process," which is "quite different" than most other schools.

94.     Indeed, in Defendant Schools' admissions process, FPs play a "key role in closing enrollments" according to Mr. Chopra.

95.     The ICB, in addition to prohibiting bonuses for recruiters, also prohibits the payment of any "commission, bonus, or other incentive payment based directly or indirectly on success in securing . . . financial aid to any persons or entities engaged . . . in  making  decisions  regarding  the  award  of  student

financial assistance." 20 U.S.C. § 1094(a)(20) (banning incentive compensation for

securing financial aid); 34 C.F.R. § 668.14(b)(22)(i) (same).







105.   Representative examples of bonuses paid under the FP Bonus Plan to

FPs at the CAD campuses include the following:

- Example: 2009–2011, Ft. Collins, Colorado Campus. Andrea Orrendorfer, a Financial Planner at the Ft. Collins campus, received bonuses worth between $100 and $300 under the FP Bonus Plan for obtaining financial aid for prospective students when she worked for Defendant CAD.

- Example: 2010, Colorado Springs, Colorado, Campus. In 2010, Defendant CAD paid the following FPs located in Colorado Springs, Colorado, the following bonuses under the FP Bonus Plan for various months: Jason Dunn $2,000, Kerri Hustad $2,800, Kristy Mobley $6,800. Other FPs were also paid bonuses at the campus during this time—these are just a few examples. In total, the Colorado Springs campus paid more than $58,000 in bonuses to financial planners in 2010.

106.   Representative examples of bonuses paid under the FP Bonus Plan to

FPs at the SHC campuses include the following:

- Example: 2010, Boise, Idaho, Campus. In 2010, Defendant SHC paid the following FPs located in Boise, Idaho, the following bonuses under the FP Bonus Plan for various months: Steven Wargo $7,000, Connie Haycock $3,000, and Christine Moore $8,800. Other FPs were also paid bonuses at the campus during this time—these are just a few

examples. In total, the Boise campus paid more than $114,000 in bonuses to financial planners in 2010.

- Example: 2010, Ogden, Utah, Campus. In 2010, Defendant SHC paid the following FPs located in Ogden, Utah, the following bonuses under the FP Bonus Plan for various months: Troy Doman $2,000, Gary Eskelson $1,500, and William Moore $2,000. Other FPs were also paid bonuses at the campus during this time—these are just a few examples.

- Example: 2010, Salt Lake City/Murray, Utah, Campus. In 2010, Defendant SHC paid the following FPs located in Salt Lake City, Utah, the following bonuses under the FP Bonus Plan for various months: Carolina Hendren $2,000, Kelie Herrera $1,500, and Michael Peterson $800. Other FPs were also paid bonuses at the campus during this time—these are just a few examples.

- Example: 2010, Logan, Utah, Campus. In 2010, Defendant SHC paid the following FPs located in Logan, Utah, the following bonuses under the FP Bonus Plan for various months: Stacy Newman $1,600 and Tara Crane $373.

107.   Representative examples of bonuses paid under the FP Bonus Plan to FPs at the CAA campuses include the following:

- Example: 2010, Phoenix, Arizona, Campus. In 2010, Defendant CAA paid the following FPs located in Phoenix, Arizona, the following bonuses under the FP Bonus Plan for various months: Veronica James $1,000 and Suzanne Stevenson $1,900. Other FPs were also paid bonuses at the campus during this time—these are just a few examples. In total, the Phoenix campus paid more than $12,000 in bonuses to financial planners in 2010.

108.   Representative examples of bonuses paid under the FP Bonus Plan to FPs at the CCSD campuses include the following:

- Example: 2010, San Diego, California, Campus. In 2010, Defendant CCSD paid the following FPs located in San Diego, California, the following bonuses under the FP Bonus Plan for various months: Erin Bangs, $1,694 (February), $3,700 (October); Kory Henley $1,100 (May); and Leslie McDonough $1,700 (October). Other FPs were also paid bonuses at the campus during this time—these are just a few examples. In total, the Salt Lake City campus paid more than $60,000 in bonuses to financial planners in 2010.

109. Relators have provided examples from 2010 for all brands of Defendant Schools and can provide additional examples from later periods of time upon request.

110. On information, Relators allege that Defendant Schools ceased paying bonuses under the FP Bonus Plan in approximately 2012 after revoking the policy in July 2011.

### e)  Director of Admission Bonuses.

111. Directors of Admission ("DOAs") and Assistant Directors of Admission ("ADOAs") directly manage and supervise ACs and FPs and also engage in recruiting efforts with prospective students. 34 C.F.R. § 668.14(b)(22)(ii)(G) (2008).

112. From 2003 to 2011, Defendant Schools paid DOAs and ADOAs bonuses for their own recruiting activities under the same bonus plans as the ACs. DOAs and ADOAs could earn additional bonuses based on the enrollment

achievements of the ACs they supervised. (*E.g.*, 2004 Procedure Directive, Ex. B at 6.)

113.    Defendant Schools paid numerous bonuses that violated the ICB to their DOAs and ADOAs, including the following representative examples:

- Example: 2009, Multiple Campuses. In 2009, Defendant Schools paid the following DOAs the following bonuses: Jesse Hafen, DOA for the Orem/Provo campus, $30,780; Caleb Garcia, DOA for the Flagstaff campus, $25,100; and Kristy McNear, DOA for the Ft. Collins campus, $18,250. Other DOAs were paid other bonus amounts during this period as well—these are just representative examples.

- Example: 2010, Multiple Campuses. In 2010, Defendant Schools paid the following DOAs and ADOAs the following bonuses: Heather Heinbaugh, ADOA for the Colorado Springs campus, $63,400 (which was more than her base salary); Sharrie Maple, ADOA of the other Colorado Springs campus, $40,000; Vanessa Ocasio, ADOA of the San Diego campus, $27,800; Cristi Derrick, DOA for the Layton campus, $61,650 (more than her base salary); Caleb Garcia, DOA for the Flagstaff campus, $38,300; and Jesse Hafen, DOA for the Orem/Provo campus, $36,045. Other DOAs and ADOAs were paid other bonus amounts during this period as well—these are just representative examples.

### f)  Campus Director Bonuses.

114.    Campus Directors are the highest-ranking managers at each campus of Defendant Schools. Campus Directors manage all of the operations of their campuses, including all recruiting and financial aid activities. For larger campuses, Campus Directors directly manage and supervise Directors of Admission. In smaller campuses, the Campus Directors also serve as the Directors of Admission

and directly manage and supervise ACs and FPs. Campus Directors are also ultimately responsible for the recruitment and admission of students on their campuses.

115.   On April 15, 2008, Carl Barney announced a campus director bonus program through Management Memo 285. The bonus program allowed each campus director to select the measurements of campus performance upon which their bonuses would be based. Carl Barney revised the plan on January 4, 2010, and personally transmitted the revised plan in March 2010.

116.   The performance measurements upon which bonuses could be earned included the following enrollment-related categories: campus interview conversion (interview-to-start ratio), enrollment percentage, retention,[26] and upgrades. All four of these criteria are a direct or indirect measure of success in enrolling students, and the ICB prohibits the payment of any type of bonus relating to such measures.

117.   Before July 2011, the Incentive Compensation Regulations prohibited paying incentive compensation to managerial employees who directly supervise employees engaged in recruiting activities. 34 C.F.R. § 668.14(b)(22)(ii)(G) (2008). After July 2011, the Incentive Compensation Regulations prohibit the payment of incentive compensation to any "higher level employee with

---

[26] ████████████████████████████████████████████████████
████████████████████████████████████████████████

responsibility for recruitment or admission of students." 34 C.F.R. § 668.14(b)(22)(iii)(C)(2) (2011).

118. Campus Directors both directly supervise employees engaged in recruiting activities, including the DOAs and ADOAs, and they have overall responsibility for recruitment and admissions at their campuses. Nevertheless, Defendant Schools paid numerous Campus Directors bonuses for enrollment-related achievements after 2008. Defendant Schools continued to pay these bonuses even after the safe harbors were repealed and the Incentive Compensation Regulations were rewritten in July 2011.

119. Representative examples of bonuses paid under the Campus Director Bonus Plan for achievements relating to success enrolling students include the following:

- Example: 2009, Denver, Colorado, Campus. Defendant Schools paid Nathan Larson, the campus director for the Denver campus, a $2,000 bonuses for his campus achieving its goals for enrolling students in upgraded programs.

- Example: 2009, Logan, Utah, Campus. Defendant Schools paid their campus director, Sharla Lemon, a bonus of $1,000 because the Logan campus met its goals for keeping students enrolled in Defendant Schools' programs.

- Example: 2009, San Diego, California, Campus. Defendant Schools paid their campus director, David Parker, a bonus of $2,000 because the San Diego campus met its goals for keeping students enrolled in Defendant Schools' programs.

- Example: 2009, Flagstaff, Arizona, Campus. Defendant Schools paid their campus director, Suzanne Scales, a bonus of $1,000 because the Flagstaff campus met its goals for keeping students enrolled in Defendant Schools' programs.

- Example: 2011, Cheyenne, Wyoming, Campus. Defendant Schools paid Debbi Potts, the Campus Director for the Cheyenne, Wyoming, campus, bonuses under the Campus Director Bonus Plan for achieving success in the enrollment-related performance measures. In the fourth quarter of 2011, Ms. Potts was awarded a $1,000 for retention but missed her targets for interview conversion, upgrades, and enrollment percentage.

- Example: 2012, Cheyenne, Wyoming, Campus. In the first quarter of 2012, Ms. Potts was paid $1,000 for the Cheyenne campus achieving the interview conversion goal and she was paid $500 for the campus achieving the upgrades goal. Both performance measurements are a direct measure of success in enrolling students and violate the ICB.

### g) Post-Safe Harbor Repeal Violations: $60K Club.

120. When the safe harbors to the ICB were repealed in July 2011, Defendant Schools repealed their then-existing AC Bonus Plan and FP Bonus Plan. However, Defendant Schools did not give up in their attempts to pay incentive compensation to recruiters.

121. In approximately April 2014, Defendant Schools began offering a new incentive compensation plan to at least their Online ACs. The new Online AC Bonus Plan was referred to by Defendant Schools as the "$60K Club." Defendant Schools distributed a flyer about the $60K Club to their Online ACs explaining the incentive compensation program. ($60K Club Flyer, attached as Exhibit E hereto.)

122.   While Online ACs generally earned a base salary of approximately $38,000 at the time, they could become part of a "club" of Online ACs earning $60,000 per year—almost twice what the other Online ACs earned. The flyer identified the one and only requirement for getting into the $60K Club— enrollments. As the flyer explained in question-and-answer format: "What does it take to be part of the $60k club?"—"6-7 starts per mod."

123.   In an email to Online ACs located in Phoenix, Arizona,[27] their ADOA Sandra Pierre explained that "[t]o get into the $60K Club is easy, because ALL of you have started 6+ students!!!" She went on to explain that if the Online ACs could maintain their 6-start average, they would get a "spot" in the $60K Club.

124.   In another email on June 5, 2014, Ms. Pierre explained to the Online ACs under her supervision that "[m]embership to the 60K Club is easy!! 6 starts and you are golden!!! Let's start off in the club in the right foot!! Get those starts!!!!!"

125.   On June 20, 2014, Defendant Schools allowed Matt Weller, Amanda Smith, Rayna Williams, and Jason Schiffer into the $60k Club based on their average number of starts. In announcing to their peers that these employees would be paid substantially greater compensation based directly on starts, the ADOA, Ms.

---

[27] Although located in Phoenix, Arizona, Relators believe that the Online ACs were employed by the online division, which was historically operated by SHC.

Pierre, explained that to stay in the $60K Club, the new members would have to "get that 6 start minimum!!!"

126.   The $60K Club compensation violated the ICB in effect in 2014. The current version of the Incentive Compensation Regulations, which were in effect in 2014, specify that "[m]erit-based adjustments to employee compensation [are permissible] provided that such adjustments are not based *in any part*, directly or indirectly, upon success in securing enrollments or the award of financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (2014) (emphasis added). Under the $60K Club incentive compensation plan, the adjustments to the employees' compensation were based *solely* on success securing enrollments.

127.   The difference between the Online AC's base rate of pay and the $60,000 pay rate for achieving the enrollment goals is impermissible incentive compensation under the Incentive Compensation Regulations. 34 C.F.R. § 668.14(b)(22) (2014).

### B.   <u>Accreditation</u>

128.   As a condition to be eligible to participate in Title IV, HEA programs, all schools must "meet the requirements established by . . . accrediting agencies or associations." 20 U.S.C. § 1094(a)(21); 34 C.F.R. § 668.14(b)(23); *see also* 20 U.S.C. § 1002(b)(1) ("Accreditation Requirement").

129.   The accreditation process ensures that before a school receives Title IV funding, the school has effective educational programs and has met high standards of quality. The accrediting agencies, by rigorously investigating the schools and their educational programs and determining whether they meet the DOE's and the agencies' standards, help guarantee that the federal government, the DOE, and taxpayers are receiving a valuable educational product in exchange for the Title IV funding.

130. Defendant Schools' accrediting agency is the Accrediting Commission of Career Schools and Colleges ("ACCSC"). According to Defendant Schools, ACCSC is a "quasi-governmental body recognized by the United States Secretary of Education." Defendant Schools have explained that ACCSC's "quasi-governmental" status derives from the "oversight authority granted through its recognition by the United States Secretary of Education."

131.   While Defendant Schools are supposed to be in compliance with all accreditation standards at all times, since at least 2009, Defendant Schools have been violating various accreditation standards, and falsifying records relating to accreditation, at various campuses.

132.   Sadly, while Defendant Schools paid bonuses to trained recruiters to enroll ever greater numbers of students, instruction was never a priority for

Defendant Schools. According to an analysis of the finances of CAD and CEHE by Rohit Chopra, a former Special Advisor to the Secretary of Education, Defendant Schools generally spent less than 20 percent of each tuition dollar on instruction. Compared to other for-profit schools, the relative difference between expenditures on marketing/admissions and instruction is much greater at Defendant Schools.

### 1. Examples of Accreditation Violations and Falsification of Records Relating to Accreditation Compliance.

133.  Example: 2010-2011, Orem, Utah, Campus, Falsification of Records Relating to Faculty Qualifications. In the summer of 2010, Ms. Wride became the executive assistant to Dr. Stephen Babb, the Dean of Education at SHC's Orem Campus, and was asked to investigate each faculty member's qualifications, including education, work, and clinical experience, to ensure that each faculty member met the minimum accrediting standards of ACCSC.[28]

134.  Ms. Wride discovered that many faculty members at SHC's Orem campus did not have the required minimum qualifications, as established by the ACCSC, to teach the courses that SHC had allowed them to teach. For example, several faculty members lacked sufficient academic degrees and/or related

---

[28] In order to be recognized by the Secretary of Education as an accrediting agency, an agency must establish "sufficiently rigorous" "standards for accreditation" that include provisions for, among other areas, "faculty." 34 C.F.R. § 602.16(a).

practical work experience to meet the ACCSC accreditation standards for faculty members.

136.   For example, Ms. Wride discovered that Dr. Robert Roberts did not have the minimum number of years of related practical work experience that the ACCSC required him to have to be eligible to teach certain courses, including medical and radiological courses, in the Medical Specialties and Health Care Administration programs.

136.   Ms. Wride discovered the deficiencies in Dr. Roberts' background when she reviewed the information in SHC's "Faculty Personnel Report" for Dr. Roberts. SHC prepares such Faculty Personnel Reports for ACCSC to demonstrate that the faculty members meet the minimum accreditation standards. The Faculty Personnel Reports specifically state: "By submitting this report to ACCSC, both the school and the faculty member certify that the information contained herein, attached hereto, and maintained on file with the school is correct and that the faculty member's qualifications comply with the applicable Standards of Accreditation."

137.   Ms. Wride found mistaken, misleading, or untrue representations in Dr. Roberts' Faculty Personnel Report. Indeed, Ms. Wride contacted the businesses that Dr. Roberts claimed to serve as his required practical work

experience and found that Dr. Roberts had materially misrepresented the nature of his prior work experience.

138.   As a result, Dr. Roberts did not have the required minimum number of years of practical work experience in the relevant subject area, as required by the ACCSC's accrediting standards, for him to teach the courses that SHC assigned him to teach and that he was in fact teaching.

139.   Ms. Wride found similar problems with the claimed qualifications and credentials of numerous other faculty members at SHC's Orem campus. For example, through her investigation, Ms. Wride also discovered that Dr. Bryan Thayn did not have sufficient education and related practical work experience to meet the ACCSC accreditation standards for faculty members. In particular, Ms. Wride discovered that Dr. Thayn had never practiced as a chiropractor and had no related practical work experience and therefore did not have the minimum number of years of related practical work experience required by the ACCSC to teach the courses that SHC assigned him to teach and that he was in fact teaching.

140.   When Ms. Wride brought these deficiencies to the attention of Dr. Babb, he said he was already aware of them. Dr. Babb told Ms. Wride that when he previously brought the problems to the attention of SHC's upper management, he was nearly terminated for exposing the problems.

141.   Eventually, Dr. Babb went to Mr. Plant with the information Ms. Wride had collected. On information, Relators believe and allege that SHC retaliated against Dr. Babb for attempting to bring to light the fact that SHC had knowingly provided materially false Faculty Personnel Reports to ACCSC by reprimanding Dr. Babb, withholding bonuses he had earned, and sanctioning him with a three-day involuntary leave of absence.

142.   Shortly thereafter, Mr. Plant called Ms. Wride into his office and demanded that she stop investigating faculty qualifications and stop doing anything more with respect to faculty issues, even though Ms. Wride was specifically hired by Dr. Babb to track and document faculty qualifications and to ensure that SHC's faculty members complied with accrediting standards.

143.   Ms. Wride showed documentary proof of the results of her investigation to Mr. Plant during the meeting. In response, Mr. Plant told Ms. Wride to "leave it alone" and to "never look at it again."

144.   Concerned about the information she had learned, Ms. Wride instead reported the results of her investigation directly to Eric Juhlin, Defendant Schools' Chief Executive Officer, and Barbara Thomas, the Chief Operating Officer. Specifically, Ms. Wride showed the documentary proof establishing the faculty members' deficiencies to both Mr. Juhlin and Ms. Thomas and discussed in detail

each item with them. Even though Mr. Juhlin and Ms. Thomas assured Ms. Wride that they would address the issue, no corrective action was ever taken. Most, if not all, of the faculty members that Ms. Wride discovered had insufficient qualifications continued to teach courses at SHC that they were not eligible to teach pursuant to ACCSC accreditation standards.

145.   Additionally, SHC failed to correct any of its prior false representations to the ACCSC regarding the faculty members' qualifications.

146.   Instead, after Ms. Wride brought the materially erroneous information to the attention of Defendant Schools' most senior management, including specifically CEO Eric Juhlin and COO Barbara Thomas, SHC continued to submit the same false Faculty Personnel Reports to the ACCSC to maintain its accreditation.

147.   When Ms. Wride was responsible for preparing the Faculty Personnel Reports that SHC provided to the ACCSC, SHC management pressured Ms. Wride to provide false information on many of the reports.

148.   After Mr. Plant learned that Ms. Wride had reported the results of her investigation to Mr. Juhlin and Ms. Thomas, he stripped her of all responsibility and excluded her from day-to-day operations in retaliation. Ms. Wride believes that SHC did not want to risk firing her because of the information she had learned.

149.   ACCSC conducted an audit of SHC's Orem campus in approximately spring 2011. SHC's management forced Ms. Wride to "take the day off" to make sure that Ms. Wride did not have any contact with the auditors and, in particular, to prevent Ms. Wride from disclosing the results of her investigation about insufficient faculty qualifications to the auditors.

150.   In further retaliation for Ms. Wride's report to Mr. Juhlin and Ms. Thomas, Mr. Plant had Ms. Wride dropped from SHC's respiratory therapy program, in which she was then enrolled as a student. At the time, Ms. Wride only needed six additional classes to complete her bachelor's degree.

151.   When Ms. Wride contacted Ms. Thomas to complain of her treatment, Ms. Thomas agreed to reinstate Ms. Wride and to waive her tuition and fees if Ms. Wride agreed to be quiet about the faculty qualifications problems and to "just leave things alone."

152.   Ms. Wride resigned her employment with SHC on June 6, 2011, three days after she graduated and after she found a job as a respiratory therapist.

153.   Additional representative examples of the falsification of records relating to faculty qualifications include the following:

SHC/CEHE

- Example: 2013, Salt Lake City/Murray, Utah, Campus. In 2013, administrators at the Salt Lake City/Murray campus told students and ACCSC that Paul VanAssche, a professor with the required qualifications, was teaching a philosophy class, but then used a different teacher, without the required qualifications, to actually teach it. Nevertheless, the name of the instructor with the required qualifications was included on all records associated with the course, even though he never taught it.

CCSD/CEHE

- Example: February 2016,[29] San Marcos, California, Campus. Prior to a visit by an ACCSC accreditation team, Defendant Schools' "compliance team" told the then-registrar of the San Marcos campus, Misha Snow, to remove Completion Certificates showing specific bonuses paid to recruiters at the campus under the illegal bonus program (which is also a separate accreditation violation) so that the accreditation team did not see that the recruiters had been paid bonuses. As instructed by Defendant Schools' management, Ms. Snow removed a stack of certificates from the employee files of George Rivera, Myra Smith, and Kreshawn Freeman and "stashed" them in an office that the accreditors did not see.

- Example: February 2016, San Marcos, California, Campus. On February 11, 2016, an accreditor visited the San Marcos campus to, among other things, meet with instructors relating to accreditation issues. That morning, Jason Marks, the Dean of Education at the campus, ordered an instructor, Valerie Chau, who had been raising concerns about numerous policies and procedures at the campus relating to accreditation issues, including serious problems with curriculum and student attendance and grades, to leave the campus so that the accreditors would not meet her. To ensure that the accreditation team did not learn of Ms. Chau's existence, her name and photograph were taken off a bulletin board in one of the workrooms during the accreditation visit.

---

[29] Relators offer examples from 2016 to help demonstrate the plausibility of their claims, even though Relators are not pursuing claims relating to these violations.

- Example: February 2016, San Marcos, California. During an accreditation visit in February 2016, Defendant Schools assigned Roshelle Sovrieno to teach a course because she had the necessary qualifications to teach it. The Dean, Jason Marks, had previously assigned Wilson Saltos to teach the courses, but he did not have the required credentials. (While Mr. Saltos claimed to have the equivalent of a bachelor's degree from Ecuador, when the registrar, Misha Snow, had his degree evaluated by a third-party service that verifies international degrees, his degree was deemed the equivalent of a high-school diploma in the United States.) One of Defendant Schools' lead compliance managers, Ann Meiling, told Ms. Snow to hide the existence of Mr. Saltos from the accreditation team by putting him in a "suspension" status in the campus's computer system during the accreditation visit, which removed him from the official roster of instructors. But as soon as the accreditation team left the campus, Ms. Sovrieno was removed as the instructor of the course and replaced with Mr. Saltos.

154. Additional representative examples of the falsification of records relating to compliance with other accrediting standards include the following:

CAD/CEHE

- Example: approximately 2009, Denver, Colorado, Campus. Joshua Allen, who was an instructor and an associate dean at Defendant Schools' Denver campus, was involved in preparing for a five-year reaccreditation audit by CAD's accreditor, ACCSC. Because the Schools' student files were out of compliance with ACCSC standards, the Schools used students who were being paid from work-study funds to fabricate compliant student files. Mr. Allen observed several work-study students and assistants at a table with stacks of student files and blank forms. When he asked them what they were doing, they told him they were filling in the forms that were missing from the student files and putting them in the files.

- Example: approximately 2009, Denver, Colorado. When the ACCSC auditors were on the Denver campus to complete the audit, Mr. Allen

was tasked with providing the auditors with specific student files that they requested. After auditors asked for a specific file, but before Mr. Allen was permitted to provide the file to the auditors, he was required to take the requested file to another room where Defendant Schools' management, including Chief Operating Officer Barbara Thomas, were located. After Defendant Schools' senior management reviewed the file and realized it did not comply with ACCSC requirements because it was missing an important form containing key student information, Defendant Schools' Chief Operating Officer, Barbara Thomas, told Mr. Allen to complete the form, even though he had not verified the information with the student, and to put the form in the student's file before giving the file to the ACCSC auditor. Mr. Allen was later praised by Defendant Schools' senior management, including Ms. Thomas, for the "great job" he had done on the audit.

- Example: 2011-2013, Colorado Springs, Colorado, Campus. The Career Services Director, Jasmine Valencia, was in charge of compiling graduation and employment information for the campus for ACCSC reporting purposes. Even though ACCSC guidelines have strict requirements for reporting a self-employed graduate as "employed in field"—including a statement from the graduate that he or she is actually generating income in the field—Ms. Valencia reported graduates as self-employed without the required information. Even though it was contrary to ACCSC standards, she reported it that way because she was instructed to do so by superiors.

- Example: 2012, Cheyenne, Wyoming, Campus. Before an ACCSC visit to the Wyoming campus in 2012, Defendant Schools' Chief Operating Officer, Barbara Thomas, told employees to hide documents and the existence of the bookroom from ACCSC representatives. In particular, Ms. Thomas told the employees to hide brochures for a "free" pre-college program that the School used to recruit students. The "free" program violated accreditation standards (ACCSC Standards, Section IV, A.11), which prohibit using such inducements to obtain enrollments.

155. Additional representative examples of deliberate violations of accrediting standards include the following:

CAD/CEHE

- Example: April 2009-August 2010, Colorado Springs, Colorado, Campus. At Defendant Schools' Colorado Springs campus between April 2009 and August 2010, the Schools had recent graduates of the Schools teach classes. Those recent graduates could not have had the requisite years of practical experience required to teach those classes by virtue of the fact they had just graduated in the fields they were teaching.

- Example: 2009, Denver, Colorado, Campus. In approximately November 2009, when Joshua Allen was hired as an instructor at Defendant Schools' Denver campus and assigned to teach Anatomy, Physiology, and Medical Terminology, he was, according to his own admission, "not at all qualified to teach these classes."

- Example: 2013, Cheyenne, Wyoming, Campus. Instructor John Heller was allowed to teach several accounting courses even though he admitted to another instructor, Liz Duff, that he did not have the correct degree to teach the classes.

CCSD/CEHE

- Example: 2013, San Marcos, California, Campus. While the Dean of Education, Mr. Marks, had hired an instructor with the required education to teach the math courses at the campus, he instead assigned his friend, Gary Naylor, to teach math classes. Mr. Naylor, who has a degree in history, does not have the required education to teach such courses.

SHC/CEHE

- Example: 2013, Salt Lake City/Murray, Utah, Campus. In 2013, at the Salt Lake City/Murray campus, Defendant Schools allowed

instructors without the required years of experience to teach medical coding and billing courses.

- Example: late 2013, Salt Lake City/Murray, Utah Campus. In approximately late 2013, the Salt Lake City campus allowed an instructor without a background in the law to teach a business law course.

### C.   Accurate Recordkeeping Relating to Refunds: Grade and Attendance Records.

156.   Schools participating in Title IV, HEA programs are required to keep accurate records relating to their administration of Title IV funding, including accurate records relating to student attendance and grades.

157.   Regulations specify that all schools must keep accurate records at all times, including records relating to a student's eligibility to receive Title IV funding and any refunds the school must remit to the DOE based on a student's ineligibility. 34 C.F.R. § 668.24(c)(iii)–(iv).

158.   If a student enrolls at a school but fails to attend class, the school is obligated to refund any Title IV funding received for that student to the DOE within a specified period of time. 34 C.F.R. § 668.21(a), (c); 20 U.S.C. § 1091b.

159.   Similarly, if a student enrolls and attends some classes but then subsequently stops attending classes, the school is obligated to calculate the amount of Title IV funding the student earned and to refund any Title IV funding the school received in excess of the amount earned to the DOE. 34 C.F.R.

§ 668.22(a)(1) (Schools are obligated to "determine the amount of title IV grant or loan assistance that the student earned as of the student's withdrawal date."); 34 C.F.R. § 668.22(a)(4) (The "difference between these amounts must be returned to the title IV programs."); *see also* 20 U.S.C. § 1091b; 34 C.F.R. §§ 668.22(b), (g), (i).

160.   A school's attendance records are used to determine the student's withdrawal date, which in turn determines how much money the school must refund to the DOE. 34 C.F.R. § 668.22(b); 34 C.F.R. § 668.22(a)(2)(i)(A).[30]

161.   Because a student's withdrawal date is determined from the school's attendance records and because the determination of the withdrawal date directly affects how much money a school must refund to the DOE following a withdrawal, it is important that the school accurately record and report student attendance so that the correct refund amount is calculated. However, because schools may retain

---

[30] A school is "required to take attendance if" either an "outside entity (such as the institution's accrediting agency or a State agency) has a requirement that the institution take attendance" or "[t]he institution itself has a requirement that its instructors take attendance." 34 C.F.R. § 668.22(b)(3)(i)(A), (B). ACCSC's accrediting standards require accredited schools, including Defendant Schools, to create, publish, and enforce attendance policies that "must promote sufficient levels of student attendance such that the required knowledge, skills, and competencies can be reasonably achieved." (*See generally* ACCSC "Standards of Accreditation," Ch.2, Sec. VII.) Indeed, Defendant Schools' written policies also require the taking of attendance. (*See, e.g.,* Defendant Schools' Combined Course Catalog 2012 at 78.)

more money if the withdrawal date is postponed, schools have a strong financial incentive to misreport the attendance of students who withdraw.[31]

162.   Schools participating in Title IV, HEA programs must also create and enforce reasonable standards of academic performance. 34 C.F.R. § 668.34(a) ("An institution must establish a reasonable satisfactory academic progress policy for determining whether an otherwise eligible student is making satisfactory academic progress in his or her educational program and may receive assistance under the title IV, HEA programs."); 20 U.S.C. § 1091(a)(2) (requiring students to make satisfactory progress); 20 U.S.C. § 1091(c) (defining satisfactory academic progress); 34 C.F.R. § 668.14(b)(24); 34 C.F.R. § 668.16(e)(2)(i).[32]

---

[31] By reporting a student as having attended classes when he or she did not, Defendant Schools either (i) delayed the applicable withdrawal date, 34 C.F.R. §§ 668.22(b)(1) ("[T]he student's withdrawal date is the last date of academic attendance as determined by the institution from its attendance records."), thereby fraudulently inflating the amount of Title IV funds the student appeared to have earned and lowering the amount Defendant Schools were obligated to return to the DOE, or (ii) completely avoided reporting a student as having withdrawn (i.e., having ceased attending classes), thereby fraudulently avoiding any obligation to return unearned Title IV funds to the DOE. By recording students as having attended classes that they did not attend, Defendant Schools falsely represented that the students had earned more Title IV funding than they actually had earned, even though Defendant Schools were legally obligated to refund the unearned funds to the DOE.

[32] Such a policy must include "the grade point average (GPA) that a student must achieve at each evaluation" in order to remain eligible to receive Title IV funding. 34 C.F.R. § 668.34(a)(4)(i). Furthermore, ACCSC must require that all schools that it accredits establish standards regarding "[s]uccess with respect to student achievement," 34 C.F.R. § 602.16(a)(1)(i); 20 U.S.C. § 1099b(a)(5), and Defendant Schools must follow those standards to be eligible to receive Title IV funding, 34 C.F.R. § 668.14(b)(23). Indeed, the ACCSC's Standards of Accreditation include such requirements. (*See generally* ACCSC "Standards of Accreditation," Ch. 2, Sec. VII.)

163.   As with the attendance-tracking requirement, it is required that schools establish and enforce reasonable academic performance standards and to actually and genuinely grade student performance based on reasonable standards. However, since schools lose revenue when a student's Title IV funding eligibility is suspended due to poor grades, schools have a strong financial incentive to misrepresent students' academic performance to keep them eligible to receive Title IV funding.

### 2.    Examples of Violations of the Recordkeeping Requirements Relating to Grades and Attendance.

164.   On information, Relators allege that as a result of Defendant Schools' management threatening the employment of employees at various campuses for not maintaining satisfactory retention rates, Deans and other management officials will alter grades, without the knowledge of the instructors who originally gave them, in order to keep students from having issues with academic progress requirements.

165.   Likewise, the intense pressure by Defendant Schools' management to appear to have students regularly attending class, so the Schools can continue earning Title IV funding for them, has led to rampant falsification of attendance records.

166.   The enrollment and retention goals and the intense pressure on Deans to maintain enrollment by any means necessary are communicated during monthly calls between Defendant Schools' senior management and the Deans of all campuses. Defendant Schools' COO would often lead these calls when she worked for the Schools. During these calls, Ms. Thomas would call out specific Deans whose enrollment numbers were not high enough to satisfy Defendant Schools' management. These pressures, as well as overt directives, have resulted in a practice of Deans and other campus-level management changing student grades in order to keep students enrolled and out of trouble with academic progress requirements.

167.   Representative examples of Deans, instructors, and others either altering student grades or falsifying student grade records by giving students passing grades they did not earn include the following:

CAD/CEHE

- Example: 2009-2013, Denver, Colorado, Campus. Joshua Allen, a faculty member and dean at Defendant Schools' Denver campus from November 2009 to October 2013, was pressured by his superiors to pass students who had not met his course requirements. A dean named Barbara Snyder told Mr. Allen that "we all do it." Referring to the students, Ms. Snyder told Mr. Allen to "get 'em out of your hair" and "pass 'em along." Because of the pressure, the overt threats of termination, and the advice of Defendant Schools' management, Mr. Allen set up his courses so that if a student showed up to class, they

passed, even though he thought it was shameful to pass students along like this.

- Example: 2011, Denver, Colorado, Campus. Jean Lesmeister gave a student (J.L.[33]) an F in her Psychology 299 course because the student failed to do any of the required work. After Ms. Lesmeister submitted her grades using the Schools' student information management system (then called Diamond D), Kacey Jechura, the Director of Student Services, attempted to persuade Ms. Lesmeister to give the student a passing grade so he would stay enrolled. When Ms. Lesmeister refused, Ms. Jechura or her assistant logged into Diamond D, the computer system used to track grades, and changed the grade from an F to an A-. Based on screenshots taken by Ms. Lesmeister, the change occurred sometime between July 20 and July 25, 2011.

- Example: approximately 2011, Cheyenne, Wyoming, Campus. The Dean of Education had dropped a student (T.S.) from the school because she had failed too many courses and was not making satisfactory academic progress under the Schools' policies and the applicable regulations. Defendant Schools' CEO, Eric Juhlin, called the Campus Director, Debbi Potts, and the Dean of Education, Linda Carter, and insisted they do whatever it took to get the student re-enrolled. He put tremendous pressure on Ms. Potts and Ms. Carter to get the student re-enrolled. *Ms. Potts understood Mr. Juhlin to be asking them to falsify the student's grades* because that was the only way the student could stay enrolled at the School.

- Example: approximately 2011, Ft. Collins, Colorado, Campus. Ann Scott, who was an instructor at Defendant Schools' Fort Collins campus from January 2008 to October 2011, reported that the Dean of Education told Ms. Scott that one of the students in Ms. Scott's Microbiology class needed to pass Ms. Scott's class and had already failed the class twice. Ms. Scott told the Dean of Students that she would give the student the same test as every other student and that she would tutor him. Even with all of the extra help and support, the student failed the test. Incredibly, the Dean of Education told Ms.

---

[33] For the privacy of the students involved, full names will not be used in this Complaint.

Scott to give the student another test that was easier, but Ms. Scott refused to do that in fairness to the other students. The Dean responded that "it was out of Ms. Scott's hands" and gave the student another test, which the student passed easily. Defendant Schools reported that the student had passed the class based on the substitute test. Ms. Scott reported a "great deal of pressure" from the Dean of Education to pass students to maintain their eligibility for federal financial aid.

- Example: 2013, Cheyenne, Wyoming, Campus. In 2013, Liz Duff was terminated as instructor of several medical courses because she refused to give passing grades to students who did not earn them. She was pressured to pass more students by "dumbing down" her courses. When she did not comply, she was terminated. As explained above, these practices have led many other instructors to pass every student, regardless of whether they earned a passing grade.

SHC/CEHE

- Example: 2010, Orem/Provo, Utah, Campus. In August 2010, the registrar, Mr. Collier, discovered that instructor Karen Farley had been using a grading scale that ensured all students received a "passing" grade even when their actual scores showed them failing. As Mr. Collier concluded, Ms. Farley's use of the "unacceptable" grade scale allowed "[s]tudents who should have been received a failing grade [to] have otherwise received a passing grade in the class." As he explained, "[b]y doing so, the student(s) has/have been charged for the course and possibly additional financial aid has been collected where otherwise the student would have been ineligible for the funding." *Mr. Collier recognized that what the instructor was doing was "manipulating data in order to collect additional funding from the government."*

- Example: 2010, Orem/Provo, Utah, Campus. In June 2010, instructor Bryan Messenger gave a student (T.N.) a passing grade in a LBT 280 class (Medical Laboratory Processes) because the professor gave her 50% credit for a paper that she never actually completed, as verified by the registrar of the campus.

- Example: 2010, Orem/Provo, Utah, Campus. In July 2010, instructor Jamie Mittelman gave two students (J.H. and K.J.) passing grades in a MED 106 class even though the students had excessive absences and had only earned 41% in the class according to the instructor's own grade book.

- Example: 2010, Orem/Provo, Utah, Campus. In February 2010, instructor Catherine Smith gave grades to numerous students for an externship that none of the students actually completed.

- Example: 2010, Orem/Provo, Utah, Campus. In July 2010, Instructor Shane Bradford submitted a grade change form for a grade that another instructor, Bryan Thayn, had given to the student (J.V.). The grade change form indicated that the "reason" for the grade change was that a "death in the family" had resulted in "almost no attendance." However, the original attendance records for the class indicated that the student had perfect attendance.

- Example: approximately 2010, Orem/Provo, Utah, Campus. The Orem campus registrar, Austin Collier, was directed to change a student's grade from a failing grade ("F") to a passing grade by the Director of the Orem campus's Financial Aid Office, Mary Jo Barratt, *so that the School could "order more money [from the DOE] for the student."*

- Example: 2010, Orem/Provo, Utah, Campus. An instructor, Bryan Thayn, attempted to change a student's grade two years after the grade was first reported *specifically so that the student could be eligible for Title IV funding*.

- Example: 2010, Orem/Provo, Utah, Campus. A professor submitted a grade change form for a student—from a D to a C+ —for a class the student (M.B.) had not yet taken and that was scheduled to begin in the future.  This grade change was submitted for the same student, described below, who had recently given birth and was unable to attend classes because of her distance from the campus.

- Example: 2012, Salt Lake City/Murray, Utah, Campus. In 2012, an instructor in the business school at the Salt Lake City, Utah, campus

regularly "rubber stamped" perfect grades (100%) for all of his students, regardless of actual performance. Such activity should have been discovered and the instructor should have been severely disciplined for such activity, but Defendant Schools' management instead turned a blind eye to it.

CCSD/CEHE

- Example: approximately 2013, San Marcos, California, Campus. In approximately 2013, Krista Coleman, an adjunct professor at the San Marcos campus, was discussing the need to make late grade changes (based on makeup work) for students that initially failed her class with the registrar of the campus, Misha Snow. Ms. Snow informed Ms. Coleman that the grade changes did not need to be made because the Dean and Associate Dean had already gone into the system and changed the grades, without consulting or notifying Ms. Coleman. (The Deans were unaware of the makeup work or the grades the students had actually earned.) Ms. Coleman suspects that the Deans' grade alteration activities occurred over a long period of time and for many students because she would frequently see students she had previously failed in more advanced courses the very next module.

168.    Representative examples of instructors falsifying attendance records include the following:

CAD/CEHE

- Example: 2009–2013, Denver, Colorado, Campus. Joshua Allen, who was a faculty member and an Associate Dean at Defendant Schools' Denver campus from November 2009 to October 2013, has explained that when he worked for Defendant Schools, he attended "'Last Day Attended' meetings in which [the deans] reached out to students who weren't showing up and encouraged them to log on to their student account so [Defendant Schools] wouldn't have to count them as 'dropped.'" *As Mr. Allen explained in sworn testimony, it was his "most important duty" to encourage students to appear to be attending classes by logging into their accounts because Defendant*

> Schools *"needed the students to have 'attendance' so [they] wouldn't have to drop them."*

SHC/CEHE

- Example: 2009, Orem/Provo, Utah, Campus. In November and December 2009, instructor Bryan Thayn filled out an attendance sheet for a student's (S.W.) externship during the first week of a four-week module showing that the student had perfect attendance during the entire four-week class. It appears Mr. Thayn also gave the student a passing grade for the externship during the first week.

- Example: 2010, Orem/Provo, Utah, Campus. In July 2010, instructor Jamie Mittelman recorded in the official school records that a student (M.B.) had perfect attendance in her MED 106 class—Vital Signs and Emergencies—even though the student had given birth during the module in a different part of the state and had not been to the campus since that time.

- Example: 2010, Orem/Provo, Utah, Campus. In June 2010, instructor Bryan Messenger gave a student (T.N.) an 84% attendance report in a LBT 280 class even though the student failed to attend approximately half of the classes.

- Example: 2010, Orem/Provo, Utah, Campus. In August 2010, instructor Rob Roberts was found to have been marking students present in class who had emailed the registrar, Austin Collier, to inform him that they would not be in attendance due to various scheduling conflicts. According to emails given to Relator Wride by Mr. Collier, instructor Roberts was "incorrectly report[ing] attendance," including "record[ing] student attendance when the student was actually not in the building or completing a documented assignment in replacement of attendance," because of the instructor's "drive to qualify for bonus dollars." After investigating the situation and asking for documentation from the instructor concerning his alleged excuse, Mr. Collier concluded that "the instructor is marking students present in class intentionally when they are not in class."

- Example: 2013–2014, Online Program (Phoenix-based call center). In 2013 and 2014, several Online ACs, including Rayna Williams, Amber Leigh, and Stephanie Smith, reported that other Online ACs in the Phoenix call center would call students they had enrolled, who were not doing the work necessary to stay enrolled, to get them to login to the online learning program because attendance is determined by the students logging in. ACs would pressure students to login to the program so that they would continue to stay enrolled in the courses, even if the students were not actually doing any work.

CCSD/CEHE

- Example: approximately 2013, San Marcos, California, Campus. Krista Coleman, an adjunct professor at the San Marcos campus, was instructed by the Associate Dean of Medical Specialties to deal with students that failed to attend a hybrid class (partially online and partially in class) by "at least getting them to sign in on their computers to keep their attendance active."

**D.     90/10 Rule.**

169.   In order to be eligible to receive Title IV funding, schools must not "derive less than ten percent of [their] funding from sources other than [Title IV] funds." 20 U.S.C. § 1094(a)(24) (referred to hereafter as the ("90/10 Rule")).

170.   The Department of Education's regulations further reiterate that schools must comply with the 90/10 Rule in order to be eligible to receive Title IV funding and that schools must expressly agree to abide by the 90/10 Rule in PPAs. 34 C.F.R. § 668.14(a) & (b)(16).

171.   Additionally, the schools must report their calculations under the 90/10 Rule in their annual financial audits. 34 C.F.R. § 668.23(d)(3).

172.   The relevant statutes and regulations specify exactly how schools must compute their revenues for the purpose of calculating compliance with the 90/10 Rule. 20 U.S.C. § 1094(d); see *also* Appendix C to Subpart B of Part 668 of Title 34 of the Code of Federal Regulations—90/10 Revenue Calculation.

173.   While this Court has (perhaps unintentionally) suggested that a complaint must allege that a school derived less than ten percent of its revenue from non-Title IV funds for two consecutive years to state a claim, that is incorrect and would in fact reward schools for providing misleading information about their 90/10 Rule compliance year in and year out and for failing to maintain accurate records relating to compliance.

174.   Indeed, as the Fifth Circuit Court of Appeals explained in upholding a sentence for just such a scheme, a defendant that "continuously misrepresent[s] its 90/10 Rule compliance to the DOE by constructing a fraudulent scheme in order to mischaracterize the actual portion of funds each of its campuses received as FSA versus non-FSA program funds" violates the 90/10 Rule and numerous other requirements of the PPAs, Title IV, and implementing regulations. *United States v. Sheets*, 814 F.3d 256, 258 (5th Cir. 2016).

175.   Furthermore, the two-year provision only applies to schools that were otherwise eligible when they violated the 90/10 Rule.

176.   By contrast, "[i]f the Secretary designates an institution or any of its educational programs or locations as eligible on the basis of inaccurate information or documentation, the Secretary's designation is void from the date the Secretary made the designation, and the institution or program or location, as applicable, never qualified as eligible." 34 C.F.R. § 600.40(c)(1).

177.   "The [90/10] rule's enforcement [i]s also retroactive, meaning that when the DOE ma[kes] a final assessment of a school's noncompliance with the rule, with limited exceptions, the school [has] to pay back any Title IV funds it received during any year it was ineligible." *Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 103 (1st Cir. 2015).

178.   It is not true that the 90/10 Rule only prevents schools from being out of compliance for two straight years. (ECF 417 at 43.) The cited regulation actually provides that an institution that violates the 90-10 Rule is placed on automatic provisional certification, itself a form of discipline, which terminates if (1) the school's PPA expires during its provisional certification, 34 C.F.R. § 668.28(c)(2)(ii);[34] (2) the Secretary of the DOE determines that the school cannot

---

[34] Since, as alleged herein, the Defendant Schools' various PPAs expired at various times during periods of time that the Schools were falsifying records relating to the 90/10 Rule, the two-consecutive-year requirement is not the sole mechanism by which the Defendant Schools could have lost their eligibility based on 90/10 Rule violations. Moreover, had the DOE known the Defendant Schools had violated the 90/10 Rule, the Secretary could have exercised its authority

meet its PPA obligations, 34 C.F.R. § 668.28(c)(2); 34 C.F.R. § 668.13(d)(1); *or* (3) it violates the 90/10 Rule for a second consecutive year.

179.   Defendants understand the importance of complying with the 90/10 Rule. Defendants' former Chief Operating Officer, Barbara Thomas, emphasized the importance of complying with the 90/10 Rule and the consequences of failing to do so to Campus Directors. Specifically, she told them that Defendant Carl Barney had previously owned a for-profit college in San Jose, California, that was closed for failing to comply with the 90/10 Rule.

180.   Defendant Schools track their compliance with the 90/10 Rule on a continual basis and provide periodic reports to key management personnel about their current ratio. A major responsibility of Defendant Schools' various business managers is tracking the purported ten percent part—that is, tracking the amount of supposed non-Title IV funds received by the Schools.

181.   Defendant Schools circulated a "key results" report to all upper-level management on a monthly basis, including to the Campus Directors. This report included each campus's current 90/10 ratio, which the COO would carefully watch each month. Whenever any campus got near the threshold, Ms. Thomas would yell

---

under the law to determine whether the Schools could comply with the 90/10 Rule or other portions of the PPAs. However, because the Schools falsified records and thereby prevented the DOE from learning of its noncompliance with the 90/10 Rule, the DOE was prevented from exercising its authority.

at the Campus Director during their monthly telephone conferences. Ms. Thomas specifically told the Campus Directors that Carl Barney is "watching" the 90/10 number very closely during these monthly conference calls.

182.   Indeed, Defendant Schools' management places intense pressure on lower-level managers to show compliance with the 90/10 Rule. Defendant Schools' business manager for the Denver campus, who is in charge of making sure the School has sufficient non-Title IV revenues, will "cry" when the School is on the verge of not complying 90/10 Rule.

183.   Based on the information available, Relators believe and allege that the Defendant Schools have struggled to comply with the 90/10 Rule year in and year out since the early 2000s.

184.   These pressures have resulted in Defendant Schools taking various actions to show they are complying with the 90/10 Rule, some of which, as detailed below, violate the Defendant Schools' PPAs, as well as statutes and regulations requiring that the Schools maintain accurate records.

      **1.**    **EduPlan Provides Context for Relators' Claims—It Demonstrates that Defendant Schools Were Aware of the 90/10 Rule, Focused on Showing Compliance, and Continuously on the Verge of Noncompliance.**

185.   Around 2002, Defendant Schools began offering private loans to their students, which they called EduPlan. The primary purpose of this loan program

was to generate cash receipts from students in order to show compliance with the 90/10 Rule so that they could continue to participate in Title IV, HEA programs. Defendant Schools do this by pricing their programs beyond the average federal award, thereby creating what Defendant Schools call a "gap."[35] Defendant Schools market EduPlan as a "gap funding" loan.

186.   However, as explained by Mr. Chopra, a former high-ranking official with the Consumer Financial Protection Bureau and former Special Advisor to the Secretary of Education, EduPlan has a "number of features that deviated from market norms." All of these "significant deviations all had one common theme": they "all accelerate cash collections."

187.   Moreover, the same manager who had responsibility for approving in-school repayment rates under EduPlan also had responsibility for monitoring the Defendant Schools' compliance with the 90/10 Rule, an arrangement a former regulator found "very weird."

188.   EduPlan was not offered by Defendant Schools for traditional lending reasons given that by Defendant Schools' own estimates, a large portion of their

---

[35] From 2006 to the present, Defendant Schools have often had years where their profit margins were near or exceeded 20 percent, which is high compared to industry averages. Additionally, Defendant Schools often spent less than 20 percent of their revenues on instruction and education, with far greater expenditures on recruitment and advertising. It appears that Defendant Schools priced their programs to create the so-called gap for their average student, which allowed them to enroll the student in EduPlan and helped comply with the 90/10 Rule.

"borrowers" default on their debt in a relatively short period of time. For example, by CEHE's own corporate estimates, as stated in a 2013 internal write-off report, Defendant Schools projected that 40 percent of the balances would be uncollectible after just one year. In some years, the rate was greater than 60 percent.

189. An analysis by a former Special Advisor to the Secretary of Education found "very high default rates" and "exceptionally high" rates of default using an "extremely conservative definition" of default. As he concluded, given the financial performance of EduPlan, if it had been offered for traditional lending purposes, it would have long ago folded and been put out of business.

190. The former Special Advisor to the Secretary of Education, Rohit Chopra, concluded that Defendant Schools' "motivations" for offering a loan plan with "abysmal" performance was to try to comply with the 90/10 Rule. As he explained, it was "clear" from "the policies and procedures manual, as well as the sworn testimony" of CEHE officials, that there was "a fixation on 90/10."

191. All of the deviations between EduPlan and traditional loan programs came down to one factor—"maximizing quick collections and getting as much cash as early as possible, which would allow the business model of enrolling as many students dependent on federal financial aid possible" under the 90/10 Rule.

192.    Although it seems counterintuitive for Defendant Schools to care only about short-term cash receipts, Defendant Schools do not actually extend any real credit to the students.[36] As a former Special Advisor to the Secretary of Education concluded, "[t]here is nothing -- there is no economic harm to the company if the borrower defaults. When you default on a private lender, a private loan that's offered by Sallie Mae or Wells Fargo, they're going to get hurt. But when you're defaulting on a loan that isn't actually sending real cash, there's no money that they're losing." This led Mr. Chopra to conclude that "[i]f the loans defaulted, they didn't really lose any money."

193.    Indeed, Mr. Chopra explained that since Defendant Schools are "very financially strong, profitable, [and are] making good money, the only reason it seems to offer this type of program is to make sure that short-term profitability is not sacrificed," i.e., so they can try to comply with the 90/10 Rule. EduPlan "allow[ed] high short-term profitability to continue year after year" to comply with the 90/10 Rule, "even though borrowers wouldn't be able to repay it" ultimately.

---

[36] Additionally, Defendant Schools have very little marginal expense—that is, they expend very little to educate one more student. According to Barney in an email dated April 21, 2012, the Defendant Schools' marginal profit is 65%. In other words, it costs Defendant Schools very little to educate a few more students but yields an enormous return on that investment. This explains why it makes tremendous economic sense for the Schools to extend "loans" to students even though they knew most would default: because those loans did not really cover actual out-of-pocket expenses, a student's subsequent default did not result in the Schools losing any money; however, the payments on those loans, even if they were never ultimately repaid in full, allowed the Schools to show a better rate for purposes of the 90/10 Rule.

194.   The Colorado Attorney General's office has brought suit against Defendant Schools over EduPlan. A trial was held in the fall of 2017 relating to this and many other issues.

195.   Relators provide this information about EduPlan as context for their own claims relating to Defendant Schools' falsification of records relating to the 90/10 Rule and to further demonstrate the plausibility of their claims. The Court has questioned whether there is any evidence to suggest that Defendant Schools had any incentive or motive to falsify records relating to the 90/10 Rule. This context demonstrates they did—acutely so. These allegations further demonstrate scienter and materiality for Relators' own 90/10 Rule claims—Defendant Schools were well aware of the 90/10 Rule, its importance, and the consequences for failing to adhere to it.

### 2.    Violations of the 90/10 Rule

196.   Example: 2009-2012, Cheyenne, Wyoming, Campus. Since at least 2012, though likely for far longer for reasons identified below, Defendant Schools have used their revenues from student textbooks, campus bookstores, and other non-educational sources of revenue to inflate their revenue from non-governmental sources for 90/10 Rule purposes.

197.   The relevant statute and regulations specify precisely how schools must count various forms of revenue for 90/10 Rule purposes. First and foremost, to count in the ten percent category, revenue must be educationally related. If the revenue is not from tuition and fees, then the revenue must be related to activity that is "necessary for the education and training of the institution's students." 20 U.S.C. § 1094(d)(1)(B). For example, a school cannot count revenues from an on-site cafeteria or other non-educationally related activity towards the 90/10 Rule.

198.   The relevant statute also dictates precisely how schools are to treat "amount[s] charged for books, supplies, and equipment" as part of their 90/10 Rule calculations, requiring schools to exclude such revenues from their calculations. 20 U.S.C. § 1094(d)(1)(F)(v). Defendant Schools do not include costs of textbooks as part of their tuition and fees—instead, they specifically charge for any textbooks that students fail to return and count that separate revenue for 90/10 Rule purposes. To the extent Schools separately charge for textbooks, that revenue cannot be counted towards the ten percent category. *Id.*

199.   At the Cheyenne, Wyoming, campus from January 2009 to July 2012, the business officer for the campus was not trained to, and did not, separately account for revenues from various sources. Instead, all funds received at the campus, including for tuition, textbooks, and other non-educational charges (e.g.,

for copies of transcripts, etc.) were commingled into a single banking account. The business officer, who was just an FP at the campus with additional responsibility, would deposit all revenues received at the campus into one banking account. On information, including interviews with numerous witnesses who worked at the Cheyenee campus, Relators allege that the business officer never reported the separate revenue streams to anybody else. In other words, no one was tracking the revenues for the Cheyenne campus in a way that would permit accurate reporting for 90/10 Rule purposes.

200.   On information, including numerous interviews of former employees at the Cheyenne campus, Relators allege that none of the other campuses in Defendant Schools' system were separately tracking revenues from textbooks and other non-educational sources. Part of the basis of that belief are statements made by Barbara Thomas, the Schools' former Chief Operating Officer, to the Campus Director, Debbi Potts, and the Dean of Education, Linda Carter, during a pre-accreditation visit in April 2012. On approximately April 25, 2012, just prior to the inspection, Ms. Thomas specifically told the campus's staff that she did not want ACCSC to see the book room because it might cause the accrediting body to raise questions about Defendant Schools' compliance with the 90/10 Rule.

201.   As Debbi Potts, the former Campus Director at the Cheyenne campus, stated in an affidavit signed in 2012, "CollegeAmerica attempts to manipulate the Title IV funding requirements to maximize Title IV funds beyond the 90% limit. An example of this is where Ms. Thomas attempted to hide the existence of a textbook room from an accrediting body survey" because "Ms. Thomas indicated that the textbook loan program might detrimentally affect CollegeAmerica's 90% federal funding limit under Title IV and she did not want the accrediting body to know about it."

202.   Additionally, Vicky Dewsnup, the Campus Director for the Ogden, Utah, campus—one of Defendant Schools' largest campuses—confided in Ms. Potts at one of the quarterly meetings of Campus Directors that her campus was using revenue from the campus bookstore—from such things as t-shirts with the college's logo and similar items—towards the ten percent category of the 90/10 Rule.

203.   On information, Relators allege that all other campuses in Defendant Schools' system were also counting revenues from textbooks and other non-educational sources towards the ten percent requirement of the 90/10 Rule and that they lacked any formal system of accounting that permitted them to accurately track the source of various revenue streams.

204.   Example: 2014, Salt Lake City/Murray, Utah, and Flagstaff and Phoenix, Arizona, campuses. Because the Salt Lake City campus was often comfortably complying with the 90/10 Rule, Defendant Schools' management and compliance department devised a scheme to account for revenues from Salt Lake City-based students as revenues for other campuses that were not in compliance with the 90/10 Rule.

205.   For example, in approximately January 2014, at the direction of either Susie Reed, the director of compliance, or her assistant, a number of employees, including Michelle Romney, Gina Seats, and Robert Anderson, were called into the office during a weekend when other employees were gone. The employees were instructed to sanitize certain closed student files from the Salt Lake City/Murray campus—that is, files for students who graduated or were no longer attending the campus—and change them to show that those students had instead attended one of the Arizona campuses of Defendant Schools because those campuses were not in compliance with, or were on the verge of not complying with, the 90/10 Rule. The student files were selected to make the Arizona campuses' statistics appear better than they actually were for purposes of the 90/10 Rule.

206.   Based on interviews with former employees, including a former Dean at the Salt Lake City campus, Relators believe and allege that this practice of sanitizing student files from the Salt Lake City campus so that they could be administratively moved to other campuses to help bring other campuses into compliance occurred on a semi-regular basis.[37]

## III.   STATEMENTS AND CLAIMS: DEFENDANTS HAVE FALSELY CERTIFIED COMPLIANCE WITH THE LEGAL REQUIREMENTS IN THREE SEPARATE WAYS.

207.   Although schools submit a variety of actionable certifications of compliance at various points in the financial aid process,[38] Relators pursue here just three forms of false statements and claims: the PPAs, the G5 Certifications, and the RMAs.

### A.   PPAs: Defendant Schools' False Promises of Compliance with the Legal Requirements Fraudulently Induced the DOE to Allow Them to Participate in the Title IV, HEA Programs.

208.   Defendant Schools have executed numerous PPAs over the years to remain eligible to participate in Title IV, HEA programs.

---

[37] Presently, Defendant Schools are attempting to convert to not-for-profit status under the DOE's regulations, which would exempt them from the 90/10 Rule. This is not a violation of a Legal Requirement but does provide circumstantial evidence of Defendant Schools' state of mind during the relevant periods of time.

[38] *See* Footnote 42, *infra*.

209. Executing a PPA with the DOE "is a prerequisite to [a school's] initial or continued participation in any Title IV, HEA Program." (*E.g.*, 2007 SHC PPA at 1, attached as Exhibit F hereto.)[39] A school's participation in Title IV, HEA programs is "subject to the terms and conditions" of the PPA. (*Id*.) No school can receive any Title IV, HEA program funds without first executing a PPA with the DOE—it is a *sine qua non* of federal student financial aid funding.

210. In each PPA, each Defendant School certifies that "[i]t will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA."

211. PPAs identify and expressly restate just twenty-five "Selected Provisions"[40] from the body of laws incorporated by reference. (*Id*. at 5.)

212. The "Selected Provisions" section provides that "[b]y entering into this Program Participation Agreement, the Institution agrees" to comply with the

---

[39] In order to receive student financial aid funds, Defendants must first enter into a PPA with DOE that "shall condition the initial and continuing eligibility of an institution to participate in a program upon compliance with" a variety of requirements set forth in the statute. 20 U.S.C. § 1094(a). The regulations reiterate that "initial and continuing eligibility" to receive Title IV funds is conditioned upon compliance with these requirements. 34 C.F.R. § 668.14(a)(1).

[40] While the Selected Provisions section actually contains twenty-six numbered paragraphs, the first one simply incorporates by reference other applicable statutory and regulatory provisions.

specific, select provisions set forth in that section. (*Id.*) All of the Legal

Requirements are specifically identified and expressly restated in the "Selected

Provisions" section of the PPA:

> (4) It will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs . . . .

> (16) For a proprietary institution, the institution will derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds . . . .[41]

> (22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance . . . ;

> (23) It will meet the requirements established pursuant to Part H of Title IV of the HEA by . . . nationally recognized accrediting agencies;

> (24) It will comply with the refund provisions established in 34 CFR Part 668.22.

(*Id.* at 5, 7.)

213.   On information, Relators believe and allege that the DOE has never

accepted a PPA from any school when the DOE had actual knowledge that the

---

[41] This provision was added to the PPA in 2008 by the Higher Education Opportunity Act.

school's promises to comply with any of the provisions, including those relating to the Legal Requirements, were false.

214.   Likewise, Relators allege on information and belief that the DOE has never accepted a PPA from any school when that school made the DOE aware when the school executed the PPA that it did not intend to comply with one or more of the provisions, including those relating to the Legal Requirements.

### 1.   Identification of Program Participation Agreements Fraudulently Induced by Defendant Schools.

215.   Defendant SHC falsely stated it would comply with the ICB in its PPA executed in April 2007 by Vicky Dewsnup, the Campus Director of the Ogden campus. Based on information provided by Defendants during the course of discovery, Relators allege that Ms. Dewsnup did nothing to determine whether SHC was complying with ICB (or any other Legal Requirement) when she executed the PPA and did nothing to determine whether SHC intended to comply with the ICB in the future. At the time Ms. Dewsnup executed the PPA on behalf of SHC, SHC was at least violating the ICB by virtue of its payment of bonuses under the AC Bonus Plan and DOA Bonus Plan and intended to continue to pay bonuses under those plans into the future.

216.   Defendant SHC falsely stated it would comply with the ICB, Accreditation Requirement, and the Refund and Recordkeeping Requirements in

its PPA executed in January 2010 by Vicky Dewsnup, the Campus Director of the Ogden campus. On information and belief, Relators allege that Ms. Dewsnup did nothing to determine whether SHC was complying with ICB, Accreditation Requirement, and the Refund and Recordkeeping Requirements when she executed the PPA and did nothing to determine whether SHC intended to comply with those Legal Requirements in the future. At the time Ms. Dewsnup executed the PPA on behalf of SHC, SHC was violating (1) the ICB by virtue of its payment of bonuses under the AC Bonus Plan, FP Bonus Plan, DOA Bonus Plan, and Campus Director Bonus Plan, and intended to continue to pay bonuses under these plans into the future; (2) the Accreditation Requirement, as outlined above, and intended to continue such violations; and (3) the Refund and Recordkeeping Requirements, as outlined above, and intended to continue such violations.

217.   On behalf of the campuses and operations covered by the former SHC entity, Defendant CEHE falsely stated it would comply with the ICB and Accreditation Requirement in its PPA executed in January 2013 by Eric Juhlin, the CEO of CEHE. On information and belief, Relators allege that Mr. Juhlin did nothing to determine whether former SHC campuses and online operations were complying with ICB and Accreditation Requirement when he executed the PPA and did nothing to determine whether they intended to comply with those Legal

Requirements in the future. At the time Mr. Juhlin executed the PPA on behalf of CEHE, the former SHC campuses and online operations were violating (1) the ICB by virtue of their payment of bonuses under the Campus Director Bonus Plan and possibly the $60K Club Plan, and intended to continue to pay bonuses under these plans into the future; and (2) the Accreditation Requirement, as outlined above, and intended to continue such violations.

218.   Defendant CAD falsely stated it would comply with the ICB in its PPA executed in June 2007 by Nathan Larson, the Campus Director of the Denver campus. On information, Relators allege that Mr. Larson did nothing to determine whether CAD was complying with ICB (or any other Legal Requirement) when he executed the PPA and did nothing to determine whether CAD intended to comply with the ICB in the future. At the time Mr. Larson executed the PPA on behalf of CAD, CAD was at least violating the ICB by virtue of its payment of bonuses under the AC Bonus Plan and DOA Bonus Plan and intended to continue to pay bonuses under those plans into the future.

219.   Defendant CAD falsely stated it would comply with the ICB, Accreditation Requirement, and the Refund and Recordkeeping Requirements in its PPA executed in February 2010 by Nathan Larson, the Campus Director of the Denver campus. On information and belief, Relators allege that Mr. Larson did

nothing to determine whether CAD was complying with ICB, Accreditation Requirement, and the Refund and Recordkeeping Requirements when he executed the PPA and did nothing to determine whether CAD intended to comply with those Legal Requirements in the future. At the time Mr. Larson executed the PPA on behalf of CAD, CAD was violating (1) the ICB by virtue of its payment of bonuses under the AC Bonus Plan, FP Bonus Plan, DOA Bonus Plan, and Campus Director Bonus Plan, and intended to continue to pay bonuses under these plans into the future; (2) the Accreditation Requirement, as outlined above, and intended to continue such violations; and (3) the Refund and Recordkeeping Requirements, as outlined above, and intended to continue such violations.

220.   On behalf of the campuses covered by the former CAD entity, Defendant CEHE falsely stated it would comply with the ICB, Accreditation Requirement, and the Refund and Recordkeeping Requirements in its PPA executed in January 2013 by Eric Juhlin, the CEO of CEHE. On information and belief, Relators allege that Mr. Juhlin did nothing to determine whether former CAD campuses were complying with ICB, Accreditation Requirement, and the Refund and Recordkeeping Requirements when he executed the PPA and did nothing to determine whether they intended to comply with those Legal Requirements in the future. At the time Mr. Juhlin executed the PPA on behalf of

CEHE, the former CAD campuses were violating (1) the ICB by virtue of their payment of bonuses under the Campus Director Bonus Plan, and intended to continue to pay bonuses under these plans into the future; (2) the Accreditation Requirement, as outlined above, and intended to continue such violations; and (3) the Refund and Recordkeeping Requirements, as outlined above, and intended to continue such violations.

221.   Defendant CAA falsely stated it would comply with the ICB in its PPA executed in June 2008 by Barbara Thomas, the Chief Operations Officer for all Defendant Schools. On information, Relators allege that Ms. Thomas did nothing to determine whether CAA was complying with ICB (or any other Legal Requirement) when she executed the PPA and did nothing to determine whether CAA intended to comply with the ICB in the future. At the time Ms. Thomas executed the PPA on behalf of CAA, CAA was at least violating the ICB by virtue of its payment of bonuses under the AC Bonus Plan, DOA Bonus Plan, FP Bonus Plan, and Campus Director Bonus Plan, and intended to continue to pay bonuses under those plans into the future.

222.   Defendant CAA falsely stated it would comply with the ICB in its PPA executed in November 2011 by Suzanne Scales, the Campus Director of the Phoenix campus. On information and belief, Relators allege that Ms. Scales did

nothing to determine whether CAA was complying with ICB when she executed the PPA and did nothing to determine whether CAA intended to comply with the ICB in the future. At the time Ms. Scales executed the PPA on behalf of CAA, CAA was violating the ICB by virtue of its payment of bonuses under the Campus Director Bonus Plan, and intended to continue to pay bonuses under this plan into the future.

223.   Defendant CCSD falsely stated it would comply with the ICB in its PPA executed in August 2008 by Barbara Thomas. On information, Relators allege that Ms. Thomas did nothing to determine whether CCSD was complying with ICB (or any other Legal Requirement) when she executed the PPA and did nothing to determine whether CCSD intended to comply with the ICB in the future. At the time Ms. Thomas executed the PPA on behalf of CCSD, CCSD was at least violating the ICB by virtue of its payment of bonuses under the AC Bonus Plan, DOA Bonus Plan, and Campus Director Bonus Plan and intended to continue to pay bonuses under those plans into the future.

224.   On behalf of the campuses covered by the former CCSD entity, Defendant CEHE falsely stated it would comply with the ICB, Accreditation Requirement, and the Refund and Recordkeeping Requirements in its PPA executed in January 2013 by Eric Juhlin, the CEO of CEHE. On information and

belief, Relators allege that Mr. Juhlin did nothing to determine whether former CCSD campuses were complying with ICB, Accreditation Requirement, and the Refund and Recordkeeping Requirements when he executed the PPA and did nothing to determine whether they intended to comply with those Legal Requirements in the future. At the time Mr. Juhlin executed the PPA on behalf of CEHE, the former CCSD campuses were violating (1) the ICB by virtue of their payment of bonuses under the Campus Director Bonus Plan, and intended to continue to pay bonuses under this plan into the future; (2) the Accreditation Requirement, as outlined above, and intended to continue such violations; and (3) the Refund and Recordkeeping Requirements, as outlined above, and intended to continue such violations.

### B.   G5 Certifications.

225.   Students apply for financial aid using a free federal application and the school uses that information to offer an award package, which is a variety of grants and subsidized and unsubsidized loans,[42] depending on the student's financial condition.[43]

---

[42] Under Title IV's loan programs, the government is itself the lender under FDLP. 34 C.F.R. § 685.101(a)(1). Prior to July 1, 2010, the government was also the ultimate guarantor of all student loans originated under FFELP. 34 C.F.R. § 682.100(a); 34 C.F.R. § 682.100(b)(1); 34 C.F.R. § 682.102; 34 C.F.R. § 682.404. No new loans were originated under FFELP after July 1, 2010.

226.   The student can accept all or part of the financial aid award package.

227.   The Defendant Schools make claims to the DOE for specific funds under the Title IV, HEA programs through a system known as "G5." Defendant Schools make these claims by submitting electronic requests for the funds in the G5 system.

228.   Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request . . . the funds are being expended

---

A school participating in FDLP (and previously in FFELP) must determine and certify that the student is eligible to receive the loan and must provide information regarding student eligibility to the DOE. 34 C.F.R. § 85.301(a)(1), (2); 34 C.F.R. § 682.102(a); 34 C.F.R. § 682.603(a). Among other requirements, to be eligible to receive proceeds from a FDLP or FFELP loan, a student must be enrolled, or accepted for enrollment, at a school eligible to receive Title IV funding. 34 C.F.R. § 685.301(a)(2)(i); 34 C.F.R. § 685.200(a)(1)(ii); 34 C.F.R. § 668.32(a)(1)(i); 34 C.F.R. § 682.201(a); 34 C.F.R. § 682.603(a). Notably, the court in *U.S. ex rel Rose v. Stephens Inst.*, No. 09-CV-05966-PJH, 2016 WL 5076214, (N.D. Cal. Sept. 20, 2016), found these certifications to be actionable under the FCA.

[43] Under the Pell Grant program, which provides federal funds to assist postsecondary school students with demonstrated financial need, 20 U.S.C. § 1070a; 34 C.F.R. § 690.1, the student initiates the process by submitting a FAFSA to the Department of Education to have her expected family contribution ("EFC") calculated. 34 C.F.R. § 690.12(a).

Students seeking loans under the FDLP (and previously the FFELP) loan program also initiate the process through a FAFSA. 34 C.F.R. § 685.201(a); 34 C.F.R. § 682.102(a)

The DOE sends the student's application information and EFC to the student on a Student Aid Report ("SAR") and sends each school the student has designated an Institutional Student Information Record ("ISIR") for that student. 34 C.F.R. § 690.13.

The school uses the above-described information, including the EFC, to calculate the student's eligibility for all aid and to assemble a "financial aid award package" for the student borrower. 34 C.F.R. §§ 685.301(4), (5). The financial aid package may include Pell Grants, FDLP loans, or Campus-Based Aid (which in turn includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student may be eligible.

within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement."

229.   Without these G5 certifications, which are made with Defendant Schools' requests for specific amounts of funds, Defendant Schools could not receive any Title IV funding.

230.   It is the DOE's policy and legal position that in making each drawdown request in the DOE's G5 payment system, all schools certify that the funds are being requested consistent with the terms of the PPA, which in turn requires compliance with applicable Title IV rules and regulations.

231.   It is the DOE's policy and legal position that without these certifications, no Title IV funding can (or will) be distributed to any school. That is, if any school fails to make the certification, Title IV funding cannot be distributed to that school.

232.   On information and belief, Relators allege that the DOE has never paid any school Title IV funding that has not certified it was complying the PPA at the time of the payment request. Relators also believe and allege that the DOE has never paid a claim submitted in the G5 system when the DOE had actual knowledge that the school's accompanying G5 Certification was false.

233.   The DOE has taken action against schools found to have provided false certifications of compliance with their payment requests. For example, the DOE has prosecuted several actions under the FCA against schools found to have submitted false certifications in payment requests, including against Lacy School of Cosmetology and FastTrain College.

234.   Defendant Schools have submitted the following G5 Certifications relevant to this Fourth Amended Complaint:

- In 2007, Defendant Schools submitted almost 1,400 G5 Certifications with requests for payment to the DOE, including SHC (455), CAA (196), CAD (457), and CCSD (284).[44] At the time all of these payment requests were submitted, all Defendant Schools were knowingly violating their obligations under the PPAs, including the ICB, as alleged above.

- In 2008, Defendant Schools submitted over 2,100 G5 Certifications with requests for payment to the DOE, including SHC (633), CAA (291), CAD (849), and CCSD (384). At the time all of these payment requests were submitted, all Defendant Schools were knowingly violating their obligations under the PPAs, including the ICB, as alleged above.

- In 2009, Defendant Schools submitted over 3,400 G5 Certifications with requests for payment to the DOE, including SHC (947), CAA (476), CAD (1,370), and CCSD (738). At the time all of these payment requests were submitted, all Defendant Schools were

---

[44] While some of these G5 Certifications were submitted under prior PPAs that were executed before the statute of limitations period in this case, the G5 Certifications submitted within the limitations period are actionable. Notably these G5 Certification claims are actionable even if the PPAs they were submitted under were not originally induced by fraud, though Relators believe they were.

knowingly violating their obligations under the PPAs, including the ICB, as alleged above.

- In 2010, Defendant Schools submitted over 3,600 G5 Certifications with requests for payment to the DOE, including SHC (1,025), CAA (566), CAD (1,344), and CCSD (738). At the time all of these payment requests were submitted, all Defendant Schools were knowingly violating their obligations under the PPAs, including the ICB, as alleged above.

- In 2011, Defendant Schools submitted nearly 3,000 G5 Certifications with requests for payment to the DOE, including SHC (938), CAA (500), CAD (945), and CCSD (515). At the time all of these payment requests were submitted, all Defendant Schools were knowingly violating their obligations under the PPAs, including the ICB, as alleged above.

- In 2012, Defendant Schools submitted over 2,600 G5 Certifications with requests for payment to the DOE, including SHC (808), CAA (567), CAD (751), and CCSD (515). At the time all of these payment requests were submitted, all Defendant Schools were knowingly violating their obligations under the PPAs, including the ICB, as alleged above.

- On information, Relators allege that in 2013 and 2014, Defendant Schools submitted thousands of G5 Certifications with requests for payment to the DOE. At the time all of these payment requests were submitted, all Defendant Schools were knowingly violating their obligations under the PPAs, including the ICB, as alleged above.

## C. **Required Management Assertions.**

235. To ensure that schools are continuing to comply with the Legal Requirements during the term of a PPA, the DOE requires every schools' management to annually certify compliance with each of the Legal Requirements.

236.   These annual certifications are required as part of the annual audit process. For-profit colleges, like Defendant Schools, must conduct their annual financial statements and compliance audits in accordance with the DOE Office of Inspector General's Audit Guide. (*See* DOE Audit Guide at 32–33, 55 (ECF pagination), attached as Exhibit G hereto.)

237.   The DOE requires Defendants to employ independent outside auditors to audit each one of these certifications. (*See generally id*.)

238.   Indeed, the ***very first step*** in the audit process is for the school's management to provide the required RMAs: as the Audit Guide explains at the very outset, "this guide provides for the practitioner to obtain management's assertions." (*Id*. at 4.)

239.   In their audit letters to the DOE, each of Defendant Schools' auditors for the years 2007 to 2011 told the DOE that they had specifically "examined management's assertions" of compliance as part of their audit. (Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 16, 2008; Report on Compliance with Specified Requirements Applicable to the SFA Programs, June 18, 2009; Cover Letter from PwC, June 30, 2010; Cover Letters to Independent Accountants' Report on Compliance with Specified

Requirements Applicable to the FSFA Programs, June 16, 2011 & June 18, 2012.)[45]

240.   In the RMAs, the schools' management must expressly certify the school complied with the ICB, the Accreditation Requirement, the Refund Requirement, and the 90/10 Rule during the audited year. These are not "global" or "general" certifications of compliance; rather, they are specific to each of the Legal Requirements.

241.   In the RMAs, each school's management must annually certify to the DOE that the school has

- "Not paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention" (Ex. H at 32–33);

- Complied with its accreditation requirements (*id*. at 32–33);

- "[C]omplied with the Refund compliance requirements," which are detailed in the Audit Guide (*id*. at 55); and

- Complied with the "90/10 Revenue Test" by "disclos[ing] in a footnote to [their] audited financial statements the percentage (including the figures used to make the calculation) of [their] revenues derived from the Title IV funds" (*id*. at 23).

---

[45] Relators' Third Amended Complaint alleged claims against Defendant Schools' auditors as well, which this Court previously dismissed. This Fourth Amended Complaint is not intended to supersede Relators' prior complaint with respect to those claims, which are not alleged herein.

242.   The DOE takes the RMA and audit process extremely seriously and takes action against schools who do not comply with all of the requirements. On information, Relators allege that the DOE rejected the audits submitted by one or more Defendant Schools in approximately 2015 because the Schools' audit report did not contain all of the necessary information about the Schools' compliance with the 90/10 Rule.

243.   The Audit Guide, which the DOE uses to evaluate schools' audit reporting, repeatedly stresses the importance of the RMAs in the audit process, referencing them more than a dozen times. (*See generally* Ex. G.) The Audit Guide declares that "[m]anagement's written assertions are the basis for the [auditor's] testing and therefore are an integral part of the engagement" and specifies that "all applicable management assertions . . . must be addressed by the" auditor. (*Id*. at 15, 25.) All of Section II of the Audit Guide is directed to determining whether an institution's RMAs are in fact true.

244.   If Defendant Schools had not made these false certifications in the annual RMAs, Defendants' auditors would have been unable to complete their audits, and Defendants would have been ineligible for Title IV funds.

245.   On information, Relators believe and allege that the DOE has never allowed a school to continue to participate in any Title IV, HEA program, or to

receive additional Title IV funding, when the DOE had actual knowledge that the school's RMAs were false.

246.   Because Defendant Schools used the same auditor for all four of the school brands each year they were audited, Defendant Schools' management would execute a series of RMAs in the form of a letter addressed to the auditor— one for each of the four school brands—in approximately June of each year. The RMA letters closely tracked the requirements of the Audit Guide, which, as explained above, specifies precisely what assertions management must make each year.

### 1.   Identification of Examples of False RMAs.

247.   In approximately June 2008, each Defendant School submitted RMAs to their auditor, Shaw Mumford, certifying their compliance in 2007 with each of the Legal Requirements. The certifications of compliance with at least the ICB were false because, in 2007, (a) all Defendant Schools violated the ICB since they were all paying bonuses under the AC Bonus Plan and DOA Bonus Plan, and (b) SHC violated the ICB by paying bonuses under the Online AC Bonus Plan.

248.   In approximately June 2009, each Defendant School submitted RMAs to their auditor, Shaw Mumford, certifying their compliance in 2008 with each of the Legal Requirements. The certifications of compliance with at least the ICB

were false because, in 2008, (a) all Defendant Schools violated the ICB since they were all paying bonuses under the AC Bonus Plan, DOA Bonus Plan, FP Bonus Plan, and Campus Director Bonus Plan, and (b) SHC violated the ICB by paying bonuses under the Online AC Bonus Plan.

249.   In approximately June 2010, each Defendant School submitted RMAs to their auditor, PricewaterhouseCoopers, certifying their compliance in 2009 with each of the Legal Requirements. The certifications of compliance with at least the ICB, Accreditation Requirements, and Refund and Recordkeeping Requirements were false because, in 2009, (a) all Defendant Schools violated the ICB since they were all paying bonuses under the AC Bonus Plan, DOA Bonus Plan, FP Bonus Plan, and Campus Director Bonus Plan, (b) CAD violated the Accreditation Requirements, as exemplified above, (c) CAD violated the Refund and Recordkeeping Requirements, as exemplified above, and (d) SHC violated the ICB by paying bonuses under the Online AC Bonus Plan.

250.   On approximately June 16, 2011, each Defendant School submitted RMAs to their auditor, Weworski & Associates, certifying their compliance in 2010 with each of the Legal Requirements. The certifications of compliance with at least the ICB, Accreditation Requirements, and Refund and Recordkeeping Requirements were false because, in 2010, (a) all Defendant Schools violated the

ICB since they were all paying bonuses under the AC Bonus Plan, DOA Bonus Plan, FP Bonus Plan, and Campus Director Bonus Plan, (b) SHC violated the Accreditation Requirements, as exemplified above, and (c) SHC and CAD violated the Refund and Recordkeeping Requirements, as exemplified above.

251.   On approximately June 18, 2012, each Defendant School submitted RMAs to their auditor, Weworski & Associates, certifying their compliance in 2011 with each of the Legal Requirements. The certifications of compliance with at least the ICB, Accreditation Requirements, and Refund and Recordkeeping Requirements were false because, in 2011, (a) all Defendant Schools violated the ICB since they were all paying bonuses under the AC Bonus Plan, DOA Bonus Plan, FP Bonus Plan, and Campus Director Bonus Plan, (b) SHC violated the Accreditation Requirements, as exemplified above, and (c) SHC and CAD violated the Refund and Recordkeeping Requirements, as exemplified above.

252.   On approximately June 17, 2013, CEHE submitted RMAs on behalf of each Defendant School to its auditor, Weworski & Associates, certifying the Schools' compliance in 2012 with each of the Legal Requirements. The certifications of compliance with the ICB, Accreditation Requirements, Refund and Recordkeeping Requirements, and 90/10 Rule were false because, in 2012, (a) CEHE caused the Defendant Schools to violate the ICB since they were all paying

bonuses under the Campus Director Bonus Plan, (b) CEHE caused CAD to violate the Accreditation Requirements, as exemplified above, (c) CEHE caused CAD to violate the Refund and Recordkeeping Requirements, as exemplified above, and (d) CEHE caused CAD to violate the 90/10 Rule (and Recordkeeping Requirements), as described above.

253.   On approximately June 16, 2014, CEHE submitted RMAs on behalf of each Defendant School to its auditor, Weworski & Associates, certifying the Schools' compliance in 2013 with each of the Legal Requirements. The certifications of compliance with at least the ICB, Accreditation Requirements, and Refund and Recordkeeping Requirements were false because, in 2013, (a) CEHE caused all Defendant Schools to violate the ICB since they were all paying bonuses under the Campus Director Bonus Plan, (b) CEHE caused CCSD and CAD to violate the Accreditation Requirements, as exemplified above, and (c) CEHE caused CCSD, CAD, and SHC (the online division) to violate the Refund and Recordkeeping Requirements, as exemplified above.

254.   On approximately June 22, 2015, CEHE submitted RMAs on behalf of each Defendant School to its auditor, Weworski & Associates, certifying the Schools' compliance in 2014 with each of the Legal Requirements. The certifications of compliance with at least the ICB, Refund and Recordkeeping

Requirements, and 90/10 Rule were false because, in 2014, (a) CEHE caused the Defendant Schools to violate the ICB since they were all paying bonuses under the Campus Director Bonus Plan, (b) CEHE caused SHC (the online division) to violate the ICB by paying incentive compensation under the $60K Club program, (c) CEHE caused SHC (online division) to violate the Refund and Recordkeeping Requirements, as exemplified above, and (d) CEHE caused SHC and CAA to violate the 90/10 Rule (and Recordkeeping Requirements), as described above.

## IV.   MATERIALITY.

255.   A false statement is material under the False Claims Act if either (1) a reasonable person would likely attach importance to it or (2) the defendant knew or should have known that the government would attach importance to it.

256.   Materiality is a holistic assessment, including four non-exclusive factors: (1) whether the legal requirement violated is expressly stated in a statute, regulation, or contract, (2) whether the violation goes to the essence of the bargain, (3) whether the violation is significant, as opposed to minor or insubstantial, and (4) whether the Government has taken action in response to similar, known violations.

A. **ICB.**

1. **Defendant Schools' Receipt of Title IV Funds Is Triple Conditioned on Compliance with the ICB and Defendants Must Demonstrate Compliance to the DOE.**

257. As alleged above, Defendant Schools are mandated to comply with the ICB in at least five different ways: (1) it is expressly stated in the statute governing Defendant Schools' receipt of student financial aid; (2) it is expressly stated in the DOE's regulations applicable to Defendant Schools; (3) it is expressly stated in the contracts (the PPAs) between Defendant Schools and the DOE, through which Defendant Schools receive Title IV, HEA program funds; (4) pursuant to the DOE's reporting requirements, Defendant Schools' management must annually expressly certify compliance with the ICB; and (5) Defendant Schools must annually hire independent outside auditors to verify their compliance with the ICB, which must be set forth in audit reports that Defendant Schools provide to the DOE.

2. **Compliance with the ICB Is an Important Part of the Title IV, HEA Programs.**

258. Congress enacted the ICB because incentive compensation payments were associated with high loan default rates, which in turn resulted in a significant drain on program funds. When Congress enacted the ICB, it did so because of evidence of serious program abuses, including the payment of incentive

compensation to motivate admissions personnel to enroll students without regard to the students' ability to benefit from the education. S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

259.   Congress specifically required that the PPAs include the ICB. The DOE did not simply incorporate the ICB into the PPAs by reference, as it did for many other legal requirements. Instead, the DOE included the ICB among the twenty-five specially selected to be set forth in the PPAs *in haec verba*.

### 3.   The ICB Violations Were Systemic and Widespread, Not Minor and Insubstantial.

260.   As alleged above, Defendant Schools' violations of the ICB were not isolated, minor, or inconsequential. Defendant Schools violated the ICB over many years, through many different policies aimed at numerous classes of employee, and at every campus in multiple states. The multiple versions of the AC Bonus Plan, as well as the FP Bonus Plan, DOA Bonus Plan, and Campus Director Bonus Plan, all demonstrate a systematic effort to pay prohibited incentive compensation. Over the

years, it is likely that hundreds of employees were paid millions of dollars in impermissible bonuses.

261.   Defendant Schools deliberately and blatantly violated the ICB, including through the Online AC Bonus Plan. The Online AC Bonus Plan in particular demonstrates the significance of Defendant Schools' ICB violations. Even though the bonuses were only paid to Online ACs at one location, numerous employees received substantial bonuses month over month for years that were tied directly to starts.

262.   The Campus Director Bonus Plan is an additional example of the substantial nature of the violations. While that bonus plan violated the ICB and Incentive Compensation Regulations when it was first adopted in 2008, even after the more lenient safe harbors were repealed in 2011, Defendants Schools continued to pay Campus Directors bonuses based on various measures of enrollment success. Given that Campus Directors have authority to hire, fire, and otherwise discipline recruiting staff, continuing to pay such bonuses was a substantial violation of the ICB and revised Incentive Compensation Regulations.

### 4.     The Government Has Taken Actions Against Many Schools Found to Have Violated the ICB.

263.   The government has taken enforcement action against other schools who have violated the ICB. *See, e.g.*, *U.S. ex rel. Rose v. Stephens Inst.*, No. 09-

CV-05966-PJH, 2016 WL 5076214, at *6 (N.D. Cal. Sept. 20, 2016) (noting that

the DOE took action in 25 of the 32 substantiated cases of ICB violations).





269.   The government has also settled a number of cases under the FCA that were grounded on violations of the ICB. In 2015, the DOE settled an ICB case for more than $95 million. U.S. Dep't of Justice, For-Profit College Company to Pay $95.5 Million to Settle Claims of Illegal Recruiting, Consumer Fraud and Other Violations, Nov. 16, 2015.

270.   In 2009, the DOE recouped more than $67 million for ICB violations in the *Hendow* case. U.S. Dep't of Justice, University of Phoenix Settles False Claims Act Lawsuit for $67.5 Million, Dec. 15, 2009.

271.   On information, Relators allege that the DOE has never permitted a school to participate in any Title IV, HEA program or made payments to any school when the DOE had actual knowledge that the school was intentionally and systematically violating the ICB.

272.   On information, Relators allege that the DOE has never entered into a PPA with any school that refused to comply with ICB or stated its intention not to comply with the ICB notwithstanding the representations in the PPA.

**B.   Accreditation Requirement.**

  **1.   Defendant Schools' Receipt of Title IV Funds Is Triple Conditioned on Compliance with the Accreditation Requirement and Defendants Must Demonstrate Compliance to the DOE.**

273.   As alleged above, Defendant Schools are mandated to comply with the Accreditation Requirement in at least five different ways: (1) it is expressly stated in the Title IV statute;[46] (2) it is expressly stated in the DOE's regulations; (3) it is expressly stated in the contracts (the PPAs); (4) Defendant Schools' management must annually expressly certify compliance with the Accreditation Requirement; and (5) Defendant Schools must annually hire independent outside auditors to verify their compliance with the Accreditation Requirement, which must be set forth in the auditors' reports.

---

[46] Additionally, Title IV provides that for a student to be eligible to receive a FDLP or FFELP loan, the school, as well as the specific program of study, must be accredited by the appropriate accrediting agency. 20 U.S.C. § 1094(a)(21).

### 2.      The Accreditation Requirement Ensures the Government Is Getting What It Is Paying For.

274.   "Accrediting agencies or associations recognized by the [DOE] are invested with a public trust and perform an important public function." 154 Cong. Rec. H7658-03, 110th Cong., 2d Sess. at H7668 (2008). The accreditation requirement is fundamental to the integrity of the financial aid programs because the government, despite paying billions of dollars in student financial aid, does not directly monitor or ensure the quality of the educational programs it funds. Instead, that oversight function is performed by accreditors. The accreditation process ensures that before a school receives student financial aid, the school has effective educational programs and has met high standards of quality.

275.   Congress specifically required that the PPAs include the Accreditation Requirement. The DOE did not simply incorporate the Accreditation Requirement into the PPAs by reference, as it did for many other legal requirements. Instead, the DOE included the Accreditation Requirement among the twenty-five specially selected to be set forth in the PPAs *in haec verba*.

### 3.      Defendant Schools' Accreditation Violations Were Systematic and Widespread.

276.   As alleged above and described further below, while Defendant Schools have violated the Accreditation Requirement in a variety of different

ways, all of those violations stem from Carl Barney and other senior managements' open disregard and even hostility towards their accreditor and its standards.

277. Ms. Wride, for example, found multiple false Faculty Personnel Reports, brought those to the attention of Defendant Schools' CEO and COO, and instead of correcting the false records, Defendant Schools continued to peddle them. They even asked Ms. Wride to create more of them. Relators' further investigation has determined that the use of unqualified faculty is rampant throughout Defendant Schools' system, as is the falsification of records relating to such violations. Relators' found examples of such problems at nearly every brand of Defendant Schools across time.

### 4. The Government Has Taken Action Against Schools Violating the Accreditation Requirement.

278. The government has taken enforcement actions against schools found violating the Accreditation Requirement in the past, demonstrating that the government takes such violations seriously and considers them important.

279. For example, in 2016 the DOE announced the closure of two schools for, among other things, providing false information to their accreditor. U.S. Dep't of Educ., Press Release (Feb. 1, 2016).



282.   On information, Relators allege that the DOE has never permitted a school to participate in any Title IV, HEA program or made payments to any school when the DOE had actual knowledge that the school was intentionally and systematically violating the Accreditation Requirement.

283.   On information, Relators allege that the DOE has never entered into a PPA with any school that refused to comply with Accreditation Requirement or stated its intention not to comply with the Accreditation Requirement notwithstanding the representations in the PPA.

### C.   Recordkeeping and Refund Requirements.

**1.   Defendant Schools' Receipt of Title IV Funds Is Triple Conditioned on Compliance with the Recordkeeping and Refund Requirements and Defendants Must Demonstrate Compliance to the DOE.**

284.   As alleged above, Defendant Schools are mandated to comply with the Recordkeeping and Refund Requirements in at least five different ways: (1) they are expressly stated in the Title IV statute; (2) they are expressly stated in the DOE's regulations; (3) they are expressly stated in the contracts (the PPAs); (4) Defendant Schools' management must annually expressly certify compliance with the Recordkeeping and Refund Requirements; and (5) Defendant Schools must annually hire independent outside auditors to verify their compliance with the Recordkeeping and Refund Requirements, which must be set forth in the auditors' reports.

**2.   The Recordkeeping and Refund Requirements Are Important to the Basic Integrity of the Title IV, HEA Programs.**

285.   The importance of the record-keeping requirement, which includes records associated with student attendance, grades, and refunds, is called out in the statutory language itself. Congress enacted the record-keeping requirements "to ensure proper and efficient administration of funds." 20 U.S.C. § 1094(a)(3).

286. "[G]rade and attendance records . . . are 'necessary to ensure the proper and efficient administration of funds': They determine eligibility (and thus disbursements) and refunds. *See* 34 C.F.R. §§ 668.34 (noting GPA determines SP, which determines eligibility), 668.22(b) (setting withdrawal date as 'last date of academic attendance as determined by the institution from its attendance records'). While not every grade or day of attendance impacts funding, the DOE cannot determine whether funds were properly administered if records are inaccurate." *U.S. ex rel. Miller v. Weston Educ., Inc*., 840 F.3d 494, 503 (8th Cir. 2016).

287. The DOE's regulations expressly state that "[f]alsification of any document . . . pertaining to a student's eligibility for assistance under a Title IV, HEA program" constitutes "[e]ngaging in fraud involving the administration of a Title IV, HEA program" that "cause[s] misuse . . . of Title IV, HEA program funds." 34 C.F.R. § 668.83(c).

288. Congress specifically required that the PPAs include the Recordkeeping and Refund Requirements. The DOE did not simply incorporate the Recordkeeping and Refund Requirements into the PPAs by reference, as it did for many other legal requirements. Instead, the DOE included the Recordkeeping and Refund Requirements among the twenty-five specially selected to be set forth in the PPAs *in haec verba*.

### 3. Defendant Schools' Violations of the Recordkeeping and Refund Requirements Were the Result of Corporate Policy and Intense Management Pressure to Maintain Enrollments By Any Means Necessary.

289.  As alleged above, Defendant Schools' violations of the Recordkeeping and Refund Requirements were not isolated, one-off, or singular. Rather, the violations persisted across multiple campuses for years. The extent of the violations was a direct result of the pressure and requirements conveyed by Defendant Schools' most senior management during monthly telephone calls with Deans and other employees.

290.  As with the other violations, the violations of the Recordkeeping and Refund Requirements were not the result of some "bad apple" in one corner of Defendant Schools' operations. Rather, the violations were encouraged by Defendant Schools' most senior management. For example, Defendant Schools' CEO Eric Juhlin was personally involved in pressuring a Dean and Campus Director to "do whatever it takes" to keep a student who had failed multiple classes multiple times enrolled, notwithstanding the rules, regulations, and Defendant Schools' own purported policies. The employees understood Mr. Juhlin to be asking them to directly violate all of them.

291.   This same pressure was communicated to Deans and other managers throughout Defendant Schools' system on a consistent basis. The violations alleged above were the natural result of those pressures.

### 4.   The Government Has Taken Enforcement Actions Against Defendant Schools for Violations of the Recordkeeping and Refund Requirements.

292.   The government has taken enforcement action against schools found in violation of the Recordkeeping and Refund requirements. Indeed, "[t]he government's acts confirm that it cares about the promise at issue: The DOE relies on school-maintained records to monitor regulatory compliance." *U.S. ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 504-05 (8th Cir. 2016) (citing cases).

293.   For example, in *In re Performance Training Inst., Toms River*, U.S. Dep't of Educ., No. 15-42-SP, 2015 WL 10459891 (Oct. 8, 2015), the DOE required the school to repay more than $18 million in part due to inadequate documentation of students' attendance.

294.   Likewise, in *In re Inst. of Med. Educ.*, U.S. Dep't of Educ., No. 13-58-SP, 2014 WL 1871068 (Jan. 13, 2014), the DOE imposed liability of over $8 million on the school in part because the school did not comply with academic progress requirements, which are part of the Refund Requirements, as explained above.



or



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[47] Defendant Schools' management, including COO Barbara Thomas, openly joked about the fact that they were caught by the DOE for disbursing money to students at the Cheyenne campus before they were authorized to do so. Carl Barney told Campus Directors that the fine the School received for the violations was "just a cost of doing business." Indeed, all penalties and fines for violations of legal requirements were justified by Carl Barney to senior management as the "cost of doing business."

303.   On information, Relators allege that the DOE has never permitted a school to participate in any Title IV, HEA program or made payments to any school when the DOE had actual knowledge that the school was intentionally and systematically violating the Recordkeeping and Refund Requirements.

304.   On information, Relators allege that the DOE has never entered into a PPA with any school that refused to comply with Recordkeeping and Refund Requirements or stated its intention not to comply with the Recordkeeping and Refund Requirements notwithstanding the representations in the PPA.

**D.    <u>90/10 Rule.</u>**

      **1.    Defendant Schools' Receipt of Title IV Funds Is Triple Conditioned on Compliance with the 90/10 Rule and Defendants Must Demonstrate Compliance to the DOE.**

305.   As alleged above, Defendant Schools are mandated to comply with the 90/10 Rule in at least five different ways: (1) it is expressly stated in the Title

IV statute; (2) it is expressly stated in the DOE's regulations; (3) it is expressly stated in the contracts (the PPAs); (4) Defendant Schools' management must annually expressly certify compliance with the 90/10 Rule; and (5) Defendant Schools must annually hire independent outside auditors to verify their compliance with the 90/10 Rule, which must be set forth in the auditors' reports.

### 2.   The 90/10 Rule Is a Critical Component of Congress' Efforts to Clean Up Fraud in the Title IV, HEA Programs.

306.   Congress passed the 90/10 Rule[48] because it is "*particularly important in removing the fraud and abuse that currently plague the system*." 138 Cong. Rec. E2152-01, 138 Cong. Rec. E2152-01, E2152, 1992 WL 157892138 Cong. Rec. E. 2152 (emphasis added).

307.   Indeed, "Congress enacted the 90/10 Rule to address perceived issues of widespread fraud by proprietary schools." *U.S. v. Sheets*, 814 F.3d 256, 258 n.2 (5th Cir. 2016) (citing 138 Cong. Rec. E. 2152 (July 9, 1992)).

308.   "[T]he purpose of the [90/10 Rule] is to require proprietary institutions to attract students based upon the quality of their programs, not solely because the institutions offer Federal student financial assistance. Thus, under the statute, these institutions must attract students who will pay for their programs with

---

[48] When it was first enacted, the 90/10 Rule was actually the 85/15 Rule and required for-profit institutions to derive at least 15% of their revenues from non-Title IV sources. The rule was subsequently eased.

funds other than Title IV, HEA program funds." *Institutional Eligibility Under the Higher Education Act of 1965*, as amended, 59 FR 6446-01.

309.   As former Special Advisor to the Secretary of Education, Rohit Chopra, explained after examining Defendant Schools' business practices, the 90/10 Rule is one of "the most important federal regulations that the company had to follow."

310.   Congress specifically required that the PPAs include the 90/10 Rule. The DOE did not simply incorporate the 90/10 Rule into the PPAs by reference, as it did for many other legal requirements. Instead, the DOE included the 90/10 Rule among the twenty-five specially selected to be set forth in the PPAs *in haec verba*.

### 3.      Defendant Schools Have Systematically Violated the 90/10 Rule and Engaged in Blatant Violations.

311.   As alleged above, Defendant Schools have taken extraordinary actions to try to comply with the 90/10 Rule, including establishing an entire "loan" program—albeit one the Colorado Attorney General believes is a consumer fraud—for the sole purpose of trying to comply with the 90/10 Rule. As a former Special Advisor to the Secretary of Education explained, Defendant Schools' documents demonstrate a "fixation" on the 90/10 Rule.

312.   These facts provide important context to Relators' own allegations about systematic commingling of revenues that do not count in the 90/10 Rule

calculations—principally textbook and bookstore sales—in order to try to impermissibly boost their non-Title IV revenue. Although the scope of this violation is still to be determined, it appears it was happening on at least two different campuses at two different brands of Defendant Schools, which are separately tracked for 90/10 Rule purposes. Moreover, the failure to accurately report revenue for 90/10 Rule purposes renders the Schools' 90/10 Rule calculations false for an entire year, since compliance is reported annually.

313. Likewise, Defendant Schools' obsession with 90/10 Rule compliance—given that Carl Barney had previously had a school he owned closed for violating the 90/10 Rule—and the intense pressure they place on employees to show compliance with the rule explains the deliberate violations alleged regarding the alteration of student files. This action was ordered by Defendant Schools' compliance department—the very department that is supposed to ensure that falsification of student records does not occur. Such violations are not minor or insignificant—they had the effect of altering the 90/10 Rule reporting for at least two different entities for an entire year.

### 4. The Government Has Taken Enforcement Actions for Known Violations of the 90/10 Rule.

314. The government has taken a number of enforcement actions against schools found violating the 90/10 Rule.

315.   In *In re of Star Tech. Inst*., U.S. Dep't of Educ., No. 09-22-SA, 2012 WL 564574 (Feb. 7, 2012), the DOE ordered the school to repay more than $9.8 million for violating 90/10 Rule.

316.   In *In re Int'l Junior Coll.*, U.S. Dep't of Educ., No. 07-52-SA, 2008 WL 5636249 (Sept. 24, 2008), the DOE ordered the school to repay $1.3 million for failure its to comply with the 90/10 Rule.

317.   In *In re Pacific Travel Trade School*, U.S. Dep't of Educ., No. 00-55-SA, 2002 WL 32396161 (Jan. 24, 2002), the DOE fined a school almost $7.5 million for violating the 90/10 Rule.

318.   In *In re La Lan 2000 Computer Training Ctr*., No. 05-50-SP, 2010 WL 3514127, at *9 (Aug. 10, 2010), the DOE fined a school more than $350,000 for violations of the 90/10 Rule.

319.   On information, Relators allege that the DOE has never permitted a school to participate in any Title IV, HEA program or made payments to any school when the DOE had actual knowledge that the school was intentionally and systematically violating the 90/10 Rule.

320.   On information, Relators allege that the DOE has never entered into a PPA with any school that refused to comply with 90/10 Rule or stated its intention not to comply with the 90/10 Rule notwithstanding the representations in the PPA.

**E.      The Government Has Already Taken Some Action against Defendant Schools Due to the Allegations in this Lawsuit.**

321.   Defendants admit that in 2015, the DOE required Defendants to post a $42.9 million letter of credit, which the DOE told Defendants was in part predicated upon this lawsuit.

## V.      SCIENTER.

322.   The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(B) (2009).

### A.      ICB.

323.   Numerous versions of the AC Bonus Plan Procedure Directive and every annual version of the AC Manual, all authored by Carl Barney on behalf of the Defendant Schools, specifically reference the ICB and Regulatory Safe Harbor E in its entirety. (*See* AC Manual, Ex. A; 2004 Procedure Directive, Ex. B; 2008 Procedure Directive, Ex. C.)

324.   Indeed, Defendant Schools' AC Manuals and Procedure Directives discuss the ICB in detail, including, before 2011, the requirements for the regulatory safe harbors. Defendant Schools' AC Manuals state that "[a]ccording to Federal Regulations . . . bonuses, commissions or other incentive payments may not be paid to any employee based, directly or indirectly, on starts. (AC Manual, Ex. A at 33.) The Manuals then set forth the pertinent parts of the Incentive Compensation Ban in full. (*Id.*) The Manuals conclude that "according to the regulation, incentives relating to enrolling students is [sic] generally prohibited." (*Id.*)

325.   The fact that Defendants' own internal manuals and communications discuss the importance of the Legal Requirements further establishes their knowledge of materiality. *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 501 (8th Cir. 2016) (statements about requirements in school's "own policy" establishes knowledge of materiality).

326.   At the time that Defendant Schools stated in their PPAs and other documents that they would not make incentive payments to admissions personnel based on their success in securing enrollments, Defendant Schools knew that they were paying, and planned to continue to pay, admissions personnel incentive payments based directly on their success in securing enrollments.

327.   Defendant Schools knew that their misrepresentations regarding compliance with the ICB would result in the payment of federal funds and that a reasonable and foreseeable consequence of such misrepresentations was that such funds would be paid out.

328.   Defendant Barney, who personally authored Defendant Schools' compensation policies, has in the past admitted knowing that the relevant "regulations . . . prohibit *any kind* of incentive, bonus, commission, payable to admissions personnel based on recruiting students." (emphasis added). Barney has explained that the ICB is so fundamental, "[i]t's known by everybody . . . who has student federal financial aid."

329.   Barney has in the past admitted that he understands that payment of incentive compensation for recruiting students is a "serious violation" that carries with it "adverse consequences" for schools that engage in the practice. Barney has stated that he is aware that the payment of incentive compensation "is a violation of federal regulations" of a "serious nature."

330.   That Defendant Schools knew that their compensation practices violated the ICB and did not qualify under any of the regulatory safe harbors is also demonstrated by the fact that in 2009, Defendant Schools retrieved (or attempted to retrieve) all copies of their AC Manual that contained charts and other

possible information revealing that Defendant Schools determined ACs' bonuses based on each AC's three-module average number of starts.[49] Although Defendant Schools did not modify their compensation practices in any material way when they revised the Manual—and specifically continued to base AC bonuses on start-related performance measures—Defendant Schools removed all references to such practices in their written Manual because they knew that such practices were unlawful.

331.   Defendant Schools' most senior management coached ACs to lie to regulators about the bonuses—and specifically about whether the bonuses were tied to enrollments. Cristi Brougham, who was an AC at Defendant Schools' Denver campus, was told by Defendant Schools' COO, Barbara Thomas, and other senior management to lie to regulators about how bonuses were paid at the Schools. When regulators visited the Denver campus in February 2011, Ms. Brougham was selected to participate in what was supposed to be a confidential

---

[49] Ms. Brooks recalls that the version of the Manual that she received when she first started working for Defendant SHC in March 2009 included a chart that showed how Defendant SHC determined ACs' bonuses. That chart associated particular bonus awards with an AC's three-module average number of starts. In mid- to late-2009, Defendant SHC demanded that all ACs surrender all copies of the Manual to management. Defendant SHC then issued a revised version of the Manual that omitted the chart directly connecting starts to bonuses. The new version of the Manual that Ms. Brooks and the other ACs received had been scrubbed of all references connecting start-related performance measures to bonuses. Even though the Manual omitted such terms and conditions, in practice, Defendant SHC continued to use starts and other start-related measures to determine ACs' bonuses.

interview with the regulators. Before she went into the room with the regulators for the interview, Ms. Thomas and the campus's director, Nathan Larson, took her aside. Ms. Thomas and Mr. Larson told Ms. Brougham how to respond to questions about AC bonuses, specifically telling her that if asked about bonuses, she should tell them "we don't give bonuses based on enrollments." They told her to avoid suggesting bonuses were based on starts, even though they were. As Ms. Brougham explained in sworn testimony, "I was instructed to lie to the auditors about the bonuses received by admissions representatives." After the meeting, which was supposed to be confidential, Ms. Thomas and Mr. Larson took Ms. Brougham aside and asked her what questions she was asked by the regulators and what answers she had given them.

332.  In 2012, ACCSC scheduled a "surprise" visit to various campuses of Defendant Schools. Although the visits were considered unannounced, Defendant Schools actually received several days' notice of the inspections. The day before ACCSC's visit to the Salt Lake City/Murray campus, the written bonus policy for ACs was altered, the new version was printed and distributed, and employees were told to destroy the copies of the existing bonus policy so that ACCSC could not review them. Defendant Schools' Chief Operating Officer, Barbara Thomas, who came to the campus to supervise ACCSC's visit, became irate when she found out

that an employee still had a copy of the replaced bonus policy—changed the day prior—on her desk. Ms. Thomas berated the Campus Director, Robert Salmon, about the fact the employee had the replaced policy where ACCSC could potentially view it.

333.   In another case, Barbara Thomas went to the Defendant Schools' Boise campus just before, and during, an ACCSC audit. Just before the audit, Ms. Thomas told the ACs to take their manuals home so that auditors could not see the manuals, which, on information, contained information on how ACs could achieve bonuses and how these bonuses were based on enrollment statistics.

334.   Defendant Schools' efforts to conceal their violations of these requirements is further evidence that Defendant Schools are well aware they are significant to the DOE's decisions. *United States v. Savannah River Nuclear Sols., LLC*, No. 1:16-CV-00825-JMC, 2016 WL 7104823, at \*24 (D.S.C. Dec. 6, 2016) ("Defendants' alleged conduct in covering up the [violations] suggests that they would be material to the [agency]."); *U.S. ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 638 (4th Cir. 2015) (same).

335.   The evidence relating to Defendant Schools' payment of bonuses under the Online AC Bonus Plan also demonstrates the Schools' had the requisite knowledge of their violations. Defendant Schools did not even attempt to justify

the Online AC Bonus Plan under the existing statutes and regulations and never bothered to have the Plan evaluated for compliance by any lawyer or other professional. The Online AC Bonus Plan blatantly violated the ICB.

336.   Moreover, Defendant Schools and Mr. Barney knew well that the Online AC Bonus Plan violated the ICB and attempted to hide its existence from all but the most loyal senior management by designating the Online AC Bonus Plan "Confidential." Indeed, on information, Relators allege that the documents associated with the Online AC Bonus Plan are the only documents relating to employee compensation policies that Defendant Schools designated as "Confidential" for internal purposes. Defendant Schools' and Mr. Barney's actions regarding the Online AC Bonus Plan suggest they were attempting to hide those documents from others. Such efforts to conceal the documents supports an inference that Defendant Schools and Mr. Barney knew the Plan violated the law.



338. Even though Defendant Schools are aware of the ICB and repeal of the safe harbors, they continued to pay bonuses to Campus Directors—both before and after the repeal of the safe harbors—based on several measures of enrollment success.

**B.   Accreditation.**

339. Defendant Schools and Carl Barney are well aware of the need to comply with the Accreditation Requirement but choose not to.

340. Additionally, Defendant Schools spend a great deal of time and effort each year attempting to show they are in compliance with accreditation standards and have to deal with self-reporting and site visits for accreditation purposes on a regular basis. There is no real doubt that Defendants are well aware of their obligations to comply with the Accreditation Requirement and to maintain accurate records for that purpose.

341. Indeed, a number of the violations described above were done at the express direction of Defendant Schools' most senior management. For example,

Ms. Wride was directed to prepare false Faculty Personnel Reports at the express direction of her supervisors at the Orem campus; Ms. Snow was told to remove documents from employee files before an accreditation visit by the Schools' compliance team; Ann Meiling, a senior manager in Defendant Schools' compliance department, specifically instructed Ms. Snow to falsify information about faculty members; Barbara Thomas, the Schools' COO, specifically instructed employees at the Cheyenne campus to hide documents from ACCSC before an accreditation visit; Ms. Thomas also specifically told Mr. Allen to falsify records to place in student files during an ACCSC site visit. These violations were all knowingly directed by Defendant Schools' most senior management.

342.   Barney and Mr. Juhlin, during a company meeting in November 2011, stated that ACCSC standards would not prevent Defendant Schools from taking a course of action, regardless of whether ACCSC standards prohibited the practice. For example, when employees questioned whether certain practices were permitted under ACCSC standards, Barney and Mr. Juhlin responded, in effect, that Defendant Schools would do as they "please and ask for forgiveness later."

343.   In an April 21, 2012, email to a number of other high-ranking managers, Barney proposed a new marketing strategy to pay students for attending class under the guise of reimbursing the students for the costs of gas to attend the

classes, even though ACCSC standards prohibit such practices. Barney, anticipating accreditation concerns would be raised, dismissed them offhandedly: "I know, I know all about accreditation and yada yada ya."

344. Defendant Schools have an openly hostile view of ACCSC and its auditors and instruct their employees to do the same. The Schools' current highest-level compliance officer wrote a memorandum to all employees instructing them that ACCSC "is not your friend" and telling them not to share "dirty laundry" or their "frustrations" with ACCSC, apparently even if that "dirty laundry" or those frustrations relate directly to accrediting issues within the purview of ACCSC.

345. Defendants Schools' deception towards ACCSC caused managerial-level employees to resign. Debbi Potts, the former Campus Director (highest-ranking official) at the Wyoming campus, quit after she was forced to engage in the deceptive practices outlined above during an ACCSC visit to the campus. The Wyoming Department of Workforce Services allowed the Campus Director's claim for unemployment benefits, even though she quit, because it determined she had been forced to resign because she was directed to lie to accrediting agencies regarding CAD's business practices.

346. Similarly, the former Dean of CAD's campus in Wyoming, Linda Carter, quit because Defendant Schools' most senior management asked her to lie

to ACCSC. In granting Ms. Carter unemployment benefits, the Division of Appeals of the Wyoming Department of Workforce Services, after holding a hearing, found that Ms. Carter had "good cause" to "le[ave] her employment with the employer because the claimant was being asked to conceal information from an accreditation team" and the "employer's customary working conditions involved deceit."

347.   The former Campus Director at the Wyoming campus disclosed all of the violations of ACCSC standards (described above) directly to Barney, including those relating to Ms. Thomas instructing her to mislead and deceive ACCSC. Barney failed to take any corrective action after being informed of these facts.

348.   Shortly after she resigned in 2012, Barney told Debbi Potts that he did not really care about accreditation standards.

349.   Likewise, Ms. Wride informed both Defendant Schools' CEO, Eric Juhlin, and their COO, Barbara Thomas, about the false Faculty Personnel Reports that she had found. Yet neither of them took any action to correct the situation once they became specifically aware of the false information provided to ACCSC. To the contrary, those same false Faculty Personnel Reports continued to be provided to ACCSC. Defendant Schools knew that providing false Faculty Personnel Reports to ACCSC would result in ACCSC accrediting the School even

though many of their faculty members did not possess the minimum qualifications required under the relevant ACCSC accreditation standards.

350.   Instead of taking corrective action, Defendant Schools' management took steps to cover up the problem, including reprimanding Dr. Babb, taking away all responsibilities from Ms. Wride, and demanding that Ms. Wride stop looking into the issue and remain quiet about the results of her investigation.

351.   Even after Ms. Wride brought the materially false information to the attention of Defendant Schools' senior management, management asked Ms. Wride to prepare further false Faculty Personnel Reports.

352.   Further evidence of Defendant Schools' knowledge of their accreditation violations and falsification of accompanying records is found in their treatment of Relator Wride during a site visit by ACCSC. ACCSC conducted an audit of SHC's Orem campus in approximately spring 2011. SHC's management forced Ms. Wride to "take the day off" to make sure that Ms. Wride did not have any contact with the auditors and, in particular, to prevent Ms. Wride from disclosing the results of her investigation about insufficient faculty qualifications to the auditors.

353.   In a further effort to cover up the violations, Mr. Plant had Ms. Wride dropped from SHC's respiratory therapy program, in which she was then enrolled

as a student. At the time, Ms. Wride only needed six additional classes to complete her bachelor's degree. When Ms. Wride contacted Ms. Thomas to complain of her treatment, Ms. Thomas agreed to reinstate Ms. Wride and to waive her tuition and fees if Ms. Wride agreed to be quiet about the faculty qualifications problems and to "just leave things alone." Ms. Wride understood Ms. Thomas was trying to buy her silence about the accreditation violations.

### C.   Accurate Recordkeeping of Grades and Attendance.

354.   Defendant Schools knew that they were required to submit accurate information concerning student attendance and grades, that their submission of this information constituted a certification by the school to the DOE that the information they supplied was accurate, and that submitting false information concerning attendance and grades was unlawful. Indeed, Defendant Schools were well aware that they submitted such information to the DOE in order to request additional Title IV funding—or, in the vernacular of Defendant Schools, to "order more money" from the DOE.

355.   The registrar at Defendant Schools' Orem/Provo campus understood that manipulating student grades had the likely effect of allowing Defendant Schools to earn more Title IV money than they should have. In addressing an instructor's widespread use of a grading system that allowed every student to

"pass," Mr. Collier explained in an email in August 2010 that when "[s]tudents who should have been received a failing grade have otherwise received a passing grade in the class[, . . . ] the student(s) has/have been charged for the course and possibly additional financial aid has been collected where otherwise the student would have been ineligible for the funding." Mr. Collier identified that what Defendant Schools were doing was "manipulating data in order to collect additional funding from the government."

356.   ACCSC's accreditation standards, which Defendant Schools must comply with at all times, expressly require Defendant Schools to accurately maintain grade and attendance records and enforce reasonable academic performance requirements.

357.   Additionally, Defendant Schools' combined course catalog discusses the importance of academic progress and attendance and the necessity of students attending classes and meeting minimum academic performance standards.

358.   Defendant Schools' own internal communications demonstrate the school was aware of the consequence of falsely reporting student attendance and grades. In one such email communication, Dr. Stephen Babb, a dean at the Orem campus, wrote in an email dated September 1, 2010, that "the attendance roll and grade sheet[s] are official documents . . . that when they are signed by the

instructor, they represent legal documents that are used to draw down federal funds." The email notes that Defendant Schools "have to be able to certify the[ records'] accuracy."

359. Nevertheless, if Defendant Schools' records at the end of a disbursement period indicated that they were required to reimburse Title IV funding to the DOE because a student had failed to attend class, Defendant Schools' management would pressure the instructor who had marked the student absent to change the record so that the Title IV funds would not have to be returned.

360. In fact, managerial-level employees were involved in almost all of the recordkeeping violations, as outlined above.

361. Indeed, according to sworn testimony from a former CAD Dean, the pressure to pass students who failed "was coming from corporate." Specifically, the pressure was communicated through the monthly telephone conferences between Defendant Schools' central management and the Campus Directors and Deans. These monthly calls are the primary means that Defendant Schools' management uses to communicate operational changes to Deans, who supervise the instructors. Defendant Schools' management was the source of the pressure to ensure that the Schools' grade and attendance records helped the Schools

maximize their receipt of Title IV funding, regardless of whether the records were accurate.

### D.     90/10 Rule.

362.   Defendant Carl Barney is acutely aware of the importance of the 90/10 Rule given that, according to statements Barbara Thomas made to Campus Directors, a prior for-profit college that he owned, Sawyer College in San Jose, California, was closed for violating the 90/10 Rule. (Ms. Thomas worked for Mr. Barney at Sawyer College before she began working for Defendant Schools.)

363.   Defendant Schools' records demonstrate their knowledge of the 90/10 Rule and the importance of showing compliance with the rule. Indeed, as alleged above, Defendant Schools track their compliance with the 90/10 Rule on a continual basis and circulate a "key results" report to all upper-level management on a monthly basis, which includes each campus's current 90/10 ratio and which the COO carefully watches each month. Campus Directors are told that Carl Barney is "watching" the 90/10 ratio very closely during monthly conference calls.

364.   Indeed, Defendant Schools' management places intense pressure on lower-level managers to show compliance with the 90/10 Rule, causing employees to cry.

365.    Moreover, as described above, Defendant Schools' policies and procedures demonstrated "a fixation on 90/10" according to a former high-ranking DOE official with deep experience reviewing such documents from a wide variety of schools, including other for-profit colleges.

366.    Moreover, the violations of the 90/10 Rule alleged above were all done with the explicit knowledge—and at the direction of—Defendant Schools' most senior management, including the COO and senior compliance department officials.

## VI.    **DAMAGES**

367.    A large majority of students attending Defendant Schools receive Title IV funding assistance in one form or another.

368.    For example, during the 2010-2011 academic year, approximately 85% of students attending Defendant Schools received some type of loan under a Title IV, HEA program, while approximately 74% of students received a Pell Grant. (Information reported from the mean across all reporting Defendant Schools; information derived from data available from Department of Education's Integrated Postsecondary Education Data System.)

369.   During the 2009-2010 academic year, approximately 87% of students attending Defendant Schools received some type of loan under a Title IV, HEA program, while approximately 74% of students received a Pell Grant. (*Id.*)[50]

370.   Defendant Schools' incentive compensation practices and emphasis on enrollments, regardless of a student's ability to benefit from the education, resulted in ACs enrolling students who were incapable of benefitting from the educational programs or were recruited because they were considered easy targets, such as the homeless.

- Example: In 2009 through 2011, Ms. Brooks and Ms. Wride observed ACs enrolling students at the Orem, Utah, campus with severe cognitive disabilities, as well as others with severe mental disabilities. One such student spent class time talking to inanimate objects. Relators are also aware that at least one AC affirmatively recruited "students" from known homeless populations, persuading them to enroll by telling them that taking classes would give them a warm place to go during poor weather.

- Example: In 2010, an AC at the Colorado Springs campus, Donna Wilcox, recruited both Jessica McCart and Alexander Shaw by providing them with false information about Defendant Schools' programs, specifically about whether those programs were sufficient to qualify a student as a limited scope X-ray technician. Ms. Wilcox

---

[50] According to data reported by Defendant CAD to ACCSC in their 2011 annual reports (covering the period July 2010 to June 2011), 91% of students received Title IV funding at Defendant Schools' Fort Collins, Colorado, campus, 86% received Title IV Pell Grants, and 84% received Title IV Loans. At Defendant Schools' Denver campus, 99.2% of students received some sort of Title IV funding, with 83.8% receiving Pell Grants and 98.1% receiving Title IV Loans. At Defendant Schools' Colorado Springs campus, 96% of students received some type of Title IV funding, with 85% receiving Pell Grants and 96% receiving Title IV Loans.

rushed the students through the enrollment process. Ms. McCart testified that she was directed to "sign here, sign here, sign here" without explanation of the terms of the enrollment agreement and without being given time to read the contract. On May 3, 2018, the Colorado Court of Appeals affirmed arbitration awards to both students based on the misrepresentations during the enrollment process. Notably, in 2010, the AC, Donna Wilcox, was paid $14,560 in bonuses under the AC Bonus Plan and her direct supervisors, Heather Heinbaugh and Sherrie Maple, ADOAs for the Colorado Springs campus, made $63,400 and $40,000 in bonuses that year, respectively.

- Example: In 2012, it was a common practice among ACs paid bonuses at Defendant Schools' Salt Lake City/Murray campus and their campuses throughout Colorado to recruit students into the Medical Specialties program by telling the students they could upgrade to the nursing program. However, only a very small percentage of graduates from the Medical Specialties program were accepted into nursing programs—a fact that was hidden from the prospective students.

- Example: During her tenure as the Career Services Director at the Colorado Springs campus from 2011 to 2013, Jasmine Valencia, witnessed ACs enroll students without the intellectual capacity to do college-level work, including those who could not even read or comprehend an online application. She also witnessed ACs enroll the homeless, who had to be asked to leave when they would sleep in the building and who would leave their belongings in shopping carts outside of the building.

371.   Indeed, the incentives to enroll students caused ACs to misrepresent facts to potential students. As one AC explained in sworn testimony, "[m]any admission representatives would tell prospective students anything to get them enrolled in the school in order to make their quotas to earn bonuses."

372. The harm to the federal student aid program, to the federal government, and to the taxpayer generally is not theoretical.

- Example: In 2007, Kylie Burwell, an AC at the Colorado Springs campus, signed an enrollment agreement with Andres Gilliam,[51] who has severe intellectual disabilities that were readily apparent even to children who interacted with him. Indeed, he would routinely express "incoherent" thoughts; had "delayed and choppy" speech; would ask the same questions repeatedly in a conversation, with no apparent recollection of the earlier answers; and, according to the Dean of the school, "shouldn't have been in school." Nevertheless, Mr. Gilliam was allowed to accrue "an exorbitant amount in student loans"—in excess of $50,000 in federal Title IV loans. Those loans will never be repaid, however, because Mr. Gilliam has been declared totally and permanently disabled due to his intellectual disabilities and his federal loans discharged as a result. Defendant Schools have retained all of the Title IV funds relating to Mr. Gilliam. Notably, Kylie Burwell, the AC that recruited Mr. Gilliam, was paid thousands of dollars in bonuses in 2008, which means it is probable that she was paid a bonus for enrolling Mr. Gilliam.

- Example: Sherrie Maple, who received tens of thousands of dollars in enrollment-based bonuses in 2009 (an example is alleged above), convinced Stacey Lynn Potts[52] to enroll that year. Ms. Maple provided misleading information to Stacey about her career and earnings prospects, including about the salary typical graduates from the college earn, and withheld important information to convince Stacey to enroll. Stacey successfully completed the program but never received the promised jobs that supposedly existed. Ms. Potts now owes approximately $28,000 in student loans but has not been able to make any payments on them because she does not earn enough.

- Example: In 2009 and through 2011, Ms. Brooks witnessed many prospective students who "interviewed" at Defendant SHC's Orem

---

[51] Mr. Gilliam has testified publicly about his experiences.

[52] Ms. Potts has also testified publicly about her experiences.

campus express a desire to enroll in academic programs that Defendant SHC's Orem campus did not offer. ACs at the Orem campus were paid bonuses to convince the prospective students that they should study one of the four programs that the Orem campus offered. Defendant Schools' pressured enrollment of students has resulted in numerous students dropping out of the programs and defaulting on loans provided under the Title IV, HEA programs.

373.   These are not isolated examples. According to an analysis of the repayment rates of CAD/CEHE students, while 75% of CAD/CEHE's students have not paid a single dollar back within three years, the average rate is only 40%. According to Defendant CAD's own data, more than 70% of students who enroll at the school dropout before graduating, 26% dropout within 90 days of the beginning of their term, and 46% of all students dropout within 180 days. Almost all of these students incur debt from Title IV, HEA programs, often tens of thousands of dollars in debt. On information, Relators allege that these rates are similarly dismal at other brands of Defendant Schools.

374.   Defendant SHC's FY2008 three-year cohort default rate, which is the rate at which students default on their Title IV loans, was 24.25%. The FY2008 three-year cohort default rates for the other Defendant Schools were as follows: Defendant CAA: 39.74%; Defendant CAD: 32.02%; and Defendant CCSD: 30.67%. See Department of Education, FY2008 Cohort Default Rates (Updated

April 2011), Column: "Trial 3-Year Default Rate," available at http://studentaid.ed.gov/about/data-center/student/default.

375.  Graduation rates at Defendant Schools are also dismal. For example, for the 2010-11 academic year, the mean graduation rate among Defendant Schools was a scant 40%. (Information reported from the mean across all reporting Defendant Schools; information derived from data available from Department of Education's Integrated Postsecondary Education Data System.)

376.  The federal government has been harmed by the violations of the FCA because Defendant Schools have received hundreds of millions of dollars in grant and loan money from Title IV, HEA programs while those Schools were falsely certifying compliance with one or more of the Legal Requirements.

377.  For example, during the 2009-2010 award year, which ran from July 1, 2009 to June 30, 2010, Defendant Schools received over $127 million in Title IV funding.

378.  During the 2010-2011 award year, Defendant Schools received over $139 million in Title IV funding.

379.  The vast majority of Defendant Schools' total revenues are from Title IV funding.

380.   In this case, "the proper measure of damages is the full amount the United States paid out." *United States v. FastTrain II Corp.*, No. 12-CIV-21431, 2017 WL 606346, at *9 (S.D. Fla. Feb. 15, 2017) (citing *United States ex rel. Longhi v. Lithium Power Techs.*, 575 F.3d 458, 461–62, 473 (5th Cir. 2009)).

381.   Thus, in this case, the measure of damages is at least (1) the value of all Pell grant money, and (2) a percentage of the loan proceeds received by Defendant Schools received by Defendant Schools at a time they were falsely certifying compliance with any Legal Requirement, the exact amount to be determined at trial

## VII.   CLAIMS FOR RELIEF.

### A.   First Claim for Relief: Fraudulent Inducement (PPAs) under 31 U.S.C. § 3729(a)(1)(B) and Its Predecessor.

382.   Defendants are liable for their violations of 31 U.S.C. §3729(a)(1)(B) and its predecessor statute for fraudulently inducing the DOE into the PPAs identified above.

383.   Since June 7, 2008,[53] the FCA has made liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009). Prior to

---

[53] Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625.

that date, the FCA imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (1986).

384.   The elements of a fraudulent inducement or promissory fraud claim are (1) that the defendant made (or caused to be made) false statements, (2) that the defendant knew that the statements were false, (3) that the false statements were material to the government's decision to enter into a contract with the defendant, and (4) that the defendant made claims for payment under the contract that was fraudulently induced.

385.   Here, Defendant Schools (1) made false statements in their PPAs regarding their intent to comply with each of the Legal Requirements, (2) at the time they made these statements, Defendant Schools had policies and practices that violated the Legal Requirements, (3) the false statements in the PPAs were material to the government's decision to sign the PPAs and accept Defendant Schools into the Title IV, HEA programs, and (4) Defendant Schools made thousands of payment requests under the fraudulently induced PPAs.

386.   Here, Defendant Barney (1) caused Defendant Schools to make false statements in their PPAs regarding their intent to comply with each of the Legal Requirements, (2) Barney knew the statements were false because he personally

directed the policies and practices that violated the Legal Requirements at Defendant Schools, (3) the false statements in the PPAs were material to the government's decision to sign the PPAs and accept Defendant Schools into the Title IV, HEA programs, and (4) Defendant Schools made thousands of payment requests under the fraudulently induced PPAs, which personally benefitted Barney.

> **B.**   **Second Claim for Relief: Implied False Certifications (G5 Certifications) under 31 U.S.C. § 3729(a)(1)(A) and its Predecessor.**

387.   Defendants are liable for their violations of 31 U.S.C. § 3729(a)(1)(A) and its predecessor for submitting thousands G5 Certifications with their requests for payment of Title IV funding, which impliedly certified compliance with the PPAs.

388.   For violations occurring on or after May 20, 2009, the false claims provision of the FCA, 31 U.S.C. § 3729(a)(1)(A) (2009), provides that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be liable to the United States Government. For violations occurring prior to May 20, 2009, the false claims provision, at 31 U.S.C. § 3729(a)(1)(1986), provides that a person is liable who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . [a] false or fraudulent claim for payment or approval."

389.   The elements of an implied false certification claim are (1) there was a false or fraudulent claim that made specific representations about the goods or services provided, (2) the defendant knew the claim was false, and (3) defendant presented the claim or caused it to be presented for payment.

390.   Here, Defendant Schools (1) submitted thousands of G5 Certifications with their requests for payment to the DOE, which G5 Certifications made specific representations about Defendant Schools' services complying the PPAs, (2) Defendant Schools knew those certifications were false since they were openly violating numerous PPA requirements at the time they submitted the G5 Certifications with their claims for payment, and (3) Defendant Schools presented the G5 Certifications to the DOE for payment.

391.   Here, (1) at the direction of Defendant Barney, Defendant Schools submitted thousands of G5 Certifications with their requests for payment to the DOE, (2) Defendant Barney knew that the those certifications were false since, at his direction, Defendant Schools were openly violating numerous PPA requirements at the time they submitted the G5 Certifications with their claims for payment, and (3) Barney caused Defendant Schools to present the G5 Certifications to the DOE for payment.

**C.**     **Third Claim for Relief: Express False Certifications (RMAs) under 31 U.S.C. § 3729(a)(1)(B) and Its Predecessor.**[54]

392.   Defendants are liable for their violations of 31 U.S.C. §3729(a)(1)(B) and its predecessor statute for falsely and expressly certifying compliance with each of the Legal Requirements in the RMAs identified above.

393.   The elements of an express false certification claim under the false statements provision of the FCA are (1) an express false statement, (2) made with requisite scienter, (3) that had a natural tendency to influence, or be capable of influencing, the payment of a false claim.

394.   Here, (1) Defendant Schools submitted numerous RMAs to their auditors that expressly and falsely certified the Schools' compliance with each of the Legal Requirements, (2) knew that their express certifications were false, and (3) the RMAs did influence the payment of false claims because without the RMAs the Schools could not have remained eligible to participate in Title IV, HEA programs, as outlined above.

395.   Here, Defendant Barney (1) directed Defendant Schools to submit false RMAs to Defendant Schools' auditor, (2) knew that the express certifications

---

[54] While this Court claimed that Relators "suggest[ed] that all of the management assertions submitted by the Colleges are actionable under a theory of promissory fraud" (ECF 417 at 46), as Relators explained in their brief to the Court resulting in the Order, Relators have always "alleged express false statements claims relating to Defendants' Required Management Assertions" (Motion for Reconsideration, ECF 364 at 27).

contained in the RMA were false, and (3) the RMAs did influence the payment of false claims because without the RMAs the Schools could not have remained eligible to participate in Title IV, HEA programs, as outlined above.

## VIII. <u>JURISDICTION AND VENUE.</u>

396.   This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. §§ 3730, 3732.

397.   This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants transact business and are found in this District and because acts proscribed by 31 U.S.C. § 3729 occurred in this District.

398.   Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because Defendant Schools maintain and operate numerous campuses in this District wherein the alleged violations occurred on a regular basis.

399.   As required under the FCA, 31 U.S.C. § 3730(b)(2), Relators have provided the United States Attorney and the United States Attorney General with written disclosures of substantially all material evidence and information supporting the allegations herein.

400.   Relators are "original sources" as that term is defined in the FCA. 31 U.S.C. § 3730(e)(4)(B). Relators have independent, material, and first-hand knowledge of the information on which the allegations of fraudulent misconduct are based. Relators voluntarily provided such information to the Office of the Inspector General of the Department of Education and the United States Attorneys for the Districts of Idaho and Utah on various dates, including on October 16, 2012, June 7, 2013, and May 13, 2014. Additionally, Ms. Wride orally provided information to the Department of Education at various prior times, including in approximately May 2011.

## IX.   PRAYERS FOR RELIEF

WHEREFORE, Relators, on behalf of themselves and the United States, demand and pray that judgment be entered in their favor against Defendants, as follows:

401.   On Claims I through III, for triple the amount of the United States' damages, plus pre- and post-judgment interest to the extent allowed by law, as well as such civil penalties as are allowable by law, together with all costs and such other and further relief as may be just and proper;

402.   That Relators be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730;

403.   That to the extent the United States Government has intervened in this action, the Relators be awarded an amount of at least 15% but not more than 25% of the proceeds of any award or the settlement of the intervened claims; and

404.   That to the extent that the United States Government has not intervened in this action, the Relators be awarded an amount that the Court decides is reasonable, which is not less than 25% nor more than 30% of the proceeds of any award or settlement for those claims.

## X.   **JURY TRIAL DEMAND**

405.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators demand a jury trial.

DATED this 4th day of May 2018.

/s/ Brandon J. Mark

Brandon J. Mark
Alissa M. Mellem
PARSONS BEHLE & LATIMER
*Attorneys for Relators*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of May 2018, a true and correct copy of the foregoing **RELATORS' FOURTH AMENDED COMPLAINT AGAINST CURRENT DEFENDANTS** was served via the court's CM/ECF electronic filing system to all counsel of record, including the following:

**John W. Black**
john.w.black@usdoj.gov

**Steven M. Gombos**
sgombos@ritzert-leyton.com

**James S. Jardine**
jjardine@rqn.com,jevans@rqn.com,docket@rqn.com

**Jay D. Majors**
jay.majors@usdoj.gov

**Gerald M. Ritzert**
gritzert@ritzert-leyton.com

**Alan L. Sullivan**
asullivan@swlaw.com,phaslam@swlaw.com,lpump@swlaw.com,
amcdonald@swlaw.com,DOCKET_SLC@swlaw.com


/s/ Brandon J. Mark

4830-0441-6353v2