JOHN W. HUBER, United States Attorney (#7226)
SANDRA STEINVOORT, Assistant United States Attorney (#5352)
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Sandra.Steinvoort@usdoj.gov

CHAD A. READLER, Acting Assistant Attorney General
MICHAEL D. GRANSTON, Director
ALLISON CENDALI, Assistant Director
JAY D. MAJORS, Trial Attorney
JOHN W. BLACK, Trial Attorney
U.S. Department of Justice, Civil Division
175 N Street NE
Washington, DC 20002
Telephone: (202) 307-0264
Jay.Majors@usdoj.gov

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. KATIE BROOKS and NANNETTE WRIDE, <br><br> Plaintiffs, <br><br> vs. <br><br> STEVENS-HENAGER COLLEGE, INC., et al., <br><br> Defendants. | Case No. 2:15-cv-00119-JNP-EJF <br><br> **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE GOVERNMENT'S AMENDED COMPLAINT IN INTERVENTION** <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Evelyn J. Furse |

**TABLE OF CONTENTS**

I.      **INTRODUCTION** ............................................................................................... 1

II.    **ARGUMENT** ..................................................................................................... 2

     A.    The Government's Amended Complaint in Intervention Properly Pleads Implied Certification ........................................................................................... 2

         1.    SHC impliedly certified in its G5 Certifications that it was eligible to receive Title IV funding.  SHC was not eligible because it was violating the Incentive Compensation Ban. ................................................................................ 2

         2.    The Government sufficiently alleged that SHC knew it was violating the ICB, rendering its G5 Certifications impliedly false. ............................................. 5

         3.    Title IV Program Participants must submit the required G5 Certifications in order to request payment of federal funds. ......................................................... 8

     B.    The United States Has Properly Alleged Materiality as to its False-Certification Claims ........................................................................................................ 9

         1.    Language of Applicable Requirements .................................................... 14

         2.    Importance of the Requirements to the Program ...................................... 15

         3.    Significance of the Violations ................................................................. 17

         4.    How the Government Treats the Same or Similar Violations .................. 18

III.   **CONCLUSION** .............................................................................................. 22

## TABLE OF AUTHORITIES

**Federal Cases**

*D'Agostino v. ev3, Inc.*, 845 F.3d 1 (1st Cir. 2016)……………………………………………...20

*Kungys v. United States*, 485 U.S. 759 (1988)........................................................................ 9,10

*Neder v. United States*, 527 U.S. 1 (1999) ................................................................................. 9

*Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006)…………………………………….6

*United States ex rel. Berg v. Honeywell Int'l, Inc.*  2018 WL 3237518

    (9th Cir. July 3, 2018)………………………………………………………………16

*United States ex rel. Capriola v. Brightstar Education Group Inc.*, 2013 WL 1499319

    (E.D. Cal., Apr. 11, 2013)……………………………………………………………6

*United States ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103 (1st Cir. 2016) . 14

*United States ex rel. Harman v. Trinity Indus.*, 872 F.3d 645 (5th Cir. 2017)…………………..19

*United States ex rel. Heath v. Wisconsin Bell Inc.*, 272 F. Supp. 3d 1094, 1097

    (E.D. Wis. 2017)……………………………………………………………………...21

*United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)....................... 4

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171

    (10th Cir. 2010)……………………………………………………………………...5, 6

*United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005)........................ 13

*United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494 (8th Cir. 2016) ...................... 14

*United States ex rel. Prather v. Brookdale Senior Living Communities*, 892 F.3d 822

    (6th Cir. 2018)………………………………………………………………10, 11, 12, 13

*United States ex rel. Rose v. Stephens Institute*, 2016 WL 5076214

    (N.D. Cal., Sep. 20, 2016)............................................................................... 7, 8

*United States v. FastTrain II Corp.*, 2017 WL 606346 (S.D. Fla., Feb. 15, 2017) ...................... 5

*United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010) .................... 10

*Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989 (2016) .... passim

**Federal Statutes**

20 U.S.C. § 1001-1002……………………………………………………………………………3

20 U.S.C. § 1094(a)…………………………………………………………………...3, 13

20 U.S.C § 1094(c)(1)(G)……………………………………………………………..13

31 U.S.C. § 3729(b)(4) ........................................................................... 8

**Federal Rules**

34 C.F.R. § 668.32(a) – (a)(1)(i)................................................................. 3

34 C.F.R. Part 600………………………………………………………………………3

34 C.F.R. § 600.40(c)(1)………………………………………………………………4

34 C.F.R. § 668……………………………………………………………………13

Fed. R. Civ. P. 9(b)……………………………………………………………………..5

59 Fed. Reg. 22,348 (Apr. 29, 1994) ....................................................... 15

75 Fed. Reg. 34,806 (June 18, 2010)…………………………………………………15

## I.     <u>INTRODUCTION</u>

In its Order of March 30, 2018, this Court upheld that portion of the United States'
Complaint in Intervention that asserted a False Claims Act cause of action sounding in
promissory fraud, while dismissing the Government's false-certification theory of liability with
leave to amend.  Memorandum Decision and Order, ECF No. 417 ("Order").  On May 4, 2018,
the Government filed its Amended Complaint in Intervention, re-alleging its promissory fraud
claim and amending and re-pleading its false certification theory.  Amended Complaint in
Intervention, ECF No. 424 ("Amended Complaint" or "Am. Compl.").  Defendants, for the third
time, have sought dismissal of at least some portion of the United States' case, renewing
arguments this Court has already heard, considered, and ruled upon, in a last-ditch effort to
dismiss this case at the pleadings stage.  *See* Defendant's Motion to Dismiss the Government's
Amended Complaint in Intervention ("Def. Mot."), ECF No. 439.  Notably, their motion is styled
without qualification as a "Motion to Dismiss" and is silent as to its scope. Although Defendants'
brief limits their arguments to the United States' implied certification theory, Defendants also
assert that this Court must revisit its ruling upholding the United States' promissory fraud theory,
"because the same materiality requirements apply to all FCA claims."  Def. Mot. at 2. This
Court's prior ruling upholding the United States' promissory fraud theory is the law of the case
and is not incorrect simply because Defendants continue to disagree with it.  The Government
will not now burden the Court with needless recitations of facts or statutory background already
presented in prior briefing.

Also, in its Order, when the Court permitted the Government to amend its Complaint in
Intervention, it expressly recognized that the Government's implied certification cause of action

"appears to be a valid legal theory," Order at 21, if the United States could allege the necessary facts and circumstances needed to align with the theory.  The Government has done so, provided detailed specific allegations as to the nature of SHC's impliedly false certification, including the specific representations that were false, and how they were submitted in connection with SHC's claims for payment under Title IV.

Defendants ignore those specific allegations, instead relying on an incorrect reading of the United States Supreme Court's decision in *United Health Services, Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989 (2016) regarding the application of the implied certification theory and the requirements for pleading materiality under the False Claims Act.  As the United States details below, the Government has now properly set forth the allegations necessary for its implied certification theory.  The Court should deny Defendants' Motion.

## II.   ARGUMENT

### A.   The Government's Amended Complaint in Intervention Properly Pleads Implied Certification

#### 1.   SHC impliedly certified in its G5 Certifications that it was eligible to receive Title IV funding.  SHC was not eligible because it was violating the Incentive Compensation Ban.

As this Court recognized in its Order, "the Government's implied-false certification theory appears to be a valid legal theory."  Order at 21.  The Court concluded, however, that in its original Complaint in Intervention, the Government failed to articulate this theory in its factual allegations, instead relying solely on a theory of promissory fraud.  The Court granted the Government leave to amend to articulate both the legal theory and the facts that support it, namely that "[a]t a minimum, the Government needs to allege what Stevens-Henager impliedly represented when it requested Title IV funds." The Government has done so.

The claim forms submitted by SHC for Title IV funding in this case, accompanied by the certifications known as "G5 Certifications" as alleged in the Amended Complaint, are half-truths capable of misleading the Department of Education ("DOE" or "ED").  *See Escobar*, 136 S.Ct. at 2001 ("[T]he defendants' failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths").  Stevens-Henager's claims for payment purported to be submitted on behalf of eligible students, Am. Compl. ¶ 62, and the G5 Certifications accompanying its claims represented that "by processing this payment request … the funds are being expended within three business days of receipt for the purpose and condition of the agreement."  *See* Am. Compl. ¶ 47.  As the United States alleges, the agreement in question is the Program Participation Agreement ("PPA"), into which a school must enter in order to become eligible to received Title IV funding.  Am. Compl. ¶ 25.  The PPA expressly conditions a school's initial *and continuing* eligibility to receive Title IV funding on compliance with specific statutory and regulatory requirements, including the Incentive Compensation Ban ("ICB").  *Id.* ¶ 26-27 (emphasis added); *see also id.* ¶ 28.

The United States alleges that Stevens-Henager submitted numerous claims for payment pursuant to its 2007 and 2010 PPAs on behalf of eligible students.  *Id.* ¶ 62.  However, a student is only eligible if he or she is enrolled at an eligible institution.  *See id.* ¶¶ 62-63; 34 C.F.R. § 668.32(a) – (a)(1)(i) ("A student is eligible to receive Title IV, HEA program assistance if the student . . . . [i]s a regular student enrolled . . . *at an eligible institution*") (emphasis added).  Defendants do not dispute this requirement.  *See* Def. Mot. at 9.  An institution ceases to be an eligible institution for purposes of a Title IV program when it ceases to be an institution of higher education as defined in 20 U.S.C. §§ 1001 and 1002, ceases to be an "eligible institution"

- 3 -

as that term is defined for the purpose of that program, or ceases to have a PPA with the Secretary of Education.  20 U.S.C. § 1094(a).  In general, an institution loses its eligibility on the date it fails to meet any of the eligibility requirements of 34 C.F.R. Part 600.  If the Secretary designates an institution as eligible on the basis of inaccurate information or documentation, such as a representation that the institution will not pay prohibited incentive compensation, the Secretary may determine the designation is void *ab initio*, and the institution was never an eligible institution.  *See* 34 C.F.R. § 600.40(c)(1).

The United States has alleged that Stevens-Henager was not an eligible institution because it violated a core requirement in its PPA—the ICB—and that violation made the institution (and thus its students) ineligible for Title IV funds.  Am. Compl. ¶ 65.  This is so because the applicable statute, regulations, and PPA "explicitly conditioned" both "initial and continuing eligibility of an institution upon compliance" with the ICB, among other provisions. *See id* ¶¶ 26, 28; *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1175 (9th Cir. 2006).  Stated simply, a school cannot enter into the Title IV program without entering into a PPA and each PPA expressly conditions initial *and continuing* eligibility on compliance with the ICB.  Am Compl. ¶¶ 26, 28 (emphasis added).  Despite Defendants' protestations to the contrary, the Government has properly set forth allegations supporting this conclusion.  *See id*. ¶¶ 23-29; 59-67.  Indeed, the Government alleges that Stevens-Henager knew that it was not an eligible institution because it was in violation of the ICB, yet it submitted claims for payment with the required G5 Certifications impliedly representing otherwise.  *Id.* ¶ 65.

Stevens-Henager's post-eligibility claims for payment therefore contained the very type of half-truths to which liability can attach under *Escobar*.  At the time of payment, Stevens-

Henager impliedly represented that it was submitting a loan request on behalf of an eligible

student, and its G5 Certifications represented that the funds were sought "for the purpose and

condition" of the PPA,[1] yet the school failed to disclose that it was in violation of the ICB and

thus violated a core requirement for continuing eligibility to receive Title IV funding. *See* Am.

Compl. ¶¶ 64-65; *see also Escobar*, 136 S.Ct. at 2001 (the claim "makes specific representations

about the goods or services required"). The court in *United States v. FastTrain II Corp.*

("*FastTrain*"), described the mechanics of these claims for payment: an institution requests

"separate draw-downs … in the DOE's Grants Management System (G-5)" while "[e]ach draw-

down falsely certified … compliance with DOE regulations."  2017 WL 606346, at *10 (S.D.

Fla. Feb. 15, 2017).  That court held that each of those separate certifications was also a false

claim under the FCA.  *See id.*  In short, by alleging that Stevens-Henager previously agreed, as

part of its PPA, to comply with the ICB, and subsequently submitted claims for payment with

associated G5 Certifications while knowing it was not in compliance with the ban, the United

States has sufficiently pleaded allegations of implied false claims.

> **2.      The Government sufficiently alleged that SHC knew it was violating the ICB, rendering its G5 Certifications impliedly false.**

Defendants also suggest incorrectly that the Government's Amended Complaint does not

adequately plead allegations "supporting an inference that SHC *knowingly* made false claims for

payment."  Def. Mot. at 12.   Federal Rule of Civil Procedure 9(b) expressly provides, however,

that issues of knowledge need not be pleaded with particularity but rather may be pleaded

---

[1]      The Defendants disagree with the Government's position that "agreement" as used in the G5 Certification refers to the PPA, but they offer no other alternative meaning.  In any event, this disagreement cannot be resolved on the pleadings.

generally. Fed. R. Civ. P. 9(b); *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010).  In its Amended Complaint, the United States has alleged that the Defendants knew and acknowledged that their purported completion payments were based on enrollments and that the ICB prohibited enrollment-based payments.  Am. Compl. ¶ 97-98.  It further alleges that they also knew that Safe Harbor E allowed only "[c]ompensation of recruiters based on the number of students successfully completing a program of study . . . ." *Id.* ¶ 99.

The Amended Complaint alleges that at the time that the Defendants stated in PPAs and other documents that they would not make incentive payments based on success in securing enrollments, they knew that they were paying and planned to continue to pay admissions personnel incentive payments based on their success in securing enrollments.  *Id.* ¶ 100.  The United States goes on to allege that Stevens-Henager "made false certifications of compliance with the Incentive Compensation Ban and of its eligibility for Title IV funding in its Program Participation Agreements, compliance audit Management Assertions, G[5] Certifications, Master Promissory Notes, School Certifications and other documents." *Id.* ¶ 101.  And as alleged, "Stevens-Henager knew that its misrepresentations regarding compliance with the Incentive Compensation ban would result in the payment of federal funds and that a reasonable and foreseeable consequence of such misrepresentations was that the federal Government would pay out such funds." *Id.* ¶ 102.  Further, it alleged that Carl Barney was at the center of these knowing misstatements in promulgating Procedure Directive 85R from 2000 forward.  *Id.* ¶ 77.  All of this information is more than enough to satisfy Rule 9(b).  *See United States ex rel. Capriola v. Brightstar Education Group Inc.*, 2013 WL 1499319, at *6-7 (E.D. Cal., Apr. 11,

2013) (allegation of knowingly running enrollment competitions, along with identification of senior corporate officers involved, was sufficient to allege scienter under Rule 9(b)).

To bolster its argument, Defendants impermissibly ask the Court to take judicial notice of the contents of several documents.  As the United States argued in opposition to Defendants' Motion for Judicial Notice, this is improper.  *See Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006) (the court should not take judicial notice of documents to prove the truth of matters asserted therein).  It is plain that Defendants seek to introduce these documents for the supposed truth contained therein, which they claim supports their Motion to Dismiss the Government's Amended Complaint in Intervention.  Defendants proffer, for instance, that the Hansen Memo— an internal memorandum promulgated without notice and comment and without legal effect— was a "publicly issued statement[] of policy unequivocally establishing [the Department of Education's] intent to treat violations of the Incentive Compensation Ban (ICB) as mere regulatory violations—as opposed to a basis to require the return of Title IV funds."  Def. Mot. at 2.  Defendants' argument as to the Hansen Memo rests on disputed facts: namely, that it was (a) an official statement of policy; (b) that it established the intent of the DOE; and (c) that the intent of the DOE was to "treat violations of the ICB as mere regulatory violations."  Notably, the most recent court to interpret the Hansen Memo disagrees with Defendants' interpretation, finding explicitly that violations of the ICB were material to ED for purposes of the False Claims Act, despite the Hansen Memo.  *See United States ex rel. Rose v. Stephens Inst.*, 2016 WL 5076214, *4 (N.D. Cal. 2016), *interlocutory appeal docketed*, No. 17-15111 (9th Cir. Jan. 20, 2017).  The United States intends to introduce evidence establishing the context of the Hansen Memo and

clarity regarding its interpretation and supporting the view established in *Rose*.  Accordingly, Defendants' argument rests on disputed facts, which the Court cannot resolve on the pleadings.

###     3.     Title IV Program Participants must submit the required G5 Certifications in order to request payment of federal funds.

Finally, Defendants misconstrue the Government's allegations regarding the required G5 Certifications by asserting without support that "the Government does not allege how the G5 Certification makes [Stevens-Henager's] claims for payment on behalf of eligible students false." Def. Mot. at 13.  Contrary to Defendants' assertion, the Government alleges precisely how the G5 Certification makes SHC's claims for payment false: "Stevens-Henager's G5 Certification were false because Stevens-Henager failed to disclose that it was violating the Incentive Compensation Ban.  Because it was knowingly violating the Incentive Compensation Ban, Stevens-Henager was not an eligible institution, thus rendering the institution (and its students) ineligible for Title IV funds."  Am. Compl. ¶ 65.   .

As the United States alleged, the G5 Certifications were not standalone documents; rather, *all* claims for Title IV funding pursuant to a PPA are "required to be accompanied by the G5 Certification."  Am. Compl. ¶ 64.  The G5 Certification explicitly stated its connection to the payment requests.  Indeed, as SHC represented in the G5 Certification, "by processing *this payment request* . . . the funds are being expended within three business days of receipt for the purpose and condition of the agreement."  *Id.* (emphasis added).  As explained above and alleged in the Amended Complaint, that agreement was the PPA.  *Id.*   In short, the Government has alleged that a G5 Certification was required to be submitted with every claim for payment.  That is all that is required at this stage.

Defendants' final argument—that to the extent there is a representation in the G5 it amounts only to an express certification—is of no moment.  In the G5 Certification, SHC represented that the "funds are being expended within three business days of receipt for the purpose and condition of the agreement."  Am. Compl. ¶ 64.  The implied representation is that the school is eligible, which is a fundamental requirement for the receipt of payments under DOE regulations and the PPA. This does not appear on the face of the G5, therefore, the representation is a misleading half-truth which supports a claim for implied certification under *Escobar*. Defendants' distinction, however, is ultimately a meaningless one, considering the United States has alleged both implied certification and express certification in the alternative.  *See* Am. Compl. ¶¶ 114, 116, 120, 122.   Notably, the False Claims Act does not reference such a categorization, and the United States has characterized its claims under both implied and express certification theories.

**B.**     **The United States Has Properly Alleged Materiality as to its False-Certification Claims**

The Supreme Court has explained that requirements (such as the ICB) are material when there is reason to think they are capable of affecting the Government's decision-making process. The False Claims Act defines the term "material" to mean "having a natural tendency to influence or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  In *Escobar*, the Court cited the statutory definition of materiality and noted that the "natural tendency" and "capable of influencing" concepts in that definition are derived from the common law and are used in other federal fraud statutes.  *See Escobar*, 136 S.Ct. at 2002 (citing *Neder v. United States*, 527 U.S. 1, 16 (1999); *Kungys v. United States*, 485 U.S. 759, 770 (1988)).

- 9 -

By embracing the "natural tendency" test codified in the False Claims Act and enshrined in the common law, the Supreme Court made clear that materiality is determined through a holistic assessment of the tendency or capacity of the undisclosed violation to affect the Government decision-maker.  Critically, the Supreme Court did not depart from the statutory text and the common law and did not hold that a relator (or the United States) must demonstrate that the Government would *in fact* refuse payment if it knew of the alleged violations.  Thus, it is not necessary for the United States to show that it would in fact have refused payment had it known the full details of the defendant's scheme, or even that it likely would have refused payment, but merely that the type of violation alleged had the tendency or capability to influence the decision to pay.  The Defendants' motion concedes this point, as it must.  Def. Mot. at 5 ("[t]he materiality standard, the Supreme Court explained, looks to the *likely or actual* affect [sic] a misrepresentation has" on the Government's decision to pay a claim) (emphasis added).  However, Defendants immediately still attempt to steer the materiality inquiry into precisely this error, insisting that the court look only at whether the United States has *in fact* refused payment.  Def Mot. at 5 ("the Supreme Court placed the Government's actual decision to pay claims at the forefront of the materiality analysis").  This court should reject this approach.

As this Court stated in its Order, *Escobar* clarified that a variety of factors are relevant to the materiality inquiry, and it stressed that no one factor is exclusive or dispositive.  *See* Order at 27, *citing Escobar*, 136 S.Ct. at 2001 ("materiality cannot rest on a 'single fact or occurrence as always determinative'").  The Supreme Court rejected the dichotomy between a so-called condition of participation and a condition of payment: "[s]ection 3729(a)(1)(A) imposes liability on those who present 'false or fraudulent claims' but does not limit such claims to

misrepresentations about express conditions of payment." *Id.* at 2001 (*citing United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1268 (D.C. Cir. 2010)); *see also id.* at 2003 ("the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive"). In addition, the Court identified at least three other factors bearing on, but not necessarily dispositive of, the materiality inquiry, including whether the violation goes to the "essence of the bargain," whether the violation is significant or "minor or insubstantial," and whether the Government took action when it had actual knowledge of the same or similar violations. *See id.* at n.5 *(quoting Junius Construction Co. v. Cohen,* 257 N.Y. 393, 400 (1931)) and at 2003-04.

If there were any doubt that this Court was correct about the multi-factor nature of the *Escobar* inquiry, its view of the issue was strongly endorsed in a recent appellate opinion from a different circuit. *United States ex rel. Prather v. Brookdale Senior Living Communities*, 892 F.3d 822 (6th Cir. 2018). The *Prather* court examined each element of the *Escobar* analysis in turn,[2] stating that "[n]one of these considerations is dispositive alone, nor is the list exclusive," 892 F.3d at 831, and it assessed the adequacy of that relator's pleading based on all of those factors. Perhaps most importantly for purposes of this Court's handling of the instant motion, *Prather* held that materiality had been properly alleged *despite the relator having included no allegations about the Government's payment practices. Id.* at 833-34. Absent any such allegations, that factor provided no support for the materiality element of that relator's case, *id.*, but the other

---

[2] The Sixth Circuit appears to have treated *Escobar*'s importance and significance factors largely as two sides of the same coin, as aspects of whether the conduct complained of went to the essence of the bargain between the United States and the party receiving government funds. *See Prather*, 892 F.3d at 831. The multi-factor nature of the analysis, however, remains the overall point.

materiality factors – standing by themselves – were sufficient to render dismissal improper.  *Id.* at 836-37.  The *Prather* court further held that it was improper for the district court to have assessed the absence of payment-related allegations *against* the relator, since at the pleading stage, all inferences had to be drawn in the relator's favor.  *Id.* at 834.

In this way, *Prather* exposes the fatal flaw in the Defendants' motion to dismiss the Government's false-certification claim.  The Defendants' entire materiality argument essentially amounts to an attempt to persuade this court to overturn its own prior Order, ignore the multi-variate aspect of the Supreme Court's guidance, and instead make a narrow materiality inquiry into one aspect of the Government's payment practices.  Def. Mot. at 5 ("The materiality standard in *Escobar* is singularly focused on the Government's decision to pay claims").  They incorrectly portray the Government's payment practices as the "exclusive" focus of the element of materiality.  Def. Mot. at 15 (describing *Escobar*'s materiality standard, as "focused … exclusively on the payment decision").  Even to the extent that they acknowledge the other *Escobar* factors, they seek to collapse them into an issue of payment.  Def. Mot. at 23 (arguing that essence-of-the-bargain factor requires allegations relating to "the Department's payment decision").  *Escobar* is clear that analyzing materiality in the way Defendants do here is wrong, and indeed *Prather* demonstrates that materiality can be adequately alleged even without saying anything at all about the Government's past payment practices.[3]

---

[3]     The Defendants cite various district court ruling ostensibly for the proposition that the Government's past payment practices should be the overweening focus of the materiality inquiry.  To the extent there is any validity to the characterization of those cases, they are at odds with *Prather* and with this Court's own prior ruling.

The Defendants did not have the benefit of the *Prather* opinion when preparing their motion, since it was issued very shortly before their motion was due, but in a Notice of Supplemental Authority, they suggest generally that the dissent in *Prather* was better reasoned. *See* ECF no. 442, at 1-2.  This argument is unavailing, however, because the dissent in *Prather* fully agreed that *Escobar* requires an examination of multiple factors.[4]  *Prather*, 892 F.3d at 845 (McKeague, J., dissenting).  While the dissent in *Prather* put more emphasis on "the government's payment habits," it concluded that the relator failed to provide sufficient facts to support most of the *Escobar* factors.

In the instant case, all of the *Escobar* factors are present and support a finding that materiality has been properly alleged as to the false certification claim in the Amended Complaint filed by the United States, especially as the United States strove to plead its Amended Complaint in accordance to address the concerns previously identified by this Court.  In particular, the United States has alleged an even stronger showing of materiality than that which was deemed sufficient in *Prather*, as the Government has alleged numerous past instances where it has taken adverse action over violations of the ICB.

---

[4]      The *Prather* dissent wrote:

> *Escobar* made it clear that the world is Prather's oyster: No "single fact or occurrence [i]s always determinative" in deciding whether something is material. *Escobar*, 136 S.Ct. at 2001. Instead, the Court subscribes to an approach that treats everything as relevant, so long as it sheds light on the government's behavior, rather than its abstract legal rights. *Id.* at 2001–03 (observing that the relevant barometer of influence is "the effect on the likely or actual behavior of the recipient," not merely whether "the Government would have the option to decline to pay").

*Prather*, 892 F.3d at 845 (McKeague, J., dissenting).  Note too that the dissent agrees that *Escobar*'s test encompasses the "likely" as well as the "actual" behavior of the agency.

### 1.    Language of Applicable Requirements

In *Escobar*, the Supreme Court explained that "the Government's decision to expressly identify a provision as a condition of payment is relevant but not automatically dispositive" in determining materiality.  *Escobar*, 136 S.Ct. at 2003; *Prather*, 892 F.3d 831-32.  In its Order, this Court explicitly found this factor have been adequately pleaded as to the Government's promissory fraud claim, Order at 28, and there is no reason to find otherwise now on the false certification theory.

As pleaded in the Amended Complaint, the governing statute and regulations expressly condition an institution's "initial and continuing eligibility" to receive Title IV funds on compliance with all applicable requirements, including the ICB.  *See* Am. Compl. ¶ 105, (citing 20 U.S.C. § 1094(a)); *see also* 34 C.F.R. § 668.14).  Moreover, ED has authority to withhold payment of funds based upon non-compliance with statutory requirements.  *See* 20 U.S.C. § 1094(c)(1)(G) (allowing the Department to take "emergency action" to withhold funds where it receives reliable information regarding violations of funding requirements); *see also* 34 C.F.R. § 668.83.  After the PPA was executed, compliance had to be re-attested repeatedly in annual audits and in the G5 Certifications with every claim for payment (or else payment might not issue). *See* Am. Compl. ¶¶ 61, 65, 106.

Prior to *Escobar*, the Seventh and Ninth Circuits held that the prohibition on paying incentive compensation to student recruiters is material to ED's decision-making process.  *See United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (holding that false statement in PPA was "integral to the causal chain leading to payment"); *see also Hendow*, 461 F.3d at 1176 (explaining that PPA "is a condition of payment that the federal government

- 14 -

requires – a promise that the University shall not break the law").  Those courts that have considered the issue post-*Escobar* have likewise found that continued compliance with the PPA is a condition of payment for materiality purposes.  *See Rose*, 2016 WL 5076214 at *7; *see also LaPorte*, 2017 WL 3471163 at *3.  The Eighth Circuit recently reached the same conclusion as to a different provision of the PPA.  *See United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 504 (8th Cir. 2016).  The incentive compensation ban is a prerequisite to an institution's initial and continued participation in Title IV programs under the statute, regulations, and PPA.  Stevens-Henager could not have executed the PPA without stating it would comply with that prohibition, and without a PPA, Stevens-Henager could not have received any Title IV funds.  *See Hendow*, 461 F.3d at 1176.

In their motion, the Defendants quibble in a desultory way with the level of specificity with which the ICB was designated a condition of payment, Def. Mot. at 18, 24, but they offer no basis for reconsideration of the Court's prior finding on this point.

### 2.    Importance of the Requirements to the Program

The Supreme Court also indicated in *Escobar* that an important factor in evaluating materiality is whether the alleged violation "went to the very essence of the bargain."  136 S.Ct. at 2003 n.5 (citation omitted); *see also United States ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103, 110-11 (1st Cir. 2016) (on remand).  This factor was critical to the court's analysis in *Prather* as well.  This factor strongly supports the conclusion that violations of the ICB are material.

As alleged in the Government's Amended Complaint, Congress recognized the pernicious influence of commissions when it enacted the ICB, specifically noting that its purpose

was to ensure that Title IV funds were disbursed to students who enrolled in institutions likely to meet their educational needs and who could repay their loans. *See* Am. Compl. ¶ 107; *see also Hendow*, 461 F.3d at 1168-69 (prohibition "is meant to curb the risk that recruiters will 'sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans.'") (*quoting Main*, 426 F.3d at 916). Thus, a core reason for Congress' adoption of the ban was to protect the public fisc.

The DOE has also repeatedly emphasized the importance of the ban. "[T]he Secretary has seen evidence of lowered satisfactory progress standards and in extreme cases, falsified attendance and leave of absence requests, all in an effort to keep students enrolled. In many cases, these practices were designed by admissions personnel who were duly paid after the student passed a retention mark. After that mark, the students were dropped." 59 Fed. Reg. 22,348 at 22,377 (Apr. 29, 1994); *see also* 75 Fed. Reg. 34,806 at 34,817 (June 18, 2010) ("[w]hen admission personnel are compensated substantially, if not entirely, upon the numbers of students enrolled, the incentive to deceive or misrepresent the manner in which a particular educational program meets a student's need increases substantially"). There can be little doubt that the violations of the ICB alleged here go to the "very essence of the bargain" that the DOE entered into when it allowed Stevens-Henager to participate in Title IV programs.

In their motion to dismiss the Government's false certification claim, the Defendants first attempt to read this factor out of the law, calling it "a parenthetical buried in a footnote" in *Escobar*. Def. Mot. at 22. The *Prather* court, however, recognized this element of *Escobar* as one of the primary aspects of the materiality inquiry: "Another factor relevant to materiality is whether the 'non-compliance is minor or insubstantial' or if it goes 'to the very essence of the

bargain.'" *Prather* at 834, citing *Escobar*, 136 S.Ct. at 2003 & n.5.  The Defendants then attempt yet again to collapse this requirement into an exclusive inquiry into the Government's "payment decision," Def. Mot. at 23, but *Prather* rejects this approach as well.  Instead, *Prather* found this element to be satisfied by that relator's allegation that compliance with the requirement at issue in that case was important in preventing fraud, and her allegations of several Government documents indicating that the requirement at issue was "of special concern" to the cognizant agency.  *Prather* at 835-36.  As set forth above, that is precisely what the United States has pleaded in this case.

### 3.      Significance of the Violations

The Supreme Court also noted that "[m]ateriality . . . cannot be found where noncompliance is minor or insubstantial." *Escobar*, 136 S.Ct. at 2003. This factor likewise underscores the materiality of the violations alleged.[5]  Far from "minor or insubstantial," the improper compensation alleged by the Government makes up a large portion of the compensation earned by Stevens-Henager's recruiters.  Under the Defendants' plan, admissions recruiters who secure a high number of enrollments can earn commissions large enough to raise their compensation as much as six times as much as recruiters with low enrollment success.  *See* Am. Compl. ¶ 109.  By any measure, this is a significant amount of remuneration that clearly had significant potential to influence recruiters in their decisions about how and whom to recruit.

---

[5]      The Ninth Circuit recently upheld dismissal of an FCA case, based in part upon a finding that satisfaction of the significance element of the *Escobar* analysis alone, and no other, was inadequate to survive summary judgment.  *United States ex rel. Berg v. Honeywell Int'l, Inc.*, 2018 WL 3237518, at *2 n.5 (9th Cir. July 3, 2018).  In the instant case, however, for all the reasons set forth in this brief, the United States has sufficiently pleaded all of the *Escobar* elements, not simply the significance factor.  Moreover, this case is still only at the pleading stage, and not summary judgment.

The Defendants' motion has nothing to say about this element of the Government's allegations.

### 4.       How the Government Treats the Same or Similar Violations

The Supreme Court also indicated that how the Government has treated violations that are the same or similar to the ones alleged may provide "proof of materiality." *Escobar*, 136 S.Ct. at 2003.  The Court stated that:

> proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.

136 S.Ct. at 2003.  Cases following *Escobar* have taken this approach as well.  The Eighth Circuit found that ED's past enforcement actions were relevant to a finding of FCA liability after *Escobar*.  *See Miller*, 840 F.3d at 504-05 ("The government's acts confirm that it cares about the promise at issue: The DOE relies on school-maintained records to monitor regulatory compliance"). The district court in *Rose* likewise supported a finding of FCA materiality based on the fact that ED "took corrective actions against schools, issued fines, and entered into settlement agreements (which function like a fine or partial revocation of funds) totaling tens of millions of dollars" and "cared about the ICB, and … did not always pay the claims 'in full' despite knowledge of the ICB violations."  *Rose*, 2016 WL 5076214, at *6.

Defendants' motion repeatedly attempts to limit the materiality inquiry by insisting that only a decision by the United States to cut off funding in its entirety should be relevant to this element.  Def. Mot. at 18.  As the case law cited above shows, however, other courts interpreting *Escobar* have not recognized that limitation, at least in the context of for-profit education.

Instead, *Miller* and *Rose* looked to the whole panoply of adverse agency action to evaluate materiality and found it relevant where ED took more limited steps such as corrective actions, fines, and settlement agreements.[6]   Those other adverse actions, even when unaccompanied by a full cutoff of funding, demonstrated the seriousness of the misconduct at issue to the agency.

Outside the context of for-profit education, the limitation on materiality proposed by the Defendants might be viable.  Schools in this industry, however, typically receive up to 90 percent

---

[6]        Moreover, as noted above, the *Rose* court made the point that fines and settlements are themselves a form of partial disgorgement of funds, and its instructive findings are worth noting in full:

> AAU is thus correct that, with one exception, the DOE "has not limited, suspended or terminated any schools' participation in Title IV" based on ICB [incentive compensation ban] violations.  However, this fact does not prove that the DOE considered ICB violations immaterial or unimportant to the Title IV bargain.  To the contrary, the DOE took corrective actions against schools, issued fines, and entered into settlement agreements (which function like a fine or partial revocation of funds) totaling tens of millions of dollars.  The government's actions show that the DOE cared about the ICB, and that it did not always pay the claims "in full" despite knowledge of the ICB violations.  *Escobar*, 136 S.Ct. at 2003; *cf. Hendow*, 461 F.3d at 1176 ("[T]he DOE . . . quite plainly care about an institution's ongoing conduct, not only its past compliance [with the ICB.]").

> Finally, the court notes that the DOE's enforcement of the ICB has changed over time, signaling a "change in position" that is relevant under *Escobar*.  136 S.Ct. at 2004.  In 2002, in informal guidance, the DOE took the position that fines, and not suspension of participation in Title IV, were the most appropriate penalty for ICB violations.  *See* Hansen Memo.  It also created the safe harbors in that year.  However, by 2008 this position had attracted criticism and Congress commissioned a study of DOE's ICB enforcement.  The DOE subsequently took steps to eliminate the safe harbors.  In 2015, after the Office of the Inspector General released a critical report, *see id.*, the DOE officially rescinded the Hansen Memo.  Considering these recent changes, it would be a mistake to give too much weight to the DOE's record of past enforcement.

*Rose*, 2016 WL 5076214 at *6 (internal docket citations omitted).

of their revenue from federal funding,[7] and a complete cessation of such funds would necessarily be a corporate death penalty.  Further, adverse action by ED that has the effect of rendering a chain of colleges defunct necessarily carries a significant risk of harm to innocent third-party students, whose course of studies (and whose entitlement to Title IV funding) will be disrupted if a school is forced to fold.  The Defendants are trying to narrow the materiality inquiry excessively, so that the United States can protect itself against fraud only by incurring the highest possible burden of programmatic disruption.  That is not the spirit or the letter of the Supreme Court's holding, and this Court should not so rule.

The allegations pleaded by the United States in its Amended Complaint as to the actions taken by the Department of Education in other instances over violations of the ICB are clearly stated.

> 110.    Because compliance with the Incentive Compensation Ban is an important factor in a school's initial and continuing eligibility to receive Title IV funding, the Department of Education has taken corrective actions over violations of the Ban against other schools numerous times. The Department of Education has revoked an institution's provisional Program Participation Agreement over a violation of the Ban on one occasion. The Department of Education has imposed administrative fines (which function like a partial revocation of funds) over violations of the Ban, whether through contested adverse action or via settlement of administrative proceedings, on or about 27 other instances since 2002. The United States has settled federal lawsuits over violations of the Ban on at least seven other instances since 2002.

Am. Complaint in Intervention ¶ 110.  Notably, this allegation points out that the Department of Education has revoked a Provisional PPA in one instance, over a violation of the ICB.

---

[7]    See, e.g., the relators' claim arising from an alleged violation of the Higher Education Act's 90-10 Rule.

The above allegations, in the Government's view, affirmatively and adequately allege this element of the *Escobar* analysis so as to render dismissal of the Government's false-certification claim unwarranted.  If this Court were to disagree, however, *Prather* correctly indicates that this would simply mean that this element of the *Escobar* analysis is absent, and materiality would rise or fall depending upon the other factors analyzed above.  In other words, failure to adequately allege this element of the test cannot be the basis for a negative inference against the sufficiency of the Government's Amended Complaint in Intervention.

*United States ex rel. Harman v. Trinity Indus.*, 872 F.3d 645 (5th Cir. 2017), cited by the Defendants, does not support any different result.  Def. Mot. at 24.  In that case, the United States was a non-party, having declined to intervene, but in that litigation, it submitted a declaration expressly stating that the cognizant agency did not consider the particular goods at issue in that case (a type of highway crash barriers) to be defective.  In the instant case, by contrast, the United States has not produced any such exonerating declaration.[8]

Finally, the Defendants argue in their brief that the United States has not adequately alleged that SHC tried to conceal its ICB violations.  Def. Mot. at 20.  Concealment, however, is not part of the *Escobar* inquiry, and thus has no bearing upon materiality.  Moreover, it is not a

---

[8]    Defendants also cite *D'Agostino v. ev3, Inc.*, 845 F.3d 1 (1st Cir. 2016), but that case is distinguishable, because the relator there alleged a continuing violation of FDA drug-labeling requirements that was still in existence at the time of the *qui tam* suit, and the agency in that case had taken no adverse or corrective action even after learning of the allegations.  That is different from the instant case, where the period of liability alleged by the Government ended in 2011, before this *qui tam* suit was filed, so the Government had no opportunity to take action.  *See United States ex rel. Heath v. Wisconsin Bell Inc*., 272 F. Supp. 3d 1094, 1097 (E.D. Wis. 2017) (government's continued payment "while this litigation is pending," though simultaneously monitoring the progress of the lawsuit, allows the government see development of evidence prior to the decision to cease payment).

required element of FCA liability at all.  It is certainly possible that evidence of concealment

could be relevant to the Defendants' scienter, but the United States is permitted to plead the

knowledge element of an FCA violation generally at this stage of the case.  Fed. R. Civ. P. 9(b).

**III.**     **CONCLUSION**

      For the reasons set forth above, this Court should deny Defendants' Motion to Dismiss

the Government's Amended Complaint in Intervention.

      DATED this 13th day of July, 2018.

      CHAD A. READLER
      Acting Assistant Attorney General

      JOHN W. HUBER
      United States Attorney

      /s/ Sandra L. Steinvoort
      SANDRA L. STEINVOORT
      Assistant United States Attorney (#5352)
      111 South Main Street, Suite 1800
      Salt Lake City, Utah 84111
      Telephone: (801) 524-5682
      Sandra.Steinvoort@usdoj.gov

      JAY D. MAJORS, Trial Attorney
      MICHAEL D. GRANSTON, Director
      ALLISON CENDALI, Assistant Director
      JOHN W. BLACK, Trial Attorney
      U.S. Department of Justice, Civil Division
      175 N Street NE
      Washington, DC 20002
      Telephone: (202) 307-0264
      Jay.Majors@usdoj.gov

      Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of July 2018, a true and correct copy of the foregoing Response in Opposition to Defendants' Motion to Dismiss the Government's Amended Complaint in Intervention was served via the court's CM/ECF electronic filing system to all counsel of record.


/s/  Sandra L. Steinvoort