WLF

Washington Legal Foundation
**Advocate for freedom and justice®**
2009 Massachusetts Avenue, NW
Washington, DC 20036
202.588.0302

Critical Legal Issues: WORKING PAPER SERIES

# CONSTITUTIONAL CHALLENGES TO THE FCA'S *QUI TAM* MECHANISM: RIPE FOR A REVIVAL?

By
John T. Boese
Douglas W. Baruch
*Fried, Frank, Harris,*
*Shriver & Jacobson LLP*

WLF

**Washington Legal Foundation**
Critical Legal Issues WORKING PAPER Series

Number 206
February 2018

# TABLE OF CONTENTS

ABOUT OUR LEGAL STUDIES DIVISION ................................................................. ii

ABOUT THE AUTHORS ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

I. *QUI TAM* ENFORCEMENT ..................................................................................... 2

II. RECENT DECISIONS QUESTIONING *QUI TAM* ENFORCEMENT .................. 4

III. PRIOR CONSTITUITONAL CHALLENGES TO *QUI TAM* ENFORCEMENT ...... 8

      A. Prior Case Law ........................................................................................... 8

      B. Prior Department of Justice Opinions ................................................. 12

IV. POTENTIAL GROUNDS FOR REVIVED CONSTITUTIONAL CHALLENGES TO
   *QUI TAM* ENFORCEMENT ...................................................................................... 15

      A. Article II Challenge: Separation of Powers .................................... 16

      B. Article II Challenge: Appointments Clause .................................... 18

      C. Fifth Amendment Challenge: Due Process Clause ....................... 20

CONCLUSION ............................................................................................................... 21

Copyright © 2018 Washington Legal Foundation     i

## ABOUT OUR LEGAL STUDIES DIVISION

Since 1986, WLF's Legal Studies Division has served as the preeminent publisher of persuasive, expertly researched, and highly respected legal publications that explore cutting-edge and timely legal issues.  These articles do more than inform the legal community and the public about issues vital to the fundamental rights of Americans—they are the very substance that tips the scales in favor of those rights. Legal Studies publications are marketed to an expansive audience, which includes judges, policymakers, government officials, the media, and other key legal audiences.

The Legal Studies Division focuses on matters related to the protection and advancement of economic liberty.  Our publications tackle legal and policy questions implicating principles of free enterprise, individual and business civil liberties, limited government, and the rule of law.

WLF's publications target a select legal policy-making audience, with thousands of decision makers and top legal minds relying on our publications for analysis of timely issues. Our authors include the nation's most versed legal professionals, such as expert attorneys at major law firms, judges, law professors, business executives, and senior government officials who contribute on a strictly *pro bono* basis.

Our eight publication formats include the concise COUNSEL'S ADVISORY, succinct LEGAL OPINION LETTER, provocative LEGAL BACKGROUNDER, in-depth WORKING PAPER, topical CIRCULATING OPINION, informal CONVERSATIONS WITH, balanced ON THE MERITS, and comprehensive MONOGRAPH.  Each format presents single-issue advocacy on discrete legal topics.

In addition to WLF's own distribution network, full texts of LEGAL OPINION LETTERS and LEGAL BACKGROUNDERS appear on the LEXIS/NEXIS® online information service under the filename "*WLF*," and every WLF publication since 2002 appears on our website at www.wlf.org.   You can also subscribe to receive select publications at www.wlf.org/subscribe.asp.

To receive information about WLF publications, or to obtain permission to republish this publication, please contact Glenn Lammi, Chief Counsel, Legal Studies Division, Washington Legal Foundation, 2009 Massachusetts Avenue, NW, Washington, DC 20036, (202) 588-0302, glammi@wlf.org.

Copyright © 2018 Washington Legal Foundation     ii

# ABOUT THE AUTHORS

**John T. Boese** is  of counsel in the Litigation Department in Fried Frank's Washington, D.C. office, where he was a partner for almost 30 years.  He joined the firm after five years as a trial attorney in the Civil Division of the United States Department of Justice.  Mr. Boese is a nationally recognized expert on the civil False Claims Act.  He is the author of the book, *Civil False Claims and Qui Tam Actions* (Wolters Kluwer Law & Business 4th ed.), a comprehensive, two-volume treatise on the law and *qui tam* enforcement at both the federal and state levels, which was initially published in 1993 and is routinely cited as authority by courts at all levels.  He has represented defendants in numerous False Claims Act cases brought by *qui tam* relators or by the Department of Justice.  His clients include corporations and institutions in a broad variety of industries.  He has appeared in over 40 federal district courts and argued in most of the federal circuit courts of appeal.  Mr. Boese lectures frequently at law schools and to private and public groups on the False Claims Act and other civil and criminal fraud issues.

**Douglas W. Baruch** is a partner in the Litigation Department in Fried Frank's Washington, D.C. office, where he leads the Firm's False Claims Act and FIRREA Practice.  Mr. Baruch represents corporations and individuals in a variety of complex civil and criminal litigation matters, ranging from investigations and subpoena compliance to federal court litigation, with an emphasis on cases arising under the False Claims Act and FIRREA.  He regularly handles matters arising in the healthcare, financial institutions, and defense and aerospace sectors.  Mr. Baruch is a co-author of *FraudMail Alert*®, which reports on significant developments in the False Claims Act and FIRREA arena.  He also writes and lectures extensively on various aspects of the False Claims Act and FIRREA and is a co-author of a book chapter in the Settlement Agreements in Commercial Disputes treatise entitled, *Settlement Considerations Under the Federal Civil False Claims Act* (Wolters Kluwer Law & Business).

# CONSTITUTIONAL CHALLENGES TO THE FCA'S *QUI TAM* MECHANISM: RIPE FOR A REVIVAL?

## INTRODUCTION

The *qui tam* enforcement provisions of the civil False Claims Act, 31 U.S.C. §§ 3729-33 (2012) (FCA), allow a private party (known as a "*qui tam*" relator) to initiate and independently prosecute an FCA case on behalf of the United States and to be awarded up to thirty percent of any government recovery based on the relator's claims.[1] The constitutionality of this unique *qui tam* enforcement mechanism was the subject of much academic and judicial focus in the initial years after the passage of the watershed amendments to the FCA in 1986.

Once the U.S. Supreme Court issued its decision in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*,[2] however, the interest in that topic dropped off dramatically.  Justice Scalia's opinion traced the history of *qui tam* enforcement

---

[1] *Qui tam* cases have many unique procedural features.  First, the *qui tam* complaint is filed under seal and served only on the Justice Department and the appropriate U.S. Attorney's Office, together with a written disclosure of the information the *qui tam* relator possesses.  31 U.S.C. § 3730(b)(2).  The government then has 60 days—subject to extension by the court for good cause shown—to investigate the allegations and decide whether to intervene or decline to intervene in the action. 31 U.S.C. §§ 3730(b)(2), (b)(3), (b)(4).  While the government declines to intervene in the vast majority of *qui tam* cases, the statute provides in such non-intervened cases that "the person bringing the action shall have the right to conduct the action" without the government.  *Id.* at § 3730(d)(2). The constitutional issues raised in this WORKING PAPER arise predominantly in those cases where the government declines to intervene and the *qui tam* relator is allowed to independently prosecute the FCA claims for alleged government loss on behalf of the government.

[2] 529 U.S. 765 (2000).

Copyright © 2018 Washington Legal Foundation     1

from the Colonial era, and the Court unanimously held that *qui tam* relators have

Article III standing, even though they suffer no injury themselves, because relators are

"assignees" of a portion of the government's FCA claim.  The other possible grounds

to question the constitutionality of *qui tam* enforcement—interference with the

executive branch's Article II power, the Appointments Clause, and Due Process—were

not before the Court in *Stevens*.  Even so, many practitioners and academics assumed

that those constitutional challenges could not succeed in light of *Stevens'* outcome.

Recent court decisions, however, have questioned the wisdom of *qui tam*

enforcement, at least in many circumstances where the interests of the *qui tam*

relator conflict directly with the interests of the executive branch and the public

interest.  Now, more than 30 years after the 1986 amendments expanded the power

and independence of *qui tam* relators, those opinions may form a basis for courts to

revisit the constitutionality of this private enforcement of the government's rights and

remedies, and to review whether Justice Scalia's rationale in *Stevens* enhances, rather

than precludes, the other grounds for questioning the constitutionality of *qui tam*

enforcement.

## I.    *QUI TAM* ENFORCEMENT

The FCA, known as the "Informer's Act" or the "Lincoln Law," was enacted in

1863 in response to allegations of fraud on the government (such as providing the

Union Army with lame horses, sawdust instead of gunpowder, etc.) during the Civil

Copyright © 2018 Washington Legal Foundation    2

War.  Both then and now, the FCA can be enforced not only by the powerful resources of the federal government, but also by private plaintiffs, referred to as *qui tam* relators. The term "*qui tam*" is derived from a Latin phrase, "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," or "who pursues this action on our Lord the King's behalf as well as his own."[3]  As this phrase indicates, the *qui tam* action arose in early English common law as a device for permitting private individuals to litigate on the sovereign's behalf.  Like relators in current FCA actions, early *qui tam* litigants not only gained standing they otherwise would lack, but also were entitled to a share of any recovery obtained on the sovereign's behalf as a result of the *qui tam* action.[4]

The rights, power, and independence of *qui tam* relators were expanded in the 1986 amendments to the FCA's *qui tam* provisions.[5]  As a result, relators now are authorized to initiate *qui tam* litigation on the government's behalf, to continue the litigation when it has declined to intervene, to participate in the litigation when the government has intervened, to receive up to 25 percent of the government's recovery in intervened cases and up to 30 percent in declined cases, to share in the

---

[3] *Stevens,* 529 U.S. at 768 n.1.

[4] *See* John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 1.01[A] (Wolters Kluwer Law & Business) (4th ed. & Supp. 2018-1).  Following amendments to the FCA in 1943 that were intended to eliminate abuses in *qui tam* enforcement, the statute fell into relative disuse after the Second World War, but it gained notoriety and prominence after amendments in 1986 re-energized private enforcement.

[5] The 1986 amendments expanded the *qui tam* enforcement mechanism by, *inter alia*, allowing *qui tam* participation after government intervention, encouraging *qui tam* enforcement if the government declined to intervene, replacing the government knowledge bar with the public disclosure and original source provisions, increasing *qui tam* recoveries, and adding a retaliation provision.

Copyright © 2018 Washington Legal Foundation    3

government's recovery obtained through an alternate remedy, and to object to the

government's dismissal or settlement of FCA claims raised by relators.  In a number of

recent FCA cases, relators' pursuit of *qui tam* claims has resulted in clear injustices, as

evidenced by massive jury verdicts ultimately overturned for lack of merit and

dismissal of actions following extensive and expensive discovery and motions practice.

Federal programs have expanded greatly since the FCA's Civil War enactment,

and with that expansion, opportunities for abuse—or perceived abuse—of

government resources also have increased.  Relator claims now extend far beyond

those encompassed by the original intent to punish Civil War fraudsters for selling

defective goods to the Army.  Today, the government's and *qui tam* relators' interests

are not always aligned, and their misalignment has significant consequences.  Recent

declined *qui tam* cases show that relators are challenging noncompliance with

increasingly remote regulatory requirements, and that *qui tam* enforcement is

extending far beyond actual "fraud" on the government.  The gap between the

government's and relators' interests has widened as a result.  In light of these

developments, it is appropriate to re-examine the constitutional basis for the FCA's

*qui tam* provisions.

## II.    RECENT DECISIONS QUESTIONING *QUI TAM* ENFORCEMENT

In *United States ex rel. Harman v. Trinity Industries, Inc.*,[6] the relator alleged

---

[6] 872 F.3d 645 (5th Cir. 2017).

Copyright © 2018 Washington Legal Foundation    4

that the defendant sold defective highway guardrails and concealed a modification of the guardrail end terminals from the federal agency that had approved them.   The relator relentlessly pursued fraud allegations against a competitor—through a mistrial, a second trial, and two appeals to the Fifth Circuit—despite the government's thorough investigation of the alleged safety violations, its finding that its safety standards were met, its repeated rejection of the relator's fraud allegations, and its continuous payment for the defendant's product.  In fact, the evidence showed that the Federal Highway Administration crash tested the modified guardrails, approved them, and determined that there was "an unbroken chain of eligibility" for federal reimbursement for them.

Yet, because the *qui tam* relator, not the Justice Department, controlled the litigation, the case proceeded to trial.  The jury found the defendant liable for FCA violations, and the trial court ordered the defendant to pay $663 million in damages to the government, plus $19 million for the relator's attorneys' fees and costs.  The Fifth Circuit reversed, finding no FCA liability because the government knew about the modifications and nevertheless accepted and paid for the guardrails.  The court observed that, absent some reason to doubt the government's decision as genuine, the jury's determination "cannot defy the contrary decision of the government," the only actual victim of an FCA violation.  The Fifth Circuit added this cautionary note decrying the circumstances which enabled the case to proceed:

Copyright © 2018 Washington Legal Foundation     5

> As the interests of the government and relator diverge, this congressionally created enlistment of private enforcement is increasingly ill served. When the government, at appropriate levels, repeatedly concludes that it has not been defrauded, it is not forgiving a found fraud—rather it is concluding that there was no fraud at all.[7]

The First Circuit expressed similar concerns in *United States ex rel. D'Agostino v. ev3, Inc.*,[8] where a relator attempted to impose FCA liability arising out of allegations of regulatory noncompliance involving a medical device.  The court found that the relator's fraudulent inducement allegations failed to take into account the government's interest in the continuing validity of its regulatory rulings, which included the FDA's actions with respect to the defendant's medical device:

> The FDA's failure actually to withdraw its approval of Onyx in the face of D'Agostino's allegations precludes D'Agostino from resting his claims on a contention that the FDA's approval was fraudulently obtained. To rule otherwise would be to turn the FCA into a tool with which a jury of six people could retroactively eliminate the value of FDA approval and effectively require that a product largely be withdrawn from the market even when the FDA itself sees no reason to do so. The FCA exists to protect the government from paying fraudulent claims, not to second-guess agencies' judgments about whether to rescind regulatory rulings.[9]

Finally, as in *Harman,* the relator in *United States ex rel. Ruckh v. Salus Rehabilitation, LLC,* initiated and pursued a declined *qui tam* case to verdict, winning a

---

[7] *Id.* at 669-70.

[8] 845 F.3d 1 (1st Cir. 2016).

[9] *Id.* at 8.

Copyright © 2018 Washington Legal Foundation    6

$350 million judgment against the nursing home defendants, which ultimately was overturned by the district court based on its finding that the relator failed to show that the government would not have paid the nursing homes' claims.[10]  The relator contended that the bills to Medicaid and Medicare of 53 nursing facilities were for inadequate or "unnecessary" services because the facilities failed to maintain care plans, and had some unsigned or undated documents on file.  The court granted the defendants' renewed motion for judgment as a matter of law, based on the findings that the relator offered no meaningful proof that the government would have considered the disputed practices material, and that the government's continued payment was of more consequence than the inference of fraud espoused by the relator:

> In fact, both [the federal and state] governments were—and are—aware of the defendants' disputed practices, aware of this action, aware of the allegations, aware of the evidence, and aware of the judgments for the relator—but neither government has ceased to pay or even threatened to stop paying the defendants for the services provided to patients throughout Florida continuously since long before this action began.[11]

These and other recent cases show that relators' interests have diverged from, and even directly conflicted with, government interests in a wide variety of declined *qui tam* cases, and that relators often win large judgments in *qui tam* cases—even

---

[10] *Ruckh,* No. 8:11-cv-1303-T-23TBM, 2018 WL 375720 (M.D. Fla. Jan. 11, 2018).

[11] *Id.* at *1.

Copyright © 2018 Washington Legal Foundation    7

where the government has received exactly what it paid for.[12]  They call into doubt

the purpose and efficacy of the congressionally created *qui tam* enforcement

mechanism, and at the root of these questions lies the fundamental issue of whether

*qui tam* enforcement itself is constitutional, separate and distinct from whether

relators have Article III standing, as determined by the Supreme Court in *Stevens*.

## III.   PRIOR CONSTITUTIONAL CHALLENGES TO *QUI TAM* ENFORCEMENT

### A.   Prior Case Law

Previous constitutional challenges to *qui tam* enforcement of the FCA have

argued, *inter alia*, that *qui tam* actions violate the separation of powers doctrine by

---

[12] For example, in *United States ex rel. Bishop v. Wells Fargo & Co.*, the Second Circuit declined to expand the FCA to reach the relator's claims that defendants failed to comply with the Fed's discount window borrowing regulations, noting that

> [i]t could incentivize individuals to bring suit without regard for the larger implications on the financial system.  Permitting *qui tam* plaintiffs like the relators here to proceed on the facts of this case could discourage banks from accessing the discount window out of concern that they might face FCA liability if they are not in compliance with "any law or regulation."  The result would be precisely the opposite of the Fed's intentions in changing discount window operations in 2003.

823 F.3d 35, 46 (2d Cir. 2016), *vacated on other grounds and remanded*, 137 S. Ct. 1067 (2017).  *See United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746 (3d Cir. 2017) (nothing in declined *qui tam* suit suggested that a necessary work-around to new Part D regulations in order to fill necessary prescriptions paid by CMS "served anything other than the practical purpose of facilitating that payment and disbursement of those prescriptions"); *United States ex rel. Nargol v. Depuy Orthopaedics, Inc.*, 865 F.3d 29 (1st Cir. 2017) (despite relator's allegations, government paid claims because FDA affirmatively deemed product safe and effective); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017) (relator disclosed reporting deficiency claims to FDA, FDA continued approval, CMS reimbursed claims, and DOJ took no action against defendant).  *See also* Notice of Voluntary Dismissal, *United States ex rel. Morgan v. Bank of Am.,* No. 16-cv-03425 (N.D. Ill. Jan. 19, 2018) (notice of voluntary dismissal of all claims against Bank of America, Countrywide, and Wells Fargo with prejudice as to relator "in light of exonerating evidence produced by ... Defendants"); Notice of Voluntary Dismissal, *Morgan,* No. 16-cv-03425 (N.D. Ill. Jan. 2, 2018) (notice of voluntary dismissal of all claims against J.P. Morgan Chase and Citigroup as to relator "in light of exonerating evidence produced by ... Defendants").

Copyright © 2018 Washington Legal Foundation      8

impermissibly placing the prosecutorial discretion of the United States in private hands and authorizing congressional and judicial control over executive functions. Courts rejected these arguments because the FCA grants "a degree of control" over the litigation to the executive branch that is "sufficient."

One of the first appellate court decisions to discuss the constitutionality of the *qui tam* provisions was the Ninth Circuit's opinion in *United States ex rel. Kelly v. Boeing Co.*[13] Addressing the threshold question of whether *qui tam* relators have Article III standing to bring the government's claim under the FCA, the Ninth Circuit concluded that the relator had standing because Congress assigned the government's fraud claim to the relator, the theory later adopted by the Supreme Court.[14]  The court further found that the assignment of this prosecutorial function to private parties did not impermissibly undermine the role of the executive branch.[15]  In its analysis of the separation of powers question under Article II, § 3, the court looked to the Supreme Court's holding in *Morrison v. Olson* that the executive branch had "sufficient control" over the office of the "independent counsel" under the Ethics in Government Act of

---

[13] 9 F.3d 743 (9th Cir. 1993).

[14] Specifically, the Ninth Circuit concluded that *qui tam* relators had standing because the FCA bestowed on them the United States' interest in fraud claims by assignment of a contractual right.

[15] After finding the relator had Article III standing, the court addressed the additional constitutional questions of whether the *qui tam* provisions violate: (1) the separation of powers principle under Article II, § 3 that the President—not the legislative branch or the judiciary—"shall take Care that the Laws be faithfully executed," (2) the requirements under the Appointments Clause, Article II, § 2, cl. 2, and (3) the Fifth Amendment's Due Process Clause, and concluded that none was violated.

Copyright © 2018 Washington Legal Foundation     9

1978 to withstand challenge on separation of powers grounds.[16]  Analogizing the

FCA's *qui tam* provisions to the independent counsel provisions and applying the

*Morrison* test, the Ninth Circuit concluded that the judicial requirements under the *qui*

*tam* provisions (*e.g.*, judicial approval for government intervention, settlement, and

dismissal) did not exceed the bounds of judicial infringement on prosecutorial

authority established in *Morrison,* and thus did not violate the separation of powers.

Justice Scalia famously disputed the Court's validation of the independent

counsel provisions in a vigorous dissent in *Morrison,* arguing that they violated the

separation of powers principle under Article II, § 1, cl. 1, which vests executive power

in the President, that "this does not mean *some of* the executive power, but *all of* the

executive power," and that the Court's decision to allow Congress to transfer the

"vast power and the immense discretion that are placed in the hands of a prosecutor"

to a "mini-Executive" "permanently encumbered the Republic with an institution that

will do it great harm."[17]  These controversial provisions have since lapsed (in 1999).

Subsequently, the Fifth Circuit, in *Riley v. St. Luke's Episcopal Hospital*, found

---

[16] 9 F.3d at 751 (citing *Morrison,* 487 U.S. 654, 696 (1988)).

[17]*Morrison,* 487 U.S. 658, 705, 727, 732, 733 (Scalia, J., dissenting).  Justice Scalia's arguments in defense of executive power continue to resound today, and his dissent in *Morrison* is worth reading not only for its constitutional arguments, but also for its clear, passionate language expressing them, as in this characterization of the independent counsel provisions:

> Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing:  the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis.  But this wolf comes as a wolf.

*Id.* at 699.

Copyright © 2018 Washington Legal Foundation     10

that the executive retains "significant control" over the litigation in declined *qui tam* cases, citing as evidence that "[t]he record before us is devoid of any showing that the government's ability to exercise its authority has been thwarted in cases where it was not an intervenor."[18]  The Fifth Circuit distinguished the independent counsel provisions and the ruling in *Morrison,* finding *qui tam* relator intrusion on the executive's Article II power "comparatively modest, especially given the control mechanisms inherent in the FCA to mitigate such an intrusion and the civil context in which *qui tam* suits are pursued."[19]

Nevertheless, it is important to note that the independent counsel provisions were intended to cure a structural problem within the executive branch—the perceived conflict of interest when the Attorney General is called upon to investigate criminal wrongdoing by his close colleagues within the executive branch.  Unlike the rationale for those provisions, which was restricted to that narrow circumstance, the *qui tam* provisions' encroachment on Article II executive power extends far beyond narrow circumstances:  the *qui tam* provisions of the FCA deputize the public at large to enforce the law.

The *qui tam* provisions essentially take the executive's power to initiate suit under the FCA and give it to private persons who owe no loyalty to the government or

---

[18] 252 F.3d 749, 753 (5th Cir. 2001).

[19] *Id.* at 757.

Copyright © 2018 Washington Legal Foundation     11

its interests and are without responsibility for the government programs at issue. They allow these private individuals and entities to sue in the government's name, and to continue the litigation even if the government makes clear that it disagrees on the merits or has other legitimate reasons not to pursue the litigation.

In addition, the government's ability to settle the case when the relator objects is subject to judicial review as to whether the settlement is "fair, adequate and just" under the circumstances.  In cases such as *United States ex rel. Schweizer v. Oce N.V.*, the government has been unable to settle the *qui tam* case without judicial review when the relator objected to the settlement.[20]

Given the key role executive control plays in the courts' separation of powers analysis, the erosion of executive control reflected in *Harman, Schweizer,* and other recent *qui tam* cases underscores the importance of assessing whether *qui tam* enforcement passes constitutional muster today.

## B.    Prior Department of Justice Opinions

Noting the "massive upsurge" in *qui tam* actions following the 1986 amendments, the Justice Department's Office of Legal Counsel, the Civil Division, and

---

[20] 677 F.3d 1228 (D.C. Cir. 2012) (citing § 3730(c)(2)(B)).  The court concluded that this limit on executive control was permissible under the separation of powers doctrine because, unlike executive decisions not to prosecute, which are immune from review, or the government's dismissal authority under § 3730(c)(2)(A), which is unconditional, judicial review under § 3730(c)(2)(B) applies when the government seeks to end a pending *qui tam* action through settlement and invokes the court's supervisory powers.  *See Gravitt v. General Elec. Co.,* 680 F. Supp. (S.D. Ohio), *cert. denied,* 109 S. Ct. 250 (1988) (rejecting the settlement after relator objected).

Copyright © 2018 Washington Legal Foundation     12

the Office of Legal Policy all initially agreed that the *qui tam* provisions were

unconstitutional.  In 1989, the Office of Legal Counsel sent the Attorney General a

lengthy memorandum opinion that vigorously challenged the constitutionality of

these provisions, arguing that they posed "a devastating threat to the Executive's

constitutional authority and to the doctrine of separation of powers," and that they

gave Congress "carte blanche to divest the Executive Branch of its constitutional

authority to enforce the laws and vest that authority in its own corps of private

bounty hunters."[21]

In this memorandum, the Office of Legal Counsel directly opposed the Solicitor

General's recommendation that the government intervene in district court to support

the facial constitutionality of the *qui tam* statute, and mounted serious constitutional

arguments against it, including that the statute (1) violates the separation of powers

doctrine by impermissibly encroaching on Article II executive power, (2) interferes

with the government's enforcement role and prosecutorial discretion, (3) violates the

Article II Appointments Clause, and (4) violates the Article III standing doctrine.  These

arguments focused on the separation of powers concern—a concern that the

Founders framed as the choice between liberty and tyranny:

> [I]n the qui tam provisions, Congress has extended its power
> far beyond the legislative sphere.  Where, as here, Congress
> has provided for its law to be enforced by its own deputies,

---

[21] 13 Op. O.L.C. 207, 208 (July 1989), *available at*
https://www.justice.gov/file/24271/download.

Copyright © 2018 Washington Legal Foundation     13

the essence of separation of powers has been violated, for "[w]hen the legislative and executive powers are united in the same person or body, . . . there can be no liberty, because apprehensions may arise lest the same monarch or senate should *enact* tyrannical laws, to *execute* them in a tyrannical manner."[22]

In a subsequent memorandum in 1996 entitled "The Constitutional Separation of Powers between the President and Congress," the Office of Legal Counsel indicated that its view on the constitutionality of the *qui tam* provisions had changed, and that lower courts were correct in rejecting Appointments Clause challenges to the role of *qui tam* relators.[23]  This memorandum stressed that applying the general separation of powers principle to specific questions was "unavoidably difficult," and "the answers we or the courts reach ordinarily should be viewed as quite specific to context."[24] Though it did not directly address the separation of powers issue in the *qui tam* context, the memorandum's general separation of powers principle clearly encompasses that context:

> Executive branch agencies should be careful to object to any legislation that unduly reduces the accountability of officials or agencies to the President, or that unnecessarily interferes with the flexibility and efficiency of executive decision making and action.

---

[22] 13 Op. O.L.C. 207, 231 (quoting THE FEDERALIST No. 47, at 326 (J. Madison) (J. Cooke ed. 1961) (quoting Montesquieu)).

[23] 20 Op. O.L.C. 124, 146 n.65 (May 1996) (citing with approval the analysis in *United States ex rel. Burch v. Piqua Eng'g, Inc.,* 803 F. Supp. 115 (S.D. Ohio 1992) (holding that "because *qui tam* plaintiffs are not officers of the United States, the FCA does not violate the Appointments Clause" and disapproving the 1989 memorandum's analysis and conclusion that the *qui tam* provisions violate the Appointments Clause), *available at* https://www.justice.gov/file/20061/download.

[24] 20 Op. O.L.C. 124, 135.

Copyright © 2018 Washington Legal Foundation    14

Such legislation undercuts the constitutional purpose of creating an energetic and responsible executive branch.[25]

The government's various conflicting past positions reflect the difficult, context-specific constitutional questions raised by *qui tam* enforcement, without providing definitive answers to them.  Except for the Article III standing argument invalidated in *Stevens*, the grounds for constitutional challenges that the government previously has considered and/or rejected under Article II are still viable today.

## IV.   POTENTIAL GROUNDS FOR REVIVED CONSTITUTIONAL CHALLENGES TO *QUI TAM* ENFORCEMENT

Analysis of the *qui tam* provisions' constitutionality begins with the questions decided in *Stevens,* and perhaps more importantly, also considers constitutional questions the *Stevens* majority specifically left open under Article II.  An additional ground for challenging these provisions is the Due Process Clause in the Fifth Amendment.

---

[25] *Ibid*.  In a later memorandum in 2007, the Office of Legal Counsel again concluded that *qui tam* relators are constitutional in the context of the Appointments Clause because their authority is "ad hoc or temporary" rather than "continuing," and they "do not hold offices."  *See* 31 O.L.C. 73, 77 (Apr. 2007), *available at* https://www.justice.gov/file/451191/download.  The 2007 memorandum noted that the *qui tam* provisions allow the relator "essentially to appoint himself to act as a civil prosecutor for the United States in a case"—without critique as to this extraordinary aspect of government litigation—and skipped over the relevance of his "'appointing' himself," in contrast to a person who contracts with the government, as a distinction that "does not pose a problem under the Appointments Clause," without noting the problems caused by the lack of government influence over its own litigation. 31 O.L.C. at 114.  The memorandum also minimizes the relator's role as involving "only occasional duties, and extending only to a single case," glossing over the pervasiveness of the government control problems shown in the *Harman* and *Ruckh* litigation.  *Ibid.*

Copyright © 2018 Washington Legal Foundation    15

### A.    Article II Challenge:  Separation of Powers

In *Stevens,* the Supreme Court squarely addressed just one of the constitutional

questions raised by the *qui tam* provisions—whether *qui tam* relators have standing

to sue under Article III's justiciability requirements—without delving into other

constitutional questions addressed in *Morrison* and *Kelly.*  Writing for the majority in

*Stevens*, Justice Scalia concluded that the United States' injury in fact met the "case or

controversy requirement" and conferred Article III standing on the relator, and that

the relator could recover the bounty provided under the FCA as a partial assignee of

the United States.  It is important to factor into the analysis of the constitutionality of

the *qui tam* provisions that the *Stevens* majority did not address separation of powers

or Article II issues at all—other than to note that standing jurisprudence "may

sometimes have an impact on Presidential powers," while also noting that standing

"derives from Article III and not Article II."[26]

Before *Stevens* and shortly afterward, some courts opined that the assignment

theory adopted in *Stevens* also disposed of separation of powers challenges to the *qui*

*tam* provisions under Article II.  For example, the dissent in *Stevens* stated that the

historical evidence supporting the majority's finding that *qui tam* suits met Article III's

case or controversy requirements "is also sufficient to resolve the Article II

---

[26] 529 U.S. 765, 778 n. 8.

Copyright © 2018 Washington Legal Foundation    16

question."[27]  The majority's response to this assertion was to point out that standing

derives from Article III, not Article II, and to make clear that it was expressing no view

as to whether *qui tam* suits violate Article II's Appointments Clause or "take care"

Clause. Thus, the *Stevens* majority did not apply its historical-evidence rationale for

standing to Article II challenges to the *qui tam* enforcement mechanism, nor does its

assignee rationale necessarily preclude them.

Moreover, determining that the case or controversy requirements in Article III

have been met answers the justiciability question, which is not the same as

determining whether, in enacting the *qui tam* provisions, Congress impermissibly

encroached on the prosecutorial authority of the executive branch.  Indeed, "usage

alone—regardless of how longstanding and venerable—cannot validate a practice that

clearly violates constitutional principles."[28]

The better approach would seem to be to take the *Stevens* majority at its word

and view the weighty separation of powers and Article II questions as undecided.

And, in addressing them directly and anew, courts should take into account the

evidence of interference with executive functions by *qui tam* relators, the lack of

---

[27] *Stevens,* 529 U.S. 789, 801 (Stevens, J. dissenting).  *See Kelly*, 9 F.3d 743, 757; *Riley*, 252 F.3d 749, 752 ("[W]e are persuaded that it is logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to qui tam lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question.").

[28] 13 Op. O.L.C. 207, 232 & n.17 (citing *Walz v. Tax Commission,* 397 U.S. 664, 678 (1970) ("It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.")).

Copyright © 2018 Washington Legal Foundation    17

government control in recent cases, and the potential for such conflicts and

interference under the *qui tam* provisions in the future.

### B.    Article II Challenge:  Appointments Clause

A second constitutional argument against *qui tam* enforcement is that it

violates the requirements under the Appointments Clause in Article II, § 2, cl. 2 that

the President, with the advice and consent of the Senate, shall appoint Officers of the

United States, and that Congress may vest appointment of "inferior" officers in the

President, the courts, or department heads.  Because the *qui tam* provisions authorize

those who are not "appointed" under this clause, and thus are not "officers" of the

United States, to control litigation on behalf of the government, a serious

constitutional argument can be made against the *qui tam* provisions under this clause.

This argument relies on the Supreme Court's holding in *Buckley v. Valeo* that

the Federal Election Commission (FEC) could not engage in civil law enforcement so

long as Congress had a role in appointing its members.[29]  Courts have upheld the *qui*

*tam* provisions by differentiating between relators and the members of the FEC in

*Buckley* based on technical distinctions such as that relators receive no federal salary,

serve for no specified term, and are not vested with primary responsibility to enforce

the FCA.[30]  They also have found that *Buckley's* central concerns about congressional

---

[29] 424 U.S. 1 (1976).

[30] *See, e.g., Riley*, 252 F.3d 749, 757-58 (5th Cir. 2001); *Kelly*, 9 F.3d 743, 758 (9th Cir. 1993).

Copyright © 2018 Washington Legal Foundation

aggrandizement of its powers were not relevant in FCA litigation.[31]

Technical distinctions notwithstanding, relators exercise significant government power, particularly in declined *qui tam* cases.[32]  And, as the Supreme Court noted subsequent to *Buckley* in *Freytag v. Commissioner of Internal Revenue,* the Appointments Clause serves not only to prevent "subterfuge for congressional control," but also to prevent "*widely distributed* appointment power subvert[ing] democratic government," [33] a test that easily could encompass those who qualify as relators but are not accountable to the government in non-intervened *qui tam* suits. If the FCA impermissibly undermines executive functions by taking control from that branch, it does not save it that Congress did not give itself the enforcement power it took from the executive.[34]  To the extent that Congress enforces the law without

---

[31] *See, e.g., Kelly,* 9 F.3d at 758-59.

[32] Notably, in 2009, the Supreme Court described the government's involvement in declined *qui tam* cases as "minimal."  *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 931 (2009) (describing the government's real party in interest status in *qui tam* cases and stating that the "United States is aware of and minimally involved in every FCA action" but is not a "party" unless it intervenes).  *Cf. United States ex rel. Ruckh v. Salus Rehab.*, No. 8:11CV1303-T-23TBM, 2017 WL 1495862 (M.D. Fla Apr. 26, 2017) (rejecting the Justice Department's statement of interest in a declined *qui tam* action and finding that, under § 3730(c)(3), the United States' participation in a declined case is limited to receiving pleadings and deposition transcripts).

[33] 501 U.S. 868 (1991) (emphasis added).

[34] No other fraud statute or common-law action allows private individuals to bring suit in the name of the United States or to enforce the law on the government's behalf.  In fact, Congress has not authorized *qui tam* enforcement in any other statute or whistleblower reward program since the 1986 FCA amendments—not in 2010, when Congress added whistleblower provisions to the securities and commodities exchange laws enforced by the SEC and the CFTC, nor in 2006, when Congress amended the Internal Revenue Code to strengthen the IRS's whistleblower program by making its whistleblower rewards mandatory, but continued enforcement of the tax laws solely by the government.  *See* 15 U.S.C. § 78u-6 (2012); 7 U.S.C. § 26 (2012); 26 U.S.C. § 7623(b) (2012). Indeed,

Copyright © 2018 Washington Legal Foundation     19

reliance on the executive, and shifts discretion to bring suit and control the action away from that branch, it decreases executive power and makes Congress relatively stronger.  This concern must be evaluated in light of recent cases and current law.

## C.      Fifth Amendment Challenge:  Due Process Clause

A third major constitutional challenge is that the FCA's bounty provisions conflict with the duty of prosecutors to seek a just and fair result in the performance of their governmental functions.  The concept underlying this challenge is that a prosecutor cannot be self-interested, but must represent the public interest, and that *qui tam* relators' self-interest in their bounty conflicts with the public interest.[35]  The Ninth Circuit in *Kelly* found no conflict because these interests were "congruent" and relator interests "coincide with the public interest in remedying harm to the federal treasury."[36]  However, the pernicious effects of self-interested prosecutors also apply to self-interested relators:

---

tax law violations are specifically excluded from enforcement under the FCA.  *See* 31 U.S.C. § 3729(d). Thus, Congress repeatedly has declined to provide for *qui tam* enforcement under any other statutory scheme.  Whistleblowers are rewarded under the whistleblower programs created under these other laws without any constitutional challenge to their rewards.

[35] *See, e.g., Berger v. United States,* 295 U.S. 78, 88 (1935); *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 814 (1987) (establishing a "categorical rule against the appointment of a [self-]interested prosecutor").

[36] 9 F.3d at 760.  The court also questioned whether relators owed the same type of duty of service to the public interest as government prosecutors since they do not hold public "office," they sue on the government's behalf only with respect to their standing to sue, and they lack the full machinery of the state in scrutinizing a given individual.  Another court disposed of this challenge by citing the court's impartiality and the Justice Department's ability to seek dismissal as protection against relator bias.  *See United States ex rel. Robinson v. Northrop Corp.*, 824 F. Supp. 830 (N.D. Ill. 1993).

Copyright © 2018 Washington Legal Foundation     20

> Between the private life of the citizen and the public glare of
> criminal accusation stands the prosecutor. That state official
> has the power to employ the full machinery of the state in
> scrutinizing any given individual. Even if a defendant is
> ultimately acquitted, forced immersion in . . . investigation
> and adjudication is a wrenching disruption of everyday life.
> For this reason, we must have assurance that those who
> would wield this power will be guided solely by their sense of
> public responsibility for the attainment of justice.[37]

The due-process concept requires "a disinterested prosecutor with the unique responsibility to serve the public, rather than a private client, and to seek justice that is unfettered."[38] While many precedents that disapprove of self-interested government prosecutors have involved criminal or quasi-criminal actions, their holdings may also be relevant to the FCA, due to its penal nature, which may trigger a heightened due process analysis. And, while pre-*Stevens* decisions recognized the self-interest and bias of private individuals who prosecute *qui tam* suits, their analysis did not include the context of more recent cases, discussed above, where this self-interest directly conflicted with the broader interests of the government and the public.

## CONCLUSION

Currently, four out of every five actions filed under the FCA are initiated by *qui tam* relators, and the proportion of these actions to suits brought by the government

---

[37] *Young*, 481 U.S. at 814.

[38] *Id.* at 815 (Blackmun, J., concurring).

alone has grown steadily since the Justice Department started keeping FCA statistics in 1987.  Major constitutional challenges to *qui tam* suits have lain dormant since the Court decided *Stevens* in 2000, and they remain unresolved.  History indicates that such a *laissez-faire* approach did nothing to keep this unusual enforcement mechanism from gaining strength in the 30 years since the 1986 amendments expanded *qui tam* enforcement under the FCA, and injustice often can result.  These challenges should be taken seriously and addressed directly to ensure that important checks and balances embedded in our Constitution are not swept away, unexamined, through future inexorable acceptance of the *qui tam* mechanism over the next 30 years.

Copyright © 2018 Washington Legal Foundation     22