IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KATIE BROOKS and NANNETTE WRIDE, <br><br> *Plaintiffs*, <br><br> v. <br><br> STEVENS-HENAGER COLLEGE, INC., *et al.*, <br><br> *Defendants*. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS** <br><br> Case No. 2:15-cv-119-JNP-EJF <br><br> District Judge Jill N. Parrish |

## INTRODUCTION

This is a qui tam action. Relators Katie Brooks and Nannette Wride alleged that Defendants Stevens-Henager College, Inc.; California College San Diego, Inc.; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc.; the Center for Excellence in Higher Education (CEHE); and Carl Barney (collectively, the Colleges) submitted false claims for federal financial aid.

The Government filed a complaint in intervention. It intervened on some but not all of the relators' claims against two defendants: Stevens-Henager and its apparent successor in interest, CEHE. Shortly thereafter, the relators filed their second amended complaint. This complaint asserted new claims and named additional defendants. The Government elected to not intervene as to the new claims but "respectfully refer[red]" the court to 31 U.S.C. § 3730(b)(1), which supposedly "allows [a] relator to maintain the non-intervened portion of the action in the name of the United States."

Since then, the Government's claims against the Colleges have had two masters. The United States has pursued some claims directly through its Complaint in Intervention. The relators,

on behalf of the United States, have asserted other claims against the Colleges in a separate Complaint, which the relators have publicly amended by naming additional defendants and asserting additional claims for relief. The operative pleadings in this case currently consist of an Amended Complaint in Intervention filed by the Government and a Fourth Amended Complaint filed by the relators.

The Colleges filed a motion to dismiss the Government's Amended Complaint, [Docket 439], and a separate motion to dismiss the relators' Fourth Amended Complaint, [Docket 438]. The Colleges have also moved this court to take judicial notice of certain documents in relation to the motions to dismiss. [Docket 440]. The court subsequently asked the parties to brief whether the False Claims Act permitted the relators to independently pursue claims against the Colleges after the Government elected to intervene in the lawsuit. Upon consideration of the briefing of the parties, the court rules as follows: the court GRANTS the motion for judicial notice, GRANTS IN PART and DENIES IN PART the motion to dismiss the Government's Amended Complaint, and GRANTS IN PART and DENIES IN PART the motion to dismiss the relators' Fourth Amended Complaint. Finally, the court concludes that the relators may not maintain their separate complaint in this action because the Government has elected to intervene. The court, therefore, STRIKES the relators' post-intervention complaints.

## BACKGROUND

The relators filed their complaint in early 2013. They named as defendants Stevens-Henager, California College, CollegeAmerica Denver, and CollegeAmerica Arizona. The complaint alleged that these schools were liable under the False Claims Act because they made false statements concerning compliance with the Incentive Compensation Ban (ICB). Moreover, the complaint alleged an alternative factual basis for liability as to Stevens-Henager: the school made false statements to its accreditor regarding faculty qualifications.

Toward the end of 2013, the relators amended their complaint, adding CEHE and Carl Barney as defendants. The amended complaint added three factual bases for liability as to Stevens-Henager. Specifically, Stevens-Henager allegedly made false statements concerning attendance-taking requirements, academic-progress requirements, and recordkeeping requirements.

In May 2014, the Government intervened in the action. The Government filed a complaint in intervention that named two defendants: Stevens-Henager and CEHE. The Government stated that it was intervening on some but not all of the relators' claims. Specifically, the Government alleged one factual basis for its claims against Stevens-Henager and CEHE: Stevens-Henager made false statements concerning the ICB. The Government chose not to intervene as to any of the claims against California College, CollegeAmerica Denver, CollegeAmerica Arizona, and Mr. Barney.

Shortly after the Government intervened, the relators filed their second amended complaint. Purporting to comply with 31 U.S.C. § 3730(b)(2), the relators filed portions of the second amended complaint under seal because it "alleged violations of the [False Claims Act] never before set forth in any prior complaint." The relators included allegations that the Colleges made false statements concerning the so-called 90/10 Rule—another factual basis for imposing liability on the Colleges. The relators also expanded the factual bases for liability as to California College, CollegeAmerica Denver, and CollegeAmerica Arizona.

The Government declined to intervene as to the new claims alleged in the second amended complaint. But the Government "respectfully referred the Court to 31 U.S.C. § 3730(b)(1)," which supposedly "allows [a] relator to maintain the non-intervened portion of the action in the name of the United States . . . ." Section 3730(b)(1) actually provides:

> A person may bring a civil action for a violation of section 3729 for the person and
> for the United States Government. The action shall be brought in the name of the

Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

The relators subsequently moved for leave to file a third amended complaint. The stated purpose of the third amended complaint was to "narrow and streamline the scope of the allegations and eliminate two theories of falsity from the [second amended complaint]: [the Colleges'] violations of the attendance-taking and academic-progress requirements." The relators explained that they "never intended to pursue these theories" but included them "at the Government's request." But because the Government declined to intervene as to these theories, the relators "wish[ed] to eliminate them and focus on the . . . more substantial theories."

Some six months later, following a change of venue to this court, the court granted the relators leave to file a third amended complaint. At the hearing on the motion to amend, the parties agreed that the relators could file a complaint that differed from the one attached to the motion to amend. But despite representing that they would eliminate factual bases for liability related to violations of attendance-taking and academic-progress requirements, the Third Amended Complaint actually expanded those factual bases for liability to California College, CollegeAmerica Denver, and CollegeAmerica Arizona. The Third Amended Complaint also added Weworski & Associates, an accounting firm, as a defendant. The relators did not file the Third Amended Complaint under seal, so the Government had no opportunity to intervene while the complaint remained under seal.

The court eventually dismissed the relators' Third Amended Complaint and granted the relators and the Government leave to amend. The court granted both parties leave to amend so that they could allege facts to support a theory of liability that appeared viable in light of the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct.

1989 (2016). The Government filed an Amended Complaint in intervention, and the relators filed their Fourth Amended Complaint.

The Fourth Amended Complaint, like the relators' previous complaints, expands the scope of their claims. The relators allege that CEHE fraudulently induced the Department of Education to execute a Program Participation Agreement (PPA) in January 2013—a period that was not covered by any prior pleadings. And the relators allege that Stevens-Heanger violated the ICB by paying bonuses to online admissions consultants and enrollment advisors who worked for Independence University—an online school operated by Stevens-Henager. No prior pleading mentioned Independence University. The relators did not file the Fourth Amended Complaint under seal, so the Government had no opportunity to intervene while the complaint remained under seal.

The Colleges moved to dismiss both the relators' and the Government's complaints, claiming that neither states a claim upon which relief can be granted. After reviewing the briefing, however, the court became concerned with the way the case had been litigated. Specifically, the False Claims Act provides that if the Government intervenes in the action, the Government conducts the action and has the primary responsibility for prosecuting the action. Nothing in the False Claims Act suggests that a relator could maintain the non-intervened portion of an action, conducting, in essence, his or her separate action. And in light of how the case had proceeded, the court expressed concern as to whether the False Claims Act violates the "take Care" clause of Article II. Accordingly, the court asked the parties to submit supplemental briefs on these issues, which they did.

## ANALYSIS

The court first addresses the Colleges' motion to dismiss the Government's Amended Complaint and the related motion to take judicial notice. The court then turns to the Colleges'

motion to dismiss the relators' Forth Amended Complaint. Finally, the court addresses the issue of whether the relators may maintain a separate action after the Government chose to intervene.

## I. MOTION TO DISMISS THE GOVERNMENT'S AMENDED COMPLAINT

### A. *The Government's Amended Complaint in Intervention*

Stevens-Henager must comply with the ICB, which provides that schools will not provide "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." (Government's Am. Compl. ¶ 27 (quoting 20 U.S.C. § 1094(a)(20)).)

In 2002, the regulations that accompany the ICB were amended to add certain "safe harbor[s]." (*Id.* ¶¶ 30–31.) One of the safe harbors—Safe Harbor E—allows schools to pay "[c]ompensation that is based upon students successfully completing their educations programs, or one academic year of their education programs, whichever is shorter." (*Id.* ¶ 30 (quoting 34 C.F.R. § 668.14(b)(22)(ii)(E)).)

#### 1) The Admissions Consultant Bonus Plan

Stevens-Henager distributed manuals to its admissions consultants. (*Id.* ¶ 69.) Each manual provides examples of how an admissions consultant can receive bonuses by enrolling students. (*Id.*) Stevens-Henager also issued various directives to its admissions consultants in the form of "Procedure Directives" and "Information Letters." (*Id.* ¶ 70.) Mr. Barney, the former sole shareholder and chairman of Stevens-Henager, issued versions of "Procedure Directive 85R" in 2000, 2003, 2004, and 2007. (*Id.* ¶ 71.)

The 2007 Procedure Directive 85R details the Admissions Consultant Bonus Plan. (*See id.* ¶ 72.) When a student completes 36 credits, the admissions consultant who enrolled that student receives a "Completion Certificate." (*Id.* ¶ 74.) The value assigned to a Completion Certificate

depends on two factors: (1) the average number of starts (*i.e.*, enrollments) that the admissions consultant achieved during the last three modules, and (2) the admissions consultant's "Interview Conversion Rate." (*Id.* ¶ 75.) Each module is about one month long and consists of about three or four credit hours. (*Id.* ¶ 90.)

The 2007 Procedure Directive 85R contains a chart for determining the value of Completion Certificates. (*Id.* ¶ 75.) The first row in the column is "Packaged Starts." (*Id.* ¶ 79.) Packaged Starts refers to the average number of starts that an admissions consultant achieved per module during the last three modules. (*See id.* ¶ 72.) The lowest value in the Packaged Starts column is five. (*Id.* ¶ 79.) The top row of the chart lists ascending Interview Conversion Rates, or "Intconversion%" for short. (*Id.* ¶ 76.) The lowest value in the Intconversion% row is 33 percent. (*Id.* ¶ 77.) Notes to the chart explain that "Intconversion%" is calculated by "[t]otal[ing] the last three modules' starts and interviews and dividing the total number of starts by the total number of interviews." (*Id.* ¶ 76.) So if an admissions consultant interviewed ten students and five enrolled, the "Intconversion%" would be 50 percent. (*See id.*)

## ADMISSION CONSULTANT POTENTIAL COMPENSATION

| Packaged Starts | Intconversion% – Quality of Service to Honored Guests | | | | |
|---|---|---|---|---|---|
| win: | >33% | >35% | >40% | >45% | >50% |
| 5 | $100 | $300 | $400 | $500 | $600 |
| 6 | $100 | $300 | $400 | $500 | $600 |
| 7 | $100 | $300 | $400 | $500 | $600 |
| 8 | $100 | $300 | $400 | $500 | $600 |
| 9 | $100 | $300 | $400 | $500 | $600 |
| 10 | $100 | $300 | $400 | $500 | $600 |
| Total @ 10 | $1,000 | $3,000 | $4,000 | $5,000 | $6,000 |
| 11 | $100 | $300 | $400 | $500 | $600 |
| 12 | $100 | $300 | $400 | $500 | $600 |
| 13 | $100 | $300 | $400 | $500 | $600 |
| 14 | $100 | $300 | $400 | $500 | $600 |
| 15 | $100 | $300 | $400 | $500 | $600 |
| Total @ 15 | $1,500 | $4,500 | $6,000 | $7,500 | $9,000 |
| 16 | $100 | $300 | $400 | $500 | $600 |
| 17 | $100 | $300 | $400 | $500 | $600 |
| 18 | $100 | $300 | $400 | $500 | $600 |
| 19 | $100 | $300 | $400 | $500 | $600 |
| 20 | $100 | $300 | $400 | $500 | $600 |
| Total @ 20 | $2,000 | $6,000 | $8,000 | $10,000 | $12,000 |

According to the chart, before an admissions consultant's Completion Certificates were worth anything, the admissions consultant had to (1) "start," or enroll, at least five students per module, and (2) enroll at least one out of every three students interviewed. If an admissions consultant failed to meet either requirement, the admissions consultant's Completion Certificates were worthless because he or she would be ineligible to receive a bonus.

Under the 2007 Procedure Directive 85R, an admissions consultant who enrolled four students, all of whom completed their studies, received no bonus. But an admissions consultant who achieved a 33 percent Conversion Rate and enrolled five students—three of whom completed their studies—would receive a $1,500 bonus ($500 per Completion Certificate). And an admissions consultant who achieved a 40 percent Conversion Rate and enrolled ten students—two

of whom completed their studies—would receive an $8,000 bonus ($4,000 per Completion Certificate).

| Hypothetical Admissions Consultant | Starts | Completions | Conversion Rate | Bonus |
|---|---|---|---|---|
| A | 4 | 4 | 33% | $0 |
| B | 5 | 3 | 33% | $1,500 |
| C | 10 | 2 | 40% | $8,000 |

Ms. Brooks and Ms. Wride worked at Stevens-Henager between 2009 and 2011, and both were aware of the Admissions Consultant Bonus Plan. (*Id.* ¶¶ 13–14.) Ms. Brooks and Ms. Wride attended conferences in Las Vegas where they learned that Stevens-Henager employed the Admissions Consultant Bonus Plan at all of its campuses. (*Id.* ¶ 84.) Stevens-Henager paid bonuses based on the Admissions Consultant Bonus Plan until at least 2011. (*Id.* ¶ 89.)

2)      The Program Participation Agreements

To participate in Title IV programs, Stevens-Henager entered into PPAs with the Department of Education. (*Id.* ¶ 25 (citing 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14)).) Each PPA provides:

> By entering into this [PPA], the Institution agrees that:
>
> . . .
>
> (22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance . . . .

(*Id.* ¶ 28 (citing 34 C.F.R. § 668.14(b)(22)).)

Vicky Dewsnup, as the President of Stevens-Henager, executed two PPAs on the school's behalf, one on April 19, 2007 and another on January 21, 2010. (*Id.* ¶¶ 57–58.) In both PPAs,

Stevens-Henager promised to comply with the ICB. (*Id.* ¶ 114.) But Stevens-Henager allegedly knew that these promises were false because it was paying and planned to continue paying admissions consultant bonuses based on their success in securing enrollments. (*Id.*) According to the Government, Stevens-Henager's promises to comply with the ICB were material to the Department of Education's decision to allow Stevens-Henager to receive Title IV funds. (*Id.*)

        3)      The G5 Certifications

A student applies for financial aid by completing a free application. (*Id.* ¶ 40.) A school uses the information in the application to create a financial-aid package for the student. (*Id.* ¶ 43.) The student can accept all or part of the package. (*Id.* ¶ 44.) If the student accepts a Pell Grant, a Direct Loan, or both, the student's school creates an electronic origination record. (*Id.* ¶ 45.) The school then submits the record to the Department of Education using a computerized database called the Common Origination and Disbursement System. (*Id.*)

If the information supplied by the school is consistent with the Department of Education's information, the Department of Education makes funds available for the school to draw down from a computerized system known as G5. (*Id.* ¶ 46.) Before drawing down funds, a school certifies that "the funds are being expended within three business days of receipt for the purpose and condition of the agreement." (*Id.* ¶ 47.) The parties refer to this as the G5 certification.

Stevens-Henager submitted numerous claims for Title IV funds under its 2007 and 2010 PPAs. (*Id.* ¶ 61.) These claims were made in the G5 system and were accompanied by the representation that the funds would be "expended within three business days of receipt for the purpose and condition of the agreement." (*Id.* ¶ 64.) According to the Government, the "agreement" referenced in the G5 certification is the school's PPA. (*Id.*) And, according to the Government, "Stevens-Henager failed to disclose that it was violating the [ICB]" when it requested funds in the G5 system. (*Id.* ¶ 65.) Because Stevens-Henager was "knowingly violating the [ICB],

[it] was not an eligible institution, thus rendering the institution (and its students) ineligible for Title IV funds." (*Id.*)

B.    *The Motion to Take Judicial Notice*

Stevens-Henager and CEHE (collectively, Stevens-Henager) ask the court to take judicial notice of five Government documents: (1) the "Hansen Memo," (2) the "Mitchell Memo," (3) the Government Accountability Office, GAO-10-370R, Higher Education: Information on Incentive Compensation Violations Substantiated by the U.S. Department of Education (First GAO Report), (4) the United States Government Accountability Office Report to the Congressional Committees: Stronger Federal Oversight Needed to Enforce Ban on Incentive Payments to School Recruiters (Second GAO Report), and (5) an Office of Inspector General Audit Report (OIG Report).

1)    The Hansen Memo

The Hansen Memo is dated October 30, 2002. It was written by William D. Hansen, the former Deputy Secretary of Education, and addressed to Terri Shaw, the former Chief Operating Officer for Federal Student Aid. It provides, in relevant part:

> The purpose of the memorandum is to provide direction with regard to the Department's response to violations of [the ICB] . . . .
>
> The [ICB] was designed to reduce the financial inventive for an institution to enroll students by misrepresenting the quality of the institution, or the ability of students to benefit from its educational programs. The Department has in the past measured the damages resulting from a violation as the total amount of student aid provided to each improperly recruited student. After further analysis, I have concluded that the preferable approach is to view a violation of the [ICB] as not resulting in monetary loss to the Department. Improper recruiting does not render a recruited student ineligible to receive student aid funds for attendance at the institution on whose behalf the recruiting is conducted. Accordingly, the Department should treat a violation of the law as a compliance matter for which remedial or punitive sanctions should be considered.
>
> In some instances, violations of the [ICB], either themselves or in combination with other program violations, may constitute a basis for limitation, suspension, or termination action. However, much more commonly, the appropriate sanction to consider will be the imposition of a fine.

(footnote omitted).

### 2) The Mitchell Memo

The Mitchell Memo is dated June 2, 2015. It was written by Ted Mitchell, the former Undersecretary to the Secretary of Education, and addressed to James Runcie, the former Chief Operating Office of Federal Student Aid. It provides, in relevant part:

> Until 2002, long after the enactment of the [ICB], the Department measured damages resulting from a violation of the prohibition as the total amount of student aid provided to improperly recruited students. In 2002, however, the Department's Deputy Secretary issued [the Hansen Memo] that changed the Department's approach for measuring damages in the context of establishing administrative liabilities, to view a violation of [the ICB] as not resulting in monetary loss to the Department. The [Hansen Memo] rested on the view that the Department purportedly suffers no loss when an institution receives Title IV funds by violating the promises and representations it made as a condition of participation in the Title IV programs.
>
> To the contrary, the Department, in fact, incurs monetary loss upon a violation of [the ICB], and the appropriate response is to recover that loss, as provided for in the Department's original policy. When acting as the Department's fiduciary, an institution may receive funds only in accord with the representations it makes in order to become eligible for those funds. When an institution makes an incentive payment based upon the number of students enrolled, the institution breaches those representations. It thus violates a condition of its Title IV program eligibility and is not entitled to receive those Title IV funds. In this situation, an institution is liable to the Department for the cost of the funds it received.

Put simply, the Mitchell Memo repealed the Hansen Memo. But between October 30, 2002 and June 2, 2015, the Department of Education's position was that ICB violations do not result in monetary loss and do not render students ineligible to receive Title IV funds.

### 3) The Remaining Reports

In addition to the Hansen Memo and the Mitchell Memo, Stevens-Henager asks the court to take notice of three reports: (1) the First GAO Report, (2) the Second GAO Report, and (3) the OIG Report.

In the First GAO Report, the GAO analyzed the Department of Education's program-review and audit-report data related to the ICB for January 1998 through December 2009. The GAO found that during that period the Department of Education reported that 32 schools violated the ICB. In addition to these 32 schools, the Department of Education entered into settlement agreements with 22 other schools.

In the Second GAO Report, the GAO provided "additional information" on the Department of Education's oversight of the ICB between January 1998 and December 2009. The relevant findings are as follows:

- Between 1998 and 2008, [the Department of Education] resolved most incentive compensation cases by requiring corrective actions or reaching settlement agreements, and did not limit, suspend, or terminate any school's access to federal student aid.

- [The Department of Education] changed its enforcement policy in 2002, which resulted in an increased burden on [the Department of Education] to prove a violation and lessened associated financial penalties (fines and settlement payments). As a result, it became more difficult for [the Department of Education] to prove a school violated the [ICB] and schools ultimately paid smaller penalties.

- [Department of Education] officials shared with [the GAO] internal guidance that is used to determine fines and settlement payments for incentive compensation cases. Internal guidance for imposing fines and settlement payments establishes caps on total penalty amounts, although related regulations do not have such caps. [Department of Education] officials have stated that the agency has not always used the guidance to determine fines and settlement payments.

- [The Department of Education's] varying approaches for determining fines and settlement payments could lead to inconsistent treatment of schools without adequate justification for the differential treatment. For example, some schools were fined for [ICB] violations, while others were not. In one case, [the Department of Education] withdrew an initiated school fine of over $2 million dollars, and case documentation did not reveal the reason for the fine withdrawal.

In the OIG Report, the OIG reiterated the findings from the First and Second GAO Reports, made findings as to Department of Education's enforcement of the ICB, and proposed recommendations that would facilitate enforcement of the ICB.

4)      Judicial Notice: Federal Rule of Evidence 201

A court may take judicial notice of a fact that is not subject to reasonable dispute because the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). This rule allows courts to "take judicial notice of . . . facts which are a matter of public record." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (citation omitted). If a party requests that a court take judicial notice of a fact and supplies the court with the necessary information to do so, the court must take judicial notice of the fact. FED. R. EVID. 201(c).

Here, the court must take judicial notice as to the contents of the five documents provided by Stevens-Henager because their contents can be accurately and readily determined from sources whose accuracy cannot be questioned. *See* FED. R. EVID. 201(b); *Tal*, 453 F.3d at 1264 n.24. Indeed, no party disputes the authenticity and accuracy of the documents, and the documents are a matter of public record. Instead, the parties' dispute centers on what the court should do once it has taken notice as to the contents of the documents.

Stevens-Henager contends that the court can use the documents to take judicial notice of the fact that the Department of Education "did not enforce the ICB by seeking the return of Title IV funds or by terminating or limiting participation in Title IV programs." The Second GAO Report provides: "Between 1998 and 2008, [the Department of Education] resolved most incentive compensation cases by requiring corrective actions or reaching settlement agreements, and did not limit, suspend, or terminate any school's access to federal student aid."[1] The Government has not argued that the accuracy of this finding can be questioned, so the court takes judicial notice of it.

---

[1] This is hearsay, but it is covered by the public-records exception. *See* FED. R. EVID. 803(8)(A)(iii) (factual findings from a legally authorized investigation).

But the Government argues that the court must not use this fact to infer that the Department of Education did not attach importance to a school's representations about the ICB, and the court agrees that it would be improper to use this fact to draw inferences against the Government at this stage. *See Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." (citation omitted)); *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) ("Nonetheless, we may not, on the basis of these reports, draw inferences or take notice of facts that might reasonably be disputed.").

In sum, the court takes judicial notice of the fact that "[b]etween 1998 and 2008, [the Department of Education] resolved most incentive compensation cases by requiring corrective actions or reaching settlement agreements, and did not limit, suspend, or terminate any school's access to federal student aid." But it would nevertheless be improper for the court to use this fact to draw inferences against the Government or the relators at this stage of the proceedings, which is, in reality, what Stevens-Henager asks the court to do. Indeed, Stevens-Henager asks the court to use the judicially noticed fact to conclude that the Department of Education did not attach importance to a school's promise to comply with the ICB. This the court cannot do.

C.     *The Motion to Dismiss*

Stevens-Henager moves to dismiss the Government's amended complaint on the grounds that it fails to state a claim upon which relief can be granted. But, as noted above, Stevens-Henager did not address the Government's claims for payment by mistake and unjust enrichment, so the motion is better characterized as a motion to dismiss the Government's claims that arise under the False Claims Act. Moreover, Stevens-Henager's motion focuses almost entirely on only one of the Government's two theories of liability, the theory based on Stevens-Henager's G5 certifications.

Stevens-Henager raises, in essence, three arguments. First, Stevens-Henager argues that the Government fails to allege that Stevens-Henager's requests for payment in the G5 system constitute false claims. Second, Stevens-Henager argues that the Government fails to allege that Stevens-Henager knew that its requests for payment made in the G5 system were false. Third, Stevens-Henager argues that the Government has not alleged sufficient facts to establish that ICB noncompliance was material to the Department of Education's payment decisions.

### 1) Motion Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Where the allegations are merely "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," the plaintiff's claim will not survive a motion to dismiss. *Twombly*, 550 U.S. at 555. To survive, the plaintiff's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility, in this context, means that the allegations allow "the court to draw [a] reasonable inference that the defendant is liable for the alleged misconduct." *Id*. Allegations that are merely consistent with a defendant's liability do not give rise to a plausible claim. *Id.*

A plaintiff alleging violations of the False Claims Act must also satisfy the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. *U.S. ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 726 (10th Cir. 2006). Rule 9(b) provides that a plaintiff must "state with particularity the circumstances constituting fraud." To satisfy this standard, a plaintiff must allege the "'who, what, when, where, and how' of the alleged fraud." *Id.*

at 726–27 (citation omitted). Put another way, the plaintiff must "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Id.* at 727 (citation omitted). "Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud and mistake' that must be pled with particularity under Rule 9(b)." *Id.* (citation omitted). Moreover, "[a] relator must provide details that identify particular false claims for payment that were submitted to the government." *Id.* (citation omitted).

2) The False Claims Act: Section 3729

"[A]ny person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). The term "knowingly" means "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard to the truth or falsity of the information." § 3729(b)(1). The term "claim" means, among other things, "any request or demand . . . for money or property . . . that is presented to an officer, employee, or agent of the United States." § 3729(b)(2). Thus, to state a claim under the False Claims Act, a plaintiff must allege three things: (1) the defendant submitted a claim for payment to the Government, (2) the claim was false, and (3) the defendant knew the claim was false. § 3729(a)(1)(A); *United States ex rel. Brooks v. Stephens-Henager College*, 305 F. Supp. 3d 1279, 1293 (D. Utah 2018).[2]

---

[2] The False Claims Act was amended in 2009. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, sec. 4, 123 Stat. 1617, 1621 (2009). And the Government brings claims under both the pre- and post-amendment versions of the statute. But the court previously determined that there is no reason to treat the claims differently, *Brooks*, 305 F. Supp. 3d at 1293 n.5, and no party has

3)      The G5 Certifications

The Government contends that it has sufficiently alleged that Stevens-Henager's requests for payment in the G5 system are false claims because they were accompanied by G5 certifications that were half-truths that misled the Department of Education into believing that Stevens-Henager was an eligible institution. According to the Government, a G5 certification impliedly certifies that the student for whom the funds are requested is eligible to receive Title IV funds. And, as the Government's argument goes, a student is eligible to receive Title IV funds only if he or she is enrolled at an eligible institution. And Stevens-Henager, according to the Government, was not an eligible institution because it violated the ICB. But this theory fails for at least two reasons.

*First*, the Government's allegations are inconsistent with Title IV's regulatory framework. There is a distinction between an institution's designation as an eligible institution under Part 600 and its certification to participate in Title IV programs under Part 668. The regulations "recognize [a] distinction between determinations that institutions meet the definition of an eligible institution, and matters relating to the assessment of administrative and financial capability, typically referred to as the certification process." Institutional Eligibility Under the Higher Education Act of 1965, as Amended; Student Assistance General Provisions, 55 Fed. Reg. 32,180 (Aug. 7, 1990) (to be codified at 34 C.F.R. pts. 600 and 668).

An institution must qualify as an eligible institution *before* it can be certified to participate in Title IV programs. "The Secretary certifies an institution to participate in the title IV, HEA programs if the institution qualifies as an eligible institution under 34 CFR Part 600 [and] meets the standards of [Part 688, subpart B, which includes the PPA requirement]." 34 C.F.R.

---

suggested that the court do otherwise. Accordingly, the court applies the post-2009 version of the statute.

§ 668.13(a). An institution becomes certified when it enters into a PPA with the Department of Education. Indeed, the PPA "conditions the initial and continued participation *of an eligible institution* in any Title IV programs" on compliance with various legal requirements. § 668.14(a)(1) (emphasis added). The "initial and continuing participation" language does not mean that a school becomes ineligible to participate in Title IV programs simply because it violates the ICB.

The applicable regulations explain the possible consequences for failing to comply with a PPA:

> Noncompliance with these standards by an institution already participating in any Title IV, HEA program . . . *may subject* the institution . . . to proceedings under subpart G of this part. These proceedings *may lead* to any of the following actions:
>
> (1) An emergency action.
>
> (2) The imposition of a fine.
>
> (3) The limitation, suspension, *or termination of the participation of the institution* in a Title IV HEA, program.

§ 668.11(b) (emphasis added). Notably, an institution may continue to participate in Title IV programs despite noncompliance with its PPA *unless* the Secretary of Education commences proceedings that result in the "termination of the participation of the institution in a Title IV HEA, program." § 668.11(b)(3). Moreover, the regulations make clear that "[a]n institution's participation in a Title IV, HEA program ends on the date that . . . [t]he institution's participation *is terminated under the proceedings in subpart G* [of Part 668]; [or] . . . [t]he institution's [PPA] is *terminated or expires* under § 668.14 . . . ." § 668.26(a)(3), (5) (emphasis added). That is, an institution can participate in Title IV programs unless and until its PPA is terminated or expires.

The Government argues that Stevens-Henager "was not an eligible institution because it violated a core requirement in its PPA—the ICB—and that violation made the institution (and thus

its students) ineligible for Title IV funds." But there is no regulation that provides for an automatic loss of eligibility when an institution violates "a core requirement of its PPA." The Government simply ignores the applicable regulations in an attempt to suit its legal theory.

In short, the Government fails to allege that students at Stevens-Henager were ineligible to receive Title IV funds. The Government does not allege that the Secretary of Education terminated Stevens-Henager's PPA or its participation in Title IV programs. Put simply, the Government's allegation that Stevens-Henager was ineligible to participate in Title IV because it violated the ICB is an unsupported legal conclusion that is belied by the applicable regulations. Consequently, the Government's claims fail to the extent they are based on a theory that Stevens-Henager's students were ineligible to receive Title IV funds because the school was not an eligible institution.[3]

*Second*, even if the Government had alleged that Stevens-Henager was not an eligible institution (it did not), the Government has failed to allege that Stevens-Henager *knowingly* misrepresented that it was an eligible institution when it submitted G5 certifications. The Government alleges that Stevens-Henager knowingly violated the ICB. (Am. Compl. ¶ 97.) But "a violation of a regulatory provision, *in the absence of a knowingly false or misleading representation*, does not amount to fraud." *United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998) (emphasis added). "Violating a regulation is not synonymous with filing a false claim." *United States ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014).

_____

[3] In fact, the Government, as amicus curiae in another case, admitted that a school's G5 certifications were "literally true," despite noncompliance with the ICB, because the Department of Education had "not (yet) terminated the school's eligibility." Brief for the United States of America as Amicus Curiae Supporting Appellees at 20, *United States ex rel. Rose v. Stephens Institute*, No. 17-15111 (filed Aug. 7, 2017). This admission is consistent with the regulatory framework and contradicts the Government's theory in this case.

The Government argues in its brief that it has alleged that Stevens-Henager knew that it was ineligible to receive Title IV funds because of ICB violations, rendering its requests for Title IV funds false or fraudulent. To support this, however, the Government cites a paragraph of its complaint that provides that Stevens-Henager was not an eligible institution because it "knowingly violat[ed] the [ICB]." (Am. Compl. ¶ 65.) That is not enough. The Government needed to allege that Stevens-Henager knew that it was ineligible to receive Title IV funds, and thus knew that its requests for payment were false or fraudulent.

The Government notes that knowledge may be alleged generally. True, "[k]nowledge . . . may be alleged generally." FED. R. CIV. P. 9(b). But the Government has not even attempted to allege that Stevens-Henager knew that it was ineligible to receive Title IV funds because of ICB violations. Put simply, the Government misses the point. Perhaps the Government could have alleged generally that Stevens-Henager knew that it was ineligible to receive Title IV funds based on ICB violations. But it did not.[4] Because the Government has failed to allege that Stevens-Henager knew that it was ineligible to receive Title IV funds because of ICB violations, the Government has not plausibly alleged that Stevens-Henager knew that its requests for Title IV funds were false.

Stevens-Henager also argues that the Government's claims based on G5 certifications fail because the Government has not pled "facts supporting materiality." The court, however, need not address this argument because the Government has failed to allege that Stevens-Henager's requests

---

[4] The Government, however, is probably unable to allege this in good faith because its own policy between 2002 and 2015 was that "[i]mproper recruiting does not render a recruited student ineligible to receive student aid funds for attendance at the institution on whose behalf the recruiting is conducted."

for payment in the G5 system were either expressly or impliedly false, and even if they were, the Government has not alleged that Stevens-Henager knew that the requests for payment were false.

For the reasons stated above, the court dismisses the Government's claims under the False Claims Act to the extent that they are based upon its G5 certification theory of liability. Because there is a fundamental legal impediment to the G5 certification theory, amendment of the complaint would be futile. *Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) ("Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." (citation omitted)). Therefore, dismissal is with prejudice.

4)      Promissory Fraud: The PPAs

The court previously determined that the Government had stated a claim under the False Claims Act based on a theory of promissory fraud. Stevens-Henager suggests that the court should reconsider this ruling and hold that ICB noncompliance is not material to the Department of Education's payment decisions. But Stevens-Henager misunderstands the court's prior holding and the promissory-fraud theory of liability.

Unlike the terms "claim" and "knowingly," which are defined in the False Claims Act, "false" and "fraudulent" are defined only by judicial interpretation and construction. *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 740 (10th Cir. 2018). Congress has explained that the terms "false" and "fraudulent" should be construed broadly:

> [E]ach and every claim submitted under a contract, loan guarantee, or other agreement *which was originally obtained by means of false statements* or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.

S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (emphasis added) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)).

Consistent with this, courts have recognized that False Claims Act liability can attach to each and every claim submitted under a PPA that was obtained through fraudulent statements. *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 503–05 (8th Cir. 2016); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006); *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916–17 (7th Cir. 2005). Put simply, an initial falsehood "can taint subsequent claims for payment, even if those claims are for legitimate goods or services." Joan H. Krause, *Reflections on Certification, Interpretation, and the Quest for Fraud that "Counts" Under the False Claims Act*, 2017 U. Ill. L. Rev. 1811, 1817 (2017); *see also Hendow*, 461 F.3d at 1173 ("[S]ubsequent claims are false because of an *original fraud* (whether a certification or otherwise).").

As the court previously explained, to state claim under the False Claims Act based on promissory fraud, the Government must allege: "(1) Stevens-Henager made false statements in its PPAs; (2) Stevens-Henager knew that its statements were false; (3) *the statements were material to Department of Education's decision to execute the PPAs*; and (4) Stevens-Henager made claims for payment under the fraudulently induced PPAs." *Brooks*, 305 F. Supp. 3d at 1299–300 (emphasis added).

The court went to great lengths to explain to the parties the proper focus for materiality when liability is based on a theory of promissory fraud:

> [T]he Government's claims are based on promissory fraud, unlike the claim in *Escobar*, which was based on implied certification. The Supreme Court, in *Escobar*, discussed materiality as it relates to claims for reimbursement that are allegedly false because they impliedly certify compliance with underlying regulations. Here, the Government alleges that claims were false based on promissory fraud: Stevens-Henager falsely certified that it would comply with the ICB in its 2007 and 2010 PPAs. In other words, the "fraud" was not a failure to disclose noncompliance with a regulation, as was the case in *Escobar*, but rather an affirmative misrepresentation: a false promise to comply with the ICB. Because the Government alleges promissory fraud, the court "examines the false statements that

*induced the government to enter the [PPAs].*" Thus, the court must determine
whether the Government has alleged sufficient facts to plausibly establish
that Stevens-Henager's allegedly false promises to comply with the ICB *in its PPAs*
were material to the Department of Education's decision to execute the PPAs.

*Id.* at 1301–02 (citation omitted). After explaining the relevant inquiry, the court held that "the

Government ha[d] alleged sufficient facts to plausibly establish that the Department of Education

attached importance to Stevens-Henager's promises to comply with the ICB." *Id.* at 1302.

Stevens-Henager suggests that this was error "because the same materiality requirements

apply to all [False Claims Act] claims." True, the materiality standard does not change: "a false

statement is material under the False Claims Act 'if either (1) a reasonable person would likely

attach importance to it or (2) the defendant knew or should have known that the government would

attach importance to it.'" *Id.* at 1300 (citation omitted). But, as the court made clear, the standard

applies to the false statement that forms the basis of liability, which, for the Government's claims

based on promissory fraud, is the statement that induced the Department of Education to enter into

PPAs with Stevens-Henager.

Because Stevens-Henager has not addressed whether its allegedly false promises in its

PPAs were material to the Department of Education's decision to enter into the PPAs, the court

declines to revisit its prior holding. Accordingly, the Government may proceed on a theory that

Stevens-Henager submitted false claims for payment based on a theory of promissory fraud.

## II.     MOTION TO DISMISS THE RELATORS' FOURTH AMENDED COMPLAINT

The relators allege three claims for relief based upon three distinct theories of liability.

First, the relators allege that the Colleges are liable under 31 U.S.C. § 3729(a)(1)(B) and its

predecessor because they fraudulently induced the Department of Education to enter into various

PPAs, thereby rendering their subsequent requests for Title IV funds "false or fraudulent." Second,

the relators allege that the Colleges are liable under § 3729(a)(1)(A) and its predecessor because

their requests for Title IV funds were rendered false by virtue of their G5 certifications. Third, the relators allege that the Colleges are liable under § 3729(a)(1)(B) and its predecessor because they made false statements in their Required Management Assertions (RMAs).

A.  *The G5 Certifications*

The relators, like the Government, allege that the Colleges are liable under the False Claims Act because of their G5 certifications. (Fourth Am. Compl. ¶¶ 387–91.) This claim, however, fails for the same reason that the Government's G5 certification claim fails. The relators, like the Government, have failed to allege that the Colleges were ineligible to receive Title IV funds, and even if the relators had, they have not alleged that the Colleges knew that they were ineligible to receive Title IV funds. The court, therefore, dismisses the relators' second claim for relief with prejudice.

B.    *The Required Management Assertions*

The Colleges submitted RMAs that expressly certified compliance with the legal requirements that they allegedly violated. (*Id.* ¶ 235.) The RMAs were required as part of the Colleges' annual audit process. (*Id.* ¶ 236.) Indeed, the first step of the audit process is for a school's management to provide RMAs to the school's auditor. (*Id.* ¶ 238.)

According to the relators, the Colleges are liable under the False Claims Act because assertions in their RMAs were false. (*Id.* ¶ 394.) In the relators' own words, the Colleges "are liable for . . . violations of 31 U.S.C. § 3729(a)(1)(B) and its predecessor statute for falsely and expressly certifying compliance with each of the Legal Requirements in the[ir] RMAs." (*Id.* ¶ 392.) But this claim for relief fails.

Section 3729(a)(1)(B) imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." A claim for relief under § 3729(a)(1)(B) has three elements: (1) the defendant makes a false

statement, (2) the defendant knows that the statement is false, and (3) the false statement is material to a false claim for payment. § 3729(a)(1)(B); *Brooks*, 305 F. Supp. 3d at 1293–94. "Section 3729(a)(1)(B) is 'designed to prevent those who make false records or statements . . . to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval.'" *Brooks*, 305 F. Supp. 3d at 1294 (quoting *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014)). "In other words, the primary purpose of § 3729(a)(1)(B) is to remove any defense that the defendant did not personally submit, or cause to be submitted, a false claim." *Id.* Indeed, many violations of § 3729(a)(1)(B) may also be considered violations of § 3729(a)(1)(A), which imposes liability on persons who "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval." *Id.*

The court has already explained the problems with relators' theory of liability based on the RMAs. *Brooks*, 305 F. Supp. 3d at 1314. To be clear, the RMAs are not "claims"—that is, they are not requests for payment. *See* § 3729(b)(2); *Brooks*, 305 F. Supp. 3d at 1296 n.6 (pointing out that PPAs are not "claims," as that term is used in the statute). The RMAs are nothing more than a set of statements, or assertions. And the False Claims Act does not impose liability on persons who "knowingly make[] . . . a false record or statement." *Cf.* § 3729(a)(1)(B). Instead, the false record or statement must be material to a "false or fraudulent claim." § 3729(a)(1)(B). In essence, the relators attempt to impose liability on false statements alone, reading the "false or fraudulent claim" requirement out of § 3729(a)(1)(B). Consequently, the relators' third claim for relief must be dismissed with prejudice because it is not based on a valid legal theory.

Indeed, the court is confused as to the purpose of the relators' third claim for relief. The purpose of § 3729(a)(1)(B) is to remove any defense that the defendant did not submit the false claim. *Brooks*, 305 F. Supp. 3d at 1294. But in this case the Colleges are alleged to have submitted

(or at least caused to be submitted) each and every claim for payment. And the relators themselves allege, albeit in a conclusory fashion, that "the RMAs did influence the payment of *false claims*." (Fourth Am. Compl. ¶ 395 (emphasis added).) That is, the relators allege that the Colleges' claims for payment, *which the Colleges submitted*, are false claims. If those claims are false, which they must be for the relators to prevail under § 3729(a)(1)(B), then the relators should have proceeded under § 3729(a)(1)(A). In other words, if the Colleges' claims for payment were false, there is no need to show that they also made false statements in their RMAs. *See* § 3729(a)(1)(A) (imposing liability on anyone who submits a false claim for payment).

The court, therefore, dismisses with prejudice the relators' third claim for relief based upon the RMAs.

C.     *The PPAs*

The Colleges entered into a number of PPAs with the Department of Education. (*See* Fourth Am. Compl. ¶ 208.) When a school enters into a PPA, it agrees that, among other things:

(4) It will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs . . . .

(16) For a proprietary institution, the institution will derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds . . . .

(22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance . . . .

(23) It will meet the requirements established pursuant to Part H of Title IV of the HEA by . . . nationally recognized accrediting agencies; [and]

(24) It will comply with the refund provisions established in 34 CFR Part 668.22.

(*Id.* ¶ 212.)

### 1)  The 90/10 Rule

A proprietary school, when it executes a PPA, agrees that it "will derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV [programs]." (*Id.*) This is the so-called 90/10 Rule. 20 U.S.C. § 1094(a)(24). The relators allege that the Colleges took various steps "to inflate their revenue from non-governmental sources for 90/10 Rule purposes." (*Id.* ¶ 196.) But the relators have not alleged that the Colleges made false statements in their PPAs concerning the 90/10 Rule. (*See id.* ¶¶ 215–24.)[5] Accordingly, the relators have not sufficiently alleged that any of the Colleges' claims for payment were "false or fraudulent" because they made false statements in their PPAs concerning the 90/10 Rule. (*See id.*) Thus, the court dismisses the relators' first claim to the extent that it rests upon the 90/10 Rule.

### 2)  The ICB

As explained above, schools, in their PPAs agree to not pay employees "commission[s], bonus[es], or other incentive payment[s] based directly or indirectly on [their] success in securing enrollments." (*Id.* ¶ 212.) The relators have plausibly alleged that the Colleges compensated employees based on their success in enrolling students beginning in 2003 and ending in July 2011. (*Id.* ¶¶ 34–120.) Specifically, the Colleges uniformly paid bonuses on versions of Procedure Directive 85R during this timeframe. (*Id.* ¶¶ 42–65.) Each version of Procedure Directive 85R detailed bonuses that admissions consultants could earn based "on [their] success in securing enrollments." (*Id.*)

---

[5] The court is confused as to why the relators allege that the Colleges agreed to comply with the 90/10 Rule in their PPAs. (Fourth Am. Compl. ¶ 212.) But then the relators do not allege that any of the Colleges ever made false statements in their PPAs as to the 90/10 Rule. (*See id.* ¶¶ 215-24.) This, however, is consistent with the scattershot approach that the relators have taken with their pleadings. *See Brooks*, 305 F. Supp. 3d at 1309 n.20 (discussing how the relators copied wholesale portions of a complaint used by the Government in another case).

In July 2011, the Colleges "repealed their then-existing [Admissions Consultant] Bonus Plan and FP Bonus Plan." (*Id.* ¶ 120.) But according to the relators, the Colleges began violating the ICB again in "approximately April 2014." (*Id.* ¶ 121.) Specifically, the Colleges implemented an Online Admissions Consultant Bonus Plan under which online admissions consultants earned a base salary of $38,000 but could earn up to $60,000 if they started, or enrolled, an average of six students per module. (*Id.* ¶ 122.) In short, the relators have plausibly alleged that the Colleges compensated online admissions consultants based on their success in enrolling students beginning around April 2014. (*See id.* ¶¶ 120–27.)

The relators have plausibly alleged that the Colleges knowingly misrepresented their intent to comply with the ICB in the following PPAs: Stevens-Henager's April 2007 PPA; Stevens-Henager's January 2010 PPA; CollegeAmerica Denver's June 2007 PPA; College America Denver's February 2010 PPA; CollegeAmerica Arizona's June 2008 PPA; CollegeAmerica Arizona's November 2011 PPA; and California College's August 2008 PPA. (*See id.* ¶¶ 215–24.)[6] When the Colleges executed these PPAs, they were paying and continued to pay bonuses based on employees' successes in enrolling students. (*See id.* ¶¶ 42–65.) This plausibly establishes that the Colleges knowingly misrepresented their intent to comply with the ICB when they executed the various PPAs identified above.

The relators, however, have failed to allege that CEHE knowingly misrepresented its intent to comply with the ICB in its 2013 PPA. (*Id.* ¶¶ 217, 220). When CEHE executed this PPA, the

---

[6] Notably, if the Government can prove that the Colleges made false statements concerning their intent to comply with the ICB in these PPAs, the additional factual bases for proving that the Colleges fraudulently induced the Department of Education to enter into these PPAs would be irrelevant for establishing a claim under § 3729(a)(1)(A). That is, proving that a school made multiple false statements in a PPA does *not* increase the number of false claims. Put simply, the number of claims doesn't change when there are multiple false statements in a PPA.

Colleges had "repealed their then-existing [Admissions Consultant] Bonus Plan and FP Bonus Plan." (*Id.* ¶ 120.) Indeed, "[admissions consultants] could earn no new bonuses after July 2011" but "they continued to be paid under the old program *until approximately early 2012*." (*Id.* ¶ 82 (emphasis added); *see also id.* ¶ 110.)

So, taking the relators' allegations as true, the Colleges were *not* violating the ICB when CEHE executed its PPAs in January 2013. (*See id.* ¶¶ 82, 120.) And the Colleges did not begin to violate the ICB because of the Online Admissions Consultant Bonus Plan until "approximately April 2014," over a year after CEHE executed its January 2013 PPAs. (*See id.* ¶ 121.) Consequently, unlike the PPAs executed between 2007 and 2011, the relators have not plausibly alleged that CEHE knowingly misrepresented its intent to comply with the ICB in its January 2013 PPA.

In sum, the relators have plausibly alleged that the Colleges knowingly misrepresented their intent to comply with the ICB in the PPAs executed between 2007 and 2011. But the relators have not plausibly alleged that CEHE knowingly misrepresented its intent to comply with the ICB in its January 2013 PPA. The court dismisses the relators' first cause of action to the extent that it is based upon this PPA.

### 3) Refund Requirement

Schools that participate in Title IV programs must keep accurate records related to administration of Title IV funds, including records relating to student attendance and grades. (*Id.* ¶ 156.) Regulations specify that all schools must keep accurate records at all times, including records relating to a student's eligibility to receive Title IV funding and any refunds that the school must remit to the Department of Education based on a student's ineligibility to receive Title IV funds. (*Id.* ¶ 157 (citing 34 C.F.R. § 668.24(c)(iii)–(iv)).)

If a student enrolls at a school but fails to attend class, the school must refund any Title IV funds received for that student to the Department of Education. (*Id.* ¶ 158 (citing 20 U.S.C. § 1091b; 34 C.F.R. § 668.21(a), (c)).) Similarly, if a student attends some classes but then stops attending classes, the school must calculate the amount of unearned Title IV funds and refund that amount to the Department of Education. (*Id.* ¶ 159 (citing 20 U.S.C. § 1091b; 34 C.F.R. § 668.22(a)(1), (4); § 668.33(b), (g)(i)).)

A school uses its attendance records to determine a student's withdrawal date, which, in turn, determines how much money the school must refund to the Department of Education. (*Id.* ¶ 160 (citing 34 C.F.R. § 668.22(a)(2)(i)(A), (b)).) Because a student's withdrawal date is determined based on attendance records, schools must accurately record and report student attendance. (*Id.* ¶ 161.) But because schools retain more money if a student's withdrawal date is "postponed," schools have a financial incentive to misreport students' withdrawal dates. (*Id.*)

As noted above, when a school executes a PPA, it agrees to "comply with the refund provisions established in 34 CFR Part 668.22." (*Id.* ¶ 212.) The relators allege that three of the Colleges made false statements concerning the refund requirement in certain PPAs:

- Stevens-Henager falsely stated that it would comply with the refund requirement in its January 2010 PPA. (*Id.* ¶ 216.)

- CollegeAmerica Denver falsely stated that it would comply with the refund requirement in its February 2010 PPA. (*Id.* ¶¶ 219.)

- CEHE—on behalf of CollegeAmerica Denver and California College—falsely stated that it would comply with the refund requirement in its January 2013 PPA. (*Id.* ¶ 220, 224.)

### i. Stevens-Henager: January 2010 PPA

The relators have alleged five "[r]epresentative examples" of Stevens-Henager falsifying attendance records. (*Id.* ¶ 168.) First, in "November 2009 and December 2009," an instructor reported that a student had perfect attendance for an externship before the student completed the

externship. (*Id.*) The relators do not allege whether the student did not end up with perfect attendance. Second, in July 2010, an instructor reported that a student had perfect attendance when the student missed a number of classes because she was pregnant and gave birth. (*Id.*) Third, in June 2010, an instructor gave a student an 84 percent attendance report even though the student missed about half of the classes. (*Id.*) Fourth, in August 2010, an investigation found that an instructor was "marking students present . . . when they are not in class." (*Id.*) The relators do not allege what action, if any, Stevens-Henager took when it discovered this. Fifth, in 2013 and 2014, several online admissions consultants called students and encouraged them to login to the online learning program because their attendance was determined based on whether they logged in. (*Id.*)

These examples, four of which occurred between November 2009 and August 2010, plausibly establish that Stevens-Henager knew that it would not comply with the refund requirement when it executed its January 2010 PPA. *See Miller*, 840 F.3d at 498–99 (identifying potential violations of the refund requirement that occurred "before and after the signing of the PPA").

ii.     CollegeAmerica Denver: February 2010 PPA

For CollegeAmerica Denver, the relators allege that "Joshua Allen, who was a faculty member and an Associate Dean . . . explained that when he worked for [CollegeAmerica Denver], he attended 'Last Day Attended' meetings in which [the deans] reached out to students who weren't showing up and encouraged them to log on to their student account so [CollegeAmerica Denver] wouldn't have to count them as dropped." (Fourth Am. Compl. ¶ 168 (internal quotation marks omitted).) According to Mr. Allen, "it was his most important duty to encourage students to appear to be attending classes by logging into their accounts because [CollegeAmerica Denver] 'needed the students to have attendance so [it] wouldn't have to drop them." (*Id.* (internal quotation

marks omitted).) Mr. Allen worked at CollegeAmerica Denver "from November 2009 to October 2013." (*Id.*) This allegation does not plausibly establish that CollegeAmerica Denver falsely certified that it intended to comply with the refund requirement in the February 2010 PPA. At most, the allegation suggests that it was possible but not plausible that CollegeAmerica Denver falsely certified that it would comply with the refund requirement in its February 2010 PPA. Indeed, the allegation does not even establish that CollegeAmerica Denver improperly withheld Title IV funds from the Department of Education. Consequently, the relators have failed to allege that CollegeAmerica Denver falsely certified that it would comply with the refund requirement in its February 2010 PPA.[7] The court, therefore, dismisses the first cause of action against CollegeAmerica Denver to the extent that it is based upon the February 2010 PPA.

iii.        CEHE: January 2013 PPA

The relators allege that CEHE, acting on behalf of CollegeAmerica Denver and California College, falsely certified that it intended to comply with the refund requirement. (*Id.* ¶¶ 220, 224.) For California College, the relators allege one representative example of "instructors falsifying attendance records." (*Id.* ¶ 168.) Specifically, in "approximately 2013," an adjunct professor taught a "hybrid class" (*i.e.*, a class that is partially online and partially in class). (*Id.*) The Associate Dean of Medical Specialties allegedly told the adjunct professor "to deal with students that failed to attend [the class] by 'at least getting them to sign in on their computers to keep their attendance active.'" (*Id.*) The relators do not allege whether the professor actually followed this

---

[7] To the extent relators are aware of specific instances where a school improperly withheld Title IV funds, they could have alleged violations of § 3729(a)(1)(D), which imposes liability on any person who "has possession . . . of . . . money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money." *See Brooks*, 305 F. Supp. 3d at 1313 n.24. Indeed, it is likely far easier to allege a violation of § 3729(a)(1)(D) than it is to allege that all of a school's claims for payment are false or fraudulent based on a theory of promissory fraud.

advice. And, most importantly, the relators do not allege that any professor at California College engaged in such conduct. For CollegeAmerica Denver, the relators again point to Mr. Allen's statements about the importance of encouraging students to log on to their accounts so that they would not be "dropped." (*Id.*)

These allegations do not plausibly establish that CEHE knowingly misrepresented its intent to comply with the refund requirement. Indeed, the allegations do not establish that CEHE improperly withheld Title IV funds from the Department of Education. That is, the relators have failed to identify any students whose attendance records were falsified, resulting in an underpayment of Title IV funds. Consequently, these allegations do not plausibly establish that CEHE knowingly misrepresented its intent to comply with the refund requirement when it signed its January 2013 PPA, and the court dismisses the first cause of action against CEHE to the extent that it is based upon this PPA.

4) Accreditation Requirement

To be eligible to participate in Title IV programs, all schools must "meet the requirements established by . . . accrediting agencies or associations." (*Id.* ¶ 128 (quoting 20 U.S.C. § 1094(a)(21).) Indeed, when schools execute PPAs, they agree that they will "meet the requirements established pursuant to Part H of Title IV of the HEA by . . . nationally recognized accrediting agencies." (*Id.* ¶ 212.) The Colleges accrediting agency is the Accrediting Commission of Career Schools and Colleges (ACCSC). (*Id.* ¶ 130.)

The relators allege that three schools made false statements concerning the accreditation requirement in certain PPAs:

- Stevens-Henager falsely stated it would comply with the accreditation requirement in its January 2010 PPA. (*Id.* ¶ 216.)

- CollegeAmerica Denver falsely stated that it would comply with the accreditation requirement in its February 2010 PPA. (*Id.* ¶ 219.)

- CEHE—on behalf of Stevens-Henager, CollegeAmerica Denver, and California College—falsely stated that it would comply with the accreditation requirement in its January 2013 PPA. (*Id.* ¶¶ 217, 220, 224.)

i. Stevens-Henager: January 2010 PPA

In the summer of 2010, Ms. Wride became the executive assistant to the Dean of Education at Stevens-Henager's Orem campus. (*Id.* ¶ 133.) She was asked to investigate each faculty member's qualifications to ensure that they met the minimum accrediting standards for the ACCSC. (*Id.*)

According to the relators, Ms. Wride "discovered that many faculty members . . . did not have the required minimum qualifications, as established by the ACCSC, to teach the courses that [Stevens-Henager] allowed them to teach." (*Id.* ¶ 134.) The relators provide two examples. (*See id.* ¶¶ 135–39.) First, Ms. Wride discovered that one professor "did not have the minimum number of years of related practical work experience that the ACCSC required him to have . . . to teach certain courses . . . ." (*Id.* ¶ 135.) This professor, according to Ms. Wride, had "misrepresented the nature of his prior work experience." (*Id.* ¶ 137.) Second, Ms. Wride discovered that another professor "did not have sufficient education and related practical work experience to meet the ACCSC accreditation standards for faculty members." (*Id.* ¶ 139.) Specifically, the professor "had never practiced as a chiropractor and had no related practical work experience . . . ." (*Id.*)

Ms. Wride eventually raised these issues with the Dean of Education at Stevens-Henager's Orem campus. (*Id.* ¶ 140.) The Dean told Ms. Wride that he previously brought similar problems to the attention of "upper management" and that he was "nearly terminated for exposing the problems." (*Id.*) Ms. Wride eventually reported the problems to the Colleges' CEO and COO. (*Id.* ¶ 144.) Despite this, Stevens-Henager continued to submit the same faculty personnel reports to the ACCSC for accreditation. (*Id.* ¶ 146.)

When the ACCSC conducted an audit of Stevens-Henager's Orem campus, Ms. Wride was told to "take the day off" to make sure that she had no contact with the auditors. (*Id.* ¶ 149.) Ms. Wride was also dropped from Stevens-Henager's respiratory-therapy program, the program in which she was enrolled, as retaliation for raising concerns with faculty personnel reports. (*Id.* ¶ 150.) When Ms. Wride complained, she was reinstated and Stevens-Henager agreed to waive her tuition and fees if she "just [left] things alone." (*Id.* ¶ 151.)

While the relators allegations suggest that Stevens-Henager knowingly violated accreditation requirements beginning in "summer 2010," the allegations do not establish that Stevens-Henager knowingly made false statements regarding its intent to comply with accrediting standards in January 2010, months before Ms. Wride first raised concerns over faculty qualifications. Notably, the relators have alleged only violations that occurred after Stevens-Henager entered into the relevant PPA. *See Main*, 426 F.3d at 917 ("Tripping up on a regulatory complexity does not entail a knowingly false representation."). Indeed, the relators have not alleged that Stevens-Henager knew that faculty members were under-qualified when it executed its PPA in January 2010. At most, the relators' allegations are merely consistent with Stevens-Henager knowingly misrepresenting its intent to comply with accreditation requirements. Consequently, the relators have not plausibly established that Stevens-Henager knowingly misrepresented its intent to comply with the accreditation requirement in its January 2010 PPA, and the court dismisses the first cause of action against Stevens-Henager to the extent that it rests upon the accreditation requirement in this PPA.

ii.     CollegeAmerica Denver: February 2010 PPA

The relators allege four examples of CollegeAmerica Denver violating accrediting standards. (*Id.* ¶ 154.) First, in approximately 2009, an instructor observed work-study students

and employees falsifying student files in an attempt to bring the files into compliance with ACCSC standards. (*Id.*) Second, during the same time period, the same instructor falsified student files before giving them to an ACCSC auditor. (*Id.*) Third, between 2011 and 2013, a career services employee reported students as being "self-employed" with sufficient information and in violation of ACCSC standards. (*Id.*) Fourth and finally, in 2012, employees were told to hide documents and a book room from ACCSC representatives. (*Id.*) The documents advertised a "free" college program used to recruit students, but ACCSC standards prohibit the use of such inducements to enroll students. (*Id.*)

These allegations plausibly establish that CollegeAmerica Denver knowingly violated accrediting standards between 2009 and 2013. Consequently, the relators' allegations plausibly established that CollegeAmerica Denver knowingly misrepresented its intent to comply with accrediting standards in its 2010 PPA.

### iii.    CEHE: January 2013 PPA

The relators allege that CEHE—acting on behalf of Stevens-Henager, CollegeAmerica Denver and California College—falsely certified that it intended to comply with accrediting standards. (*Id.* ¶¶ 217, 220, 224.)

For California College, the relators allege examples of when the school took action to conceal violations of accrediting standard. (*Id.* ¶ 153.) But these events occurred in "February 2016," over three years after CEHE entered into its January 2013 PPA. (*Id.*) For Stevens-Henager, the relators allege that "[i]n 2013" the school reported to ACCSC that a philosophy class was being taught by a professor with the requisite qualifications. (*Id.*) But in reality, a different instructor who was not qualified taught the class. (*Id.*) "In 2013," Stevens-Henager "allowed instructors without the required years of experience to teach medical coding and billing courses." (*Id.* ¶ 155.)

And in late 2013, Stevens-Henager "allowed an instructor without a background in the law to teach a business law course." (*Id.*) For CollegeAmerica Denver, the relators have alleged the examples discussed above in connection with CollegeAmerica Denver's February 2010 PPA. And the relators also allege that in 2013, a professor was allowed to teach several accounting courses even though "he did not have the correct degree to teach the classes." (*Id.*)

These allegations plausibly establish that Stevens-Henager and CollegeAmerica Denver violated accrediting standards both before and after CEHE executed its PPA (on their behalf) in January 2013. Consequently, the allegations plausibly established that CEHE falsely certified that it intended to comply with accrediting standards in its 2013 PPA.[8]

## III.    VIABILITY OF THE RELATORS' POST-INTERVENTION COMPLAINTS[9]

The court finally turns to the question of whether the relators have a right to "maintain the non-intervened portion of the action in the name of the United States." Up till this point, the parties have operated under the assumption that the relators may do so. This apparently led the relators to publicly file amended complaints, name additional defendants, and assert additional claims for relief. Problematically, however, nothing in the False Claims Act or the legislative history suggests that a relator can maintain the non-intervened portion of an action. In fact, the plain language of the statute suggests otherwise.

The statute is unambiguous. If the Government intervenes in the action, it must conduct the action and has the "primary responsibility for prosecuting the action." While a relator retains

[8] The allegations related to California College add little, if any, support to this conclusion because the alleged violations took place in February 2016—over three years after CEHE entered into the January 2013 PPA.

[9] The court also asked the parties to brief whether permitting private citizens to prosecute claims on behalf of the Government violates the "take Care" clause found in Article II of the U.S. Constitution. Because the court strikes the relators' complaints, it need not address this constitutional question.

a limited right to continue as a party to the action, that right does not allow the relator to amend his or her complaint to add defendants and claims to the Government's action. Those rights necessarily belong to the party with the primary responsibility for conducting the action—in this case, the Government. Consequently, the Government's complaint in intervention superseded the relators' amended complaint, and any pleading subsequently filed by the relators lacked legal effect.

### A. The False Claims Act

"A [relator] may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). "The action shall be brought in the name of the Government." § 3730(b)(1). The Federal Rules of Civil Procedure provide that "[t]here is one form of action—the civil action," FED. R. CIV. P. 2, and one commences a civil action "by filing a complaint with the court," FED. R. CIV. P. 3.[10] In short, a relator commences a civil action by filing a complaint with the court.

"A copy of the complaint and written disclosure of substantially all material evidence and information the [relator] possesses shall be served on the Government . . . ." § 3730(b)(2). "The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." § 3730(b)(2).

"The Government may elect to intervene and proceed with the action within 60 days after it received both the complaint and the material evidence and information." § 3730(b)(2). "The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal . . . ." § 3730(b)(3).

---

[10] *See Civil Action*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining civil action as "[a]n action brought to enforce, redress, or protect a private or civil right; a noncriminal litigation").

"Before the expiration of the 60-day period and any extensions . . . , the Government *shall* (A) *proceed with the action*, in which case *the action shall be conducted by the Government*; or (B) notify the court that it declines to take over the action, *in which case the* [*relator*] *shall have the right to conduct the action*." § 3730(b)(4) (emphasis added).

"*If the Government elects not to proceed with the action*, the [relator] shall have the right to conduct the action." § 3730(c)(3) (emphasis added). "When a [relator] proceeds with the action, the court, without limiting the status and rights of the [relator], may nevertheless permit the Government to intervene at a later date upon a showing of good cause." § 3730(c)(3).

"If the Government proceeds with the action, it shall have the *primary responsibility for prosecuting the action*, and shall not be bound by an act of the [relator]." § 3730(c)(1) (emphasis added). "If the Government elects to intervene and proceed with an action . . . , the Government may file its own complaint or amend the complaint of [the relator] to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief." § 3731(c).

If the Government intervenes, the relator has "the right to continue as a party to the action," subject to certain limitations. § 3730(c)(1). Those limitations include "(i) limiting the number of witnesses the [relator] may call; (ii) limiting the length of the testimony of such witnesses; (iii) limiting the [relator's] cross-examination of witnesses; [and] (iv) otherwise limiting the participation by the [relator] in the litigation." § 3730(c)(2)(C).

If the Government intervenes, the court may impose restrictions on the relator if: (1) the Government shows that "unrestricted participation during the course of the litigation by the [relator] would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for the purpose[] of harassment," § 3730(c)(2)(C); or (2) the defendant

shows that "unrestricted participation during the course of the litigation by the [relator] would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense . . . ," § 3730(c)(2)(D).

B.    *"Action" Unambiguously Means "Civil Action"*

The Government contends that Congress used the word "action" to mean "cause of action," as opposed to "civil action." In evaluating this contention, the court must "determine congressional intent, using traditional tools of statutory construction." *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1245 (10th Cir. 2009) (citation omitted). The first step in statutory construction is to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," which is determined by "reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997). To the extent a statute is ambiguous, a court must consider its purpose and the legislative history to determine the statute's meaning. *McGraw v. Barnhart*, 450 F.3d 493, 499 (10th Cir. 2006).

Here, the text of the statute and its structure undermine the Government's interpretation of the term "action." *First*, § 3730(b)(1) unambiguously shows that Congress used "action" to mean "civil action." The first sentence provides that a relator may bring a "civil action," and the following sentence explains that the "action" (*i.e.*, the civil action) shall be brought in the name of the Government. § 3730(b)(1). The next sentences provides that "[t]he action [*i.e.*, the civil action] may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." § 3730(b)(1).[11]

_____

[11] This sentence further undermines the Government's position because it is unlikely that Congress would have required that the court and the Attorney General give written consent anytime a relator moves to dismiss a cause of action.

*Second*, other provisions show that Congress used "action" to mean something other than "cause of action." "The court shall dismiss an action *or claim* under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action *or claim* were publicly disclosed." § 3730(e)(4)(A) (emphasis added). If "action" means "cause of action," the words "or claim" would be superfluous. *See Cause of Action*, BLACK'S LAW DICTIONARY (10th ed. 2014) (suggesting that one review the definition of "claim" for more information on the definition of "cause of action"). That is, interpreting "action" to mean "cause of action" runs afoul of the rule that courts must "give effect, if possible, to every clause and word of a statute." *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152 (1883).

The Government contends that the so-called first-to-file bar supports its position. It provides, "When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." § 3730(b)(5). According to the Government, courts uniformly examine the bar's applicability to a second case on a cause-of-action by cause-of-action basis. And, as the Government's argument goes, this suggests that "action" means "cause of action." Not so.

The court agrees that the phrase "related action based on the facts underlying the pending action," bars claims arising from events that are already the subject of existing suits. *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 232 (3d Cir. 1998). But this is because once a court dismisses the claims that arise from events that are the subject of a pending suit, the second action is no longer "based on the facts underlying [a] pending action." § 3730(b)(5). The cause-of-action by cause-of-action approach simply lets courts excise those

claims that are the subject of a pending action. This makes it so that the second action is no longer based on the facts underlying a pending action.[12]

Notably, the Government's proffered interpretation is inconsistent with actions it took in this case. Following the Supreme Court's decision in *Escobar*, the Government, by its own admission, instructed the relators to not file a motion for reconsideration. Specifically, the Government "asserted its authority to restrict Relators' counsel from taking actions in the case that the Government believed were inappropriate."

But according to the Government's proffered interpretation, it declined to intervene as to the relators' "causes of action," so the relators should have had the right to conduct those "causes of action." *See* § 3730(c)(3). Short of seeking outright dismissal of those "causes of action," which would require a showing of good cause, *see* § 3730(c)(2)(A), it is unclear what authority the Government had to instruct the relators to not file a motion for reconsideration. Indeed, "if the United States declines to intervene, the relator retains 'the right to conduct the action'" and "[t]he United States is thereafter limited to exercising only *specific rights* during the proceeding," such as "requesting service of pleadings and deposition transcripts," "seeking to stay discovery that 'would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts,'" and "vetoing a relator's decision to voluntarily dismiss the action"

_____

[12] The relators contend that the court's interpretation will lead to a perverse outcome: relators will "file separate complaints—perhaps for each defendant, each cause of action, or both." But the court struggles to see how relators would do so when the first-to-file bar provides that "[w]hen a person brings an action under this subsection, *no person other than the Government may . . . bring a related action* based on the facts underlying the pending action." § 3730(b)(5) (emphasis added). The plain language of the first-to-file bar prevents a relator from commencing a second action that is based on the facts underlying the first. The relators also contend that "a construction that eliminates partial intervention will simply lead the Government and relators to sever the non-intervened claims into separate actions during the seal period." Again, the court struggles to see how this is possible when relators cannot file a second action that is based on the underlying facts of the first action.

*United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 932 (2009) (emphasis added). Nothing in the statute gives the Government the authority to instruct relators to not file certain motions when the Government has declined to intervene. *See* § 3730(c)(3), (4). Instead, the Government's actions in this case are consistent with the court's interpretation and the plain language of the statute, which gives the Government the primary responsibility for prosecuting "the action."

In sum, the False Claims Act unambiguously uses "action" to mean "civil action." *See Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears."). The Government's arguments to the contrary are unavailing and undermined by the plain language of the statute.

C.      *The Government May Intervene on Some But Not All of a Relator's Claims*

The Government, in its briefing, creates a false narrative. The Government argues that the court's interpretation will force the Government to "choose between intervening in the case as a whole, even including those claims and defendants that it did not wish to pursue, or declining the entire matter and abandoning potentially meritorious causes of action." This would be troubling if it were true. But it is not.

"If the Government elects to intervene and proceed with an action . . . , the Government may file its own complaint or amend the complaint of [the relator] to clarify or add detail *to the claims in which the Government is intervening* and to add any additional claims with respect to which the Government contends it is entitled to relief." § 3731(c) (emphasis added). This unambiguously lets the Government add claims when it intervenes—indeed, the Government did so in this case. And it lets the Government intervene as to certain claims in the relators' complaint. But it says nothing about whether relators can maintain the non-intervened portion of the action, which is the concern at issue here.

*Relators May Not Maintain the Non-Intervened Portion of an Action*

The court now turns to the heart of the matter: whether a relator retains an independent right to maintain the non-intervened portion of an action. The Government's main argument is that Congress' silence as to whether a relator may prosecute the non-intervened portion of an action suggests that the relator retains a right to do so. Specifically, the Government contends that the language allowing it "to clarify or add detail to the claims in which [it] is intervening" means that a relator can pursue the non-intervened claims. The court is not convinced.

Congress would not have given relators the primary responsibility for prosecuting the non-intervened claims in such a cryptic fashion. *See F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."). There are a number of ways in which Congress could have given relators such a right. It could have written, "The person bringing the action has the primary responsibility for prosecuting the claims in which the Government did not intervene." *Cf.* § 3731(c). Or, "If the Government proceeds with the action, the action shall be conducted by the Government *and the person bringing the action*." *Cf.* § 3730(b)(4). Or, Congress could have taken the Government's "practical" approach, replacing "action" with "claim for relief."[13] But such language is noticeably absent from the statute.

Congress' silence as to a relator's right to prosecute the non-intervened claims leads to the conclusion that no such right exists. In essence, the Government asks the court to read provisions into the statute to allow the relators to maintain the non-intervened portion of the action. But this would result "not [in] a construction of [the] statute, but, in effect, an enlargement of it by the

---

[13] *See Claim*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining claim as "[a] demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for.—Also termed *claim for relief*").

court, so that what was omitted [*i.e.*, the relator's right to maintain the non-intervened claims] . . . may be included within its scope." *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (first and second alterations in original) (citation omitted). But the court need not proceed in this fashion— indeed, there is a fundamental "difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted," which is what the Government asks the court to do. *Id.* (citation omitted).

The structure of the statute further undermines the Government's position. Indeed, if the Government intervenes, it has "the *primary responsibility for prosecuting the action, and shall not be bound by an act of the* [*relator*]." § 3730(c)(1) (emphasis added). Allowing relators to pursue the non-intervened claims is in direct conflict with this provision. The Government would not have primary responsibility for conducting the action if, after the Government files a complaint in intervention, a relator's complaint remained operative and the relator retained the right to amend that complaint, adding parties and claims to the Government's action. And it is unclear how the Government is not "bound by an act of [a relator]" if the relator can add allegations, defendants, and claims to the Government's action.[14]

At least three other provision of the False Claims Act suggest that relators may not maintain the non-intervened portion of an action. *First*, consider the provisions that deal with awards to relators. Section 3730(d)(1) provides that "[i]f the Government *proceeds with an action* brought by a [relator] under subsection (b), such [relator] shall . . . receive at least 15 percent but not more

---

[14] The relators argue that "[t]he Government is primarily, not solely, responsible for the claims in which it has intervened." And they state that they are "not in any way challenging the authority of the Government to prosecute the *intervened claims in whatever way the Government prefers*, with as little or as much help from Relators as the Government desires." (emphasis added). This statement is problematic. It implies that the relators think that they, not the Government, are primarily responsible for prosecuting portions of the action, which is troubling since it is the Government that is primarily responsible for "prosecuting the action." § 3730(c)(1).

than 25 percent of the proceeds of the action or settlement of the claim." (emphasis added). Section 3730(d)(2) provides that "[i]f the Government does *not proceed with an action* under this section, the [relator] . . . shall receive . . . not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement." (emphasis added). Put simply, a relator's potential award depends on whether the Government intervenes in the action, not on whether a relator prevails on the non-intervened claims.

The legislative history confirms this:

> *If the Government enters the action* and if the [relator] disclosed relevant evidence or relevant information which the Government did not have at the time the action was brought, the [relator] shall receive not less than 15% nor more than 25% of the proceeds of the action or settlement of the claim. . . .
> *If the government does not enter and proceed with the action*, and *if the [relator] proceeds with it to judgment or settlement*, the [relator] shall receive an amount which the court decides is reasonable. That amount shall not be less than 25% nor more than 30% of the proceeds of the action or settlement and is to be paid out of such proceeds.

H.R. Rep. No. 99-660, at 36–37 (1986) (emphasis added).[15] Like the statute, nothing in the legislative history suggests that Congress intended for courts to apply the damages provision for intervened actions to the claims that the Government prosecuted and then apply the damages provision for non-intervened actions to the claims that the relators prosecuted.

The relators, in their fourth amended complaint, request that "to the extent that the United States Government has not intervened in this action, [they] be awarded an amount that the Court decides is reasonable, which is not less than 25% nor more than 30% of the proceeds of any award

---

[15] *See also* S. Rep. No. 99-345, at 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5292 ("Subsection (d)(1) provides that when the Government has intervened, taken over the suit and produced a recovery either through a settlement agreement or a judgment, the relators will receive between 10 and 20 percent [sic] of the recovery. Subsection (d)(2) provides that if the relator has litigated the false claims action successfully and the Government did not take over the suit, the relator will be awarded between 20 and 30 percent [sic] of the judgment or settlement proceeds.")

or settlement for those claims." But the statute unambiguously provides that the relators would be entitled to "at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim" because the Government has "proceed[ed] with [the] action." § 3730(d)(1); *see also* H.R. Rep. No. 99-660, at 36 (1986) ("If the Government enters the action . . . the [relator] shall receive not less than 15% nor more than 25% . . . ."). Neither the statute nor the legislative history suggests that a relator can pursue claims that are separate from the Government's to recover an increased award. In sum, the structure of damages provisions undermines the idea that relators can pursue "non-intervened claims."

Even if the court could apply the damages provisions to separate claims, the way in which this case has been litigated would create additional problems with apportioning an award between the Government and the relators. The Government seeks to impose liability on Stevens-Henager's requests for Title IV funds based on allegations that the school made false statements in certain PPAs concerning its intent to comply with the ICB. The relators seek to impose liability on the same exact requests for Title IV funds based on different sets of false statements. That is, the relators' claims against Stevens-Henager are duplicative of the Government's in the sense that the relators attempt to impose liability on the same claims for payment, but with a different factual basis. Assuming that both the relators and the Government prevail on their claims, it is entirely unclear how the court would determine the relators' share of damages. Presumably, the Government and the relators can come up with a "practical" solution to this problem. But such a solution would be unmoored from the plain language of the statute.[16]

---

[16] In fact, with respect to the claims against Stevens-Henager, the relators' interests and the Government's are potentially adverse. Assuming that relators are entitled to an increased award if they prevail on their separate claims, it is in the relators' interest to prevail on their claims against Stevens-Henager without assisting the Government. Indeed, under the relators' interpretation of the statute, this would allow them to recover 25 to 30 percent of the proceeds of any award or

*Second*, consider the provisions dealing with an award of attorney fees to the defendant:

> *If the Government does not proceed with the action and the [relator] conducts the action*, the court may award to the defendant its reasonable attorneys' fees and expenses *if the defendant prevails in the action* and the court finds that the claim of the [relator] was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

§ 3730(d)(4) (emphasis added); *see also* H.R. Rep. No. 99-660, at 37 (1986) ("This section further provides that that if the [relator] proceeds with the action without the Government and the defendant prevails, the court may award reasonable attorneys fees and expenses to the defendant . . . ."). Put simply, defendants are precluded entirely from recovering attorney fees if the Government "proceeds with the action." If, however, the Government declines to intervene in the action, the relator is potentially on the hook for expenses and attorney fees.

The attorney fee provision does not contemplate a situation in which a relator prosecutes "separate" claims after the Government intervenes in the action. And this makes sense. When the Government intervenes, it has the primary responsibility for conducting the action, and the Government presumably elected to intervene because the action has merit: Congress envisioned that the Government would intervene in those cases with merit, as opposed to those without. *See*

---

settlement. But if the Government were to prevail on its claims against Stevens-Henager, the relators would potentially be limited to recovering 15 to 25 percent of the proceeds. Surely Congress did not intend that relators could prosecute claims in a way that makes them potentially adverse to the Government. This would undermine the entire purpose of the statute: "to encourage a working partnership between both Government and the [relator]." 132 Cong. Rec. H9382-03, 1986 WL 786917 (1986) (Remarks of Rep. Howard L. Berman). The Government even points out, citing *United States ex rel. Becker v. Tools & Metals, Inc.*, Nos. 3:05-CV-0627-L, 3:05-CV-2301-L, 2009 WL 855651, at *6 (N.D. Tex. Mar. 31, 2009), that courts have dismissed "claims of relators that overlap[] with the claims as to which the Government intervened." So it is unclear why the Government has not taken issue with the relators' continued attempts to allege alternative factual bases for liability related to the same exact claims for payment upon which the Government seeks to impose liability. Indeed, even if the relators could pursue their own separate claims, the court would likely need to strike the relators' allegations that arise from alternative factual bases for liability as to Stevens-Henager.

*Eisenstein*, 556 U.S. at 933 ("Congress expressly gave the United States discretion to intervene in [False Claims Act] actions—a decision that requires consideration of the costs and benefits of party status.").

But if relators, after the Government intervenes, are allowed to add defendants and claims to the action, the attorney fee provision is undermined because the relators' new claims could prove frivolous, and the defendants would nevertheless be precluded from recovering attorney fees because the Government "proceed[ed] with the action." In short, the attorney fee provision envisions that the Government, when it intervenes, takes responsibility for the entire action. It does not contemplate a situation in which a relator continues to add claims to the action.[17]

*Third*, consider the False Claims Act's statute of limitations:

*A civil action* under section 3730 may not be brought

(1) more than 6 years after the date on which the violation of section 3729 is committed, or
(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

§ 3731(b) (emphasis added).

The Tenth Circuit has held that paragraph (2) "was not intended to apply to private qui tam suits." *United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 725 (10th Cir. 2006). So only the six-year statute of limitations in paragraph (1) "applies to actions pursued by private qui tam relators." *United States ex rel. Told v. Interwest Constr. Co.*, 267 F.

---

[17] The relators contend that the attorney fee provision can be applied to non-intervened claims only. Of course, this conflicts with the plain language of the statute. And it is problematic because it would shift the burden to defendants to apportion attorney fees and expenses between the intervened and non-intervened claims. Thus, even if a defendant proves that a relator's claims were frivolous, the relator could, and likely would, argue that the defendant has not properly apportioned fees between the fee-bearing and non-fee-bearing claims.

App'x 807, 809 (10th Cir. 2008). Put simply, the Tenth Circuit's interpretation of § 3731(b) suggests that either the Government or the relators conducts the action, not both. Indeed, if a relator could pursue non-intervened claims after the Government intervenes in an action, it is unclear why the relator could not invoke the statute of limitations found in paragraph (2). The better approach is that the Government, when it intervenes, decides which claims are a part of the action, and the Government decides whether to prosecute any claims that fall under paragraph (2).

In sum, there is nothing in the False Claims Act to suggest that a relator may maintain "non-intervened portion[s] of [an] action." Indeed, the False Claims Act is clear that the Government either "elect[s] to intervene and proceed with the action," § 3730(b)(2), or it "declines to take over the action," § 3730(b)(4)(B).[18] There is no in between.[19]

When the Government intervenes in the action, the relator can "continue as a party to the action." § 3730(c)(1). But that right does not encompass the right to conduct the action. If Congress intended to let relators conduct portions of the action after the Government intervened, the statute would provide, "If the Government proceeds with the action, the action shall be conducted by the Government *and the person bringing the action*." *Cf.* § 3730(b)(4); *see also* § 3730(c)(3) ("If the

---

[18] *See also United States ex rel. Bennett v. Biotronik, Inc.*, 876 F.3d 1011, 1021 (9th Cir. 2017) ("[T]he Government becomes a 'party' to the suit as a whole when it intervenes. It does not become a 'party' to a particular claim or number of claims."); *United States ex rel. Estate of Robert Gadbois v. PharMerica Corp.*, 292 F. Supp. 3d 570, 577 (D.R.I. 2017) ("The plain language of the statute makes clear that intervention serves to make the Government a party to the entire suit, not just certain claims or causes of action.")

[19] This is confirmed by the legislative history:

Subsection (b)(4) of section 3730 restates current law which provides that within the initial 60-day period, or before expiration of any stays granted by the court, the Government must indicate whether it will intervene and proceed *with the action or decline to enter. If the Government takes over the civil false claims suit, the litigation will be conducted solely by the Government. If the Government declines, the suit will be litigated by the individual who brought the action*.

S. Rep. No. 99-345, at 23 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5290 (emphasis added).

Government elects not to proceed with the action, the [relator] shall have the right to conduct the action."). But it does not. Instead, after the Government intervenes, it conducts the action and the relator continues as a party to the action. § 3730(c)(1); *Eisenstein*, 556 U.S. at 932 ("If the United States intervenes, the relator has 'the right to continue as a party to the action, but the United States acquires the 'primary responsibility for prosecuting the action.'").

The right to continue as a party to the action is more limited than the right to conduct the action, and it does not encompass the right to add defendants and claims to the action. Section 3730(c)(2)(C) contemplates the rights that a relator would have as a party to the action. It provides that the court, after the Government has intervened, can limit the number of witnesses a relator may call, limit the testimony of those witnesses, and limit the relator's cross-examination of other witnesses. § 3730(c)(2)(C). So, the statute contemplates that a relator, as a party to the action, could call and cross-examine witnesses.

Section 3730(c)(2)(D) further undermines the idea that a relator, as a party to the action, can add defendants and claims to the Government's action. It lets a court limit a relator's "participation during the course of the litigation" if the defendant shows that the relators' participation "would cause the defendant undue burden or unnecessary expense." § 3730(c)(2)(D). This provision makes little sense if the right to continue as a party to the action includes the right to add defendants and claims to the action.

Assume, as is the case here, that a relator named an additional defendant after the Government intervened. Could the defendant then argue that the relator's "participation" causes the defendant "undue burden" and "unnecessary expense"? § 3730(c)(2)(D). Indeed, the defendant would not have been a party to the action *but for* the relator's "participation." If a relator had the right to add defendants and claims to the action, courts would be put in the awkward position of

evaluating these types of arguments. *See United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 28–29 (D.D.C. 2014) (noting that the "similarity of the legal theories advanced by the government and the relator" alleviates the potential burden "caused by relator's continued prosecution of th[e] action").

If Congress truly intended that the right to continue as a party to the action included the right to add defendants and claims to the action, it would not have given courts the ability to limit a relator's "participation" upon a showing that the defendant would suffer undue burden or unnecessary expense. Section 3730(c)(2)(D) contemplates that the right to continue as a party to the action is more limited (*e.g.*, calling and cross-examining witnesses and engaging in discovery). And it suggests that Congress did not intend to let relators maintain the non-intervened portion of an action.

The legislative history provides further insight on what Congress intended when it gave relators the right to continue as a party to the action. The Senate Judiciary Committee explained that relators, under prior versions of the False Claims Act, "ha[d] virtually no guaranteed involvement or access to information about the false claims suit." S. Rep. No. 99-345, at 25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5290. So, the proposed § 3730(c)(1) in the Senate Bill gave relators the right to request "copies of all pleadings filed in the action and copies of all deposition transcripts." S. 1562, 99th Cong. (1986). It also gave relators the right to "file objections with the court and petition for an evidentiary hearing to object to any proposed settlement or to any motion to dismiss filed by the Government." *Id.* But the court was required to grant an evidentiary hearing only "upon a showing of substantial and particularized need." *Id.* And finally, the relators could "move the court for leave to conduct the action in the name of the United States if, after making its election to take over the suit, the Government does not proceed with the action with reasonable

diligence within six months or such reasonable additional time as the court may allow after notice." *Id.* As the Senate Judiciary Committee explained, the proposed Senate Bill gave relators "increased involvement in suits brought by the relator *but litigated by the Government*." S. Rep. No. 99-345, at 13 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5278 (emphasis added).

The House Judiciary Committee expressed similar concerns, citing an example where a relator was "precluded from conducting his own discovery." H.R. Rep. No. 99-660, at 29 (1986). So, the proposed § 3730(c)(1) in the House Bill would have expanded the "role of the relator so that when the Government enters the action . . . , the relator remains a party to the suit with the same rights as if he had been an intervenor of right under Rule 24(a), Federal Rules of Civil Procedure." *Id.* at 30. "*The Government remains the primary litigant and has control of the litigation*, but . . . the relator has access to all documents filed with the court, as well as the right to conduct discovery." *Id.* (emphasis added).

Notably, the final language passed by Congress tracked the proposed Senate Bill, which "narrowed somewhat" a relator's role as a party to the action by allowing courts "to limit the role of qui tam plaintiffs in the litigation." 132 Cong. Rec. H9382-03, 1986 WL 786917 (1986) (remarks of Rep. Dan R. Glickman). The House Bill defined the rights of relators by express reference to the rights of an intervenor of right under Federal Rules of Civil Procedure. *See* H.R. Rep. No. 99-660, at 30 (1986). But the final language of the statute does not. This severely undercuts the relators' argument that the court must look to the Federal Rules of Civil Procedure to ascertain what rights a relator has as a "party to the action."[20]

---

[20] Moreover, the Department of Justice expressed concerns with the language in the House Bill that gave relators the "same rights as provided by Rule 24(a)." Specifically, the Department of Justice believed that there was a "serious potential for the [misuse] of the statute and the sweeping rights available to a private plaintiff under the Federal Rules of Civil Procedure," so it "strongly object[ed]" to the provision giving relators the same rights "as provided by Rule 24(a)." H.R. Rep.

In sum, both the plain language of the statute and the legislative history suggest that Congress envisioned that a relator, as a party to the action, could (1) call witnesses, (2) cross examine witnesses, (3) request to receive pleadings and deposition transcripts, (4) object to proposed settlements, and (5) at the most, conduct discovery. *See A.C.L.U. v. Holder*, 673 F.3d 245, 250 (4th Cir. 2011) (noting that a relator, as a party to the action, "may participate in discovery, engage in motions practice, and participate at trial"). But neither the statute nor the legislative history suggests that a relator, as a party to an action, can add defendants and claims to the action. If Congress intended to give relators such rights, one would imagine that either the statute or the legislative history would reflect its intent to do so. But neither does.[21]

### E. The Relators' Post-Intervention Complaints Lack Legal Effect

Here, the relators filed a complaint and later an amended complaint. The Government then filed its complaint in intervention. *See* § 3731(c) (providing that the Government may file its own complaint if it elects to intervene in an action). At that point, the Government was required to conduct the action and had the primary responsibility for prosecuting the action. § 3730(b)(4); § 3730(c)(1). The Government's complaint superseded the relators' complaint and became the operative pleading. *Cf. United States ex rel. Serrano v. Oaks Diagnostics, Inc.*, 568 F. Supp. 2d 1136, 1140 (C.D. Cal. 2008) ("The intervening complaint simply alters the complaint already filed

---

No. 99-660, at 67 (1986) (letter from Assistant Attorney General John R. Bolton). In the Department of Justice's view, giving relators the same rights as a private plaintiff would "introduce[] a major disruptive element into the careful and tactically difficult job of proving a complex fraud case," leading to "an unnecessary burden to the courts and to the United States." *Id.*

[21] Indeed, if finding legislative history to support one's position is "the equivalent of entering a crowded cocktail party and looking over the heads of guests for one's friends," the relators and the Government have no friends at the party. *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993). At most, the Government and the relators point to general statements about the statute's purpose. These statements, however, do not suggest one way or the other that Congress intended to let relators maintain the non-intervened portion of an action.

[by the relator].").[22] The relators then lost the right to add defendants and claims to the action. Any pleading filed by the relators after the Government elected to intervene lacked legal effect. At most, the relators could have persuaded the Government to amend its complaint to include additional claims, allegations, or defendants.[23] But the relators were unable to take the steering wheel from the Government, adding new claims, allegations, and defendants to the Government's action. Accordingly, the court must strike the relators' second, third, and fourth amended complaints because they have no legal effect.

> ### F. Alternatively, Relators May Not Pursue Claims Alleged in Their Fourth Amended Complaint Because It Was Not Filed Under Seal

The False Claims Act provides that relators must comply with certain mandatory filing requirements. Specifically, a relator must (1) provide the Government with a copy of the complaint and (2) file the complaint under seal for at least 60 days. § 3730(b)(2); *State Farm Fire & Cas. Co. v. United States ex rel. Rigby*, 137 S. Ct. 436, 442 (2016). These requirements allow the Government to "make an informed decision about whether to intervene in the qui tam action." *A.C.L.U.*, 673 F.3d at 250.

---

[22] Indeed, the statute is clear that the action is "brought in the name of the Government" and no one else. § 3730(b)(1). So it is unclear why the plaintiff—the Government—can have two operative complaints, one filed by the Government and one filed by the relators. The Federal Rules of Civil Procedure contemplate no such thing. *See* FED. R. CIV. P. 2, 3, 15.

[23] This would let the relators take some responsibility in prosecuting those claims, but the Government would nevertheless be primarily responsible for prosecuting them. This is entirely consistent with the purpose of the statute, which is "to encourage a working partnership between both Government and the [relator]." 132 Cong. Rec. H9382-03, 1986 WL 786917 (1986) (remarks of Rep. Howard L. Berman). The Government could delegate work to the relators' counsel, achieving "a coordinated effort of both the Government and the citizenry [to] decrease [fraud on the Government]." S. Rep. No. 99-345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5267. If anything, this approach would achieve a more coordinated effort between the Government and the relators.

The False Claims Act, however, says nothing "about the remedy for a violation of [the sealing requirement]." *State Farm*, 137 S. Ct. at 442. The structure of the statute indicates that violating the sealing requirement "does not mandate dismissal." *Id.* The sealing requirement is meant to protect the Government, so it "make[s] little sense to adopt a rigid interpretation of the seal provision that prejudices the Government by depriving it of needed assistance from private parties." *Id.* at 443. Thus, while dismissal may be an appropriate sanction in some cases, courts should look to the following factors: (1) whether the Government suffered harm because of the violation of the sealing requirement, (2) the nature of the violation, and (3) whether the violation was willful or made in bad faith. *See id.* at 444 (citing *United State ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 246 (9th Cir. 1995)).

Here, the relators have added new claims to both their third and fourth amended complaint while disregarding the sealing requirement. The relators were aware of the sealing requirement. In fact, they stated that they filed portions of their second amended complaint under seal because it "alleged violations of the [False Claims Act] never before set forth in any prior complaint." *See also United States ex rel. Davis v. Prince*, 766 F. Supp. 2d 679, 684 (E.D. Va. 2011) (holding that the sealing requirement applies when a relator "add[s] new claims for relief or new and substantially different allegations of fraud").

Most recently, the relators added allegations that CEHE fraudulently induced the Department of Education to execute a PPA in January 2013. By including allegations concerning the January 2013 PPA, the relators attempted to impose liability on claims for payment that were never before at issue in this case. That is, the fourth amended complaint "allege[s] violations of the [False Claims Act] never before set forth in any prior complaint." But the relators did not file it under seal.

The Government states that the third and fourth amended complaints merely "added detail to the fraudulent schemes already described, and thus did not have to be filed under seal." This is, at best, a misstatement. As noted above, the third amended complaint added a defendant—Weworski & Associates—to the action. And the fourth amended complaint attempts to impose liability on requests for Title IV funds that were not covered by any prior pleading. Those complaints undeniably allege new violations of the False Claims Act.

Because the fourth amended complaint was not filed under seal, the Government had no opportunity to intervene as to the new claims while the fourth amended complaint remained under seal. By not filing the complaint under seal, the relators deprived the Government of its right to intervene as to the new claims without showing "good cause" to do so. *Compare* § 3730(b)(2) ("The Government may elect to intervene and proceed with the action . . . ."), *with* § 3730(c)(3) ("When a person proceeds with the action, the court, without limiting the status and rights of the [relator], may nevertheless permit the Government to intervene at a later date upon a showing of good cause.").

Even if the relators had a right to pursue their own claims, the proper sanction for violating the sealing requirement in this case is to prohibit relators from pursing the new claims alleged in their third and fourth amended complaints. *See State Farm*, 137 S. Ct. at 444 (suggesting that district courts have broad discretion to craft sanctions when the sealing requirement is violated). Such a sanction is appropriate because it encourages compliance with the sealing requirement, but it does not prevent the Government from pursuing the relators' claims. *See id.* at 443 (stating that the sealing requirement was meant to protect the Government's interest).

G.      *Government's Request to Amend*

The Government requests that it be given an opportunity to submit a revised complaint in intervention if the court determines that the relators cannot pursue the non-intervened portion of

the action. If the Government intends to expand the scope of its allegations, it is directed to file a motion to amend under Federal Rule of Civil Procedure 15(a)(2). Given the age of this case, the court is inclined to deny a motion to amend unless the Government files its motion within 21 days of this order.

## CONCLUSION AND ORDER

For the reasons set forth above, it is hereby ORDERED:

1. The Colleges' "Motion for Leave to Take Judicial Notice" (ECF No. 440) is GRANTED.

2. Stevens-Henager's and CEHE's "Motion to Dismiss the Government's Amended Complaint in Intervention" (ECF No. 439) is GRANTED IN PART and DENIED IN PART. The court dismisses with prejudice the Government's claims under the False Claims Act to the extent that they are based upon its G5 certification theory of liability. The court denies the remainder of this motion to dismiss.

3. The Colleges' "Motion to Dismiss Relators' Fourth Amended Complaint" (ECF No. 438) is GRANTED IN PART and DENIED IN PART. The court dismisses with prejudice the relators' second cause of action based upon the G5 certifications and the third cause of action based upon the RMAs. As described in detail above, the court also dismisses portions of the relators' first cause of action based upon the PPAs.

4. Additionally, the relators' "Second Amended Complaint" (ECF No. 52), "Third Amended Complaint" (ECF No. 175), and "Fourth Amended Complaint" (ECF No. 427) are STRICKEN for the reasons stated in Part III of this Order.

5. If it desires to expand the scope of its allegations, the Government is directed to file a motion to amend under Federal Rule of Civil Procedure 15(a)(2) by February 4, 2019.

Signed January 14, 2019

BY THE COURT

Jill N. Parrish
United States District Court Judge