IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. KATIE BROOKS and NANNETTE WRIDE, <br><br> Plaintiffs, <br><br> v. <br><br> STEVENS-HENAGER COLLEGE, INC., a Utah corporation, CENTER FOR EXCELLENCE IN HIGHER EDUCATION, a Delaware corporation, <br><br> Defendants. | **MEMORANDUM DECISION & ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT** <br><br> **FILED UNDER SEAL** <br><br> Case No. 2:15-cv-00119-JNP-DAO <br><br> District Judge Jill N. Parrish |

In this action, the United States of America ("Government"), acting as Intervenor-Plaintiff, alleges that Stevens-Henager College, Inc. and its apparent successor, the Center for Excellence in Higher Education (collectively, "Defendants" or "Stevens-Henager"), submitted false claims for federal financial aid and are therefore liable under the False Claims Act and the common law. Before the court at this time are two motions: the United States' Motion for Partial Summary Judgment, ECF No. 530 ("Government Mot."), and Defendants' Motion for Summary Judgment, ECF No. 533 ("Defs.' Mot."). For the reasons set out below, the Government's motion is **GRANTED IN PART AND DENIED IN PART**, and the Defendants' motion is **DENIED**.

## BACKGROUND

This lawsuit began in January 2013, when relators Katie Brooks and Nannette Wride filed suit in the United States District Court for the District of Idaho, alleging that Stevens-Henager and

others had submitted false claims to the Government to receive federal financial aid. In May 2014, the Government intervened in some (but not all) of the relators' claims. Then, in February 2015, the action was transferred to this court. In March 2016, this court dismissed the relators' third amended complaint and granted both the relators and the Government leave to amend their respective complaints. *United States ex rel. Brooks v. Stevens-Henager Coll.*, 174 F. Supp. 3d 1297 (D. Utah 2016) ("*Brooks I*"). Two years later, this court granted in part and denied in part the parties' motions for reconsideration filed in response to the Supreme Court's decision in *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), which expressly rejected a legal theory upon which the court had relied in *Brooks I*. *United States ex rel. Brooks v. Stevens-Henager Coll.*, 305 F. Supp. 3d 1279 (D. Utah 2018) ("*Brooks II*").

In 2019, this court, in ruling on motions to dismiss the Government's amended complaint and the relators' fourth amended complaint, determined that the relators could not maintain their separate complaint in this action given the Government's election to intervene on some of their claims. *United States ex rel. Wride v. Stevens-Henager Coll.*, 359 F. Supp. 3d 1088 (D. Utah 2019) ("*Brooks III*"). It also narrowed the range of legal theories that the Government could maintain.

Central to the parties' summary judgment motions are the Government's claims brought under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA" or "Act"). "The FCA imposes liability for 'fraudulent attempts to cause the government to pay out sums of money.'" *United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co.*, 48 F.4th 1146, 1151 (10th Cir. 2022) (quoting *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 736 (10th Cir. 2019)). "It permits the recovery of civil penalties and treble damages from anyone who, inter alia, (1) 'knowingly presents . . . a false or fraudulent claim for payment or approval,' 31 U.S.C. § 3729(a)(1)(A), or (2) 'knowingly makes, uses, or causes to be made or used, a false record or

2

statement material to a false or fraudulent claim,' id. § 3729(a)(1)(B)." *Id*. The "FCA does not impose liability for any and all falsehoods," *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 540 (10th Cir. 2020), and is "not an appropriate vehicle for policing technical compliance with administrative regulations," *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 959 (10th Cir. 2008).

Here, the alleged false claims relate to Stevens-Henager's compliance with the Incentive Compensation Ban, 20 U.S.C. § 1094(a)(20), as set out in Title IV of the Higher Education Act of 1965. 20 U.S.C. §§ 1070-1099c. The Incentive Compensation Ban demands that institutions "not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22).

Effective July 1, 2003, the Department of Education ("Department") amended the regulations governing the Incentive Compensation Ban to include Safe Harbor E. Safe Harbor E created a carveout from Incentive Compensation Ban liability, indicating that institutions could properly carry out

> [c]ompensation that is based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter. For this purpose, successful completion of an academic year means that the student has earned at least 24 semester or trimester credit hours or 36 quarter credit hours, or has successfully completed at least 900 clock hours of instruction at the institution.

34 CFR § 668.14(b)(22)(ii)(E) (2003). Safe Harbor E was eliminated by the Department effective July 1, 2011. *See* 75 Fed. Reg. 66832, 66872-73 (October 29, 2010).

Institutions like Stevens-Henager must enter into program participation agreements ("Participation Agreements") with the Department in order to receive Title IV funding. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14. The Department countersigns such Participation Agreements after reviewing an institution's online application ("E-App"). At issue here are two such Participation Agreements that promise compliance with the Incentive Compensation Ban: Stevens-Henager's 2007 and 2010 Participation Agreements. Government Mot. at 6. Both Participation Agreements were signed by a regional director of Stevens-Henager named Vicky Dewsnup ("Ms. Dewsnup"). Government Opp'n Mem. at 13. The Participation Agreements state that

> [b]y entering into this Program Participation Agreement, the Institution agrees that . . . (22) [i]t will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance[.]

*See* ECF Nos. 533-2, 533-3.

Stevens-Henager's policy for compensating its admissions consultants was contained in a series of procedure directives, which were updated or reissued from time to time. Stevens-Henager maintained some version of Procedure Directive 85R ("PD 85R") between 2006 and July 1, 2011, when the procedure directive was cancelled. The version in effect when Stevens-Henager executed its Participation Agreement on April 19, 2007, was PD 85R-06. *Id*. at 4-10. Stevens-Henager later revised the directive and issued PD 85R-08 in November of 2008. This is the version that was in effect when Stevens-Henager executed its Participation Agreement in January of 2010.

Under PD 85R, admissions consultants were entitled to receive a bonus for each student enrolled by the admissions consultant who completed 36 credit hours. However, the amount of the completion bonus earned by an admissions consultant was based on the number of students he or

she recruited. Specifically, the exact value of the bonus an admissions consultant could receive for a student who completed 36 hours, under PD 85R-06, was tied to how many students the admissions consultant had successfully enrolled at Stevens-Henager (known as "starts") and, under PD 85R-08, reflected the admissions consultant's "conversion ratio." The conversion ratio was calculated by dividing the number of starts by the number of prospective students who went through the interview process.

The parties do not dispute that Stevens-Henager's on-the-ground practice conformed to PD 85R. The parties do dispute, however, the legal import of this fact, including whether this compensation regime falls within Safe Harbor E. Before the execution of the 2010 Participation Agreement, Stevens-Henager consulted with an attorney from the law firm of Duane Morris regarding PD 85R, who, after 2.2 hours of time billed to the question, opined that PD 85R was legal. Stevens-Henager also distributed each iteration of PD 85R widely within the firm for an process internally referred to as "side-checking," Defs.' Mot. at 7, and sought the advice of external specialists such as Education Management Systems. The Accrediting Commission of Career Schools and Colleges, which accredited Stevens-Henager, was also aware of its compensation plan for its admissions consultants but did not ever raise it as a potential legal issue. Carl Barney ("Mr. Barney"), the sole owner and chairman of the board of Stevens-Henager during the relevant period, testified in a 2006 deposition in an unrelated civil case that he was aware that any violations of the Incentive Compensation Ban would be an issue of great concern and a violation of law. Government Mot. at 25-26.

During the relevant period, Department of Education policy regarding enforcement of the Incentive Compensation Ban was set forth in the "Hansen Memorandum." The Hansen Memorandum stated that the Department's "preferable approach [was] to view a violation of the

incentive compensation prohibition as not resulting in monetary loss to the Department," because "[i]mproper recruiting does not render a recruited student ineligible to receive student aid funds for attendance at the institution on whose behalf the recruiting is conducted." Government Opp'n Mem. at 15. Nonetheless, the Government alleges that it enforced the Incentive Compensation Ban through a range of actions. The Government points to the fact that it has recovered over $100 million from approximately 37 schools through a combination of fines, administrative settlements, and FCA settlements relating to Incentive Compensation Ban violations. *Id*. at 2. Additionally, the Department rejected a Participation Agreement application by the Medical and Technical Institute and revoked a provisionally certified Participation Agreement with another institution, Maison D'Esthetique. *Id*. at 32. Both institutions were in violation of, among other things, the Incentive Compensation Ban.

False promises to comply with the Incentive Compensation Ban are potentially actionable under the FCA. Liability under the Act arises when there is "(1) a false statement or fraudulent course of conduct; (2) made with the requisite scienter; (3) that is material; and (4) that results in a claim to the Government or conceals, decreases, or avoids an obligation to pay the Government." *Janssen*, 949 F.3d at 539.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is

genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). However, this does not mean that nonmovants may "defeat summary judgment by relying on ignorance of the facts, on speculation, or on suspicion." *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (citation omitted). "Rather, to defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (cleaned up).

In any case, a plaintiff "must still identify sufficient evidence requiring submission to the jury," *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009); *accord Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005), where such evidence offered is in admissible form. *Wetherill v. Bank IV Kan., N.A.*, 145 F.3d 1187, 1191 (10th Cir. 1998). Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

### I. Government's Motion

The Government moves for summary judgment on three issues. In particular, the Government moves for summary judgment (a) as to the first FCA claim element (falsity) under

both Participation Agreements; (b) as to Stevens-Henager's affirmative defense of advice of counsel under the 2007 Participation Agreement; and (c) as to the third FCA claim element (scienter) under the 2007 Participation Agreement. The court considers each of these arguments in turn. At the outset, however, the court emphasizes that it does not attempt to determine how it would rule if it were the trier of fact. *See Dreiling v. Peugeot Motors of Am., Inc.*, 850 F.2d 1373, 1377 (10th Cir. 1988). Instead, this court only circumscribes the range of conclusions that a reasonable jury could reach based upon the evidence. Where reasonable jurors might disagree on matters of fact, summary judgment is inappropriate. *Id.*

### A. Falsity

The Government argues that it is entitled to summary judgment on the element of falsity because "[t]here is no factual dispute about how Stevens-Henager's compensation program for its Admissions Consultants operated." Government Mot. at 7. "In other words, there is no dispute that Stevens-Henager compensated [its] Admissions Consultants in accordance with the plain text of its compensation plans," including as it was alleged by the Government in its pleadings. *Id.* at 17. And this court has already determined that, if Stevens-Henager's compensation plan operated as alleged by the Government, it would fall outside the scope of Safe Harbor E and violate the plain language of the Incentive Compensation Ban. *Brooks I*, 174 F. Supp. 3d at 1305-06.

Because Stevens-Henager signed Participation Agreements promising compliance with the Incentive Compensation Ban, and because Stevens-Henager's compensation plan was not compliant with the Incentive Compensation Ban during the program participation period, the Government argues that Stevens-Henager cannot identify a triable issue as to whether or not its representations of compliance were false. Stevens-Henager responds by arguing that the issue of falsity should instead be determined by analyzing its *intent* to comply with the Incentive

Compensation Ban requirement in good faith during the program participation period. Defs.'
Opp'n Mem. at 15.

There are "two doctrines that attach potential False Claims Act liability to claims for
payment that are not explicitly and/or independently false: (1) false certification (either express or
implied); and (2) promissory fraud." *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166,
1171 (9th Cir. 2006) (citing *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784
(4th Cir. 1999)). As this court explained in *Brooks II*, the Government's FCA claims rely on a
theory of promissory fraud, not false certification. 305 F. Supp. 3d at 1301.

The promissory-fraud theory of FCA liability "holds that liability will attach to each claim
submitted to the government under a contract, when the contractor extension of government
benefit was originally obtained through false statements or fraudulent conduct." *United States
ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1173 (9th Cir. 2006). When considering whether
certain representations are false based on a promissory-fraud theory of liability, the Seventh and
Ninth Circuits have looked to defendants' subjective state of mind:

> To prevail in this suit [relator] must establish that the University not only
> knew . . . that contingent fees to recruiters are forbidden, but also planned to
> continue paying those fees while keeping the Department of Education in the dark.
> This distinction is commonplace in private law: failure to honor one's promise is
> (just) breach of contract, but making a promise that one intends not to keep is
> fraud. . . . [I]f the University knew about the rule and told the Department that it
> would comply, while planning to do otherwise, it is exposed to penalties under the
> False Claims Act.

*Id*. at 1174 (quoting *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir.
2005).

The Tenth Circuit had not yet had occasion to consider the issue of when a representation is false for FCA purposes under a promissory-fraud theory of liability.[1] However, the court finds the intent-informed falsity analysis for promissory-fraud FCA claims, as adopted by the Seventh and Ninth Circuits, to be persuasive. Because the Government's FCA claims turn on a theory of promissory fraud, Stevens-Henager's representations were false "if the University knew about the rule and told the Department that it would comply, *while planning to do otherwise*." *Id*. (emphasis added); accord *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996); *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 733, 741 (7th Cir. 2021). Because the Government's claims against Stevens-Henager turn on a promissory-fraud theory of FCA liability, Stevens-Henager's intent, plans, and scienter are all relevant to the falsity analysis. And because, as is discussed below, there remains a genuine dispute as to material facts regarding Stevens-Henager's intent to comply with the Incentive Compensation Ban, summary judgment on this issue is inappropriate.[2]

---

[1] In fairness, an analysis of falsity that considers Stevens-Henager's mental state or intention invites conceptual overlap with the independent scienter inquiry. The Tenth Circuit has addressed this in the context of FCA claims relying on a false certification theory. *See United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 743 (10th Cir. 2018); *accord United States ex rel. Druding v. Druding*, 952 F.3d 89, 96-97 (3d Cir. 2020).

[2] The court reiterates its position, taken in *Brooks I*, that PD 85R fell without the ambit of Safe Harbor E. 174 F. Supp. 3d at 1305-06. Although Stevens-Henager cursorily invites reconsideration of this court's earlier holding that Safe Harbor E does not apply, on the basis of "starts or [conversion] percentage to value completion certificates," *id*. at 21, it does not sufficiently explain its position or prove factual disputes that would demand this court change course from its interpretation of Safe Harbor E. *See Brooks I*, 174 F. Supp. 3d at 1306. The court already considered the issue of Safe Harbor E's "silence on additional requirements," and determined that the "value of the bonus" being "determined on a sliding scale that considered the employee's conversion ratio and whether the employee independently recruited new students" violated the Incentive Compensation Ban. *Id*. at 1305. Because completion bonus amounts for completion certificates, as the parties stipulated, varied depending upon the realization of additional recruiting

### B.  Advice of Counsel

Second, the Government moves for summary judgment on Stevens-Henager's affirmative defense that it acted upon advice of counsel in executing the 2007 Participation Agreement. Government Mot. at 8. In the Tenth Circuit, to establish a good-faith reliance on counsel defense, a defendant must show

> (1) a request for advice of counsel on the legality of a proposed action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from counsel that the action to be taken will be legal, and (4) reliance in good faith on counsel's advice.

*United States v. Wenger*, 427 F.3d 840, 853 (10th Cir. 2005). Such reliance must also be reasonable. *See Roesler v. TIG Ins. Co.*, 251 F. App'x 489, 502 (10th Cir. 2007) (unpublished).

Stevens-Henager concedes this affirmative defense as to the 2007 Participation Agreement. Defs.' Opp'n Mem. at 1 n.1. Thus, summary judgment in favor of the Government is appropriate as to the availability of the affirmative defense of advice of counsel on the 2007 Participation Agreement. Stevens-Henager's affirmative defense of advice of counsel as it relates to the 2010 Participation Agreement is discussed below.

### C.  Scienter

i)      Government's Motion

The Government argues that there is no genuine dispute as to any fact material to the issue of Stevens-Henager's mental state (i.e., scienter) in executing the 2007 Participation Agreement. It therefore seeks summary judgment on that part of its FCA claim. Government Mot. at 8. The

---

requirements (that is, starts and interview conversion percentages), PD 85R fails to pass muster under Safe Harbor E and was therefore violative of the Incentive Compensation Ban.

scienter required for FCA liability is that the false claim be made knowingly. Under the FCA, "knowing" and "knowingly" are defined to mean

> (A) [] that a person, with respect to information—
>     (i) has actual knowledge of the information;
>     (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>     (iii) acts in reckless disregard of the truth or falsity of the information; and
> (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

The Government argues that Stevens-Henager "appreciated the substantial risks associated with the Incentive Compensation Ban" but nonetheless "avoided taking steps to confirm compliance before entering the 2007 Participation Agreement." Government Mot. at 25. It further argues that this matches the culpable mental state of deliberate ignorance described by 31 U.S.C. § 3729(b)(1)(A)(ii).

The Government first points to Mr. Barney, "the sole owner and chairman of the board of Stevens-Henager during the period at issue in the case." Government Mot. at 25. Specifically, the Government cites to Mr. Barney's 2006 deposition testimony in an unrelated civil lawsuit in which he generally acknowledges the unremarkable proposition that paying compensation based on the number of students "would be an issue of great concern and violation of law, a serious violation of law," particularly "Department of Education Regulations." Government Mot. at 26. The Government argues that this testimony, coupled with his testimony acknowledging that "[t]here's a section of" Department of Education "regulations which prohibit any kind of incentive, bonus, commission, payable to admissions personnel based on recruiting statements," demonstrates that Mr. Barney was well aware of potential legal jeopardy flowing from Incentive Compensation Ban violations. *Id.*

Stevens-Henager responds that the Government has failed to identify any evidence that Stevens-Henager "subjectively believed there was a high probability that *PD 85R violated the Incentive Compensation Ban* and took deliberate actions to avoid learning this fact before promising to comply with the Incentive Compensation Ban in its 2007 Participation Agreement." Defs.' Opp'n Mem. at 21 (emphasis added) (citing *United States ex rel. Schutte v. SuperValu, Inc.,* 143 S. Ct. 1391 (2023)).

As the Supreme Court articulated in *Schutte*, the three-prong scienter element of the FCA tracks Restatement (Second) of Torts § 526. And the Act's inclusion of deliberate ignorance as a culpable mental state tracks a deeply rooted tradition in Anglo-American fraud jurisprudence that makes a person liable should he "shut his eyes to the facts, or purposely abstain[] from inquiring into them." 143 S. Ct. at 1400 (quoting *Derry v. Peek*, [1889] 14 App. Cas. at 376). Thus, "deliberate ignorance" in the Act captures "defendants who are aware of a substantial risk that their statements are false, *but intentionally avoid taking steps* to confirm the statement's truth or falsity." *Schutte*, 143 S. Ct. at 1400 (emphasis added). Under *Schutte*, where a defendant becomes "aware of a substantial likelihood of [] terms' correct meaning," even where such terms are ambiguous, he can be held to have knowingly acted in violation of the False Claims Act. *Id.* at 1401-02. As applied to a theory of deliberate indifference, "[t]he [Act's] scienter element refers to [a defendant's] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Schutte*, 143 S. Ct. at 1399.[3]

---

[3] However, the Supreme Court squarely declined to address the question of whether the third form of scienter in the Act—reckless disregard—may incorporate an objective test. *See Schutte*, 143 S. Ct. at 1401 n.5. This apparent carveout, and its interaction with Tenth Circuit precedent, are discussed at greater length below.

With *Schutte* in mind, Stevens-Henager argues that its decision to have legal counsel review PD 85R for Incentive Compensation Ban compliance shortly after the execution of the Participation Agreement "underscores (rather than undermines) the good-faith nature of [its] promise in the Participation Agreement." Defs.' Opp'n Mem. at 22. Stevens-Henager also contends that "[t]here is no record evidence" that it was "aware of any substantial risk that PD 85R violated the Incentive Compensation Ban." *Id*. Stevens-Henagar argues that neither annual compliance audits by the Accrediting Commission of Career Schools and Colleges nor review by the Department of Education alerted it to the possibility that PD 85R violated the Incentive Compensation Ban, which evidences a lack of a culpable mental state. Because Mr. Barney sought non-legal expert advice regarding Incentive Compensation Ban compliance, he did not stick his head in the sand, Stevens-Henager argues.

Stevens-Henager is correct that the Government has failed to demonstrate an entitlement to summary judgment on the issue of scienter (under a theory of deliberate ignorance) as to the 2007 Participation Agreement. As Stevens-Henager points out, the Government's evidence is generally directed towards Stevens-Henager's awareness of the *general* legal risks of noncompliance with the Incentive Compensation Ban rather than the *particular* noncompliance of PD 85R itself. This lack of evidence of subjective knowledge defeats the Government's entitlement to summary judgment, at least under a theory of deliberate indifference.

A reasonable jury could find that Stevens-Henager took reasonable steps to secure Incentive Compensation Ban compliance and did not subjectively believe that there was a substantial risk of noncompliance in the case of PD 85R. Because the mental state under which a party acted is generally squarely within the province of the jury, *Goodman v. Simonds*, 61 U.S. (20 How.) 343, 366 (1858), and because the court is satisfied that there is more than a scintilla of

evidence suggesting that Stevens-Henager did not "shut [its] eyes to the facts, or purposely abstain[] from inquiring into them," *Schutte*, 143 S. Ct. at 1400, it declines to withhold this question from the wisdom of the jury.

ii)   Defendants' Motion as to scienter

Through its cross motion, Stevens-Henager also moves for summary judgment on the Government's FCA claims as to the element of scienter. Specifically, it argues that the Government has failed to raise any genuine dispute of material fact regarding whether it acted knowingly as that term is defined in 31 U.S.C. § 3729(b)(1)(A) as to either of the Participation Agreements. Stevens-Henager's first argument regards *whose* knowing action is of concern. They cite *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 709 (7th Cir. 2015), for the proposition that it is the knowledge of the individual representative who signed the Participation Agreement—in this case, Ms. Dewsnup—that counts. Defs.' Mot. at 36. Because the Government did not depose Ms. Dewsnup, Stevens-Henager argues that the Government cannot show that *she* knowingly made a false claim. *Id.*

But zeroing in on Ms. Dewsnup is inappropriate. As a preliminary matter, the court is of the opinion that Stevens-Henager reads this sentence fragment of *Sanford-Brown* out of context. In any case, however, parsing *Sanford-Brown* is unnecessary: it is beyond dispute that Ms. Dewsnup signed the Participation Agreement on behalf of (and as an agent of) the corporation, which was the Participation Agreement signatory and party. Because Stevens-Henager was the Participation Agreement signatory, it is the knowledge of Stevens-Henager as a corporation, not its signing agents, that is relevant to the Government's FCA claims. It is the black-letter law that corporations are chargeable with the knowledge of agents acting within the scope of their authority. *W. Diversified Servs. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1276 (10th Cir. 2005); *Polukoff*,

15

895 F.3d at 745 n.9. Thus, what Stevens-Henager knew or may be deemed as having known as a corporation is not limited to the knowledge of Ms. Dewsnup who signed on its behalf.

Stevens-Henager then argues that even if this court were to consider the "collective knowledge of [Stevens-Henager's] management," there is still no genuine dispute of fact as to the scienter requirement even under the liberal "reckless disregard" standard. Defs.' Mot. at 37. "Reckless disregard" includes "defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Schutte*, 143 S. Ct. at 1401 (citing Restatement (Third) of Torts § 10, Comment c).

As discussed above, when theories of direct knowledge or deliberate indifference are at play, FCA scienter generally demands evidence of subjective knowledge. But the Supreme Court expressly left open the question of whether an objective theory of knowledge (i.e., allowing the jury to consider what a defendant should have known) may be applied to a theory of reckless disregard under the FCA. *Schutte*, 143 S. Ct. at 1401. Without express guidance from a higher court to do otherwise, then, this court is bound by previous doctrinal declarations of the Tenth Circuit.

The Tenth Circuit, borrowing from the D.C. Circuit, has adopted a "gross negligence plus" theory of reckless disregard under which reckless disregard is understood to be "an aggravated form of gross negligence." *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 945 n.12 (10th Cir. 2008) (citing *United States v. Krizek*, 111 F.3d 934, 941-42 (D.C. Cir. 1997)). Under *Krizek*, the reckless disregard standard of § 3729(b)(1)(A)(iii) does not merely stand as a substitute for "willful misconduct," but instead makes culpable "an extreme version of ordinary negligence." 111 F.3d at 942. *Krizek*, including through its reference to another D.C. Circuit opinion, *Saba*, accepts that such reckless disregard can be demonstrated through objective analysis of what a

16

defendant should have known. *See Saba v. Compagnie Nationale Air Fr.*, 78 F.3d 664, 668-69 (1996). Because the court understands the Tenth Circuit as having adopted a test for reckless disregard that would allow weighing of inferences derived from objective analysis, and because the Supreme Court expressly declined to address the question, the jury is entitled to consider what Stevens-Henager should have known or considered as it considers the culpability of Stevens-Henager's mental state.

Stevens-Henager argues that the unrefuted evidence establishes that it sincerely believed that PD 85R complied with Safe Harbor E when it executed the 2007 and 2010 Participation Agreements. This allegedly unrefuted evidence comes from Stevens-Henager's attendance at higher education conferences and meetings where the Incentive Compensation Ban was discussed, from its understanding of Safe Harbor E, in the form of internal side-checks, and from the fact that it repeatedly passed independent audits.

While the evidence adduced by Stevens-Henager may be appropriately weighed by a jury, it is not the only evidence relevant to the issue. *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1221 (10th Cir. 2013). It therefore does not remove the issue of scienter from the province of a jury. As the Government argues, there is other evidence supporting its contention that Stevens-Henager acted with reckless disregard of the truth or falsity of its certifications to the Department. Government Opp'n Mem. at 40. This includes evidence regarding Mr. Barney's appreciation of the complexity and legal risk presented by Incentive Compensation Ban compliance (or what he *should have* known under an objective test) and his understanding of how PD 85R actually worked. *Id*. at 41, 44-45.

The same analysis applies to Stevens-Henager's affirmative defense of reliance on the advice of counsel as to the 2010 Participation Agreement. While Stevens-Henager has established

that it obtained legal advice regarding PD 85R, the jury is entitled to decide whether its reliance on counsel was, in fact, reasonable. Whether the 2.2 hours billed by outside counsel on the issue of Incentive Compensation Ban compliance was sufficient to render reliance reasonable (or whether Stevens-Henager actually relied on such advice in continuing an existing practice adopted before the advice was obtained) demands weighing and evaluating evidence. *See Brooks II*, 305 F. Supp. 3d at 1300 n.13. Because both parties have adduced evidence that may support a verdict in their favor on the issue of Stevens-Henager's mental state when executing the Participation Agreements, there is a triable issue regarding scienter as to both Participation Agreements, at least under a theory of reckless disregard.

## II.   Defendants' Motion

Stevens-Henager moves for summary judgment as to the Government's FCA claims, arguing that the Government cannot create a triable issue as to three FCA claim elements: (a) materiality, (b) causation, and (c) scienter (discussed above). Additionally, Stevens-Henager moves for summary judgment as to the Government's common-law claims.

### A.  Materiality

Stevens-Henager first argues that the Government cannot identify a genuine dispute as to any fact material to whether Stevens-Henager's allegedly false representations regarding its compliance with the Incentive Compensation Ban were material to the Department's decision to execute the 2007 and 2010 Participation Agreements. Defs.' Mot. at 29-30. In support of its argument that its representations regarding the Incentive Compensation Ban were not material, Stevens-Henager points to the Department's past conduct, including its execution of Participation Agreements with other institutions despite credible allegations of non-compliance with the Incentive Compensation Ban.

18

Stevens-Henager further relies on the testimony of the Department's 30(b)(6) designee who, by Stevens-Henager's characterization, stated that "no school was denied participation solely based on Incentive Compensation Ban violations" and that "the Department could not say that it would have refused to enter Participation Agreements with [Stevens-Henager] had it known of PD 85R." *Id*. at 30. Given this testimony, Stevens-Henager argues that a jury verdict for the United States would necessarily be founded on speculation. *Id*.

          i)        Materiality Standard

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 192. "Materiality is a mixed question of law and fact that can be decided as a matter of law if reasonable minds could not differ on the question." *Janssen*, 949 F.3d at 539 (citing *Long v. Ins. Co. of N. Am.*, 670 F.2d 930, 934 (10th Cir. 1982)). The FCA itself defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). But "the mere fact 'the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment' is not enough, standing alone, to render a misrepresentation material." *Sorenson*, 48 F.4th at 1151-52 (citing *Escobar*, 579 U.S. at 194). "Likewise, the mere fact the Government could opt not to pay if it knew about a defendant's noncompliance does not, in itself, establish materiality." *Id*.

The Supreme Court recently discussed the materiality requirement under the FCA in *Escobar*, in which it clarified that "rather than directing courts to focus exclusively on a reasonable person—as they would under a purely objective analysis—or exclusively on the mindset of the misrepresenter—as they would under a purely subjective analysis—*Escobar* focuses the

materiality inquiry on the likely reaction of the recipient." *Janssen*, 949 F.3d at 541. Thus, materiality is determined by reference to the actual or likely reaction of the *factual* recipient of the representations—in this case, the Department of Education—rather than the reasonable person as a legal fiction.

"[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id*. (citing *Escobar*, 579 U.S. at 194-95). Rather than zero in on any singular element to derive materiality, the Tenth Circuit has, in light of *Escobar*'s language, determined that a "holistic" inquiry is most appropriate in making materiality determinations. *Id*. at 541.

Elements in this "holistic" inquiry identified in *Escobar* and further expounded by the Tenth Circuit in *Janssen* include, but are not limited to, "(1) whether the Government consistently refuses to pay similar claims based on noncompliance with the provision at issue, or whether the Government continues to pay claims despite knowledge of the noncompliance; (2) whether the noncompliance goes to the 'very essence of the bargain' or is only 'minor or insubstantial;' and (3) whether the Government has expressly identified a provision as a condition of payment." *Id*. at 541 (quoting *Escobar*, 579 U.S. at 193 & n.5). "None of these factors alone are dispositive." *Id*. (citing *United States v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831 (6th Cir. 2018)).

**Escobar *Element One.*** The first *Escobar* element considers the Government's past conduct, including its payment history with respect to similar claims despite knowledge of noncompliance. The Government's awareness of detailed allegations of noncompliance, unless coupled with some action, is taken by the Tenth Circuit to weigh in favor of immateriality. *Id*. at 542 & n.12. Contrary to the Government's apparent position, the Government need not have actual

20

knowledge of the violations before an inference of immateriality can be drawn from Government inaction. *Janssen*, 949 F.3d at 542 n.13.[4]

Both *Escobar*, *see, e.g.*, 579 U.S. at 195-96, and *Janssen* emphasize and use the "payment of claims" as the exemplar or typical indicator of materiality. *Janssen*, 949 F.3d at 542 n.13. However, some other governmental remedial actions may also give rise to an inference of materiality—particularly where such remedial action does more than merely police noncompliance, *id*. at 543, but, for example, disgorges previously disbursed funds or is punitive in nature. Such actions may give rise to an inference that, had the Department known about the violations before entering into a Participation Agreement, it would have declined to disburse the funds in the first place, rather than seek post-execution remedial action.

This is consistent with the position taken by the Ninth Circuit in *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1022 (9th Cir. 2018), in which it concluded that "[a] full examination of the Department's past enforcement habits in similar cases, therefore, reveals that a reasonable trier of fact could find that Defendant's violations of the incentive compensation ban were material," even though the Department failed to limit, suspend, or terminate schools' access to federal student aid in 32 cases in spite of Incentive Compensation Ban violations. *Id*. at 1020-22.

**Escobar** *Element Two.* The second element looks to a number of factors, including the sort of violations at issue, the scope of noncompliance, and defendants' conduct in attempting to

---

[4] Doing "nothing in response" to credible allegations of Incentive Compensation Ban violations, or total "inaction," beyond merely investigating such allegations, may suggest immateriality. *Janssen*, 949 F.3d at 542. However, the court reiterates its previous holding, *see Brooks II*, 305 F. Supp. 3d at 1304 n.16, that rescinding payment contracts or refusing to pay are not the *only* Government reactions to alleged violations that may speak to materiality.

obfuscate such noncompliance. "[M]inimal aspects" of alleged misconduct, or noncompliance with a regulatory requirement that is "minor or insubstantial," suggest immateriality. *Janssen*, 949 F.3d at 543. On the opposite side of this ledger are instances where the alleged noncompliance goes to the "essence of the bargain." *Id*. Thus, *Escobar* Element Two acknowledges that some kinds of noncompliance are more material than others.

But *Escobar* and *Janssen* suggest that the "essence of the bargain" may be inferred not only from the sort of noncompliance but also the scope of noncompliance and the degree to which it is systemic in nature within the relevant institution. In other words, whether noncompliance occurs occasionally, in some sporadic fashion—perhaps "limited" rather than a "wholesale," institution-wide failure, *id*. at 545—goes to whether an FCA plaintiff has demonstrated "sufficiently widespread deficiencies that they would likely affect the Government's payment decision." *Id*. at 543. Built into this calculus is the assumption that the Government is less likely to contract with or disburse funds to institutions that practice widespread noncompliance of many sorts.

Element Two also considers whether the Government has at its disposal, as an alternative to the FCA, an "administrative scheme for ensuring that [institutions] remain in compliance and for bringing them back into compliance when they fall short." *Id*. (quoting *U.S. ex rel. Conner v. Salina Regional Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008)). Where this is the case, immateriality is properly inferred. But even where alternative administrative procedures exist,

courts nonetheless consider whether "sufficiently widespread deficiencies" exist, such that the Government's payment decision may have nevertheless been affected. *Id*.[5]

**Escobar *Element Three*.** The third *Escobar* element considers whether the Government has expressly required compliance with some regulatory or other requirement as a condition of payment. In evaluating this element, courts ask whether the thing at issue is actually and expressly enumerated by the Government as a condition of payment, rather than simply being included within "generic regulatory requirements." *Id*. at 544-45. As *Escobar* makes clear, "when evaluating materiality under the [FCA], the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Sorenson*, 48 F.4th at 1152 (citing *Escobar*, 597 U.S. at 194-95).

    ii)  Materiality of the Instant Representations

**Escobar *Element One Applied*.** Stevens-Henager argues that the Government cannot establish materiality because the Department executed Participation Agreements with numerous institutions despite credible allegations of regulatory violations *and* can point to only one instance "in which [it] revoked a provisionally certified institution's [i.e., Maison D'Esthetique's] participation in the Title IV programs" upon discovery of Incentive Compensation Ban violations. Defs.' Mot. at 31-32.

    The Government responds by asserting that, in addition to revoking the provisionally certified Participation Agreement of Maison D'Esthetique, it also rejected a Participation

---

[5] Additionally, *Janssen* suggests that evidence of a cover-up by FCA defendants signals materiality, notwithstanding "the minor effects of the alleged misconduct." *Id*. at 544 (citing *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 638 (4th Cir. 2015), and *Triple Canopy, Inc.*, 857 F.3d 174 (4th Cir. 2017)).

Agreement application by the Medical and Technical Institute in 2006 on the basis of its owners' prior violations of the Incentive Compensation Ban. The Government also points to its recovery of over $100 million from approximately 37 schools through a combination of fines, administrative settlements, and FCA settlements relating to Incentive Compensation Ban violations." Government Opp'n Mem. at 16, 31-32.

As to the Government's response that it rejected one Participation Agreement and revoked another, Stevens-Henager replies by arguing that these two instances cited by the Government do not tend to show materiality because Incentive Compensation Ban violations were not the only Title IV violations at issue in those cases. Instead, the Government "terminated eligibility in instances when institutions with Incentive Compensation Ban violations have engaged in student aid fraud." Defs.' Reply Mem. at 2-3. While it is true that Incentive Compensation Ban violations played only a partial role in these two Participation Agreement decisions of the Government, the court is hesitant to lean too far into the province of the jury by weighing competing inferences regarding the Government's motivation, or otherwise divvy out materiality between multiple possible rationales that may have driven the Government's decision.

As to the Government's response that it recovered fines and settlements, Stevens-Henager argues that post-Participation Agreement-execution corrective action by the Department against Incentive Compensation Ban-violating schools "confirms that Incentive Compensation Ban compliance is *immaterial to its decision to execute Participation Agreements*," Defs.' Reply Mem. at 9 (emphasis in original), since it can always simply take post-execution action later. Stevens-Henager is correct that the Government's election to enter into Participation Agreements with some

institutions, despite detailed allegations of Incentive Compensation Ban violations, necessarily "suggests immateriality." *Janssen*, 949 F.3d at 542.[6]

But the Tenth Circuit has not gone so far as to explicitly adopt the position taken by other courts that such inaction is independently "sufficient to establish the lack of materiality." *See United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d 1162, 1174 (10th Cir. 2020). After all, no single factor of the *Escobar* analysis is dispositive. *Janssen*, 949 F.3d at 541. And this court has previously determined that past "corrective action" taken by the Department against other institutions for Incentive Compensation Ban violations could "support the conclusion that [Stevens-Henager's] promises to comply with the Incentive Compensation Ban were material," *Brooks II*, 305 F. Supp. 3d at 1304 n.16, regardless of whether or not fines and settlements are, as the Government argues, literally the functional equivalent to revoking funds or refusing to pay claims in full. *See* Government Opp'n Mem. at 30 (citing *Rose*, 909 F.3d at 1020). Under *Escobar* Element One, the court is thus satisfied that reasonable minds could disagree in resolving the inferences to be drawn from the Government's post-execution corrective action.

***Escobar* Element Two Applied.** This element considers issues such as the type of violations at issue and the scope of noncompliance. As the Government argues, the regulatory noncompliance at issue here consists of more than mere stray inaccuracies—far from "uncertain effects on a factor of a factor." *Janssen*, 949 F.3d at 544. Stevens-Henager's alleged violations were company-wide, institutional, systemic, and definitionally "widespread," *id.* at 543, as opposed to "minor or insubstantial." *Escobar*, 579 U.S. at 194.

---

[6] Stevens-Henager is also correct that immateriality is supported by the statements of the Department's 30(b)(6) designee conceding that revocation or denial of recertification were not "ordinary remed[ies]," ECF No. 533-11 at 164:18-165:2, including under then-existing policy.

The "widespread" nature of the violations gives rise to an inference that they would likely affect the Government's payment decision, particularly given the size of the alleged monetary awards at issue. *See Rose*, 909 F.3d at 1022. Also, much like the Ninth Circuit in *Rose*, this court previously has determined that Congress enacted the Incentive Compensation Ban because it determined that violative payments "were associated with serious program abuse and high loan default rates," *Brooks II*, 305 F. Supp. 3d at 1303. This gives rise to an inference that Incentive Compensation Ban compliance may go to the essence of the bargain underlying the execution of the Participation Agreements and be integral to the Government's payment decision. *Accord Conner*, 543 F.3d at 1222. While certainly not dispositive, analysis of *Escobar* Element Two tends to support a conclusion that the allegedly widespread Incentive Compensation Ban violations at issue could be material.

**Escobar Element Three Applied.** This element considers whether the Government has expressly required compliance as a condition of payment. *Escobar*, 579 U.S. at 194. As this court has already acknowledged, "the Government expressly conditioned Stevens-Henager's participation in Title IV programs on the school promising to comply with the Incentive Compensation Ban." *Brooks II*, 305 F. Supp. 3d at 1302. This express conditioning differs from the facts at issue in *Janssen*, where the regulatory conditions at issue were not "directly address[ed]" in the program terms and the payment of Government funds was apparently conditioned on compliance with "generic regulatory requirements" instead. *Janssen*, 949 F.3d at 544. While the express conditioning of payment of funds on compliance with certain regulatory

26

requirements is far from dispositive, the court is satisfied that *Escobar* Element Three weighs in favor of the Government.[7]

\*     \*     \*

In sum, the "holistic" materiality analysis mandated by the Tenth Circuit, *Janssen*, 949 F.3d at 541, leads to the conclusion that there is a dispute of material fact regarding the issue of materiality. While Stevens-Henager has marshaled strong evidence for its position on materiality (which may very well find significant persuasive power with a jury), the Government has adduced admissible record evidence giving rise to the contrary inference. Because reasonable minds could differ on the question of materiality, entry of summary judgment on materiality is inappropriate.

### B.  Causation

As an alternative ground for the entry of summary judgment against the Government on its FCA claims, Stevens-Henager argues that "the United States cannot show that [Stevens-Henager's] alleged failure to disclose [its] alleged Incentive Compensation Ban violations actually caused" the Department to execute the Participation Agreement. Defs.' Mot. at 33. While "causation is generally a jury question," *Stevens v. Barnard*, 512 F.2d 876, 879 (10th Cir. 1975); *accord Hayes v. Mich. C. R. Co.*, 111 U.S. 228, 241 (1884), evidence as to causation can be "too speculative" to be presented to the jury, *Valdez v. Macdonald*, 66 F.4th 796, 833 (10th Cir. 2023). Stevens-Henager

---

[7] Stevens-Henager also argues that this court should look to the terms of the E-App, rather than the Participation Agreement, in its materiality analysis. While the E-App does not identify Incentive Compensation Ban compliance as a prerequisite for the payment of funds, Defs.' Mot. at 32, Stevens-Henager fails to show that the Participation Agreement is not the document governing the transaction and the payment of funds. Similarly, it fails to show that execution of both the E-App and Participation Agreement is not a prerequisite—part of the "causal chain"— leading to the disbursement of funds, rendering false statements in *either* actionable. *See Hendow*, 461 F.3d at 1174. "[I]t is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *Id.* at 1177; *accord Main*, 426 F.3d at 917.

argues that the Department, through its 30(b)(6) designee, testified "that it could not say it would have refused to enter Participation Agreements with Stevens-Henager in 2007 and 2010 even had it known about PD 85R." Defs.' Mot. at 34. This testimony by itself, Stevens-Henager argues, "precludes the United States from establishing causation" and would demand that a jury speculate in order to find in the Government's favor. *Id*. The court disagrees.

When asked if she would say whether the Department, knowing about Stevens-Henager's compensation plan, would have declined to enter into the 2007 and 2010 Participation Agreements, the Department's designee gave a somewhat inconsistent answer. Speaking as of the day of her testimony, she said that the Department "would not have entered into a [Participation Agreement]." ECF No. 533-30 at 282:12-14. However, as of 2002, she could not say definitively whether the Department would have declined to enter into the Participation Agreement with Stevens-Henager. *Id*. at 282:5-11.

It is unclear whether the designee's reference to 2002 refers to the Hansen memorandum and a policy extending into 2007 and 2010,[8] or whether it should be understood in isolation—meaning that her answer was generally unresponsive as not answering the question as it related to the execution of the 2007 and 2010 Participation Agreements. And the Government's opposition memorandum does not meaningfully articulate its arguments in response to Stevens-Henager's contentions. *See* Government Opp'n Mem. at 32. While unclear, the court concludes that the

---

[8] The Hansen Memorandum states that the Department's "preferable approach [was] to view a violation of the incentive compensation prohibition as not resulting in monetary loss to the Department" because "[i]mproper recruiting does not render a recruited student ineligible to receive student aid funds for attendance at the institution on whose behalf the recruiting is conducted." Government Opp'n Mem. at 15. Like the Seventh Circuit, however, this court is cautious to read too much into the Memorandum, which does not authoritatively construe any regulation. *Main*, 426 F.3d at 917.

designee's testimony is insufficient to remove the issue of causation from the province of the jury, nor would it be "necessarily contradict[ed]" by a verdict in favor of the United States. Defs.' Mot. at 34. The testimony is confusing, and it is altogether best left to a jury to draw out the meaning of the designee's statement and testimony, as well as inferences surrounding the factual question of causation.

Stevens-Henager's additional arguments as to causation, for the most part, overlap with arguments made on materiality. Stevens-Henager argues that the Department's past conduct or policy show that it would have executed the Participation Agreement in any case, or that the E-App, which did not refer to the Incentive Compensation Ban regulations, should be understood as setting the transactional terms. But for the same reasons set out above in relation to materiality, reasonable jurors could disagree regarding whether Stevens-Henager's representations regarding Incentive Compensation Ban compliance in the Participation Agreement actually caused the Government to disburse funds it otherwise would have withheld. Thus, there is an evidentiary basis to dispute whether the Department would have approved Stevens-Henager to participate in Title IV programs.

## C.  Common-law Claims

The final issue raised by Stevens-Henager's motion relates to its entitlement to summary judgment as to the Government's common-law claims for unjust enrichment and payment by mistake. Stevens-Henager argues that *Brooks III* supports a conclusion that the Department cannot show that it would not have made Title IV funds available to Stevens-Henager's students had it known about the college's compensation plan. *See Brooks III*, 359 F. Supp. 3d at 1105. However, the portion of *Brooks III* identified by Stevens-Henager is inapt. There, this court discussed the sufficiency of the Government's allegations "to the extent that they are based upon its G5

certification theory of liability." *Id*. at 1106.[9] The Government's claims based on a G5 certification theory of liability were dismissed in *Brooks III*, and the Government's common-law claims do not rely on a such a theory. Instead, these claims turn on whether Stevens-Henager made false statements on which the Department relied in entering into the 2007 and 2010 Participation Agreements. These claims thus turn on the same analysis as is discussed above regarding the FCA claims—including elements of falsity, factual reliance, and causation. For the same reasons as discussed above, summary judgment on the common-law claims is inappropriate.

## CONCLUSION

For the foregoing reasons, the United States' Motion for Partial Summary Judgment, ECF No. 530, is **GRANTED IN PART AND DENIED IN PART**. The Government is entitled to summary judgment as to Defendants' affirmative defense of advice of counsel regarding the 2007 Participation Agreement. The Government's motion is denied in all other respects. Defendants' Motion for Summary Judgment, ECF No. 533, is also **DENIED**.

DATED March 29, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge

---

[9] The G5 certification theory of liability refers to a theory of FCA liability previously pursued by the Government. A student applies for financial aid by completing a free application. A school uses the information in the application to create a financial-aid package for the student. The student can accept all or part of the package. If the student accepts a Pell Grant, a Direct Loan, or both, the student's school creates an electronic origination record. The school then submits the record to the Department of Education using a computerized database called the Common Origination and Disbursement System. If the information supplied by the school is consistent with the Department of Education's information, the Department of Education makes funds available for the school to draw down from a computerized system known as G5. *Brooks III*, 359 F. Supp. 3d at 1099.